EXHIBIT "A"

1
2
3
4
5
6
7

IN THE SUPERIOR COURT OF WASHINGTON,
COUNTY OF KING, STATE OF WASHINGTON

8
9

MARK E. PHILLIPS,                                    )      Case No.:  13-2-07233-5 SEA
                                                     )
10                          Plaintiff,               )      **DECLARATION OF STEPHEN JAMES**
                                                     )      **SCHWEICKERT**
11   vs.                                             )
                                                     )
12   CHAD HAROLD RUDKIN AND                          )
     ELIZABETH RUDKIN, STEPHEN JAMES                 )
13   SCHWEICKERT, and JANE DOES 1                    )
     THOUGH 4,                                       )
14                                                   )
                                                     )
15                          Defendants.              )
                                                     )
16   _____        )
                                                     )
17   MARK E. PHILLIPS,                               )
                                                     )
18                          Plaintiff,               )
                                                     )
19   vs.                                             )
                                                     )
20                                                   )
     STEPHEN JAMES SCHWEICKERT,                      )
21   HUNTS POINT VENTURES, INC., and                 )
     HUNTS POINT VENTURE GROUP, LLC,                 )
22                                                   )
                                                     )
23                          Defendants.              )
     _____        )
24

25        I, STEPHEN JAMES SCHWEICKERT certifies and declares as follows:

26        1.      I am over the age of 18, am competent to testify, and have personal knowledge of

27   the following facts and if called as a witness, would competently testify thereto.

28

---

2.      I have known Mark Phillips for many years because he was a childhood friend of my second cousins, Jennifer Schweickert and Jeffrey Schweickert, as well as my son, James Schweickert.

3.      I have known Chad Rudkin, Elizabeth Rudkin, Doug Lower, and Kenn Gordon for several years having been introduced to them by Mark Phillips and Chad.  Jeff Schweickert, Mark, Chad, and Doug all attended military school in Missouri while growing up so they all had a bond with each other.

4.      I received my undergraduate degree from California State Fullerton in 1978 and went on to become a Certified Public Accountant at KPMG's precursor, Main Hurdman.  I have years of experience in auditing major corporations, corporate finance and corporate financial governance including at Clothestime, Inc.  I was the CFO of EggHead from 1986 to 1988.  See Exhibit "A" attached hereto.

5.      I knew that Mark was a talented computer engineer who had gone on to become a very successful entrepreneur and consumer products designer.  I also knew that Mark was very loyal to his friends and family, often giving them jobs at his various companies.  Mark was also generous to his friends and family, giving them gifts or loaning them money.

6.      In early 2010, I was approached by Mark, Chad and Doug to join a business venture that they were planning.  It was at that time that I first learned about the problems Mark was having at MOD and later, that he was the subject of a federal investigation.

7.      During our initial discussions, we wanted to start a business that not only would protect Mark's interest in his intellectual property, but set up a business that would generate money to help defray Mark's legal expenses as well as give him some money to pay for his living expenses.  Mark wanted all of us to be able to profit as well, so we talked about setting up

1     a profit sharing system in which all of us, who would be shareholders in the corporation, would

2     enjoy success as the business succeeded.

3           8.     In March, 2010, we had several meetings to discuss our new corporation, "Hunts

4     Point Ventures ("HPV")."  I assured Mark and the others that I had the resources to set up the

5     corporation, the experience to manage the corporation, and the integrity to manage the

6     corporation so that Mark's interests would be protected and the Phillips' IP would be protected.

7           9.     One of the points of emphasis for us as we discussed the formation of HPV was

8     that we needed to protect the Phillips IP, and that we needed to guarantee that the Phillips IP

9     would always be "owned" by Mark.  At that time, everyone understood that the Phillips IP would

10    always be owned by Mark and no one raised any objection to this.  It was further understood that

11    this new entity, HPV, was intended to indemnify Mark from any and all claims.

12          10.    I generated several memorandums and pre-incorporation documents that clearly

13    delineated that Mark would always be the owner of the Phillips IP.  Everyone involved in the

14    pre-incorporation discussions, Mark, Chad, Doug and Kenn, all received copies of all of the

15    memoranda and documents for the formation of HPV.  To the best of my recollection, no one

16    ever sent a written objection nor did they tell me in person that they objected to the goal of HPV

17    to protect the Phillips IP and guarantee that the Phillips IP would always belong to Mark.

18          11.    On March 29, 2010, I verify that I wrote an email that confirmed the things we

19    had been discussing regarding the formation of HPV and sent the email to all of the founders.

20    (See Exhibit "B" attached hereto).

21          12.    We had many meetings discussing the formation of HPV and the best way for

22    HPV to achieve its goals.  For example, Mark, Doug Chad and Kenn flew down to Texas, where

my then girlfriend, Joyce Schweickert, had recently purchased a home, to meet for several days to discuss the formation of HPV.

13.     In addition, I had numerous telephone discussions with Mark to discuss various ideas and to make sure that Mark was satisfied with the steps we were taking to protect him and the Phillips IP.  One such option discussed was to set up a trust that would own the Phillips IP and license the rights to HPV.  We decided not to pursue a trust because, after speaking with counsel and drawing on my own experience, we believed we could achieve the same results and the same level of security by setting up a separate corporation that would be owned by Mark, which would then license the rights of enforcement to HPV.

14.     Many times during these discussions with Mark he emphasized the fact that he wanted to make sure that all of the founders would be compensated for our efforts and that I needed to make sure that the profit-sharing agreement was prepared and signed.

15.     As formation of HPV neared, the founders continued to discuss the best way for HPV to achieve its goals.  We also emphasized that some of us would be fiduciaries for Mark, either by appointment or by operation of a power of attorney.  In the end, Chad and I ended up with the obligation of acting as Mark's fiduciaries because we would be the most actively involved in the early management of HPV.  Chad and I had numerous conversations regarding the duties we owed to Mark, and the best ways to avoid any violations of our fiduciary duties.

