# EXHIBIT "B"

IN THE SUPERIOR COURT OF WASHINGTON,
COUNTY OF KING, STATE OF WASHINGTON

| | |
|---|---|
| MARK E. PHILLIPS,<br><br>   Plaintiff,<br><br>vs.<br><br>CHAD HAROLD RUDKIN AND ELIZABETH RUDKIN, STEPHEN JAMES SCHWEICKERT, and JANE DOES 1 THOUGH 4,<br><br>   Defendants. | Case No.: 13-2-07233-5 SEA<br><br>**DECLARATION OF DOUG LOWER** |
| MARK E. PHILLIPS,<br><br>   Plaintiff,<br><br>vs.<br><br>STEPHEN JAMES SCHWEICKERT, HUNTS POINT VENTURES, INC., and HUNTS POINT VENTURE GROUP, LLC,<br><br>   Defendants. | |

DOUG LOWER certifies and declares as follows:

1. I have personal knowledge of the following facts, and I am competent to testify.

2. I was involved in Hunts Point Ventures ("HPV") from December of 2009 through June of 2011. I agreed to be an employee of HPV working in sales and marketing in HPV. It

---

DECLARATION OF DOUGLAS LOWER — 1
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

was also agreed that I would be granted an equity interest in HPV. (See Exhibit A, MOU). I worked at the HPV offices in Hunts Point.

3. I have known Mark Phillips and Chad Rudkin since high school. We were friends with Jeff Schweickert and Jennifer Schweickert who are brother and sister. Steve Schweickert, a cousin, is also the boyfriend of Jeff and Jennifer's mother, Joyce. At school Mark was an honor roll student, and, after college, a successful computer engineer and inventor. I worked closely with Mark at several of his prior companies and businesses, being involved in the day to day operations of the business and helping to plan the corporate strategy.

4. In December 2009, Mark and I contacted Chad Rudkin to start a company that was specifically designed to protect his intellectual property and to generate funds that would help pay for Mark's legal fees as well as provide him with some financial support. The plan is that the company would also, eventually, be profitable for all of us that agreed to work there. We also called Steve Schweickert to ask if he would join the new company. Mark, Steve, Chad and I worked together for the purpose of setting up a company to both protect and prosecute issues related to Mark's patents. This was the early stages of the formation of HPV, in which we tried to develop a business strategy that would both protect Mark's interest in the IP, and develop a mutually beneficial profit sharing enterprise. Chief among all concerns was the protection of the IP. As memorialized in the Memorandum of Understanding, we all agreed that Mark's IP would always be owned by him.

5. Both Steve and Chad promised me that protecting Mark's IP was a priority for them and it was because of these promises that I trusted them, just as I completely trusted Mark to fulfill any promise he made to us. In the initial development phases, all members were to be part of HPV's corporate governing board with Mark holding a "veto." Mark was very

DECLARATION OF DOUGLAS LOWER — 2
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

experienced with corporate governance and because everyone agreed that the corporation was to protect Mark and his IP, we wanted to take advantage of his experience and expertise in managing the new company. During this period of time, early 2010, I heard Steve and Chad make repeated promises to protect Mark, his interests, and his IP, through the company, HPV. In order to guarantee that Mark's IP would remain his property, we planned to set up a separate company, Hunts Point Intellectual Properties ("HPIP") which would be wholly-owned by Mark and operated by Chad. HPIP would then license to HPV the right to development and prosecution of the Phillips IP.

6. These discussions led to Steve retain the firm of Cairncross Hempelman in order to draft articles of incorporation for HPV, which articles were to include a precisely defined corporate governance plan, appoint an initial board of directors, and create licensing agreements between Hunts Point Intellectual Property ("HPIP") and HPV for use of the Phillips IP. I was copied on the email from attorney Scott Bell regarding the formation and licensing. (See Exhibit B). Because of his accounting background and business experience, Steve was chosen to act as the director of HPV. Steve and Joyce were to be the original shareholders of HPV, each owning 50% of the 100 shares.

7. In May of 2010, Steve hired me to work at HPV and to issue me shares in HPV against my employment income. I signed a subscription agreement and a memorandum of understanding ("MOU") confirming my employment (See Exhibit A). I do not have signed copies of these agreements, however, because after handing them to Steve, I was never provided a copy with his signatures and the signatures of others on the MOU.

8. I was specifically hired by HPV to seek licensees for Mark's IP. The subscription agreement promised to issue me 9,200 shares in return for my employment. Steve also showed

DECLARATION OF DOUGLAS LOWER — 3
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

me that he and Joyce Schweickert, the original founders of HPV, had prepared amended articles of incorporation that cancelled the formation shares of 100 and reformed the ownership structure of HPV, issuing 50,000 voting shares and 50,000 non-voting shares. (See Exhibit C). The agreement gave me one year to pay for the shares in HPV and it was our agreement that part of my compensation from HPV would go to pay for the shares. In addition, Steve showed me a copy of the Technology Licensing Agreement, to license the IP between HPIP and HPV. (See Exhibit D).

9. From that point forward, Steve, Chad, and Mark all operated with the understanding that I had shares in the company. I was included in all board and executive meetings including decisions to approve paying me. (See Exhibit E – 05282010 email). I later learned that Steve never filed the amended articles of incorporation and my shares in HPV were non-existent, and in effect, I was working for free.

