EXHIBIT "C"

**1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER P. SCHWEICKERT,          )
                                  )
          Plaintiff,              )
                                  )
     vs.               ) No. 13-CV-675
                                  )
HUNTS POINT VENTURES, INC.;       )
HUNTS POINT VENTURE GROUP,        )
LLC; CHAD and ELIZABETH           )
RUDKIN, and their marital         )
community comprised thereof;      )
JOHN DU WORS and AMBER DU         )
WORS, and their marital           )
community comprised thereof;      )
and DOES 1 - 4,                   )
                                  )
          Defendants.             )

DEPOSITION UPON ORAL EXAMINATION OF JENNIFER P. SCHWEICKERT

9:00 a.m.
Friday, September 12, 2014
701 Pike Street, Suite 1800
Seattle, Washington

Laurie B. Porter, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136
www.northwestcourtreporters.com

**2**

APPEARANCES

On Behalf of the Plaintiff:
          BRANDON WAYMAN
          MDK Law
          777 108th Avenue NE, Suite 2170
          Bellevue, Washington  98004

          REED YURCHAK
          Law Office of Reed Yurchak
          40 Lake Bellevue Drive, Suite 100
          Bellevue, Washington  98005

On Behalf of the Defendants:
          SAM FRANKLIN
          Lee Smart
          701 Pike Street, Suite 1800
          Seattle, Washington  98101-3929

**3**

EXAMINATION INDEX

Mr. Franklin ..................................... 4

* * *

EXHIBIT INDEX

No.    Description                    Marked
1    Complaint, 17 pages                40
2    Promissory Note and Joint Participation
     Agreements, 14 pages              48

**4**

(Deposition commenced at 9:22 a.m.)

JENNIFER SCHWEICKERT,    having been first sworn under oath by a Washington State Certified Court Reporter, testified as follows:

EXAMINATION

BY MR. FRANKLIN:

Q. Ms. Schweickert, would you state your name and current address for the record.

A. Jennifer Schweickert, 2450 Aurora Avenue North, Apartment 328, Seattle, Washington 98109.

Q. You've identified this location as an apartment.  I assume from that that you are a tenant, that you don't own those premises.

A. Yes.

Q. Are you on a lease?

A. Yes.

Q. And what are the inclusive dates of that lease?

A. I believe it ends October 31st of this year.

Q. And when did it commence?

A. July of this year.

Q. And where did you reside prior to July of this year?  That is, prior to July of 2014 where did you reside?

A. For the past year we were at 2801 First Avenue, Apartment 309, and our zip code there was 98121.

Q. You said you were at 2801 First Avenue?

1 (Pages 1 to 4)

Jennifer Schweickert - September 12, 2014

## 5

1   A. Uh-huh.
2   Q. And that was from what inclusive dates?
3   A. From June of ... what is it?  2014?  June of 2013 to July of
4      2014.
5   Q. Would that be like the 1st of June, or approximately when?
6   A. Middle of June.
7   Q. And did you have a lease?
8   A. No.
9   Q. Just a-month-to-month?
10  A. Yes.
11  Q. And was that an apartment house?  Was it a hotel?  What was
12     it?
13  A. It was a condo.
14  Q. Do you know who you were renting from?
15  A. I believe it was more like a sublease kind of a thing.
16  Q. And who were you subleasing from, if you know?
17  A. We paid the association fees for the condo.  That's all we
18     paid, just to the building, the Ellington.
19  Q. Who was the owner of the unit that you lived in?
20  A. I believe their last name was Shapiro.  We're not acquainted
21     with them.
22  Q. You used the term "we."  And who is "we" in this instance,
23     Ms. Schweickert?
24  A. My fiance.
25  Q. That's Mark Phillips?

## 6

1   A. Uh-huh.  Yes.
2   Q. Thank you.  When did you and Mr. Phillips enter into this,
3      I'll characterize it as a somewhat formalized relationship
4      of being your fiance?  Has he been your fiance for some
5      period of time?
6   A. Since July of this year.
7   Q. And does anyone else reside with you and Mr. Phillips?  Do
8      you have children?
9   A. My daughter Mia.
10  Q. And that would account for your email address, then, I take
11     it.
12  A. My email address?
13  Q. Is it miasmom?
14  A. That's one of them, yes.
15  Q. Okay.  Does she reside there with you?
16  A. Yes.
17  Q. And she's been up here with you since you came up here in
18     June of 2013?
19  A. Yes.
20  Q. All right.  Do you maintain any other residences?
21  A. Yes.
22  Q. Where?
23  A. A house on Queen Anne.
24  Q. And what's the address of that?
25  A. 2582 3rd Avenue West, and I believe the zip code there is

## 7

1   98119.
2   Q. And who's the owner of that house?
3   A. I am.
4   Q. When did you acquire that house?
5   A. Spring of this year.  I don't remember the exact date.  I
6      think it was in March -- or April.
7   Q. Is the house habitable at this time?
8   A. No.
9   Q. Is it in the process of being renovated?
10  A. Yes.
11  Q. All right.  Do you maintain any other residences besides the
12     one on Queen Anne, then?
13  A. Not to my knowledge.
14  Q. Okay.  Fair enough.  Ms. Schweickert, could you give me kind
15     of a quick rundown of your employment history or any
16     professional licensing, such as a realtor or stockbroker,
17     anything of that nature?
18        Let me withdraw that question.  Let me go back.
19     What's your level of education?
20  A. My level of education?
21  Q. Yes.
22  A. I have a bachelor of arts degree about Washington State
23     University.  I was very close to finishing my master's
24     degree in psychology.
25  Q. Is that also at WSU?

## 8

1   A. No.  Antioch University.
2   Q. Pardon?
3   A. Antioch University.
4   Q. Okay.  When did you get your bachelor's from WSU?
5   A. I graduated in 1994.
6   Q. What's been your employment history since 1994?
7   A. Mostly odd jobs.
8   Q. Like what?
9   A. Gosh, lots of weird different things.  I worked at an
10     upscale florist in Laguna Beach for a few years.  I worked
11     as a caterer.  I worked at a golf course.  And then I went
12     to grad school.  I did different schoolings too, like
13     interior design school.  Wasn't thrilled with it.
14  Q. Okay.  Do you have any particular training in business?
15  A. No.
16  Q. Do you regard yourself as being particularly knowledgeable
17     about intellectual property?
18  A. Not -- I wouldn't say particularly knowledgeable; although,
19     I'd say I have a better understanding of it than most people
20     that don't know anything about it.
21  Q. And how did you gain that understanding?
22  A. Through my family and Mark Phillips.
23  Q. How long have you known Mark Phillips?
24  A. Oh, gosh.  Over 20 years.
25  Q. How did you meet him?

2 (Pages 5 to 8)

Jennifer Schweickert - September 12, 2014

9

1  A. Through my brother.
2  Q. Was he a classmate of your brother's?
3  A. He went to school with my brother, yes.
4  Q. Is your brother older or younger than Mark?
5  A. I believe he's older.
6  Q. Okay.
7  A. A year or two.
8  Q. How old are you?
9  A. How old am I?
10 Q. Yes.
11 A. Forty-four.
12 Q. How old?
13 A. Forty-four.
14 Q. Do you know how old Mr. Phillips is?
15 A. Yes.
16 Q. How old is he?
17 A. He'll be 40 tomorrow.
18 Q. Okay. You said you've known Mr. Phillips quite a while.
19    Did you first meet him while he was still in school with
20    your brother?
21 A. Gosh, that's hard to say. I'm not sure. He may have just
22    graduated.
23 Q. Did you stay in touch with him after the first time that you
24    met him? Or was it just something you would see him
25    periodically, you'd run across him?

10

1  A. It was just a periodical thing. Usually he'd come to our
2    house for Christmas, dinners, any kind of party that -- my
3    brother and I would have a few friends over and Mark would
4    come over.
5  Q. Where were you living at that time when you would be seeing
6    Mr. Phillips on this occasional basis? Where were you
7    living?
8  A. It depends on which time you're referring to, which year.
9  Q. You've lived a variety of places since you've graduated from
10    WSU, then?
11 A. Yes.
12 Q. Have you primarily resided in the California, or is there --
13 A. Yes.
14 Q. -- some -- in the LA area?
15 A. Yes.
16 Q. What parts of LA have you lived in?
17 A. I lived in West Hollywood for three or four years, and then
18    I moved to Orange County for a few years, and then I moved
19    back up to the LA area, north of there, to Santa Monica, and
20    I was there for 11 years.
21 Q. What was the last address you had in California?
22 A. 2045 11th Street, Santa Monica, California 90405.
23 Q. Is that a condominium? Is it an apartment? What is that?
24 A. It's a single-family home.
25 Q. And when is the last time you lived in that address?

11

1  A. Last time I lived at that address. Lived ... let's see.
2    Well, we moved some of our things up here in June of 2013.
3    And my daughter and I and Mark, we would fly, you know, to
4    and from California on occasion and stay in the house. And
5    when we weren't there we would rent it out, short-term
6    rentals, Airbnb sort of thing.
7      So I would say -- but I sold the house earlier this
8    year, in January or February, so.
9  Q. Had you ever rented out the house on these short-term bases
10    prior to partially relocating up in the Seattle area in June
11    of 2013?
12 A. I'm sorry. Could you repeat the question?
13 Q. When did you first rent out the house in Santa Monica?
14 A. I believe it was for the end of June 2013.
15 Q. So the end of June 2013. Did you list it with a broker?
16    How did you do that?
17 A. Through Airbnb.
18 Q. Okay. Did you continue to utilize that place as a place of
19    residence after you listed the house with Airbnb?
20 A. Yes. My personal belongings were in the house, and storage,
21    along with my furniture.
22 Q. When did you move the furniture up here?
23 A. After I sold the house.
24 Q. And you didn't sell the house till this year.
25 A. Right.

12

1  Q. When was that sold?
2  A. I don't remember the exact escrow closing date. I'd have to
3    look at my records. This last spring was kind of -- I know
4    it was in the spring.
5  Q. Somehow or other I heard through the grapevine that you
6    netted 900,000. Is that approximately correct?
7  A. Netted? Yes, I think so.
8  Q. How would you describe your relationship with Mark Phillips?
9    Let's go up to 2011, in the approximate time frame in which
10    you entered into this transaction with HPV. What was your
11    relationship with Mr. Phillips at that time?
12 A. He was a trusted and respected family friend of ours.
13 Q. You said "trusted and respected family friend." I assume
14    what you mean by that, for starters, would be that you
15    believe Mr. Phillips is a truthful guy.
16 A. Yes.
17 Q. And what was the basis for the respect? Was that primarily
18    based upon his intellectual acumen? What are you talking
19    about?
20 A. I think it's a collective thing. Of course there's respect
21    for his intellectual acumen, but he was one of the few
22    friends of my brother that was there throughout time and
23    history. He wasn't a fair-weather friend. He was a true
24    friend. So he was very close to our family.
25 Q. Was that generally the view held in your family generally,

Jennifer Schweickert - September 12, 2014

13

1    including your mother, for example?
2    A. Yes.
3    Q. Would that be true today also?
4    A. I believe so, yes.
5    Q. Now, what was your knowledge about the ownership of HPV?
6       And I'm going back to March and April of 2011. Was it your
7       understanding that your mother had been or might still be an
8       owner in HPV?
9    A. I'm sorry. Can you repeat that for me?
10   Q. Sure. In March or April of 2011, as you were beginning to
11      discuss lending money to HPV with your uncle, Steve
12      Schweickert, did you have the understanding that your mother
13      either had been a shareholder in HPV or was currently a
14      shareholder in HPV?
15   A. Yes.
16   Q. What was your understanding?
17   A. My understanding? From her perspective, not much. We
18      didn't really discuss it. I did most of the discussing of
19      HPV with my uncle, Steve.
20   Q. Okay. What was your opinion of Steve Schweickert at that
21      time?
22   A. I have known Steve a very long time, so it's complicated.
23   Q. I would imagine. When did he and your mother form a close
24      relationship? Do you remember when that would have been?
25   A. Around the time of my mother and father's divorce.

14

1    Q. That would have been approximately when?
2    A. 1998. But he and his wife were close with my parents for a
3       long time too, so.
4    Q. Let's go back up to March, April of 2011. Was the
5       relationship between your mother and Steve Schweickert still
6       fairly stable apparently, to your knowledge at that time?
7    A. Stable to the outside views. But someone as close to them
8       as I was knew that things weren't 100 percent stable.
9    Q. So there were some problems beginning to develop between
10      Joyce and Steve at that time?
11   A. I would say not beginning to develop. They just had grown
12      apart.
13   Q. Sure. Did you talk to your mother at all about your
14      contemplated loan or investment in HPV?
15          MR. WAYMAN: Object as to form; assumes facts not
16      in evidence. We haven't gotten into the fact that she
17      contemplated a loan to HPV.
18   Q. Did you discuss with your mother any consideration or
19      possibility of loaning money or investing money in HPV prior
20      to the time that you did it?
21   A. Define "discuss."
22   Q. Pardon?
23   A. Define "discuss." I mean, was it a two-way discussion? I
24      mean, I'm not sure what you mean, what kind of ...
25   Q. Did you talk to her at all about it?

15

1    A. Yes, I did.
2    Q. Tell me what you said and what she said.
3    A. I told her that Steve had approached me to invest in HPV.
4       And she said she didn't know anything about it.
5    Q. Didn't know anything about Steve's doing that, or she didn't
6       know anything about HPV?
7    A. Didn't know anything about Steve's doing that.
8    Q. Did she indicate any disquiet or irritation or concern about
9       the fact that Steve would do that?
10   A. She didn't say anything about it.
11   Q. She just said, "I didn't know he did that"? Is that pretty
12      much what she said?
13   A. That is pretty much what she said.
14   Q. Did she convey to you either directly or by implication that
15      she thought that was not a good idea?
16   A. No, she didn't.
17   Q. Did you ask her about what her current relationship was with
18      HPV?
19   A. No, I didn't.
20   Q. Did you believe at that time that she was still a
21      shareholder in HPV?
22   A. I think she was. I thought she was.
23   Q. You thought she was. Have you had conversations
24      subsequently with your mother on that topic as to when she
25      dissolved her relationships with HPV?

16

1    A. No, we haven't discussed that.
2    Q. Never have?
3    A. She doesn't like discussing it.
4    Q. Okay. How do you know that?
5    A. Because I've tried.
6    Q. How did you try and what was her response?
7    A. She'll change the subject.
8    Q. When did you first try to talk to her about it?
9    A. The very first? When Steve approached me for the loan.
10   Q. Okay. So when Steve approached you for the loan you tried
11      to talk to your mother about it, and she basically shut you
12      down?
13   A. She said, "You do whatever you feel is right." And I took
14      her advice.
15   Q. Okay. When did Steve first approach you with regard to
16      loaning or investing money in HPV?
17   A. That would be April of 2011.
18   Q. Are you able to pin it down at all, Ms. Schweickert? Are
19      there any phone records or notations or anything that you
20      have that would allow you to pin that down more exactly?
21   A. Nothing in writing, I wouldn't say, no.
22          I remember for my mother's birthday we went to her
23      house in Texas. And I spent a lot of time with Joyce and
24      Steve whenever they would come to California or whenever I'd
25      fly to Texas. And Steve and I spent time talking about HPV.

4 (Pages 13 to 16)

Jennifer Schweickert - September 12, 2014

17

1    He'd been working on it diligently for, I don't know, six
2    months or more. And he approached me for the loan.
3        I'm sorry. Can you ask the question again?
4    Q. Fair enough. What's your mother's birthday?
5    A. April 6th.
6    Q. And I take it you got down to Woodland or out back to
7    Woodland, Texas sometime before the 6th?
8    A. It was after, I believe.
9    Q. After the 6th?
10   A. I believe it was the following week.
11   Q. And how long were you there in Woodland?
12   A. Jeez. Anywhere from four to six days.
13   Q. How soon after you arrived in Woodland did Steve Schweickert
14   broach the topic of lending or investing in HPV with you?
15   A. Right away. Now I'm recalling that he probably called me on
16   the phone prior to Texas, but you know, I can't be sure,
17   honestly. I don't remember that as much as I remember
18   talking to him in person. Is that okay?
19   Q. Sure. Makes sense. So tell me about the conversations you
20   had with Steve when you were back in Woodland, Texas about
21   investing or loaning money to HPV.
22   A. Well, I'm not sure what you mean specifically. In terms of
23   amounts?
24   Q. Just tell me what you remember about the conversation. In
25   other words, how did he approach you? What was he

18

1    proposing? Was he presenting to you reasons why this was a
2    great investment? Was he trying to persuade you that this
3    was something you might want to do for other reasons besides
4    investment?
5        I just want to know what he said to you.
6    A. Okay. My mother's real estate agent we had gotten to know
7    fairly well. And I had emailed him saying that I was
8    interested in looking at income property in Texas and that I
9    had $200,000 to invest. The stock market had crashed. I
10   was trying to find another method to grow my money.
11       Steve found out I was looking at property and said, "I
12   have this other option for you that's going to have a much
13   better return, and you'll get to keep it in the family."
14       And I liked the sound of that. And I liked being able
15   to help out Mark Phillips and I liked being involved in
16   projects with Mark Phillips.
17   Q. Okay.
18   A. So Steve approached me about that for those reasons and gave
19   me a couple of options to choose from on how I would invest.
20   He gave me two options.
21   Q. Okay.
22   A. One would be that I invest -- if I invest $100,000, that I
23   would get paid back, it would be treated like a loan, but it
24   would also buy me into profit sharing with Hunts Point
25   Venture Group. You know, if I paid the 100,000, that I

19

1    would be entitled to 4 percent, but if I paid 200,000 I
2    would be entitled to 8 percent.
3    Q. Okay.
4    A. And I told him I needed time to think about it.
5        And there was a sense of urgency on his part, and I
6    felt a lot of pressure. He told me that Sandy Hoover wanted
7    to invest money, and that I should invest instead of Sandy
8    because it would be better to keep the money in the family,
9    but that I needed to make a decision as soon as possible or
10   else I would miss out on this opportunity.
11   Q. Okay. What was your view of Steve at that time,
12   Ms. Schweickert? Did you trust him?
13   A. That's a good question. Did I trust him? I trusted him
14   with limits.
15   Q. With what?
16   A. I had limited trust in Steve.
17   Q. Can you kind of define that for me? What do you mean by
18   that?
19   A. Well, I told him I would need more time to think about it,
20   and that if I was going to do it, I would need to speak with
21   an attorney on the other end who would be facilitating this
22   whole process, who would be responsible for this whole
23   process, who would answer, you know, to the shareholders.
24   Q. Why do you feel like the attorney would be the right one to
25   talk to?

20

1    A. Because I didn't feel Steve had adequate business acumen.
2    He had ...
3    Q. Was your limited trust of Steve primarily based upon his
4    limited business experience and acumen, or was it based upon
5    the fact that you didn't believe that he was honest?
6    A. I think it was more the first thing.
7    Q. Okay. You didn't think he was a great businessman
8    necessarily?
9    A. No, he wasn't. He was out of work for 20 years, and he was
10   kind of like, you know, bragging about the good ol' days
11   with Egghead software. And everybody had heard that story a
12   million times. And generally when people are successful,
13   they don't go around bragging about it for 20 years. So you
14   know, I had my doubts about his actual success.
15       And he was also, you know, very happy to be in my
16   mom's company and spending plenty of money that was, you
17   know, hers. I didn't have a lot of respect for him as a
18   business person.
19   Q. Fair enough.
20   A. But I believed in the concept of the company. Please don't
21   mistake that. That's very different. Just because Steve
22   was involved wasn't going to stop me from seeing a good
23   thing.
24   Q. You say you believed in the concept of the company. And
25   you're talking about at the time that you talked to Steve,

Jennifer Schweickert - September 12, 2014

21

1   you, at that time, had a -- you believed in the concept of
2   the company. Where did you get your understanding of what
3   the concept was? Was that from Steve, or were there other
4   sources?
5   A. It was mostly from Steve.
6   Q. Okay. What do you mean when you tell me that you believed
7   in the concept of the company? What was it that you thought
8   was a good thing? What was a good idea about it?
9   A. I know Mark Phillips knew what he was doing. I've seen the
10   amazing things he's created. He's a very talented
11   innovator. His vision is limitless. We've always been very
12   proud of him, and we've always believed in his ability. So
13   it wasn't about Steve. It was about Mark. It was about
14   wanting to be a part of that. Steve was just a catalyst.
15   Q. Okay.
16   A. He was actually just the first step on, you know ... getting
17   to speak with Du Wors.
18   Q. Thank you. I think I understand your comments of
19   Mr. Phillips.
20      Did you have a general understanding as to what was
21   contemplated as a business plan? How are we going to turn
22   Mr. Phillips' products -- you knew Mr. Phillips had some
23   patents?
24   A. Uh-huh.
25   Q. What was your understanding as to how those patents were

22

1   going to be monetized or turned into a cash stream?
2   A. Well, patents -- there's a reason why we have patents, so
3   that we can protect our ideas. And if people use our ideas
4   without our permission, we have the right to sue them.
5   That's very simple. The whole patent control thing is a
6   very simple concept. I never had a question about how that
7   worked.
8   Q. Right. Okay. Fair enough. And that was something you were
9   fairly clear on when you talked even to Steve? In the
10   course of those conversations you understood that the
11   primary purpose at that point in time, at least, was to
12   pursue patent infringement enforcement lawsuits, correct?
13   A. Yes.
14   Q. All right. And I appreciate your earlier answers about your
15   assessment of Steve Schweickert's ability to bring business
16   to successful fruition.
17      What exactly was it that you wanted to talk to the
18   attorney about? What were the questions that you had in
19   your mind to direct to the attorney?
20   A. Well, I knew Steve wasn't an attorney. I know boards are
21   required to have attorneys for a reason. And if this was
22   going to be treated like a real thing, it needed to have a
23   real attorney, and a competent attorney at that.
24      And I wanted to vibe him out. I wanted to meet him
25   and make sure that somebody on the other end, you know,

23

1   actually existed, and they would be willing to speak to me,
2   and they would be willing to explain how the profit sharing
3   was going to work.
4      Not necessarily because I wanted to be educated
5   100 percent about all the details. I'm not a business
6   person. I'm not a lawyer. But I wanted to make sure that
7   John Du Wors knew what he was talking about, that I could
8   have confidence in him and that I could rely on him to make
9   sure that everything was done correctly and that Steve
10   wasn't going to get in the way of messing up a good thing.
11   Q. Okay.
12   A. And that I could, that I could trust. I could get some
13   validation from an attorney, an actual live person on the
14   other end, that I would feel a lot more comfortable in
15   making a decision to invest.
16   Q. Again, I'm going back to April of 2011. What was the last
17   time that you had had any direct communication with Mark
18   Phillips as of that time? Had you had any conversation
19   either by way of email, letters, telephone calls,
20   face-to-face conversations, with him in the preceding six
21   months?
22   A. No.
23   Q. When was the last time prior to that that you'd had any
24   direct communication of any sort with Mark Phillips?
25   A. Direct communication? The last time I had seen him my