16.     In order to confirm some of the discussions held by the founders, I directed that a Memorandum of Understanding be prepared on or about May 21, 2010.  See Exhibit "C" attached hereto.  Specifically the Memorandum of Understanding reiterated that the purpose of HPV was to protect the Phillips IP, to monetize the Phillips IP for Mark's and everyone's benefit, and to ensure that the Phillips IP would always be Mark's property.  There was never

any doubt among the founders or in my mind that Mark was to retain true ownership of his IP. In addition, the Memorandum of Understanding outlined the roles of the respective parties that I would serve as CEO, CFO, and corporate director; that Chad would serve as administrator and plant manager; and that Mark would serve as chief "envisioneer," as a corporate director, as chief technology officer, and as executive vice president of research and development.

17.     In preparation for the formation of HPV, I had discussions with lawyers and other professionals regarding the issues of corporate formation and the best way for HPV to achieve its stated goals.  I had met Mr. John Fluke while I was forming HPV and contacted him to solicit his advice on managing the new corporation and the best ways to fulfill my fiduciary duties to Mark. After these discussions, I would often tell Mark and Chad of some of the advice that Mr. Fluke had offered, knowing that Chad was equally as obligated to protect Mark's interests.

18.     On May 7, 2010, my then girlfriend, Joyce Schweickert, and I formed HPV, which issued 100 shares, each of us owning 50% of the new corporation.  I was to be the managing member of the new corporation and Joyce Schweickert was to be a shareholder and director.  I had retained the law firm of Cairncross and Hempelmann ("C&H") to prepare the incorporating documents, a firm that I looked to for advice while discussing the formation of HPV and which would act as counsel for HPV.  The firm agreed to act as the designee for service.  I filed the incorporating documents, which included the Articles of Incorporation, with the Washington Secretary of State.  See Exhibit "D" attached hereto.

19.     Rather than form a trust to own the Phillips IP, I proposed to Mark that we form other corporations within the HPV family that would own the Phillips IP and license the enforcement rights to HPV.  This would allow a new corporation, Hunts Point Intellectual Properties ("HPIP"), to be owned by Mark but managed by one of the other founders to allow

1   continuity and to fully protect Mark's interests.  After some discussion, it was decided that Chad

2   would be the operating officer of HPIP.  See Exhibit "E" attached hereto.

3          20.     After consultation with the attorneys and the founders, I formed HPV with only

4   Joyce and me as shareholders just to guarantee that HPV would be formed and a viable concern.

5   At the time, Mark was in litigation with MOD and had just learned of a criminal complaint being

6   filed against him.  I wanted to guarantee that HPV was operating during this chaotic period in the

7   event that the litigation was resolved and a settlement would result with the transfer of the

8   Phillips IP into the new corporate entity, HPIP.  I anticipated that we would later have to amend

9   the Articles of Incorporation with HPV to add additional shareholders as was discussed with and

10  promised the founders.

11         21.     I discussed this new formation with Mr. Scott Bell at C&H.  I paid C&H $15,000

12  to draft amendments to all of the corporate documents for HPV, including amended articles of

13  incorporation for HPV, stock subscription agreements to HPV, a Memorandum of

14  Understanding, Joint Consent in Lieu of Special Meeting of Board of Directors and

15  Shareholders, Limited Liability Company Agreement of Hunts Point Intellectual Properties,

16  LLC, Technology Licensing Agreement (from HPV to HPIP), and Intellectual Property

17  Contribution Agreement (of the IP from HPIP to HPV).

18         22.     On May 9, 2010, Chad and I met with Mark and showed him the new corporate

19  documents for the formation of the new legal entity, HPIP, including an Operating Agreement,

20  an IP Contribution Agreement, and a HPV Licensing Agreement of the IP between the two

21  entities.  Consistent with our earlier discussions, we planned to amend the Articles of

22  Incorporation to allow the founders to become actual shareholders of HPV.  The amended

23  Articles of Incorporation would authorize 100,000 shares (50,000 shares voting and 50,000

---

1
2
3
4
5
6
7
8

shares non-voting) and Mark, Chad, and I would be given the immediate opportunity to purchase 9,200 shares at $1.00 (one dollar) per share.  Chad, Mark, Lower, Gordon and I eventually would each own 18% of the 46,000 issued shares of voting; and non-voting stock including Joyce Schweickert's 8% (or 4,000 non-voting shares) of the 50,000 non-voting stock.  Mark was a vested shareholder because he had contributed the major asset, his IP.  Chad was chosen as one of the other shareholders because he would be the managing director of HPIP and, like me, would be spending a significant amount of time in the operation of HPV.

9
10
11
12
13

23.     Joyce, who had resigned her position as a manager or director, and I would cancel our shares in HPV in order to reallocate the shares according to the amended Articles of Incorporation.  Because Joyce and I had invested money into HPV, we would not be required to supply new money to purchase the new share allocation.

14
15
16
17
18

24.     On May 19, 2010, Chad and I met with Mark and gave him copies of the Memorandum of Understanding, the Joint Consent of Directors and Shareholders, the HPV Subscription Agreement, and the HPV Amended Articles of Incorporation.   Mark and I signed the stock subscription agreement granting him 9,200 voting shares in the newly formed HPV.

19
20
21
22
23

25.     In early June, 2010, I understood that Mark directed Chad, who was in the process of liquidating Mark's accounts, to allot $9,200 of his funds for his share allocation.  Although the amended Articles of Incorporation gave Chad a year to pay for his shares, to my knowledge he never paid any money for the allocation of 9,200 shares in HPV.

24
25
26
27
28

26.     Although Doug was not going to be an initial shareholder of HPV, he was promised an employment position to work in the sales and marketing arm of HPV and he would receive a salary as well as was proposed 9,200 shares within a year per the amended articles of incorporation.