10. I worked very hard furthering the interests of HPV. It became apparent to me early on that Steve and Chad had limited experience in running a corporation. All decisions and advice for the company were being made by Mark, our colleague Kenn Gordon, and me. I would characterize much of Steve and Chad's discussion with me about HPV as very "grandiose," believing that they were going to be "making millions" in the HPV endeavor. They always talked about how much money they would personally make. I was somewhat surprised that they were mostly interested in talking about the money that Mark and his patents were going to make them.

11. I attended various meetings at HPV between December 2009 and March 2010, during which Mark made it clear that HPV was to be a group effort. Steve and Chad promised they would listen to the advice of Kenn, the attorneys and me. However, Steve and Chad began

DECLARATION OF DOUGLAS LOWER — 4
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

to act differently about May 2010. After attorney John Du Wors became involved in HPV, Cairncross and Hempelman were dismissed and a contingency retainer agreement that Mark had negotiated with attorney John Whitaker to prosecute violations of the Phillips IP was disregarded. I noticed that Steve and Chad began to take advice only from Mr. Du Wors. I found that troubling because I was omitted from these discussions on strategy and I was not sure that Mark's interests were being properly protected.

12. For example, Mark's first criminal attorney David Bukey was owed $60,000, and Steve told me that Mr. Du Wors told him to "stiff" him and instead pay the seed money for HPV to Mr. Du Wors for the patent litigation. Steve and Chad did not honor their promises to Mark because, I believe, they thought Mr. Du Wors would be generating "millions" off the patents.

13. Another example that caused me concern about the strategy of HPV occurred upon the formation of Hunts Point Ventures Group ("HPVG"). Again, I was not a party to these discussion regarding HPVG, its formation, why it was formed, or what its purported relationship was to be with HPV. Steve later confided in me that Mr. Du Wors had come up with a "brilliant scheme" to obtain funding for HPV, funding that would not be secured by HPV or the Phillips IP, but instead would be secured by offering stock in a sister corporation that had a profit sharing agreement with HPV. Steve showed me a promissory note from Jennifer Schweickert in favor of HPV that included a profit sharing agreement with HPVG in which shares were allotted to various individuals, including me. I was quite surprised to see myself included in HPVG because I had not heard of HPVG before and not been in any meeting in which HPVG was discussed. I never received any shares or profit according to the agreement and doubt that any profit sharing ever occurred.

DECLARATION OF DOUGLAS LOWER — 5
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

14. I asked Steve about the loan that Jennifer made to HPV, and was told that the majority of that money was needed to pay Mr. DuWors to prosecute violations of the Phillips IP. When I pointed out that Mr. DuWors worked on a contingency basis on those claims, and that the money loaned by Jennifer was needed to meet other obligations of HPV, my advice was dismissed. I was left with the uneasy feeling that Steve was treating Jennifer's money not as a "loan," but as a "gift."

15. Later in mid-2011, just prior to my resignation from HPV, I learned that Steve and Chad on the advice of Mr. Du Wors were "hiding" Mark's ownership interest in HPV, and were planning to extinguish Mark's interest in the Phillips IP. Steve told me it had been Mr. Du Wors' plan to extinguish Mark's interest in HPV because of a fear that creditors might otherwise be able to attach the IP. Chad explained to me that because he had Mark's power of attorney, he could "hold" Mark's shares in his name, which is the reason he said Mark was not officially issued shares in HPV. Chad again assured me that he was "looking out for Mark" and was doing all this "for Mark's benefit." As Mark was in prison and contact with him was limited, I wondered whether he was even aware of this.

16. In June of 2011, I decided to tender my resignation. When I inquired about my stock in HPV, both Steve and Chad refused to recognize my interest in HPV. In fact, Mr. Du Wors threaten to sue me if I did not execute a full release of HPV, which I refused to do.

17. I reported my suspicions regarding the irregularities that I witnessed with Jennifer's promissory note to Mr. Jeff Keane, Joyce's attorney, to Jennifer, and to the Washington State Division of Financial Institutions. I have assigned my claims against HPV, Chad and Elizabeth Rudkin, and Steve Schweickert to Mark Phillips and Jennifer Schweickert.

DECLARATION OF DOUGLAS LOWER — 6
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al

18. During my tenure at HPV, I was shocked in the way that HPV was operated. I have never seen Steve or Chad ever hold board meetings, seek corporate advice, consult with Mark, seek approval from anyone other than one time for disbursements, or pay salaries. Instead, both appeared to rely heavily on the advice and guidance of Mr. Du Wors regarding the direction and actions of HPV. As my advice was generally disregarded by that group of people, and because I learned I was not recognized as a shareholder in HPV and did not see that HPV was fulfilling its corporate obligations nor was it following the plan upon which we originally agreed (to protect the Phillips IP and generate profit sharing). I felt I had no other choice but to disengage completely from HPV.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

SIGNED at SEATTLE, WASHINGTON on December 2, 2013.

_____
DOUG LOWER

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

On this 3rd day of December, 2013 before me, the undersigned, a notary public in and for the State of Washington, duly commissioned and sworn, personally appeared Doug Lower, known to me (or proved to me on the basis of satisfactory evidence) to be the individual described in and who executed the within instrument and acknowledged that she signed and sealed the same as her free act and deed, for the uses and purposes herein mentioned.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal.

_____
NOTARY PUBLIC in and for the State of Washington, residing at King County, WA.
My appointment expires: 08-25-2015

DECLARATION OF DOUGLAS LOWER — 7
PHILLIPS v RUDKINS et al, PHILLIPS v HPV et al