24

1   daughter was two. I think it was December -- it was New
2   Year's Eve, December of 2008, I think. He came to a family
3   gathering.
4   Q. Okay.
5   A. But there were a lot of people there. New Year's Eve, you
6   know.
7   Q. Sure.
8   A. But I had a two-year-old at the time, so you know, I was
9   busy with mothering.
10   Q. Sure. Did you have any conversation of any substance at all
11   with Mark on that occasion, if you recall?
12   A. No, I did not. I was unaware of all the stuff that was
13   going down.
14   Q. When did you first become aware that your mother and Steve
15   were getting involved in an enterprise that involved Mark
16   Phillips and his intellectual property? When did you first
17   become aware of that?
18   A. I think it was in the fall of 2010 sometime.
19   Q. How did you become aware of it?
20   A. Through Steve.
21   Q. What did he tell you?
22   A. Well, first there was the drama around Mark's criminal
23   conviction, or you know, indictment at the time. Everybody
24   was very upset, very surprised, feeling like it was
25   completely unfair. And we wanted to protect him in any way

Jennifer Schweickert - September 12, 2014

25

1    we could.  You know, that's what families do.  So we started
2    talking about that.
3        And then Steve and Mark met a few times with some
4    other mutual friends, Mark's mutual friends.  They're all
5    from the same school.
6    Q.  Is Rudkin one of those?
7    A.  Yes.
8    Q.  How about Kenn Gordon?  Is he one of them?
9    A.  I don't believe Kenn Gordon went to that school.
10   Q.  How about Doug Lower?
11   A.  I think Doug Lower went to that school.  I'm pretty sure.
12   Q.  Okay.  And your brother Jeff?
13   A.  Uh-huh.  But he wasn't involved in any of those discussions.
14   Steve and Jeff didn't get along.
15   Q.  Okay.  What does Jeff do?
16   A.  I don't know.
17   Q.  Okay.
18   A.  The last I heard he paints and he has cats and he rides a
19   motorcycle and he likes poker.
20   Q.  That sounds like a good life.
21   A.  I hope so.
22   Q.  Let me jump ahead and I'll come back to this time frame
23   again.
24       But have you subsequently learned things about Steve,
25   given the travails between him and your mom and the shakeout

26

1    there and other events, that would cause you to change your
2    opinion of him?  Would you tell me today that you think he's
3    an honest guy?
4    A.  An honest guy?  Boy, that's hard.
5    Q.  Is he going to tell the truth?
6    A.  What?
7    Q.  Is he going to tell the truth?
8    A.  Is he going to tell -- yeah, I do.  I believe he's going to
9    tell the truth now because he got himself into a big ol'
10   mess.
11   Q.  Do you think he consistently has told the truth throughout
12   getting into this mess?
13   A.  I'm sorry?
14   Q.  Has he consistently told the truth --
15   A.  No.  No.  He had a major drinking problem and he was hiding
16   his illicit affair.  Like I said, he made a tangled weave --
17   or web, so.
18   Q.  Do you think he's a new man now?
19   A.  I don't know.  Nobody can really turn all the way new.  But
20   I think that he has enough support and enough advice in his
21   life and he doesn't want any more trouble and he wants to
22   set the record straight.  I believe that.  I do believe
23   that.  I trust him in that manner.  I think he's got a good
24   heart.  He's not a perfect person.
25   Q.  I gathered that.  When did you first have a conversation of

27

1    any sort with John Du Wors?
2    A.  That was the only conversation.  In April, I believe it was
3    on or around the 22nd.  I thought it was on a Friday, around
4    noon.
5    Q.  Friday around noon.  You think April 22nd sounds about right
6    to you?
7    A.  I think so.  It was just shortly before I made the wire
8    transfer.
9    Q.  Were you back home in California then?
10   A.  I was in California, but I was at my mother's home in
11   Malibu.  We had been staying there, so.
12   Q.  Okay.  Did Steve call you or did you call Steve?  How was
13   the connection made?
14   A.  Steve arranged for the phone call between, you know, Du Wors
15   and I so he could introduce us.  The call came in to the
16   landline.
17   Q.  The call came in to the landline at your mother's house in
18   Malibu?
19   A.  Uh-huh.
20   Q.  Was anyone present on your end of the line besides you?
21   A.  Just me.
22   Q.  And what were you told as to who was on the other end of the
23   line?
24   A.  What was I told?  Du Wors and Steve.
25   Q.  Okay.  And you knew Steve's voice, obviously.

28

1    A.  Yes.
2    Q.  You didn't know Du Wors' voice?
3    A.  No.
4    Q.  Steve introduced him as being on the line with him?
5    A.  Uh-huh.
6    Q.  You need to say yes --
7    A.  Yes.  Sorry.
8    Q.  We all talk that way, Ms. Schweickert.
9        Did you have an understanding as to whether or not
10   Steve and John Du Wors were in the same room physically, or
11   did you have a different understanding, if you know?
12   A.  My understanding is that they were at his office, they were
13   at Du Wors' office together.
14   Q.  So the call would have been initiated at Du Wors' office?
15   A.  Yes.
16   Q.  All right.  Take me through that call, if you would,
17   Ms. Schweickert.  So you get the call and you answer the
18   phone.  And I assume the first voice you hear is Steve's.
19   A.  Steve introducing me to Du Wors.  We say hello.  Du Wors
20   introduces himself.  He talks about -- what he did -- well,
21   I asked him -- he said, "What can I do for you?"
22       And I said, "Steve's telling me about HPV.  He's told
23   me wonderful things.  What is your role?"
24       He explained what his role was.  He went into a little
25   bit of a thing about what patent trolling is, and that took

Jennifer Schweickert - September 12, 2014

---

29

1    up about five minutes.  And then I asked him how the
2    corporation would be run, how profit sharing would work, how
3    all these pieces of Hunts Point Ventures and all the little,
4    you know, cluster constellation that we have that we're
5    trying to set up, how that would all work, who would get
6    paid first.
7        And my general understanding and remembering of the
8    call was that it was still kind of a new concept.  They had
9    just formed HPVG, but they didn't really -- it wasn't a
10    well-oiled machine yet.
11        So I was told what things were going to be like in
12    theory, and that my investment in the company would allow
13    for Du Wors to get everything running up to speed and to
14    start prosecuting patents, but that a big chunk of my
15    investment would go to pay down the balance due on Mark's
16    criminal defense.
17    Q.  Okay.
18    A.  But that once that was taken care of, then it would free
19    Du Wors up to then vigorously prosecute the patents so that
20    we were, you know, going to be able to make a lot of money.
21    Like, that term, "a lot of money," was kind of a joke in the
22    phone call.  We kept saying it.  Everybody was all excited
23    about the money.
24    Q.  Okay.  And by "a lot of money," what was meant by that?  Was
25    that ever --

---

30

1    A.  Mainly jokes about Learjets.  I mean, what else are you
2    going to do with a lot of money, right?
3    Q.  Sure.
4    A.  I had mentioned the two investment structures that Steve had
5    given me, and we talked a little bit -- the three of us
6    discussed that a little bit.
7        At the -- towards the end of the phone call Du Wors
8    asked me, "So which one do you think you're going to go
9    with:  The $100,000 for 4 percent profit sharing or the
10    $200,000 for 8 percent profit sharing?"
11        And I said, "Well, I believe you know what you're
12    talking about.  I have confidence in your ability" -- even
13    though I had some reservations about his personality.  He
14    didn't really rub me the right way, but that didn't, you
15    know, stop me from thinking that he could do a good job.
16        And I had some faith that Steve wasn't completely
17    wrong about Du Wors at the time.  I thought Steve was coming
18    from the right place in helping Mark and helping the rest of
19    our family.
20        And so I said, "Well, gosh, you know, after talking --
21    you know, it's been a short talk, but I've got a pretty good
22    feeling about things.  I'm probably going to go with the
23    200,000."
24        And that's when Du Wors said, "Huh.  Smart girl."
25        And it felt awkward.  I mean, to say the least, it

---

31

1    just was like -- I really didn't know how to process it at
2    the time, but I felt like it was a backhanded something
3    disguised as a compliment to go over my head.
4        I really didn't have a lot more -- I couldn't -- what
5    more information was I going to be able to glean from
6    speaking with either of them on the phone to know if this
7    was an excellent proposition?
8        But I believed in the concept.  I believed in Mark
9    Phillips.  And I was assured in that phone call that Mark
10    was going to be on board and running the company.  And that
11    was the only reason I invested the money.  I would never
12    have given my money blindly to Steve, or to Chad for that
13    matter, who was running, you know, the company up until
14    whenever it went in receivership.
15    Q.  Sure.  What was your understanding or knowledge with regard
16    to Mark's corporate track record, that is, companies that he
17    had run?  When was your understanding?
18    A.  My understanding of Mark's corporate track record?
19    Q.  Yes.
20    A.  My understanding is that he got caught in a horrible
21    situation of corporate espionage, and they pretty much
22    burned his entire company to the ground after they locked
23    him out.  But it was a scam.  And the attorney that was on
24    the board has just been indicted in New York.  So I mean,
25    he's been saying this all along.

---

32

1    Q.  That's not Cane, is it?
2    A.  Yes, Cane.
3    Q.  It doesn't surprise me.
4    A.  So he was the victim of a bad situation, so.
5    Q.  You're talking about M O D?
6    A.  Yeah, MOD.
7    Q.  You knew at this time, that is, in April of 11, that Mark
8    had actually been convicted on March 2nd, didn't you?
9    A.  Yes.
10    Q.  And I don't recall that he'd been sentenced yet, but did you
11    have any understanding of -- strike that.
12        Did you talk with Mr. Du Wors at all about what Mark's
13    situation was with regard to what anticipated sentence or
14    disposition he might be looking at?
15    A.  It might have been mentioned.  I wasn't worried about that.
16    It was a four-year sentence, or you know -- and I don't
17    remember when I knew that, if I knew that during the phone
18    call or not.  But I had confidence that it wasn't going to
19    be that long, that he'd be out and running the company.
20        So I wanted to make sure that Du Wors was cool with
21    that and that that was the whole point of having Du Wors
22    wear both hats, to defend Mark to try to keep him out of
23    prison, which we, you know, would have hoped he would have
24    tried to do.
25        And then, you know, of course, have all the knowledge

---

Jennifer Schweickert - September 12, 2014

33

1    of how the IP works so that he could then help Mark run the
2    company. That was the intent.
3    Q. You just used a phrase that kind of prompts me to ask you
4       another question. You said: We would hope that John would
5       at least try to keep Mark out of prison.
6          Do you have any reason to think that Du Wors threw the
7       fight in the criminal trial, screwed it up?
8    A. I believe he did.
9    Q. You believe he did?
10   A. (Nods head.)
11   Q. And what's the basis for that belief?
12   A. There was exculpatory evidence that wasn't introduced.
13   Q. And you're referring to the licensing agreement between MOD
14      and other entities, including Mark? Or what are you talking
15      about?
16   A. That's probably the big one, the licensing agreement.
17   Q. Okay. Anything else?
18   A. I'd really rather not ... I mean ...
19   Q. Whatever you know you need to tell me.
20   A. Jesus. I'm just shocked. I'm really shocked.
21   Q. About what?
22   A. When I see, when I see the licensing agreement and how clear
23      it is with the signatures, with the, you know -- everything
24      that's been -- it wasn't just Du Wors too. It was like ...
25      I mean, the FBI had so many files to go through, but how

34

1    hard is it to do a search on a computer, you know, this
2    particular subscription agreement, license agreement? How
3    hard is it to do a search?
4          And the computer forensic experts that went through
5       everything after the FBI turned everything back, they found
6       everything. It was all right there. But Du Wors, he never
7       hired a forensic team. Who does that?
8          I mean, you're dealing with, you're dealing with --
9       this is a computer-related issue, really, I mean, when it
10      comes down to it as far as evidence: Where's this page?
11      Where's this page?
12         It's all -- send it to the computer expert people.
13      Why didn't he do that? I don't think -- I think he had a
14      motive to keep Mark locked up. That's what I believe about
15      Du Wors.
16   Q. Okay.
17   A. But you know what? That's not why I'm here.
18   Q. I understand.
19   A. I do have opinions about Du Wors outside of this case, but
20      this case is about me and how he screwed me directly, so.
21   Q. Fair enough. Let's go back to the conversation that you had
22      with Du Wors and Steve Schweickert. How long was the total
23      conversation, if you remember?
24   A. I would say it was somewhere between 15 and 20 minutes.
25   Q. Some of the topics that you said that you discussed during

35

1    the course of that 15 to 20 minutes, which included a
2    5-minute dissertation by Mr. Du Wors about how patent
3    trolling worked, you said that you questioned how the
4    corporation was to be run.
5       Tell me about that. What were you told in that
6    regard?
7    A. I just wanted to see what his general idea of who would be
8       on the board, how would -- how often would board meetings
9       be. I just wanted to know that he knew what he was doing.
10         I don't have too much knowledge. I've been in board
11      meetings before, but I'm not -- I just wanted to make sure
12      that there's -- that everything's being done correctly, so.
13   Q. What did he tell you as to who was going to be on the board?
14   A. I don't remember. I know that there were -- I believe there
15      was Steve, Mark -- absolutely Mark, Chad, Doug Lower at one
16      point. But I guess Steve and Doug Lower ended up in an
17      argument prior to my investment, so I wasn't sure what the
18      state of Doug would be. Kenn Gordon.
19   Q. You said one of the other topics was: How does the profit
20      sharing work?
21   A. Uh-huh.
22   Q. Tell me about that. As much as you can remember, in as much
23      detail as you can, tell me about that aspect of the
24      conversation.
25   A. I just wanted to invest my money into something that was

36

1    going to give me dividends. I needed to find something else
2    to invest in after the stock market crashed. And that was
3    the whole point in looking for income property, so that I
4    could fix up the condos or whatever they were and then
5    receive rent money every month.
6       I wanted to make sure that I was getting a monthly --
7    something that would yield some monthly cash. So that's why
8    I wanted to know about it.
9       And I don't remember the details. Just, you know, the
10   8 percent of HPVG, there was profit sharing, apparently the
11   settlements that came from prosecuting patents would go into
12   HPVG, where they would be paid out to the investors and paid
13   out to whoever else was owed money.
14   Q. Okay. You said one other topic you talked about was how the
15      pieces of HPV would work together. What do you remember in
16      that regard?
17   A. Pieces of HPV. Well, I know that Steve had talked about,
18      you know, wanting to protect Mark's IP and having it sitting
19      over here. Like, he drew circles on the page and said,
20      "Here's Mark's IP and then here's HPV. And so Mark is over
21      here and then HPV is here and this other company HPVG is
22      here. And we can have, we can have as many as we want."
23         And I was just like, okay, I get the concept. But it
24      was such a general understanding. I mean, it wasn't like I
25      could repeat details.

Jennifer Schweickert - September 12, 2014

37

1  Q. Okay. In the course of that conversation was there any
2     other source of income discussed other than what we've
3     called, for shorthand, patent trolling? Any other source of
4     income discussed?
5  A. I'm sorry. Was there any other source of income discussed?
6  Q. During that conversation on approximately April 21st or 22nd
7     with Du Wors and Steve Schweickert was there any other
8     source of income that was discussed or anticipated for HPV
9     other than that which was to be realized from the
10    patent-trolling operations?
11 A. Yes, absolutely. There was -- gosh, I forgot to mention
12    that. When Steve handed me the two proposals, there were
13    also a couple of other pages in there: One was an email
14    between Du Wors and Steve talking about what they were
15    doing; and then there was this article about Digicor and
16    they were in the process of -- or I think they sent me a
17    draft complaint or something that was in the process, that
18    they were expecting to have a settlement happen sometime
19    very soon.
20       Which, to my knowledge, I think they settled within a
21    month after I invested the money. So I was expecting, you
22    know, some kind of paperwork about that.
23 Q. But the Digicor, that was part of the patent-troll
24    operation, was it not?
25 A. Yes. Yes.

38

1  Q. What I'm getting at is: Was there anything else besides the
2     patent trolling discussed as a profit center, potentially?
3  A. I'm not sure I understand the question. I'm sorry.
4  Q. Well, all I'm trying to find out -- and it may be that there
5     really was nothing there, so that's what I want to
6     determine.
7        I gather from your testimony that the only source of
8     income that was discussed on the occasion of this
9     conversation on April 22nd, 2011 was the income which would
10    be anticipated from the patent-trolling operation. Correct?
11 A. To my knowledge. But I mean, it had room for growth, and I
12    was under the impression I would be the last investor.
13 Q. Okay. Do you have any reason to believe that you weren't
14    the last investor?
15 A. No.
16 Q. In fact, you probably were, weren't you?
17 A. I think so. I was supposed to help pay off, you know, some
18    of the balance for Mark's criminal defense, and then that
19    would free up the company. And then once they got their
20    settlement from Digicor, they would have more money and then
21    they'd be off and running.
22 Q. Right. One other topic you said was discussed was the
23    question of who gets paid first. Tell me about that.
24 A. I just wanted to know what he knew. I wanted to know if he
25    had set it up, if it was -- you know, these are things

39

1     that -- I mean, running a corporation, I know that you have
2     to have an operating agreement, you have to have bylaws, you
3     have to have all kinds of contracts in order to make things
4     run smoothly so that, you know, if somebody doesn't get paid
5     they could say, "Hey, here's this contract. I want my
6     money," or whatever.
7        So I just wanted to make sure that there was some kind
8     of a structure.
9        And I was being very lenient because it was a family
10    endeavor. And I figured, all right, you know, Steve is in
11    this for himself. I know that about Steve: He's
12    self-serving. And if he's in it for himself, that means
13    that I can, you know, sort of trust to make sure that he's
14    going to make sure that this is done in a prudent manner.
15       So that's all I meant by that.
16 Q. So what were you told about those questions that you were
17    addressing to him, other than, "Well, we're going to put
18    together contracts" -- because you had mentioned several
19    elements that you expected to be present for an orderly
20    administration of this business enterprise. What were you
21    told in response to your inquiries?
22 A. I was told how it would be -- how everything was structured.
23 Q. Okay.
24 A. It was a very mechanical discussion. The details were over
25    my head. I couldn't even tell you the words he used. It

40

1     was like business jargon between plumbers. You know, you
2     don't know what they're talking about. But it's a language
3     they have, and as long as they're knowledgeable about it,
4     then you trust that they know what they're doing.
5        But I was told that ... I was told that I was going to
6     get paid 8 percent of the profits that came in from the
7     litigation settlements.
8  Q. Okay. What else were you told?
9  A. That I would get my $200,000 loan back, that I would get
10    $11,000 on December 31st of 2011, and that I would receive
11    the rest of that loan plus interest by October of 31st of
12    2012.
13 Q. Okay.
14 A. So that it was worth it to me. I mean, that sounded like a
15    really, a really good deal. I would be, you know,
16    permanently involved in a company with profit sharing and I
17    would get my 200 back, plus interest.
18       (Exhibit No. 1 marked for identification.)
19 Q. Ms. Schweickert, the reporter has handed you what's been
20    marked for purposes of the deposition as Exhibit 1. Have
21    you ever even this before?
22 A. Yes.
23 Q. What is it?
24 A. It's my suit against HPV, the Rudkins and Du Wors.
25 Q. Okay. If I remember, this is the original complaint, and

Jennifer Schweickert - September 12, 2014

41

1    there were two subsequent amendments.  We'll get to those
2    later.  But for now my questions are directed pretty much to
3    the allegations and substances set forth in this initial
4    complaint, which is reflected as having been received by my
5    clients on or about April 16th, 2013.
6         Would you look at the next-to-last page of Exhibit 1,
7    Ms. Schweickert.
8    A.  The signature page?
9    Q.  Yes.  That is your signature?
10   A.  Yes.
11   Q.  And I take it that before you signed this you did notice,
12   among other things, it says, "I declare under penalty of
13   perjury under the laws of the State of Washington that the
14   foregoing is true and correct to the best of my knowledge."
15        That was a true statement, was it not?
16   A.  Yes.
17   Q.  And you had read the complaint?
18   A.  Yes.
19   Q.  All right.  And have you had a chance to review this
20   complaint recently?
21   A.  No, I have not.
22   Q.  Have you read it since the date that you actually first read
23   it and signed that verification?
24   A.  No.
25   Q.  Do you have any reason to think that any of the facts which

42

1    you set forth in support of your claim are, in fact,
2    incorrect?
3    A.  Not to my knowledge.
4    Q.  Okay.  Who assisted you in putting this together?  Was that
5    your attorney, or did Mr. Phillips assist you also?
6    A.  My attorney.
7    Q.  Did Mr. Phillips have anything to do with it?
8    A.  No.
9    Q.  Are you sure about that?
10   A.  Am I sure about that?
11   Q.  Yes.
12   A.  Yeah, I'm sure about that.  He helped me organize paperwork.
13   That's all.  But I spoke with Reed about it directly.
14   Q.  Okay.  Fair enough.  Ms. Schweickert, I don't want to go
15   through every detail in this complaint, but I do want to go
16   through some of the allegations here just so I understand
17   what your recollection of the facts are.
18        Page 2, in what's designated as the Introduction, the
19   second paragraph of that you are discussing what you believe
20   and understand to have been the purpose of HPV.
21   A.  Uh-huh.
22   Q.  And it says on the third line of that second paragraph, "The
23   principal goal of HPV was to monetize intellectual property
24   of Mark Phillips."
25        And that's a correct statement, is it not?

43

1    A.  Yes.
2    Q.  Going down four more lines you say, "but primarily to
3    provide capital to Mark Phillips who was going through
4    significant civil litigation as well as fighting criminal
5    charges."
6    A.  Yes.  And I, yeah, told you about Du Wors and I talking
7    about that, yes.
8    Q.  And you also, I think, might have made mention, at least by
9    inference, to the MOD litigation as well.
10   A.  I'm sorry.  Say that again.
11   Q.  You understand that Mark was also involved in litigation
12   with MOD?
13   A.  Uh-huh.  Yes.
14   Q.  All right.  Then you get to the allegations on line 18,
15   "Plaintiff" -- and that's you -- "is a personal friend of
16   Mr. Phillips and was interested in investing HPV because the
17   investment would go toward helping Mr. Phillips."
18   A.  Uh-huh.
19   Q.  Correct?
20   A.  Yes.
21   Q.  And that's a true statement, is it not?
22   A.  Absolutely, yes.
23   Q.  And then you go on to say, "and would be secured by the
24   licensing revenue of HPV."
25        Now, when you say licensing revenue, are you referring

44

1    to the patent-trolling operation?  Is that what you meant by
2    that, or --
3    A.  I think so, yeah.  That's licensing revenue.
4    Q.  All right.
5    A.  Fancy legalese.
6    Q.  Okay.  Fair enough.
7    A.  Covers the concept.  Thank you.
8    Q.  All right.  Going to page 3.  And some of this may be a
9    little bit like your earlier testimony, but some of it adds
10   a little more.  On the top paragraph on page 3 you say,
11   "Ms. Schweickert was assured by Steven Schweickert and
12   defendant John Du Wors that her investment would go to pay
13   Mr. Du Wors past due fees."
14        That's a correct statement, is it not?
15   A.  Yes.
16   Q.  "Which would allow him to aggressively pursue the patent
17   litigation."
18        That's also a correct statement, is it not?
19   A.  Yes.
20   Q.  All right.  Now, do you have any reason to doubt that a good
21   part or a substantial part of the money that you loaned did
22   go to Mr. Du Wors directly to pay fees incurred on behalf of
23   Mr. Phillips?
24   A.  I am aware -- I was aware that he got about half of them,
25   so.