27.     On May 28, 2010, Chad and Doug came to me to ask for an "advance" against their future salaries.  I wanted to approve the requests, so I raised the issue with the HPV board and discussed it specifically with Mark.  The board, including Mark, approved the disbursement.  I don't believe that I discussed any other HPV disbursements with Mark, partly because he was busy defending himself and partly because I felt that I was hired to make such decisions.

28.     Chad had been involved in all of the pre-incorporation discussions and had received all email threads that discussed HPV.  He had also received and reviewed all of the HPV corporate documents, including the Joint Consent of Directors and Shareholders, HPV Shareholder Agreements, the Amended Articles of Incorporation of HPV, and all relevant documents for HPIP, including the proposed Operating Agreement for HPIP.

29.     Both Chad and I discussed our roles as fiduciaries and understood that we were constrained in our actions and required to consider Mark's best interests in any action involving HPV or HPIP.  In addition, I believed that Chad was also personally instructed on his legal obligations as a fiduciary by Mr. Du Wors during a meeting held in Mr. Du Wors' office in June 2010.  I know that some of Mark's personal possessions were held by Chad, including a laptop computer.  In November of 2010, it is my recollection that Mr. Du Wors was concerned about Mark's corporate documents and ordered the deletion of specific files on Mark's laptop, purportedly because he did not want the government to obtain any evidence from the laptop.

30.     I began dealing with Mr. Du Wors on a regular basis in June 2010.  He was one of the attorneys defending Mark against the criminal charges and was representing Mark in some other civil litigation.  Mr. Du Wors told me that he had extensive experience with patents, including prosecution of patent violations.

---

DECLARATION OF STEPHEN JAMES SCHWEICKERT — 8
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al., CASE NO. 13-2-07233-5 SEA

31.     Mr. Du Wors soon became involved in all of Mark's ongoing legal issues, including separate litigation involving ADOT, Banana, and MOD and the settlement of his Intellectual Property, which at the time, was owned by Mark and licensed to MOD.  Mr. Du Wors became involved in HPV as well.  I soon began to discuss all HPV business with Mr. Du Wors and felt beholden to consider his legal advice on all issues, including the issues involving HPV, because I was Mark's fiduciary and Mark had retained Mr. Du Wors.

32.     I know that Chad began relying on the advice of Mr. Du Wors as well.  Initially, it seemed normal that Mr. Du Wors would become so involved in HPV because he was Mark's attorney and one of the goals of HPV was to help Mark pay the fees of his lawyers, including Mr. Du Wors.  I also believe that, at that time, Mr. Du Wors took his fiduciary duties to Mark seriously and he told me repeatedly that he was constrained to always consider the best interests of Mark, even when offering advice concerning the management of HPV.

33.     I was aware that Mark had retained a different law firm to prosecute violations of his IP, and we had discussed the issue before Mark signed the retainer agreement.  Mark assured me that this attorney, Mr. Whitaker of the Mann Group, had experience prosecuting violations of intellectual property and would do so on a contingency basis, meaning HPV would not have to spend some of its limited resources paying for attorneys.

34.     After Mr. Du Wors was retained in June, 2010, I met with him at his office and provided him a copy of the documents prepared by C&H, which included a signed copy of the stock subscription agreement and Memorandum of Understanding.  Mr. Du Wors knew when he took over from C&H that we still had to file the incorporation documents for HPIP as we had agreed as well as file the amended articles of incorporation for HPV.  However, Mr. Du Wors immediately told me not to do either of these tasks.  He told me that he felt it was in Mark' best

interests if his ownership of the IP was not formally acknowledged in the incorporated documents and he directed me to put aside those documents that recognized Mark's ownership interest, specifically the amended Articles of Incorporation and other amended documents for HPV.

35.     I understood that Mr. Du Wors was Mark' attorney and I believed I had to follow his advice; but I also knew that Mr. DuWors and I were fiduciaries for Mark and, as such, would be legally obligated to protect Mark's interests.  I was uneasy, however, with the manner in which this was accomplished and was concerned that we were just "destroying documents," instead of creating documents that would explain the steps being taken.

36.     Mark had executed a stock subscription agreement, the original of which was maintained at HPV.  See Exhibit  "F" attached hereto.  On or about June 7, 2010 Mark sent to Chad and me a Power of Attorney in which Chad was authorized to liquidate his remaining accounts.  See Exhibit "G" attached hereto.  Mark copied me on this email and the copy attached hereto is the same email I received on that date.  The POA also had an account statement.  See Exhibit "H" attached hereto.  Mark listed all accounts, account numbers, and the amount of funds to be liquidated and in handwriting indicated the purpose for which these funds were to be used.  Mark wrote that $9,200 of the $75,052.67 was payment for his purchase of his shares in HPV.

37.     In general, my understanding of the transfer of Mark's funds by Chad was to document the "mortgage" HPV would hold against the Phillips IP in HPIP.  "Mortgage" was meant that HPV was paying for the right to enforce the Phillips IP, and not own the Phillips IP outright.  See Exhibit "I" attached hereto.  The purpose of HPV was to become a vehicle to monetize the Phillips IP, to generate revenue to assist in paying for Mark's attorneys and the costs of litigation as well as to benefit the shareholders who were providing assistance to Mark.

Thus, rather than pay Mr. Du Wors directly, Mark, as a shareholder, would make a capital contribution of his remaining funds into HPV for accounting purposes, which would document the primary expenses of the corporation (which were litigation related) that could be off-set against the anticipated generation of revenue by HPV. Since Mark was an equity owner of HPV, we felt it was in the corporation's best interest to indemnify Mark with his ongoing legal matters.