45

1    Q. Okay. But that was something you anticipated when you
2        loaned the money?
3    A. Yes.
4    Q. But you also expected that once he had resolved, got those
5        bills paid, that the money that you advanced would also
6        allow him to pursue patent litigation?
7    A. Yes.
8    Q. And do you have any reason to believe that that did not
9        happen?
10   A. The Digicor settlement happened. I never received anything.
11   Q. Do you know what happened to the Digicor proceeds?
12   A. No. I was never privy to anything.
13   Q. Do you know whether or not there were any profits realized
14       from the Digicor settlement?
15   A. I thought they settled for -- I don't remember, but I
16       thought it was in the -- what sticks in my brain is 150,000.
17       And I thought that was kind of -- maybe it was more than
18       that. I don't, I don't remember because I wasn't told. I
19       didn't receive any paperwork on it. But I never received a
20       dime, never got anything back.
21   Q. Okay.
22   A. They still owe me.
23   Q. Now, I know from one of the allegations in the complaint --
24       and I can pin it down if you need for me to -- that
25       relatively shortly after the investment that you were

46

1        contacted by Steve Schweickert to confer with you about what
2        your views were on investing in another corporation.
3        Correct? Was it Viacam? Does that ring a bell?
4    A. Oh, yeah. Viacam? I think there was one other -- and I
5        just wanted to keep the money in HPV. You know, why spread
6        it so thin? He had all these other ideas, and I said, "No,
7        no, no. Let's stay -- let's just put the money in one place
8        and see how it goes."
9    Q. How soon after the investment was that conversation with
10       Steve Schweickert regarding the possibility of investing
11       money in a third-party entity, a non-connected entity, if
12       you will, to HPV? How soon after?
13   A. It was really soon after. I would say within a week or two.
14       Because I didn't talk to Steve ever again after that.
15   Q. Was that because there was a fairly imminent breakup between
16       him and your mom?
17   A. Yeah. Yeah.
18   Q. Let's go back to the conversation. Did it strike you as odd
19       that Steve was calling you to ask you about the advisability
20       of an investment?
21   A. Why would it be odd? I was supposed to be a board member.
22       He was supposed to ask permission. It wasn't an odd request
23       at all.
24   Q. When were you told that you were supposed to be a board
25       member?

47

1    A. When I made the investment.
2    Q. Who told you that?
3    A. I would have voting rights. I don't know. Jeez. From the
4        conversation I had with Du Wors and Steve I was told that
5        there would be board meetings, that I would be going, that I
6        would be voting, that there would be, you know, an organized
7        situation, that it wasn't, it just wasn't up to that yet,
8        but they needed money to be able to make it that way, so.
9    Q. So let me get back so I understand. So in the course of the
10       conversation on April 22nd, 2011, either Steve or Du Wors
11       said to you, "You're going to be a board member of HPV"?
12   A. Uh-huh.
13   Q. You've got to say yes or no.
14   A. Yes. Yes.
15   Q. How did you feel about that announcement? Did it come out
16       of the blue, or is that something you were expecting?
17   A. I expected that.
18   Q. Why did you expect that?
19   A. Why did I expect that? Because it was an investment, I was
20       buying into a company, and I was expecting to do profit
21       sharing. And of course I'm going to have an interest and
22       say in what decisions the company makes at that point.
23   Q. You'd already had in hand the proposal from Steve, the
24       options that were in written form at that time?
25   A. I got a very rough idea from that. I knew that more details

48

1        would be to come. Steve was just giving me the proposal as
2        it was.
3    Q. When did you get that?
4    A. When did I get it?
5    Q. Did you get that before the conversation on April 22nd?
6    A. Yes. I received the, you know, the you know -- what do you
7        call it? I wish I knew what to call those. The options.
8    Q. Let's do this.
9    A. I received those in April while I was in Texas.
10                (Exhibit No. 2 marked for identification.)
11   Q. The reporter has handed you what's been marked for the
12       purposes of this deposition as Exhibit 2. What is that,
13       Ms. Schweickert?
14   A. Well, it says Promissory Note and Joint Participation
15       Agreement.
16   Q. It's actually kind of a package. My recollection is that
17       there's some optional forms in here. I don't know why
18       they're packaged together. I think this was the way that it
19       was presented from your attorneys to me, that it was somehow
20       provided to you in this format.
21           Is this what you were talking about that you got from
22       Steve Schweickert?
23   A. Yes.
24   Q. And this was something you had in hand before the telephone
25       call on the 22nd of April, correct?

49

1    A.  Yes.
2    Q.  And when you got it from Steve, since you were contemplating
3        loaning some money, I'm assuming that you went through these
4        and looked at them.
5    A.  Uh-huh.  Yes.
6    Q.  You went through the promissory note, correct, which says
7        that HPV owes you 200,000 plus 8 percent interest, and sets
8        forth the general payment dates?
9            Then there was an attachment, which was called Exhibit
10       A, Loan Funding Schedule, and Exhibit B, which is entitled
11       Proposed HPVG, LLC, Participation Schedule.
12   A.  Uh-huh.
13   Q.  Did you look at that?
14   A.  Yes.
15   Q.  And I am assuming that you looked on to see if you were on
16       the list.  You saw yourself on the list, didn't you?
17   A.  Yes, I did.
18   Q.  And did you see what your status, what your participation
19       role was?
20   A.  Oh, it says passive member.
21   Q.  Yes.  What did that mean to you?
22   A.  Well, passive would mean no voting, I guess, now that I'm
23       looking at it.
24   Q.  So when you took the call on the 22nd you did not have any
25       expectation that you were going to have any vote in this

50

1        entity, did you?
2    A.  I still did.
3    Q.  Why did you?
4    A.  This word didn't mean anything to me for some reason.  This
5        was just a proposal.  This was not -- I mean, this was --
6        yes, this was to say, "Yes, Jennifer, this is what you are
7        entitled to, 8 percent, and that we would do, you know, some
8        further tightening of the screws on how this would all work
9        later."
10           But this was just to get the money into the company.
11       This was just their way -- their vehicle of getting an
12       outline.
13   Q.  When I just asked you about what the "passive" meant, your
14       response to me just a moment ago was, "I guess it means
15       nonvoting"?
16   A.  I'm seeing that now.
17   Q.  So in that conversation on April 22nd, since I assume your
18       response would have been the same back then as it would today,
19       did you raise that issue with Du Wors and Steve Schweickert
20       and say, "Look, I see that you've got me down as a
21       passive" --
22   A.  No, I did not.  Yeah, I didn't.
23   Q.  How did this issue of your being a director come up?  Who
24       brought it up?  Steve?
25   A.  I'm not sure.  I didn't ask.

51

1    Q.  As best you can recollect tell me exactly, as close as you
2        can, what you were told in that regard.  That is, "Jennifer,
3        look, as an additional incentive we're going to make you a
4        director.  Or as an additional incentive you're going to get
5        a gold star by your name on the stockholders" --
6    A.  No, it wasn't like that.
7    Q.  What were you told?
8    A.  Well, he was calling and asking about, you know, advice:
9        "Should we do this thing with Viacam?"
10           And I was, like, "No.  This is -- no.  Look, we're
11       family."
12           It's a little bit more -- it's not as formal -- it
13       wasn't as formal with Steve and me.  We were on the phone
14       all the time about different things.  My computer would
15       break down, I'd call him and he would, you know, help walk
16       me through stuff.  If there was an issue with my mom, we
17       would, you know, talk it out.  I'm just saying that we
18       talked about a lot of things.  It was a very informal
19       relationship.
20           So my understanding was that this was taken from a
21       template and just, you know, given to look like, you know,
22       we were being prudent about outlining the terms of my loan.
23           And this "passive" word, it jumps out at me now where
24       it didn't before.  So the fact that he asked me, though, let
25       me know that my input's important.

52

1    Q.  But that was after the fact.  That was after the money was
2        already in, wasn't it?
3    A.  Yeah, it was.
4    Q.  So I just want to be as clear as I can, and I want you to be
5        clear in your own mind too.  Do you think maybe that your
6        first assumption that you were going to be a director might
7        have come when Steve called you after the investment?  Or
8        are you pretty sure that that was discussed on the 22nd?
9    A.  I think it came before.  I think we talked about having
10       group meetings and discussing things.
11           We were always talking about it and exchanging ideas.
12       I had ideas, and Steve would be, like, "I like that idea.
13       We're going to do that."
14           So it wasn't -- I never expected to open this up and
15       see "passive."  But I guess in my mind if at the time that I
16       had seen this word and it had registered, I would have
17       believed that through time it would have changed, I could
18       have bought into a more active position.  So it didn't
19       really concern me.
20   Q.  Okay.
21   A.  I still expected my investment back and I still expected
22       profit sharing.  So as far as, you know, voting and not
23       voting, I understand the position of -- I'm actually a
24       passive member of a board right now, so it's not the end of
25       the world.  That can change.  It just takes a few votes, so.

Jennifer Schweickert - September 12, 2014

---

53

1   Q. You're a passive member of a board now?
2   A. I believe so. I mean, at some point ...
3   Q. Okay.
4   A. Yeah. But I was a voting member, and you know, it just runs
5       its course throughout the year and then people vote new
6       members to who votes and who doesn't. You know, it's a
7       fluid thing.
8   Q. Turn to page 5 of Exhibit 1. Not Exhibit 2 but Exhibit 1.
9       We're back to the Complaint now.
10  A. Okay. Page 5?
11  Q. Page 5.
12  A. Okay.
13  Q. Paragraph 11, "HPV was set up to monetize the intellectual
14      property of Mr. Phillips by prosecuting those violations of
15      the IP. Mr. Phillips recommended his attorney, Mr. Du Wors,
16      as the attorney to prosecute the IP violations."
17  A. Uh-huh.
18  Q. You have to say yes.
19  A. Yes.
20  Q. And where did you --
21  A. I didn't know that was a question.
22  Q. Is that something that Mr. Phillips told you?
23  A. What?
24  Q. Did Mr. Phillips tell you that he recommended Mr. Du Wors as
25      the attorney to prosecute the IP violations?

---

54

1   A. He told Steve that.
2   Q. He told Steve that?
3   A. Yes.
4   Q. And how do you know that?
5   A. Because Steve told me.
6   Q. Okay. And have you ever heard anything from Mr. Phillips
7       that would lead you to believe that that's not correct?
8   A. No. What I understand is that there was already a patent
9       attorney on board. I forget -- I think it -- was it Smith &
10      Hennessey? I don't remember.
11  Q. Whitaker.
12  A. Okay. There was already somebody lined up to do the job
13      that Mark was confident in. And Du Wors talked Steve and
14      Mark out of that deal and wanted to be in that position
15      instead. That's what I understand happened.
16  Q. Is that something that Mark told you?
17  A. Yeah. It's what Steve told me too.
18  Q. Okay. When did Steve tell you that?
19  A. Well, I read it in his Declaration, I mean ...
20  Q. Okay.
21        THE WITNESS: Would this be a good time to take a
22      break?
23        MR. FRANKLIN: Sure.
24        (A break was taken from 10:37 to 10:48.)
25  Q. Back to Exhibit 1, which is the Complaint, Ms. Schweickert,

---

55

1       that we were looking at before the break. And I want to
2       direct your attention to page 6. I want to quickly run
3       through some of these things.
4   A. Okay.
5   Q. You say in paragraph 16, "Mr. Du Wors met with plaintiff."
6       And you're referring to the telephone conversation, right?
7   A. I'm reading it. I'm not sure what this part is about.
8   Q. Okay. Well, put it in context there. I want you to be
9       certain of your answer, so. You can start with maybe
10      paragraph 15.
11  A. Okay.
12  Q. It says, "Plaintiff was introduced to Mr. Du Wors while
13      considering her 'investment' in HPV."
14  A. Yeah. I don't know why that's in quotes, but yes.
15  Q. Well, let me --
16  A. It wasn't pretend.
17  Q. Well, let me ask you about that. It certainly was a little
18      bit of -- the loan or investment -- and I'm not trying to
19      trap you -- but it was a little bit of a hybrid the way it
20      was eventually presented to you by Steve Schweickert, wasn't
21      it?
22  A. Yes. Yes.
23  Q. In other words, there was a clear contractual obligation by
24      HPV to pay you the 200,000 plus accrued interest, correct?
25  A. Yes.

---

56

1   Q. I don't think there's ever been any question about that.
2       But in addition to that, as an additional incentive,
3       it was pretty clearly lined out that you would be given an
4       8 percent interest in this entity called HPVG, that is,
5       Hunts Point Venture Group, LLC, correct?
6   A. Yes.
7   Q. And it was your understanding that in general there was some
8       kind of a profit-sharing relationship between HPVG and HPV?
9       Or what was your understanding in that regard?
10  A. That was my understanding, that it was a vehicle for profit
11      sharing.
12  Q. What were you told as to how the profits would be split as
13      between HPV and HPVG? Was there going to be a 50/50 split
14      between those two corporate entities, or was there going to
15      be some other formula? Did you have an understanding in
16      that regard?
17  A. No, I did not have an understanding in that regard.
18  Q. Okay. But you did have a clear understanding that HPVG was
19      going to receive at least some of the profits from the
20      patent-trolling operation, correct?
21  A. Yes.
22  Q. All right. And then you would have an 8 percent interest in
23      HPVG, no question about that, correct?
24  A. Yes.
25  Q. Now, taking it in that context, we're down at paragraph 16,

---

57

1    you say, "Mr. Du Wors met with plaintiff and orally
2    represented that the majority of plaintiff's loan would go
3    to pay for Mr. Phillips' mounting legal fees."
4         And that is true, he did tell you that, did he not?
5    A.  Yeah, he mentioned that.
6    Q.  Okay.  But it was also clear in your mind that Mr. Du Wors
7    also assured you that the plaintiff's loan, your loan, would
8    allow him to vigorously pursue any patent violations,
9    correct?
10   A.  Yes.
11   Q.  And we already talked briefly about the Digicor litigation,
12   which did settle as you were advised, but they didn't give
13   you any details.  You never got any accounting on those
14   moneys at all, did you?
15   A.  No.
16   Q.  Were you aware as to whether or not there was any other
17   patent litigation that was initiated by Mr. Du Wors or his
18   firm?
19   A.  Not at that time.
20   Q.  Did you later learn that there was other patent-enforcement
21   litigation filed by them?
22   A.  There was one other that I'm aware of with RIM that they
23   tried to --
24   Q.  Research in Motion?
25   A.  Research in Motion, yes.  They tried to get that ball

58

1    rolling.  And I'm not sure what happened.  I think they
2    weren't able to settle.
3    Q.  Okay.  You don't know what happened to the RIM litigation?
4    A.  No.
5    Q.  But as far as you know, it didn't produce any money, did it?
6    A.  No, it didn't, not for Hunts Point Ventures.
7    Q.  Did it produce any money for anybody?
8    A.  Not that I know of.
9    Q.  My terminology is probably defective, but was there a
10   request for reexamination of the patents by RIM, do you
11   know?
12   A.  I believe there was.  I believe Mark had said that they
13   asked him to -- it had something to do with clouded title.
14   Q.  Who asked Mark?
15   A.  Huh?
16   Q.  Who asked Mark?
17   A.  Boy, I'm not exactly sure.  Someone involved in that process
18   on one of the sides trying to clear up the clouded title.
19        And Mark refused to clear up the title.
20   Q.  And Mark was what?
21   A.  Mark didn't want to corporate.
22   Q.  Okay.  Was that a request from RIM or was it a request from
23   HPV?
24   A.  I'm not sure.
25   Q.  But in any event, whoever it was, Mark declined to

59

1    cooperate?
2    A.  Yes, because he was told he wasn't on the board of HPV, and
3    he was told that he would be at the time that he entered
4    into the agreement with Du Wors.  So they rewrote all the
5    rules while Mark was in prison.
6    Q.  You say in paragraph 17, "Plaintiff" -- that's you -- "was
7    also told by Steve Schweickert that the loan would allow HPV
8    to form HPVG."
9         Did you have an understanding as to whether HPVG had
10   actually been formed at that time or not?  Did you know?
11   A.  No.  You know what?  I didn't notice that it was HPVG, that
12   extra G.  That letter in there was like, whoa, that's new to
13   me.  I don't remember talking about a separate entity.
14        Although, that makes sense, because Steve had said
15   it's a cluster, it's a constellation, there's this other
16   little subset over here that will be responsible for profit
17   sharing.
18        So I wasn't, I wasn't aware if it was -- I believe it
19   was formed a month before, but at the time I couldn't -- I
20   wasn't sure.
21   Q.  Well, you just said a moment ago that you were surprised
22   when you saw that last letter G.  When did you first notice
23   that additional --
24   A.  After I invested.
25   Q.  Okay.  So --

60

1    A.  So I was under the impression:  All right.  I'm just getting
2    on board with HPV because this is HPV.  It's all these
3    different little clusters.
4    Q.  Okay.
5    A.  Kind of like the HPV that we don't like.
6    Q.  All right.  So in other words, when you actually viewed the
7    package that was sent to you by Steve prior to the
8    conversation on April 22nd that included the optional
9    proposals and including the participation schedule that says
10   proposed HPVG, LLC, you did not note that difference at that
11   time; is that right?
12   A.  I don't know when I noted that difference.  I really don't
13   remember.
14   Q.  Sure.
15   A.  I didn't think it mattered.
16   Q.  Pardon?
17   A.  I didn't think it mattered.
18   Q.  Why was that?
19   A.  Because it was all under management of HPV.  It was just the
20   way that they -- it was how they categorized my investment.
21   Q.  Going on with the allegation that you have in paragraph 17,
22   "The loan would allow HPV to form HPVG, and that she would
23   be given an '8 percent passive membership.'"
24        I take it that by putting that in quotes, that you're
25   indicating that you understood what a passive membership

Jennifer Schweickert - September 12, 2014

61

1    meant?
2    A. Uh-huh.
3    Q. You have to say yes.
4    A. Yes.
5    Q. Okay. "Without regard to HPV's obligation on the $200,000
6    note."
7        And we've covered that, and that is that no one would
8    quibble with the fact that you were to be repaid the 200
9    plus interest, correct?
10   A. Correct.
11   Q. And in addition to that, an 8 percent interest in HPVG.
12   A. Yes.
13   Q. Passive interest.
14       You say on paragraph 18 of Exhibit 1, "On or about
15   April 21, 2011, plaintiff received a signed copy of the
16   Promissory Note and Joint Participation Agreement."
17       And you're referring to Exhibit 2 when you say the
18   Promissory Note and Joint Participation Agreement, correct?
19   A. Yes.
20   Q. So that was something you received the day before the
21   conversation with Steve Schweickert and John Du Wors on the
22   22nd, correct?
23   A. Uh-huh.
24   Q. Yes?
25   A. Yes. Well, I received it more than a day before. It was a

62

1    week before.
2    Q. Okay. How long before was it that you received it, do you
3    think?
4    A. A week, at least a week. Probably 10 days.
5    Q. Did you consult with anybody at all about this proposal that
6    Steve Schweickert sent to you that you received probably
7    somewhere between April 12th and maybe April 15th? Did you
8    consult with anybody about this proposition?
9    A. Well, I mentioned earlier that I spoke with my mom about it.
10   But there wasn't a lot coming back from her
11   information-wise.
12   Q. Anybody else?
13   A. I didn't want to discuss it with anybody. I felt it was a
14   private sensitive matter.
15   Q. Sure. Did you talk to Steve in between the time that you
16   received Exhibit --
17   A. Yes.
18   Q. -- 2 and the conversation with John Du Wors and Steve?
19   A. Yes, yes.
20   Q. How many times did you talk to Steve in that interim period?
21   A. At least once.
22   Q. How long a conversation was that?
23   A. I don't recall. Our conversations on the phone, unless it
24   was a computer issue that he was walking me through and it
25   was time sensitive -- or what do you call the word? Anyway,

63

1    probably 10 or 15 minutes at the most.
2    Q. Okay. What was the purpose of that call after you received
3    the proposal in written form somewhere between the 12th and
4    the 15th and the 22nd? What was the purpose of that call to
5    Steve? Did you have some questions for him?
6    A. No. I believe he called me, "Hey, are you going to invest?"
7    You know, that type of a phone call.
8    Q. Right. So what did you tell him when he asked you, "Are you
9    going to invest?" What did you tell him?
10   A. "Well, have you set up an appointment with John Du Wors
11   yet?"
12   Q. Do you remember anything about that conversation, or would
13   that be pretty much it.
14   A. That would be pretty much it.
15   Q. Fair enough. Turn to page 9 of Exhibit 1. No. For now
16   let's go to 11. I'm sorry. Page 11, if you would.
17   Directing your attention to paragraph 48.
18       Now, did Steve ever tell you in the course of your
19   conversations that when HPV was formed by a different law
20   firm, Cairncross & Hempelmann, in May -- well, it might have
21   been March of 2010. Did Steve tell you that initially there
22   were only two shareholders: him and your mother Joyce?
23   A. I believe that, yes.
24   Q. Okay. And you didn't know whether your mother had divested
25   herself of her interest in HPV at this time in --

64

1    A. I did not know. I didn't find out about that until much
2    later.
3    Q. So going back to paragraph 48. You say in here in your
4    Complaint, "Steve Schweickert misrepresented to plaintiff
5    that she would be given shares in HPV and HPVG, that
6    Mr. Phillips would be a shareholder and director of HPV and
7    HPVG."
8    A. Yes.
9    Q. Now, what you're saying there is that Steve Schweickert was
10   telling you, "Look, even though the shares were issued to me
11   and Joyce, Mark is going to be a shareholder, and officer
12   and director."
13       Is that correct?
14   A. Yes.
15   Q. And you knew that they weren't going to be able to put those
16   shares in Mark's name until he got clear of his criminal
17   matter? You knew that?
18   A. Yes.
19   Q. Pardon?
20   A. Yes. Yes. I'm aware of that. That was the whole point of
21   doing this.
22   Q. This goes on to state that Mr. Schweickert, Steve
23   Schweickert, told you that your investment was better than
24   purchasing property and that your loan would be secure and
25   timely repaid. That was what Steve told you, correct?