38.     Mark's monetary contribution to HPV has been characterized in a variety of different ways over the course of HPV's history. At one point it was a capital contribution, then it was changed to a stock purchase, then it was listed as a repayment of legal expenses, and later Chad, Elizabeth and I booked it as a loan. Though there was never a written loan document, schedule of payments, interest rate, payment schedule, or collateral pledged for those funds, it was later agreed by Chad, Elizabeth and me, after they had become officers of HPV, that this money would be booked as a loan.

39.     Although Mark believed that he was shareholder of HPV, I had been advised by Mr. Du Wors to not file the amended articles of incorporation and was told by Mr. Du Wors that he would discuss all of this with Mark and that I did not have to worry about explaining the legal strategy to Mark. Mr. Du Wors assured me that Mark's interests would be protected and the outcome of Mark's civil litigation and criminal case would determine the best course of action.

40.     In addition, Mr. Du Wors advised me to encourage Mark to break the contingency fee agreement that he had with Mr. Whitaker at the Mann Group for prosecuting patent violations. Mr. Du Wors didn't mention that his contingency agreement was for 40 percent of any recovery made by HPV plus additional attorney fees; a higher contingency fee agreement than that agreed to by the Mann Group. Mr. Du Wors said that he was a more effective litigator and that he had experience with prosecuting violations of IP. He also explained that it would be

more cost effective to have him prosecute the patents because he was involved in the negotiations that would transfer the Phillips IP to HPV and was readily familiar with the Phillips IP.  The argument that it was far more efficient to use Mr. Du Wors for the patent work was especially persuasive since I did not want to involve more attorneys in HPV and was worried that the Mann Group would take too long to "get up to speed" on the patents which would delay the litigation.

41.     My concerns regarding Mr. Du Wors handling the IP prosecutions was allayed by the fact that Mark trusted Mr. Du Wors to handle the patent work on the settlement with MOD and the transfer documents of the Phillips IP to HPV.  I finally agreed with Mr. Du Wors and convinced Mark to allow Mr. Du Wors to prosecute the Phillips IP.

42.     I attended every day of Mark's criminal trial.  In January 2011, Mark was found guilty, and later, during sentencing, ordered to pay a $15,000 fine.  Mark was not ordered to pay any restitution.

43.     On January 25, 2011, Mr. Du Wors represented Mark, HPV and me in settling Mark's claims against MOD.  I signed a waiver of conflict of interest and I know that Mark signed one as well, but only with HPV in this transaction.  The settlement resulted in Mark assigning all of his IP to HPV.  See Exhibit "J" and "K" attached hereto.  I was specifically advised by Mr. Du Wors during the negotiations and agreed to execute the settlement agreement, in large part, based upon Mr. Du Wors' assurances to me that I was acting in Mark's best interests.  Mr. Du Wors assured me that in his legal opinion, this transaction was in Mark's best interests and would allow him to move forward without concern for the safety and security of the IP and that Mr. Du Wors could begin patent litigation in earnest.

44.     I was not aware of any cloud on the title of the Phillips IP that was transferred to HPV and Mr. Du Wors made no comment that the Phillips IP had a cloud to the title.  To the contrary, Mr. Du Wors repeatedly assured me that the Phillips IP was transferred free and clear of any cloud to title.

45.     In the settlement with MOD, Mark waived his rights to a $5 million licensing fee for the use of his IP.  Mr. Du Wors told me on several occasions that he would easily be able to recoup the $5 million in settlements and other legal judgments in the prosecution of the Phillips IP.

46.     After the settlement, Mr. Du Wors completed the assignment of the Phillips IP to HPV and filed the appropriate documentation.  Shortly prior to this settlement, I can clearly recall a shift in Mr. Du Wors' attitude towards me and his posture towards HPV.  He became extremely insistent on being involved in every action undertaken by HPV, no matter how small. He was very involved in every aspect of HPV, including business decisions and investments and was anxious to use the Phillips IP to encourage investment and generate income from patent violation settlements.

47.     One early example of Mr. Du Wors' exerting control over me and HPV was when Joyce Schweickert was summarily removed as a shareholder from HPV in December 2010.  At the time, Mark was preparing to defend himself in the criminal trial.  While it was true that the United States prosecutor, Mr. Swaminathan, threatened HPV, Mr. Du Wors and me that he would levy against any interest Mark still owned if he were found guilty, I no longer believe that this was a viable threat.  The government never asserted a claim against the Phillips IP, and would have been hard pressed to assert such a claim since the Phillips IP was developed and

1    owned by Mark prior to his formation of MOD.  My conclusions were confirmed when Mark

2    was not ordered to pay any restitution as a result of his conviction.

3          48.     Mr. Du Wors used the stress of the criminal trial and the threat of a federal

4    government investigation to manipulate Chad, me, and Joyce.  Mr. Du Wors knew that Joyce

5    was concerned that she could be "dragged into" a federal investigation because of her investment

6    in HPV.  Mr. Du Wors told me that she should protect herself by redeeming her shares in HPV.

7    Mr. Du Wors used me to exert pressure on Joyce to forgo her $200,000 investment (much of

8    which was paid to Mr. Du Wors) and redeem her shares in exchange only for indemnity from

9    HPV.  Because of this, Joyce agreed to terminate her involvement in HPV and she voluntarily

10   signed the documents that redeemed her shares and gave notice of her resignation from HPV.  As

11   counsel for HPV, Mr. Du Wors prepared the redemption agreement.  Mr. Du Wors later revealed

12   the real reason he wanted Joyce ousted was so that he would not have to deal with Joyce's

13   involvement in HPV and with her long-time attorney, Jeff Keane, meddling in HPV's affairs.

14         49.     Mr. Du Wors increased his control over HPV throughout 2011 and 2012.  For

15   instance, in March, 2011, I had proposed that we create a new profit-sharing entity in order to

16   honor the commitments that we had made when discussing the formation of HPV.  I intended to

17   use this new entity to be the vehicle that would distribute the profits from HPV to those who had

18   invested in Mark and HPV, and those who had worked on Mark's behalf.  Mr. Du Wors,

19   subsequently, created Hunts Point Ventures Group ("HPVG") which was incorporated in March,

20   2011.