65

1  A. Yes.
2  Q. And Steve also was the one who told you that you need to
3     beat Sandy Hoover to this; otherwise, she's going to beat
4     you out of this opportunity?  That was Steve who told --
5  A. Yes, there was some pressure there.
6  Q. All right.  Let's go back to page 9, paragraph 38.  And
7     that's specifically referring to representations by
8     Mr. Schweickert.
9  A. Okay.
10 Q. This does get back to one of the things you and I were
11    talking about earlier.  Line 16, you say that
12    Mr. Schweickert told you that you would participate in
13    decisions on HPV's investments in third parties.  And that
14    is a true statement, isn't it?
15 A. Yeah.  Well, that's why he called me about Digicor.  So yes.
16 Q. And Viacam too?
17 A. Not Digicor.  I meant Viacam.  Sorry.  Wrong name.  It's
18    been a few years.
19 Q. I understood what you meant.
20 A. Good.  Thank you.
21 Q. Okay.  So when he called you with Viacam, that was
22    consistent with what he had represented to you, which is,
23    "I'm going to be asking your input.  I want you
24    participating in these decisions."
25 A. He knew I would openly disagree with him on anything at any

66

1     given time.  So it wasn't ...
2  Q. So you're not a shrinking violet when it comes to dealing
3     with Steve Schweickert then.
4  A. Well, I also think he knew how to keep me happy about -- he
5     wanted me to invest the money, so he knew how to deal with
6     me in that way.
7  Q. You go on to say that Steve Schweickert also represented
8     that "HPV and HPVG had a profit sharing agreement that was
9     approved by the members of HPV."
10 A. Yes.
11 Q. And did he ever give you any of the details about what that
12    profit-sharing agreement was?
13 A. Well, the only detail that pertained to me was the 8 percent
14    for me.
15 Q. And you knew that you would have an 8 percent interest in
16    HPVG, correct?
17 A. Yes.
18 Q. All right.  But you didn't know what the profit-sharing
19    agreement was between HPV and HPVG?
20 A. No, I didn't know any of the details of that.  And I didn't
21    know what payments would be made out of HPVG versus out of
22    HPV.  You know, it was a waterfall schedule, however they
23    wanted to set that up, and I wasn't privy to that.  I don't
24    think it was structured yet.
25 Q. Okay.

67

1  A. I was just given a proposal, like:  "This is what we're
2     thinking about doing.  We've set up HPVG.  You know, it's a
3     thing."
4        Or maybe -- I don't remember that particular -- but I
5     knew that, okay, I'm talking to an attorney.  He's telling
6     me this is taken care of.
7        And I went with it.  I trusted his word.  That's all I
8     needed at the time.
9  Q. Okay.  And then you go on down to the last couple of lines
10    of paragraph 38 and you say that Schweickert also told you
11    that you would have an ownership interest in HPVG, "that her
12    loan would be repaid on time."
13 A. Which line are you?
14 Q. 19 and 20.
15 A. Oh, okay.
16 Q. And that's correct that Steve Schweickert did tell you that
17    you would have an ownership interest in HPVG, did he not?
18 A. Yes.
19 Q. And in fact, that's documented in Exhibit 2, by that it
20    clearly states, no question about it, you own 8 percent of
21    HPVG, correct?
22 A. Yes.
23 Q. All right.  I want to take a little time on paragraph 39,
24    and not undue, but I want to try to figure out exactly what
25    you're saying here.

68

1        You say, "Representations made by Mr. Du Wors
2     include," but then you say, "(but are not limited to)" the
3     claim that he would be able to generate a lot of money
4     through patent litigation.
5        And you've already talked about that, that the three
6     of you in that conversation never quantified it but you
7     talked and made jokes about a lot of money, correct?
8  A. Yes.
9  Q. And no attempt to ever quantify that, though, correct?
10 A. No.
11 Q. All right.
12 A. Although, there were big numbers thrown around as examples.
13 Q. You mean, from the earlier litigation that he had done for
14    another client?
15 A. Yes.
16 Q. He gave you some examples of those?
17 A. Yes, of his successes.
18 Q. And Mr. Du Wors clearly told you that he represented HPV and
19    HPVG, correct?
20 A. Yes.
21 Q. All right.  Mr. Du Wors told you that you would be paid back
22    on your promissory note from the Digicor settlements?
23 A. Yes.
24 Q. Tell me about that, as best you can.  Give me some detail on
25    that.

Jennifer Schweickert - September 12, 2014

69

1    A.  Well, that's how I believed that they would make good on the
2    loan repayment, that they had a, they had a suit already in
3    motion and that it was -- that they were on the verge of
4    settling.
5         So this is not -- they were saying so this is not
6    something you're going to have to wait a long time for.
7    Because I thought, gosh, $200,000 to loan and then have
8    it -- have the repayment of the loan being due a year and a
9    half later, that's pretty quick turnaround.  And I was
10   wondering how they were going to do that, how they were
11   going to pull that off.
12        But you know, I believed that they would, but I wanted
13   to see what they had in the hopper.  And I was disappointed
14   that they only settled for that amount, though, whatever
15   that was.  I think they could have settled for a lot more.
16   Q.  And why do you think that?
17   A.  I was under the impression that they were entitled to a lot
18   more money.  I just thought that maybe Du Wors wasn't as
19   great as he puffed him up to sound like, you know, he wanted
20   everybody to think he was.  So I was disappointed.
21   Q.  Okay.  Then you say -- and this is one part that I feel like
22   I need a little clarification.  Starting on line 25 on page
23   9, and reading over to the next page on paragraph 39, "that
24   Mr. Du Wors would see to settlement funds be disbursed to
25   his firm, HPVG for profit sharing."

70

1    A.  Yes.
2    Q.  I don't know if there's typos or an error there.  What is
3    meant by that partial sentence there?
4    A.  Partial sentence?
5    Q.  Maybe you need to read the whole sentence.
6    A.  I will read the whole sentence.
7    Q.  Why don't you do that and tell me what you're trying to say
8    there.
9         (Witness perusing document.)
10   A.  That's a long sentence.
11   Q.  Uh-huh.
12   A.  "Representations made by Du Wors include (but are not
13   limited to) the claim that by using her investment to pay
14   his fees because HPV had no money, he would be able to
15   generate a lot of money through patent litigation that would
16   help Mr. Phillips, he represented HPV and HPVG, that
17   Ms. Schweickert would be paid back her promissory note from
18   'Digicor' settlement funds," -- I think there meant to be a
19   period in here.
20   Q.  Okay.
21   A.  And, "that Mr. Du Wors would see to settlement funds be
22   disbursed to his firm, HPVG for profit sharing, that
23   Ms. Schweickert would participate in future patent
24   litigation settlements from HPVG, and his participation in
25   HPVG and HPVG would provide oversight to the actions of

71

1    Mr. Schweickert and the Rudkins as they didn't not have
2    extensive corporate governance experience."
3         Oh, okay.  So that "didn't" is a double negative.
4    That's a typo.  That's all that is.
5         So this is a list of all of the things that I
6    expected, and that these things would -- and that Du Wors'
7    participation -- this is important, line 3, his
8    participation in these entities would provide the oversight
9    to the actions of Schweickert and Rudkins.  That was his
10   role.  That was his job.
11   Q.  Tell me a little bit about that.  Because I take it this is
12   something that was communicated in the course of that
13   conversation on April 22nd, 2011.  Correct?
14   A.  I believe so.
15   Q.  Tell me about what all was said about John Du Wors'
16   participation in HPV and HPVG which would give you
17   confidence that he was going to provide some oversight over
18   Mr. Rudkin and Mr. Steve Schweickert's --
19   A.  He's the only attorney on board.  He's the only person that
20   has a legal ethical requirement to do no harm, to abide by
21   the book, to keep everybody in line so that we don't end up
22   in some kind of trouble with the law, or however.
23        This is -- he's the only one that knows how to do
24   this.  He is the person we hired to do this for us, people
25   who don't know how to run patent litigation, who don't know

72

1    how to secure an IP, who don't know how to, you know, secure
2    loans, things like that.  This is why we hired John Du Wors.
3    Q.  I understand that that's your understanding.  What I want to
4    know from you, though, is:  What did John Du Wors say to you
5    with regard to what he was going to do to guarantee or to
6    assure or to encourage proper administration of those
7    corporate entities?  What did John Du Wors say to you?
8         Did he say, "I'm going to be down there, I'm going to
9    be running the show"?  Or did he say, "Look, I'm going to
10   make sure" --
11   A.  Yes.
12   Q.  -- "that things are done legally"?
13   A.  Yes, he said he would be running the show and that he was in
14   charge, and that he knew how to do this and he was very good
15   at his job and knew how to do this.
16   Q.  When he said, "I'm going to be running the show," was he
17   taking about the patent trolling?  Or what was he talking
18   about?
19   A.  Yes, he was talking about all of it, the patent trolling,
20   the running board meetings, being there to answer any
21   questions, that he was somebody that was tangible that I
22   could call if I had a question or if I wanted to have a
23   meeting and get some clarification about something.
24        In fact, at the end of the phone call I remember him
25   saying, "Look me up next time you're in Seattle.  We'll

18 (Pages 69 to 72)

Jennifer Schweickert - September 12, 2014

73

1    meet. We can go over any of the questions that you may
2    have."
3    Q. Okay.
4    A. That was before I made the -- you know, that was the only
5       time I ever spoke with him.
6    Q. Now, I know that you weren't entranced by his personality,
7       but did you ever, in fact, contact him by either email,
8       letter, or telephone call?
9    A. Not until much later after there were defaults on the loan
10      and I hadn't received any paperwork. And it wasn't until, I
11      think, January of 2013 that I started, you know, my process
12      of trying to get information, trying to get him to answer
13      some questions. And he acted like he didn't know who I was.
14   Q. Was there any reason why you waited that long to make
15      inquiries about --
16   A. Oh, I didn't wait that long. I mean, I tried to speak with
17      Chad Rudkin. I called him several times. We had arranged
18      meetings to get together when I'd come up for Thanksgiving
19      and for Christmas of 2012, and he had flaked all three
20      times. And two of those times were a month apart and he
21      said, "Oh, we all have the flu." Which I knew was BS.
22   Q. Let's go back real briefly on that. When was the first time
23      that you made an inquiry to Chad Rudkin about the status of
24      the company operations and your loan? When was the first
25      contact with Chad?

74

1    A. August of 2011.
2    Q. August of 2011?
3    A. Uh-huh.
4    Q. And was Steve Schweickert still connected with the company
5       at that time?
6    A. At that time I don't believe he was. I believe he had
7       passed the baton to Chad. And that's why I spoke with Chad.
8       I wanted to know when I was going to be put on the board. I
9       wanted to know when I was going to get shares. I wanted to
10      know when I was going to get my paperwork.
11         I wanted everything locked down. I wanted to make
12      sure I was going to get paid back.
13   Q. What did you ask him about the financials? Did you just
14      say, "Hey, is there any money in the kitty? How are we
15      doing on the patent" --
16   A. Of course I asked him those things.
17   Q. What did he tell --
18   A. He didn't know.
19   Q. He didn't know?
20   A. He didn't know anything. He was very confused.
21   Q. Was he the CEO, from your --
22   A. Yes, he was.
23         THE COURT REPORTER: Excuse me.
24         (Discussion off the record.)
25   Q. What did Chad say about when he was going to put you on the

75

1    board? Or did he give you an answer?
2    A. He assured me that everything was going to be up to speed in
3       a few months, he and his wife were working diligently at
4       trying to organize the mess that Steve made, and that he
5       would be in touch with me in the fall.
6    Q. Okay. How did you feel at the conclusion of that
7       conversation? Did you feel like you were being put off? Or
8       were you concerned about the disarray that you kind of
9       sensed with the corporation? What was your feeling?
10   A. I'm thinking about the dates. I think it was August of 2012
11      that he and I spoke. I think it was -- some time had
12      passed. It was more than just a couple of months. It was
13      more like a year and a couple of months.
14   Q. So you're talking August 12?
15   A. Yeah. I'm taking a step backwards because I don't want to
16      be misquoting the timeline here.
17         At that time I didn't feel he was putting me off. I
18      felt he was overwhelmed and needed time to get organized.
19   Q. Okay.
20   A. But then I started to feel he was putting me off a few
21      months later, in October or November or December of 2012.
22   Q. When you talked to him August of 2012 the note was already
23      delinquent, wasn't it?
24   A. On October 31st it became delinquent, yes.
25   Q. Of 2011?

76

1    A. No. December 31st of 2011 they owed -- the first payment
2       wasn't made, so the 11,000 wasn't given.
3    Q. Okay. So when you talked to Chad Rudkin the note was
4       delinquent?
5    A. Yes.
6    Q. Did you ask him about, "When can I get that payment, because
7       it's, you know, eight months overdue"?
8    A. I did ask, and he said, "I have no idea. I'm, you know,
9       overwhelmed. Steve just dumped all these papers on me."
10   Q. Well, given the fact that I understand from your answer
11      before that Mr. Du Wors left you with a clear understanding
12      that if you had questions, call him, did you call him?
13   A. Not at that time.
14   Q. Why not?
15   A. Gosh. Honestly, I never really thought I would need to have
16      to talk to him directly. I felt like at the time I made the
17      investment that Steve was going to be on board and that
18      Steve would be a good liaison.
19         I didn't feel comfortable talking with Du Wors
20      directly. I had a weird vibe from him. And I had hoped
21      that Chad would be able to take Steve's place. I was really
22      hoping that Chad would make good with what Steve had, you
23      know, set out to do.
24   Q. Now, Chad was a classmate of your brother's as well, or same
25      school --

77

1    A. Yes.
2    Q. -- anyway?
3    A. Yes.
4    Q. How well did you know him?
5    A. I knew Chad better than I knew Mark, actually.  Chad had
6       lived in my parents' house for some time, for about, I
7       think, a year or three months, like, a summer.  Anywhere
8       between three to twelve months.
9    Q. And Mark trusted him?
10   A. Yeah, I believe Mark trusted him.
11   Q. What was your understanding as to Chad Rudkin's business
12      experience?
13   A. I was really surprised that Steve had selected Chad for this
14      type of thing.  Chad was a party boy in high school,
15      college.  He was an Army Ranger.  He was a beer-drinking,
16      womanizing, you know, social climber.
17          And he was not a good friend to my brother.  He
18      decided, you know, to start hanging out with some of my
19      brother's friends and then started putting my brother down.
20      And it hurt, it hurt my brother quite a bit.  So I know that
21      Chad's loyalty is not very -- he's not very loyal.  It's
22      very much in question.
23          But Steve somehow felt that Chad had something to
24      contribute.  And I wasn't sure what that was.  It always
25      kind of baffled me.

78

1           But then later Steve said he and his wife, who had some
2       business experience, I thought, okay, good, somebody with
3       business experience is helping Chad.  I wasn't, I wasn't
4       100 percent confident, but given that Steve had made his
5       departure and that Du Wors was onboard being busy with Chad
6       and Elizabeth, I was hoping that we would somehow come to
7       some resolution.
8           But I wanted to, I wanted to be reasonable and give
9       them plenty of time.
10   Q. Okay.  One of the allegations -- and part of it is referred
11      to in paragraph 41 on page 10 -- was that there was a
12      recharacterization, I guess, of your loan on the corporate
13      books, and at some point the loan was recharacterized as a,
14      quote, angel investment, or something like that?
15   A. Yeah, I saw that.  I was shocked.
16   Q. What does that mean?  What did that mean to you?
17   A. I don't know what that means.  I had no idea what that meant
18      at all.  And you know, when I saw that I was amazed that
19      that had happened.  It looked like they just rewrote the
20      books.
21   Q. Now, that was on the books at HPV, correct?
22   A. I believe so.
23   Q. It didn't change the fact that you had a piece of paper that
24      said they owed you 200 grand plus interest, did it?
25   A. Nope, not to me.  A contract's a contract.

79

1    Q. I tend to agree with you.
2    A. But this is all under Du Wors' watch, under his supervision.
3    Q. Well, what do you mean --
4    A. So that's the problem.
5    Q. What do you mean that?
6    A. They don't know what they're doing.  They're asking Du Wors
7       for advice, and then they're doing things like putting my
8       loan down as an angel investment.  I don't understand that.
9       I don't understand all of a sudden removing Mark from the
10      board.  I don't get it.
11   Q. Had Mark ever been on the board?
12   A. Well, isn't this -- where it this?  I'm looking here ...
13          (Witness perusing document.)
14   A. Active member, manager, Steve.  Mark Phillips -- oh, I guess
15      they were planning on it, because he was obviously otherwise
16      indisposed with prison.  But the intent was to make sure
17      that once he got out, that he would be in charge of
18      everything.
19   Q. Mark got out in October of 12?
20   A. Yes.  Or September 12.
21   Q. It was September?
22   A. Uh-huh.
23   Q. Okay.
24   A. I believe.
25          MR. FRANKLIN: It's about 11:25.  Let's stay on

80

1    the record for a minute.
2           I don't know if you have a date that you can commit to
3       right now, or if you want to just agree on the record that
4       we will reschedule this at a time that is mutually
5       convenient, hopefully within the next two or three weeks.
6           Are you guys in a position to set the deposition right
7       now?
8           MR. WAYMAN: I don't think we're in a position
9       right now.  If you want to just shoot us an email with your
10      dates, and then I can check my calendar and Reed and
11      Jennifer can check their calendars, and we can get back to
12      you with a date.
13          MR. FRANKLIN: Fair enough.
14      Well, thanks, Ms. Schweickert.  I appreciate you being
15      here today, and we will continue this on an agreed-upon
16      date.
17          THE WITNESS: Okay.
18          (Deposition adjourned at 11:25 a.m.)
19          (Signature reserved)
20          (Exhibits 1 - 2 attached)
21
22
23
24
25

Jennifer Schweickert - September 12, 2014

---

81

1
2                    C E R T I F I C A T E
3     STATE OF WASHINGTON)
                         ) ss.
4     COUNTY OF KING    )
5
6         I, Laurie B. Porter, Certified Court Reporter
7     in and for the State of Washington, license number 2376,
8     do hereby certify:
9         That the annexed and foregoing deposition of
10    the witness named herein was taken stenographically before
11    me and reduced to typewriting under my direction;
12        I further certify that the said witness was
13    afforded the opportunity to examine, read, and sign said
14    deposition after the same was transcribed, unless
15    indicated in the record that the parties and the witness
16    waive the signing;
17        I further certify that all objections made at
18    the time of said examination were noted by me upon said
19    deposition;
20        I further certify that I am not a relative or
21    employee or attorney or counsel of any of the parties to
22    said action, or a relative or employee of any such
23    attorney or counsel, and that I am not financially
24    interested in the said action or the outcome thereof;
25        I further certify that the witness before

---

82

1     examination was by me duly sworn to testify to the truth,
2     the whole truth, and nothing but the truth;
3         I further certify that the deposition, as
4     transcribed, is a full, true, and correct transcript of
5     the testimony, including questions and answers, and all
6     objections, motions and exceptions of counsel made and
7     taken at the time of the foregoing examination, to the
8     best of my ability.
9
10
11        IN WITNESS WHEREOF, this 19th day of September
12    2014.
13
14
15
16
17             _____
18             Laurie B. Porter, CCR
               License No. 2376
19             Certified Court Reporter in
               and for the State of Washington,
20             residing in Issaquah.
21
22
23
24
25

---

83

1
2                    D E C L A R A T I O N
3     STATE OF WASHINGTON)
4                        ) ss.
5     COUNTY OF _____)
6
7         Pursuant to the laws of the State of
8     Washington, I declare under penalty of perjury the
9     following to be true:
10
11        I have read my deposition transcript, and the
12    same is true and accurate, save and except for any changes
13    and/or corrections as indicated by me on the
14    CORRECTIONS/CHANGES page hereof.
15        Signed at _____, Washington on the
16    _____ day of _____, 2014.
17
18
19
                  _____
20
                  Jennifer Schweickert
21
22
23    Case name: Schweickert vs. Hunts Point Ventures, et al.
      Cause No.: 13-CV-675
24
25

---

84

1     Laurie B. Porter, CCR   Schweickert vs. Hunts Point Ventures,
                               et al.
2     1415 2nd Avenue, # 1107 District Court, Western District
                               No. 13-CV-675
3     Seattle, WA 98101        Deposition of Jennifer Schweickert
      (206)623-6136            September 12, 2014
4
5     Please make all corrections, changes or clarifications to your
      testimony on this sheet, showing page and line number and the
6     nature of the change.  If there are no changes, write "none"
      across the page and then sign this sheet on the line provided.
7
8     Page   Line                Reason for Change
9     _____/_____/_____
10    _____/_____/_____
11    _____/_____/_____
12    _____/_____/_____
13    _____/_____/_____
14    _____/_____/_____
15    _____/_____/_____
16    _____/_____/_____
17    _____/_____/_____
18    _____/_____/_____
19    _____/_____/_____
20    _____/_____/_____
21    _____/_____/_____
22    See:  Wash. Reports 34A,
            Rule 30(b), USCA 28,
23          Rule 30(e)
            Signature_____/Date_____
24
25            Jennifer Schweickert

---

85

LAURIE B. PORTER, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136
September 19, 2014

Brandon Wayman
MDK Law
777 108th Avenue NE, Suite 2170
Bellevue, Washington  98004

RE: Schweickert vs. Hunts Point Ventures, et al.
District Court, Western District  Cause No. 13-CV-675
Deposition of Jennifer Schweickert
Taken September 12, 2014

   Enclosed is your copy of the above-referenced
deposition, plus a correction sheet and a Declaration.
Please have Ms. Schweickert read the deposition
transcript, make whatever corrections and/or changes that
are appropriate, then sign the correction sheet and the
Declaration.
   Please be aware that the court rules provide that
this be accomplished within 30 days of receipt of notice.
The corrections and signed Declaration should be forwarded
to me at the above address for distribution among counsel
and inclusion in the original transcript.  If this is not
received by me within the time period noted above,
signature will be deemed for all purposes waived.
   Thank you for your cooperation in this matter.

                                 Laurie B. Porter
Enc.
Cc:  Court file
     File
     Sam Franklin

86

LAURIE B. PORTER, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136

September 19, 2014

TO: Sam Franklin
    Lee Smart
    701 Pike Street, Suite 1800
    Seattle, Washington  98101-3929

NOTICE REGARDING FILING OF ORIGINAL
DEPOSITION TRANSCRIPT

RE:  Case Name:    Schweickert vs. Hunts Point Ventures, et al.
     Venue:       District Court, Western District
     Cause No:    13-CV-675
     Deposition of: Jennifer Schweickert
     Taken:       September 12, 2014
     Enclosed you will find the original sealed transcript
of Jennifer Schweickert.