21         50.     In April, 2011, Mr. Du Wors approached me to discuss additional ways to

22   generate working capital for HPV.  He knew I had been in a relationship with my then girlfriend,

23   Joyce, and that Joyce had already invested $200,000 to HPV in 2010.  He knew the Schweickert

family had considerable wealth.   I approached Jennifer Schweickert, her daughter.  At first, Jennifer was reluctant to loan HPV money.  I explained that the loan would really help Mark by allowing his attorney to pursue patent litigation, which would, in turn, assist Mark.  I knew Jennifer had been friends with Mark for a long time and had expressed an interest in trying to assist him following his conviction.  However, she was still hesitant to loan HPV the money.

51.     I discussed my initial conversations with Jennifer with Mr. Du Wors, who suggested that I assure Jennifer that she would be a shareholder of HPVG, which would be the corporate vehicle that would recognize the investments of time and money that had been contributed to HPV by Chad, Doug, Mark, Jennifer, Joyce and me.  I was especially insistent that we include everyone as a shareholder in HPVG because the amended Articles of Incorporation of HPV that included as shareholders Chad, Doug, Mark, and Joyce had never been filed.  Mr. Du Wors and I believed that presenting this plan to Jennifer would convince her not only that her loan was to a viable concern, but that we intended to fairly compensate everyone who had invested in HPV, loaned money to HPV, or worked for HPV.

52.     Mr. Du Wors became very excited by Jennifer's interest in making the loan and asked that I set up a conference call with her.  In anticipation of the call, I prepared a promissory note and participation schedule, and Mr. Du Wors produced a litigation plan for monetizing the Phillips IP; which included a letter, some exhibits and two draft complaints.

53.     I was a participant on the conference call between Jennifer and Mr. Du Wors which took place in April 2011, and I heard all of Mr. Du Wors' representations regarding HPVG.  During the telephone call, Mr. Du Wors stressed that HPVG had been set up with Mark's knowledge for the purpose of creating a strictly profit-sharing enterprise that would be based upon the prosecution of Marks' patents.  He said that as additional incentive for Jennifer to

make the loan, besides interest on the loan, that she would be included in the profit sharing between HPV and HPVG at a return of 8 percent.  He explained HPVG was a concept he came up with and was intended to be inclusive of all people who had given Mark assistance and was Mark's way of showing his appreciation to everyone who had helped him and that all those people were aware they were being granted shares in HPVG.  Mr. Du Wors stressed that the money from Jennifer's loan would assist him with Mark's defense and with prosecuting patent violations and that settlement money received as a result of the patent violations would directly benefit Mark as well as the other shareholders of HPVG.

54.     However, behind the scenes, Mr. Du Wors was telling Chad and me something much different.  In March, 2011, Mr. Du Wors had threatened Chad and me by saying that if we couldn't come up with a way to generate money for HPV in order to pay his outstanding legal fees of $117,652.57, he would file a lien against the Phillips IP and foreclose on it and quit working on Mark's cases.  I believed he was serious when he made these threats and I scrambled to find investment in HPV to pay Mr. Du Wors in order to protect Mark.  As it turned out, even after Mr. Du Wors was paid as a result of Jennifer's loan, he quit working on all of Mark's civil cases anyway.  After Jennifer's loan, Mr. Du Wors was dismissive of HPVG.  He berated me for "offering" Jennifer "anything beyond simple interest" and said it was "too generous" and that HPV "shouldn't honor that promise."  Mr. Du Wors was angry that money he "generated" with his work on Phillips IP on behalf of HPV would be transferred into HPVG and then shared with "everyone."  In addition, he never prepared a profit sharing agreement between HPV and HPVG. In fact, this was the last time Mr. Du Wors ever discussed HPVG with me.

55.     I was also shocked when Mr. Du Wors said during the conversation with Jennifer that his criminal defense bill had reached $300,000.00 and that he would be taking most of

Jennifer's loan for himself.  He said that it was necessary to pay for the criminal trial because HPV had purchased the IP in exchange for paying Mark's fees for the criminal trial.  I was surprised for two reasons: the first was that I could not believe that the fees for the criminal case could be that high; and second, because after Mr. Du Wors had paid himself $117,000 from Jennifer's loan, HPV would be left with almost no operating capital, which would contradict his assertion that the funds would go towards facilitating his work in prosecuting patent violations.

56.     On October 24, 2011, Mr. Du Wors told me that he had successfully settled a claim for one of the patent violation cases he had filed.  I never saw any money from this settlement because Mr. Du Wors told me he would be taking the entire sum in payment for the fees owed his firm from the settlement as well as past due fees from the criminal trial.  I was bewildered because a) Jennifer's loan supposedly had paid off his outstanding legal bill for the criminal defense; and b) some of the money should have flowed into HPVG, which would be used to pay creditors and shareholders of HPVG.  I was again concerned that HPV was being starved of resources, but even more concerned that Mr. Du Wors was now unilaterally making decisions for HPV that needed to be made by management and the board.  No board meeting was called regarding the payment of the fees to Mr. Du Wors; and he seemed to treat HPV like his own fiefdom and the HPV accounts as his own piggy-bank.

57.     My understanding was that Mark owed a number of past attorneys who had provided him with legal services and that he had told them that some of the profits of HPV would go to repay his legal debts.  However, there was no discussion about using the settlement funds or Jennifer's loan to pay any other attorneys or creditors of HPV, or to fund any profit sharing with HPVG.