   The original signature page and changes, if any,
received by this office will be forwarded to all counsel.
   Thank you for your cooperation in this matter.

                                 Laurie B. Porter, CCR

Cc:  Court file
     File
     Brandon Wayman

85

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

JENNIFER P. SCHWEICKERT,          )
                                  )
             Plaintiff,           )
                                  )
        vs.                       )   No. 13-CV-675
                                  )
HUNTS POINT VENTURES, INC.;       )
HUNTS POINT VENTURE GROUP,        )
LLC; CHAD and ELIZABETH           )
RUDKIN, and their marital         )
community comprised thereof;      )
JOHN DU WORS and AMBER DU         )
WORS, and their marital           )
community comprised thereof;      )
and DOES 1 - 4,                   )
                                  )
             Defendants.          )
_____

DEPOSITION UPON ORAL EXAMINATION OF JENNIFER P. SCHWEICKERT
                        VOLUME II
_____




                        9:00 a.m.
                  Friday, October 3, 2014
                  701 Pike Street, Suite 1800
                     Seattle, Washington




                  Laurie B. Porter, CCR
                  Northwest Court Reporters
               1415 Second Avenue, Suite 1107
                 Seattle, Washington  98101
                      (206) 623-6136

               www.northwestcourtreporters.com

Jennifer Schweickert, Volume II - October 3, 2014

86

```
 1                        APPEARANCES

 2

 3   On Behalf of the Plaintiff:

 4                        BRANDON WAYMAN

 5                        MDK Law

 6                        777 108th Avenue NE, Suite 2170

 7                        Bellevue, Washington  98004

 8

 9

10

11   On Behalf of the Defendants:

12                        SAM FRANKLIN

13                        Lee Smart

14                        701 Pike Street, Suite 1800

15                        Seattle, Washington  98101-3929

16

17

18

19

20

21

22

23

24

25
```

Jennifer Schweickert, Volume II - October 3, 2014

87

1
2                             EXAMINATION INDEX
3
4      Mr. Franklin ..................................... 88
5
6
7
8                                  * * *
9
10
11                            EXHIBIT INDEX
12      No.     Description                              Marked
13      3      Letter to Steve from J. Du Wors, 4-10-11,
               re HPV Patent litigation, 2 pages              96
14
15      4      Notice of Annual Meeting of Shareholders,
               1 page                                       101
16      5      First Amended Complaint, 22 pages            123
17      6      Letter to Rudkins and J. Du Wors from
               J. Schweickert, 1-25-13, re RCW 23B.16.010(5),
18             1 page                                       147
19      7      Letter to Rudkins and J. Du Wors from
               J. Schweickert, 2-4-13, re Demand for
20             Repayment of Promissory Note, 2 pages        153
21      8      Email chain between J. Du Wors, J. Schweickert,
               Rudkins, M. Phillips, J. Smith, 2-8-13,
22             re Following Up, 1 page                       153
23      9      Email chain between J. Schweickert, J. Du Wors,
               Rudkins, M. Phillips, J. Smith, 1-1, 1-8, 1-11
24             2013, re Getting Real, 3 pages               155
25

88

1          (Deposition commenced at 10:07 a.m.)

2    JENNIFER SCHWEICKERT,        having been previously sworn
                                  under oath by a Washington
3                                 State Certified Court Reporter,
                                  testified as follows:

4

5                         EXAMINATION

6    BY MR. FRANKLIN:

7    Q.  Good morning.  How are you?

8    A.  Pretty good.  Woke up to the sound of construction this

9        morning in the building we're in.  And we moved there to get

10       away from construction.

11   Q.  Well, Seattle's a bad place for you to come to to get away

12       from construction, particularly depending on what part of

13       town you live in, because the cranes are back.

14   A.  Oh, I don't mind.  They're great at Christmastime.

15   Q.  Ms. Schweickert, I want to kind of jump ahead a little bit

16       right now momentarily.  Now, you testified briefly about the

17       separation of your mother and Steve Schweickert, which I

18       think happened in 2011.  Subsequently Mr. Schweickert

19       apparently sued your mother and that case was settled.

20   A.  Uh-huh.

21   Q.  You're aware of that, correct?

22   A.  Uh-huh.

23   Q.  And you're also aware that part of that settlement, maybe

24       paragraph 17, that your mother undertook to indemnify Steve

25       Schweickert against any claims that you might bring against

Jennifer Schweickert, Volume II - October 3, 2014

89

```
 1      Steve Schweickert.
 2  A.  Yes.
 3  Q.  All right.  Now, we know from your testimony and from other
 4      submittals by you that a lot, if not all, of the same
 5      allegations that you make against Mr. Du Wors were also
 6      representations made by Mr. Steve Schweickert to you as
 7      well.  Correct?
 8  A.  Uh-huh.
 9  Q.  You have to say yes.
10  A.  Yes.
11  Q.  Okay.  Was there a reason why you didn't sue Mr. Schweickert
12      when you sued Mr. Du Wors and Mr. Rudkin?
13  A.  Was there a reason?  Yeah.  Because my mother had
14      indemnified him.
15  Q.  So there was no point in you suing Steve if your mother was
16      going to indemnify that claim, right?
17  A.  Right.
18  Q.  Okay.
19  A.  But Steve wasn't, Steve wasn't as responsible.
20  Q.  And why is that?
21  A.  In this whole equation.  Because Steve isn't an attorney.
22      Steve doesn't have a duty to not lie, cheat, and steal.
23  Q.  Duty to not lie.
24  A.  Which is exactly why I spoke to Du Wors on the phone that
25      day, to make sure that I had an attorney making sure
```

Jennifer Schweickert, Volume II - October 3, 2014

90

 1      everything Steve was doing was legal.  So that's where we

 2      are now.

 3   Q. Well, let me be clear that I understand what you're saying.

 4      Is it your view, then, that it was okay for Steve

 5      Schweickert to lie to you?

 6   A. Could you rephrase the question?  I don't understand what

 7      you mean.

 8   Q. Well, you said a moment ago that the difference between

 9      Steve Schweickert and John Du Wors in terms of liability to

10      you is that Steve Schweickert is a nonlawyer, didn't have a

11      duty to not lie, steal, and cheat.

12           Did you really mean that?

13   A. Did I really mean that?

14   Q. Yes.

15   A. Did I really mean that Steve doesn't -- well, he didn't take

16      an oath.  He didn't -- doesn't have the schooling.  He's not

17      an attorney.  That's why, that's why I made sure that I

18      spoke with the person that would be representing the company

19      and agreeing and signing off on everything that I had been

20      told by Steve.

21           So suing Steve was really not a smart thing to do.  It

22      didn't seem like the right thing to do, given Steve's

23      circumstances.

24   Q. Okay.  Well, you told me last time that you thought that

25      Steve was an honest guy.  Is that correct?

Jennifer Schweickert, Volume II - October 3, 2014

91

1    A.   I didn't say that.

2    Q.   What did you say?

3    A.   What did I say?  I'm not sure.  I don't remember.  It was a

4         couple of weeks ago.

5    Q.   You have not read --

6    A.   My relationship with Steve is very complicated.  I've known

7         him since I was a child.  He's family.

8    Q.   I understand.

9    A.   So as far as -- nobody is a black and white honest,

10        dishonest person.  I think Steve had some difficult times in

11        his life.  And during the time, you know, he was dealing

12        with Hunts Point Ventures he was living a double life where

13        my mom and his other relationship were concerned, and he was

14        drinking quite a bit.  And I don't believe he was fully

15        honest then.

16             Which is part of the reason why I had a gut feeling I

17        needed to call and speak with the attorney responsible.

18   Q.   Okay.  All right.

19   A.   Okay.

20   Q.   Did your mother offer to, in effect, buy you out to pay that

21        note owed by HPV?

22   A.   Yes.

23   Q.   And you turned her down?

24   A.   That's right.

25   Q.   And why is that?

Jennifer Schweickert, Volume II - October 3, 2014

92

1   A.  Because I didn't feel it was the right thing to do.  I

2      wanted my shares in the company.  I wanted my shares.  I

3      wanted what I bought, what I paid for.

4   Q.  Okay.

5   A.  I wanted the 8-percent ownership in HPV, and I wanted, I

6      wanted what I paid for.  And I -- you know, her issues with

7      Steve were just for her, they were between her and Steve,

8      and I didn't want to be a part of that.

9   Q.  So let me make sure I understand your answer to me.  You

10     turned down your mother's offer to buy you out, that is, to

11     pay you the 200,000 plus interest, correct?

12  A.  Uh-huh.

13  Q.  You have to say yes.

14  A.  Yes.

15  Q.  But in return, then, your mother wanted -- did she want you

16     to then turn over your shares of HPVG to her?

17  A.  We didn't get that far in the discussion.  I just told her

18     flat out no, that I wouldn't let her buy me out.  We didn't

19     even get that far.  She put her attorney on the phone and I

20     told him no.

21  Q.  That's Jeff Keane?

22  A.  Yes.

23  Q.  When was that?

24  A.  It was in December 2012.  It was right before they settled.

25     I believe their trial date was December 11th.  So I would

93

1       say that conversation happened on or around the 8th or the

2       10th of December.

3   Q.  Of 2012?

4   A.  Yes.

5   Q.  Now, a moment ago you said you wanted your shares, your

6       8 percent at HPV.  Are you still contending that you have an

7       ownership in the parent corporation, HPV, or are you

8       contending that you have an interest in HPVG, or both?

9   A.  Oh, I guess I misspoke.  You know, honestly, I believe that

10      I purchased shares in whatever company it was that owned the

11      intellectual property, that I owned 8 percent of that

12      company, whether that was HPVG or HPV.  I was told it was

13      HPVG.

14          So when I refer to this company, it's always HPV.

15      It's just easier for me to say.  It's all part of the same

16      thing.  It's all connected in my mind.  But that's, you

17      know, that's where I was coming from.

18  Q.  Now, I take it from your earlier comments and answers this

19      morning that you've not had a chance to read your deposition

20      transcript from three weeks ago.  Would you --

21  A.  Oh, yeah, I looked that over, sure.

22  Q.  So you've read it?

23  A.  Uh-huh.

24  Q.  You have to say yes, please.

25  A.  Yes.  You're on me about that today.

Jennifer Schweickert, Volume II - October 3, 2014

94

1  Q.  Well, if I don't, she will be.

2          Now, I take it from the transcript -- because I read

3      it also, of course -- that in the conversation that you had

4      with Steve Schweickert and John Du Wors on the 22nd of

5      April, which all three of you participated in that

6      conversation, I got the understanding from your testimony

7      and from your pleadings here that the main new information

8      that you got on this occasion really had to do with

9      Mr. Du Wors explaining to you the details of the

10     patent-troll operation -- and you had a basic understanding

11     of what it was -- and Mr. Du Wors, you had some questions

12     for him about the profit sharing and you had some questions

13     for him about how the corporation was to be run.  But that

14     most of the specific representations were nothing new;

15     they'd already been made to you by Steve Schweickert.

16     Correct?

17         Steve Schweickert told you that the company was set up

18     to monetize Mr. Phillips' intellectual property, and that

19     part of the purpose was -- definitely a major part was to

20     help Mr. Phillips, because he had some pretty urgent

21     problems at that time, did he not?

22 A.  He did.

23 Q.  And so part of the reason to set up HPV was to assist

24     Mr. Phillips in dealing both with some civil litigation,

25     including the MOD, M O D, and some others, Mr. Arnold, or

Jennifer Schweickert, Volume II - October 3, 2014

95

1       Arnold's estate, rather, and as well as the criminal

2       matters, that Mr. Phillips had some legal matters that were

3       going to require a fair amount of money, correct?

4    A. Yes.

5    Q. All right.  And Steve Schweickert had already told you that,

6       correct.

7    A. Yes.

8    Q. And he told you HPV had been formed already as a company?

9    A. Yes.

10   Q. And he told you that the profit model, the monetizing of the

11      IP at that time that was contemplated in the near future was

12      going to be the patent-troll model, correct?

13   A. Can you say that again?

14   Q. Steve Schweickert told you that the way that HPV was going

15      to make money for the foreseeable future was primarily going

16      to be derived from patent-infringement cases?

17   A. Yes.  You know, everything that you're saying Steve said,

18      Du Wors said too in that phone call.  Du Wors did most of

19      the talking.

20   Q. Okay.  How are you able to recall who said what in that --

21   A. Because I wasn't there to talk to Steve.  I could call Steve

22      and talk to him any time I wanted to.  And I knew an

23      attorney's time is expensive, so I wasn't going to waste

24      that phone call listening to Steve.  I had heard everything

25      from Steve, and I had questions for Du Wors to verify

Jennifer Schweickert, Volume II - October 3, 2014

96

1        everything Steve was telling me was true.

2   Q.   Fair enough.

3                   (Exhibit No. 3 marked for identification.)

4   Q.   Take a look at Exhibit 3.  Do you recognize that?

5   A.   I recognize the picture on the top.

6   Q.   Okay.

7   A.   It's been a long time since I looked at these, but I believe

8        this was one of the pieces of paper, articles, that were in

9        the stack that Steve handed me when I was in Texas.  Is that

10       correct?

11  Q.   Pardon?

12  A.   Is that what this is?

13  Q.   Well, I don't know.  I don't know if this is something he

14       gave you in Texas or this is something he gave you later.

15  A.   No.  I remember Steve handing me a packet with two options,

16       those contracts, and an article about Du Wors and an email

17       between -- yeah, this is it, the email between Steve and

18       Du Wors.  I'm assuming this is the email that I had a copy

19       of at that time.

20  Q.   The email that you had a copy of at that time, you're

21       talking about during the time that you were down in

22       Woodland, Texas?

23  A.   Uh-huh.

24  Q.   You have to say yes.

25  A.   Yes.

97

1    Q.   What was the general purpose or tenor of that email that
2         you're talking about?  And this is an email from Du Wors to
3         Steve Schweickert, correct?
4    A.   Yes, this is Du Wors to Steve, yes.
5    Q.   What appeared to you to be the purpose of this email?  What
6         was Du Wors communicating to Steve in this email as a
7         general message?
8    A.   He's selling himself to Steve, looks like.
9    Q.   Okay.  And how was he doing that?  What was he selling?
10   A.   Well, he's selling these big round zeros.
11   Q.   Okay.
12   A.   I mean, I'm being frank here.  I mean, 1.5 million, 550 down
13        here and 800,000 for trial, yadda, yadda, yadda, yadda, how
14        HPV's buffering and playlist patents appear to cover all
15        portable video.
16             This is basically what he's willing to do for HPV.
17        Just skimming it now, that's the impression that I'm getting
18        from it now.
19   Q.   Okay.  When you read this back in 2011 was this where you
20        gained your understanding in general of the patent-troll
21        business model?
22   A.   No.
23   Q.   Where did you gain your knowledge of the patent-troll
24        business model?
25   A.   I actually -- funny you should ask.  In college I dated

98

1      somebody who liked to invent things and had patents on

2      things.  And then in my 20s I dated someone else who also

3      had patents on things.  So I've heard about patents and

4      this, that, and the other.

5              As far as anybody ever suing on those patents, that's

6      a different story.  But the patent-troll model, I think the

7      first time we talked about that with regard to HPV was with

8      Steve on and around Christmas, family holidays, "Hey, what

9      are you up to?"

10             "I'm helping Mark Phillips.  We're putting together

11     this company.  We're going to be prosecuting the patents,"

12     and you know.

13  Q.  That was Christmas of what year?

14  A.  Oh, I don't remember.

15  Q.  Was it 2009 or 2010?

16  A.  Probably both.

17  Q.  Okay.

18  A.  I don't remember where I was at those times.  I'd have to

19     look at my records.  I don't know if we were in Texas at

20     that time or ...

21  Q.  So whether it was the 2009 or 2010 holiday season, you

22     recall that Steve Schweickert brought up his intent to be

23     involved in a business enterprise with Mark Phillips to --

24  A.  Uh-huh.  Yes.

25  Q.  -- prosecute patent infringers on Mark's IP?

99

1   A.   Yes.

2   Q.   Okay.

3   A.   He was telling me that we were setting up Hunts Point

4        Ventures to do this specifically.

5   Q.   Do you remember him using the name "Hunts Point Ventures" at

6        that time?

7   A.   Yes.

8   Q.   Presumably that would be the holiday season of 2010.  Maybe

9        not.

10  A.   That's just a wild guess.

11  Q.   Maybe 09, okay.

12  A.   It may not have been Christmas too.  It could have been any

13       time they happened to be in Malibu when I was living in

14       Santa Monica.  They came over to my house regularly.  I saw

15       Steve and my mother probably about once a month, so they

16       were around.

17  Q.   So your recollection, then, is that Exhibit 3 would have

18       been part of the packet that Steve Schweickert would have

19       given you when you were down at your mother's place in

20       Woodland, Texas in the days following her birthday?  Which,

21       as I recall, was April 6th.  Correct?

22  A.   Yes.  You're asking me if this was in the packet?

23  Q.   Yes.

24  A.   I believe it was.

25  Q.   And you read this email, did you not, at the time?

100

```
 1   A.  I skimmed it.

 2   Q.  And what was your impression when you read it?  Did you

 3       think Mr. Du Wors is trying to sell himself?  Is that what

 4       your impression was?

 5   A.  I say that now.  I think at the time it looks like a typical

 6       email that would be going between Mark and the attorney of

 7       Hunts Point Ventures, talking about his intent, or getting

 8       ready to come on board as the attorney for Hunts Point

 9       Ventures.

10           I mean, I see this April 10, 2011.  Maybe Steve -- I

11       mean, I don't know.  Maybe Steve asked Du Wors if he could,

12       you know, send him some information?

13           I'm not sure what you're asking.

14   Q.  What I'm asking is:  How did you respond?  Did you think,

15       "Hey, this looks like a really good investment opportunity"?

16   A.  Yes.

17   Q.  Okay.  And why did you react in that fashion?  What was it

18       about this memo that caused you to come to that conclusion?

19   A.  It wasn't this memo that had me come to that conclusion.

20   Q.  Well, did the memo affect your decision in any respect?

21   A.  No, not at all.

22   Q.  We can put that aside, then.

23   A.  Okay.

24   Q.  Ms. Schweickert, the last time we were together you

25       mentioned a Notice of Annual Meeting of Shareholders.
```

Jennifer Schweickert, Volume II - October 3, 2014

101

1                    (Exhibit No. 4 marked for identification.)

2    Q.  The court reporter has handed you what's been marked for the

3        purposes of this deposition as Exhibit 4.  Do you recognize

4        that?

5    A.  I think so.  I think I received this in the summertime of

6        2013.

7    Q.  Okay.  I believe this is the notice that you mentioned in

8        the last session we were together.  You appeared to feel

9        that there was some significance to this notice to you, and

10       you particularly made reference to agenda item 3:

11       Discussion of debt and/or equity interests of Joyce

12       Schweickert, Jennifer Schweickert, and Sandy Hoover.

13   A.  Yes.

14   Q.  You received this notice, did you not?

15   A.  Yes.

16   Q.  And do you remember how long before the announced meeting

17       date it was that you got this?  Was it a week?  Two weeks?

18       Three weeks?

19   A.  I don't remember.  But it wasn't, it wasn't possible for me

20       to attend.

21   Q.  Okay.

22   A.  I'm a single mother, and it just -- the traveling and our

23       schedule, it just wouldn't have worked out for me.

24       Usually -- I have board meetings I'm supposed to attend in

25       Las Vegas as well sometimes, and I usually just do those by

102

```
 1        conference call.
 2   Q.   Okay.
 3   A.   So that would have been my intent, to meet with them via
 4        conference call.
 5   Q.   I take it you were not able to attend the meeting
 6        personally, in person.
 7   A.   That's correct.
 8   Q.   Did you make any arrangements or attempt to arrange
 9        attending by conference call?
10   A.   No, I don't believe I did.
11   Q.   Why not?
12   A.   I'm not sure.  Maybe the time was inconvenient.
13   Q.   Well, this was in August of 2012, correct?
14   A.   Yes -- or 2013.
15   Q.   Pardon?
16   A.   This was 2013.
17   Q.   2013?
18   A.   This was after they had defaulted on my loan and obviously
19        we're -- they showed intent to discuss that at the meeting.
20   Q.   So item number 3 on the agenda was of considerable interest
21        to you, was it not?
22   A.   Yes.  But I wasn't sure if they were really going to do
23        anything.  I don't think -- I felt like:  This is a sham
24        corporation.  This is really frustrating to me.
25             I don't know how I felt about it, but I'm not making a
```

103

1     trip to Seattle to sit around and watch people act like

2     they're running a business.  I was angry.

3  Q.  Okay.  So what did you do when you became angry after

4     reading this notice and deciding that this is evidence that

5     they were running a sham?  What did you do?

6  A.  Just ignored it.  I mean, they owed me the money anyway, so.

7     If they were going to make good on it, then I would have

8     received something a little bit different.

9         This was just, they wanted me to probably show up and

10    say, "Oh, there, there, it's okay.  You owe me money.  I'll

11    let it slide."

12        I wasn't okay with that.  I honestly just -- it was a

13    difficult, it was a difficult time.

14  Q.  Why was that?

15  A.  I was just -- the idea of traveling with a child, it's just

16    not -- to go to talk to them about -- they had been ignoring

17    me for months.  I already had tried to meet with them six

18    months, seven, eight months before, and they blew me off,

19    the Rudkins blew me off.  So I didn't believe that they were

20    really going to make good on this.

21        Why would you waste your money traveling 1,200 miles

22    with a child when, you know -- why would you do that?

23  Q.  How about a phone call to Mr. Du Wors?

24  A.  How about a phone call to Mr. Du Wors?  Mr. Du Wors was

25    responsible for these people's behavior, and he acted like

104

1     he didn't know anything about who I was.  He acted like I

2     didn't exist.  He acted like -- he actually claimed that he

3     didn't know what HPVG was.

4          I mean, these people were not serious about my loan or

5     my investment or my shares or putting me on the board or

6     voting me, you know, into a place where I would have a say.

7  Q.  Between August 6th of 2012 and the announced date of the

8     August 27th meeting had Mr. Du Wors told you at that time

9     that he didn't know anything about your interest in HPV or

10    HPVG?  Had Mr. Du Wors told you that?

11  A.  It was in the winter, yeah, the winter of 2013.  He acted

12    like he didn't know I was supposed to have shares.  I don't

13    remember the exact email.  I'm sure that that's around here.

14    You may have that in your notes.  I don't have that with me,

15    and it's been a few years since I read it.  But I remember

16    being very upset about that.  I think it was in March or

17    February.

18  Q.  Of what year?

19  A.  2013.

20  Q.  So you're talking about six months after this Mr. Du Wors

21    you thought gave you a dismissive answer, right?

22  A.  Six months after what?

23  Q.  Six months after you got this notice.

24  A.  No.  Six months -- three months before this note.  This came

25    in summer of 2013.