58.     As time passed, my interest waned in continuing to be a part of HPV.  I had

personal problems and could no longer devote so much time to HPV.  I was also experiencing

financial problems and could not devote so much time to a company that was not giving me a

regular paycheck.   More importantly, Mr. Du Wors had gradually marginalized my role in HPV

and had effectively taken over management of HPV, including management of the HPV bank

accounts which were deposited in and managed through his IOLTA account.  He was also

making all decisions regarding HPV without consulting me or anyone else.  I became tired of the

conflict with Mr. Du Wors regarding the corporate governance of HPV and was increasingly

troubled over whether Mr. Du Wors' decisions were in the best interests of HPV and Mark.

59.     I also had grown weary of Mr. Du Wors' continuous promises that HPV was

going to "hit it big."  I admit that because of him, I had been very optimistic about the early

prospects of HPV being a successful company.  Whenever difficulties arose, whether it was

dealing with Joyce, Mark, or Jennifer, or there were difficulties in keeping HPV funded, Mr. Du

Wors always fell back upon the allure of his assurances that he would generate large patent

settlements to keep me involved in HPV and faithful to his decision-making.

60.     However it became clear that as I became disillusioned with Mr. Du Wors, he was

trying to manipulate me and that he had grown weary of me.  My problems with Mr. Du Wors

came to a head in early 2012 when I was charged with DUI in Kirkland Municipal Court.  In

April, Mr. Du Wors told me he knew I had no money and needed help.  He told me he would get

me an attorney and pay for that attorney if I agreed to step down from my role as CEO and allow

Chad and Elizabeth to take over.  I believe Mr. Du Wors  wanted this because he liked Chad and

Elizabeth better as they had no prior business experience, would be dependent upon him for the

decisions he felt HPV should make, and would always rubber-stamp his decisions.  I was

desperate to have help to clear up the DUI and was tired of dealing with Mr. Du Wors and the problems at HPV, so I agreed. And that is exactly what happened.

61.     At this time, all of HPV's money had been deposited into Mr. Du Wors' IOLTA account and only Mr. Du Wors could disperse those funds. On April 3, 2012, Mr. Du Wors transferred $8,500 to Peter Mair who defended me against the DUI charge. Mr. Mair had a prior relationship with Mr. Du Wors as co-counsel in Mark's trial. I was then demoted to COO of HPV and Chad was appointed Chairman and CEO and Elizabeth to Secretary and CFO.

62.     In May 29, 2012, Mr. Du Wors prepared a "Joint Consent in lieu of Annual Meeting of Shareholders and Directors." See Exhibit "L" attached hereto. The purpose of the Joint Consent was to recognize Chad as having a 50 percent ownership in HPV. As the Joint Consent states, "Although the Shareholders never memorialized the transfer in writing, it has been the agreement and understanding of Schweickert and Rudkin that Rudkin became an owner of 50% of the shares of Hunts Point Ventures, Inc., effective January 1, 2011, and have shared equally in all operating decisions of the corporation since that time." In the joint consent, I assumed the new position of Vice President and COO while Chad became the new President and CEO and his wife, Elizabeth Rudkin, became the corporate secretary and CFO.

63.     Of note is the fact that the Joint Consent states that "the Board hereby approves, adopts, ratifies and confirms all past actions taken by Steve Schweickert as President, Vice President, Secretary and Treasurer of the Corporation from December 31, 2010 through the date hereof."

64.     In keeping with my posture to not question Mr. Du Wors' decisions, I thought it strange that the Joint Consent only approved all past actions going back to December 31, 2010, while HPV had been incorporated in March, 2010, seeming to conveniently exclude the period of

time when Mark should have been a shareholder of HPV, when Chad had received

disbursements from HPV, and when Chad had transferred Mark's money into HPV.  I should

also note that Mark was not made aware of this change in ownership in HPV by any party to this

transaction, which effectively demoted me and made Chad and Elizabeth the *de facto* manager of

HPV.  There was no question in my mind that Mr. Du Wors would be making all of the decisions

regarding HPV and that the Rudkins would be merely figureheads at HPV as he desired it.

65.     Mr. Du Wors emphasized two reasons had for advising me to exclude Mark from

HPV.  First, his firm was corporate counsel for HPV and was the registered agent (as well as for

HPVG).  Mr. Du Wors explained that control over HPV would help him generate a lot of money

prosecuting violations of the Phillips IP.  Second, as Mr. Du Wors expressed it to me, it was "too

dangerous" to include Mark in the manner that C&H had proposed because of the potential

liability Mark faced in his ongoing litigation and the possibility of a civil forfeiture action

stemming from the criminal matter.  Mr. Du Wors stressed that a conviction could result in a

government levy on all of Mark' "ill-gotten" gains and his primary concern was to shield the IP

from any such potential consequences.

66.     This corporate structure, as well as the exclusion of Mark from HPV and his

intellectual property, violated our discussions prior to incorporation and violated the spirit of our

original agreements as well as Mark's desire to play an active role in HPV.  As Mark and I

discussed at length, and as reflected in the MOU, Mark was to be a board member and CTO of

HPV as well as the Senior Vice President of Research and Development with veto rights on

decision making.  In fact, in the sentencing letter written on behalf of Mark, I wrote to the court

that he was a key member of the HPV team.  I was especially uneasy removing Mark from the

ownership records of HPV because he had given up so much to set up HPV by transferring his IP

into a profit-sharing enterprise for the benefit of many, instead of just one attorney and he had provided significant funding for HPV.

67.     I stand by my conviction that my actions taken on behalf of HPV and Mark were done in good faith and with good intent despite the appearance of certain transactions.  I believe that the amount of work that I put into the formation and early stages of HPV will vindicate me.  I also admit that I relied upon the legal advice of HPV's corporate counsel and Mark's personal attorney, Mr. Du Wors, in believing that all steps taken at Mr. Du Wors' direction were lawful and in Mark's best interests.