Jennifer Schweickert, Volume II - October 3, 2014

105

1   Q.  Where does it say that?

2   A.  Wait a minute.  Oh, you know what?  I'm looking at this

3       filed 13 up here.

4           And I remember where I was sitting when I got the

5       email that had this attachment in it, and I remember calling

6       and talking to my friend and going, "I don't know what's

7       going on."

8           This is -- you're right, this was six months before

9       that.  Sorry.  This was in 2012.  Thank you.  My memory

10      sometimes -- I was a sleep-deprived mother.

11  Q.  So you've had a number of memory lapses in the course of

12      this deposition about changes, correct?

13  A.  No.  Which ones are you talking about?

14  Q.  The record speaks for itself.

15  A.  This is the first.

16  Q.  You think this is your first one?  Okay.

17          Well, let's get back to this notice.  You now recall

18      having received this notice of a meeting for August of 2012,

19      correct?

20  A.  Yes, August -- yeah, exactly.  Okay.

21  Q.  And HPV was delinquent already, were they not?

22  A.  Yeah, they were delinquent.  They hadn't paid me my 11,000

23      that was due on New Year's Eve, and ... I had spoken with

24      Chad before this, saying, "What is going on with my loan?

25      What's going on, you know, with my stock?"

106

1          Because I guess Steve had taken off by that time.

2          And you're right.  This was not -- that's right.  This

3     was before, before they had started blowing me off.  My

4     anger about this ... why was I angry about this?  I was

5     angry when I got this, and I don't know why.

6  Q.  Exhibit 4 is what you're referring to, right?

7  A.  Yeah.  I was angry about this meeting of shareholders.

8  Q.  Okay.  And you were angry because they were delinquent, and

9     why else?  Any other reason?  And that might be reason

10    enough.

11 A.  Well, I had thought -- I was putting myself where I was in

12    2013 with everything that had happened to my knowledge at

13    that time when I was answering the questions about this.

14    But it turns out this was a year before.  So I don't know

15    where I was.  I remember seeing this in an email and I

16    remember calling a friend and being pissed.

17 Q.  Who was the friend you called?

18 A.  You know what?  I might have been fighting with my ex and

19    angry with him and thinking, "Fuck Hunts Point Ventures.

20    I'm not going anywhere.  I have too much shit to take care

21    of.  I'm not going to this."

22          So that's probably where we are.  That's probably why

23    I was upset.

24 Q.  You read the description in item 3, and it says:  Discussion

25    of the debt and/or equity interests of Joyce Schweickert,

107

1         Jennifer Schweickert and Cindy Hoover.

2    A.   Yeah.

3    Q.   And that was significant to you, correct?

4    A.   Yes.

5    Q.   Because you knew, among other things, there clearly was a

6         debt owed to you, 200,000 plus interest, right?

7    A.   That's right.

8    Q.   You also knew that there was an equity interest in HPVG that

9         you owned, correct?

10   A.   Yes.

11   Q.   And you knew they were delinquent, correct?

12   A.   Yes.

13   Q.   And you knew that Chad Rudkin was unresponsive when you

14        said, "Where's my stock?  Where's my payment?  What's going

15        on?"  He wasn't able to give you any satisfactory answers,

16        correct?

17   A.   Not at that time, no.

18   Q.   Ever?

19   A.   Ever.  You're right, ever.

20   Q.   And you still didn't call Du Wors, the guy that you're now

21        saying was the responsible adult there.  Why didn't you?

22   A.   Because I had hoped when I saw this, probably, that:  Oh

23        good, they haven't forgotten about my loan.  They're busy

24        working on it right now.  They're putting together this

25        meeting.  And good, when they're at that meeting, they'll

1      come up with some kind of solution and I'll hear about it

2      and then I'll be bothered.  But right now, if I'm just

3      supposed to go and listen to them try to brainstorm ideas on

4      how to pay me back, I'm not making a trip to Seattle to do

5      that.  But you know, when they want to call me with some

6      kind of response or some kind of a solution, then I'll pick

7      up the phone or I'll make the arrangements to meet.

8   Q.  Okay.  So can I assume that sometime within a week after

9      August 27th, when the meeting was held, that having waited

10     for an update, you called somebody and said, "What did you

11     decide?"

12  A.  No.

13  Q.  Why not?

14  A.  Why not?  I had other things going on.  I had ... I need to

15     say single mother again and again, because you don't

16     understand.  I was in the trenches with an ex that was nuts.

17     I was not sleeping well, obviously.

18         This was something I had hoped and had expected would

19     resolve itself because it had a good attorney on board

20     taking care of this that wasn't going to let this go unpaid.

21  Q.  Okay.

22  A.  So I was trusting.  That's why I didn't pick up the phone.

23         And I -- it wasn't -- it was just a couple of months

24     later, I guess, looking at the date here and knowing when I

25     tried to get ahold of Chad and Elizabeth, when I started

109

1   making trips to Seattle in the fall.  I came here once a

2   month and arranged to meet with them two or three times, and

3   they blew me off each time.

4        I had a vibe that was going that way anyway.  I felt

5   like this was just, this was just to make it look like they

6   were having an annual meeting of shareholders that was

7   supposed to have this fanfare attached to it.  That's why I

8   didn't pick up the phone.

9   Q.  So when you came up to Seattle in the fall of 2012 in both

10      times with prearranged meetings with the Rudkins --

11  A.  Yes.

12  Q.  And they blew you off.

13  A.  Yes.

14  Q.  And so why didn't you pick up the phone and call Du Wors and

15      say, "John, Mr. Du Wors, you're the guy that was going to be

16      running this thing or in charge"?

17  A.  I felt so uncomfortable.  I just -- I didn't get a vibe that

18      I liked from him.  I just didn't -- I guess I felt

19      intimidated.  I was afraid, because I didn't even know where

20      to start.  I was disappointed.

21  Q.  When you say you were "afraid," what do you mean by that?

22  A.  Intimidated is a form of fear.

23  Q.  Okay.  When you say "intimidated," what do you mean by that,

24      then?  What was it that was intimidating?

25  A.  Well, I told you I got a creepy vibe from him.

1   Q.   And that was because he used some terminology that was

2        patronizing and somewhat demeaning, I take it.  He said

3        "smart girl," right?

4   A.   When he meant the opposite.

5   Q.   Pardon?

6   A.   He meant the opposite, obviously.

7   Q.   Well, I don't know what he meant.  I mean, I would agree

8        with you that it's an unfortunate and stupid thing to say.

9   A.   Well, I've learned since then that, you know, he's a

10       misogynist.  And I think my gut feeling was right about him,

11       and I didn't want to have interactions with him.

12            I had hoped -- I had expected that Steve would be

13       there along the way to sort of be a good liaison and that my

14       relationship with Chad and Elizabeth would be more open.  I

15       didn't expect them to lose their daughter in that process in

16       that year.  Things were just -- things were very

17       uncomfortable.

18            And calling and bothering Chad any time before I tried

19       in the fall -- when was that?  She got sick that year,

20       didn't she?  Any time after that, after she got sick, I was

21       afraid to call them because I didn't, I didn't want to put

22       stress on them.  And I thought that -- I want to give them

23       the benefit of the doubt, so.

24            But Chad was my next person to call after Steve.  And

25       when Steve wasn't there and I wanted to talk to Chad about

1      it, depending on when that was ... I just never wanted to

2      speak to this guy, Du Wors.

3   Q.  Because you did get a bad vibe from him.

4   A.  Yes, I did.  But that didn't stop me from thinking that he

5      knew how to run the company.

6   Q.  Or how to run the patent-troll operation, correct?

7   A.  Well, that kind of goes without saying.  That's what his job

8      was.  We hired him for that purpose.

9          But we also hired him for corporate governance, to

10      make sure that everything was done by the book, that, you

11      know, the company was viable, that there was a payment

12      schedule, that ... that I was going to get paid back, that I

13      was going to get shares.

14          And then I would find out how I would get voted onto

15      the board, and you know, I'd learn all these things as I

16      went.  But I never received any paperwork.

17          So what was your question?

18   Q.  Pardon?

19   A.  Sorry.  What was your question?

20   Q.  I guess my next question would be:  Since you never received

21      any of the paperwork that you thought would follow from your

22      conversation with Mr. Du Wors when you got the understanding

23      that all of the documentation of corporate activity would be

24      done properly, notwithstanding that reassurance by him that

25      things were going to be done by the book with regard to

Jennifer Schweickert, Volume II - October 3, 2014

112

```
 1        documentation and taking corporate action, you never got
 2        anything to memorialize your interest in the company?
 3   A.   That's right.
 4   Q.   And you never called Du Wors.  Why not?
 5   A.   I already told you why.  I understood that Steve's situation
 6        got a little sticky and may have caused some setbacks
 7        because he was no longer involved.  I wanted to be
 8        reasonable and give Hunts Point Ventures time to get their
 9        shit together.  Plus, I didn't like Du Wors.  I didn't want
10        to talk to him.  He was a creepy bastard.
11   Q.   Okay.
12   A.   I didn't want to have to deal with him one on one.  I wanted
13        him to babysit the patents and take care of everything the
14        way they were supposed to and get the paperwork lined up and
15        have it ready for when Mark got out of prison, and then I
16        would get involved.
17   Q.   Okay.  So in part, you visualized that Mr. Du Wors was going
18        to have kind of a caretaker role until Mark got out, then.
19             I'm trying to understand what you're telling me here.
20   A.   Understand what, specifically?
21   Q.   Well, was it your understanding that Mr. Du Wors was going
22        to have somewhat of a caretaker role in the actual
23        management of the corporation, working with Steve and then
24        subsequently with Chad, until Mark got out of prison?  Was
25        that your understanding at the time?
```

Jennifer Schweickert, Volume II - October 3, 2014

113

 1   A.  Yes.

 2   Q.  Okay.  And as you told us last time, you knew at the time

 3       that you talked to Du Wors and Schweickert on April 22nd,

 4       2011, that at that time Mark did not have an interest of

 5       record, he was not an officer or director, and that was

 6       going to be changed when he got out of prison, right?

 7   A.  What?  That doesn't sound right to me.

 8   Q.  Well, let's take a look at your deposition testimony, if you

 9       want to challenge it.  But let me ask you this:  When you

10       talked to Steve and John on April the 22nd, was it your

11       understanding that at that time Mark did not have an

12       ownership interest of record in HPV?

13   A.  I don't remember saying that.

14   Q.  Well, what was your understanding when the time --

15   A.  My understanding at the time that I spoke on the phone with

16       Du Wors and Steve?

17   Q.  Right.

18   A.  I understood that Mark was the head honcho of this whole

19       thing, that everything that we were doing was at his

20       request, that he was running the show, that he was an

21       officer and director, and that whatever limits he had was

22       simply because he was in prison, and that as soon as he got

23       out he would resume that place, but that everybody else that

24       was involved in Hunts Point Ventures was doing as he

25       directed.

114

1    Q.   And how was he directing that?  From prison?

2    A.   Honestly, I was living in California.  My mother was living

3         in Texas.  Steve was living in Seattle the whole time, we

4         believed, because he was on the phone with Mark all the time

5         talking with Du Wors.

6              My impression was that Steve and Du Wors and Mark were

7         in conversations with each other.  Do you understand?

8         Because while Steve was living in Seattle, he was cheating

9         on my mother.  So he had all of us thinking that he was

10        living in Seattle to conduct business with Du Wors and Mark

11        Phillips.

12             So whatever -- Mark Phillips and I were not in cahoots

13        with each other at that time.  He was in prison.  We knew

14        each other, but we didn't communicate with each other.  So I

15        believed Steve when he said that he would speak to Mark and

16        Du Wors, the three of them -- that's why I trusted in

17        Du Wors, because I trusted Mark.  And I trusted that Steve

18        had Mark's best interests, because that would, in turn,

19        benefit Steve.

20             Does that make sense?

21   Q.   I'm not sure.  Let me ask you this.  Do you remember saying

22        last time -- I'll let you look at the transcript if you

23        don't have one.  The question was, "And you knew" -- and

24        this is as of April 22nd, "And you knew that they weren't

25        going to be able to put those shares in Mark's name until he

Jennifer Schweickert, Volume II - October 3, 2014

115

1      got clear of his criminal matter?  You knew that?"

2           And your answer is, "Yes."

3   A.  Oh, no.  I must have misunderstood the question.

4   Q.  Really?

5   A.  I did not hear them say that to me until I'd asked about

6       where my money was.

7           And I talked to Chad on the phone in the spring of

8       2013, finally got him on the phone.  And it was the last

9       time I talked to him.  I believe it was the last time I

10      talked to him.  Because I realized he was just Du Wors'

11      parrot.  He kept quoting Du Wors:  Well, Du Wors says this.

12      Well, Du Wors says this.  Well, Mark can't be an officer and

13      a shareholder.  Mark can't because he's in prison, blah,

14      blah, blah.

15          And that was the first time I'd heard that.

16          I would never -- look at me.  I would never -- I mean,

17      I may not be the sharpest tool in the shed, but I would

18      never give my money to Steve and Chad, under any

19      circumstances.  The only reason I gave that money was

20      because Mark said, "Hey, I like this attorney.  I trust

21      Steve.  I trust Chad enough."

22          But I believed in Mark.  I believed Mark knew what he

23      was doing.

24  Q.  Okay.  A moment ago when I read you the question, which is

25      on page 64 of your deposition, line 15 -- I'll reread it

1          just so you'll get it in context, "And you knew that they

2          weren't going to be able to put those shares in Mark's name

3          until he got clear of his criminal matter?  You knew that?"

4                Your answer is, "Yes."

5                Your response to me when I read it to you was, "I must

6          have misunderstood"?

7      A.  I was probably tired.  What time -- where was that in the

8          deposition?

9      Q.  Just a minute.  In response to your answer "Yes," confirming

10         that you knew that, I said, "Pardon?"

11               And your answer then was, "Yes.  Yes.  I'm aware of

12         that.  That was the whole" --

13     A.  Oh.

14     Q.  -- "point of doing this."

15               So get it --

16     A.  Why I said yes --

17                      THE COURT REPORTER:  Excuse me.

18                   (Discussion off the record.)

19     Q.  Would you please tell me what it was that you did understand

20         or didn't?  Were you tired?  Were you getting a little --

21     A.  Well, the reason I said "Yes.  Yes" was probably because I

22         went "Uh-huh," and said, "You have to say yes."

23               So I was saying "Yes.  Yes" to that, most likely.  I

24         don't usually say yes more that once.  I usually say uh-huh

25         when I'm talking to people.

117

1   Q.  And was that why you went ahead and said, "I'm aware of

2       that.  That was the whole point of doing this"?

3           Why did you say that, then, if that was simply --

4   A.  The whole point of doing what?  What do you mean?

5   Q.  Why don't you just read --

6   A.  Can I read that?

7   Q.  Sure.

8   A.  Thank you.

9   Q.  You think it sounds wrong?

10  A.  What?

11  Q.  You think it sounds wrong?

12  A.  It does sound wrong to me.  It sounds like I was spacing

13      out.

14  Q.  Oh, you were spacing out?

15  A.  I think I was spacing out when you were talking.

16  Q.  Okay.

17  A.  I knew that Mark wasn't going to be able to come in and see

18      how things were going.  I knew that he would be able to do

19      the best he could from his proximity.  I didn't know how

20      often he was able to speak on the phone.  I don't know what

21      he was able to do.

22          But I was told that he was an officer and director and

23      that he was the head honcho, he was the key to this whole

24      thing.  So that's my experience.

25          And whatever I said here, I'm sorry if I misspoke.

118

1       This was not -- I'm not sure -- you're circling something.

2       I don't know where to look here.

3    Q. It's down on line 15 and following, is what we were just

4       reading.

5    A. "And you knew they weren't going to be able to put those

6       shares in Mark's name until he got clear" -- I heard --

7       yeah, I remember hearing that, but that was in 2013 from

8       Chad.  Not at the time I was on the phone Steve and Du Wors.

9           So you may have asked me a question, and I may have

10      been thinking of being in my room talking on that chair to

11      Chad in 2013 when I heard that, yeah, this was how they were

12      going to get him off the register or write him out of the

13      company, saying, "Oh, he's got, he's got to clear his name

14      or he can't participate because he's got a criminal record."

15          I remember Chad telling me that, but that was in the

16      spring of 2013.  While I was on the phone with Du Wors and

17      Steve I thought he was a shareholder and director.  So

18      there's the correction.

19          Did I answer your question?

20   Q. In a way.

21   A. Is there something that's not clear about that?

22   Q. Well, we'll let the record speak for itself to the court.

23   A. Okay.

24   Q. Ms. Schweickert, one of the allegations you've made is that

25      when you talked to Du Wors and Steve Schweickert on

119

1     April 22nd, the one time you talked to them before you made

2     your investment, that he told you that the majority of your

3     money would go to pay down Mark Phillips' bill, and that

4     would then allow him to proceed ahead to prosecute the

5     patent-infringement claims.  Is that correct?

6  A.  Uh-huh.  That's correct.

7  Q.  All right.  Now, do you have any reason to believe that that

8     statement by John Du Wors was an untrue statement?

9  A.  Do I have any reason to believe that that was untrue at the

10     time he spoke it?  Or did I learn differently?  I'm not sure

11     what you're asking me.

12  Q.  Was it an untrue statement at the time?  Let's do that

13     first.  Was that an untrue statement at the time, in your

14     opinion?

15  A.  What part of it being untrue?

16  Q.  Any part.  Any part.  Was there any part of that statement

17     by John Du Wors to you untrue, in your opinion?

18  A.  He told me that my paying down Mark's criminal balance or

19     the balance due on the criminal trial would free him up to

20     aggressively pursue the patent infringement.

21  Q.  Okay.  And in your opinion is any part of that statement

22     untrue?

23  A.  I don't believe he aggressively pursued anything after that.

24  Q.  Okay.  So --

25  A.  So I think yes, it was being untrue.  I think he was just

1       trying to get my money.

2   Q.  So the part of that statement that is untrue, in your

3       opinion, is when he said, "After I get Mark's bill paid

4       down, I will then be in a position to aggressively pursue

5       the patent-infringement cases."  Correct?  And you think

6       that's an untrue statement?

7   A.  It turned out he had no intention.  It looks like, I mean,

8       Digicor, the settlement there was -- was it Digicor or RIM?

9       Either way, it was just very flaky.  It didn't look anything

10      like this.

11          This Exhibit 3 over here with $1.5 million settlements

12      for Essociate, it had nothing to do with that when he had

13      spoken of, you know, larger settlement possibilities with

14      Mark's intellectual property, so.

15  Q.  But you've already told us this morning that Exhibit 3 was

16      not a factor in your decision.

17  A.  It wasn't.  It wasn't.  Because I believed in that concept

18      without having to see Du Wors' and Steve's email.

19  Q.  You said just a moment ago that Mr. Du Wors had no intention

20      of pursuing the patent-infringement litigation.

21  A.  I don't believe he did.  I think he just pocketed the cash.

22  Q.  You're aware that there were four lawsuits filed, are you

23      not?

24  A.  No, not aware of four.  I thought there were two.

25  Q.  That's your information, that there were only two lawsuits

Jennifer Schweickert, Volume II - October 3, 2014

121

1      filed for patent infringement; is that right?

2  A.  I believe so.

3  Q.  Where did you get your information?

4  A.  Not sure.

5  Q.  Okay.

6  A.  Not sure.  It's been a few years.  I hear things.  I see

7      things from time to time.  I hear the words, you know,

8      Digicor.  I hear RIM, Research in Motion.  Is that what

9      that's called, Research in Motion?

10         It was not what I expected it to be.  They had talked

11     about suing these little companies first, and then suing

12     larger companies after that, and eventually suing companies

13     like Microsoft and Apple.

14 Q.  Okay.

15 A.  I didn't see any of that happening, so I believe that John

16     Du Wors had no intention.  I believe he said, "Hey, here's

17     some money.  I think I'm going to keep it.  Thank you very

18     much.  I'll do as minimum a job over here and be done."

19         That's what I think.

20 Q.  In addition to your opinion on this, do you have any

21     evidence of that?  I know that's your opinion, but do you

22     have any evidence?

23 A.  Well, I think the record kind of speaks for itself.  Nothing

24     happened.  Nothing happened.

25         And all the patents got -- they all were allowed to

Jennifer Schweickert, Volume II - October 3, 2014

122

1      lapse.  They didn't maintain the fees that were required for

2      them to be in good standing.  They all ended up worthless,

3      and we -- I have spent my own money reviving those patents

4      and working with the receiver to fix them.

5  Q.  Do you know which ones were allowed to lapse in this

6      country?

7  A.  Gosh, I'm not sure.  I think it was the buffering patent.  I

8      honestly don't know.  There were several.

9           But I talked to the receiver.  I paid them, or I gave

10     them a loan.  And then as they've needed it I've given them

11     money so that they can pay for these things.

12          I don't keep track of which is which, but all of them

13     are valuable.  One of them is so destroyed by Du Wors'

14     negligent that I don't think we're going to be able to get

15     it out of hock.

16  Q.  Which one is that?

17  A.  I don't know.

18  Q.  Okay.  You think there were two suits filed.  If I told you

19     there were four suits filed, would that change your opinion

20     as to whether or not Mr. Du Wors had any intention of

21     prosecuting the patent infringement?

22  A.  No.

23          MR. WAYMAN:  Object to form.

24  Q.  Your answer is "No," right?

25  A.  Yeah, "No."

Jennifer Schweickert, Volume II - October 3, 2014

123

1   Q.  Wouldn't change your opinion?

2   A.  That's my opinion.  I think he's all about keeping the

3       appearances up.

4   Q.  Okay.  When did you come to that conclusion?

5   A.  There wasn't a certain time that I can remember.  I felt

6       that way for a while, a long time.

7   Q.  Pretty much from the beginning, right?

8   A.  Yeah.  He's been quite the disappointment.

9   Q.  Okay.

10          (Exhibit No. 5 marked for identification.)

11   Q.  Ms. Schweickert, the court reporter's handed you what's been

12      marked for the purposes of this deposition as Exhibit 5.

13      Take a look at that, if you would.

14        Do you recognize it?

15   A.  This is the First Amended Complaint.  And I believe we had a

16      second one.

17   Q.  You did.

18   A.  I did.

19   Q.  If you will look at the last page of Exhibit 5, if you

20      would, quickly.

21   A.  Sure.  Okay.

22   Q.  And that's your verification of the facts that are alleged

23      in this complaint?

24   A.  Yes.

25   Q.  Okay.  Now, if you go to page 3 of that complaint, which is

124

1        kind of a long section, but it's part of an introductory

2        section.  You start in middle of that page, line 14,

3        reciting the material misrepresentations of fact that

4        Mr. Du Wors made on that occasion, correct?

5    A.  It looks like that, yes.

6    Q.  Okay.  And you say, "Based upon those misrepresentations,

7        plaintiff agreed to transfer $200 thousand as described in

8        the promissory note that was prepared by Mr. Du Wors and

9        would loan HPV the money."