68.     I believe that Mr. Du Wors overstated his experience and competence in prosecuting violations of intellectual property.  I am only aware of the one, small settlement that he achieved while he was counsel for HPV, and believe Mr. Du Wors only filed two other actions.  I do not know if this lack of success is due to his lack of experience or competence, but this limited record of success directly contradicts the statements he made to me which were used to convince me that he and his firm should be hired to prosecute the Phillips IP and that he and his firm would "easily" replace the $5 million licensing fee that Mark had foregone in the MOD settlement.

69.     At the time the Joint Consent was signed, both Chad and Elizabeth were fully aware that Mark's ownership in HPV had been "hidden," per Mr. Du Wors' advice.  Chad had been copied on all email communications between C&H and me and had received copies of all correspondence between the founders, including all the formation documents for HPV, the amended articles of incorporation for HPV, the MOU, and the HPIP documents.  He knew the amended Articles of Incorporation had never been filed and that his 50 shares were from the

original Articles of Incorporation for HPV.  Chad was also aware that Mr. Du Wors had advised us to specifically exclude Mark's ownership interest in HPV.

70.    There were many transactions that did not seem to serve any corporate purpose and seemed unrelated to the affairs of HPV.  These transactions were approved by Chad and Elizabeth Rudkin.  After the joint consent was signed in May, 2012, I had many discussions with Chad and Elizabeth about how to categorize expenses in the HPV books since its inception.  I have now learned that what is now reflected in HPV's books was not the method we had originally discussed.  For example, payments made to Chad were entered as "future profit sharing," but they were later altered and entered as a "loan receivable."  Additionally, valid payments to James Schweickert and Chris Grundy for information technology services directly related to HPV's product have now, unaccountably, been challenged as "fraudulent conveyances."  Finally payments made to John Ridgeway and Arnold Schmidt were investments made by HPV to diversify and strengthen its balance sheet through strategic partnerships and carried clear business purposes.  I don't understand why Chad and Elizabeth are now re-categorizing and misrepresenting these payments.  All of us explicitly approved those disbursements in the summer of 2012 on multiple conference calls, and this was documented in the May 2012 Joint Consent (See Exhibit L and para. 58 and 59 above).  I reviewed Exhibit "M" and found many instances of similar "re-categorizations" which deviated from my discussions with the Rudkins.  See also Exhibit "N" attached hereto.  Last, we believed it appropriate to characterize the money Mark contributed in June 2010 as a loan because of Mr. Du Wors' insistence that he be "hidden" from HPV.

71.    I also noted that Jennifer's loan to HPV had been changed in the HPV accounting records after Elizabeth had met with Clark Nuber and just prior to Ms. Hoover's January 2013

secured loan to HPV.  See Exhibit "P" attached hereto.  Jennifer's loan was booked as an "angel investment," contrary to the clear language of her promissory note which I signed as CEO on behalf of HPV.  Chad and Elizabeth were aware that the money given to HPV by Jennifer was a loan.  Jennifer was also to receive 8% of HPV stock.  See Exhibit "O" attached hereto.

72.     In late October 2012 after Mark was released from federal custody, we met and he asked me about the status of his ownership in HPV.  I told him he had no membership interest but that I would consider transferring my 50 percent ownership in HPV to him.  I later discussed this possibility with Mr. Du Wors but he immediately told me "no," that I could not transfer the shares to Mark.  He emphasized the continued need to keep Mark's name off of any document related to HPV "for his protection" and because of this legal strategy, he guaranteed that the government could not seize his interest in HPV.  He also told me he wanted to discuss it with Chad and Elizabeth, who were, at that point, "in charge" of HPV.  Not long after that, Chad called me and wanted to acquire my shares in HPV from me and added that he could not put Mark on the board or recognize him as a shareholder because he was a convicted felon.  This was also the reason given why I should not give my shares to Mark.  Chad told me Derek Linke (an attorney with Newman & Du Wors) had said this was in Mark's best interests and that  my transfer of my shares to him would be a lawful transaction.  When I again expressed concerns about my fiduciary duties towards Mark, I was assured by Mr. Du Wors that as Mark's attorneys, Mr. Linke and Mr. Du Wors were looking after Mark's best interests.

73.     During this time, I was going through personal issues with Joyce Schweickert and was involved in litigation with her.  We scheduled a mediation in an effort to resolve the issues in that litigation and I made her an offer of my shares in HPV.  Through the mediator, Joyce communicated she declined my offer for shares.  I then acquiesced to Chad's offer to acquire my

shares.  I was at the point where I was living in my car and needed out of the HPV mess.  Mark was becoming increasingly belligerent and I didn't know how to handle the pressure from him as well as the pressure from Mr. Du Wors.  I owed a duty to both Mark and HPV and wasn't sure how to reconcile them.

74.     I do not believe that Mr. Du Wors had been honest with me.  I later learned that since HPV was not a public traded company, it did not matter if Mark had an ownership interest in the corporation and his role in HPV would have had no adverse impact on HPV.  In addition, Mark explained to me that at that time he had no civil or criminal liability that might impact his IP.  I assumed that Chad had been talking with Mr. Du Wors regarding the acquisition  of  my ownership interest, but neither one of them seemed to be acting in Mark's best interests.

75.     After I transferred  my shares to Chad, Mark told me Chad, who had been promising Mark to "restore his interest in HPV," went with Mark to Mr. Du Wors office, where Mr. Du Wors told Mark his "interest in HPV" never existed, would never be recognized by HPV and there was nothing he could do about it.  I felt I had been duped by Mr. Du Wors and regretted my decision to transfer my shares to Chad.

76.     I do not presume to understand the motivations of Chad and Elizabeth.  I believe Chad and Elizabeth felt disrespected by Mark and felt they had made great contributions to HPV on behalf of Mark and deserved significant compensation.