10             Now, you say that note was prepared by Mr. Du Wors.

11       Who told you that?

12   A.  Well, I spoke with Steve and Du Wors on the phone and was

13       going over the contract with them in that call.

14   Q.  Okay.

15   A.  So Du Wors was in charge of preparing everything else, so my

16       understanding was that he prepared it.

17   Q.  Take me through that discussion you had with John Du Wors

18       and Steve when you went through the contract.  Let's get the

19       contract out here, in fairness, so you can look at it.  I

20       believe that's Exhibit 2.

21                   (Discussion off the record.)

22   Q.  This is a copy of Exhibit 2.  You said in this conversation

23       on April 22nd of 2011 you and Mr. Schweickert and

24       Mr. Du Wors discussed the "contract."  And by "contract,"

25       you mean the Promissory Note and Joint Participation

Jennifer Schweickert, Volume II - October 3, 2014

125

1     Agreement?

2  A.  Yes.

3  Q.  All right.  Take me through that conversation between the

4      three of you on that occasion, if you would.  You obviously

5      had some questions.  What do you remember about that?

6  A.  Not much at this time.  Was that three or four years ago

7      now?

8  Q.  Yes.

9                  (Witness perusing document.)

10 A.  This looks like this is repeating itself a few times, except

11     for the last one looking a little different.

12 Q.  Well, they're repetitious because these, I think, are the

13     alternatives that maybe Steve sent you.

14         Having reviewed it, Ms. Schweickert, can you recall

15     any of the conversation then that you and Steve Schweickert

16     and John Du Wors had on April 22nd, 2011 about this contract

17     that was being contemplated?

18 A.  Well, it was pretty self-explanatory here, this little table

19     setup here with all of our names on it, that we'd be sharing

20     the profits, we'd be sharing ownership in the company, Steve

21     would have 21 percent, Chad would have 21 percent, Doug

22     would have 21 percent, so would Mark, and that my mom and I

23     would each have 8 percent.

24         So there really weren't -- which questions are you

25     thinking -- are you referring to?

Jennifer Schweickert, Volume II - October 3, 2014

126

1    Q.   I'm referring to your testimony that you and John and Steve

2         had a discussion about the terms of this contract.  I just

3         want to know.  I don't know what questions you had.

4    A.   Oh.  The terms of the contract.  Wow.  I guess I just meant

5         how things were going to be paid back.

6    Q.   Okay.

7    A.   And how we were going to conduct ourselves as a business,

8         and how I was -- what is my role in that?  What is Mark's

9         role in that?  What's my mom's role?  What's Steve's role?

10        "What's your role, John?  Can I count on you to make sure

11        every 'I' is dotted and every 'T' is crossed?  Am I going to

12        get paid back?  Am I going to get shares?"

13             That's what that conversation was about.  I wasn't

14        necessarily going through the contract and, you know,

15        having, you know, tons of little questions.  It wasn't like

16        this.  This was very straightforward.  This was very ...

17   Q.   Okay.  And you have made reference to Exhibit B, which is

18        the proposed HPVG participation schedule.

19   A.   Where is that exhibit?

20   Q.   I think it's probably the third page of the exhibit, if you

21        look at the third page.

22   A.   Third page of which exhibit?

23   Q.   Exhibit 2.

24   A.   Exhibit 2, okay.  What was your question?

25   Q.   Well, you made reference a moment ago to the recitations in

127

1          this little schedule of the share ownership.  And I took it

2          from your answer that you understood that this percentage

3          ownership to be referring to HPV.  Is that correct?

4    A.   Well, it's HPVG, it says up here.

5    Q.   But as far as you're concerned, they're the same thing in

6          effect?

7    A.   Yes, for all intents and purposes.

8    Q.   Okay.

9    A.   I was owning -- I bought shares in the company that owned

10         the IP.  So whichever that was, HPV, HPVG, whatever we

11         called that.

12              Does that make sense?  Okay.

13   Q.   All right.  So your understanding was that this schedule of

14         percentage ownership reflected on page 3 of Exhibit 2 refers

15         to whichever company -- whether it's HPV, HPVG, you didn't

16         really care -- whichever company owned the IP, correct?

17   A.   Yes.

18   Q.   Okay.  So have you found out anything subsequent to that

19         time to contradict that understanding that you had on that

20         day, that is, April 22nd, 2011, as to the ownership of the

21         company that owned the IP?  Do you have a different

22         understanding now than what you had at that time?

23   A.   What I understand now -- what I believe now is that Hunts

24         Point Ventures Group never had any arrangement with Hunts

25         Point Ventures, and that I was sold shares in HPVG.  Which

Jennifer Schweickert, Volume II - October 3, 2014

128

1       looks like it doesn't have any kind of contract with Hunts

2       Point Ventures.  So that's what I believe happened.

3  Q.  Well, I understand that, but that's not my question.  My

4       question is:  On April 22nd, 2011 you had the understanding

5       that the ownership of the corporation or company that owned

6       the intellectual property, that share ownership is reflected

7       on this schedule on page 3 of Exhibit 2, correct?

8  A.  I think so, yes.

9  Q.  Have you learned anything subsequent to that time, to

10      April 22nd, 2011, that would contradict that understanding?

11      Is that a correct understanding or an incorrect

12      understanding as to ownership of the company that owns the

13      IP?

14  A.  I'm sorry.  I don't think I understand your question.

15  Q.  Well, what is your understanding today as to who owns the

16      company that owns the intellectual property?

17  A.  I believe Hunts Point Ventures owns the intellectual

18      property.

19  Q.  Okay.  Let me ask you this, Ms. Schweickert.  Pretty clearly

20      on the basis of your conversation with Mr. Schweickert and

21      Mr. Du Wors on that occasion, I take it you had in front of

22      you -- clearly, since you discussed it -- you had Exhibit 2

23      with you.  And you made reference to that in the course of

24      your conversation with those two gentlemen, did you not?

25  A.  Yes, I did.  I believe I had these with me when I was on the

Jennifer Schweickert, Volume II - October 3, 2014

129

```
 1        phone with them.
 2   Q.   Okay.  And at least Mr. Schweickert certainly had a copy of
 3        it.  You don't know if Mr. Du Wors had a copy or not, I take
 4        it.
 5   A.   Well, they were together, so why wouldn't they each have a
 6        copy, or share a copy?
 7   Q.   Okay.  But you --
 8   A.   Du Wors probably -- he was responsible for having drawn this
 9        up.  I don't see Steve doing something like this.
10   Q.   But you said earlier that that was simply your assumption or
11        understanding, no one ever told you that Mr. Du Wors drew it
12        up.
13   A.   It was my understanding that he did.  Why would I think that
14        he didn't?
15   Q.   That's just your understanding based upon your assumption
16        that Steve would not be the one to draw it up, correct?
17   A.   This is getting kind of silly.  Of course Du Wors drew it
18        up.  It was him.  He was in charge of the company.  He was
19        the attorney.  He was -- his company is going to -- his firm
20        is going to be responsible for drawing up contracts.  That
21        goes with the territory when you hire an attorney.  People
22        inside your company don't write the contracts.  The
23        attorneys do.  So why on earth I would assume different?
24   Q.   That's the basis for --
25   A.   So is he saying he didn't draw this up?  That's funny to me.
```

Jennifer Schweickert, Volume II - October 3, 2014

130

1   Q.  That's funny to you.

2   A.  Not ha-ha funny.

3   Q.  Okay.

4   A.  Not at all ha-ha funny.

5   Q.  And it was from this schedule here that you're looking at

6       that you got a clear understanding that Mr. Phillips was

7       going to have a 21 percent interest in the company that

8       owned the IP, correct?

9   A.  21 percent interest or 21 percent ownership, however you

10      slice it.  Yes, he was a 21 percent owner of this company,

11      but that he would own -- still own the intellectual property

12      and license it out, and that this company would be comprised

13      of these people here, but he would have a piece of that as

14      well.

15  Q.  Okay.

16  A.  So that's why it didn't matter to me, you know, passive

17      member, all that stuff.  That didn't matter to me.  I knew

18      at the time that Mark was a director and an officer of this.

19  Q.  Because Steve Schweickert told you that when he talked to

20      you down in Woodland, Texas, correct?

21  A.  Yeah.  And then Du Wors signed off on it when I spoke to him

22      on the phone, they both did.

23  Q.  Tell me the exact words used in the conversation with John

24      Du Wors.

25  A.  I don't remember the exact words.

Jennifer Schweickert, Volume II - October 3, 2014

131

1  Q.  You're going to have to get close, because you're pretty
2      vague so far.
3  A.  Have I been vague?
4  Q.  Really.  Really.
5  A.  I wouldn't have given my money to this company if I hadn't
6      been assured by John Du Wors that Mark Phillips was a
7      director.
8  Q.  Tell me the words and the context.  How did it come up?
9  A.  How did it come up?  Well, I had all kinds of questions for
10     Du Wors.  And he talked a lot, and he talked a lot about
11     patent trolling.  And I was, like, "I understand.  I
12     understand how that works.  But can we please talk about
13     payment.  How am I going to get paid?  What's this going to
14     look like?"
15         I've already gone through all of this with you.  I
16     don't know why we're covering this yet again.
17 Q.  Well, there was a lot of time devoted to this issue of
18     payment, was there not?
19 A.  I wanted to make sure I was going to get paid back and I
20     wanted to make sure I was getting my shares.  But that
21     was -- it wasn't like I had to say it 18 times.  It was a
22     one-time question.  I trusted the answer I was given.
23         As well as I trusted the answer that I was given that
24     Mark would be involved and running the entire thing, and
25     that when he was out of prison he would be here running the

Jennifer Schweickert, Volume II - October 3, 2014

132

1      company.  But in the meantime, we're getting our ducks in a

2      row.

3  Q.  Say that again.  When he's out of prison what would happen?

4  A.  That he would be physically here running the company, but

5      that he's running the company from -- you know, by proxy

6      right now.

7          And at no time did Du Wors or Steve ever say to me,

8      "He can't.  He's a criminal.  He's a convicted felon.  He's

9      not allowed to do that from prison."  No one said that to

10     me.

11         And what I understood was that that was only an issue

12     if we had a publicly-traded company.  But it was a private

13     company, so we could do whatever we wanted as long as, you

14     know, we followed the law, as long as we had an attorney who

15     knew what the hell he was doing.  Which is what I thought we

16     had.  And that is why I invested my money.

17  Q.  Okay.  Back to Exhibit 5, if you would, Ms. Schweickert.

18      Exhibit 5 is the First Amended Complaint.

19  A.  Okay.

20  Q.  We're talking about material misrepresentations Mr. Du Wors

21      made that are set forth in this introductory statement.  You

22      go on to say that both Schweickert and Du Wors represented

23      that plaintiff had no money and needed your investment to

24      pursuit the patent violations.

25          That's a true statement, isn't it?

Jennifer Schweickert, Volume II - October 3, 2014

133

1   A.   Where in Exhibit 5 are you reading?

2   Q.   Page 3, where we were before.

3   A.   Page 3, where we were.

4   Q.   Starting down on line 15.  And by now I'm down to line 20.

5   A.   Okay.  "Ms. Schweickert was told by Stephen Schweickert and

6        John Du Wors that her investment would be used to pay

7        Mr. Du Wors past due fees, which would allow him to

8        aggressively pursue patent litigation."

9             Yes.

10  Q.   "Both Stephen Schweickert and John Du Wors represented to

11       the plaintiff that HPV had no money and needed her

12       investment to pursue the patent violations."

13            That's a true statement, isn't it?

14  A.   Yes.  Yes.  And there was a considerable amount of pressure

15       put on me to do so.  I mean, it was really -- time was of

16       the essence.  Both of them wanted to know when I was going

17       to invest.  And that's why I went out and I invested within,

18       you know, three or four days.  It wasn't -- I don't even

19       remember how much time had passed, but it wasn't much.

20            I was told that it was either me or Sandy Hoover was

21       going to invest.  They wanted me to invest because, I guess,

22       Sandy Hoover was only willing to invest 100,000.  And I

23       found out later on that she had already invested.

24  Q.   Skip over to the more detailed statements of what you

25       believe to have been material misrepresentations.  And that

134

 1   would start -- it actually starts with section 19, but

 2   you've already addressed those issues.

 3   A.  So we've skipping to section 19?

 4   Q.  We're skipping to section 20 on page 8.

 5   A.  Okay.

 6   Q.  Now, you've already addressed some of the issues regarding

 7   patent sharing in your earlier Volume I of your deposition

 8   about the significance of the profit sharing.

 9        And you say, starting on line 14 of page 8, "The

10   representation" -- which is referring to the profit

11   sharing -- "was material because plaintiff believed she

12   would participate in an equity sharing scheme between HPV

13   and HPVG, and that even if this expectancy did not come to

14   fruition, she was led to believe the parties had formulated

15   and would at least attempt to execute upon this strategy for

16   any patent violations that Mr. Du Wors prosecuted."

17        What did you intend to convey by this statement on

18   line 16, "even if this expectancy did not come to fruition"?

19   What did you mean by --

20   A.  I'm not sure why my attorney put that in there.

21   Q.  But you understood that there was a risk that it might not

22   happen, there might not be any money, or that the money

23   might not be as --

24   A.  Well, of course everybody understands that when they make an

25   investment.  But it's not gambling.

Jennifer Schweickert, Volume II - October 3, 2014

135

1   Q.   No.

2   A.   No.  It's very different.  Especially when you have

3        wonderful patents to work with, somebody who claims they're

4        very good at patent trolling, such as, you know, Mr. Du Wors

5        here, and the passion that we all had in protecting and

6        making sure that Mark had support to do what he does best:

7        Create.

8   Q.   Let me go back to something you just said about Mr. Du Wors

9        selling himself as a patent enforcer.  Do you think that he

10       made any misrepresentations to you about himself and his

11       abilities?

12  A.   Yes, I do.  I believe --

13  Q.   Tell me what they were.

14  A.   I just believe he used hard-sale tactics with Steve and with

15       Mark Phillips when Mark was vulnerable.  I just -- I can see

16       everything that's happened ever since he came on board.

17       He's helped himself to everybody's money and made sure that

18       Mark didn't get good representation in his criminal trial.

19  Q.   I'm not asking --

20  A.   And then he allowed all the other lawsuits' patent -- not

21       patent -- all the other lawsuits' statutes of limitations --

22       he's responsible for all the failures of the other lawsuits.

23       He should have been on top of those.  That was his job, and

24       he just didn't do his job.  All he had to do was his job.

25       And he didn't want to do his job.  He just wanted to take

 1        the money.

 2   Q.   But that's not the question.  My question was:  Did he make

 3        misrepresentations to you regarding his capabilities as a

 4        patent enforcer?

 5   A.   Regarding his capabilities?

 6   Q.   Any aspect of that undertaking with regard to enforcing the

 7        patents, did he make any misrepresentations to you?

 8   A.   I think you should rephrase the question.

 9   Q.   Did he mislead you as to his ability to enforce those

10        patents?  And if so, tell me what he did.

11   A.   He may have.  I mean, it's possible that he didn't know what

12        he was doing.  But I believed he knew what he was doing.  He

13        told me he knew what he was doing.  So the fact that he

14        hasn't done it tells me that he lied.  So yes, I believe

15        that's a misrepresentation.

16   Q.   Anything else?

17   A.   Anything else?

18   Q.   Yes.

19   A.   About what?

20   Q.   About his representations as to his ability to enforce the

21        patents.

22   A.   As to his ability?

23   Q.   Yes.

24   A.   I'm not sure what you're getting at.

25   Q.   Do you understand what the word "ability" means?

Jennifer Schweickert, Volume II - October 3, 2014

137

1   A.  Yes, I know what the ability -- what --

2   Q.  What is your lack of clarity in your understanding,

3       Ms. Schweickert?

4   A.  Why do I have a lack of clarity?

5   Q.  Yes.  Why don't you understand the question?

6   A.  I might need a break.  I might be a little tired or I need a

7       break.  I'm not sure -- you're asking a very open-ended

8       question.

9   Q.  Well, I'm asking if you think that John Du Wors misled you.

10      There appeared to be a pretty material question from you to

11      him, which is:  Are you up to the job of enforcing these

12      patents?

13          That was pretty important to you, wasn't it?

14  A.  Yes, it was.

15  Q.  That was a pretty central issue, wasn't it?

16  A.  Of course it was.

17  Q.  So what I'm asking you is:  Did he mislead in any way that

18      caused you to rely upon him, as to his ability and his

19      intention --

20  A.  Yes.

21  Q.  Okay.  Tell me.

22  A.  That's the answer you want.  Yes.

23  Q.  But I want to know what the misleading was.  What did he say

24      that was misleading or false or incorrect?

25  A.  He said he knew what he was doing.  And it turns out, either

1        he didn't or he just didn't care.

2   Q.   Okay.

3   A.   He didn't offer, he didn't offer us the duty that I thought

4        he had taken an oath to do, to do no harm, you know, to take

5        care of the company, to make sure that everybody was paid.

6   Q.   Okay.

7   A.   He didn't prosecute the patents like he said he would.

8             You're telling me there's four lawsuits.  Well, there

9        may have been four measly little drafts written, but I don't

10       feel like there was any vigorous pursuit of patent

11       prosecution.  I don't believe that for a minute.

12            I don't feel that that was who he is now.  I don't

13       believe that now.  At the time he represented himself to be

14       this person that could kind of take the world by storm with

15       these patents.

16  Q.   Do you have any specific statements in that regard that you

17       can repute to Mr. Du Wors?  I'm looking for specifics.

18  A.   For specifics.

19  Q.   Sure.

20  A.   Aren't we all looking for specifics.

21            With regards to what?  Say that again.

22  Q.   Do you have anything more specific with regard to

23       Mr. Du Wors' statements to you about his abilities with

24       regard to enforcing the patents?  Anything more specific

25       than what you've given me so far?

1    A.   I think I've been as specific as I can be, you know, talking

2         about his knowledge of patent trolling, the trolling monster

3         machine that he is, that he promises to vigorously -- he

4         used the word "vigorously" pursue.

5             And it just turns out he did nothing.  So I don't know

6         what more you want me to say.

7    Q.   Just the truth, that's all.

8    A.   That's the truth, unfortunately.

9    Q.   Skip to 23, section 23, Ms. Schweickert.

10                  MR. FRANKLIN:  Do you need a break, by the way?

11                  THE WITNESS:  Yes, please.

12                  MR. FRANKLIN:  Let's do that.

13                  (A break was taken from 11:26 to 11:38.)

14   Q.   Back on the record.  Ms. Schweickert, before the break I

15        directed your attention to paragraph 23, which is on page 9.

16        And maybe you can explain this to me a little bit.  One of

17        the statements that you impute to Mr. Du Wors, and to

18        Mr. Steve Schweickert as well, but certainly Mr. Du Wors

19        here, you say that you were told that Mark Phillips was a

20        shareholder, director, and officer of HPV with at least a

21        30 percent interest in the company.

22            And now, that's kind of a curious way to word it, and

23        I wonder what you're referring to.  How was that

24        communicated to you?  To say that, "Well, he's at least a 30

25        percent ownership interest" is kind of an odd way to say it.

140

1    A.    I'm not sure.  I think that was just an error in translation

2          between my attorney and I.

3                I just remember thinking he had at least 30 percent

4          interest combined with HPV ownership, and then the

5          intellectual property was all his.  So I'm not sure.  I

6          don't think that really mattered to me when I gave that

7          information to my attorney.  I did the best I could getting

8          documents together.

9    Q.    Okay.  So what I'm trying to get at is, do you remember

10         Mr. Du Wors telling you something that led you to that

11         general conclusion that there was a combined ownership

12         interest between the ownership of the IP separate from the

13         corporation in a percentage ownership interest in the

14         corporation?

15               How did you get to the 30 percent, is what I'm getting

16         at?

17   A.    I don't know.  I don't actually -- that 30 percent doesn't

18         mean anything to me now.

19   Q.    Okay.  Fair enough.

20   A.    I think it's just a number that I threw out.

21   Q.    Fair enough.

22   A.    Is that all right?

23   Q.    Sure.  Sure.  Going down to line 24, it says,

24         "Defendant Du Wors was aware that plaintiff was motivated

25         solely by her desire to help and assist Mr. Phillips in

141

```
 1           agreeing to loan HPV money."
 2                What do you mean by that?
 3    A.   What do I mean by that?
 4    Q.   Yes.
 5    A.   Well, this statement is written the way that it is to convey
 6         that Du Wors preyed upon my generous nature.
 7    Q.   Fair enough.  Skip on down to paragraph 24, which commences
 8         on page 10 of Exhibit 5.  Again, it's referring to
 9         wrongdoing reputed to Mr. Du Wors.  And at the end of that
10         page you commence a sentence that says, "He" -- Du Wors --
11         "counseled or instructed the Rudkins to book plaintiff's
12         loan as an 'angel investment'."
13                Now, did Rudkins tell you that?  Where did you gain
14         that understanding?
15    A.   I didn't hear about that until Mark and I were having a
16         conversation.  He had discovered it.  And that was probably
17         in early to mid 2013.
18    Q.   And tell me what Mark learned.  How did he learn?  Did he go
19         by looking at the books?
20    A.   Yeah, that's right, he did.  He was able to see the books.
21    Q.   And were the Rudkins there with him as he reviewed the
22         books, if you know?
23    A.   I don't remember.  I wasn't there.
24    Q.   So Mark reported back to you that, "Hey, Jennifer, your loan
25         is reflected as an angel investment"?
```

142

1    A.   Yes.

2    Q.   And do you understand what that means?

3    A.   I didn't at the time.  And Mark explained to me that it

4         certainly wasn't an actual loan and it wasn't an actual

5         purchase of shares.

6              So they just decided to take my money and say, "Oh.

7         Jennifer just bestowed this $200,000 on the company and we

8         don't have to pay her back."

9    Q.   Did you get an understanding as to what the term "angel

10        investment" means?  Do you think it just means it's a gift?

11   A.   I'm not sure.  I'm not sure.  But they changed it.  They

12        basically wrote me in there as a loan only and that they

13        owed the money but that I wasn't supposed to be given any

14        shares.  That's what I understood that angel investment

15        booking to mean.

16   Q.   I see.  Okay.  Do you know, Ms. Schweickert, if there were

17        ever any profits from the patent-troll lawsuits?  We know

18        there was some net funds, but were there any profits, to

19        your knowledge?

20   A.   Not very many.

21   Q.   Any?

22   A.   Not very many.

23   Q.   Well, were there any profits, to your knowledge?

24   A.   Profits to whom?  I mean, from the transaction itself?  In a

25        gross number?  What are you asking?

Jennifer Schweickert, Volume II - October 3, 2014

143

1  Q.  What's your understanding of what "profit" is?  Is "profit"

2      the same as "gross"?