77.     Mr. Du Wors took advantage of Chad and Elizabeth.  He characterized Mark as "inconsiderate" for asking them to manage his personal and business affairs, without compensation, during a horrible time in their life.  I believe the Rudkins were understandably angry toward anyone they perceived as not "respecting" them.  I think Mr. Du Wors convinced

them that Mark was such a person, and thus, they took steps in violation of their fiduciary duties and their conscience.

78.     I received either the document or e-mail attached hereto and certify that the document is a true and correct copy of the document or email that was either sent by or received by me.

79.     I certify that attached hereto as Exhibit "1" is a true and correct copy of a Nuclear Diagram that I created to describe HPV's relationship to Mark.

80.     I certify that attached hereto as Exhibit "2" is a true and correct copy of the Voting Trust Agreement between Mark and myself.

81.     I certify that attached hereto as Exhibit "3" is a true and correct copy of an e-mail re: Trustee designee dated March 16, 2010.

82.     I certify that attached hereto as Exhibit "4" is a true and correct copy of an e-mail re: Voting Trustee Replacement dated March 23, 2010.

83.     I certify that attached hereto as Exhibit "5" is a true and correct copy of an e-mail re: shareholder consent dated March 27, 2010.

84.     I certify that attached hereto as Exhibit "6" is a true and correct copy of an e-mail re: Actions the next few days dated March 28, 2010.

85.     I certify that attached hereto as Exhibit "7" is a true and correct copy of an e-mail re: Fwd: HPV and HPIP, LLC dated May 13, 2010.

86.     I certify that attached hereto as Exhibit "8" is a true and correct copy of an unsigned HPV Joint Consent In Lieu of Special Meetings of Board of Directors and Shareholders dated May 17, 2010.

87.     I certify that attached hereto as Exhibit "9" is a true and correct copy of an unsigned Resignation of Joyce Schweickert dated May 17, 2010.

88.     I certify that attached hereto as Exhibit "10" is a true and correct copy of an Articles of Amendment to the Articles of Incorporation of HPV dated May 18, 2010.

89.     I certify that attached hereto as Exhibit "11" is a true and correct copy of an unsigned Intellectual Property Contribution Agreement between Mark and HPIP dated May 18, 2010.

90.     I certify that attached hereto as Exhibit "12" is a true and correct copy of the unsigned Operating Agreement of HPIP dated May 18, 2010.

91.     I certify that attached hereto as Exhibit "13" is a true and correct copy of unsigned Technology License Agreement between HPV and HPIP dated May 18, 2010.

92.     I certify that attached hereto as Exhibit "14" is a true and correct copy of an e-mail re: Additional questions re LLC dated May 19, 2010.

93.     I certify that attached hereto as Exhibit "15" is a true and correct copy of an e-mail re: LLC documents and HPV reconstitution documents dated May 20, 2010.

94.     I certify that attached hereto as Exhibit "16" is a true and correct copy of an e-mail re: Hunts Point Ventures and 'the x(\033), LLC' ("x0") Capital Split Diffuser dated May 21, 2010.

95.     I certify that attached hereto as Exhibit "17" is a true and correct copy of Mann Contingent Fee Agreement dated May 24, 2010.

96.     I certify that attached hereto as Exhibit "18" is a true and correct copy of an e-mail re: Hunts Point Ventures disbursements dated May 28, 2010.

97.     I certify that attached hereto as Exhibit "19" is a true and correct copy of an e-mail re: Power of Attorney dated June 7, 2010.

98.     Exhibit "20" is intentionally left blank.

99.     I certify that attached hereto as Exhibit "21" is a true and correct copy of an e-mail re: Summary of Accounts dated June 7, 2010.

100.    I certify that attached hereto as Exhibit "22" is a true and correct copy of an e-mail re: Strategy update meeting today at 4pm dated June 11, 2010.

101.    I certify that attached hereto as Exhibit "23" is a true and correct copy of an e-mail re: Please create a consolidated list of current issues and your ideas dated June 16, 2010.

102.    I certify that attached hereto as Exhibit "24" is a true and correct copy of an IRS-CI and UPIS Memorandum of Interview with me on July 8, 2010.

103.    I certify that attached hereto as Exhibit "25" is a true and correct copy of an e-mail re: Tuesday morning (early 2:00am) and letter mailed on November 3, 2010 to Mark at Seatac Federal Detention Center.

104.    I certify that attached hereto as Exhibit "26" is a true and correct copy of a letter from Joyce Schweickert's attorney Jeff Keane dated August 25, 2011.

105.    I certify that attached hereto as Exhibit "27" is a true and correct copy of the HPV and DigEcor License Agreement dated October 24, 2011.

106.    I certify that attached hereto as Exhibit "28" is a true and correct copy of the HPV Accounting records listing Mark's financial contributions.

107.    I certify that attached hereto as Exhibit "29" is a true and correct copy of the HPV Stock Subscription agreement with Chad Rudkin dated May 18, 2010.

108.    I certify that attached hereto as Exhibit "30" is a true and correct copy of HPV

Stock Subscription agreement with me dated May 18, 2010.


I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.


SIGNED at SEATTLE, WASHINGTON on December ____*20*____, 2013.



STEPHEN JAMES SCHWEICKERT


STATE OF WASHINGTON )
                                        ) ss.
COUNTY OF KING            )

On this 20th th day of December, 2013 before me, the undersigned, a notary public in and for the State of Washington, duly commissioned and sworn, personally appeared STEPHEN JAMES SCHWEICKERT, known to me (or proved to me on the basis of satisfactory evidence) to be the individual described in and who executed the within instrument and acknowledged that she he signed and sealed the same as her free act and deed, for the uses and purposes herein mentioned.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.


_____
NOTARY PUBLIC in and for the State of
Washingon, residing at ___Bellevue___, WA.
My appointment expires: ___04-19-2017___

CURTISS R NELSON
COMMISSION EXPIRES
NOTARY
PUBLIC
04-19-17
STATE OF WASHINGTON