3  A.  I'm not sure why you're asking me this.

4  Q.  Well, is it?  Do you know?

5  A.  Is profit gross?

6  Q.  Is gross receipts the same thing as profit?

7  A.  I don't know.  Are cake and bread the same thing?  I mean,

8      I'm not sure why you're asking me this.  I'm not going to

9      answer a question I don't know how to answer.

10  Q.  Well, you're not answering because you don't know the

11      answer?  Is that the problem?

12  A.  I'm not sure how to answer.  Is a profit different than

13      gross?  Yes.  I guess profit's a little bit more -- gross is

14      what comes out of the whole thing, and then you have to

15      figure out taxes and figure out expenses, payments, and all

16      that stuff.

17          Correct?  Is that what you're getting at?

18  Q.  Yes.

19  A.  Okay.

20  Q.  So out of the gross there are a lot of things you have to

21      take out before you get to profit, right?

22  A.  Yes.

23  Q.  And so you don't know whether there were ever any profits

24      realized by HPV which held the title to the IP and commenced

25      the lawsuits to enforce the patents?  You don't know if

144

1      there were any profits at all?

2  A.  I don't know.  I wasn't given any information about that, so

3      I don't have an answer.  I don't know.

4  Q.  Have you ever talked to the receiver?

5  A.  Have I ever spoken directly to the receiver?  No.

6  Q.  Have you learned anything from the receiver in that regard,

7      as to whether there were ever any profits?

8  A.  Not -- no, not to my knowledge.

9  Q.  You don't have any reason to believe that there were ever

10     any profits, do you?

11  A.  With Du Wors' way of paying himself before anything else

12     gets done, there is no profit with a model like that, so.

13  Q.  Well --

14  A.  I blame Du Wors for that.

15  Q.  You knew with regard to your investment that largely it was

16     going to go to pay Du Wors, didn't you?

17  A.  With that investment, yes.  But that further patent

18     litigation would pay me back.  That was his assurance.

19  Q.  Well, are you saying that he guaranteed HPV's performance?

20  A.  Yes.  Yes, he did.  He guaranteed his abilities, and he

21     guaranteed that he would be able to follow through with

22     making sure that HPV was a viable thing in going after

23     pursuing patents.  That was his thing.  He was all excited

24     about it.

25  Q.  Anything else that he guaranteed?  Anything else?

145

1    A.   Look, I'm not sure what you're trying to make me say with
2         your tricky question.
3    Q.   I don't think --
4    A.   But Du Wors made assurances.  Of course nobody makes
5         guarantees.
6    Q.   Including Du Wors?  He didn't make guarantees to you, did
7         he?  Did he say, "I guarantee you that we're going to
8         realize millions of dollars"?
9    A.   That would be stupid.  No, he would never do that.
10   Q.   Correct.
11   A.   I never said Du Wors was stupid.
12   Q.   Okay.  Take a look at Exhibit 4 just for a quick minute
13        here, Ms. Schweickert.  We talked about it earlier, and I'm
14        not going to beat it to death, but I want to ask you one
15        question about it.  Exhibit 4 is that Notice of Annual
16        Meeting of Shareholders that was apparently generated on or
17        about the 6th of August of 12 for an annual meeting on
18        August 27th of 2012.
19             And in Exhibit 5, paragraph 25, on line 11 --
20   A.   Exhibit 4?
21   Q.   I'm giving you Exhibit 4, but I'm also going to
22        cross-reference back to Exhibit 5.
23   A.   Okay.
24   Q.   Which is the First Amended Complaint.  And it's paragraph
25        25, which is on page 11, line 11.  And you use a phrase here

Jennifer Schweickert, Volume II - October 3, 2014

146

1    referring to the reference to item 3 on the agenda.  You say

2    that this notice that was sent out by Mr. Du Wors' office,

3    you say, "in an apparent lapse; confirmation by Mr. Du Wors

4    that plaintiff did, indeed, have a debt and/or equity

5    interest in HPV and was a shareholder."

6        Why did you use the term "in an apparent lapse"?  What

7    did you mean by that?

8    A.  Well, they hadn't paid me anything yet, I'm assuming.

9    Q.  Pardon?

10   A.  I'm assuming it's because I hadn't been paid anything yet.

11   I was owed $11,000 on the December 31st before this.

12   Q.  I understand.  But this inclusion of item 3 by Mr. Du Wors

13   on the notice of the annual meeting, why did you

14   characterize that item as a, quote, "apparent lapse" by

15   Mr. Du Wors?

16   A.  Well, this was written after they had defaulted completely

17   on the loan.  Hunts Point Ventures was responsible for that.

18   Q.  Were you trying to say that Mr. Du Wors somehow screwed up

19   by this expressed acknowledgment that you had an interest in

20   the corporation either by way of a debt or equity or both?

21   Is that what you're saying?

22   A.  I'm not sure I understand the question.

23   Q.  I'm just trying to find out what you're trying to say by

24   your allegation.  You swore to this.  You verified it under

25   oath.  What did you mean by that?

Jennifer Schweickert, Volume II - October 3, 2014

147

1   A.  Well, let me read it again.

2   Q.  Read it, please.

3                   (Witness perusing document.)

4   A.  It says, "This is an acknowledgment that Plaintiff either

5       has a debt interest in HPV, which Mr. Du Wors attempted to

6       conceal, or an equity interest in HPV, as it was so booked,

7       in which case she should have an equity stake, which by the

8       terms of the note, she never had in HPV."

9           So I think the paragraph sort of summarizes what

10      you're trying to get out of me.

11  Q.  All right.  Thank you.

12                  (Exhibit No. 6 marked for identification.)

13  Q.  Ms. Schweickert, the court reporter has handed you what's

14      been marked for this deposition as Exhibit 6.  Do you

15      recognize that?

16  A.  Do I recognize this?  It doesn't look unfamiliar.

17  Q.  Does it look familiar?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's letting the Rudkins and Du Wors know that myself or one

21      of my representatives will be at Du Wors' office to go over

22      the corporate records.

23  Q.  Did you attend that meeting or did someone on your behalf

24      attend that meeting on February 11th, 2013?

25  A.  Mark went as my proxy.  I lived in Santa Monica at the time.

Jennifer Schweickert, Volume II - October 3, 2014

148

1   Q.  So Mark Phillips went in your place?

2   A.  Yes.

3   Q.  To your knowledge was he given access to the records that he

4       requested?

5   A.  Yes, I think so.

6   Q.  And I take it that it would have been following that

7       inspection of the corporate records by Mark Phillips that he

8       would have reported to you that your loan had been

9       recharacterized as a, quote, angel investment.  Correct?

10  A.  That's correct.

11  Q.  What else did you learn by way of Mark Phillips' inspection

12      of the corporate records on February 11th, 2013?

13  A.  I also learned that they had not given him any stock or

14      shares and not put him on the board.

15  Q.  And when --

16  A.  They somehow demoted him as an officer.  They just rewrote

17      the books.

18  Q.  And it was Mark's expectation that they would have issued

19      the shares and would have voted him on the board and as an

20      officer as soon as he completed his sentence in the Federal

21      facility?

22  A.  That's true, that he was expected to have the job when he

23      came out of prison, he was expected to have transportation,

24      a place to live, and an office set up where he would then be

25      able to perform, hands-on perform as a director and officer.

149

1  Q.  Now, Mark presumably had learned that Chad Rudkin was taking

2      a position that he was not an officer, not a director,

3      before this February 11th meeting, though, had he not?

4  A.  I'm not a hundred percent sure when that knowledge was

5      acquired, I don't know, between Mark and Chad.

6           I know that Chad was elusive, didn't want to have

7      conversations.  I don't remember when I spoke to Chad.  The

8      last time I talked to Chad he said -- and he quoted Du Wors

9      left, right, and center, "Mark can't have this status

10     because, you know, he's a convicted felon," blah, blah,

11     blah, and some other -- he spouted off some jargon that I

12     know Chad doesn't understand but he used and he got from

13     Du Wors.

14          Let me -- Chad's an Army Ranger.  I've known him since

15     he was in high school.  I know Chad very well.

16  Q.  When did you first talk to Mark Phillips after his release?

17     Was he released toward the end of September of 2012, or was

18     it into October?

19  A.  I think it was the end of September.  I think he'd been

20     released three or four weeks when we started talking on the

21     phone.

22  Q.  And you were still in Santa Monica, correct?

23  A.  Yes.

24  Q.  How did it come to be that the two of you began conversing?

25  A.  He called to thank me for my investment to take care of some

Jennifer Schweickert, Volume II - October 3, 2014

150

1    of the debt towards Du Wors.  That was his reason for

2    calling.

3  Q.  Do you know when that was, that first call?

4  A.  October 25th.

5  Q.  And I take it that the calls became frequent thereafter.

6  A.  Yes.

7  Q.  When did you first see Mark?

8  A.  About a month after that, in November, for Thanksgiving.

9  Q.  Was that down in California?

10  A.  No.

11  Q.  It was up here?

12  A.  Up here.

13  Q.  So you flew up here to see Mark then?

14  A.  Yes.

15  Q.  Where was Mark living at that time?

16  A.  He was living in a halfway house facility.  He was still

17    technically in custody.

18  Q.  When did that halfway house residency terminate, if you

19    know?

20  A.  Boy, when was that.  I think it was in the spring of 2013.

21  Q.  So he continued to reside in the halfway house up until,

22    say, spring of 13, then?

23  A.  Yes.

24  Q.  At what point did you decide that you and Mark probably had

25    some joint economic interest in these entities, HPV

1        specifically?  Was that pretty immediate upon your initial
2        contact with him?
3    A.  Sure.
4    Q.  Because they were by that point quite delinquent on their
5        obligation to you, correct?
6    A.  Yes.
7    Q.  And when did Mark first tell you, if you recall, that he was
8        getting the runaround, getting stonewalled, whatever, by
9        Rudkin?  When did he first say that to you?
10   A.  I don't believe it was until November of 2012.
11   Q.  Tell me about that.  What did Mark have to say?
12   A.  The only thing I remember before he got wind that he was
13       being given a runaround -- I wish I could remember the
14       event, because it wasn't -- I think that he went with the
15       Rudkins to Du Wors' office sometime after that in November.
16       Maybe it happened in November, where they told him flat out
17       how it was going to be.  And he was not happy.
18   Q.  Tell me what Mark's account to you was about that after the
19       meeting at Du Wors' office.  Were both Rudkins there, to
20       your knowledge?
21   A.  Yes.
22   Q.  And what did they tell Mark as to what his status was going
23       to be with regard to HPV?
24   A.  They said the same thing to him that Chad told me months
25       later, that Mark couldn't be a director or officer of the

152

1        company because he was a convicted felon.

2    Q.  What did they tell him about his ownership?

3    A.  I'm not sure what they told him about his ownership.  It's

4        all fuzzy to me right now.  But basically they told him,

5        "This is ours and it's not yours.  Fuck off."

6    Q.  Okay.

7    A.  Which was shocking.  They went to high school together.

8        They'd known each other for 20 years.

9    Q.  Now, was that communicated to you by phone, then?  Since

10       Mark was still up here and obviously had just come from

11       Du Wors' office here in town.

12   A.  I made trips to see him probably once a month, once every

13       three weeks, somewhere in there.  We did the long-distance

14       relationship thing for about eight months, until I moved up

15       here in June of 2013.  And yes, we spent a lot of time on

16       the phone.

17   Q.  Was there any other event or contact or communication

18       between Mark and the Rudkins or Mark and Du Wors following

19       that November 12 meeting at Du Wors' office where he was

20       told, "You're not an officer or director because you're a

21       felon"?

22   A.  I don't remember how often they met or whether they met or

23       when.  At some point they stopped meeting because there was

24       obviously -- you know, he was being stonewalled, so.

25            That's when it became apparent that it was time to

Jennifer Schweickert, Volume II - October 3, 2014

153

1      draft a suit.

2           And he has his own suit going on.

3   Q.  Pardon?

4   A.  He has his own suit going on right now with the Rudkins.

5                (Exhibit No. 7 marked for identification.)

6   Q.  You've been handed what's been marked as Exhibit 7.  What is

7       Exhibit 7, Ms. Schweickert?

8   A.  This is my demand letter, February 4th of 2013, written to

9       Du Wors and the Rudkins.

10  Q.  Okay.  Thank you.

11               (Exhibit No. 8 marked for identification.)

12  Q.  Ms. Schweickert, the court reporter has handed you what's

13      been marked as Exhibit 8 to this deposition.  Do you

14      recognize that?

15  A.  Oh, yes.

16  Q.  It's an email chain, and it starts out with an email from

17      Du Wors to you on February 8th.

18  A.  It starts off from me to them.

19  Q.  Excuse me.  From you to them.  I'm sorry.

20           Mr. Du Wors' response to you is pretty terse and I

21      take it quite unsatisfactory to you.

22  A.  I couldn't believe it.  I was livid.  I was shocked.  I

23      literally could not believe my eyes.

24  Q.  Why was that?

25  A.  Why was that?  I think that's pretty self-explanatory after

Jennifer Schweickert, Volume II - October 3, 2014

154

1    everything we've talked about this morning and the other

2    deposition.

3         He absolutely knew that I was an investor in HPV,

4    without question.  He was the one that induced me to invest

5    in the company, and then pretended that he didn't know

6    anything about it.  I mean, that's just ... what's the word?

7    What's the word?

8  Q.  And I take it when you say "an investor in HPV," you're

9      conflating or combining HPV and HPVG?  In other words, in

10     your mind they're the same thing?

11 A.  Yes.

12 Q.  All right.  So you felt this was outrageous because he

13     clearly knew that you had an 8 percent interest in HPVG?

14 A.  That's correct.

15 Q.  All right.

16 A.  But he also then later on denied that he knew anything about

17     HPVG.  Which is weird.  So I don't know what to believe.  I

18     don't know what he believes.  I know what he's telling

19     everybody.

20 Q.  What is that?

21 A.  It's obviously not what truly happened.

22 Q.  What do you think he's telling people?

23 A.  "I do not by independent knowledge remember accurately,"

24     blah, blah, blah, blah, blah.

25          That was his answer for everything in his last

155

```
 1        deposition, so.
 2   Q.   Okay.
 3                  (Exhibit No. 9 marked for identification.)
 4   A.   I think he's obviously got things to hide.
 5   Q.   Ms. Schweickert, the court reporter has handed you what's
 6        been marked as Exhibit 9.  What is Exhibit 9?
 7   A.   Looks like an email from me to Du Wors and Rudkins, Mark and
 8        Jim Smith of Smith & Hennessey.
 9   Q.   And what was the topic of this email chain?
10   A.   The topic?  "Getting real."
11   Q.   Okay.
12   A.   Like, can we please get real?
13   Q.   Pardon?
14   A.   Like as if to say:  Could we please get real?
15            And I was confident that we were going to make some
16        kind of progress in our understanding with each other about
17        that, thus the present tense of the verb "getting."
18   Q.   In your email of February 8th you recommend or suggest to
19        Mr. Du Wors, February 8th, 8:50 p.m., "I would highly
20        recommend you consult with members of HPV for what promises
21        they have made to me and to others."
22            What promises were you referring to?
23   A.   Where are you again?
24   Q.   It's the second page of Exhibit 9, and it's an email of
25        February 8th, at 8:50 p.m., from you to Du Wors.
```

156

1  A.  Okay.  Oh, okay.  I see here in the middle, "I would highly

2      recommend you to consult" -- that one?

3  Q.  Yes.

4  A.  -- "with members of HPV for what promises they have made to

5      me and to others."

6  Q.  What promises are you referring?

7  A.  Promises of repayment and stock.

8  Q.  Fair enough.  And Mr. Du Wors does answer that, does he not?

9      He says, "Thank you for re-sending your email.  But you have

10     not sent the agreement that provides for your ownership

11     interest in HPV."

12 A.  Where?

13 Q.  At the very top of that same page.  Do you see that?

14 A.  Oh.  "Thank you for re-sending your email"?

15 Q.  Yes.

16 A.  "You have not sent the agreement that provides for your

17     ownership interest in HPV.  Would you please send a signed

18     copy of that agreement so that we can determine" -- he had a

19     copy of that.  There was no point in sending that to him.

20         For him to pretend that he had never seen that was a

21     joke.  He wrote that.  He wrote it.  It was in his

22     possession.

23 Q.  And I assume what you're referring to is Exhibit 2, that is,

24     the Promissory Note and Joint Participation Agreement.  Is

25     that what you're referring to?

Jennifer Schweickert, Volume II - October 3, 2014

157

1   A.  Exhibit 2?  We've got so many exhibits.  Yes, Exhibit 2.

2   Q.  So on the front page of Exhibit 9, about a third of the way

3       down the first big paragraph, you say, "Of course I have the

4       documents."

5           And the document you're referring to is Exhibit 2?

6   A.  Yes.

7   Q.  All right.  There's no other document that you have that

8       would evidence any ownership in HPV?

9   A.  I don't believe so.  I could be mistaken, but I don't think

10      so.  I think we're talking about just those.

11  Q.  So it's your clear assertion that Exhibit 2 gives you

12      ownership interest in HPV, not HPVG, but HPV; is that right?

13  A.  Whichever company owned the intellectual property.  Whether

14      that was HPV or HPVG didn't matter at the time to me, as

15      long as I was covered.

16              MR. FRANKLIN:  That's all I have.  Thank you,

17      Ms. Schweickert.

18              MR. WAYMAN:  No questions.

19                  (Deposition concluded at 12:15)

20                  (Signature reserved)

21                  (Exhibits 3 - 9 attached)

22

23

24

25

Jennifer Schweickert, Volume II - October 3, 2014

158

1

2                    C E R T I F I C A T E

3  STATE OF WASHINGTON)
                      ) ss.
4  COUNTY OF KING     )

5

6          I, Laurie B. Porter, Certified Court Reporter

7  in and for the State of Washington, license number 2376,

8  do hereby certify:

9          That the annexed and foregoing deposition of

10  the witness named herein was taken stenographically before

11  me and reduced to typewriting under my direction;

12          I further certify that the said witness was

13  afforded the opportunity to examine, read, and sign said

14  deposition after the same was transcribed, unless

15  indicated in the record that the parties and the witness

16  waive the signing;

17          I further certify that all objections made at

18  the time of said examination were noted by me upon said

19  deposition;

20          I further certify that I am not a relative or

21  employee or attorney or counsel of any of the parties to

22  said action, or a relative or employee of any such

23  attorney or counsel, and that I am not financially

24  interested in the said action or the outcome thereof;

25          I further certify that the witness before

159

1    examination was by me duly sworn to testify to the truth,

2    the whole truth, and nothing but the truth;

3            I further certify that the deposition, as

4    transcribed, is a full, true, and correct transcript of

5    the testimony, including questions and answers, and all

6    objections, motions and exceptions of counsel made and

7    taken at the time of the foregoing examination, to the

8    best of my ability.

9

10

11           IN WITNESS WHEREOF, this 13th day of October

12   2014.

13

14

15

16

17                          _____

18                          Laurie B. Porter, CCR
                            License No. 2376
19                          Certified Court Reporter in
                            and for the State of Washington,
20                          residing in Issaquah.

21

22

23

24

25

Jennifer Schweickert, Volume II - October 3, 2014

160

DECLARATION

STATE OF WASHINGTON)
                   ) ss.
COUNTY OF _____)

        Pursuant to the laws of the State of
Washington, I declare under penalty of perjury the
following to be true:

        I have read my deposition transcript, and the
same is true and accurate, save and except for any changes
and/or corrections as indicated by me on the
CORRECTIONS/CHANGES page hereof.

        Signed at _____, Washington on the
_____ day of _____, 2014.


                        _____
                             Jennifer Schweickert


Case name: Schweickert vs. Hunts Point Ventures, et al.
Cause No.: 13-CV-675

Jennifer Schweickert, Volume II - October 3, 2014

161

1   Laurie B. Porter, CCR    Schweickert vs. Hunts Point Ventures,
                             et al.
2   1415 2nd Avenue, # 1107 District Court, Western District
                             No. 13-CV-675
3   Seattle, WA 98101       Deposition of Jennifer Schweickert, Vol II
    (206)623-6136            October 3, 2014
4

5   Please make all corrections, changes or clarifications to your
    testimony on this sheet, showing page and line number and the
6   nature of the change.  If there are no changes, write "none"
    across the page and then sign this sheet on the line provided.
7

8   Page    Line                              Reason for Change

9   _____/_____/_____

10  _____/_____/_____

11  _____/_____/_____

12  _____/_____/_____

13  _____/_____/_____

14  _____/_____/_____

15  _____/_____/_____

16  _____/_____/_____

17  _____/_____/_____

18  _____/_____/_____

19  _____/_____/_____

20  _____/_____/_____

21  _____/_____/_____

22  See:  Wash. Reports 34A,
          Rule 30(b), USCA 28,
23        Rule 30(e)
                  Signature_____/Date_____
24

25                        Jennifer Schweickert

162

LAURIE B. PORTER, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136

October 13, 2014


Brandon Wayman
MDK Law
777 108th Avenue NE, Suite 2170
Bellevue, Washington  98004


RE: Schweickert vs. Hunts Point Ventures, et al.
District Court, Western District  Cause No. 13-CV-675
Deposition of Jennifer Schweickert, Volume II
Taken October 3, 2014


    Enclosed is your copy of the above-referenced
deposition, plus a correction sheet and a Declaration.
Please have Ms. Schweickert read the deposition
transcript, make whatever corrections and/or changes that
are appropriate, then sign the correction sheet and the
Declaration.

    Please be aware that the court rules provide that
this be accomplished within 30 days of receipt of notice.
The corrections and signed Declaration should be forwarded
to me at the above address for distribution among counsel
and inclusion in the original transcript.  If this is not
received by me within the time period noted above,
signature will be deemed for all purposes waived.

    Thank you for your cooperation in this matter.



                              Laurie B. Porter


Enc.
Cc:  Court file
     File
     Sam Franklin

163

LAURIE B. PORTER, CCR
Northwest Court Reporters
1415 Second Avenue, Suite 1107
Seattle, Washington  98101
(206)623-6136


October 13, 2014


TO: Sam Franklin
    Lee Smart
    701 Pike Street, Suite 1800
    Seattle, Washington  98101-3929


NOTICE REGARDING FILING OF ORIGINAL
DEPOSITION TRANSCRIPT


RE:  Case Name:      Schweickert vs. Hunts Point Ventures, et al.
     Venue:          District Court, Western District
     Cause No:       13-CV-675
     Deposition of:  Jennifer Schweickert, Volume II
     Taken:          October 3, 2014

     Enclosed you will find the original sealed transcript
of Jennifer Schweickert.

     The original signature page and changes, if any,
received by this office will be forwarded to all counsel.

     Thank you for your cooperation in this matter.


                         Laurie B. Porter, CCR




Cc:  Court file
     File
     Brandon Wayman