EXHIBIT "D"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

--------------------------------------------------------

JENNIFER P. SCHWEICKERT,          )
                                  )
              Plaintiff,          )
                                  )
      vs.                         )     Case Number:
                                  )
HUNTS POINT VENTURES, INC., HUNTS )     13-CV-675
POINT VENTURE GROUP, LLC; CHAD    )
RUDKIN and ELIZABETH RUDKIN, and  )
their marital community comprised )
thereof; JOHN DU WORS and AMBER   )
DU WORS, and their marital        )
community comprised thereof; and  )
DOES 1-4,                         )
                                  )
              Defendants.         )

--------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

JOHN DU WORS

VOLUME I

--------------------------------------------------------

1:06 p.m.

July 18, 2014

777 108th Avenue NE, Suite 2170

Bellevue, Washington

Lauren G. Harty, RPR, CCR #2674

Court Reporter

John Du Wors                                                                July 18, 2014

---

Page 2

A P P E A R A N C E S

FOR PLAINTIFF:    MR. MARK D. KIMBALL
                  MR. BRANDON P. WAYMAN
                  MDK Law Associates
                  777 108th Avenue N.E., Suite 2170
                  Bellevue, Washington 98004
                  425.455.9610
                  mark@mdklaw.com

FOR DEFENDANTS DU WORS:
                  MR. SAM B. FRANKLIN
                  Lee Smart
                  701 Pike Street, Suite 1800
                  Seattle, Washington 98101-3929
                  206.624.7990
                  sbf@leesmart.com

---

Page 4

E X H I B I T   I N D E X

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| 8 | 8/18/2010 "INTELLECTUAL AND GENERAL INTANGIBLE PROPERTY PURCHASE AND SALE AGREEMENT." | 56 |
| 9 | 1/23/2011 patent interest assignments. | 59 |
| 10 | 4/21/2011 "Promissory Note and Joint Participation Agreement." | 60 |
| 11 | 4/21/2011 "Promissory Note and Joint Participation Agreement." | 63 |
| 12 | Email thread ending 4/9/2013 from Jennifer Schweickert to Mark Phillips. | 76 |
| 13 | 8/27/2012 "Meeting Minutes." | 81 |
| 14 | 3/1/2011 "CERTIFICATE OF FORMATION." | 85 |

---

Page 3

E X A M I N A T I O N   I N D E X

| ATTORNEY | PAGE |
|---|---|
| BY MR. KIMBALL: | 5 |

E X H I B I T   I N D E X

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 4/30/2010 "ARTICLES OF INCORPORATION OF HUNTS POINT VENTURES, INC." | 15 |
| 2 | 5/25/2010 letter "Re:  Engagement Letter and Security Agreement" to Mark Phillips from John Du Wors. | 18 |
| 3 | 6/9/2010 letter "Re:  Our Agreement" to Hunts Point Ventures and Steve Schweickert from John Du Wors. | 20 |
| 4 | 5/2010 "ARTICLES OF AMENDMENT TO THE ARTICLES OF INCORPORATION OF HUNTS POINT VENTURES, INC." | 22 |
| 5 | 5/20/2010 "STOCK SUBSCRIPTION AGREEMENT." | 25 |
| 6 | 12/20/2013 "DECLARATION OF STEPHEN JAMES SCHWEICKERT IN OBJECTION TO JOYCE SCHWEICKERT'S MOTION FOR RELIEF FROM AUTOMATIC STAY." | 29 |
| 7 | 5/2010 "LIMITED LIABILITY COMPANY AGREEMENT OF HUNTS POINT INTELLECTUAL PROPERTIES, LLC." | 48 |

---

Page 5

JOHN DU WORS,        being duly sworn, testified
upon oath, as follows:
              E X A M I N A T I O N
BY MR. KIMBALL:
     Q.  Can you state your name for the record,
please?
     A.  John Du Wors.
     Q.  And could you spell the last name.
     A.  D-U space capital W-O-R-S, as in Sam.
     Q.  Mr. Du Wors, my name is Mark Kimball.  I
represent Jennifer Schweickert in this matter, and
you're here today pursuant to a notice of deposition.
I'm going to be taking your deposition today and
asking you some questions.  It'll be your obligation
to answer those truthfully and completely.
          If you don't understand a question, please
let me know, and I'll try to rephrase it.  It will be
my assumption that if you answer a question, that you
did understand it.
          As you're probably well aware, you can take
a break any time you need to.  You just can't take a
break while a question is pending.
          And, of course, as you probably also are
familiar with, I'll do my best not to resume a
question -- or advance on with another question until

---

2 (Pages 2 to 5)

## Page 6

1  you're done answering, and if -- I would ask you to do
2  the same, since the court reporter can only take down
3  one person at a time.
4      Do you understand those -- those terms?
5  A.  I believe that I understand the plain
6  language meaning of what you're saying to me.
7  Q.  Thank you.
8      What is your current residence address?
9  A.  I'm not going to tell you that without a
10 protective order in place.
11 MR. FRANKLIN:  If you -- yeah.  Mr. Du Wors
12 is very privacy oriented, and I think he will be
13 willing to disclose it, but it's got to do with -- we
14 would have to agree that we'd do it with a protective
15 order so that it's not disseminated outside of this
16 and -- except as it becomes necessary for the purposes
17 of the case.  I assume that should not be a limitation
18 you would object to.
19 MR. KIMBALL:  We would have no problem
20 agreeing to a protective order on those kinds of
21 issues.  Maybe what we should do is revisit that
22 question at the end of --
23 MR. FRANKLIN:  Okay.
24 MR. KIMBALL:  -- the deposition.
25 MR. FRANKLIN:  Fair enough.

## Page 7

1  MR. KIMBALL:  Perhaps even do a second
2  deposition today and stipulate on the record that it
3  won't be published --
4  MR. FRANKLIN:  We can do it that way, Mark.
5  MR. KIMBALL:  Okay.
6  MR. FRANKLIN:  That would be fine.
7  Q.  (By Mr. Kimball)  What's your current age?
8  A.  Thirty-six.
9  Q.  And are you married or single?
10 A.  Married.
11 Q.  And what is the name of your spouse?
12 A.  Amber Du Wors.
13 Q.  And when were you married?
14 A.  June 28th, 2008.
15     Well, we had our wedding ceremony on
16 June 28th, 2008.  We didn't have a legally binding
17 ceremony until later, I think November 28th of 2008.
18 Q.  Okay.
19     And what college did you attend for
20 undergraduate?
21 A.  The University of Washington.
22 Q.  And do you recall your major?
23 A.  I do.
24 Q.  And what was that?
25 A.  English literature.

## Page 8

1  Q.  What year did you graduate?
2  A.  2000.
3  Q.  And what law school did you attend?
4  A.  Seattle University.
5  Q.  Did you receive a JD?
6  A.  I don't know what you mean by a JD.
7  Q.  Juris doctorate.
8  A.  I did receive a juris doctorate.
9  Q.  And what year was that?
10 A.  That was in 2003.
11 Q.  When did you become admitted to practice in
12 the state of Washington?
13 A.  I assume you mean admitted to practice law.
14 Q.  Yes.
15 A.  I don't recall the specific date.
16 Q.  Do you recall the year?
17 A.  I do.
18 Q.  What year was it?
19 A.  It was in 2003.
20 Q.  Are you currently an active member of the
21 Washington State Bar Association?
22 A.  I believe so.
23 Q.  Are you currently working with or affiliated
24 with a firm known as Newman & Du Wors, LLP?
25 A.  Yes.

## Page 9

1  Q.  And are you an owner of an interest in that
2  firm?
3  A.  No.
4  Q.  What is your relationship with Newman &
5  Du Wors, LLP?
6  A.  I don't know what you mean by
7  "relationship."
8  Q.  Are you a partner?
9  A.  Are you asking if I have a relationship that
10 satisfies the legal criteria for a legally defined
11 partnership?
12 Q.  No.
13 A.  Then I don't know what you're asking me.
14 Q.  Are you an employee of Newman & Du Wors,
15 LLP?
16 A.  I understand myself to be an employee,
17 without being able to tell you whether or not my
18 relationship with that firm satisfies the criteria of
19 an employ -- employment relationship under Washington
20 law.
21 Q.  Do you receive a W-2 at the end of each
22 year?
23 A.  No.
24 Q.  Did you receive a K-1 -- a Schedule K-1 at
25 the end of 2013 for or associated with your work at

John Du Wors                                         July 18, 2014

Page 10

1    Newman & Du Wors, LLP?
2        A.   No.
3        Q.   Is there an entity or a law firm known as
4    Newman & Newman currently in existence?
5        A.   Known by whom?
6        Q.   Have you ever heard of a law firm called
7    Newman & Newman?
8        A.   Yes.
9        Q.   Do you work for that law firm?
10       A.   Yes.
11       Q.   Are you a partner or principal in that law
12   firm?
13       A.   What do you mean by "principal"?
14       Q.   An owner or part owner.
15       A.   No.
16       Q.   Prior to working for Newman & Newman did you
17   work for any other law firms?
18       A.   Yes.
19       Q.   What were the names of those law firms?
20       A.   Hunter Molloy & Salcido.
21       Q.   What city was that located in?
22       Q.   When?
23       Q.   I'm sorry?
24       A.   When?
25       Q.   Was it located in more than one city?

Page 11

1        A.   No.
2        Q.   When you worked for Hunter Molloy & Salcido,
3    what city was it located in?
4        A.   Pasadena.
5        Q.   Are you an active member of the State of
6    California Bar Association?
7        A.   What do you mean by "active"?
8        Q.   Licensed to practice law in California?
9        A.   Yes.
10       Q.   And when did you first become admitted to
11   practice in California?
12       A.   I don't recall the specific date.
13       Q.   Do you recall the year?
14       A.   Yes.
15       Q.   And what was the year?
16       A.   2004.
17       Q.   Have you ever heard of a company called
18   Hunts Point Ventures, Inc.?
19       A.   Yes.
20       Q.   Did you participate or assist anyone in
21   forming that -- that company?
22       A.   What do you mean by "form"?
23       Q.   Prepare articles of incorporation?
24       A.   I did not do that.
25       Q.   Did you ever prepare bylaws for the company?

Page 12

1        A.   I did not do that.
2        Q.   When did you first hear about or learn about
3    Hunts Point Ventures?
4        A.   I don't recall the specific date.
5        Q.   Do you recall the year?
6        A.   I believe that I recall the year, but I'm
7    not a hundred percent confident that I have the year
8    correct.
9        Q.   To the best of your recollection, what year
10   do you believe you first learned about HPV or Hunts
11   Point Ventures?
12       A.   2010.
13       Q.   And who did you first deal with when you
14   heard of Hunts Point Ventures on behalf of that
15   company?
16       A.   As phrased, I don't understand your
17   question.
18       Q.   Who brought --
19           MR. KIMBALL:  Strike that.
20       Q.   (By Mr. Kimball)  Were you approached by an
21   individual or did you meet with an individual about
22   the company called Hunts Point Ventures, Inc.?
23       A.   When?
24       Q.   When you first learned of it.
25       A.   You're asking if I was approached by an

Page 13

1    individual during that time frame?
2        Q.   Yes.
3        A.   I'm sure that I was approached by
4    individuals during that time frame.
5        Q.   Who was your first contact person associated
6    with Hunts Point Ventures, Inc.?
7        A.   What do you mean by "associated with"?
8           MR. KIMBALL:  We're going off the record.
9           (Discussion off the record.)
10          MR. KIMBALL:  Back on the record.
11       Q.   (By Mr. Kimball)  Mr. Du Wors, how did you
12   first hear about Hunts Point Ventures?
13       A.   Either from Mark Phillips or from Steve
14   Schweickert.
15       Q.   And you -- that was in 2010?
16       A.   Correct.
17       Q.   When you were first con --
18       A.   Well, as I said, I believe so.
19       Q.   When you were first contacted about Hunts
20   Point Ventures or heard of that company, whether it
21   was Mr. Schweickert or Mr. Phillips, did they discuss
22   with you what they were looking for in terms of your
23   role with that company?
24       A.   I don't recall.
25       Q.   Was there ever a discussion between you and

4 (Pages 10 to 13)

John Du Wors                                      July 18, 2014

Page 14

1   either Mr. Schweickert or Mr. Phillips about the
2   services that they would be asking you to provide for
3   that company?
4       A.   I'm sure that subject was broken up over a
5   period of time as the services the law firm performed
6   for Hunts Point changed.
7       Q.   Okay.
8            What were the initial services that you or
9   your law firm provided for Hunts Point Ventures?
10      A.   Transacting an assignment of intellectual
11  property from Mark Phillips to Hunts Point Ventures.
12      Q.   And do you recall more specifically what
13  kind of intellectual property that was?
14      A.   Two issued patents, several pending patent
15  applications, and several excerpts of code bases that
16  may or may not have been the subject of either
17  copyright protection or trade secret protection.
18      Q.   And I believe you indicated a few moments
19  ago that you did not draft the articles of
20  incorporation for Hunts Point Ventures, correct?
21      A.   I did not.
22      Q.   And you did -- also, similarly, you did not
23  draft any bylaws for that company.  Is that also
24  correct?
25      A.   I did not.

Page 15

1       Q.   Okay.
2            Did you draft or participate in the drafting
3   of any shareholder agreements for Hunts Point
4   Ventures?
5       A.   I didn't.
6            I -- much later I may have drafted the
7   assignment of ownership interest -- the assignment of
8   50 percent ownership interest from Steve Schweickert
9   to Chad Rudkin.  I also may have participated in the
10  drafting of the acquisition of an additional
11  50 percent ownership interest by Chad Rudkin from
12  Steve Schweickert, but that was years later, I believe
13  in the summer of 2012.
14            (Marked Deposition Exhibit No. 1.)
15      Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
16  handed a document marked as Exhibit 1.  Have you ever
17  seen this document before?
18      A.   I may have glanced at it once or twice in
19  the past, but I don't know -- I don't have an
20  independent recollection of whether or not I've ever
21  seen it.
22      Q.   All right.
23      A.   I have some vague recollection of possibly
24  having seen it in the materials we kept on file for
25  Hunts Point Ventures.

Page 16

1       Q.   Do you recall who the initial shareholder --
2            MR. KIMBALL:  Strike that.
3       Q.   (By Mr. Kimball)  Do you recall who the
4   shareholders were in Hunts Point Ventures, Inc., at
5   the first time you learned of the identity of
6   shareholders in that company?
7       A.   I believe I was told by Steve Schweickert
8   that the shareholders were Steve Schweickert to the
9   tune of 92 percent, with 8 percent ownership interest
10  being held by Joyce Schweickert.
11           Alternatively, I also perhaps recall being
12  told at that time or around that time that Steve
13  Schweickert and Joyce Schweickert each owned
14  50 percent of it.  I think I may have been told both
15  those things at different times during that early
16  phase when I first became familiar with the company.
17      Q.   Do you have an under -- did you have an
18  understanding of what the purpose of Hunts Point
19  Ventures was as relayed to you by any representative
20  thereof?
21      A.   Well, the only representative of Hunts Point
22  Ventures during that time period that I was aware of
23  was Steve Schweickert, and initially I understood that
24  Hunts Point Ventures was going to try to commercially
25  deploy some kind of technology asset, although I -- if

Page 17

1   I understood correctly, no one ever had -- no one at
2   Hunts Point Ventures ever decided what that would be
3   or even had a clear idea of what it would be.
4       Q.   Do you recall when you initially became
5   aware of Hunts Point Ventures, Inc., who the people
6   were on the board of directors of the company?
7       A.   I am only aware of there having been one
8   director of Hunts Point Ventures prior to the
9   assignment of interest to Chad Rudkin.
10      Q.   Okay.
11           And who was the one director that you
12  recall?
13      A.   Steve Schweickert.
14      Q.   To your knowledge, were the articles of
15  amend -- the articles of incorporation which are
16  marked as Exhibit 1 ever amended?
17      A.   I'm not aware of any such amendment.
18      Q.   Okay.
19           Did Hunts Point Ventures, Inc., execute a
20  retainer or engagement agreement with you or with your
21  office?
22      A.   Yes.
23      Q.   And was it Mr. Schweickert who signed on
24  behalf of the company?
25      A.   I believe there were two retainer

5  (Pages 14 to 17)

John Du Wors                                                    July 18, 2014

1   agreements, and in both instances I believe they were
2   signed by Steve Schweickert.
3       Q.   Did each of the agreements talk about the
4   scope or nature of work that you or your office would
5   be performing for the company?
6       A.   Yes.
7            (Marked Deposition Exhibit No. 2.)
8       Q.   (By Mr. Kimball)  You've been handed a
9   document marked as Exhibit 2.  Could you take a look
10  through that document and let me know if you've ever
11  seen it before?
12      A.   I have.
13      Q.   And, in fact, is this one of the two
14  retainer agreements that you referred to a moment ago?
15      A.   No.  This is a retainer agreement with Mark
16  Phillips.
17      Q.   All right.
18           Can you tell me in your own words the
19  subject matter of the engagement letter and security
20  agreement marked as Exhibit 2?
21      A.   To represent Mark Phillips in an assortment
22  of civil litigation.
23      Q.   Okay.
24           And what -- do you recall what cases those
25  were?

1       A.   As I sit here, I recall that we were
2   representing him in the Arnold case, his case against
3   MOD Systems, the MOD Systems case against Mark
4   Phillips, a computer fraud and abuse act case that
5   Mark Phillips wanted to bring on behalf of his
6   corporation, A Dot, against various defendants.  And
7   those are all the cases that I recall as I sit here.
8       Q.   And, in fact, pursuant to Exhibit 2 were you
9   retained or paid money to become retained by
10  Mr. Phillips?
11      A.   I don't think Mark Phillips ever paid me any
12  money.  He might have paid me an initial $5,000.
13  Beyond --
14      Q.   Did --
15      A.   Beyond that, I don't -- I don't think he did
16  pay me anything.
17      Q.   Did anyone pay you or your firm pursuant to
18  Exhibit 2 on Mr. Phillips' behalf?
19      A.   I don't know that it was pursuant to
20  Exhibit 2, but it was pursuant to my retention Hunts
21  Point Ventures paid me to represent Mark Phillips both
22  in his civil litigation and in his criminal
23  litigation.
24      Q.   Okay.
25      A.   But I -- you know, properly characterized,

1   it would have been pursuant to this and two other
2   engagement agreements and a conflict waiver that I
3   entered into with Hunts Point Ventures.
4       Q.   Okay.
5            (Marked Deposition Exhibit No. 3.)
6       Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
7   handed a document marked as Exhibit 3.  Have you ever
8   seen that document before?
9       A.   I have.
10      Q.   And is this one of the Hunts Point Ventures
11  engagement or retainer agreements that you referred to
12  a couple of minutes ago?
13      A.   It is.
14      Q.   Okay.
15           And I thought you indicated that there were
16  two with Hunts Point Ventures; is that correct?
17      A.   I did.
18      Q.   Okay.
19           So there would be another document in
20  addition to this?
21      A.   There is.
22      Q.   And do you recall what the nature of the
23  work you would be doing pursuant to Exhibit 3 would
24  be?
25      A.   It says right here I was going to represent

1   Mark Phillips in an assortment of civil litigation,
2   including the Arnold case, the -- the MOD Systems
3   cases, and the A Dot case.
4       Q.   And it also seems to reference -- or --
5   excuse me -- A Dot Corporation v. Anthony Bay.  And
6   that was -- it appears to have been filed in the
7   Western District Federal Court of Washington; is that
8   correct?
9       A.   I don't know.  I didn't file that case.
10      Q.   Okay.
11           Did you represent him in that case?
12      A.   I don't believe I ever appeared in that
13  matter.
14      Q.   Was there a reason why Hunts Point Ventures
15  retained you to represent Mark Phillips?
16      A.   Because Mark didn't have the funds to retain
17  me on his own.
18      Q.   When billings or statements of account were
19  created and sent for the work you were doing pursuant
20  to Exhibit 2 and Exhibit 3, do you recall if they were
21  billed to Mark Phillips or to Hunts Point Ventures?
22      A.   At minimum they were billed to Hunts Point
23  Ventures.  I believe Mark may also have received
24  courtesy copies.
25      Q.   And I believe you indicated a minute ago,

6 (Pages 18 to 21)

John Du Wors                                                    July 18, 2014

Page 22

1    just to clarify, that you did not -- you do not recall
2    representing Mr. Phillips in the A Dot Corporation v.
3    Anthony Bay case; is that correct?
4        A.   I did not say that.  I said I don't believe
5    I ever appeared in that case.
6        Q.   Okay.
7             Did you do work in that case on behalf of
8    Mr. Phillips?
9        A.   To the extent that I analyzed it.
10       Q.   And by "analyzed it" you mean you looked at
11   the allegations, the pleadings, and then discussed
12   those with Mr. Phillips?
13       A.   I have a very vague recollection of having
14   done that.  I certainly remember discussing it with
15   Mr. Phillips.  I don't have a very -- I don't have a
16   clear recollection of having reviewed the pending
17   complaint in that case --
18       Q.   All right.
19       A.   -- but Mr. Phillips described his theories
20   on behalf of A Dot to me a number of times.
21            (Marked Deposition Exhibit No. 4.)
22       Q.   (By Mr. Kimball)  You've been handed a
23   document marked as Exhibit 4, which is titled articles
24   of amendment to the articles of incorporation of Hunts
25   Point Ventures, Inc.  Do you see that document?

Page 23

1        A.   I do.
2        Q.   Did you prepare this document?
3        A.   I did not.
4        Q.   Okay.
5             Did you discuss with Mr. Schweickert or
6    anyone who did prepare this document?
7        A.   Ask me that question again?
8        Q.   Did you discuss with Mr. Schweickert or
9    anyone else the identity of the person or company who
10   prepared this document?
11       A.   My assumption would be that it was
12   Cairncross & Hempelmann, because Cairncross &
13   Hempelmann performed all of Hunts Point Ventures'
14   corporate governance work during this time period.
15       Q.   And what time period are you referring to?
16       A.   The late spring and early summer of 2010.
17       Q.   Exhibit 4, at least this version of
18   Exhibit 4, has some blank lines in it for dates and
19   also does not appear to be signed by Mr. Schweickert.
20            Do you recall if you ever saw a document
21   similar to Exhibit 4 purporting to be articles of
22   amendment for Hunts Point Ventures, Inc., which was
23   signed by Mr. Schweickert?
24       A.   I have no recollection of ever having seen
25   any such document.

Page 24

1        Q.   Do you know if these articles of amendment
2    were ever filed with the Secretary of State of the
3    State of Washington?
4        A.   I would be speculating.
5        Q.   So you don't know?
6        A.   I don't have an independent basis of
7    personal knowledge to respond to that question.
8        Q.   Was Mark Phillips ever a shareholder of
9    Hunts Point Ventures?
10       A.   Based on the information that I have ever
11   received, the answer would be no.
12       Q.   And what information was that?
13       A.   I'm sure I couldn't tell you all of the
14   information, because that would be calling upon me to
15   tell you all the documents I've ever seen and the
16   conversations I've ever had in relation to the com --
17   the company, but essentially my understanding has
18   always been from Steve Schweickert and Mark Phillips
19   and Chad Rudkin and Doug Lower that prior to the
20   transfer of interest to Chad Rudkin the only
21   shareholders in Hunts Point Ventures were initially
22   Steve Schweickert and Joyce Schweickert and then as of
23   about January 2011 just Steve Schweickert, which
24   continued to be the case for some time.
25       Q.   And then was there a subsequent transfer to

Page 25

1    Mr. Rudkins?
2        A.   Mr. Rudkin, yes.
3        Q.   Rudkin.  I'm sorry.
4             And do you recall when that occurred?
5        A.   I can only give you a general estimate
6    within a range, which is that I believe Mr. Rudkin
7    received his 50 percent interest initially in the late
8    spring or early summer of 2012.
9        Q.   Do you recall if you or your office prepared
10   any documentation relating to that interest transfer?
11       A.   I drafted that interest transfer --
12       Q.   All right.
13       A.   -- I think.  I think that I drafted it.
14            (Marked Deposition Exhibit No. 5.)
15       Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
16   handed a document which is titled "STOCK SUBSCRIPTION
17   AGREEMENT."  Could you take a look at that and let me
18   know if you've ever seen that before?
19       A.   I have never seen this document before.
20   I've heard a lot about it, but this is the first time
21   anyone's ever showed it to me.
22       Q.   When you say you heard a lot about it, what
23   have you heard more specifically?
24       A.   Mark Phillips' allegations in his civil
25   litigation against my law firm.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110    FAX: 206.622.6236

John Du Wors                                            July 18, 2014

Page 26

1    Q.  All right.
2         And what were the allegations specifically?
3    A.  Oh, I couldn't tell you all of them.  I
4  mean, have you read that complaint?  It's tremendously
5  lengthy.
6    Q.  Do you recall what the allegations were
7  regarding this particular document?
8    A.  I have not been aware of this document until
9  now, but he has generally said that he contracted to
10 become entitled to 9200 shares of stock in Hunts Point
11 Ventures.
12   Q.  Did you ever offer advice to Hunts Point
13 Ventures that Mark Phillips should not be named as a
14 shareholder in the company?
15   A.  Not phrased in that manner.
16   Q.  Okay.
17        Do you recall having a discussion or
18 communication with anyone at Hunts Point Ventures in
19 which the concept of Mark Phillips becoming a
20 shareholder in the company was criticized or was
21 questioned?
22   A.  Well, I don't know about criticized or
23 questioned, but in the fall of 2012 I met with Mark
24 Phillips and Chad Rudkin and told them that to the
25 extent that they wanted my firm to continue to

Page 27

1  represent Hunts Point Ventures on a contingent fee
2  basis with respect to the prosecution of its patents,
3  I would not feel comfortable having Mark Phillips as
4  an active shareholder or representative of the company
5  because I wouldn't -- I didn't want to make the
6  economic investment in that litigation if I'm going to
7  have one of my key witnesses be impeached by
8  introduction of evidence of his felony record.
9    Q.  Were there any other reasons?
10   A.  No.
11   Q.  Have you ever seen any stock subscription
12 agreements for shareholders in Hunts Point Venture,
13 Inc., other than Exhibit 5?
14   A.  No.
15   Q.  Do you know if Jennifer Schweickert ever
16 executed a stock subscription agreement with --
17   A.  I beg --
18   Q.  -- Hunts Point?
19   A.  Yeah.  I beg your pardon.  Let me amend
20 that.
21        With respect to your previous question if
22 I've ever seen a subscription agreement, since the
23 commencement of this litigation I have now seen
24 executed subscription agreements -- or I guess an
25 executed subscription agreement from Jennifer

Page 28

1  Schweickert that's been produced in association with
2  this case.  That was the first time I saw any such
3  document.
4    Q.  Did your firm prepare those documents --
5  that document?
6    A.  Certainly not.
7    Q.  Do you have any firsthand recollection as to
8  whether or not Mark Phillips transferred $9,200 to
9  Hunts Point Ventures putatively for the purpose of
10 purchasing stock in that company?
11        THE WITNESS:  Can I have that question read
12 back?
13        THE REPORTER:  "Question:  Do you have any
14 firsthand recollection as to whether or not Mark
15 Phillips transferred $9,200 to Hunts Point Ventures
16 putatively for the purpose of purchasing stock in that
17 company?"
18   A.  I have no firsthand knowledge, only hearsay
19 that has been relayed to me.
20   Q.  (By Mr. Kimball)  And specifically what was
21 the hearsay that was relayed to you on that subject?
22   A.  Chad Rudkin told me that Mark Phillips did
23 not do that.
24   Q.  Do you recall when he told you that?
25   A.  Recently, after the commencement of this

Page 29

1  case.  The $9200 concept and the 9200 share concept
2  concepts -- are concepts that I had never heard of
3  prior to the commencement of this case.
4    Q.  Do you recall if there was an agreement
5  between Hunts Point Ventures, Inc., and Mark Phillips
6  to pay Mark Phillips $100,000?
7    A.  Never heard of that before.
8    Q.  Was there an agreement on the part of Hunts
9  Point Ventures and Mark Phillips to pay for the
10 benefit of Mark Phillips $100,000 toward legal fees?
11   A.  I -- are you sure you're not thinking of a
12 million dollars?
13   Q.  No, specifically $100,000 right now.
14   A.  Never heard of that.
15   Q.  Okay.
16        (Marked Deposition Exhibit No. 6.)
17   Q.  (By Mr. Kimball)  You've been handed a
18 document marked as Exhibit 6.  Can you tell me if
19 you've ever seen a copy of this document before?
20   A.  I believe that I have.
21   Q.  Okay.
22        And, again, Steven Schweickert is the
23 individual you referred to earlier as being the
24 primary or initial shareholder in Hunts Point
25 Ventures; is that correct?

8  (Pages 26 to 29)

John Du Wors                                                    July 18, 2014

---

Page 30

1      A.  He is.
2      Q.  Do you recall what his role was with Hunts
3  Point Ventures in 2010?
4      A.  Steve Schweickert?
5      Q.  Yes.
6      A.  The only officer, director, or otherwise
7  principal representative.
8      Q.  And shareholder?
9      A.  Well, as I said before, Joyce Schweickert
10  was a shareholder, according to my understanding,
11  during the year 2010.
12      Q.  Right.  But he was a shareholder, correct?
13      A.  Certainly.
14      Q.  And did that change with regard to any of
15  his functions or positions with the company in 2011?
16      A.  Well, his shareholder ownership changed when
17  Joyce Schweickert relinquished her share interest in
18  Hunts Point Ventures, and he stepped down as an
19  officer -- well, as the chief executive officer at the
20  time that he transferred 50 percent ownership interest
21  to Chad Rudkin.
22          Later he transferred his remaining 50
23  percent interest and stepped out of Hunts Point
24  Ventures altogether.  During that interim period I
25  believe he stayed on the board and may have been an

Page 31

1  officer within the C suite somewhere but not the chief
2  executive officer.
3      Q.  Okay.
4          Would you turn to page nine of Exhibit 6.
5      A.  Okay.
6      Q.  Beginning with paragraph 34, there is text
7  which reads, "After Mr. Du Wors was retained in June,
8  2010, I met with him at his office and provided him a
9  copy of the documents prepared by C&H, which included
10  a signed copy of the stock subscription agreement and
11  Memorandum of Understanding."
12          Do you see that?
13      A.  I do.
14      Q.  Do you know if that's true or false?
15      A.  I believe it's false.
16      Q.  Did you meet with Mr. Schweickert at your
17  office in June of 2010?
18      A.  Many times.
19      Q.  Did he provide you with a copy of corporate
20  documents prepared by Cairncross & Hempelmann?
21      A.  Eventually he did, but I don't believe he
22  did at that time.
23      Q.  Did he provide you with a signed copy of the
24  stock subscription agreement and memorandum of
25  understanding?

Page 32

1      A.  I have never seen those documents.
2          Well, wait a minute.  I see "stock
3  subscription agreement" here.  What do you mean?
4  Which memorandum of understanding?
5      Q.  Well, I'm reading the text from
6  Mr. Schweickert's declaration, and I guess I should
7  ask you, did you ever receive a copy of a document
8  called "Memorandum of Understanding"?
9      A.  I would be speculating as to which document
10  that might be.
11      Q.  The text goes on to read, "Mr. Du Wors knew
12  when he took over from C&H that we still had to file
13  the incorporation documents for HPIP as we had agreed
14  as well as file the amended articles of incorporation
15  for HPV."
16          Do you see that?
17      A.  I do.
18      Q.  Do you know what the reference to HPIP is?
19      A.  I have several ideas about what that might
20  possibly mean but was never given a clear
21  understanding of what HPIP was.  I assume it stood --
22  stands for Hunts Point Intellectual Property, and it
23  may have been contemplated by Mr. Schweickert at some
24  point that he would use that entity as an IP holding
25  company.

Page 33

1      Q.  And there's also reference to HPV.  Is it
2  your understanding that this is likely a reference to
3  Hunts Point Ventures?
4      A.  I would have to -- I'd be speculating, but I
5  assume that's what it is.
6      Q.  Okay.
7          So the statement which reads in part,
8  "Mr. Du Wors knew when he took over from C&H that we
9  still had to file incorporation documents for
10  HPIP...," do you see that?
11      A.  I do.
12      Q.  And is that true?
13      A.  No.
14      Q.  How is that not true?
15      A.  Well, it's false, and that makes it
16  demonstrably not true.  I mean, there's literally
17  almost nothing true about that statement.
18      Q.  All right.
19          So, first of all, did you take over
20  corporate document functions from Cairncross
21  Hempelmann?
22      A.  Later we did.
23      Q.  But not in June of 2010?
24      A.  No.
25      Q.  Do you recall when that occurred?

John Du Wors                                                    July 18, 2014

Page 34

1    A.  I want to say it might have been the fall
2  sometime.
3    Q.  Of 2010?
4    A.  Uh-huh.  Might have been -- yeah, I think it
5  was fall, like late fall, almost winter.
6    Q.  Was a new retainer or engagement agreement
7  prepared to memorialize that?
8    A.  No.  But there's an email somewhere where
9  Steve says to me, "I want you to take over from
10  Cairncross."
11    Q.  Do you recall discussing with
12  Mr. Schweickert anything concerning doing amended
13  articles of incorporation for Hunts Point Ventures?
14    A.  No.
15    Q.  Did you ever agree to file articles of
16  amendment for Hunts Point Ventures?
17    A.  No.  Not that I recall.
18    Q.  So then going on to the next statement in
19  paragraph 34, which reads, "However, Mr. Du Wors
20  immediately told me not to do either of these tasks,"
21  Do you see that?
22    A.  I do.
23    Q.  Is that false?
24    A.  It is.
25    Q.  It goes on to read, "He told me that he felt

Page 35

1  it was in Mark' best interests if his ownership of the
2  IP was not formally acknowledged in the incorporated
3  documents..."
4       Do you know if that's true?
5    A.  I do.
6    Q.  Is it true or false?
7    A.  It is false.
8    Q.  And it continues, "...and he directed me to
9  put aside those documents that recognized Mark's
10  ownership interest..."
11       Is that true or false?
12    A.  That is false.
13    Q.  "...specifically the amended Articles of
14  Incorporation and other amended documents for" Hunts
15  Point Ventures or "HPV."
16       Do you see that?
17    A.  I do.
18    Q.  Is that also false?
19    A.  It is false.
20    Q.  Do you recall ever having a conversation
21  with Mark Phillips and informing him or telling him
22  that your understanding was that he was not a
23  shareholder of Hunts Point Ventures?
24    A.  I believe that I had that conversation with
25  him in the fall of 2012.

Page 36

1    Q.  Not before?
2    A.  I don't believe so.
3       We may have discussed it in June of 2010
4  when we talked about the transfer of intellectual
5  property, because I was asked to advise on whether or
6  not Mark's intellectual property could be transferred
7  to Hunts Point Ventures as a means of it not being
8  seized either by the U.S. government or by MOD
9  Systems.
10       And I told him that -- I told all of them
11  that absent a fair -- an exchange of legally
12  sufficient consideration, that transfer could be
13  considered a fraudulent transfer that could be undone
14  by way of a fraudulent transfer lawsuit against Hunts
15  Point Ventures.
16       I also told them that if Mark was a
17  shareholder in Hunts Point Ventures, it would enable
18  whatever that judgment creditor was, MOD Systems or
19  the U.S. Government, to seize Mark Phillips' shares
20  and potentially bring some kind of dissolution
21  action in order to dissolve or otherwise take away
22  those assets.
23       Certainly when I -- and so when I say I may
24  have said it in June 2010, what I mean is that I don't
25  know that I would have explicitly said, "Mark, you are

Page 37

1  not a shareholder in Hunts Point Ventures," but
2  because when consulting on the question of whether or
3  not that transfer would be fraudulent in nature or
4  whether or not a judgment creditor could reach Mark's
5  interest in the company or -- or the intellectual
6  property itself, the assumption I would have been
7  basing my advice on was that I did not understand Mark
8  Phillips to have a shareholder interest in the
9  company.
10    Q.  All right.
11    A.  It is possibly for that reason no one ever
12  told me about this subscription agreement for 9200
13  shares, assuming it is indeed authentic.
14    Q.  All right.
15       Turn, if you would, to page eleven of
16  Exhibit 6.
17    A.  Okay.
18    Q.  And specifically, would you take a look at
19  paragraph 39, which begins around line 15.  It reads,
20  "Although Mark believed that he was shareholder of..."
21  Hunts Point Ventures, "I had been advised by
22  Mr. Du Wors to not file the amended articles of
23  incorporation and was told by Mr. Du Wors that he
24  would discuss all of this with Mark and that I did not
25  have to worry about explaining the legal strategy to

10  (Pages 34 to 37)

John Du Wors                                          July 18, 2014

Page 38

```
1    Mark."
2         So I guess, first of all, turning to the
3    text, "Although Mark believed that he was a
4    shareholder of..." Hunts Point Ventures, again, do you
5    have any knowledge as to whether or not Mark Phillips
6    believed he was at any time a shareholder of Hunts
7    Point Ventures?
8         A.   I certainly can't crawl inside of his head,
9    but I have heard him make that assertion since the
10   commencement of this lawsuit.
11        Q.   Did he make the assertion prior to the
12   commencement of the lawsuit?
13        A.   No, including not in the fall 2012 meeting
14   that I had with him and Chad Rudkin.
15        Q.   Continuing on, Mr. Schweickert writes, "...I
16   had been advised by Mr. Du Wors to not file the
17   amended articles of incorporation..."
18        Do you see that?
19        A.   I do.
20        Q.   And I believe you addressed this already,
21   but I'll again -- ask it again.  Is that true or
22   false?
23        A.   It is false.
24        Q.   "...and was told by Mr. Du Wors that he
25   would discuss all of this with Mark and that I did not
```

Page 39

```
1    have to worry about explaining the legal strategy to
2    Mark."
3         A.   Also false.
4         Q.   All right.
5         "Mr. Du Wors assured me that Mark's
6    interests would be protected..."
7         Is that true or false?
8         A.   False.
9         Well -- hang on.  I don't know entirely what
10   that means.  I certainly have always said that, while
11   representing Mark the law firm would work to protect
12   Mark's interests.  That is true.  But I don't -- I
13   never certainly made any guarantees as to what would
14   happen with respect to the outcomes of our
15   representation of Mr. Phillips.  I don't predict those
16   outcomes.
17        Q.   In 2010 your office did have a professional
18   relationship with Mr. Phillips as a client, correct?
19        A.   Correct.
20        Q.   And that continued into 2011 as well?
21        A.   Yeah, until about June of 2011.
22        Q.   Okay.
23        And then finally, the last clause in that
24   paragraph reads, "...the outcome of Mark's civil
25   litigation and criminal case would determine the best
```

Page 40

```
1    course of action."
2         Do you recall discussing that with
3    Mr. Schweickert?
4         A.   Well, I mean, it's kind of a general
5    statement.  With respect to Mark's interests, the
6    outcome of his civil litigation and criminal case,
7    yes, certainly those outcomes would determine the best
8    course of action for Mr. Phillips.  I mean, that's all
9    that was going on with him legally that I understood
10   at that time.
11        Q.   All right.
12        A.   I mean, yeah.
13        MR. FRANKLIN:  Mark, let me -- if you --
14   that answer's concluded, I'd like to ask if I could --
15        THE WITNESS:  Sure.
16        MR. FRANKLIN:  -- talk to my client briefly.
17        MR. KIMBALL:  Sure.
18        MR. FRANKLIN:  Okay.
19        (Discussion off the record.)
20        MR. FRANKLIN:  I have not objected, but it
21   seems to me that, because I understand that there are
22   some -- there's some overlap certainly between this
23   case and Mark Phillips' case, but it seems to me now
24   that the inquiry really that you're going into really
25   has -- I can't see that it has anything to do with
```

Page 41

```
1    Jennifer Schweickert's case and it -- or that it would
2    lead to discoverable testimony.
3         It seems to me this is a preview of the Mark
4    Phillips deposition, and unless you can explain to me
5    how this is reasonably calculated to lead to discovery
6    of admissible evidence in Jennifer Schweickert's case,
7    which is fairly specific in what its allegations
8    are -- you know, I understand that there is some
9    degree of overlap, but I think it's limited.  So if
10   you could address that.
11        MR. KIMBALL:  Sure.  I think that we don't
12   get to the point -- strike -- I'll reword that.  We --
13   in order to get to the point in Jennifer's case where
14   we can lay out who owned what at what point in time,
15   because she was granted a stock interest in the
16   company as well or some sort of equitable interest, we
17   need to know who the shareholders were, when they came
18   and went, who was added, how much they got and when.
19   And so that is the relevance.
20        MR. FRANKLIN:  Well, I -- yeah, I can
21   understand the relevance of that, and I don't have any
22   objection to inquiries that are directed toward the
23   stock ownership.  And I -- that's -- certainly I felt
24   that that was -- those were legitimate questions that
25   were directed toward the stock ownership.  You know,
```

John Du Wors                                    July 18, 2014

1    the -- whether it was 50/50 between Joyce and Steve or
2    whether it was 92/8 percent between Steve and Joyce I
3    don't know, but --
4         I mean, it seems to me once we get much
5    beyond that, we're really getting -- I don't see how
6    it is related to Jennifer's claims, and I -- and
7    that's not because this dec -- this declaration is in
8    the Mark Phillips allega -- Mark Phillips litigation,
9    although that's where it is.
10        And I think that to -- in a large degree, to
11   a large part, Schweickert -- Steve Schweickert's
12   declaration of December 20th, 13, is set forth
13   presumably to support the allegations of Mark
14   Phillips' claims.  It really doesn't seem to have
15   much -- much relevance.  And I -- and I appreciate
16   that there could be some things that are referred to
17   in the body of the declaration that could have, but
18   once you get beyond the stock ownership, and I -- you
19   have a right to certainly inquire about that, I
20   believe, but to go -- you know, to make this a
21   preliminary foray on behalf of Mr. Phillips I think is
22   inappropriate.
23        So I -- that's -- that would be my input and
24   observation.  I'm not telling you that I will
25   necessarily tell Mr. Du Wors not to answer, but I will

1    take an object -- I will object to questioning that is
2    afield and is more properly conducted in Mark
3    Phillips' litigation and would accordingly, you know,
4    at the appropriate time move to strike it, but you go
5    ahead and do what -- whatever you want to do.
6         THE WITNESS:  I also --
7         MR. KIMBALL:  And --
8         THE WITNESS:  I also had a hard stop this
9    afternoon.  It's not completely hard, but we should
10   probably get to the core testimony.
11        MR. KIMBALL:  And what time is your hard
12   stop?
13        THE WITNESS:  Well, I -- what -- what seemed
14   to be communicated to you previously was that I had a
15   three o'clock stop, but at the pace this is going,
16   that's not going to work, so I'll try to push it a
17   half hour, 45 minutes if I can.
18        MR. KIMBALL:  How was that communicated to
19   us, the hard stop?
20        MR. FRANKLIN:  I'm pretty sure we sent
21   you a -- I'm pretty sure we advised you of the
22   three o'clock, that my guy is okay -- I know that I
23   did, and I believe that I sent you a -- either an
24   email or a letter that said, "Look, he's good until
25   three o'clock" --

1         MR. KIMBALL:  Do we have any --
2         MR. WAYMAN:  I'm not aware --
3         MR. FRANKLIN:  -- because you'd asked -- we
4    had a conversation.
5         MR. KIMBALL:  Okay.
6         MR. FRANKLIN:  You asked me if he was -- if
7    the 18th was good.  I called John.  He said, "Yeah,
8    I'm good if -- from 1:00, but I'm -- I cut off at
9    3:00."  And I'm pretty -- I'm pretty sure that was
10   communicated to you guys, but I guess what I said --
11        MR. KIMBALL:  I don't recall that.  I mean,
12   obviously it is what it is, and we'll just keep going
13   until --
14        MR. FRANKLIN:  Okay.  Let's -- let's --
15        MR. KIMBALL:  -- the hard stop occurs.
16        THE WITNESS:  Why don't we just -- let's get
17   to it.
18        MR. FRANKLIN:  Let's -- let's get on with
19   the deposition so we can get as much done as you can,
20   because I believe if -- and that's another reason,
21   Mark.  I think if you -- if you -- if you go after the
22   Jennifer Schweickert inquiry, I believe there's every
23   reason to believe you're going to finish by, you know,
24   3:00, 3:30, 3:45, so --
25        MR. KIMBALL:  And I will let you know that

1    the very next page of my questions targets
2    specifically Jennifer Schweickert.
3         MR. FRANKLIN:  All right.
4         THE WITNESS:  Let's get to it.  We started
5    late.  Let's pick it up.
6    Q.  (By Mr. Kimball)  So turn, if you would, to
7    page 13 of Exhibit 6, specifically paragraph 46, which
8    reads, "After the settlement, Mr. Du Wors completed
9    the assignment of the Phillips IP to HPV and filed the
10   appropriate documentation."
11        Do you know if that's true or false?
12   A.  I don't know what he means by appropriate
13   documentation.
14   Q.  Okay.
15        Did you complete documentation relating to
16   the assignment of the Phillips IP?
17   A.  "After the settlement."  The problem is
18   "after the settlement."  I don't -- I don't think it
19   took place after the settlement.  We transacted that
20   IP transfer in October of 2010 I believe, and the
21   settlement wasn't finalized until the end of
22   January 2011.
23   Q.  And just so we're clear on what settlement
24   we're talking about, that's the settlement involving
25   MOD, correct?

John Du Wors                                    July 18, 2014

Page 46

```
 1        A.   That's the one I assume this is talking
 2   about and it's the one that I'm talking about.  I'm --
 3        Q.   All right.
 4        A.   -- not aware of any other settlement
 5   relating to our representation of Mr. Phillips.
 6        Q.   All right.  Thank you.
 7             And then the next sentence reads, "Shortly
 8   prior to this settlement, I can clearly recall a shift
 9   in Mr. Du Wors' attitude towards me" -- that would be
10   Mr. Schweickert -- "and his posture towards HPV.  He
11   became extremely insistent on being involved in every
12   action undertaken by HPV, no matter how small."
13             So I guess my question is, over a period of
14   time did the nature of your relationship with Hunts
15   Point Ventures change where you were having a greater
16   role in the day-to-day legal and business affairs --
17   or -- excuse me -- legal or business affairs of Hunts
18   Point Ventures?
19        A.   No.
20             MR. FRANKLIN:  Objection; compound, but go
21   ahead and answer.
22        A.   No.  There was no perceptible change.  I was
23   Hunts Point Ventures' outside litigation counsel.  My
24   business advice was pretty limited and tended to
25   relate more towards the litigation objectives.
```

Page 47

```
 1        Q.   (By Mr. Kimball)  So then the next sentence
 2   begins, "He was very involved in every aspect of..."
 3   Hunts Point Ventures...
 4             Would that be true or false?
 5        A.   That would be false.
 6        Q.   "...including business decisions and
 7   investments..."
 8             Would that be true or false?
 9        A.   That would be especially false.
10        Q.   "...and was anxious to use the Phillips IP
11   to encourage investment and generate income from
12   patent violation settlements."
13             Is that true?
14        A.   I don't recall having been anxious during
15   that period.
16        Q.   Were you --
17        A.   I mean, I wasn't -- if ultimately what
18   you're asking me is --
19        Q.   Did you believe it would be beneficial to
20   use the Phillips IP to encourage investment and
21   generate income from patent violation settlements?
22        A.   The second part, yeah.  I mean, you know,
23   anxious, I had been retained to do that and that's
24   what I do for a living, so I would call myself no more
25   anxious about that representation than I would be
```

Page 48

```
 1   about representing any other litiga -- litigation
 2   client I represent, so there was no peculiar
 3   anxiousness or enthusiasm or passion about that.
 4             I represent lots of intellectual property
 5   holders in intellectual property litigation, half of
 6   them on a contingency basis and half of them on an
 7   hourly basis, and I felt the appropriate and
 8   professional level of zeal, I suppose, but --
 9        Q.   Did you ever discuss with Steve Schweickert
10   the advantages of using the Phillips IP to encourage
11   outside investment in the company?
12        A.   No.
13             (Marked Deposition Exhibit No. 7.)
14        Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
15   handed a stack of three documents collectively marked
16   as Exhibit 7.  The first document is titled
17   "TECHNOLOGY LICENSE AGREEMENT," and the second one is
18   also titled "TECHNOLOGY LICENSE AGREEMENT," and the
19   third one --
20             MR. WAYMAN:  No.  There should be three
21   separate documents.
22             MR. KIMBALL:  These are not --
23             MR. WAYMAN:  They're out of order.
24             MR. FRANKLIN:  Which is the agreement?
25             MR. WAYMAN:  There should be -- my mistake.
```

Page 49

```
 1        If you want to give me these two right
 2   here --
 3             MR. FRANKLIN:  Let's --
 4             MR. WAYMAN:  Yeah, there should be three.
 5   Sorry about that.
 6             THE WITNESS:  Tell you what, Mark.  Why
 7   don't you -- for the sake of the record, why don't you
 8   mark the second two in that set as 8 and 9.
 9   Otherwise --
10             MR. KIMBALL:  Let's do this.  Okay.  So 7 is
11   titled --
12             THE WITNESS:  That's the articles.
13             MR. WAYMAN:  7 is LLC operating agreement.
14             MR. KIMBALL:  All right.
15             MR. WAYMAN:  8 is contribution agreement.
16        Q.   (By Mr. Kimball)  All right.  So, first of
17   all, with regard to Exhibit 7, which is titled
18   "LIMITED LIABILITY COMPANY AGREEMENT OF HUNTS POINT
19   INTELLECTUAL PROPERTIES, LLC," do you see that
20   document?
21        Oh, it's here.
22        A.   Limited liability agreement.  I do.
23        Q.   Okay.
24        Have you ever seen that document before?
25        A.   I never have.
```

13 (Pages 46 to 49)

John Du Wors                                                    July 18, 2014

Page 50

1      Q.   Did anyone ever tell you who drafted this
2    document?
3      A.   No, but it appears to be forged.
4      Q.   What do you mean by "forged"?
5      A.   Well, I think that it -- I'm looking at
6    the -- well, first of all, my understanding based on
7    everything I've ever been told is that Hunts Point
8    Intellect -- Intellectual Properties, LLC, does not
9    exist and has never existed, and so I'd be curious to
10   go on the Secretary of State's office right -- website
11   right now to see if it actually ever was formed as an
12   entity.
13        I'd note that the date purportedly
14   identified in the opening preamble to all of these
15   agreements is May of 2010, but the signatory appears
16   to be Chad Rudkin, but, of course, Chad Rudkin was not
17   a manager or a principal of any entity relating to the
18   Hunts Point Ventures enterprise until about the middle
19   of 2012.
20        It appears to be the case that what Mark
21   Phillips is attempting to do by fabricating these
22   documents is give the impression that the party to be
23   charged, Chad Rudkin, had -- was entering into these
24   agreements, but Mark wanted it to be the relevant date
25   of just before I was retained, so May of 2010.

Page 51

1    Unfortunately, Chad wasn't part of it in 2010, May of
2    2010.  He and Doug Lower were kind of hangers-on.
3         I'd note in the capital table in -- on
4    Exhibit A he has purported to kind of try to sketch
5    out what the cap table might have looked at had this
6    deal gone -- been gone into the way that Mark wishes
7    it had in May of 2010, and he has listed Mark
8    Phillips, Steve Schweickert, and Chad Rudkin.  If this
9    was really made at the time, it would have included
10   Doug Lower on the list.
11        So I think what's going on is that Mark is
12   trying to invent these documents to fabricate some
13   reality, but the dates aren't working out and,
14   historically speaking, the picture of folks that would
15   have been involved isn't working out either.  So I am
16   pretty darn sure that Mark made these up, as he has
17   been found to do.
18     Q.   You indicated that your understanding is
19   that Hunts Point Intellectual Properties, LLC, was
20   actually never filed with the Secretary of State,
21   correct?
22     A.   Which entity?
23     Q.   Hunts Point Intellectual Properties, LLC.
24     A.   I certainly have no independent knowledge of
25   it ever having been formed --

Page 52

1      Q.   All right.
2      A.   -- or registered with the Secretary of State
3    of any state.  I assume it would have been Washington,
4    but I've never seen those.
5      Q.   Isn't it possible that individuals seeking
6    to set forth their rights and responsibilities with
7    regard to an LLC could prepare and execute a limited
8    liability company agreement prior to actually filing
9    with the Secretary of State?
10     A.   Well, if your question as phrased is asking
11   isn't it possible, of course anything is possible
12   within the boundaries of reality, so I suppose that
13   could be done.
14        The problem is this is totally inconsistent
15   with anything anybody related to these entities ever
16   told me, including Mark Phillips, during the relevant
17   time period.  The first time I ever heard about any of
18   this stuff is after the commencement of this lawsuit,
19   and the documents look like the kind of thing Mark
20   tends to fabricate when he's fabricating documents,
21   just like he did in relation to his management of MOD
22   Systems, you know, the stuff that he was prosecuted
23   for, that bank fraud claim where he generated board
24   resolutions when he wasn't on the board and didn't
25   have the power, and -- and just the characteristics

Page 53

1    that I told you about, the May of 2010 date, but Chad
2    Rudkin is the signing party at a time when nobody ever
3    would have thought Chad would be the signing party for
4    any Hunts Point entity.  And then the sketch of a cap
5    table that leaves out Doug Lower looks to me like
6    they're fabricated by a person who's been convicted of
7    multiple counts of fraud.
8      Q.   Did you have discussions with Doug Lower or
9    anyone else about whether or not they were going to
10   own interests in an LLC called Hunts Point
11   Intellectual Properties, LLC?
12     A.   No, and I don't have an independent
13   recollection of anyone really contemplating a Hunts
14   Point intellectual property as being likely to exist.
15   I think I heard it once in perhaps the spring of 2011,
16   but I'm hazy on dates, because it's been a long time,
17   when Steve Schweickert asked me about whether or not
18   it was valuable to have an intellectual property
19   holding company.
20        And I said that I thought that those -- I
21   thought the answer to that -- and in that conversation
22   he may have said HPIP.  If I've ever heard that term,
23   that's the only place I ever would have heard it.  I
24   said in response -- I gave him some kind of advice.  I
25   think I told him, "Part of the decision would be tax

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com       206.622.6661 * 800.657.1110   FAX: 206.622.6236

Page 54

1  driven, and I'm not competent to consult on that,"
2  Part of it would be an asset protection function, and
3  part of it would be the mechanics of joint
4  partnerships and joint venture or strategic
5  partnership agreements between various entities within
6  the family and outside.
7       So ultimately, as I understand, there was a
8  decision not to have an intellectual property holding
9  company but, rather, to leave the intellectual
10  property in title in the name of Hunts Point Ventures,
11  Inc., such that Hunts Point Ventures, Inc., would be
12  the entity that asserted -- asserted infringement
13  claims relating to that intellectual property.
14       I understood that Hunts Point Venture Group,
15  LLC, would be used to act as a licensee of that
16  intellectual property and commercially deploy
17  products, the idea being that there would be one
18  entity that was a patent troll and another entity that
19  was legitimately in business, which I think was the
20  ultimate goal, but I don't -- I never -- people didn't
21  talk about HPIP. I didn't know anything about it.
22       Q.  You made comments a moment ago regarding
23  Exhibit 7 and questioning its legitimacy or validity
24  in part because there was no mention of Doug Lower on
25  the member and manager page. Do you --

Page 55

1       A.  Correct.
2       Q.  -- recall that?
3       So why is it that Doug Lower wouldn't
4  necessarily be identified as a member or manager in
5  this company to be formed?
6       A.  Because when they showed up in my offices
7  during that period getting -- leading up to Mark
8  Phillips' trial, they came every week to talk about
9  the company and what they were going to do and how
10  they wanted to all work together. Doug Lower was
11  always there.
12       And my understanding was that whatever
13  relationship they all firmed up, that Doug Lower and
14  Chad Rudkin would essentially play the same role but
15  with different job duties, but -- whatever their
16  salary was, whatever they ended up working out in
17  terms of an ownership split.
18       Q.  And what was that understanding based upon?
19       A.  I never heard -- I never heard the actual
20  terms of any agreement.
21       Oh, what was the understanding based on?
22       Q.  Yes, your understanding.
23       A.  That's just what they all either said
24  explicitly or indicated through their speech during
25  the time period that they would come to my office for

Page 56

1  meetings.
2       Q.  And you specifically recall that there was
3  some discussion that to the extent a new company was
4  formed, that Mr. Lower would be represented in that
5  new company?
6       A.  Not to the extent that a new company was
7  formed. I understand that they -- that whatever their
8  relationship was going to be, it was going to be
9  either to HPV or possibly to HPVG, which was the group
10  that was going to deploy consumer products of some
11  kind or technology products of some kind.
12            (Discussion off the record.)
13            (Marked Deposition Exhibit No. 8.)
14       Q.  (By Mr. Kimball)  Mr. Du Wors, you've been
15  handed a document marked as Exhibit 8. Have you ever
16  seen this document before?
17       A.  Looks familiar. I mean, it looks a lot like
18  the intellectual property assignment agreement that we
19  prepared for Mark Phillips and Hunts Point Ventures,
20  but I would have to compare it to the document I have
21  back at my office, because this contains features that
22  I don't recall, such as a 30-day payment of $100,000.
23  I don't recall that.
24       Additionally, my recollection was that there
25  were two schedules of intellectual property affixed to

Page 57

1  the IP transfer agreement that we created, but I could
2  be wrong about that, but I would certainly need to
3  compare them.
4       I'd note that this doesn't have Bates stamps
5  on it, and to the extent that we have produced
6  anything, it had Bates stamps on it.
7       I'd also notice that -- note that this has
8  an "MP" in the lower right-hand corner in Mark
9  Phillips' handwriting, which I recognize, which means
10  that it probably came from Mark Phillips in the course
11  of gathering and/or manufacturing documents in
12  association with this case, so this could contain
13  terms that were not in the actual agreement that was
14  executed.
15       Q.  And the original of the executed agreement,
16  where would that be located?
17       A.  I don't know where the original is. We
18  would have a copy in my files.
19       Q.  Of the executed agreement?
20       A.  According to our ordinary procedures, we
21  would. I would have to go and look to see if we do,
22  but I believe that we produced it in association with
23  this litigation.
24       Q.  Could you take a look at paragraph three on
25  the first page of Exhibit 8?

John Du Wors                                                  July 18, 2014

Page 58

1        A.   This is the paragraph that I just told you I
2   don't think is actually what ended up in the agreement
3   we prepared for Mark Phillips and Steve Schweickert.
4   I don't think that 100-day feature was there.
5        Q.   All right.
6             Do you know if Mr. Phillips was ever paid
7   the $100,000 referred to in paragraph 3.(a)?
8        A.   Having only heard of that concept for the
9   first time today, I have no knowledge relating to that
10  subject at all.
11       Q.   All right.
12            And do you know if the purchaser, which
13  would be the company here, ever fulfilled its
14  obligation in paragraph 3.(b) to pay up to $1 million
15  of Mr. Phillips' attorney fees, court costs, and
16  related expenses?
17       A.   I think that it went well in excess of that
18  obligation.
19       Q.   So you think more than a million dollars was
20  paid?
21       A.   No.  I think that it paid for more than just
22  the MOD Systems litigation.
23       Q.   Okay.
24            Do you know what the total dollar amount
25  was?

Page 59

1        A.   For MOD Systems?
2        Q.   Yes.
3        A.   I would estimate that it is approximately
4   $100,000.
5        Q.   All right.
6             (Marked Deposition Exhibit No. 9.)
7        Q.   (By Mr. Kimball)  You've been handed a
8   document marked as Exhibit 9, which consists of
9   several pages, all of which are titled "PATENT
10  INTEREST ASSIGNMENT."  Have you ever seen this
11  collection of documents before?
12       A.   I don't know.  It's possible that I have.  I
13  believe the documents similar to these were executed
14  in or about -- or anywhere between August of 2010 and
15  January of 2011, but they were not prepared by me.
16  They were prepared by Derek Linke at my firm.
17       Q.   And is Derek Linke an attorney?
18       A.   He is.
19       Q.   All right.
20       A.   But I can't tell you if these were them.
21       Q.   You have heard of the name Jennifer
22  Schweickert, correct?
23       A.   I have.
24       Q.   And we've been discussing an individual
25  named Steve Schweickert.  Do you know if Jennifer and

Page 60

1   Steve are related?
2        A.   He is her uncle.  No.  He is her first
3   cousin once removed.
4        Q.   Do you recall when you first heard of the
5   name Jennifer Schweickert?
6        A.   Not with any level of specificity, except to
7   say that I think it was probably in the first half of
8   2011.
9        Q.   All right.
10            And do you recall the context in which that
11  name was first brought up?
12       A.   Jennifer Schweickert was going to invest
13  money in Hunts Point Ventures or -- or Hunts Point
14  Venture Group or loan either of those entities money
15  or somehow contribute capital to one or more of those
16  entities for the purpose of paying my attorney fee
17  bill.  I was never told what the terms of that
18  financial exchange were.
19       Q.   All right.
20            (Discussion off the record.)
21            (Marked Deposition Exhibit No. 10.)
22       Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
23  handed a document marked as Exhibit 10.  Have you ever
24  seen that document before?
25       A.   I certainly have never seen it before the

Page 61

1   commencement of this lawsuit, and I don't know if it
2   is what I saw relating to this transaction following
3   the commencement of this lawsuit.
4        Q.   And what transaction are you referring to?
5        A.   Jennifer Schweickert's contribution of
6   $200,000 to either of Hunts Point Ventures or Hunts
7   Point Venture Group, LLC.
8        Q.   Do you know if this document was drafted by
9   anyone at your office?
10       A.   It certainly was not drafted by anyone at my
11  office.
12       Q.   And what are you basing that certainty on?
13       A.   I know all the lawyers at my firm, and we
14  didn't consult on this deal or draft this deal or
15  participate in the transaction or know anything about
16  it, and the only people I possibly conceivably could
17  have been would be me or Derek Linke or Michael Spain,
18  and none of them did it either, and we've never had a
19  copy of it at our office.
20       Q.   Do you know if $200,000 was contributed or
21  loaned pursuant to the terms of Exhibit 10 to Hunts
22  Point Ventures?
23       A.   Well, if you break your question in half, I
24  can answer it.
25       Q.   All right.

16  (Pages 58 to 61)

John Du Wors                                            July 18, 2014

Page 62

1        A.   Steve Schweickert and Chad Rudkin and
2   Elizabeth Rudkin have all stated to me that, indeed,
3   Jennifer Schweickert contributed $200,000 to Steve
4   Schweickert for the purpose of one of those entities
5   or both or -- or the enterprise in general.  I have no
6   idea if it was pursuant to this agreement.
7        My understanding was that -- the
8   understanding I formed prior to the commencement of
9   this lawsuit was that, in fact, Steve Schweickert had
10  ginned up two different deal documents that he had
11  given to Jennifer Schweickert and that he had signed
12  both of them and that, in fact, he had never received
13  a signed copy in return of those.  And when I was
14  shown those two documents, they did not look like
15  this.  In fact, this looks completely different.
16       And then when Jennifer began asserting
17  demands that my law firm pay the money that she had
18  contributed to Hunts Point Ventures, I asked for a
19  copy of whatever written agreement governed her rights
20  in that regard, and she declined to provide me with
21  one.
22       So I think today is the first time I've ever
23  seen Exhibit 10.  The first time I ever saw any
24  unsigned documents relating to Jennifer Schweickert's
25  contribution of funds to Steve Schweickert was shortly

Page 63

1   before this litigation, and -- and I think those look
2   differently than this guy, being Exhibit 10.
3        Q.   Okay.
4        Now, just so we're clear, Exhibit 10 is
5   signed by at least one party -- or two parties,
6   correct?  Excuse me.  One party on two places,
7   correct?
8        A.   There are --
9        Q.   I'll rephrase my question.
10       There appear to be signatures on behalf of
11  Hunts Point Ventures, Inc., and Hunts Point Venture
12  Group, LLC; is that correct?
13       A.   Sure, but I don't know -- I don't know Steve
14  Schweickert's signature by sight.  I mean, I believe
15  this could be one of the documents he prepared.
16  According to the receiver in the related case, I was
17  incorrect in my understanding that there were four
18  documents he prepared -- or two documents he prepared.
19  The receiver says there were, in fact, four.
20       Q.   And, again, when is the first time that you
21  believe you saw Exhibit 10?
22       A.   Today.
23       (Marked Deposition Exhibit No. 11.)
24       Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
25  handed now a document marked as Exhibit 11.  Have you

Page 64

1   ever seen this document before?
2        A.   I don't know.  This could be one of the two
3   documents that I was shown prior to the commencement
4   of this lawsuit, but not any -- anywhere near the time
5   when Ms. Schweickert made her contribution of money.
6   The fact that this provides for $100,000 makes me
7   think that I have not seen it, because my
8   understanding was that all of the documents Steve
9   Schweickert created related to the contribution of
10  $200,000.
11       Q.   When did you first speak to Ms. Schweickert
12  concerning her loaning money to either of the Hunts
13  Point entities?
14       A.   The same time as my last conversation with
15  Jennifer Schweickert on that subject, which was
16  sometime in the late winter, early spring of 2011.
17       Q.   And not before?
18       A.   Certainly not.
19       Q.   Turn, if you would, to Exhibit 6, page 15;
20  specifically, paragraph 53 on page 15.  And in
21  paragraph 53 begins -- and, again, this is a
22  declaration of Steve Schweickert -- "I was a
23  participant on the conference call between Jennifer
24  and Mr. Du Wors which took place in April 2011, and I
25  heard all of Mr. Du Wors' representations regarding

Page 65

1   HPVG.  During the telephone call, Mr. Du Wors stressed
2   that HPVG had been set up with Mark's knowledge for
3   the purpose of creating a strictly profit-sharing
4   enterprise that would be based upon the prosecution of
5   Marks' patents.  He said that as" an -- "He said that
6   as additional incentive for Jennifer to make the loan,
7   besides interest on the loan, that she would be
8   included in the profit sharing between HPV and HPVG at
9   a return of 8 percent."
10       Do you see that?
11       A.   I do.
12       Q.   So I guess my first question is, do you
13  recall having a conference call involving Jennifer and
14  Steve Schweickert which took place in April 2011?
15       A.   I recall that the conversation took place
16  somewhere in that type frame.
17       Q.   Okay.
18       A.   Time frame.
19       Q.   And do you recall if you, in fact, said
20  roughly or approximately that HPV had -- HPVG had been
21  set up with Mark's knowledge for the purpose of
22  creating a strictly profit-sharing enterprise?
23       A.   I recall that I said nothing of the kind.
24       Q.   And Mr. Schweickert also states that you
25  stated that as an additional sensitive for Jennifer to

17 (Pages 62 to 65)

John Du Wors                                                July 18, 2014

---

Page 66

1   make the loan, besides interest on the loan, that she
2   would be included in the profit sharing between HPV
3   and HPVG at a return of 8 percent.  Do you recall if
4   you made that statement?
5       A.   I recall that I made no statement of the
6   kind.
7       Q.   Did you discuss any kind of a return of
8   8 percent during that phone call?
9       A.   We did not.  I was specifically kept out of
10  that, of -- of any discussion on that topic.
11      Q.   Mr. Schweickert then writes, "He explained
12  HPVG was a concept he came up with and was intended to
13  be inclusive of all people who had given Mark
14  assistance..."
15           Was that true or false?
16      A.   That is false.
17      Q.   He goes on to write that it "...was Mark's
18  way of showing his appreciation to everyone who had
19  helped him and that all those people were aware they
20  were being granted shares in HPVG."
21           Do you recall making a statement to that
22  effect or anything similar during that phone call?
23      A.   I recall that I have never said anything
24  even vaguely resembling the allegation contained in
25  that paragraph.

---

Page 67

1       Q.   Mr. Schweickert then writes, "Mr. Du Wors
2   stressed that the money from Jennifer's loan would
3   assist him with Mark's defense and with prosecuting
4   patent violations..."
5            Do you recall making a statement to that
6   effect?
7       A.   I believe that -- definitely with respect to
8   the criminal defense.  I don't know if I also said it
9   would have anything to do with the patent prosecution.
10  I don't think so.
11           Oh.  Patent prosecution in the sense of
12  maintenance?  You know, you've got to -- when you talk
13  about patents, you've got to clarify whether you mean
14  prosecution by -- whether you mean pro -- when you say
15  prosecution, whether you mean suing people for
16  infringement versus prosecuting applications before
17  the United States Patent and Trademark Office for the
18  purpose of either maintaining, defending, or obtaining
19  patents.
20      Q.   Do you recall if either of those were
21  discussed by you?
22      A.   We might have discussed the USPTO
23  intra-office patent prosecution activities as
24  something that might be funded by Jennifer Swipe --
25  Schweickert's contribution.  I have some recollection

---

Page 68

1   of that.  But certainly the main thing I told her was
2   that her money was going to pay my legal fees for
3   defending Mark criminally.
4       Q.   So is the statement that you discussed or
5   you stressed that the money from Jennifer's loan would
6   not only assist Mark's defense but with, quote,
7   "prosecuting patent violations," is that true or
8   false?
9       A.   I didn't stress anything.  It was a short
10  conversation, and I'm not much of a stresser, but --
11  and I say that non-sarcastically.  I'm -- I didn't
12  stress.  I didn't -- I wasn't anxious.  The -- I
13  wasn't really pushing for anything.
14           I was asked to tell Jennifer Schweickert
15  what patent infringement litigation took -- looked
16  like, and I told her that.  And I also did tell her --
17  I didn't really stress to her, but I told her that
18  most of the money's being used to pay me to defend
19  Mark criminally.
20      Q.   Finally, Steve Schweickert writes, "...and
21  that settlement money received as a result of the
22  patent violations would directly benefit Mark as well
23  as the other shareholders of HPVG."
24           Do you -- was that true?
25      A.   That is patently false.

---

Page 69

1       Q.   So you did not discuss that during that
2   April con -- telephone conversation then, correct?
3       A.   I have never said anything resembling that
4   statement at any time in my life.
5       Q.   But you do recall that either in April or
6   sometime around April of 2011 there was a telephone
7   conference call involving Schweickert -- excuse me --
8   Steve Schweickert and Jennifer; is that correct?
9       A.   Well, I recall the one that I participated
10  in somewhere in that time frame.
11      Q.   Okay.
12           Do you recall if you initiated that
13  telephone conference or if it was initiated by someone
14  else?
15      A.   It was initiated by Steve.
16      Q.   So they phoned in to your office?
17      A.   Correct.
18      Q.   Okay.
19      A.   That was necessary because Steve con --
20  well -- I don't know.  I mean, it may -- Steve was
21  certainly the person who caused Jennifer to be on a
22  call with me.  I couldn't tell you if he called me up
23  and said, "Okay.  Please hold while I conference in
24  Jennifer," or if he had Jennifer on the line and put
25  her on hold and conferenced me.  It's also possible, I

---

18  (Pages 66 to 69)

John Du Wors                                                July 18, 2014

---

Page 70

1  guess, that I called Steve and then he conferenced
2  Jennifer.  I just don't recall.
3      Q.   Was there a purpose you had in mind in
4  talking to Jennifer during that phone call?
5      A.   Yeah.  Steve told me that Jennifer was going
6  to contribute money to -- I don't know -- I don't know
7  that he ever told me what entity he was contributing
8  it to, but that she was contributing money.  I think I
9  thought at the time it was some kind of a loan, and he
10  said she wanted to know what this patent trolling
11  thing looks like, and so could I explain patent
12  trolling to her, so I said, "Sure."
13      Q.   Was it also to discuss what kind of benefits
14  she would receive by either investing or loaning money
15  to the company?
16      A.   Absolutely not.  Steve was very careful to
17  exclude me from any discussion on that topic.  I never
18  knew the terms.  I didn't know what she was getting in
19  return.  I didn't know anything about it.  In fact, I
20  think I recall -- I think I recall then that Steve
21  said, "Okay, John.  You jump off the line," after I'd
22  answered her questions about patent litigation and --
23  I think she said -- I think he said, "Okay, John.  You
24  get off the line and I'll talk with Jennifer about the
25  rest of the stuff," which causes me to believe, in

---

Page 71

1  response to your earlier question, Steve must have
2  initiated the call, because otherwise, when I jump off
3  the line, it would have terminated their call as well.
4          MR. FRANKLIN:  That may not be correct.
5  That may not be the case.
6      A.   Okay.  I --
7          MR. FRANKLIN:  But whatever.
8      A.   I guess I'm speculating then.  I don't know
9  who initiated that call.  Just wasn't important enough
10  for me to remember years later.
11      Q.   (By Mr. Kimball)  Would you --
12          MR. KIMBALL:  Strike that.
13      Q.   (By Mr. Kimball)  Would it be accurate to
14  describe your role during that telephone conference as
15  counsel for HPV or Hunts Point Ventures?
16      A.   Yes.
17      Q.   Okay.
18          Do you recall before the telephone
19  conference occurred whether or not Jennifer had
20  somehow communicated a request to have such a phone
21  call with you and Steve?
22      A.   I don't have any recollection on that topic.
23      Q.   Okay.
24      A.   If I -- if I had known that or been in
25  receipt of that information at any time, it would have

---

Page 72

1  come to me from Steve, and I don't have a recollection
2  of that.  I do recall Steve asking if I would do that.
3      Q.   Okay.
4          Did you initiate the request to have such a
5  conversation with Steve and/or Jennifer about the
6  subjects that we've just been talking about?
7      A.   Certainly not.
8      Q.   Do you recall if during that telephone
9  conference you discussed whether or not Mark Phillips
10  would be a member of HPV or Hunts Point Ven -- excuse
11  me -- a shareholder of Hunts Point Ventures, Inc.?
12      A.   There was no discussion on that point.
13      Q.   Did you ever have a discussion with Jennifer
14  about whether or not Mark Phillips was or would become
15  a shareholder in Hunts Point Ventures?
16      A.   None whatsoever.  I've spoken to Jennifer
17  once in my life, and it was that occasion on the phone
18  call with Steve Schweickert and Jennifer Schweickert
19  in late winter or early -- early spring of 2011 for
20  about 20 minutes.
21      Q.   And had there been any other in-person or
22  telephone conversa -- conferences with Jennifer
23  Schweickert since then?
24      A.   Never.  Spoken to her telephonically once,
25  and I've never met the woman.  I don't know what she

---

Page 73

1  looks like.
2      Q.   Did you ever tell Jennifer that she would be
3  able to directly benefit or --
4          MR. KIMBALL:  Strike that.
5      Q.   (By Mr. Kimball) -- directly or indirectly
6  benefit financially from successful prosecutions of
7  patent infringement actions that you would be
8  handling?
9      A.   Not at all.  Never.  Nothing of the kind.
10  Except to the extent that I assumed that by explaining
11  to her how Hunts Point Ventures was going to make
12  money from patent infringement, I assumed that that
13  was relevant to her transaction, because that money
14  would likely be the source of whatever it was she was
15  to receive, but I never discussed it with
16  Ms. Schweickert.
17      Q.   Prior to today's deposition can you
18  summarize --
19          MR. KIMBALL:  Strike that.
20      Q.   (By Mr. Kimball)  Based on your knowledge
21  prior to today's deposition can you summarize your
22  understanding of the loan structure between Jennifer
23  and Hunts Point Ventures?
24      A.   Prior to today?
25      Q.   Yes.

---

19  (Pages 70 to 73)

John Du Wors                                            July 18, 2014

Page 74

1     A.  I think it's ambiguous as to time frame,
2   because I gained no understanding of that topic until
3   the commencement of this case.
4     Q.  All right.
5         Let's say prior to the commencement of this
6   case what was your understanding?
7     A.  I had no understanding.  I never have.
8     Q.  All right.
9     A.  I understood that Steve Schweickert executed
10  two documents, and prior to the commencement of this
11  case we always wondered if -- which one Jennifer
12  executed.  I've had that conversation with Chad Rudkin
13  and Elizabeth Rudkin many times.
14        That's why I asked Jennifer Schweickert for
15  a copy of whatever the document was, because I knew
16  that there was this thing that was primarily a loan
17  that had a tremendous interest rate, and this other
18  document seemed to provide for an equity acquisition,
19  but we've never known what she went for.
20    Q.  And when you say "we always wondered," who
21  are the other parties in "we"?
22    A.  Me, Chad Rudkin, and Elizabeth Rudkin.
23    Q.  Did Chad Rudkin ever tell you that he did
24  not have a signed document bearing the signatures of
25  both Jennifer and someone on behalf of Hunts Point

Page 75

1   Ventures?
2     A.  Did Chad ever tell me that he did not have a
3   document that was countersigned --
4     Q.  Yes.
5     A.  -- by Jennifer?
6         I think Chad had always told me prior to the
7   commencement of this lawsuit that he did not have a
8   copy of any countersigned transaction document from
9   Jennifer.
10    Q.  Did he ever tell you why he wondered or was
11  uncertain of what the terms of the loan were?
12    A.  Because he had acquired Hunts Point
13  Ventures, and he was trying to get clear on what kind
14  of deal he was saddled with.  I mean, he wanted to
15  resolve whatevers Jennifer claimed -- whatever
16  Jennifer's claim of right was with respect to
17  whichever of the Hunts Point Ventures entities she was
18  claiming against, and he wanted to know if he owed her
19  money or if she was a shareholder, and if she was a
20  shareholder, what she was a shareholder in.
21    Q.  I believe that you've indirectly answered
22  this question, but I'll ask you directly.  With regard
23  to loan documents between Jennifer and Hunts Point
24  Ventures, did you ever modify or revise any such
25  documents?

Page 76

1     A.  Never touched them.  Never knew about them.
2   Left out of the conversation.  Steve did everything
3   himself.  I saw the unsigned documents for the first
4   time shortly before the commencement of this action,
5   and I first saw a countersigned document upon the
6   commencement of this action.
7         (Marked Deposition Exhibit No. 12.)
8     Q.  (By Mr. Kimball)  You've been handed a
9   document marked as Exhibit 12.  Have you ever seen
10  this document before?
11    A.  Well, there's two documents in Exhibit 12.
12  One is an email, and the other is a shareholder
13  minutes -- or a notice of annual shareholder meeting
14  rather.
15    Q.  Have you ever seen either of those
16  documents?
17    A.  Well, yeah.  I mean, I think I drafted the
18  attached notice of annual meeting of shareholders.
19    Q.  And that references a meeting to be held on
20  August 27th, 2012, at 2:00 p.m. at Newman Du Wors,
21  LLP, correct?
22    A.  Correct.
23    Q.  And the sender of the email component of
24  Exhibit 12 appears to be an individual named Lindsey
25  Rowson or Rowson?

Page 77

1     A.  Lindsey Rowson.  That's my paralegal.
2     Q.  Okay.
3         Turn, if you would, to the final page of
4   Exhibit 12, which is the page titled "Notice of Annual
5   Meeting of Shareholders."
6     A.  Okay.  I'm there.
7     Q.  There is a list of five items under the
8   purpose of the meeting, and specifically the number
9   three is a reference to, "Discussion of the debt
10  and/or equity interests of Joyce Schweickert, Jennifer
11  Schweickert and Sandy Hoover."
12        Do you see that?
13    A.  Correct.
14    Q.  When you prepared the last page of
15  Exhibit 12, specifically what were you contemplating
16  or thinking of when you used the language, "Discussion
17  of the debt and/or equity interest of Joyce
18  Schweickert, Jennifer Schweickert and Sandy Hoover"?
19    A.  We were attempting to figure out what claims
20  of right specifically Joyce and Jennifer were making,
21  because we didn't know which of the two documents from
22  Steve Jennifer had signed and we didn't know what
23  Joyce's basis was for claiming that she continued to
24  be an interest holder of some kind with respect to
25  Hunts Point Ventures or its assets.

20  (Pages 74 to 77)

John Du Wors                                        July 18, 2014

Page 78

```
 1          I didn't -- I didn't know if she continued
 2   to -- or if she viewed her initial capitalization of
 3   Hunts Point Ventures as a loan, even though she'd
 4   relinquished her shares, or if she viewed it as a
 5   capital contribution that her shares were for, in
 6   which case the relinquishment would have eliminated
 7   any interest.  And I didn't know if she considered
 8   that the elimination of that interest was legally
 9   valid or binding on her.  I just didn't know.
10          And the same is true with Jennifer
11   Schweickert.  We didn't know which document she'd
12   signed or what she claims she was owed by Hunts Point
13   Ventures.
14          So Chad and Elizabeth wanted to have this
15   meeting and invite all the stakeholders so that we --
16   they could tell us what they think they're owed and we
17   could see if we could work out a deal with them to
18   satisfy everybody, because Chad and Elizabeth wanted
19   to make good on all of the debts of Hunts Point
20   Ventures and also resolve any conflicts that might be
21   emerging.
22       Q.  Okay.
23          So when you say "we" or "we needed to
24   determine," who are you referring to as "we"?
25       A.  Well, Chad and Elizabeth were the sole
```

Page 79

```
 1   shareholders of Hunts Point Ventures at the time, so
 2   they needed to determine that.  And they were asking
 3   me what I -- for legal advice relating to that, and I
 4   was counseling them and, in order to do a complete job
 5   of counseling them, needed to know what the relevant
 6   stakeholders thought their rights were and what
 7   documents had been signed.
 8       Q.  The bullet item under that at number four
 9   reads, "Discussion of Mark Phillips' approaching date
10   of release from federal prison."
11          Do you see that?
12       A.  I do.
13       Q.  What was on your mind and why was that
14   language included there?
15       A.  I think that he and Chad Rudkin had been
16   communicating and that Mark Phillips had stated a
17   claim of right with respect to Hunts Point Ventures or
18   its assets or an employment relationship with Hunts
19   Point Ventures, and that needed to be communicated to
20   all of the shareholders and relevant stakeholders as
21   well, especially to the extent that it impacted a
22   global debt workout or global resolution that would be
23   entered into on the part of Hunts Point Ventures.
24       Q.  And specifically what are you referring to
25   when you're talking about a global debt resolution?
```

Page 80

```
 1       A.  Well, look.  You've got Sandy here.  She's a
 2   secured note holder.  You've got Jennifer Schweickert.
 3   She's claiming some kind of right with respect to one
 4   of the entities, and it's not clear if it's a debt
 5   right or an equity right or both.  You've got Joyce
 6   Schweickert, who's kind of saber rattling and making
 7   noises about having some claim of right, although we
 8   really didn't know what she either had or thought that
 9   she had.
10          And the idea was get everybody together,
11   tell each other about the debts to everybody, discuss
12   how we could run the company in a way that paid
13   everybody back and see if we could work out extensions
14   on maturity dates or some kind of a payment plan or
15   some kind of a subordinated right to go get some other
16   financing, if anybody else wanted to contribute or
17   whatever kind of a global resolution might put the
18   company in a position where it could pay back all its
19   obligations.
20       Q.  Did the meeting that is referred to as --
21   or --
22          MR. KIMBALL:  Strike that.
23       Q.  (By Mr. Kimball)  Did the meeting which was
24   scheduled to be held on August 27th, 2012, at
25   2:00 p.m. actually occur?
```

Page 81

```
 1       A.  It did.
 2       Q.  Did it occur at that date and time?
 3       A.  Yes.
 4       Q.  And was it that -- did it occur at your
 5   offices at 1201 Third Avenue?
 6       A.  It did.
 7       Q.  Do you recall who attended the meeting?
 8       A.  Chad and -- Chad and Elizabeth Rudkin
 9   certainly did.  Sandy Hoover may have, but Ms. --
10   Jennifer Schweickert and Joyce Schweickert did not
11   attend the meeting.
12       Q.  Did Mark Phillips?
13       A.  He did not.  He was still incarcerated at
14   that time.
15       Q.  Were you present at the meeting?
16       A.  I was.
17          (Marked Deposition Exhibit No. 13.)
18       Q.  (By Mr. Kimball)  You've been handed a
19   document marked as Exhibit 13.  Could you take a look
20   at that and let me know if you've ever seen this
21   document before.
22       A.  I don't recall having seen this document
23   before.  Elizabeth may have run it by me.  She
24   prepared it I think.
25       Q.  Elizabeth Rudkin?
```

21 (Pages 78 to 81)

John Du Wors                                                July 18, 2014

Page 82

1     A.   Uh-huh.
2     Q.   So sitting here today, you don't know if
3  you've seen this document before.
4     A.   I do not.
5     Q.   Can you tell me what discussion -- based on
6  your recollection, what specific discussion occurred
7  with regard to Jennifer Schweickert's equity or loan
8  position with regard to Hunts Point Ventures?
9     A.   Nothing except that we didn't know what it
10  was or what she believed it was.
11     Q.   On the second page of Exhibit 13 there is a
12  paragraph with bullet points titled "Discussion."  Do
13  you see that?
14     A.   I do.
15     Q.   And there's a reference to, "Status of
16  outstanding IP litigation - Reported by John Du Wors"?
17     A.   Okay.
18     Q.   Do you see that?
19     A.   I do.
20     Q.   And do you recall, sitting here today, the
21  general nature of what that discussion was?
22     A.   No.
23     Q.   What was the status of the outstanding IP
24  litigation at that time?
25     A.   I don't know.  I'd have to go back and look

Page 83

1  at my case dockets.  I don't know what cases were
2  settled or dismissed when.
3     Q.   There's a reference to, "Discussion of the
4  debt and/or equity interests of Jennifer Schweickert
5  and Sandy Hoover."
6         Do you recall specifically what the
7  different people attending the meeting discussed at
8  that meeting?
9     A.   Not of Sandy Hoover, except that she
10  generally was amenable to agreeing to some kind of a
11  workout agreement that -- that allowed the company to
12  continue to survive.
13         And with respect to Jennifer Schweickert,
14  the only discussion I recall was that we were trying
15  to figure out how we could get her to the table to
16  tell us what -- which deal she'd signed, if any, what
17  she thought her rights were, and whether or not we
18  thought we could work out a resolution that would
19  satisfy her.
20     Q.   The last page of Exhibit 13 is a document
21  titled "Annual Meeting of Shareholders of Hunts Point
22  Ventures, Inc. Agenda."  Do you see that?
23     A.   Yep.
24     Q.   Did you or someone at your office prepare
25  this document?

Page 84

1     A.   I don't have a clear recollection, but I
2  suspect it was me --
3     Q.   Okay.
4     A.   -- if for no other reason than that it uses
5  my particular favorite font and formatting of footers.
6     Q.   In fact, if you compare the content on the
7  final page to the "Notice of Annual Meeting of
8  Shareholders," which is this attachment to Exhibit 12,
9  it appears that the bullet point content appears
10  identical; is that correct?
11     A.   Holy cow, Mark.  I think you've got a
12  smoking gun there.  You caught me drafting both
13  documents I just admitted to drafting.  I don't know
14  if I can go on with this deposition.
15         MR. FRANKLIN:  It is what it is.
16     Q.   (By Mr. Kimball)  Have you ever heard of a
17  company called Hunts Point Venture Group, LLC?
18     A.   I have.
19     Q.   And what is your understanding of the nature
20  of the business of that company?
21     A.   The only thing that I've ever known about
22  the nature of the business of that company was that
23  Steve Schweickert told me he was going to form it for
24  the purpose of handling the commercial deployment side
25  of the overall Hunts Point Ventures enterprise as

Page 85

1  distinguished from the patent enforcement
2  revenue-generating side, which was Hunt -- Hunts Point
3  Ventures, Inc.  As of the commencement of this lawsuit
4  I actually didn't think that Hunts Point Venture
5  Group, LLC, had ever been formed, but as it turns out,
6  Steve Schweickert had directed Michael Spain, a
7  transaction lawyer at my office, to form it for him.
8         (Marked Deposition Exhibit No. 14.)
9     Q.   (By Mr. Kimball)  You've been handed a
10  document marked as Exhibit 14.  Have you ever seen
11  this document before?
12     A.   Not that I recall.
13     Q.   In fact, I'll represent to you that this is
14  a copy of a certificate of formation for Hunts Point
15  Venture Group, LLC, as we've just been discussing.
16     A.   Okay.
17     Q.   Take a look, if you would, at the second
18  page of Exhibit 14.
19     A.   Okay.
20     Q.   Identified therein in Article 6 is a
21  registered agent Newman Limited Corporate Services.
22  Do you see that?
23     A.   I do.
24     Q.   And then there's a signature down below
25  that, "Signature of Registered Agent," and then next

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110    FAX: 206.622.6236

John Du Wors                                                    July 18, 2014

Page 86

1    to that "Printed Name Derek Newman."  Do you see that?
2         A.   I do.
3         Q.   Do you have any reason to believe that that
4    is not Derek Newman's signature?
5         A.   Having never seen this document before, I
6    would be speculating entirely as to its authenticity,
7    but that sure does look like Derek Newman's electronic
8    signature.  In other words, I can tell you almost
9    assuredly that one of the paralegals at our office
10   would have affixed an electronic signature on that --
11   on this document.  I'm sure Derek Newman -- Newman
12   didn't sign it himself.
13        Q.   And then taking a look at Article 7, the
14   executor of the document is identified as, "Newman &
15   Newman, Attorneys at Law."  Do you see that?
16        A.   I do.
17        Q.   And then below "Signature of Executor"
18   "Printed Name Derek Newman."  Do you see that?
19        A.   Yep.
20        Q.   And, again, do you have any reason to
21   believe that that is not either Mr. Newman's signature
22   or his electronic signature, as --
23        A.   I --
24        Q.   -- used in your office?
25        A.   I recognize the form of the signature as

Page 87

1    match -- matching Derek's.  As I said before, I have
2    no personal knowledge with respect to this document,
3    but --
4         Q.   All right.
5         A.   -- but if -- if it weren't the case that the
6    document speaks for itself, you've certainly spoken
7    for it accurately.
8         Q.   Did you or anyone at your office ever draft
9    bylaws or any other corporate documents for Hunts
10   Point Venture -- Hunts -- Hunts Point Venture Group,
11   LLC?
12        A.   I certainly did not.  I have no knowledge
13   whether or not someone else in my office, such as
14   Michael Spain, did so.
15        Q.   Have you ever discussed any corporate
16   governance documents for Hunts Point Venture Group,
17   LLC, with either Mr. Spain or Derek Newman?
18        A.   No.
19        Q.   Did anyone ever tell you if Hunts Point
20   Venture Group, LLC, actually was up and running and
21   conducting business?
22        A.   I've had no such conversation other than
23   privileged conversations with my attorneys about that
24   question.
25        Q.   Did anyone ever discuss with you whether or

Page 88

1    not Jennifer was supposed to receive an ownership
2    interest in Hunts Point Venture Group, LLC?
3         A.   Well, I think that was the subject of one of
4    the two notes that Steve Schweickert prepared and sent
5    to Jennifer.  My recollection was that she got perhaps
6    an 8 percent interest, but I have never, until the
7    commencement of this lawsuit, known which of those
8    deals she entered into, and therefore, I've never
9    known if she did or did not have an interest in Hunts
10   Point Venture Group, LLC.  And that sort of is further
11   reinforced by the fact that prior to the commencement
12   of this lawsuit and I started looking into this stuff,
13   prior to that I didn't know that Hunts Point Venture
14   Group, LLC, had actually been formed.
15        Q.   When you said that it was your recollection
16   that she had or may have had an 8 percent interest in
17   the company, what are you basing that on?
18        A.   When I sign -- finally saw those two notes
19   that weren't countersigned that Steve Schweickert had
20   apparently created and sent to her, my recollection is
21   that one of those notes provided for an ownership
22   interest in Hunts Point Venture Group, LLC, as
23   consideration for the capital contribution she had
24   made in early 2011.
25        Q.   Did you ever have a discussion with Mark

Page 89

1    Phillips about whether or not Hunts Point Venture
2    Group existed?
3         A.   No.
4         Q.   Did you ever inform Jennifer that Mark
5    Phillips knew about Hunts Point Venture Group?
6         A.   No.
7         Q.   Do you know if there was ever a licensing
8    agreement executed between Hunts Point Venture --
9    Hunts Point Ventures, Inc., and Hunts Point Venture
10   Group, LLC?
11        A.   I have no independent knowledge of any
12   licensing agreement ever having been entered into
13   between those two entities.  However, I feel strongly
14   confident that none has ever been created.
15        MR. KIMBALL:  Okay.  You indicated earlier
16   that you needed to --
17        THE WITNESS:  Well --
18        MR. KIMBALL:  -- terminate --
19        THE WITNESS:  -- tell me what you've got.
20        MR. KIMBALL:  -- at 3:00.
21        THE WITNESS:  I mean, I have -- yeah.  So I
22   have an important family event that I want to go to,
23   but if you have a half hour of questions left, I don't
24   want to leave and come back for a half hour.  If you
25   have an hour of questions left, that might be fine, as

23 (Pages 86 to 89)

## Page 90

1  long as we really cap it there.  But if you've got two
2  hours of questions left and I'm coming back anyway,
3  let's just end now.
4        MR. KIMBALL:  I think it's the latter.  I'm
5  at page -- in the middle of page five out of nine
6  pages, so --
7        MR. FRANKLIN:  Okay.
8        MR. KIMBALL:  So --
9        THE WITNESS:  Yeah.  Let's beat the traffic
10 back to the city then.
11       MR. FRANKLIN:  All right.
12             (Deposition recessed at 3:01 p.m.)
13             (Signature reserved.)
14
15
16
17
18
19
20
21
22
23
24
25

## Page 91

1              S I G N A T U R E
2
3        I declare under penalty of perjury under the
4  laws of the State of Washington that I have read my
5  within deposition, and the same is true and accurate,
6  save and except for changes and/or corrections, if
7  any, as indicated by me on the CHANGE SHEET flyleaf
8  page hereof.
9        Signed in _____, Washington, this
10 _____ day of _____, 2014.
11
12
13       _____
14       JOHN DU WORS
15       Taken:  July 18, 2014
16
17
18
19
20
21
22
23
24 Re:  Schweickert v. Hunts Point
   Cause No.:  13-CV-675
25 Lauren G. Harty, RPR, CCR #2674

## Page 92

1              C E R T I F I C A T E
2  STATE OF WASHINGTON    )
                          ) ss.
3  COUNTY OF KING         )
4        I, the undersigned Washington Certified Court
5  Reporter, hereby certify that the foregoing deposition
6  upon oral examination of JOHN DU WORS was taken before
7  me on July 18, 2014, and transcribed under my
8  direction;
9        That the witness was duly sworn by me pursuant
10 to RCW 5.28.010 to testify truthfully; that the
11 transcript of the deposition is a full, true, and
12 correct transcript to the best of my ability; that I
13 am neither attorney for nor a relative or employee of
14 any of the parties to the action or any attorney or
15 counsel employed by the parties hereto, nor am I
16 financially interested in its outcome;
17       I further certify that in accordance with
18 CR 30(e), the witness was given the opportunity to
19 examine, read, and sign the deposition within 30 days
20 upon its completion and submission, unless waiver of
21 signature was indicated in the record.
22       IN WITNESS WHEREOF, I have hereunto set my hand
23 this 24th day of July, 2014.
24       _____
25              LAUREN G. HARTY, CCR #2674

## Page 93

1
2      SEATTLE DEPOSITION REPORTERS, LLC
3          600 University Street, Suite 320
4            Seattle, Washington 98101
                206.622.6661
5
6      C H A N G E   S H E E T
7  PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
   SHOWING PAGE, LINE AND REASON.
8  _____
9  PAGE  LINE  CORRECTION AND REASON
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22
23 _____
24 JOHN DU WORS
   Taken:  July 18, 2014
25

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

--------------------------------------------------------

| | |
|---|---|
| JENNIFER P. SCHWEICKERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case Number: |
| ) | |
| HUNTS POINT VENTURES, INC., HUNTS ) | 13-CV-675 |
| POINT VENTURE GROUP, LLC; CHAD ) | |
| RUDKIN and ELIZABETH RUDKIN, and ) | |
| their marital community comprised ) | |
| thereof; JOHN DU WORS and AMBER ) | |
| DU WORS, and their marital ) | |
| community comprised thereof; and ) | |
| DOES 1-4, ) | |
| ) | |
| Defendants. ) | |

--------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

JOHN DU WORS

VOLUME II

--------------------------------------------------------

10:21 a.m.

August 25, 2014

777 108th Avenue NE, Suite 2170

Bellevue, Washington

Lauren G. Harty, RPR, CCR #2674

Court Reporter

John Du Wors                                          August 25, 2014

                                                              Page 94

1
2                    A P P E A R A N C E S
3
4
5        FOR PLAINTIFF:    MR. MARK D. KIMBALL
6                          MR. BRANDON P. WAYMAN
7                          MDK Law Associates
8                          777 108th Avenue N.E., Suite 2170
9                          Bellevue, Washington 98004
10                         425.455.9610
11                         mark@mdklaw.com
12
13
14       FOR DEFENDANTS DU WORS:
15                         MS. PAMELA J. DeVET
16                         Lee Smart
17                         701 Pike Street, Suite 1800
18                         Seattle, Washington 98101-3929
19                         206.624.7990
20                         pjd@leesmart.com
21
22
23
24
25

                                                              Page 95

1            E X A M I N A T I O N  I N D E X
2        ATTORNEY                          PAGE
3        BY MR. KIMBALL:                     96
4            E X H I B I T  I N D E X
5        EX#         DESCRIPTION          PAGE
6        15 10/2011 "SETTLEMENT AGREEMENT" by and      113
7           between Hunts Point Ventures, Inc., and
8           digEcor.
9        16 Email thread ending 11/23/2012 from John   126
10          Du Wors to Chad Rudkin.
11       17 11/19/2012 "SECURITY AGREEMENT" by and     133
12          between Hunts Point Ventures and Sandy
13          Hoover.
14       18 1/14/2013 "SECURED PROMISSORY NOTE" by     149
15          and between Hunts Point Ventures, Inc.,
16          and Sandy Hoover.
17       19 12/31/2010 "STOCK REDEMPTION AND           160
18          INDEMNIFICATION AGREEMENT" by and between
19          Hunts Point Ventures, Inc., and Joy
20          Schweickert.
21       20 3/4/2011 invoice from Newman & Newman to   161
22          Hunts Point Ventures, Inc.
23       21 5/29/2012 "HUNT POINT VENTURES, INC.       166
24          JOINT CONSENT IN LIEU OF ANNUAL MEETING
25          OF SHAREHOLDERS AND DIRECTORS."

                                                              Page 96

1            E X H I B I T  I N D E X
2        EX#         DESCRIPTION          PAGE
3        22 11/19/2012 "SHARE PURCHASE AGREEMENT       170
4           HUNTS POINT VENTURES, INC., - STEVE
5           SCHWEICKERT."
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                              Page 97

1        JOHN DU WORS,        being duly sworn, testified
2                     upon oath, as follows:
3            E X A M I N A T I O N
4        BY MR. KIMBALL:
5        Q.   Mr. Du Wors, thank you for coming today.  As
6    you know, this is a continuation of the deposition
7    which was previously conducted on July 18th of 2014
8    here in the offices.  And it is my understanding that
9    Mr. Franklin will not be here today and, instead, you
10   are being represented by Ms. DuVet; is that correct?
11       A.   It is.
12       Q.   All right.
13           MR. KIMBALL:  Ready?
14       Q.   (By Mr. Kimball)  Mr. Du Wors, during a
15   previous deposition we talked about a telephone
16   conference call that occurred in approximately April
17   of 2011 regarding Jennifer Schweickert's loan to HPV.
18   Do you recall at all your testimony and that subject
19   being addressed previously?
20       A.   Only in the most general sense.
21       Q.   Okay.
22           Do you recall who the parties were on that
23   telephone call?
24       A.   Steve Schweickert, me, and Jennifer
25   Schweickert.

                                            2 (Pages 94 to 97)

John Du Wors                                          August 25, 2014

                                                              Page 98

1      Q.   And were all of the parties on the telephone
2   call at the same time or do you recall if any of them
3   joined later or left early?
4      A.   At the beginning of the call it is my vague
5   recollection that I was on the phone with Steve
6   Schweickert for a manner of second -- for a matter of
7   seconds before Jennifer Schweickert was on the call.
8           I do not, however, specifically recall how
9   the conferencing functionality was executed for that
10  call.  In other words, it might have been that Steve
11  called me and then joined Jennifer.  It might have
12  been that Steve called me and asked me to join
13  Jennifer.  It might have been that I called Steve and
14  then he joined Jennifer.
15          I believe it's the case that Steve contacted
16  me and then joined Jennifer using his own telephone's
17  functionality, and the reason I believe that's the
18  case is that at the end of the call in which the three
19  of us participated he asked that I jump off the call
20  and allow him to continue communicating with Jennifer
21  Schweickert, which causes me to believe based on that
22  recollection, however vague it is, and it is vague,
23  that he must have arranged the telephone conferencing,
24  because if I had done so, my exit from the call would
25  have terminated the call between Steve and Jennifer.

                                                              Page 99

1   And I feel reasonably certain that Jennifer was not
2   using her own telephone to arrange the conferencing
3   functionality.
4      Q.   Okay.
5      A.   So thereafter, my assumption, based on
6   Steve's statement to me, is that Jennifer and Steve
7   continued to speak.  And, of course, as I've told you,
8   my vague recollection is that Steve and I spoke for a
9   matter of seconds before Jennifer was joined to the
10  call.
11     Q.   During those seconds or the period of time
12  when you were speaking with Steve, if, in fact, that
13  was the case and it was just him on the phone, is it
14  fair to say that the only thing that would have been
15  discussed would be something about the logistics of
16  adding Jennifer to the call as opposed to something
17  substantive?
18     A.   My recollection of that interaction is so
19  vague that I do not know if we even talked about
20  anything.  My assumption would be that to the extent
21  an exchange took place between myself and Steve in
22  that brief period, it would have related to the
23  administrative function of joining Jennifer to the
24  call.
25     Q.   All right.

                                                             Page 100

1           Where were you during this telephone call?
2      A.   My office in Seattle.
3      Q.   Were there any other people with you in your
4   office during the phone call?
5      A.   No.
6      Q.   During any part of the phone call were there
7   any other people?
8      A.   No.
9      Q.   Okay.
10          So I believe you've answered this already,
11  but can you -- was Chad Rudkin in your office during
12  the phone call?
13     A.   No.
14     Q.   And was he a participant in the phone call
15  at any time by conference?
16     A.   No.
17     Q.   Sitting here today can you give me a general
18  description again of what it was you discussed during
19  the phone call.
20     A.   Two principal things that I recall.  One, I
21  described how revenues are generated by suing to
22  enforce patents for infringement where the plaintiff
23  is a nonpracticing entity.  Two, I described that the
24  proceeds of the funds Jennifer was contemplating
25  contributing would be used to pay me to defend Mark

                                                             Page 101

1   Phillips criminally.
2      Q.   During the telephone call did she agree with
3   you that the funds would be used to pay you for that
4   work?
5      A.   I do not recall her stating any agreement or
6   disagreement or any position on the subject other than
7   perhaps a general verbal acknowledgment that she
8   understood the intended use and dispositions of the
9   proceeds of that financial contribution.
10     Q.   Do you recall if there were any follow-up
11  emails or letters or other correspondence or
12  memorialization about the use of funds from Jennifer?
13     A.   I do not recall being a party to any such
14  written communication.
15     Q.   And, again, what was the amount or the
16  approximate amount that Jennifer was going to be
17  paying that would go toward your fees?
18     A.   At some point --
19          Well, that would go toward my fees?
20     Q.   Yes.
21     A.   I was never advised of what portion of the
22  proceeds of her financial contribution would be
23  devoted to the payment of my professional fees.  At
24  some point I learned that the total amount of her
25  contribution was $200,000, but I've never had

                                            3  (Pages 98 to 101)

John Du Wors                                         August 25, 2014

Page 102

1    knowledge as to how that was or -- was to be divided
2    or used or disposed of.
3        Q.   Were the fees or part of the fees that
4    Jennifer put in, this $200,000, did any portion of
5    those fees come directly to your office from Jennifer?
6        A.   No.
7        Q.   How did they get applied to your bill?
8        A.   I don't know.  That would have been Steve's
9    accounting decision making.
10       Q.   And you described generally, I believe, that
11   these funds were going to be used for prosecution of
12   enforcement activity against people who were using IP
13   that were -- you believed were not entitled to; is
14   that correct?
15       A.   That statement contains a number of
16   assumptions that are false, and it's compound in that
17   regard, and it also misstates my prior testimony.
18       Q.   Okay.
19            What portions of my question contained --
20            MR. KIMBALL:  Or strike that.
21       Q.   (By Mr. Kimball)  What -- what portions of
22   the question I just interposed were false?
23       A.   The -- well, you've misstated my prior
24   testimony because I've just told you -- I described
25   that Jennifer's money would be used as a -- I

Page 103

1    understood, at least in part, to pay my criminal -- my
2    bill for criminally defending Mark Phillips, but your
3    question presupposed that I had just said that I was
4    using those funds to prosecute claims.
5            The use of the term "prosecute" is vague in
6    the patent setting because it does not distinguish
7    whether or not you mean prosecute a patent in the
8    sense of administratively justifying its existence to
9    the United States Patent and Trademark Office or
10   pursuing affirmative tort claims of patent
11   infringement pursuant to the Patent Act.
12           Moreover, you have presupposed that I had an
13   independent belief as to entitlement of the defendants
14   or putative defendants sued or to be sued through
15   enforcement of the patents.  And unless we speak
16   specifically about the claims and claim charts and
17   accused infringing technologies at issue, I can't tell
18   you whether or not I had any such affirmative belief
19   or whether or not I believed that there was a basis
20   consistent with Rule 11 to assert claims of
21   infringement with respect to the claims asserted
22   and -- on the one hand and the accused infringing
23   technologies on the other hand.
24       Q.   A few moments ago in one of your responses
25   you referred to a term plaintiff is a -- where

Page 104

1    plaintiff is a nonpracticing entity.  What did you
2    mean by that?
3        A.   In the context of patent infringement
4    litigation there are at least two kinds of plaintiffs,
5    plaintiffs which practice the patent in suit and
6    plaintiffs who do not practice the patent in suit.
7            Plaintiffs who practice the patent in suit
8    are entitled, upon success, to certain remedies that
9    plaintiffs who do not practice the patent in suit are
10   not entitled to.
11           Those plaintiffs not practicing the patent
12   in suit are referred to generally within the industry
13   as nonpracticing entities and colloquially, if not
14   pejoratively, as trolls.
15       Q.   Do you know if there was any agreement,
16   either formal or informal, between HPV and
17   Ms. Schweickert that the $200 she contributed would be
18   repaid?
19       A.   I assume you mean the $200,000.
20       Q.   200,000.  I'm sorry.
21       A.   Because if it's 200, I'll give that to her
22   right now.
23       Q.   200,000.
24       A.   I might have it on me.
25       Q.   200,000.

Page 105

1        A.   Your question is do I currently have any
2    independent knowledge responsive to that question?
3        Q.   Yes.
4        A.   My current knowledge is based on hearsay and
5    documents whose authenticity I am not able to confirm,
6    so I do not independently know if any such agreement
7    existed.
8            At the time that I assume from Steve
9    Schweickert's comments that the transaction was
10   executed Steve Schweickert did not specify to me what
11   the terms of the transaction were.  I did not know if
12   the transaction contemplated was to include an equity
13   component or debt component or both.
14           Later I saw from I believe Chad Rudkin two
15   documents relating to the $200 sup -- or $200,000
16   supposed financial contribution both with -- both
17   bearing what I a -- what I understood to be Steve
18   Schweickert's signature with differing deal terms.
19           I did not learn until the commencement of
20   this lawsuit which, if any, of whose two documents
21   Jennifer Schweickert countersigned.  Upon commencement
22   of the lawsuit I believe Ms. Schweickert submitted a
23   document with her countersignature electing one of
24   those deal structures.  I do not know if she signed
25   the other document.

4 (Pages 102 to 105)

John Du Wors                                              August 25, 2014

Page 106

1        Additionally, since then the receiver and
2    the receiver's attorney have advised me that indeed
3    Mr. Schweickert generated four written memoranda with
4    four separate deal structures and that he executed all
5    four.
6        Therefore, to the extent that I have
7    knowledge, it is not personal knowledge but, rather,
8    based on what people have said to me.
9        Q.   And when you're referring to
10   Mr. Schweickert, you're referring to Steve
11   Schweickert?
12       A.   Sure.
13            As opposed to who?
14       Q.   You identified Mr. Schweickert.
15       A.   That's the only Schweickert -- only
16   Mr. Schweickert I've met.
17       Q.   Right.
18            You indicated that you had some information
19   as well based on hearsay?  What were you referring to
20   specifically?
21       A.   The comments of Diana Carey, Mark Calvert,
22   perhaps Mark Cal -- Calvert's additional counsel,
23   whose name I don't recall, Steve Schweickert, Chad
24   Rudkin, and Elizabeth Rudkin.
25       Q.   What did Elizabeth Rudkin say about the

Page 107

1    documents -- or about the transaction?
2        A.   I do not have a specific recollection of the
3    text or precise verbiage of any of Ms. Rudkin's
4    comments in that regard except to say in the most
5    general substantive sense that Steve had circulated to
6    Jennifer Schweickert two signed deal documents and
7    that we -- neither they, being the
8    Rudkins, nor Steve Schweickert knew which of those
9    documents Ms. Jennifer Schweickert had executed.
10       Q.   And you indicated as well that you had some
11   information of a hearsay nature concerning Chad
12   Rudkin; is that correct?
13       A.   Sure.  Yes.
14       Q.   And what was that information?
15       A.   Substantially the same comments as
16   Ms. Elizabeth Rudkin on the topic of not knowing which
17   of the two deal documents Ms. Jennifer Schweickert had
18   executed.  And, again, with respect to Mr. Rudkin I
19   don't have a specific recollection of the precise
20   verbiage or text of any comment that he made to me.
21       Q.   Do you have any comments --
22            MR. KIMBALL:  Strike that.
23       Q.   (By Mr. Kimball)  Do you have any information
24   provided to you by Steve Schweickert about this
25   transaction?

Page 108

1        A.   Only very general information that some kind
2    of transaction occurred, that the amount of the fin --
3    financial contribution by Jennifer Schweickert
4    associated with the transaction amounted to $200,000
5    and that -- he may have said that he gave her the
6    option of two different deal structures.  I have a
7    very vague recollection that he once told me he
8    offered her two different alternative deal structures.
9        Q.   And, again, could one of those be
10   characterized generally as debt and the other
11   characterized generally as equity?
12       A.   Well, you asked the question "could," and
13   within the boundaries of reality, I suppose that
14   anything's possible.  Again, I have no independent
15   personal knowledge of what the deal structures were.
16            I can only say that since then two documents
17   have been circulated to me by Elizabeth and Chad
18   Rudkin, and my general recollection of the substance
19   of those two documents is that one contained an equity
20   component as well as a debt component while the other
21   contained a debt component and a fee component.  And
22   as I generally recall, both included an interest
23   component.
24       Q.   I believe you also indicated that you had
25   some discussion with Mark Calvert concerning the

Page 109

1    transaction; is that correct?
2        A.   Very limited discussion.
3        Q.   And what was that discussion?
4        A.   At an interview with the receiver Mark
5    Calvert, his counsel, Diana Carey, his separate
6    counsel, whose name I don't recall, and an associate
7    from Diana Carey's law firm, or a woman who I
8    understood to be an associate from Mark -- Diana
9    Carey's law firm, I told them substantially the same
10   thing I just told you with respect to those two deal
11   memoranda I became aware of and my involvement in the
12   transaction with Steve Schweickert and Jennifer
13   Schweickert and Mark Calvert.
14            And I believe at least Dana -- Diana Carey
15   also commented somewhat incredulously that, in fact,
16   there had not only been two deal memoranda generated
17   by Steve Schweickert and circulated to Jennifer
18   Schweickert but, in fact, four.
19       Q.   Mr. Du Wors, I'm handing you a document
20   marked as Exhibit 6, which was an exhibit from your --
21   the prior session in this deposition.  I'd like you to
22   turn to page 16 and take a look at paragraph 54, if
23   you could.
24       A.   Okay.  I'm looking at 54 of 108.
25       Q.   And specifically beginning around page --

                                    5 (Pages 106 to 109)

John Du Wors                                              August 25, 2014

Page 110

1  or -- excuse me -- line ten or eleven of page 16
2  there's a sentence which reads, "However, behind the
3  scenes Mr. Du Wors was telling Chad and me something
4  much different.  In March 2011 Mr. Du Wors had
5  threatened Chad and me by saying that if we couldn't
6  come up with a way to generate money for HPV in order
7  to pay his outstanding legal fees of $117,652.57, he
8  would file a lien against the Phillips IP and
9  foreclose on it and quit working on Mark's cases."
10      Do you see that?
11  A.  I do.
12  Q.  Is any part or parts of that sentence I have
13  just read false?
14  A.  I believe that almost all of it is false,
15  except perhaps that I may have said that absent
16  payment to the firm, I would be required to withdraw
17  from continuing representation of Mark Phillips, and
18  on that topic I only have the vaguest of
19  recollections.
20  Q.  Did you ever discuss the idea of filing a
21  lien against the assets of HPV?
22  A.  Not that I recall.
23  Q.  Is it possible that it could have been
24  discussed?
25  A.  Within the boundaries of reality, anything

Page 111

1  is possible.
2  Q.  So your answer is "Yes"?
3  A.  My answer is that within the boundaries of
4  reality, anything is possible.
5  Q.  Is that possible?
6  A.  Is what possible?
7  Q.  That you could have had discussion with Chad
8  and Mr. Schweickert regarding the filing of a lien?
9  A.  It doesn't sound like something I would say.
10  To -- within the boundaries of reality, anything is
11  possible, and I have no independent recollection of
12  ever having made any such comment.
13  Q.  Okay.
14      Do you have any independent recollection
15  sitting here today that you did not make such a
16  comment?
17  A.  I have no independent recollection on the
18  subject whatsoever.
19  Q.  Thank you.
20  A.  Although I've got a pretty good memory, so
21  if I don't remember saying it, I'm going to guess that
22  I didn't say it.
23  Q.  Did you ever file any patent infringement
24  claims on behalf of HPV?
25  A.  Yes.

Page 112

1  Q.  How many complaints did you file --
2  A.  I --
3  Q.  -- or claims?
4  A.  I don't know that I specif --
5      Claims?
6  Q.  Claims.
7  A.  What do you mean by the term "claims"?
8  Q.  Complaints.
9  A.  I believe it was four.
10  Q.  Do you recall who they were filed against?
11  A.  Epson, digEcor, Tonium.  I don't recall the
12  fourth.
13  Q.  Can you spell Tonium for the record?
14  A.  T-O-N-I-U-M.
15  Q.  And can you spell Epson for the record.
16  A.  E-P-S-O-N.
17  Q.  In any of the four complaints that you filed
18  did any of them ever produce or result in a settlement
19  in favor of HPV concerning ownership of the IP and/or
20  infringement?
21  A.  The settlement would not concern an
22  ownership of the intellectual property asserted within
23  those complaints.
24  Q.  Were there settlements reached in any of the
25  complaints?

Page 113

1  A.  Two of them.
2  Q.  And against which parties?
3  A.  Epson and digEcor.
4      (Discussion off the record.)
5      (Marked Deposition Exhibit No. 15.)
6  Q.  (By Mr. Kimball)  Mr. Du Wors, you've just
7  been handed a document marked as Exhibit 15.  Have you
8  ever seen this document before?
9  A.  It looks familiar, but I can't confirm that
10  I've seen it.
11  Q.  This appears to be a document titled
12  "SETTLEMENT AGREEMENT" and references Hunts Point
13  Ventures, Inc., and digEcor -- that's D-I-G-E-C-O-R --
14  digEcor, Inc.
15      Do you recall if this could be a
16  memorialization of the settlement agreement that you
17  referred to a moment ago regarding HPV and digEcor?
18  A.  As anything possible -- is possible, it
19  certainly could be.
20  Q.  Do you believe this to be the same document?
21  A.  I don't have a belief or opinion on the
22  subject.
23  Q.  Is this a document that you participated in
24  drafting?
25  A.  I did not draft the settlement agreement

John Du Wors                                                    August 25, 2014

Page 114

1    between digEcor and Hunts Point Ventures.
2        Q.   So your testimony is you did not participate
3    in the drafting of the -- of Exhibit 15.
4        A.   I don't have an independent recollection of
5    having participated in the drafting of it, no.
6        Q.   Is it fair to say that you don't know either
7    way?
8        A.   It's fair to say that I did not prepare the
9    document, edit the document, or execute the document.
10   I may have expressed my opinion on what substantive
11   provisions within the document were acceptable
12   based -- in the context of conversations with Derek
13   Linke.
14       Q.   And who is Derek Linke?
15       A.   An attorney in my office whom I believe to
16   have prepared the settlement in that case.
17       Q.   Do you know if Mr. Linke participated in
18   drafting Exhibit 15?
19       A.   Again, I am not able to authenticate
20   Exhibit 15 on personal knowledge, so I would have to
21   speculate as to whether or not Mr. Linke participated
22   in the preparation of that document.
23       Q.   The company referred to in the first
24   paragraph, part two of Exhibit 15 is a company
25   identified as digEcor, Inc., a Washington corporation.

Page 115

1    How did you first learn of a company called digEcor,
2    Inc.?
3        A.   I learned of digEcor, Inc., through our
4    pre-complaint investigation precedent to the
5    initiation of Hunts Point Ventures' action against
6    digEcor for patent infringement.
7        Q.   What kind of business was digEcor, Inc., in?
8        A.   I understood that at least part of their
9    business activities appeared, based on the information
10   I reviewed, to include the manufacture and commercial
11   distribution of handheld digital media players used to
12   be rented and/or given to customers on Alaska Airlines
13   air flights.
14       Q.   Did you negotiate any of the substantive
15   terms of the settlement agreement between HPV and
16   digEcor?
17       A.   The price.
18       Q.   And when you refer to "the price," do you
19   mean the price that digEcor would pay to Hunts Point
20   Ventures?
21       A.   I do.
22       Q.   And was that $120,000?
23       A.   I don't recall.
24       Q.   So sitting here today you do not recall what
25   the price of the settlement of the claims against

Page 116

1    digEcor was ultimately determined to be for purposes
2    of the settlement agreement?
3        A.   Not specifically.
4        Q.   Okay.
5             Without regard to whether or not you knew
6    what the full settlement price was, do you know if the
7    full settlement price was actually paid by digEcor?
8        A.   I have a general recollection that it was.
9        Q.   Did the money go directly to HPV or did it
10   go through your office?
11       A.   I don't know.  Our usual practice would be
12   that it goes to our law firm's trust account and is
13   reduced by, at minimum, the amount of our contingent
14   fee and costs, with the balance remitted to the
15   client, but I don't have independent knowledge of
16   whether or not that occurred in this case.
17       Q.   All right.
18            Do you know if any portion of the settlement
19   proceeds in the digEcor matter were paid to HPVG?
20       A.   I have no recollection of that and, based on
21   the absence of any such recollection, believe that was
22   not the case.
23       Q.   Do you recall discussing with anyone whether
24   or not a portion of the settlement proceeds were being
25   considered to be paid to HPVG?

Page 117

1        A.   I recall no such discussion.
2        Q.   Do you recall seeing any emails or
3    correspondence on that subject?
4        A.   I don't recall seeing any such
5    correspondence or email communication.
6        Q.   You indicated you had -- did not have a
7    specific recollection of what happened to the
8    settlement proceeds in the digEcor matter; is that
9    correct?
10       A.   I don't think that's what I said.
11       Q.   What did you say on the subject?
12       A.   You're going to have to be more specific.
13       Q.   Sitting here today do you have a
14   recollection of what happened to the proceeds that
15   were paid by digEcor to HPV?
16       A.   My general recollection is that the proceeds
17   were paid and that our contingent fees and costs were
18   paid from them in some form or fashion.  I don't know
19   what happened to the balance, if there was any.
20       Q.   Did the proceeds or any part of them go
21   through your trust account?
22       A.   I think I've just told you I don't know.
23       Q.   Does your firm have a policy with regard to
24   generating a statement or document memorializing what
25   happens to gross settlement proceeds if they go

7 (Pages 114 to 117)

John Du Wors                                        August 25, 2014

Page 118

1  through your trust account?
2      A.   Other than our retainer letter?
3      Q.   Yes.
4      A.   Describing what happens --
5      Q.   Right.
6      A.   -- or memorializing --
7      Q.   Describing the --
8      A.   -- memorializing --
9      Q.   Memorializing --
10     A.   -- memorializing after the fact what has
11  happened.
12     Q.   Yes.  The latter.
13     A.   We do generate account statements showing
14  the receipt, use, application, and distribution of
15  funds received in contingent fee cases to be provided
16  to clients to account for those funds consistent with
17  professional rules of ethics here in Washington.
18     Q.   Do you know if that was done with regard to
19  the digEcor fees?
20     A.   That administrative task is not part of my
21  responsibilities at the firm, so I have no independent
22  knowledge as to whether or not that occurred.
23     Q.   Who would have been in charge at your firm
24  of such administrative functions at the time of the
25  digEcor settlement?

Page 119

1      A.   Our firm administrator, Laura Kimball, would
2  have had primary responsibility for the administrative
3  components of that.
4      Q.   And is --
5      A.   She --
6      Q.   -- Laura spelled --
7      A.   Still talking.
8      Q.   Yes.
9      A.   And she would have been instructed to some
10  degree by Derek Linke with respect to the application
11  of those funds, although I do not have an independent
12  recollection of any such instructions actually being
13  transmitted by Derek Linke to Laura Kimball.
14     Q.   Do you know if Jennifer received any portion
15  of the settlement proceeds from digEcor?
16         MS. DeVET:  Objection; asked and answered.
17     A.   As I've testified before, I have no
18  independent knowledge responsive to that question.
19     Q.   (By Mr. Kimball)  You indicated there was
20  also a settlement reached with a company called Epson;
21  is that correct?
22     A.   I did say that.
23     Q.   Do you recall when that was reached?
24     A.   No.
25     Q.   Do you know if it was in 2011?

Page 120

1      A.   No.
2      Q.   Do you know if it was in 2012?
3      A.   No.
4      Q.   Do you recall the general settlement terms?
5      A.   That a license fee was paid by Epson in
6  exchange for a fully paid, nonassessable, perpetual,
7  worldwide license with respect to the technologies
8  disclosed in the patent in suit.
9      Q.   Do you recall what the settlement amount --
10  or the license fee paid by Epson actually was?
11     A.   No.
12     Q.   Do you know if any part of that licensing
13  fee went into or through your trust account?
14     A.   I do not know.
15     Q.   Who would have knowledge about that?
16     A.   I would be speculating.
17     Q.   Who was in charge of the trust account at
18  the time the settlement agreement was reached?
19     A.   In charge?
20     Q.   In charge.
21     A.   I don't know --
22     Q.   Supervising attorney.
23     A.   Derek Newman.
24     Q.   And who was the administrative person
25  handling the trust account matters?

Page 121

1      A.   Laura Kimball.
2      Q.   Is Laura still with your firm?
3      A.   She is.
4      Q.   Have you ever heard of the name Sandy
5  Hoover?
6      A.   I have.
7      Q.   And who is Sandy Hoover?
8      A.   Elizabeth Rudkin's mother.
9      Q.   Do you know if Ms. Hoover ever loaned money
10  to Hunts Point Ventures?
11     A.   I have been told that she did.
12     Q.   Did you participate in the negotiation or
13  drafting of any documents relating to funds loaned by
14  Ms. Hoover to HPV?
15     A.   I don't believe that I -- well, I can say
16  affirmatively that I did not participate in the
17  drafting of any documents relating to Ms. Hoover's
18  initial loan of what I was told was $100,000 I vaguely
19  recall to Hunts Point as that loan preceded the
20  retention of my law firm as counsel for either Mark
21  Phillips or Hunts Point Ventures.
22         Later I believe I consulted on the
23  preparation by Michael Spain of a security agreement
24  and Uniform Commercial Code Form 1 Financing Statement
25  in association with the extension of further credit

8  (Pages 118 to 121)

John Du Wors                                         August 25, 2014

Page 122

1    and forbearance terms by Sandy Hoover in favor of
2    Hunts Point Ventures.
3        Q.   So was the initial loan amount from Sandy to
4    HPV approximately $100,000?
5        A.   I vaguely recall that Chad Rudkin, Elizabeth
6    Rudkin, and Steve -- and/or Steve Schweickert made
7    statements to me along those lines.
8        Q.   Do you recall how that loan was
9    memorialized?
10       A.   I do not.  I don't believe I've even ever
11   seen any such document.
12       Q.   So you've never seen a promissory note or
13   loan agreement relating to that initial loan?
14       A.   I don't -- not that I recall.
15       Q.   You did indicate a moment ago that there was
16   a subsequent agreement to somehow securitize part or
17   all of money that was owed by HPV to Ms. Hoover; is
18   that correct?
19       A.   Yes.
20       Q.   And I believe you indicated that that
21   included the filing of a UCC Form 1 or what is
22   commonly called a UCC 1; is that correct?
23       A.   Yes.
24       Q.   And you indicated, I believe, that that was
25   done in the context of a forbearance agreement?

Page 123

1        A.   I believe that was done in the context of an
2    agreement that included multiple components,
3    including, but not limited to, forbearance of
4    execution on previous extension of credit and
5    extension of further credit, though at least with
6    respect to the UCC 1 statement I do not recall if my
7    firm prepared that document or if Ms. Hoover's
8    independent counsel prepared that document.
9        Q.   And who was her independent counsel?
10       A.   I don't know.  I never met any such person,
11   but I believe I have been told that she had
12   independent counsel.  I know she -- I know she's
13   pretty well lawyered.
14       Q.   And who is Michael Spain?
15       A.   A transactional attorney within my firm.
16       Q.   At the time --
17            MR. KIMBALL:  Strike that.
18       Q.   (By Mr. Kimball)  At approximately the time
19   at which any security documents would have been
20   generated or created relating to the loan that we've
21   been discussing, and specifically with reference to a
22   forbearance agreement, was the --
23            MR. KIMBALL:  Strike that.
24       Q.   (By Mr. Kimball)  -- was HPV in default under
25   any repayment terms to Ms. Hoover, if you are aware?

Page 124

1            THE WITNESS:  May I have that question read
2    back, please?
3            MS. DeVET:  Yeah.
4            THE REPORTER:  "Question:  At approximately
5    the time at which any security documents would have
6    been generated or created relating to the loan that
7    we've been discussing, and specifically with reference
8    to a forbearance agreement, was the --
9            Strike that.
10           -- was HPV in default under any repayment
11   terms to Ms. Hoover, if you are aware?
12       A.   I apologize.  As asked, that question is
13   unanswerable.  Can you rephrase?
14       Q.   (By Mr. Kimball)  Was HPV ever in default
15   with regard to any of its repayment obligations to a
16   loan to Ms. Hoover?
17       A.   I don't recall what the maturity date of any
18   of -- I don't recall the maturity date of any of Hunts
19   Point Ventures' financial obligations to Ms. Hoover.
20       Q.   You used the term "forbearance."
21       A.   I did.
22       Q.   In what context were -- or -- in what
23   context were you referring to forbearance?
24       A.   I recall very generally that Ms. Hoover
25   extended the maturity date associated with her initial

Page 125

1    loan or financial contribution to Hunts Point Ventures
2    as part of the obligation agreement creating debt that
3    was the subject of the security agreement executed by
4    and between Hunts Point Ventures and Sandy Hoover,
5    which security interest was perfected by the UCC 1
6    statement that was eventually prepared either by my
7    firm or by Ms. Hoover's counsel and I assume filed for
8    the benefit of Ms. Hoover.
9        Q.   Do you know whether or not the UCC 1 was
10   ultimately filed?
11       A.   I do not have an independent recollection of
12   whether or not that UCC 1 statement was ever filed?
13       Q.   A few moments ago you also indicated that
14   Ms. Hoover was loaning at the time of this
15   documentation some additional money to HPV?
16       A.   Which documentation?
17       Q.   The security documentation.
18       A.   My general recollection is that the debt
19   agreement creating the obligation that was the subject
20   of that security interest included a term providing
21   for the extension of additional financial credit.
22       Q.   Do you recall what that amount was?
23       A.   I do not.
24       Q.   Do you know if it was $20,000?
25            MS. DeVET:  Objection; asked and answered.

9 (Pages 122 to 125)

John Du Wors                                          August 25, 2014

                                                           Page 126

1         A.   My recollection on that que -- on that
2    subject is very vague, but that number does not sound
3    entirely inconsistent with my admittedly vague
4    recollection.
5         Q.   (By Mr. Kimball)  Were you ever involved in
6    any discussions about what the business purpose of the
7    second loan from Ms. Hoover would relate to?
8         A.   I very, very generally recall that Hunts
9    Point Ventures had administrative expenses other than
10   fees to my law firm that it needed to pay using those
11   funds.
12        MR. KIMBALL:  Could I get this marked?
13        (Marked Deposition Exhibit No. 16.)
14        Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
15   handed a document marked as Exhibit 16.  I'd like you
16   to take a look at the various pages of this document
17   and let me know if you have ever seen any of the
18   content therein prior to today.
19        MS. DeVET:  Can I ask a question, Counsel?
20   On page eleven of my copy there are a number of lines
21   that aren't copied that well.  Is that -- is that true
22   of yours as well?
23        MR. KIMBALL:  Yes.
24        MS. DeVET:  Okay.
25        A.   What's your question about Exhibit 16?

                                                           Page 127

1         Q.   (By Mr. Kimball)  Have you ever seen the
2    content thereof before today?
3         A.   There's a tremendous amount of content
4    within Exhibit 15.  It includes apparently a recopying
5    of an email string over and over again, which includes
6    apparently communications between Chad Rudkin and
7    Sandy Hoover that I do not believe I have ever seen
8    myself.  Or at least I have no independent
9    recollection of having seen it myself.
10        I have a very vague recollection of the
11   communication that's replicated multiple times between
12   first myself and Michael Spain in which Michael Spain
13   communicates to me that he appears to be delivering a
14   promissory note and agreement for security with data
15   points that are not filled in within those documents.
16        And, similarly, I have a very vague
17   recollection of my communication to Chad Rudkin in
18   which I say, "FYI -- we'll get these finalized over
19   the weekend."
20        But I have no recollection of the other
21   communications that appear to be included within this
22   document, which I also am not able to authenticate.
23        Q.   On page eight of 14 of Exhibit 16, in the
24   middle of the page there appears to be a printout of
25   an email from Michael Spain sent Friday,

                                                           Page 128

1    November 23rd, 2012, at 2:20 p.m. to John Du Wors with
2    a subject line of "HPV note and security agreement."
3         Do you see that?
4         A.   I see the content that you appear to be
5    referring to.
6         Q.   And the printout that I have on the same
7    page of the content of that email reads.
8    "Hi John.
9    A belated happy Thanksgiving to you and your family.
10   A secured promissory note and security agreement for
11   HPV are attached."
12        It goes on to read,
13   "Items I do not have for the note are payment amounts,
14   commencement and due dates, interest and default
15   interest rates.  If you provide those by return
16   e-mail, I am happy to" re -- "insert and resend."
17        Do you see that content?
18        A.   I see that content.
19        Q.   Do you ever recall seeing that email or that
20   content prior to today?
21        A.   Only vaguely and in the most general sense.
22        Q.   Do you know if in response to the content of
23   this email that I have just read did you participate
24   in providing any of the requested information
25   concerning the note payment amounts, commencement and

                                                           Page 129

1    due dates, interest and default interest rates?
2         A.   I do not recall whether I had any such
3    participation in that discussion.
4         Q.   In addition to yourself were there any
5    attorneys working with you on that matter at that time
6    at your office?
7         A.   I do not have an independent recollection of
8    whether or not any other attorneys worked with me in
9    consultation on the note and security agreement
10   between Hunts Point Ventures and Sandy Hoover besides
11   Michael Spain, though I'd note that Derek Linke
12   participated with me heavily in many, if not most, of
13   the legal matters involving Hunts Point Ventures at
14   the firm.
15        Q.   Okay.
16        Would you turn to the first page of
17   Exhibit 16.  There appears to be about a third of the
18   way down on the page an email which reads, "From:
19   Michael Spain.  Sent:  Friday, November 23rd, 2012
20   2:20 p.m.  To:  John Du Wors.  Subject:  HPV note and
21   security agreement."
22        Do you see that text?
23        A.   I see what you're referring to.
24        Q.   And below that there is text which reads,
25   "Hi John.

                              10  (Pages 126 to 129)

John Du Wors                                                    August 25, 2014

Page 130

1    A belated happy Thanksgiving to you and your family."
2           And then going down three more paragraphs,
3    a statement -- or a sentence which reads,
4    "The security agreement needs the exhibit we discussed
5    listing the IP.  On Wednesday I searched the HPV
6    server folder for the terms 'asset,' 'purchase,'
7    'sale,' and 'agreement' to no avail."
8           Do you see that?
9       A.  I see that.
10      Q.  Do you recall receiving an email containing
11   that content on or about November 23rd, 2012, from
12   Michael Spain?
13          MS. DeVET:  Objection; asked and answered.
14      A.  I don't recall this email except in the most
15   vague and general sense, and I certainly remember
16   nothing specific with respect to the date I would have
17   received any such email.
18      Q.  (By Ms. DeVet)  With regard to the content of
19   the fourth paragraph, there's a reference to "...the
20   exhibit we discussed listing the IP."
21          Do you see that?
22      A.  I do.
23      Q.  Do you know what he was referring to?
24      A.  I assume that he would have been referring
25   to one of the exhibits to the intellectual property

Page 131

1    assignment agreement executed by and between Mark
2    Phillips and Hunts Point Ventures in or about the fall
3    of 2010, though I don't know whether that would have
4    been the exhibit denominated Schedule A or Schedule B.
5       Q.  You prefaced your answer with the term
6    "I assume."  Are you not clear one way or the other?
7       A.  As I've told you, I only have the vaguest
8    recollection of this email communication, and the same
9    is true of any oral discussion with Michael Spain
10   regarding the preparation of a note and corresponding
11   security agreement for a transaction by and between
12   Sandy Hoover and Hunts Point Ventures.
13          Because of the vagueness of my recollection
14   of any such discussion, I do not remember with
15   specificity what document I discussed, if I indeed did
16   so, with Michael Spain that would be appended as an
17   exhibit to the security agreement associated with that
18   transaction.
19          Based on my very general knowledge and
20   recollection of the affairs between Hunts Point
21   Ventures and Sandy Hoover, I infer that it must have
22   been a list of the collateral to be securitized by the
23   security agreement associated with that transaction,
24   which would have been the intellectual property Mark
25   Phillips transferred to Hunts Point Ventures in

Page 132

1    association with his assignment agreement with Hunts
2    Point Ventures.
3           That intellectual property was listed on two
4    schedules.  As it turns out, the list of intellectual
5    property on one of the schedules was problematic in
6    the sense that it turned out Mark Phillips had no
7    legal power to transfer that intellectual property
8    because he had already assigned it to the law firm of
9    Smith & Hennessey acting as assignee for the benefit
10   of the creditors of Banana Corporation.
11          In light of that, my inference is that it
12   would have been an exhibit disclosing collateral that
13   could be properly the subject of a security agreement
14   between Hunts Point Ventures and Sandy Hoover, that
15   being the schedule of intellectual property that had
16   not been previously encumbered or clouded in title by
17   Mark Phillips' assignment of that intellectual
18   property to Smith & Hennessey.
19      Q.  What was the subject matter of the
20   intellectual property that you've just referred to as
21   having been previously assigned?
22          THE WITNESS:  The answer to that question is
23   long, and I'd like to use the restroom.  Do you mind?
24          MR. KIMBALL:  Sure.  We can take a break for
25   a few minutes.

Page 133

1           (Recess.)
2           (Marked Deposition Exhibit No. 17.)
3           MR. KIMBALL:  Back on the record.
4           Mr. Du Wors, before we took a break at your
5    request, there was a question pending, and while it is
6    abnormal to take a break with a pending question, I
7    did permit it to occur here.
8           I would like to read back into the record my
9    question at this point.  Could you read the question?
10          THE REPORTER:  "Question:  What was the
11   subject matter of the intellectual property that
12   you've just referred to as having been previously
13   assigned?"
14          MR. KIMBALL:  And can you read Mr. Du Wors'
15   response.
16          THE REPORTER:  "The answer to that question
17   is long, and I'd like to use the restroom.  Do you
18   mind?"
19          MR. KIMBALL:  Okay.
20      Q.  (By Mr. Kimball)  Could I have your answer to
21   the question, please.
22      A.  Sure, but I disagree with the premises of
23   your question and the argumentative nature of your
24   question as well as the arguments contained within it.
25          What actually happened was that a question

John Du Wors                                                          August 25, 2014

Page 134

1    was asked.  I responded by saying, "The answer to that
2    question is long," which is a sufficient answer for
3    the purpose of causing a question no longer being
4    pending for deposition purposes.
5         I then asked you a question, if we could
6    take a brief bra -- bathroom break.  You said yes.  I
7    then came to your office and asked if you wanted to
8    take a short break; i.e., "I just went to the
9    restroom," and began right then or if you wanted to
10   take a longer break, in which case I would make a
11   phone call.
12        You said -- you elected personally to take a
13   longer break.  As a result, we took that break.  So it
14   wasn't entirely at my request, and the length of the
15   break was dictated by you, not me.
16        With respect to your question about the
17   intellectual property that Mark Phillips had already
18   assigned to Smith & Hennessey, that intellectual
19   property, as I vaguely recall, related to technology
20   practicing functionalities associated with digital
21   financial transactions.
22        In an agreement between Mark Phillips and
23   MOD Systems Mr. Phillips licensed and contributed some
24   intellectual property.  The intellectual property he
25   contributed to MOD Systems related to the business of

Page 135

1    MOD Systems; specifically, inventions used to deliver
2    media content by and through appendaged devices that
3    would go on televisions is my general recollection of
4    that.
5         But secondary to that there were two other
6    schedules of intellectual property that were licensed
7    to MOD Systems.  One kind of intellectual property,
8    which was on one of the schedules, either A or B, is
9    intellectual property that I generally refer to as
10   media technology.
11        The other schedule of intellectual property
12   he licensed to MOD Systems related to technology that
13   I refer to generally as financial transaction
14   technology.  As I understood it, Mark Phillips' other
15   company, Banana Corporation, in which Robert Arnold
16   had invested the bulk of the funds he furnished to
17   Mr. Phillips, was pursuing or purporting to pursue the
18   creation and commercial deployment of technology
19   related to mobile banking using cellphones and the
20   effectuation of financial transactions through digital
21   interfaces.
22        When Bob Arnold sued Banana Corporation
23   derivatively, Mark Phillips got the idea that he could
24   neutralize the concerns and allegations raised by Bob
25   Arnold in that derivative suit by utilizing the

Page 136

1    procedures set forth in the court rules dealing with
2    derivative suits; specifically, that a corporation in
3    receipt of a derivative demand could investigate that
4    demand through appointment of a committee which could
5    reach results and that those results, if reached in
6    good faith, could conclude that the derivative demand
7    was not worth pursuing by the corporation against the
8    third party against whom the derivative demand
9    requested action, which, of course, in that case was
10   Mark Phillips.
11        Mark Phillips therefore appointed as
12   counsel for that demand review committee the law firm
13   of Smith & Hennessey, and specifically, lead counsel
14   on that matter Jim Smith, who effectively served as
15   Mark Phillips' prosecutor.
16        Mark Phillips caused Banana Corporation, as
17   I understand it, to assume the obligation to pay
18   Mr. Smith's fees and costs, including the cost of
19   experts, such as Dennis Mandell, and Mark Phillips
20   personally guaranteed payment of those fees, as I
21   understand it, from both Phillips and Jim Smith.
22        The bill that became owing to Smith &
23   Hennessey for fees and costs as a function of that
24   representation amounted to approximately $200,000,
25   which neither Mr. Phillips nor Banana Corporation were

Page 137

1    able to pay due to Phillips' own use and distribution
2    of the investment capital Mr. Arnold had contributed
3    to Banana Corporation.
4         In partial resolution of the obligation owed
5    by Mr. Phillips and Banana Corporation to the law firm
6    of Smith & Hennessey for fees and costs, Mr. Phillips
7    purported to assign the so-called financial
8    transaction intellectual property to Smith & Hennessey
9    acting in its capacity as assignee for the benefit of
10   creditors of Banana Corporation.
11        So when subsequently Mr. Phillips
12   fraudulently misrepresented to Hunts Point Ventures in
13   his assignment agreement to Hunts Point Ventures that
14   he had clear title to that financial transaction
15   intellectual property and could and thereby did
16   transfer it to Hunts Point Ventures in exchange for
17   the promise to furnish funds for Mr. Phillips' legal
18   representation, it turned out that Mr. Phillips' title
19   to that intellectual property was indeed clouded and
20   deficient because it was owned by Smith & Hennessey as
21   an ABC.
22        And for that reason, because I believe we
23   had learned about that fraudulent misrepresentation by
24   Mr. Phillips as of the time Hunts Point Ventures
25   executed a security agreement with Sandy Hoover, that

12  (Pages 134 to 137)

John Du Wors                                             August 25, 2014

Page 138

1   financial transaction intellectual property to which
2   Mr. Phillips lacked title would not have been an
3   exhibit appended to the security agreement because it
4   did not disclose assets that could be effectively
5   collateralized by Ms. Hoover.
6       Q.   You indicated that you learned of what you
7   characterized as a fraudulent representation about the
8   same time as the content of the security agreement was
9   being negotiated and discussed; is that correct?
10      A.   No.  I didn't say that.
11      Q.   When did you learn of the -- what you
12  characterize as the fraudulent representation?
13      A.   At some point prior.
14      Q.   Prior to the date that security
15  agreement was executed?
16      A.   Yes.
17      Q.   A month --
18      A.   I don't --
19      Q.   -- prior?
20      A.   I don't know.
21      Q.   In your answer just given you testified
22  about dealings between Banana Corporation and --
23  involving Robert Arnold and Mark Phillips, including a
24  reference to a belief that Phillips believed he could
25  neutralize the allegations that were being made by

Page 139

1   Mr. Arnold.  Do you recall that testimony or the
2   subject of that testimony?
3       A.   Well, my answer speaks for itself, and I
4   would refer you to the testimony that I actually gave
5   in the matter, but I do recall commenting on what it
6   appears to me, based on my understanding of the facts,
7   Mark Phillips must have been thinking in the context
8   of appointing a demand review committee in response to
9   Mr. Arnold's derivative demand upon Banana
10  Corporation.
11      Q.   When you say that, what Mark Phillips must
12  have been thinking, are you basing that on firsthand
13  knowledge?
14      A.   I'm basing that on extensive discussions
15  with Mark Phillips, and to the extent that he's a
16  party opponent in other matters, that's based on my
17  firsthand knowledge of admissible statements from Mark
18  Phillips, yeah.
19      Q.   Was any information in the answer you gave a
20  few moments ago about these transactions and about
21  this IP, was any of that obtained from discussions you
22  had with individuals other than Mark Phillips?
23      A.   Jim Smith.
24      Q.   Anyone else?
25      A.   Numerous other people.  The discussions of

Page 140

1   Mark Phillips' misconduct relating to the Banana
2   Corporation matter were ongoing, lengthy, and involved
3   multiple parties, including, but not limited to,
4   prosecutors, co-defense counsel, Hunts Point Ventures
5   representatives, Mark himself, members of my law firm,
6   counsel for opposing parties, representatives of
7   opposing parties, counsel for Mr. Arnold, possibly
8   even Julia de Haan, and potentially others whom I am
9   not remembering as I sit here today.
10      Q.   When you referred to Hunts Point Ventures
11  representatives, who specifically were you referring
12  to?
13      A.   I don't know that I recall much about
14  specific conversations, but the derivative dispute
15  involving Mark Phillips and Bob Arnold was I believe,
16  in the most general sense, the subject of conversation
17  with Steve Schweickert, Doug Lauer, Chad Rudkin, and
18  Elizabeth Rudkin at least.
19      Q.   And when you referred to other members of
20  your law firm, who specifically were you -- were you
21  referring to?
22      A.   I wasn't referring to -- specifically to
23  anyone.
24      Q.   Were there other attorneys you were
25  referring to?

Page 141

1       A.   Multiple attorneys at my firm worked on the
2   Mark Phillips matter, both the civil matters and the
3   criminal matters.  At one time I had almost the entire
4   litigation team working on his cases, and for that
5   reason I generally believe I had conversations with at
6   least Derek Linke and Derek Newman and likely Jason
7   Sykes, Charlotte Williams and Keith Scully and perhaps
8   others.  We've had other associate attorneys come
9   through the firm during the last four years, but I
10  can't recall which of those did or may have worked on
11  Mark Phillips matters.
12          MR. KIMBALL:  Exhibit 17, is that over there
13  or --
14          THE REPORTER:  Yes.
15      Q.   (By Mr. Kimball)  You have in front of you a
16  document which has been marked as Exhibit 17.  I'd
17  like you to take a look at that document and let me
18  know if you've ever seen it before today.
19      A.   I don't know if I've ever seen it before
20  today.
21      Q.   Were you or your firm involved in the
22  negotiation or drafting of the document which is
23  marked as Exhibit 17?
24      A.   I don't know.  I'm not able to authenticate
25  Exhibit 17.

13  (Pages 138 to 141)

John Du Wors                                            August 25, 2014

Page 142

1     Q.   You indicated that you haven't seen it
2   before; is that correct?
3     A.   I don't have a clear recollection of whether
4   or not I've seen this document before.  And perhaps,
5   more specifically, I don't know that I was ever shown
6   a signed copy of any security agreement between Hunts
7   Point Ventures on the one hand and Sandy Hoover on the
8   other.
9     Q.   Does Exhibit 17 concern the securitization
10  of the loans or financial obligations of Hunts Point
11  Ventures to Sandy Hoover insofar as you're aware?
12    A.   I --
13       MS. DeVET:  Objection to the form of the
14  question.  I think you probably need to let the
15  witness read the whole thing if he's going to answer
16  that.
17    A.   Yeah.  I mean --
18    Q.   (By Mr. Kimball)  If we want to take a few
19  minutes to go through this, that would probably be
20  appropriate.
21    A.   The document speaks for itself.  It's
22  missing exhibits.
23       There was a security agreement between Hunts
24  Point Ventures and Sandy Hoover.  The content of this
25  document, whatever it is, seems to relate to the same

Page 143

1   subject matter.  Based on my inability to authenticate
2   it, because I don't know that I've ever seen it
3   before, I can't tell you if it was indeed that
4   document relating to that specific transaction, but it
5   certainly bears language that on its face appears to
6   relate generally to the subject of such a transaction.
7     Q.   What exhibits or other documents do you
8   believe were attached to or which you testified were
9   omitted from Exhibit 17?
10    A.   Having no independent knowledge of the
11  provenance of this document and no au -- no ability to
12  authenticate, I, of course, cannot be sure.  I see a
13  mention of an Exhibit A within the "Grant of Security
14  Interest" paragraph numbered three on the first page
15  of the document, and in reviewing the document itself
16  I see no Exhibit A, which could lead one to infer that
17  it's missing an Exhibit A, at minimum.  But, again,
18  having no ability to say if I've seen this document
19  before, I couldn't tell you what's missing from it.
20  Maybe it never had an Exhibit A.
21    Q.   Looking at page one of Exhibit 17, paragraph
22  three, a paragraph titled "Grant of Security
23  Interest," there's a sentence which reads, "Company
24  hereby pledges, assigns and grants to Secured Party a
25  security interest in all of its right, title and

Page 144

1   interest in and to all of its assets including but not
2   limited to the assets described on the attached
3   Exhibit A, whether" or not "now owned or hereafter
4   acquired by Company (collectively, the 'Collateral')."
5       Do you see that?
6     A.   I do.
7     Q.   A moment ago you referred to Exhibit A as a
8   document which did not appear to be attached to
9   Exhibit 17.  Do you recall that testimony?
10    A.   I do.
11    Q.   And is the Exhibit A that I have just
12  referred to in paragraph three on page one the same
13  Exhibit A you were referring to in the answer to my
14  earlier question?
15    A.   Naturally, I have no idea.
16    Q.   Did you participate in drafting or
17  negotiating the terms of a document which would be
18  characterized appropriately or described as that
19  referred to in paragraph three as Exhibit A?
20       THE WITNESS:  Could I have that question
21  read back?
22       THE REPORTER:  "Question:  Did you
23  participate in drafting or negotiating the terms of a
24  document which would be characterized appropriately or
25  described as that referred to in paragraph three as

Page 145

1   Exhibit A?"
2     A.   Well, of course, based on lack of personal
3   knowledge, I can't tell you what paragraph three truly
4   refers to.
5       Secondly, could properly be characterized,
6   as you phrased that question, calls for me to
7   speculate or express an opinion that I, frankly, don't
8   have.
9       And then, third, to the extent that you're
10  talking about the schedule of intellectual property
11  that I believe was appended to the security agreement
12  that my law firm did participate in the preparation of
13  in relation to the transaction for the securitization
14  of intellectual property between Hunts Point Ventures
15  and Sandy Hoover, that schedule was a list of
16  intellectual property that, no, I did not participate
17  in the preparation or drafting of.
18    Q.   (By Mr. Kimball)  Did anyone at your law firm
19  participate in the preparation, negotiation or
20  drafting of such a schedule?
21       MS. DeVET:  Objection to the form of the
22  question.
23    Q.   (By Mr. Kimball)  You can answer.
24    A.   Thanks for telling me the court rules.
25       I don't have independent personal knowledge

                                   14  (Pages 142 to 145)

John Du Wors                                          August 25, 2014

Page 146

1   of whether or not that occurred.  The schedules of
2   intellectual property that were the subject of both
3   the assignment agreement Mark Phillips executed with
4   Hunts Point Ventures and also the security agreement
5   executed between Hunts Point Ventures and Sandy Hoover
6   was taken from the license and contribution agreement
7   Mark Phillips entered into with MOD Systems.
8       Whether that document was simply copied
9   wholesale by means of a xerographic device and
10  appended to the various agreements my firm
11  participated in preparation of or whether someone like
12  Derek Linke scanned it, copied its content, and
13  reformatted it to cause it to appear more organized or
14  legible, I don't know.
15      Q.   Paragraph number one on page one of
16  Exhibit 17 refers to a "...promissory note of even
17  date herewith ('Promissory Note') to Secured Party..."
18      Do you see that reference?
19      A.   I see the language you're referring to.
20      Q.   Do you have any reason to believe that
21  Exhibit 17 in its final form was or was not executed
22  on November 19th, 2012?
23      A.   I have no personal knowledge responsive to
24  that question.
25      Q.   Have you ever seen a copy of a secured --

Page 147

1   excuse me -- a promissory note dated November 19th,
2   2012, in favor of Sandy Hoover and executed by Hunts
3   Point Ventures?
4       A.   I don't recall.  I've certainly seen a draft
5   form of a promissory note between those two parties.
6   I don't recall its date, whether I saw a final draft
7   or whether I saw a signed copy ever.
8       Q.   Did you participate in drafting that note?
9       A.   No.
10      Q.   Did you participate in negotiating the terms
11  of that note?
12      A.   No.
13      Q.   Do you know if anyone at your firm
14  participated in negotiating the terms of that note?
15      A.   I don't think that anybody from my firm
16  negotiated those terms as such.  The terms would have
17  been negotiated between Chad Rudkin and Sandy Hoover.
18      To the extent that my firm participated in
19  the drafting, it would have been something that
20  occurred based on the terms that were relayed to us
21  probably by Chad Rudkin.
22      But Sandy Hoover was a gracious and friendly
23  creditor to Hunts Point Ventures, so I doubt that
24  there would have been any hard negotiation.  I suspect
25  that Chad Rudkin would have said to Sandy Hoover,

Page 148

1   "What is commercially acceptable to you?"
2       And I suspect that Sandy would have come
3   forth with reasonable terms, and those would have been
4   relayed to us for the purpose of our preparation
5   efforts.
6       Q.   You used the term "gracious" a moment ago in
7   referring to Sandy Hoover and her relationship as a
8   lender to Hunts Point Ventures.  On what information
9   are you basing your invocation of the term "gracious"?
10      A.   Conversations with Steve Schweickert, Chad
11  Rudkin, Elizabeth Rudkin, and Sandy Hoover.
12      Q.   And specifically what conversations did you
13  have with Steve Schweickert that would lend support to
14  your characterization of that relationship as
15  gracious?
16      A.   I don't have a specific recollection of the
17  precise verbiage or text of any conversation between
18  myself and Steve Schweickert on the subject other than
19  that I recall substantively very general comments from
20  Steve Schweickert indicating his view that she would
21  not be an aggressive, hard-nosed creditor but, rather,
22  one that would be reasonable and supportive of Hunts
23  Point Ventures' efforts to recapitalize and fund its
24  activities so as to meet its obligations to all of its
25  creditors.

Page 149

1       MR. KIMBALL:  Can I get that marked?
2       (Marked Deposition Exhibit No. 18.)
3       Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
4   handed a document marked as Exhibit 18.  Have you ever
5   seen a copy of this document before?
6       A.   I don't have an independent recollection of
7   having seen this particular document.
8       Q.   There was a reference in Exhibit 17 to a
9   promissory note dated on or about November 19th of
10  2012, and I believe you indicated you did not
11  recall -- or you were unaware of what date, if any,
12  an agreement was signed -- excuse me -- a secured
13  promissory note was signed as referenced in
14  Exhibit 17.  Is that fair?
15      A.   Correct.
16      Q.   Okay.
17      Turning to Exhibit 18, there is a reference
18  to January 14th, 2013, at -- near the top of the first
19  page of Exhibit 18.  Do you see that?
20      A.   I do.
21      Q.   Do you have any reason to believe that the
22  original of the secured promissory note marked as
23  Exhibit 18 was signed on any date other than
24  January 14th, 2013?
25      A.   I have no basis of personal knowledge

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

John Du Wors                                          August 25, 2014

Page 150

1    sufficient to authenticate Exhibit 18 or say that
2    indeed it was a promissory note executed between Hunts
3    Point Ventures and Sandy Hoover.  Nor do I have
4    personal knowledge sufficient to say when either
5    Exhibit 18 was executed by and between Hunts Point
6    Ventures and Sandy Hoover or whether or not any
7    promissory note was indeed ever executed by and
8    between Hunts Point Ventures and Sandy Hoover, except
9    to say that I have the most general recollection that
10   I was told that they were going to execute such a
11   document, and if anyone did tell me that such a
12   document was, in fact, executed by the parties, I
13   would probably have to have my recollection refreshed
14   in order to have any real memory of whether or not it
15   occurred.
16        Q.  Do you know if there were any promissory
17   notes between Sandy Hoover and Hunts Point Ventures
18   involving the sum of $20,000 that were executed other
19   than on or about January 14th, 2013?
20        A.  Well, I don't know that there was one
21   executed on January 14th, 20,000 -- 2013, so I
22   couldn't tell you that.
23            I can tell you that I recall that our firm
24   participated in preparation of a promissory note that
25   provided for the extension of further credit by Sandy

Page 151

1    Hoover in addition to her initial loan to Hunts Point
2    Ventures.  I don't recall anyone telling me it was
3    actually executed.
4            I believe that we delivered, at minimum,
5    draft copies to Chad Rudkin and whatever happened
6    with the documents from there took place between Chad
7    Rudkin and Sandy Hoover.  I don't recall Mr. Rudkin
8    ever having transmitted to my law firm or me
9    specifically executed copies of any such document,
10   though it may have occurred, and perhaps my
11   recollection would be refreshed if I saw an email
12   containing such transmission.
13            $20,000 is a number that sounds vaguely
14   right in terms of the further extension of credit by
15   Sandy Hoover in association with the execution of that
16   promissory note and corresponding security agreement,
17   but I don't have a specific independent recollection
18   of how much further credit she actually extended.
19        Q.  Sitting here today, then, you do not recall
20   if Sandy Hoover loaned any amount in excess of the
21   initial $100,000 and the $20,000 that you've been
22   describing?
23        A.  I didn't describe $20,000.  You described
24   $20,000, and you referred to it in the language of
25   Exhibit 18.  I said to you that that sounds fairly

Page 152

1    consistent with my vague recollection of the amount of
2    further credit, at minimum, Sandy Hoover was going to
3    extend in association with the promissory note and
4    security agreement executed between Sandy Hoover and
5    Hunts Point Ventures.
6            I also have a vague recollection that
7    $20,000 or some amount in this ballpark was simply an
8    initial further extension of credit.
9            You see, promissory notes and security
10   agreements are in their nature inflatable, and I seem
11   to recall some discussion of further credit being
12   extended by Sandy Hoover beyond the initial amounts
13   that became the subject of the promissory note and
14   security agreement she was to execute with Hunts Point
15   Ventures, especially as those further funds might be
16   necessary for purposes of litigation that would be
17   initiated against Hunts Point Ventures by such parties
18   as Joyce Schweickert.
19        Q.  Do you recall the amounts of such potential
20   additional loans?
21        A.  No.
22        Q.  Do you recall the dates?
23        A.  No.
24        Q.  Which --
25            MR. KIMBALL:  Strike that.

Page 153

1        Q.  (By Mr. Kimball)  What attorneys at your firm
2    participated in drafting the security -- or -- excuse
3    me -- the secured promissory note between Ms. Hoover
4    and HPV that you alluded to a moment ago?
5        A.  I don't know if it was a secured promissory
6    note.  I believe it was, at minimum, a promissory
7    note.  It may have made reference to a security
8    agreement.
9            Promissory notes are often referred to as
10   secured, but they are not in -- secured in the sense
11   that they memorialize an obligation whose repayment is
12   secured by the encumbrance of collateral.  Rather, the
13   only inherent security offered by a promissory note is
14   that it is negotiable in nature and that, upon such
15   negotiation, becomes free of certain substantive
16   defenses to a contractual obligation.
17            That said, the note and security agreement
18   documents that my firm participated in the preparation
19   of for Hunts Point Ventures' dealings with Sandy
20   Hoover were created at least in part by Michael Spain,
21   may have been consulted on and/or edited by me, though
22   I don't have a specific recollection as to whether or
23   not I actually edited any such document, and may have
24   been consulted on or edited by Derek Linke, who
25   assisted me in many, if not most, of the tasks

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110     FAX: 206.622.6236

John Du Wors                                          August 25, 2014

Page 154

1   relating to my law firm's representation of Hunts
2   Point Ventures.
3       Q.   Did you ever have any discussion with Chad
4   Rudkins concerning subordination or prioritization of
5   HPV's financial obligations to Schweickert and that to
6   Sandy Hoover?
7       A.   What Schweickert?
8       Q.   Jennifer Schweickert.
9       A.   Subordination?
10      Q.   Or prioritization of the two loans.  Of the
11  loans.
12      A.   I think I need to consult with my counsel,
13  because I think that the answer to that question may
14  be privileged, so I'll object on the basis of
15  privilege, and so does my counsel, and we can meet and
16  confer on the instruction not to answer if you like.
17      Q.   So I'm clear on this, the privilege is being
18  invoked because it involves discussions between you
19  and your counsel in this case?
20      A.   No.  I was counsel for Hunts Point Ventures,
21  and at the time that the note and security agreement
22  were negotiated by Hunts Point Ventures with Sandy
23  Hoover Chad Rudkin was the chief executive officer of
24  Hunts Point Ventures.  Hunts Point Ventures owns that
25  privilege.

Page 155

1          Now the privilege is owned by the receiver.
2   So advice I would have given to Hunts Point Ventures
3   as to the effect of the execution of the loan
4   agreement, promissory note, and corresponding security
5   agreement with Sandy Hoover would be legal advice I
6   was giving to Hunts Point Ventures that would be the
7   subject of the privilege.
8          As I sit here, I don't know whether or not
9   the receiver has elected to waive any such privilege,
10  and I would certainly have to speak to my counsel to
11  see if she knows anything more about that.
12         If Hunts Point Ventures, by and through the
13  receiver, has not waived privilege with respect to my
14  legal advice to Hunts Point Ventures during that
15  period, specifically to its Upjohn Control Group, then
16  I would not have the ability to answer that question.
17         MR. KIMBALL:  Ms. Du Vet, would you like to
18  take a break to discuss with your client whether or
19  not the privilege has been waived based on your
20  understanding?
21         MS. DeVET:  Yeah, unless you want to move on
22  and just ask your questions.
23         THE WITNESS:  Let's talk for a sec, if
24  that's all right.
25         MS. DeVET:  All right.  That's fine.

Page 156

1          (Discussion off the record.)
2          MR. KIMBALL:  Back on the record?
3          MS. DeVET:  Uh-huh.
4          THE WITNESS:  Okay.
5          MS. DeVET:  The question pending is a
6   question that implicates the attorney-client privilege
7   between Hunts Point Ventures and my client and my
8   client's law firm.  And because we don't know of any
9   express waiver of the -- of the privilege or any
10  action that would apply to the privilege as a matter
11  of law, I'm going to instruct my client not to answer
12  questions that would violate the attorney-client
13  privilege in that -- in this matter.
14         MR. KIMBALL:  And I would ask counsel, do
15  you agree with your client's characterization that the
16  receiver would be entitled to waive the privilege with
17  regard to the question that I asked?
18         THE WITNESS:  I don't know that you're
19  prepared to take a legal position on that yet.  Are
20  you?
21         MS. DeVET:  That is exactly what I was about
22  to say.
23         THE WITNESS:  Yeah.
24         MS. DeVET:  I'd rather not make a statement
25  on that right now.  I would like to look into it

Page 157

1   before I said one way or the other.
2          MR. KIMBALL:  Fair enough.
3       Q.   (By Mr. Kimball)  Mr. Du Wors, do you recall
4   having any conversation either with Sandy Hoover or
5   her attorney about whether her loans would be given
6   preference to those made by Jennifer Schweickert?
7       A.   I do not have a specific recollection of a
8   conversation relating to the relative priority between
9   Ms. Hoover's loan obligations and Jennifer
10  Schweickert's.  I believe that I had conversations
11  with Ms. Hoover relating generally to the effect of a
12  perfected security agreement as to the intellectual
13  property and other assets of Hunts Point Ventures for
14  the purpose of supporting Hunts Point Ventures'
15  negotiations with Ms. Hoover to induce her to extend
16  further credit.
17         At the time those conversations were taking
18  place I'm not sure that we had strong expectations
19  that Jennifer Schweickert would assert a claim that
20  would be impacted by Ms. Hoover's anticipated security
21  agreement with Hunts Point Ventures.  Rather, the only
22  threatening party I recall at that time was Joyce
23  Schweickert.
24         If I recall correctly, Chad Rudkin was in
25  regular conversations with Jennifer Schweickert that,

17  (Pages 154 to 157)

John Du Wors                                          August 25, 2014

Page 158

1    as I recall, were amicable in nature and led me to
2    believe in my own mind that whatever dealings were
3    taking place between Chad Rudkin and Jennifer
4    Schweickert -- or, rather, Chad Rudkin in his
5    capacity as CEO of Hunts Point Ventures and Jennifer
6    Schweickert would be workable for purposes of Hunts
7    Point Ventures meeting its debt obligations, whatever
8    those were.
9        Q.   What did Joyce Schweickert do or say that
10   you regarded as threatening, as just indicated in your
11   answer?
12       A.   My general recollection from that time
13   period was that Joyce Schweickert had communicated
14   some kind of claim to Hunts Point Ventures by and
15   through her attorney, Jeff Keane, and that much of my
16   knowledge relating to those claimed assertions came
17   from dealings with Keane over third-party discovery
18   requests he had propounded to Hunts Point Ventures in
19   association with the litigation that transpired
20   between Joyce Schweickert and Steve Schweickert over
21   Steve Schweickert's claims of estate dissolution,
22   whatever the nature of those proceedings were.  I
23   don't know if it was an attempt at dissolution of a
24   metritricious relationship -- although I believe
25   that's not the case because, if I understand correctly

Page 159

1    from certain divorce counsel, that kind of
2    relationship has been abolished by statute in
3    Washington.
4            I simply know that Steve Schweickert brought
5    litigation claims against Joyce Schweickert seeking
6    money on some theory that looked a bit like a
7    meretricious relationship, and Jeff Keane
8    carpet-bombed Hunts Point Ventures with expansive and
9    unreasonable third-party discovery requests that I
10   moved to quash and apparently in my motion papers were
11   a success enough that Keane relented in his
12   unreasonable discovery demands.
13       Q.   You indicated a moment ago that there were
14   discussions with Sandy Hoover concerning these loans
15   or the loan that was in process.  Were your
16   conversations with Ms. Hoover directly or through
17   counsel?
18       A.   I had one or two conversations directly with
19   Ms. Hoover.  I have never met or spoke to her counsel
20   or learned of the identity of any specific counsel
21   except to know that she, generally speaking, had
22   lawyers that she did and could consult by virtue of
23   her past history as an entrepreneur and business owner
24   and, frankly, wealthy investor.
25       Q.   Was there a period of time in which Steve

Page 160

1    Schweickert was the sole shareholder of Hunts Point
2    Ventures?
3        A.   According to my understanding, there was an
4    extensive period of time in which Mr. Schweickert was
5    the sole shareholder of Hunts Point Ventures.
6            (Discussion off the record.)
7            (Marked Deposition Exhibit No. 19.)
8        Q.   (By Mr. Kimball)  Mr. Du Wors, you've been
9    handed a document marked as Exhibit 19.  Have you ever
10   seen this document before?
11       A.   I believe so.
12       Q.   Do you know what law firm drafted this
13   document?
14       A.   If it is the stock redemption and
15   indemnification agreement that was indeed entered into
16   in -- by Joyce Schweickert on the one hand and Hunts
17   Point Ventures by and through Steve Schweickert on the
18   other hand that my law firm prepared in December of
19   2010 or January of 2011, then this would have been
20   prepared by Michael Spain, but because I didn't
21   prepare this document and I am not able to compare it
22   to the original of that document we have at my law
23   firm, I can't confirm that this is indeed that
24   document or authentic.
25       Q.   Generally, Exhibit 9 appears to be a

Page 161

1    redemption agreement by which the stock owned by Joyce
2    Schweickert was being redeemed by Hunts Point
3    Ventures; is that correct?
4            MS. DeVET:  Counsel, do you mean --
5        A.   No.  That's --
6            MS. DeVET:  -- 19?
7        A.   -- not correct.
8        Q.   (By Mr. Kimball)  19?  Didn't I say 19?
9        A.   No.
10       Q.   All right.
11           Can you tell me the purpose of Exhibit 19?
12       A.   No.  I'm not able to authenticate it.  The
13   document speaks for itself.  And I can't tell you that
14   this is definitely the stock redemption agreement that
15   was executed between Joyce Schweickert and Steve
16   Schweickert on behalf of Hunts Point Ventures in
17   January of 2011 or December of 2010 at the time that
18   my law firm prepared such document for them.  Or,
19   rather, for Hunts Point Ventures.
20           The document that you have put in front of
21   me as Exhibit 19 is entitled "STOCK REDEMPTION AND
22   INDEMNIFICATION AGREEMENT."
23           (Marked Deposition Exhibit No. 20.)
24       Q.   (By Mr. Kimball)  There is --
25           MR. KIMBALL:  Strike that.

18  (Pages 158 to 161)

John Du Wors                                          August 25, 2014

---

Page 162

1    Q.   (By Mr. Kimball)  You've been handed a
2  document marked as Exhibit 20.  Have you ever seen
3  this document before?
4    A.   I don't know.  I don't prepare the invoices
5  at my firm.
6    Q.   Do you ever review them?
7    A.   Yes.
8    Q.   Do you know if you reviewed this one?
9    A.   I don't have an independent recollection of
10  whether I reviewed this one.  Hunts Point Ventures was
11  a client of mine listed under my name as the
12  originating attorney, and the general practice at the
13  firm is to circulate at the end of each month -- or,
14  rather, at the beginning of each month a list of the
15  pre-bills for the month preceding that had just come
16  to an end before the beginning of the month,
17  pre-billing activities.
18       I review the pre-bills and give my notes and
19  edits back to Laura Kimball so she can finalize final
20  invoices, which are not presented to me before they're
21  distributed to clients for payment.
22    Q.   Do you know what client billing program was
23  used in 2011 by your law firm?
24    A.   PC Law.
25    Q.   I'd like you to turn to page two of

---

Page 163

1  Exhibit 20.  There is an entry dated February 8th,
2  2011.  Do you see that?
3    A.   I do.
4    Q.   And it reads, "Draft Stock Redemption and
5  Indemnity Agreement, Resignations of Joyce
6  Schweickert, and Board Resolution to Accept
7  resignations & Redeem Shares, meeting with client."
8       Do you see that?
9    A.   I do.
10    Q.   And off to the far right of that entry are
11  the letters MS.  Do you see that?
12    A.   I do.
13    Q.   Do you know what that refers to?
14    A.   On our invoices the letters MS refer to
15  Michael Spain.  Because I'm unable to authenticate
16  this document, I couldn't tell you that for sure, but
17  assuming it's an invoice from my law firm, that would
18  refer to Michael Spain.
19    Q.   Do you have a recollection sitting here
20  today of when Chad Rudkin became a shareholder in
21  Hunts Point Ventures?
22    A.   Not by date but, rather, by event.
23    Q.   And by "event," what event are you referring
24  to?
25    A.   Steve Schweickert's criminal prosecution for

---

Page 164

1  drunk driving and perhaps domestic violence.  Or
2  assault.  I guess it would have been assault rather
3  than domestic violence.
4    Q.   And referring to those events, does that in
5  any way permit you to identify a month or a month and
6  a year in which that event occurred?
7    A.   No, because I don't remember when any of
8  those things occurred.  At some point following the
9  conclusion of Mark Phillips' criminal trial Steve
10  Schweickert became involved in a romantic dispute with
11  his domestic partner, Joyce Schweickert, that led to
12  their breakup.
13       And in the wake of that dispute, perhaps in
14  the month or two following the breakup, Steve
15  Schweickert and Joyce Schweickert apparently had some
16  sort of an interaction in a restaurant parking lot
17  that gave rise to a criminal prosecution for drunk
18  driving, on which Steve -- Pete Mair represented Steve
19  Schweickert.
20       And sometime in the near period subsequent
21  to that event, that interaction with Joyce
22  Schweickert, Steve Schweickert transferred to Chad
23  Rudkin 50 percent -- Chad Rudkin and Elizabeth Rudkin
24  jointly 50 percent ownership in Hunts Point Ventures,
25  Inc., and reconstituted the board and officer makeup

---

Page 165

1  of Hunts Point Ventures, Inc., to appoint, among other
2  things, Chad Rudkin as chief executive officer.
3    Q.   Do you recall the documents that were
4  prepared or used to accomplish the purposes that
5  you've just described?
6    A.   I recall at least some of them.  I prepared
7  the shareholder resolution appointing Chad Rudkin as
8  CEO.  I believe that resolution also -- well -- strike
9  that.
10       The shareholder resolution would have
11  appointed the board, and I believe I also prepared a
12  corresponding board resolution appointing officers.
13  And I believe the completion of the board consisted
14  of Steve Schweickert, Elizabeth Rudkin, and Chad
15  Rudkin, with Chad Rudkin as chairperson of the board.
16       And I believe in the document I drafted and
17  the board executed that the board then appointed as
18  officers Chad Rudkin in the position of CEO, Elizabeth
19  Rudkin in the position of secretary and possibly
20  treasurer, and that Steve Schweickert may have been
21  appointed as an officer of some kind somewhere within
22  the C suite, but I don't remember for sure whether
23  that occurred and/or what position that would have
24  been.  I have some semblance of a recollection that
25  Mr. Steve Schweickert may have been appointed to -- as

---

19 (Pages 162 to 165)

John Du Wors                                    August 25, 2014

Page 166

1  chief operating officer.
2         MR. KIMBALL:  Can I get this marked?
3         (Marked Deposition Exhibit No. 21.)
4    Q.  (By Mr. Kimball)  Mr. Du Wors, you just
5  described a document, and a document marked as
6  Exhibit 21 has just been handed to you.  I'd like you
7  to take a minute to look at Exhibit 21 and let me know
8  if that is either the document or one of the documents
9  you were referring to a moment ago.
10   A.   What's your question about this document?
11   Q.   Is this the document that you were referring
12 to a moment ago in which you identified that there was
13 a document between the shareholders confirming certain
14 events and the appointment of certain individuals as
15 certain officers?
16   A.   I can't say for sure because I can't -- am
17 not able to compare it to the documents I have back in
18 my holdings at the law firm, which would be necessary
19 to authenticate it with any certainty, but it does
20 look very much like the documents that I prepared,
21 although perhaps it should be noted that I apparently,
22 if this is that document, misdated the signature lines
23 on page four of the document such that they read as
24 May 2011 signatures as opposed to 2012.
25   Q.   And I was going to ask you next about that

Page 167

1  very issue.
2         So the document on the first page of
3  Exhibit 21 says that it is made and entered into
4  effective 29th day of May 2012.  Do you see that?
5    A.   I do.
6    Q.   And then if you look at the footer on each
7  page, there's a document -- or there's a reference to
8  the left-hand side which says, "20120529 HPV Joint
9  Consent."
10        Do you see that?
11   A.   I do.
12   Q.   And then finally, on the last page of
13 Exhibit 21 there's a reference to, "It is so resolved
14 this 29th day of May 2012."
15        Do you see that?
16   A.   I do.
17   Q.   So is it your belief that this document was,
18 in fact, executed sometime at the end of May of 2012
19 rather than 2011?
20   A.   The document I described that I prepared for
21 purposes of appointing Steve Schweickert and Chad
22 Rudkin as directors and all three of -- Steve
23 Schweickert, Chad Rudkin, and Elizabeth Rudkin as
24 officers would have been created in a date much closer
25 to May of 2012 and certainly was not created at any

Page 168

1  time in 2011, and I can say that with relative
2  certainty.
3         I, however, have some trouble authenticating
4  this particular document or saying when this
5  particular document was executed partly because I
6  can't compare it to my holdings -- my document
7  holdings back at the firm and partly because the
8  footer in the lower left-hand corner of each page of
9  this document suggests to me that someone else other
10 than me participated in the preparation of this
11 document, because I do not format footers for
12 corporate governance documents in that fashion.  I do
13 not include a numerical designation of the year
14 followed by the month followed by the specific day.
15        And so, therefore, while this may have been
16 a document that I prepared -- that is to say, 21 may
17 have been a version of a document that I prepared, if
18 this is indeed the final version of that document that
19 I was describing earlier, which I can't totally
20 confirm, the footer formatting causes me to believe
21 that someone such as Michael Spain may have taken it
22 over to finalize it.
23   Q.   I'd like you to look at the middle of page
24 one of Exhibit 21, paragraph D. --
25   A.   Yes.

Page 169

1    Q.   -- which reads, "To the extent that the
2  transfer of shares to Chad Rudkin was not legally
3  effectuated as of January 1st, 2011, the Shareholders
4  now unanimously make and ratify that issuance of
5  shares to Rudkin."
6         Do you see that?
7    A.   I do.
8    Q.   Do you know what the reference to that the
9  transfer of shares to Chad Rudkin was not legally
10 effectuated might be referring to?
11   A.   Yes.
12   Q.   And what was that?
13   A.   My testimony in response to that quest --
14 question is based partly on privileged information and
15 partly on non-privileged information, so I'll share
16 with you the privileged -- I'm sorry -- the
17 non-privileged information.
18        The non-privileged information is that Steve
19 Schweickert had made statements in front of me and
20 Chad Rudkin before Chad Rudkin was a member of the
21 Upjohn Control Group at Hunts Point Ventures to the
22 effect that he had always promised Chad Rudkin that
23 Chad would be a part owner in Hunts Point Ventures.
24 And actually, I'm not sure about always, but for some
25 significant period of time.

                          20  (Pages 166 to 169)

Page 170

I was not aware at the time that I drafted the document I drafted for them that any formal legally effective transfer of shares had ever transpired between Steve Schweickert and Chad Rudkin for the purpose of causing Mr. Rudkin to be a part, let alone half, owner in Hunts Point Ventures, and I do not know whether or not such an assignment may be pray -- may be made nunc pro tunc or after the fact.

And for that reason I do recall that I included language in the document I prepared for them effectuating the transfer of shares and reciting an effective date of January 1st, 2011, but I do not know from a legal point of view, as I'm not principally a corporate governance attorney, whether or not that recitation effectively creates an ownership interest on the part of Chad Rudkin that's effective as of January 1st, 2011.

Q. You indicated that your answer included reference to information which was not privileged and partly which would be privileged. When you referred to that part which would be privileged, who is the client to which the privilege belonged or belongs?

A. Hunts Point Ventures.

(Marked Deposition Exhibit No. 22.)

Q. (By Mr. Kimball) Mr. Du Wors, you've been

Page 171

handed a document marked as Exhibit 22. Do you recall if you've seen this document before?

A. I recall that such a document was prepared. I can't compare this to the document holdings back at my office, so I can't confirm its authenticity. I also don't know if I wrote this up.

I mean, assuming it is authentic, and that's an assumption for the purpose of my answer, I don't remember if I wrote this or if Michael Spain wrote it. I think I did. And the signature line next to paragraph three -- the initials, that is -- are mine. And the written text -- the handwritten text above the interlineation through the word "seller" in paragraph three with the handwritten word "purchaser" above it, that text -- that handwritten text is my penmanship, I'm embarrassed to say.

Q. What was the purpose of the creation of Exhibit 22?

A. Chad and Elizabeth bought Steve Schweickert out in the latter part of 2012 so that they would become sole shareholders in Hunts Point Ventures.

Q. And was the purpose of this document to memorialize that transaction?

A. The purpose of this document was to effect -- effectuate that transaction, if this

Page 172

Exhibit 22 is indeed the document that I prepared and that was executed between the parties, which I assume it was, based on the content and appearance.

MR. KIMBALL: Let's take a break for a couple of minutes. I don't have a whole lot more to go.

MS. DeVET: All right.

(Recess.)

MR. KIMBALL: Okay. Back on the record?

Q. (By Mr. Kimball) Mr. Du Wors, do you recall approximately the last date that your firm did work for Mark Phillips was?

A. May or June of 2011.

Q. As of May of 2011 was your firm pursuing patent violation claims or complaints on behalf of HPV?

A. I don't think so.

Q. Do you recall if you ever had any oral conversations with the Rudkins regarding Mark Phillips' release from prison?

A. No non-privileged conversations.

Q. And the client invoking the privilege would be who or what?

A. Hunts Point Ventures.

Q. Did you ever have any conversations with the

Page 173

Rudkins regarding Mark Phillips' ownership interest in HPV?

A. How is this reasonably calculated to lead to the discovery of admissible evidence in the Jennifer Schweickert case?

Q. I do not have to put that on the record.

A. Well, then I won't answer.

Q. So you're refusing to answer, and the reason you're refusing to answer is that it is -- will not lead to discoverable evidence in this case?

A. I'm refusing on two bases. One, that it's not reasonably calculated to lead to the discovery of admissible evidence in the Jennifer Schweickert case; and, two, that the only conversations that I would have had on that subject would be privileged.

Q. And who would the client be?

A. Hunts Point Ventures.

Q. Was there ever a meeting at your office involving the Rudkins and Mark Phillips concerning Phillips' ownership or putative ownership in HPV?

A. There was a meeting at my office between Chad Rudkin and Mark Phillips concerning his non-ownership interest in Hunts Point Ventures.

Q. Do you recall approximately when that occurred?

John Du Wors                                        August 25, 2014

---

Page 174

1      A.   Shortly after Mr. Phillips was released from
2  federal prison.
3      Q.   Could it have been in November of 2012?
4      A.   Within the boundaries of reality, it could
5  have been any time if Mr. Phillips was released by
6  November of 2012.
7      Q.   Do you have a recollection as to whether or
8  not it occurred in November of 2012 sitting here
9  today?
10      A.   Not with sufficient specific -- specificity
11  to say that it indeed incurred in -- occurred in
12  November of 2012.
13          In fact, if it indeed was the case that
14  Mr. Schweickert sold his 50 percent ownership interest
15  in Hunts Point Ventures to the Rudkins on
16  November 19th, 2012, then I would infer that the
17  conversation with Mr. Phillips and the Rudkins at my
18  office did not occur in November of 2012 -- I'm
19  sorry -- in November of 2012 because I believe that
20  conversation took place substantially after the
21  transaction occurred between the Rudkins on the one
22  hand and Steve Schweickert on the other.
23      Q.   With regard to the meeting that you referred
24  to at your office which included Chad Rudkins and Mark
25  Phillips, were any others present at that meeting

---

Page 175

1  beside yourself?
2      A.   His last name is Rudkin.
3      Q.   Rudkin.  Sorry.
4      A.   It's not Rudkins plural.
5          And the meeting that I had with Chad and
6  Elizabeth Rudkin on one hand and Mark Phillips on the
7  other hand at my office about Mark Phillips'
8  non-ownership and possible participation in Hunts
9  Point Ventures going forward, the only people involved
10  in that meeting were myself, Chad Rudkin, Elizabeth
11  Rudkin, and Mark Phillips.
12      Q.   Do you recall if you took any notes
13  regarding what was discussed at that meeting?
14      A.   I did not.
15      Q.   Do you recall generally the subject matter
16  of the discussion that occurred at that meeting beyond
17  the description you've given already?
18      A.   Yes.
19      Q.   And what was discussed?
20      A.   Mark wanted a role in Hunts Point Ventures
21  and I believe part ownership and appointment as
22  officer and/or director.
23      Q.   And what was the outcome of the discussion?
24      A.   No resolution on that subject was reached.
25      Q.   Was that being opposed by Chad and Elizabeth

---

Page 176

1  Rudkin?
2      A.   Yes.
3          MR. KIMBALL:  Nothing further at this time.
4          MS. DeVET:  Thank you.  We'll reserve.
5          (Deposition recessed at 12:58 p.m.)
6          (Signature reserved.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 177

1          S I G N A T U R E
2
3      I declare under penalty of perjury under the
4  laws of the State of Washington that I have read my
5  within deposition, and the same is true and accurate,
6  save and except for changes and/or corrections, if
7  any, as indicated by me on the CHANGE SHEET flyleaf
8  page hereof.
9      Signed in _____, Washington, this
10  _____ day of _____, 2014.
11
12
13      _____
14      JOHN DU WORS
15      Taken:  August 25, 2014
16
17
18
19
20
21
22
23
24  Re:  Schweickert v. Hunts Point
     Cause No.:  13-CV-675
25  Lauren G. Harty, RPR, CCR #2674

---

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

John Du Wors                                                    August 25, 2014

Page 178

1           C E R T I F I C A T E
2    STATE OF WASHINGTON   )
                            ) ss.
3    COUNTY OF KING         )
4        I, the undersigned Washington Certified Court
5    Reporter, hereby certify that the foregoing deposition
6    upon oral examination of JOHN DU WORS was taken before
7    me on August 25, 2014, and transcribed under my
8    direction;
9        That the witness was duly sworn by me pursuant
10   to RCW 5.28.010 to testify truthfully; that the
11   transcript of the deposition is a full, true, and
12   correct transcript to the best of my ability; that I
13   am neither attorney for nor a relative or employee of
14   any of the parties to the action or any attorney or
15   counsel employed by the parties hereto, nor am I
16   financially interested in its outcome;
17       I further certify that in accordance with
18   CR 30(e), the witness was given the opportunity to
19   examine, read, and sign the deposition within 30 days
20   upon its completion and submission, unless waiver of
21   signature was indicated in the record.
22       IN WITNESS WHEREOF, I have hereunto set my hand
23   this 29th day of August, 2014.
24       _____
25           LAUREN G. HARTY, CCR #2674

Page 179

1
2        SEATTLE DEPOSITION REPORTERS, LLC
3          600 University Street, Suite 320
4             Seattle, Washington 98101
                  206.622.6661
5
6           C H A N G E   S H E E T
7    PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
     SHOWING PAGE, LINE AND REASON.
8    _____
9    PAGE  LINE  CORRECTION AND REASON
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22
23       _____
24       JOHN DU WORS
             Taken:  August 25, 2014
25

23 (Pages 178 to 179)

John Du Wors                                    October 10, 2014

Page 1

```
 1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                    IN AND FOR THE COUNTY OF KING

 3      _____

 4      MARK E. PHILLIPS,                )
                                         )
 5                 Plaintiff,            )
                                         )
 6            vs.                        )
                                         ) No. 14-2-03111-4 SEA
 7      JOHN DU WORS AND AMBER DU WORS,  )
        and their marital community      )
 8      comprised thereof, et al.,       )
                                         )
 9                 Defendants.           )
        _____

10

11             DEPOSITION UPON ORAL EXAMINATION

12                           OF

13             JOHN DU WORS - VOLUME ONE

14      _____

15             777 108th Avenue N.E., Suite 2170

16                  Bellevue, Washington

17

18

19

20

21

22

23

24      DATE:  Friday, October 10, 2014

25      REPORTED BY:  Donald W. McKay, RMR, CRR, CCR 3237
```

John Du Wors                                    October 10, 2014

Page 2

1                    A P P E A R A N C E S

2

         FOR THE PLAINTIFF:
3

                  MARK D. KIMBALL, ESQ.
4                 BRANDON P. WAYMAN, ESQ.
                  MDK Law Associates
5                 777 108th Avenue N.E.
                  Suite 2170
6                 Bellevue, Washington 98004
                  425.455.9610
7                 mark@mdklaw.com
                  bwayman@mdklaw.com
8

         FOR THE DEFENDANTS:
9

                  SAM B. FRANKLIN, ESQ.
10                Lee Smart, P.S.
                  1800 One Convention Place
11                701 Pike Street
                  Seattle, Washington 98101-3929
12                206.624.7990
                  sbf@leesmart.com
13

         ALSO PRESENT:
14

                  MARK E. PHILLIPS
15

16

17

18

19

20

21

22

23

24

25

John Du Wors                                        October 10, 2014

Page 3

```
 1                         I N D E X

 2   EXAMINATION BY                                      PAGE

 3   _____

     MR. KIMBALL........................................  7
 4

 5

 6                       E X H I B I T S

 7   NUMBER      DESCRIPTION                             PAGE

 8   _____

     Exhibit 1   Engagement Letter and Security           20
 9               Agreement dated May 25, 2010, with
                 attachments
10
     Exhibit 2   Letter dated June 9, 2010, to Hunts      45
11               Point Ventures, Inc. and Steve
                 Schweickert from John Du Wors,
12               re: Our agreement

13   Exhibit 3   Letter dated May 23, 2011, to            49
                 Stephen Schweickert from John
14               Du Wors, re: Our agreement

15   Exhibit 4   E-mail chain, the most recent dated      54
                 September 4, 2014, to Brandon Wayman
16               and Sam Franklin from Diana Carey,
                 re: Phillips v. Du Wors, et al.
17
     Exhibit 5   Document titled Waiver of Rights and     54
18               Privileges to Documents,
                 Correspondence and Other
19               Communications Regarding Hunts Point
                 Ventures, Inc.
20
     Exhibit 6   License Agreement entered into           68
21               April 25, 2008, by and between Mark
                 Phillips and Anything Box, Inc.
22
     Exhibit 7   Verbatim Report of Proceedings           83
23               Before the Honorable John C.
                 Coughenour, dated February 24, 2011,
24               in the case styled USA vs. Mark E.
                 Phillips
25
```

John Du Wors                                          October 10, 2014

Page 4

1                      E X H I B I T S (continued)
2       NUMBER         DESCRIPTION                                PAGE
3       _____

        Exhibit 8      Subscription and Contribution               90
4                      Agreement, dated October 17, 2008,
                       by and between MOD Systems, Inc.,
5                      and Mark E. Phillips
6       Exhibit 9      E-mail chain, the most recent dated         92
                       May 5, 2008, to Ron Braley from
7                      Mark E. Phillips, re: ABI
                       incorporation documents, with
8                      attachment
9       Exhibit 10     E-mail chain, the most recent dated         94
                       July 3, 2008, to Kenn Gordon,
10                     et al., from Kenn Gordon,
                       re: Anything Box stock purchase
11
12      Exhibit 11     E-mail chain, the most recent dated         96
                       July 6, 2008, to David Douglass from
                       Michael Morgan, re: Anything Box
13                     stock purchase
14      Exhibit 12     E-mail chain, the most recent dated         98
                       July 9, 2008, to Mark Phillips from
15                     Kyleen Cane, re: Board meeting via
                       conference call
16
17      Exhibit 13     E-mail chain, the most recent dated        101
                       August 30, 2008, to Mark Phillips,
                       et al., from David Douglass,
18                     re: FW: SEADOCS 50926777 License
                       Agreement (MOD) 4
19
20      Exhibit 14     Minutes of Meeting of the Board of         102
                       Directors of MOD Systems
                       Incorporated, June 20, 2008
21
22      Exhibit 15     Minutes of Meeting of the Board of         109
                       Directors of MOD Systems
                       Incorporated, September 17, 2008
23
        Exhibit 16     Minutes of Special Meeting of the          114
24                     Board of Directors of MOD systems
                       Incorporated, July 8, 2008
25

John Du Wors                                    October 10, 2014

Page 5

1                    E X H I B I T S (continued)
2        NUMBER        DESCRIPTION                              PAGE

3        _____

         Exhibit 17    MOD Systems Incorporated Written          118
4                      Consent for Shareholder Action in
                       Lieu of Special Meeting
5
         Exhibit 18    Agreement to Terminate Prior License      124
6                      Agreements Between Mark E. Phillips
                       and MOD Systems Incorporated and
7                      Between Mark E. Phillips and
                       Anything Box Incorporated
8
         Exhibit 19    Independent Contractor Services           129
9                      Agreement, between MOD and Meteor
                       International Group Corporation,
10                     entered into as of June 3, 2008

11       Exhibit 20    E-mail chain, the most recent dated       144
                       August 14, 2008, to Mark E. Phillips
12                     from David Douglass, re: FW: Final
                       Agreement for Meteor/Jan Jardin
13
         Exhibit 21    E-mail chain, the most recent dated       150
14                     October 1, 2010, to John Du Wors
                       from Peter Mair, re: FW: Extension
15                     of plea offer deadline

16       Exhibit 22    E-mail dated January 11, 2011, to         152
                       Doug Lower and Chad Rudkin from
17                     Steve Schweickert, re: Latest text
                       from JD
18
         Exhibit 23    Letter dated June 9, 2010, to Mark        161
19                     Phillips and Steve Schweickert from
                       John Du Wors, re: Waiver of
20                     Conflicts of Interest

21       Exhibit 24    Document titled Hunts Point Ventures      168
                       Nuclear Unit
22
         Exhibit 25    E-mail dated May 22, 2010, to Mark        173
23                     Phillips from John Du Wors,
                       re: MOD's IP
24

25

John Du Wors                                          October 10, 2014

Page 6

1                    E X H I B I T S (continued)

2        NUMBER         DESCRIPTION                        PAGE

3        _____

         Exhibit 26    E-mail dated April 10, 2011, to        179
4                      Steve Schweickert from John Du Wors,
                       re: HPV patent litigation
5
         Exhibit 27    E-mail dated June 11, 2010, to John     183
6                      DuWors from Steve Schweickert,
                       re: Strategy update meeting today at
7                      4 p.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Du Wors                                        October 10, 2014

                                                          Page 7

 1              Bellevue, Washington; Friday, October 10, 2014

 2                           10:07 a.m.

 3

 4     JOHN DU WORS                  called as a witness in the

 5                                   above-entitled cause, being

 6                                   first duly sworn, testified

 7                                   as follows:

 8

 9                   E X A M I N A T I O N

10     BY MR. KIMBALL:

11          Q.  Can you state your name for the record, please.

12          A.  John Du Wors.

13          Q.  Could you spell your last name.

14          A.  D-U space W-O-R-S as in Sam.

15          Q.  Mr. Du Wors, as you know, I represent, for

16     purposes of today's deposition, the plaintiff, Mark

17     Phillips, in this matter.  I'll be asking you some

18     questions under oath.  It will be your obligation to

19     answer each question truthfully and completely.

20              If you don't understand a question, please let

21     me know so I can rephrase it.  Because if you do proceed

22     to answer a question, I will assume that you did

23     understand it.

24              Of course, you know the rules, which are that if

25     you need to take a break, that's fine at any time.  It's

John Du Wors                                        October 10, 2014

Page 8

1       just that technically you can't take a break while a

2       question is pending.

3               Finally, I ask that you give audible answers.

4       If a question is answered with a yes or a no, of course,

5       it is helpful for the court reporter that it be answered

6       yes or no rather than an uh-huh or uh-uh.

7               I will do my best not to talk into you or over

8       your answers and I would ask that you do likewise.

9               What is your current age?

10      A.  Thirty-six.

11      Q.  You graduated from law school.  Is that correct?

12      A.  I did.

13      Q.  What law school is that?

14      A.  Seattle University.

15      Q.  What year?

16      A.  2003.

17      Q.  Do you hold a J.D. degree from that institution?

18      A.  I do.

19      Q.  Do you have any degrees other than a Bachelor's

20      degree in addition to the J.D.?

21      A.  No.

22      Q.  Where did you receive your B.A.?

23      A.  The University of Washington.

24      Q.  What year was that?

25      A.  The year 2000.

John Du Wors                                          October 10, 2014

Page 9

```
 1              Q.  What was your major?
 2              A.  English.
 3              Q.  You are licensed to practice in the State of
 4      Washington as an attorney.  Is that correct?
 5              A.  I am.
 6              Q.  When were you first licensed?
 7              A.  October of 2003, I believe.
 8              Q.  Are you licensed to practice law in any other
 9      states?
10              A.  Yes.
11              Q.  What states are those?
12              A.  California, New York, and in the federal court
13      of the Western District of Wisconsin.
14              Q.  Have there ever been any disciplinary
15      proceedings initiated against you by the California
16      State Bar Association?
17              A.  As phrased, I think the answer is no.
18              Q.  Have there ever been any complaints filed
19      against you in your capacity as an attorney in the State
20      of California?
21              A.  Yes.
22              Q.  When was that?
23              A.  I believe there have been two.  Go ahead.
24              Q.  I was going to ask you, what were the years?
25              A.  I'm just trying to remember.  There may have
```

John Du Wors                                    October 10, 2014

                                                        Page 10

 1      been three or four.  I think I've had three or four bar

 2      complaints filed against me, I think.  Maybe just three.

 3      The two that I'm talking about, I think are the only two

 4      in California.  I think that one was in the year 2013 or

 5      2014, and I think the other was in the year 2012.  It

 6      might have been 2013.

 7           Q.  Do you recall the name of the person or the

 8      company that made the complaint in 2013 or 2014?

 9           A.  Marcia Cano.  Last name spelled C-A-N-O.

10           Q.  What city does Ms. Cano live in?

11           A.  I don't know.

12           Q.  Do you know what city she lived in at the time

13      the complaint was filed?

14           A.  No.

15           Q.  Who was the complainant in the earlier bar

16      complaint you referred to?

17           A.  Attorney Dan Balsam.

18           Q.  That's B-A-L-S-O-N?

19           A.  B-A-L-S-A-M.

20           Q.  Do you know what city he practices in?

21           A.  Predominantly San Francisco, I believe.

22           Q.  Can you tell me briefly a summary of what the

23      allegations were in the 2013 or '14, the more recent

24      case.

25           A.  There were a lot of allegations.  I don't know

John Du Wors                                    October 10, 2014

1        that I can remember all of them.  But principally, I

2        believe Ms. Cano felt or said that I misadvised her

3        about the effect that filing bankruptcy could have on

4        the sexual harassment claim she was bringing.

5              Q.  Had Marcia Cano been your client?

6              A.  She had.

7              Q.  What was the result or outcome of that

8        complaint?

9              A.  It was summarily dismissed by the bar

10       association.

11             Q.  Did she file any kind of a civil lawsuit against

12       you?

13             A.  No.

14             Q.  Has she threatened to do so?

15             A.  No.

16             Q.  The earlier complaint you referred to, you

17       indicated was brought by a person named Dan Balsam.

18             A.  Yes.

19             Q.  Can you tell me briefly what the principal

20       allegations were in that matter.

21             A.  That I contacted his client by e-mail while his

22       client was represented by counsel.

23             Q.  What was the outcome of that complaint?

24             A.  It was summarily dismissed by the bar

25       association.

Case 2:13-cv-00675-RSM   Document 90-4   Filed 11/03/14   Page 60 of 238

Page 12

```
 1          Q.  You said there may have been other bar
 2     complaints as well.
 3          A.  I know there is one, but I think that's
 4     Washington.  I think that's it.  I think there have been
 5     a total of three.
 6          Q.  And none in New York?
 7          A.  No.
 8          Q.  When was the Washington bar complaint filed?
 9          A.  Somewhere between 2009 and 2012.
10          Q.  Do you recall the name of the complainant?
11          A.  Barely.  I think his first name was Russ,
12     R-U-S-S.  I think his last name was Stevens, but I'm not
13     sure.
14          Q.  What were the principal allegations in that bar
15     complaint?
16          A.  You know, I really didn't understand that bar
17     complaint very well.  The only allegation I recall was
18     that Mr. Stevens, if that was his last name, alleged
19     that I would be appearing on a case as counsel of record
20     for the client my law firm represented, but that I
21     actually did not appear as counsel of record alongside
22     three or four other attorneys in my firm.
23          Q.  What was the disposition of that bar complaint?
24          A.  It was summarily dismissed by the bar
25     association.
```

John Du Wors                                        October 10, 2014

1          Q.  Are there any bar complaints pending currently
2      in either California, New York, or Washington against
3      you, other than the ones that you've discussed just now?
4          A.  No.  Oh, I forgot, there is one more bar
5      complaint brought by Mark Phillips.
6          Q.  A moment ago, you used the term "my firm" to
7      describe the law firm where you work.  Is that correct?
8          A.  I did.
9          Q.  What firm is that?
10         A.  The law firm doing business as Newman | Du Wors,
11     which is an entity whose legal name is Newman & Newman,
12     Attorneys at Law, LLP.
13         Q.  Do you know if Newman & Newman LLP has
14     registered a trade name of Newman | Du Wors?
15         A.  I don't know.
16         Q.  Are you an owner or principal in that law firm?
17         A.  I don't know what you mean by "principal," so
18     that is vague.  As an owner, I'm going to assume what
19     you mean is equitable owner of the business entity,
20     meaning to say that I have some ownership interest in
21     the actual entity, itself.  The answer to that is no.
22         Q.  Do you receive a profit interest based on the
23     profitability of the firm?
24         A.  Yes.
25         Q.  But you don't have an equity interest in the

John Du Wors                                    October 10, 2014

                                                        Page 14

1       firm.  Is that correct?

2            A.  Correct.  I have a profit sharing bonus as part

3       of my W-2 wages.

4            Q.  So you do not receive a K-1?

5            A.  I do not.

6            Q.  How long have you been affiliated with

7       Newman | Du Wors or Newman & Newman LLP?

8            A.  Since May of 2006.

9            Q.  Between October 2003 and May of 2006, were you

10      working as an attorney?

11           A.  I'm sorry.  Ask that again.

12           Q.  Between October 2003 and May of 2006, were you

13      working as an attorney?

14           A.  Yes.

15           Q.  Where were you working?  What city?

16           A.  Two separate law firms.  From approximately

17      August of 2004 until May of 2006, when I left and came

18      to work at my current firm in Seattle, I previously had

19      been working at the law firm of Hunter Malloy &

20      Salcido, last name spelled S-A-L-C-I-D-O.  I worked

21      there for about two years.  That was in the City of

22      Pasadena, California.

23              And then before that, I had been working in the

24      City of Seattle for the law firm known as the

25      Blankenship Law Firm, B-L-A-N-K-E-N-S-H-I-P.

John Du Wors                                    October 10, 2014

```
                                                    Page 15
   1            Q.   When did you first meet Mark Phillips?

   2            A.   Summer of 2010.

   3            Q.   How did that meeting come about?

   4            A.   He came to my office.

   5            Q.   Did he contact you initially or did you contact

   6       him?

   7            A.   I don't remember for certain.  I do remember

   8       that his matter was referred to me by way of two

   9       different people independently.

  10            Q.   Who were those people?

  11            A.   One was Bernie Hansen, H-A-N-S-E-N; the other

  12       was Jim Smith.

  13            Q.   Is Bernie Hansen an attorney?

  14            A.   No.

  15            Q.   Is Jim Smith an attorney?

  16            A.   Yes.

  17            Q.   Do you know what city he practiced in at the

  18       time?

  19            A.   Jim?

  20            Q.   Yes.

  21            A.   At minimum, Seattle.  I couldn't tell you where

  22       else he might have practiced.

  23            Q.   Who is Bernie Hansen?

  24            A.   Bernie is just a social and professional

  25       acquaintance that I know from various interactions and
```

John Du Wors                                    October 10, 2014

Page 16

1      venues.  He's a business consultant.  I met him when he

2      was running the education network for a high-tech

3      business incubator in the Tri-Cities whose name I don't

4      recall.  I want to say it might have been called the

5      Three Rivers Education Network.  Basically, it was a

6      non-profit division of the Pacific Northwest National

7      Laboratory, operated by the Batelle corporation as sort

8      of a giving back kind of arm of the nuclear powerplant

9      down in Hanford.  He had sort of a stable of Ph.D. types

10     coming out as entrepreneurs, and Bernie led these sort

11     of classes for them and acquainted them with resources,

12     professional and otherwise, to try and help them out in

13     starting their entrepreneurial ventures.

14            At some point, by some fashion, Bernie and I got

15     into contact and he referred me a couple of cases.  But

16     separately, Bernie had also referred cases to my law

17     partner, Derek Newman, before I had even met Derek

18     Newman or joined the firm.  So Bernie and Derek had an

19     independent relationship with each other.

20            Additionally, Bernie is a Bainbridge Islander,

21     and I live on Bainbridge Island as well.  I know Bernie

22     like ten different ways.  I'm a co-founder in a company

23     called Green Canopy.  One of my fellow co-founders and

24     fellow shareholders is a guy named Peter Holland.  Peter

25     and Bernie were partners in a venture called Suma

Page 17

 1    Capital.

 2            I guess, to sum it all up, Bernie is just within

 3    my arena of professional colleagues because he does a

 4    lot of high-tech business.  And I'm a business and

 5    intellectual property lawyer, so we have bumped into

 6    each other a bunch of different ways since late spring,

 7    early summer of 2006.

 8        Q.  A moment ago, you indicated that you're a

 9    shareholder in a company called Green Canopy.  Is that

10    correct?

11        A.  I am.

12        Q.  Is that a limited liability company?

13        A.  I don't think so.  Our corporate structure is

14    made up of several different entities within our

15    corporate family.  I don't know that I recall what the

16    ultimate parent holding company's legal designation is,

17    whether it's an LLC or a corporation.  I think it's a

18    corporation named G2B Ventures, Inc.  G as in George,

19    number two, B as in boy, Ventures, Inc., I think.  It's

20    not that currently.  I think it was that at one point.

21    We may have converted.

22        Q.  There is one matter that I wanted to address as

23    well that I omitted a moment ago.  You indicated a

24    company name of Batelle.  Is that B-A-T-E-L-L-E?

25        A.  I don't know.  I have a vague recollection of

John Du Wors                                    October 10, 2014

 1      maybe having seen it on paper once.  I think it's
 2      B-A-T-T-E-L, but I'm not sure.
 3          Q.  Are they affiliated with the Batelle Institute
 4      in Seattle?
 5          A.  Tell me what the Batelle Institute does.
 6          Q.  It's a research organization located in the
 7      Laurelhurst area.
 8          A.  Probably so.  If I understand correctly -- to be
 9      clear, my ties to that company were non-existent or
10      barely existent.  I just showed up and gave a lecture
11      one time.  It wasn't even a lecture for Batelle.  I was
12      giving a lecture for the Pacific Northwest National
13      Laboratory, which I understood to be a subsidiary or
14      division of Batelle.  But they -- if I understand
15      correctly, they either -- I think they might be a
16      non-profit; or if they are a for-profit, they do mostly
17      government work, managing nuclear powerplants, I think.
18      So they have -- you know, in addition to their nuclear
19      powerplant management activities, I think they do a lot
20      of stuff relating to research and scientific innovation.
21      I guess I've always assumed they did that stuff as a way
22      of making themselves a little more cosmetically
23      acceptable, given the dirty association some people have
24      with what they do as their main business.
25          Q.  What kind of business is Green Canopy engaged

John Du Wors                                          October 10, 2014

Page 19

1    in?

2        A.  We buy residences, mostly in city fill -- mostly

3    in the City of Seattle, and we rehabilitate them with a

4    specific view toward enhancing environmental efficiency

5    and reducing their carbon footprint.  So we buy them,

6    typically on the cheap.  A lot of times, they're pocket

7    listings or other kinds of off-market deals.  We

8    redesign them and rebuild them.  When we first buy them,

9    we take a reading of their green gas emissions.  We then

10   do our rehab work, and we come in and take another

11   reading of their green gas emissions, show the delta as

12   part of the selling point associated with our efforts to

13   resell the home.  We resell the home through our sort of

14   team of brokers and try to make a profit.

15       Q.  Are you a shareholder in any other companies

16   besides Green Canopy, a shareholder or equity owner?

17       A.  I have -- oh, yes.  At minimum, I'm currently

18   the sole owner of an inactive corporation called

19   J.D. Du Wors, Inc.

20       Q.  You said that was currently inactive?

21       A.  Not inactive in terms of its state of

22   registration with the Washington Secretary of State, but

23   inactive in the sense that I haven't done any business

24   using it yet, but intend to do so in the future.

25       Q.  And you've never done business in the company,

John Du Wors                                    October 10, 2014

                                                        Page 20

1       J.D. Du Wors, I guess?

2              A.   No.  Not yet.

3              Q.   Any other companies?

4              A.   There are two businesses where I have been

5       promised stock or have contracted for stock -- actually,

6       skip the contracted part -- I've just been promised

7       stock.  But nothing has happened to cause me to be in

8       receipt of any stock in either of those businesses.

9              Q.   Is the consideration to be given by you for the

10      stock, should you receive it, based on legal services?

11             A.   No.  The general idea has been that I will sit

12      on the board and do consulting services and board

13      advisory.  I'm not on the board yet for either business.

14             Q.   Do you recall the names of either of those

15      businesses?

16             A.   One is called Farmhouse, Inc., and the other is

17      called Raddish, Inc.

18             Q.   Can you spell that, please.

19             A.   R-A-D-D-I-S-H.

20             Q.   Are both of those companies formed in

21      Washington?

22             A.   They are.

23                  (Exhibit 1 marked for identification.)

24      BY MR. KIMBALL:

25             Q.   Mr. Du Wors, you've been handed a document

John Du Wors                                    October 10, 2014

Page 21

1    marked as Exhibit 1.  Can you tell me if you've ever

2    seen that document before?

3        A.  I cannot tell you for sure if I have seen this

4    document before.

5        Q.  There appears to be a signature of John Du Wors

6    or label of John Du Wors on page five of Exhibit 1.  Can

7    you tell me if that appears to be your signature?

8        A.  Well, most of it looks like my signature, but

9    parts of it don't.  I've got a pretty consistent

10   signature.  You know, this might be mine.  I might have

11   signed this document.  I'd have to go back and compare

12   it to what's on our server back at the office to make

13   sure it's indeed mine.  But the J looks like my J.  The

14   rest of the signature doesn't look like my signature.

15       Q.  Did you enter into a written engagement

16   agreement with Mark Phillips for legal services?

17       A.  Yeah.  At least one.

18       Q.  Was at least one of those agreements entered

19   into on or about May 25th of 2010?

20       A.  I can't recall the precise date, but that sounds

21   approximately correct.

22       Q.  I'd like you to take a moment and look at

23   Exhibit 1 -- in particular, the first five pages -- and

24   let me know if you have any reason, sitting here today,

25   to believe that Exhibit 1 is not a true and correct copy

John Du Wors                                    October 10, 2014

Page 22

1        of an engagement agreement you and Mr. Phillips entered

2        into on or about May 25th of 2010.

3               A.   Do you mean Exhibit A?

4               Q.   Exhibit 1.

5               A.   Oh, I'm sorry.  I thought you meant Exhibit A to

6        the agreement.  So Exhibit 1, the retainer letter,

7        itself.

8                    Can I have that question read back.

9                    (Question read by the reporter.)

10                   THE WITNESS:  I just couldn't tell you either

11       way.  I'd have to compare it to the scanned copy we have

12       back on our server at the firm.  This is too long ago

13       for me to remember.

14       BY MR. KIMBALL:

15              Q.   With regard to what you've described as a

16       scanned copy on the server back at the firm, would that

17       be an unsigned copy or a signed copy?

18              A.   It would be signed.  We'd scan it after Mark

19       Phillips signed it, and then save it on the server in

20       some kind of an appropriate location.

21              Q.   Would the scanned copy also bear your signature

22       as well?

23              A.   Most likely.

24              Q.   Can you describe what the purpose of

25       representation was or what the nature of the

John Du Wors                                          October 10, 2014

Page 23

1    representation was going to be as described in

2    Exhibit 1.

3         A.   The nature of representation as described in

4    Exhibit 1, or the nature of representation as decided by

5    me and Mark when he decided to retain me?

6         Q.   Let's talk about first what was discussed

7    between you and Mark Phillips when he decided to retain

8    you.

9         A.   Well, I understood that Mark had a dispute with

10   MOD Systems and folks -- and/or some of the folks at MOD

11   Systems that he wanted me to help him handle.  He was

12   having representation ended or disengaged or terminated

13   by a law firm called Donovan Flora, and he needed me to

14   pick the case up from them.

15        Q.   Did the scope of representation, as you've just

16   described it, vary from that which is discussed in

17   Exhibit 1?

18        A.   Yes.

19        Q.   How did it vary?

20        A.   Well, let's see.  We appeared on matters styled

21   MOD Systems versus Mark Phillips, and Mark Phillips

22   versus MOD Systems.  I think we appeared on the case

23   styled Bob Arnold versus Mark Phillips, but I don't

24   recall when we appeared on that case.  I don't think we

25   appeared on the A Dot case.  We also appeared as Mark's

John Du Wors                                    October 10, 2014

Page 24

1     criminal counsel in the criminal prosecution brought by

2     the Federal Government for various federal fraud claims

3     that were initiated against Mark.  We represented Mark

4     with respect to his transfer of intellectual property to

5     Hunts Point Ventures.  I don't know what else ultimately

6     came of the representation besides those matters.

7              I need to use the restroom soon, so let me know

8     when you're in between questions.

9              MR. KIMBALL:  You can do it now.

10             THE WITNESS:  Okay.

11             (Recess taken from 10:35 to 10:40.)

12             MR. KIMBALL:  Back on the record.

13    BY MR. KIMBALL:

14        Q.  Mr. Du Wors, before the break, I was asking you

15    some questions about Exhibit 1 and also your

16    representation of Mark Phillips.  Do you recall which

17    cases you actually entered into a -- strike that -- in

18    which you executed a notice of appearance?

19        A.  I'm pretty sure I just answered that question,

20    so I'll refer to my previous answer.  But once again, I

21    believe it was the case that we appeared on MOD Systems

22    versus Mark Phillips, Mark Phillips versus MOD Systems,

23    Bob Arnold versus Mark Phillips, and the United States

24    of America versus Mark Phillips.

25        Q.  And the last case was the criminal case that you

John Du Wors                                    October 10, 2014

Page 25

1       referred to a moment ago?

2           A.   Correct.

3           Q.   Did Mr. Phillips ask you to enter an appearance

4       on his behalf in the criminal case that you referred to?

5           A.   I believe so, yeah.

6           Q.   Did he discuss with you the reason why he wanted

7       you in the case?

8           A.   I don't have a recollection of a particular

9       conversation in that regard.  I think it would have been

10      the case that he was more agreeing with the

11      recommendations of Peter Mair, which was that Pete Mair

12      felt like he couldn't handle the case on his own because

13      he didn't really understand the intellectual property

14      and corporate law components of the case; rather Pete

15      was sort of your typical experienced criminal defense

16      lawyer who got the criminal procedure aspects of the

17      case and, you know, the general federal torts -- federal

18      claims being asserted, but didn't really understand

19      shareholder voting and patents and stuff like that.

20          Q.   So your involvement in the case was relating

21      more to the substantive issues involving IP and

22      corporate governance as opposed to criminal procedural

23      issues?

24          A.   That was certainly the idea, yeah.  I mean, I

25      don't do criminal defense work.  Besides Mark's case, I

John Du Wors                                October 10, 2014

Page 26

1       think I've probably only dabbled in one or two cases

2       over the course of my career, mostly as favors for

3       friends.

4              What happened was that Mark had previously

5       retained Dave Bukey, who I think was regarded as very

6       good, but had run up a fee bill.  He was a private

7       attorney that Mark couldn't really afford.  Mark didn't

8       have any money at that point.  I think we're talking

9       about either very late in 2010 or very early in 2011.

10      Dave Bukey gave a fee estimate of something in the range

11      of a million dollars to complete the trial.  At that

12      point, Hunts Point Ventures, I think was Mark's only

13      source of funding for either criminal defense work or

14      his civil litigation.

15             So Steve Schweickert over at Hunts Point

16      Ventures asked me if I could proceed with what I said I

17      might be able to do, which was tap Tom Hillier on the

18      shoulder for a favor.  Tom is a social acquaintance of

19      mine and kind of a professional acquaintance of mine and

20      also a neighbor on Bainbridge Island.  Tom, at the time,

21      was running the federal office of public defense here in

22      Seattle, which is the entity that normally would have

23      represented Mark Phillips in his criminal defense case,

24      except that they had already accepted representation of

25      Jan Wallace following Jan Wallace's receipt of a

John Du Wors                                          October 10, 2014

Page 27

1      so-called target letter, which puts her on notice that
2      the Federal Government is investigating her for
3      potential criminal claims.  It's the triggering event
4      that entitles her to receive public defense if she can't
5      afford private criminal defense.
6            Anyway, Tom Hillier's office had a conflict --
7      Q.  Can you give me an --
8      A.  I wasn't finished.
9            -- and because of the conflict, couldn't
10     represent Mark, himself.  So I asked Tom Hillier if he
11     could find Mark a panelist from the public defense
12     panel, but not one that would be new and didn't know
13     what he or she was doing, but rather someone with a lot
14     of experience that would take interest in the case.  As
15     a favor to me, Tom tapped Pete Mair.
16           At that time, Mark was, I think, the biggest
17     white-collar criminal prosecution that had come through
18     the Western District of Washington in years and years.
19     They thought it was, you know, another Madoff case.
20     They were ultimately wrong.  That Madoff case they were
21     looking for ended up coming shortly after Mark's
22     conviction with a criminal defendant named Berg.  But in
23     any event, Tom didn't have any trouble getting the
24     interest of a big-time criminal defense lawyer on the
25     panel, which was Pete Mair.  Then, as I told you, Pete

John Du Wors                                    October 10, 2014

                                                        Page 28

1        said he didn't understand the corporate or IP stuff, so

2        he needed me to sort of ride along sidesaddle and help

3        out.

4            Q.  With regard to the MOD Systems v. Phillips

5        matter, can you tell me, in your own words, your

6        understanding of the scope of representation and the

7        services you were to provide in that case.

8            A.  In MOD Systems versus Phillips.

9            Q.  Yes.

10           A.  Gosh, without looking at the documents, I'd have

11       trouble telling you everything; but ultimately, what it

12       amounted to was representing Mark, to defend Mark

13       against MOD Systems' tort claims against him, including

14       but not limited to fraud, and I don't remember what

15       else.  Also, to represent Mark Phillips in his pursuit

16       of a $5 million license fee from MOD Systems.

17               Initially, I think there was discussion of my

18       firm representing Mark with respect to the arbitration

19       that ensued from Bob Arnold's derivative demand, but I

20       think -- I think I had been retained for like a day or

21       something before that arbitration judgment issued.  And

22       there was some talk about trying to potentially appeal

23       that arbitration order.

24           Q.  What kind of work did you actually do in the MOD

25       Systems v. Phillips case?

John Du Wors                                        October 10, 2014

                                                           Page 29

 1          A.  I couldn't tell you which captioned case was
 2      where the work took place.  I think they might have been
 3      all consolidated at some point.  The litigation was
 4      fragmented and a little scattered.
 5              For instance, I can tell you it's in the Mark
 6      Phillips versus MOD Systems case that Mark was suing
 7      for, ultimately, breach of contract based on the failure
 8      of MOD Systems to pay Mark a $5 million license fee owed
 9      to him by virtue of an agreement that had been entered
10      into, I think, in August of 2008, maybe September
11      2008 -- anyway, in the fall of 2008, I think -- where
12      Mark Phillips contributed title to some intellectual
13      property and license rights to some other intellectual
14      property in exchange for an agreed payment of five
15      million bucks.
16              In another lawsuit brought against Mark, MOD
17      Systems was seeking damages and rescission in
18      association with that license and contribution
19      agreement, as well as, I think, damages based on some
20      other stuff I don't entirely remember.
21              So we appeared, you know, anyway, on one or more
22      of -- I think we appeared on multiple of those matters,
23      but ultimately began the process of fighting to try and
24      get Mark either a return of the title and license rights
25      to the intellectual property that he had contributed one

John Du Wors                                    October 10, 2014

Page 30

1       way or another to MOD Systems in the fall of 2008, or,

2       alternatively, his five million bucks.

3               When we first appeared, I think kind of the

4       first order of business was to try to untangle what Mark

5       referred to as a Gordian knot, which was a big mess

6       associated with an order compelling production of some

7       computer hard drives that the Court found Mark had in

8       his possession.  Mark had not produced them.  I think

9       the Court had issued an order compelling production and,

10      I think, an associated sanctions order.  In other words,

11      if Mark didn't produce them by a particular day,

12      sanctions in some amount were going to start issuing at

13      a daily rate of some amount.  I think we had concerns

14      about that, because the hard drives that had been the

15      subject of the order to compel also contained some

16      privileged information.  I think the order compelling

17      production also said that we, as his attorneys, or

18      whoever was serving as his counsel of record, wasn't

19      allowed to look at the hard drives before turning them

20      over to opposing counsel, which we viewed as problematic

21      because it restrained our ability to review them for

22      privilege and create a privilege log associated with

23      whatever documents should not be produced to MOD Systems

24      in that case.

25          Q.  Did you prepare any pleadings, such as

John Du Wors                                         October 10, 2014

1       complaints, amended complaints, answers, counterclaims,

2       or amended answers or counterclaims in the MOD Systems v.

3       Phillips case?

4           A.  Well, it depends on your definition of

5       pleadings.  We prepared lots of documents in that case.

6       I don't know if we prepared any of the pleadings that,

7       you know, asserted claims or defenses in that case, but

8       we certainly brought a lot of motions and defended a lot

9       of motions.

10          Q.  What was the outcome of the claims against Mark

11      Phillips by MOD Systems in that case?

12          A.  All of the claims by and between Mark Phillips

13      and MOD Systems were resolved by way of a settlement.

14          Q.  When did that settlement occur?

15          A.  Sometime in the end of 2010 or beginning of

16      2011.

17          Q.  Did you represent Mr. Phillips in those

18      settlement discussions?

19          A.  I did.

20          Q.  Can you describe generally what the settlement

21      terms were?

22          A.  Not without violating the confidentiality order.

23      I would have to -- I'd have to do a bunch of things.

24      I'd have to have this transcript sealed at minimum.  I

25      would have to review the settlement agreement, itself,

John Du Wors                                    October 10, 2014

                                                        Page 32

 1      to see if I'm even allowed to tell you without a motion

 2      to compel.

 3           Q.   With regard to the confidentiality order --

 4           A.   Order or provision within the agreement?

 5           Q.   Provision within the agreement.

 6           A.   Yes?

 7           Q.   Did Mr. Phillips sign that agreement?

 8           A.   Which agreement?  The settlement agreement?

 9           Q.   The settlement agreement which contained the

10      confidentiality provision.

11           A.   As I recall.

12           Q.   Was the settlement agreement that you referred

13      to a moment ago the result of going through a formal

14      mediation or settlement conference process?

15           A.   No.

16           Q.   So no mediator, such as someone working at JAMS

17      or JDR or similar entities, was used to achieve that

18      settlement.  Correct?

19           A.   Well, I mean, I guess that depends on how you

20      analyze it.  Mark had been through formal mediation on

21      those claims.  I don't know who the mediator was.  But

22      he had been at that mediation, represented by my

23      predecessor counsel, which was either Mark Johnson at --

24      boy, what the hell is the name of that firm?

25           MR. FRANKLIN:  Johnson Flora.

John Du Wors                                          October 10, 2014

                                                          Page 33

1                THE WITNESS:  Mark Johnson at Johnson Flora.

2                Is there a Donovan in that firm's name?

3                MR. FRANKLIN:  Donovan Flora is one guy.

4                THE WITNESS:  Donovan Flora is what it is.

5        Okay.

6                Mark had been represented either by Mark Johnson

7        from Johnson Flora or Tony Gewald from Lasher Holzapfel.

8                So, I mean, yeah, the settlement came following

9        mediation efforts in that respect.

10       BY MR. KIMBALL:

11           Q.  Did you enter a formal notice of appearance on

12       behalf of Mark Phillips in the Arnold v. Phillips case?

13           A.  Yep.  You'd have to specify a little bit -- oh,

14       I beg your pardon.  The answer is yes.

15           Q.  When did that occur?

16           A.  Oh, I don't know.

17           Q.  Did you represent any other defendants in the

18       Arnold v. Phillips matter?

19           A.  No -- oh -- I don't remember.  I suppose I might

20       have represented A Dot or another of Mark's entities.  I

21       just don't recall.

22           Q.  Can you describe generally what you understood

23       to be the scope of your work in the Arnold v. Phillips

24       matter.

25           A.  Well, the scope of that work was to defend the

John Du Wors                                    October 10, 2014

Page 34

1      claims being asserted against Mark.  I can only

2      generally describe what those claims were.

3            Bob Arnold had been an investor in Banana

4      Corporation, which I think had also, at one time or

5      another, been known as Meta-Wallet.  And Arnold had

6      asserted a derivative demand with respect to Banana

7      Corporation, alleging that Mark Phillips had wasted or

8      misappropriated Banana Corporation assets and funds.

9            Mark responded to the derivative demand by

10     Arnold by appointing a demand review committee to

11     investigate the appropriateness of Arnold's derivative

12     demand and reach a conclusion as to whether Banana

13     Corporation should take action against Mark Phillips

14     and/or any other third party in response to that

15     derivative demand.

16           As I recall, Jim Smith had been vested with

17     power of attorney on behalf of the corporation, both to

18     investigate those claims and also to compromise them.

19     And Jim Smith, I believe, resolved the claims asserted

20     by Arnold against Banana Corporation by getting a mutual

21     release with Arnold -- by and between Arnold and Banana

22     Corporation, and assigning all of Banana Corporation's

23     rights to sue Mark Phillips and other parties to Bob

24     Arnold or perhaps Bob Arnold's designee.  I'm not sure.

25           So the civil action styled Arnold v. Phillips

John Du Wors                                      October 10, 2014

1       was the case in which Arnold asserted those claims that

2       had been assigned to him from Banana Corporation for

3       breach of fiduciary duty and corporate negligence.

4            Q.  Did you file an answer in that case?

5            A.  I don't recall.

6            Q.  Do you recall if you ever filed a motion for

7       summary judgment in that case?

8            A.  I don't recall.

9            Q.  Did you withdraw as counsel from representing

10      Mr. Phillips in that case?

11           A.  We did.

12           Q.  When did that occur?

13           A.  I don't recall.

14           Q.  Why did it occur?

15           A.  Mark was in jail, and no one was paying us to

16      represent Mark; and because we weren't being funded, we

17      withdrew.

18           Q.  Do you recall whether or not you gave advance

19      notice of the withdrawal to Mr. Phillips?

20           A.  I believe we did, but I don't remember any

21      details associated with it.  Oh, no.  I do know that we

22      gave advance notice, because I got a piece of

23      correspondence from Mark about it.

24           Q.  Did you give notice in the form of a notice of

25      intent to withdraw?

John Du Wors                                    October 10, 2014

                                                        Page 36

1              A.  I don't know.  I think so, yes.

2              Q.  Do you recall if you filed a motion for an order

3       allowing you to withdraw?

4              A.  We did.

5              Q.  In that case?

6              A.  Yeah, I think so.  I mean, it was a long time

7       ago.  I don't recall.

8                  There were two separate sort of withdrawal

9       activities.  We filed a notice of intent to withdraw or

10      took whatever procedures were necessary to withdraw.  At

11      one point -- I want to say early in 2011 or '12 -- I'm

12      not sure.

13                 Then Jeff Smyth, counsel for Arnold, complained

14      about the appropriateness of that notice.  So shortly

15      after we -- I think because he wanted us to answer

16      Arnold's summary judgment motion on Phillips' behalf.

17      So we filed whatever documents were necessary to move

18      whatever his complaints were about it, and the Court

19      agreed with us and issued an order acknowledging our

20      withdrawal.

21                 And Mark Phillips -- I know that Mark Phillips

22      had received notice of the withdrawal, because when he

23      got our notice, either when he was in the Federal

24      Detention Center or Camp Sheridan, whichever of the two

25      he was in when he received that notice, he sent me

John Du Wors                                    October 10, 2014

Page 37

1          correspondence saying, "I thought Hunts Point Ventures

2          was supposed to pay for my continuing defense in the

3          Arnold case."

4               Q.  Did you reply or respond to his communication?

5               A.  I don't recall.

6               Q.  Did you ever talk to him about his concerns in

7          that communication?

8               A.  I don't recall.  I don't think that I ever had

9          access to communicate with Mark via telephone when he

10         was at Camp Sheridan.

11              Q.  Do you recall if Mark Phillips ever called you

12         regarding the withdrawal issue from prison or from jail?

13              A.  Not that I recall.

14              Q.  You indicated a moment ago that Jeff Smyth

15         questioned the appropriateness of the withdrawal.

16              A.  Yes.

17              Q.  What do you mean by that?

18              A.  I don't recall.  He brought a motion for summary

19         judgment, and we said, "We note that you are putting us

20         on the certificate of service with respect to this

21         motion for summary judgment, but we're not counsel for

22         Phillips anymore."  And he said, "I believe your

23         withdrawal was invalid in some respect, so I'm going to

24         deem it that you indeed did not withdraw, and you have

25         to answer for Phillips even though Phillips is in jail;

John Du Wors                                    October 10, 2014

Page 38

1        and if you don't answer for Phillips, I'm going to take

2        the position that he missed the opposition deadline for

3        a summary judgment motion, therefore, he'll lose the

4        summary judgment motion."  So we said, "All right.

5        Fine.  We'll take it to the Court."

6                We took it to the Court with some kind of an

7        ex parte motion.  The Court said, "Yep.  Nope, you've

8        withdrawn."  I think the outcome was that the Court

9        postponed Arnold's summary judgment motion until Mark

10       would be able to respond to it either from prison or

11       from outside of prison once Mark was released.  I don't

12       recall.  But the Court essentially ordered that we were

13       withdrawn, and Smyth agreed, and Mark was on his own to

14       answer that summary judgment motion.

15           Q.  You indicated that you filed an ex parte motion

16       to get that determination by the Court.  Did you give

17       Mr. Phillips notice of that motion?

18           A.  I don't recall even if it was an ex parte

19       motion.  I think it was something along those lines.

20       But I don't remember the procedural details associated

21       with that.  I'd have to look at our file on that case to

22       tell you for sure.

23           Q.  Was the judge who made the decision on your

24       withdrawal Erlick?

25           A.  I don't know.  At least I don't recall.

John Du Wors                                    October 10, 2014

Page 39

1        Q.  Did you file any kind of response in opposition

2    to the pending motion for summary judgment prior to your

3    cessation of work and/or withdrawal?

4        A.  No.

5        Q.  Do you recall if you entered a notice of

6    appearance on behalf of Mark Phillips in an A Dot v. Bay

7    case?

8        A.  I don't recall having done that.  I believe that

9    I did not.

10       Q.  Do you recall what the nature of that case was?

11       A.  I believe it was a case brought in federal court

12   under the Computer Fraud and Abuse Act, among perhaps

13   other statutes.

14       Q.  Do you know who the plaintiff was in that case?

15       A.  I believe, as the case styling reflects, that it

16   was A Dot Corporation.

17       Q.  Was Mark Phillips behind that; do you know?

18       A.  Behind that?

19       Q.  I'll rephrase it.  Was Mark Phillips the real

20   party in interest behind the A Dot filing?

21       A.  I don't know what you mean by "real party in

22   interest."  Mark Phillips was behind a lot of things.

23       Q.  Was Mark Phillips associated with A Dot at the

24   time that the lawsuit was filed?

25       A.  I don't have independent personal knowledge of

John Du Wors                                    October 10, 2014

                                                      Page 40

1        what Mark's role with respect to A Dot was, except that

2        he told me he owned A Dot.

3            Q.  Do you know if you ever drafted a complaint in

4        the Phillips v. MOD case?

5            A.  I don't believe that I did, but I don't recall.

6        Someone drafted a complaint, because the action was

7        pending.  The jurisdiction had been opened on a case.

8            Q.  What court was that case pending in?

9            A.  I think it was King County.

10           Q.  King County Superior Court?

11           A.  Yes.

12           Q.  Did you enter a notice of appearance in that

13       case?

14           A.  Well, we appeared as counsel of record in the

15       case.  I don't know what document it was that initiated

16       or effectuated our appearance as counsel of record for

17       Mr. Phillips in that case.  It might have been a notice

18       of appearance or some other document.

19           Q.  Mr. Du Wors, I note that as you're testifying

20       now, you are looking at your phone.  Are you looking at

21       your phone for purposes of refreshing your memory or

22       recollection?

23           A.  No.  I have a case styled Peterson versus

24       X2 Biosystems.  And we just got an order from the Court

25       on a motion to compel that I brought successfully.  And

John Du Wors                                    October 10, 2014

Page 41

1     I've been waiting on pins and needles to find out what

2     would happen with the motion.  Having seen an e-mail

3     coming from the Court, I wanted to read the order that

4     was attached to the e-mail as a PDF so I could see what

5     indeed occurred as the outcome, which turns out to be a

6     happy event for me.

7          Q.  Do you recall any instructions from Mark

8     Phillips concerning whether or not a complaint should or

9     should not have been filed in the Phillips v. MOD matter?

10         A.  I don't recall any such instructions as I sit

11    here.

12         Q.  Did Mark Phillips ever make a payment of a

13    retainer or any deposit to you for representation in any

14    case or group of cases?

15         A.  My recollection on that point is vague and hazy.

16    I know that Mark was not able to fund the full requested

17    retainer, but eventually Hunts Point Ventures did fund a

18    retainer to commence work in the Phillips versus MOD and

19    MOD versus Phillips cases.

20         Q.  Do you recall what that retainer amount was?

21         A.  No.  It was either a retainer of $50,000 or it

22    was a smaller retainer with a budget of $50,000.  I

23    think I told Mark and the folks over at Hunts Point

24    Ventures that I would need about 50,000 bucks to file a

25    series of five or six rapid-fire emotions -- emotions --

John Du Wors                                          October 10, 2014

                                                              Page 42

1        I think that's a Freudian slip -- five or six rapid-fire

2        motions and oppositions and related papers in order to

3        try and get that civil litigation back on its wheels

4        because it was, as Mark described, a Gordian knot when

5        it came to me.  I think I told those guys to set aside

6        50 grand so I could do a bunch of aggressive stuff to

7        try and set it straight and see if we could move forward

8        on it.

9            Q.  Did you do what you've just characterized as a

10       bunch of aggressive stuff?

11           A.  Yeah.  Oh, yeah.  That was a period where there

12       was a lot of aggressive motion practice all early on.

13       Yeah, had the whole firm working on it.

14           Q.  What were those steps?

15           A.  I don't remember.  It was a bunch of motions, I

16       think at least one or more of them relating to that

17       discovery order that required Mark Phillips to produce

18       those hard drives without showing them to his counsel.

19       I don't remember what the outcomes of those were.

20           Q.  Was there a period of time in which you believed

21       that Mark Phillips had not paid the retainer or fee

22       deposit that he had agreed to do?

23           A.  Well, sure.

24           Q.  When did that occur?

25           A.  Well, I'm looking at this Exhibit 1 here, which

John Du Wors                                          October 10, 2014

Page 43

 1          is dated May 25, 2010.  Assuming that is either the
 2          original retainer agreement or one of the early retainer
 3          agreements we entered into with Mark Phillips, then I
 4          can tell you that at or kind of around that time, we had
 5          an initial agreement with Mark that he would fund a
 6          retainer by some amount, only to find out that Mark
 7          didn't have any money to fund that retainer or
 8          completely fund that retainer.  So instead, we
 9          negotiated that he would grant us a lien on his condo in
10          order that we would have some kind of security
11          associated with Mark's retention of us.  But as it
12          turned out, Mark had already granted a security interest
13          in that condo in favor of the law firm of Smith
14          Hennessey, acting as assignee for the benefit of
15          creditors of Banana Corporation, without telling us, and
16          without telling Smith Hennessey that he was doing that
17          in favor of us.  As a result, we, I think, recorded a
18          perfecting notice in the form of, I believe, a short
19          form deed of trust, giving us superiority over Smith
20          Hennessey for a brief period, until we agreed to
21          subordinate to Smith Hennessey with respect to that
22          security interest, which subordination placed us out of
23          money, as it were, with respect to our putative lien on
24          Phillips' condo.  So we were required to look elsewhere
25          for greater security.

John Du Wors                                    October 10, 2014

Page 44

1          Q.  Were there any written agreements concerning the

2     transaction you just described authorizing the placement

3     of a deed of trust on the condo?

4          A.  Yeah.  Newman & Newman's placement of a deed of

5     trust on the condo?

6          Q.  Yes.

7          A.  Yeah.

8          Q.  Those are between your firm or the firm of

9     Newman & Newman and Mark Phillips?

10         A.  As I recall, yeah.

11         Q.  They were in writing?

12         A.  Yeah.

13         Q.  Did any other person or entity contribute to any

14    fee deposit or retainer for the benefit of Mark Phillips?

15         A.  Hunts Point Ventures, as I recall.

16         Q.  How much was the amount on that retainer or fee

17    deposit?

18         A.  Well, like I told you, it might have been

19    $50,000 or it might have been something less with a

20    corresponding budget of 50,000, but I don't recall.

21         Q.  With regard to Exhibit 1, were there any

22    documents ever executed by either you or someone at

23    Newman & Newman and Mark Phillips which explicitly

24    modified any of the terms set forth in Exhibit 1?

25         A.  I don't recall.

John Du Wors                                          October 10, 2014

Page 45

1              (Exhibit 2 marked for identification.)

2       BY MR. KIMBALL:

3          Q.  You've been handed a document marked as

4       Exhibit 2.  I'd like you to take a look at that document

5       and let me know if you have seen it before.

6          A.  Again, it looks familiar, but I'd have to

7       compare it with the documents we have on file back at my

8       firm to ensure that it is indeed authentic.

9          Q.  Do you recall signing an agreement on or about

10      June 9th of 2010 in which Hunts Point Ventures and Steve

11      Schweickert were identified as clients?

12         A.  Yes.  On or about that date.  Approximately in

13      that range, yeah.

14         Q.  Looking at page five of Exhibit 2, do you have

15      any reason to doubt that that is a copy of the page

16      bearing your signature?

17         A.  You know, it's a funny deal.  Again, it kind of

18      looks like my signature.  I would be happy and ready to

19      believe that that is indeed my signature, but a

20      non-ordinary version of it.  It looks like my J.  The

21      rest doesn't look that much like how I normally sign my

22      name.  But it wouldn't surprise me if that indeed was my

23      signature and I was just doing a kind of quick short

24      form that day.

25         Q.  In May and June of 2010, did you have and use a

John Du Wors                                          October 10, 2014

Page 46

 1      pre-made signature stamp?

 2          A.  No.  Never have.

 3          Q.  Can you describe generally what your

 4      understanding of the scope of representation was as

 5      referred to in Exhibit 2.

 6          A.  Well, I think the document speaks for itself, so

 7      I find the question objectionable on that basis.  But

 8      the text here says, "You have engaged us to represent

 9      you, Mark Phillips and Hunts Point Ventures..., in the

10      following matters:  MOD Systems Incorporated, et al.,

11      versus Mark Phillips, et al., King County Superior Court

12      Case No. 09-2-07963-3 SEA; Robert Arnold, et al., versus

13      Mark Phillips, et al., King County Superior Court

14      Case No. 10-2-10227-2 SEA; A Dot Corporation v. Anthony

15      Bay, et al., Western District of Washington Case

16      No. 2:10-cv-00549-RSM."

17          Q.  What were the issues involving Hunts Point

18      Ventures in the MOD Systems v. Mark Phillips case which

19      is identified on page one of Exhibit 2?

20          A.  Hunts Point Ventures had agreed to show up and

21      fund Mark Phillips' litigation position in his

22      litigation with MOD Systems in exchange for an

23      assignment of Mr. Phillips' intellectual property.  I

24      think the funding obligation on the part of Hunts Point

25      Ventures was capped at a million dollars.

John Du Wors                                           October 10, 2014

Page 47

1          Q.  How were you going to be representing Hunts

2     Point?  What specifically were you going to be doing to

3     advance the interests of Hunts Point Ventures in that

4     case?

5          A.  Well, I don't know about advance their interests

6     in the sense of advancing their interest in the

7     litigation.  I think the question is a little bit vague

8     on that point.  So I'm not totally sure how to answer it.

9               More or less, Hunts Point Ventures, kind of like

10    an insurance company, had agreed to be the obligee --

11    beg your pardon -- the obligor on Mark Phillips'

12    attorney fee obligation.  So, as a guarantor, we wanted

13    to have a retainer agreement with them directly, putting

14    them on the hook for those fees to fund Mark Phillips.

15              Additionally, they had dealings directly with

16    Mark Phillips, including but not limited to the

17    transaction involving the assignment of Mr. Phillips'

18    intellectual property in exchange for the extension of

19    credit associated with those attorneys' fees.

20         Q.  Was Hunts Point Ventures a party in the Robert

21    Arnold v. Mark Phillips, et al. matter?

22         A.  Not as I recall.

23         Q.  Was Hunts Point Ventures a party in the A Dot

24    Corporation v. Anthony Bay case that's referred to on

25    page one of Exhibit 2?

John Du Wors                                    October 10, 2014

Page 48

```
 1           A.  Not as I recall.
 2           Q.  Do you recall the dollar amount that was paid to
 3      you or your firm by Hunts Point Ventures pursuant to
 4      Exhibit 2?
 5           A.  Pursuant to Exhibit 2?
 6           Q.  Yes.
 7           A.  No.
 8           Q.  Take a look, if you would, at paragraph five on
 9      page two of Exhibit 2.
10           A.  Paragraph two on page five.
11           Q.  Paragraph five on page two of Exhibit 2.
12           A.  Paragraph five on page two.
13           Q.  Specifically, there is a sentence, the second
14      sentence in that paragraph, which reads, "We have agreed
15      that you will deposit a retainer in the amount of
16      $50,000."  Do you see that text?
17           A.  I see that.  I do.
18           Q.  Do you know if that was paid?
19           A.  As I testified before, I don't have an
20      independent recollection of whether or not that was
21      paid.
22           Q.  Who would know whether or not that was paid?
23           A.  Probably Laura Kimball, our law firm
24      administrator.
25           Q.  How do you spell her name?
```

John Du Wors                                          October 10, 2014

                                                            Page 49

    1            A.  L-A-U-R-A.

    2            Q.  And the last name?

    3            A.  K-I-M-B-A-L-L.

    4            Q.  Was she the firm administrator at the time that

    5       Exhibit 2 was entered into?

    6            A.  I believe so, but I don't specifically know.

    7            Q.  She's still working at Newman & Du Wors?

    8            A.  She is.

    9            Q.  Do you recall if you filed any pleadings on

   10       behalf of Hunts Point Ventures in any of the three cases

   11       which are identified in the first paragraph on page one

   12       of Exhibit 2?

   13            A.  Can I have that question read back, please.

   14                (Question read by the reporter.)

   15                THE WITNESS:  I don't believe so.

   16                (Exhibit 3 marked for identification.)

   17       BY MR. KIMBALL:

   18            Q.  Mr. Du Wors, you've been handed a document

   19       marked as Exhibit 3.  Have you ever seen this document

   20       before?

   21            A.  Again, it looks familiar.  Specifically, that it

   22       may be or is the retainer agreement we entered into with

   23       Hunts Point Ventures and Steve Schweickert for the

   24       contingent fee patent litigation we did for them, but I

   25       would have to compare it to the documents we have on

John Du Wors                                    October 10, 2014

Page 50

1     file back at the firm to tell you for sure that that's

2     what it is.

3          Q.  Exhibit 3 purports to be dated May 23rd of 2011.

4          A.  It sure does.

5          Q.  You indicated a moment ago that there was an

6     agreement that you entered into concerning patent

7     litigation and Hunts Point Ventures.  Was the agreement

8     that you recall entered into approximately on or about

9     May 23rd of 2011?

10         A.  Sometime within that general approximate time

11    frame, I believe.

12         Q.  Do you have any specific reason, sitting here

13    today, to believe that that is not your signature on

14    page five of Exhibit 3?

15         A.  Yes.

16         Q.  You do doubt that?

17         A.  I don't have an opinion either way, but there

18    are plenty of reasons to believe that that is not my

19    signature.

20         Q.  Sitting here today, do you believe that that is

21    your signature?

22         A.  I don't have an opinion either way.

23         Q.  Paragraph one on page one of Exhibit 3 is

24    titled, "Scope of Representation."  It reads, "The scope

25    of our representation is limited to representing you in

John Du Wors                                        October 10, 2014

                                                         Page 51

1        the dispute.  You hereby authorize us to file suit on

2        your behalf against digEcor and others based upon the

3        facts that you relayed to us."  Do you see that?

4             A.  Yes.

5             Q.  Who was digEcor?

6             A.  An entity that was the defendant in that

7        lawsuit.

8             Q.  That's Hunts Point Ventures, Inc., v. digEcor,

9        which was pending in the Western District of Wisconsin?

10            A.  I believe so.  I don't recall where we filed

11       that claim.  I think it's probably the Western District

12       of Wisconsin.

13            Q.  You indicated just now that you filed a claim.

14       Were you the author of the complaint in that case?

15            A.  I did not say that I filed a claim, so your

16       question misstates my prior testimony and contains

17       assumptions that are not true.  My law firm did file a

18       claim on behalf of Hunts Point Ventures against digEcor,

19       and I don't know what you mean by author.  But by this

20       time, at the firm, I was typically not the attorney in

21       charge of drafting initial pleadings.  I would typically

22       review, revise, finalize and often even sign initial

23       pleadings and other documents in cases, but it has been

24       some years since I've been the initial author of

25       anything that's gone out of my office other than e-mail.

John Du Wors                                          October 10, 2014

Page 52

1      Q.   Did you sign the complaint that was filed in the
2  Western District of Washington on behalf of Hunts Point
3  Ventures?
4      A.   That question is objectionable on multiple
5  bases, including but not limited to the fact that it
6  assumes facts not in evidence and misstates my prior
7  testimony.  My answer, subject to those objections, is
8  no.
9      Q.   Can you describe, in your own words, what the
10  issues were in the Hunts Point Ventures v. digEcor case
11  that was pending in the Western District of Wisconsin.
12      A.   The issues?  I don't know.  It was a claim for
13  patent infringement.
14      Q.   Who was asserting that there had been a patent
15  infringement?
16      A.   Hunts Point Ventures.
17      Q.   What did they base the assertion that there had
18  been a patent infringement on?
19      A.   A precomplaint analysis that my law firm had
20  conducted of the infringing nature of the accused
21  infringing device in that case.
22      Q.   Who at your law firm participated in the
23  investigation of that analysis?
24      A.   I couldn't tell you everyone that participated
25  in that investigation.

John Du Wors                                    October 10, 2014

Page 53

1       Q.  Can you tell me the people you recall.

2       A.  Myself and Derek Linke and probably others.

3       Q.  Before taking on representation of Hunts Point

4    Ventures in the matter in the Wisconsin court, did you

5    contact digEcor concerning the allegations that were

6    being made about their use of Hunts Point Ventures' IP?

7       A.  I don't think so.  That would be an unusual

8    practice.

9       Q.  Did you or your firm ever withdraw from

10   representation of Hunts Point Ventures in the case filed

11   in the Western District of Wisconsin as referred to in

12   Exhibit 3?

13      A.  Withdraw?  The matter was settled.  So I don't

14   know if you characterize it as withdrawal when

15   representation terminates by virtue of settlement and

16   closure of a particular piece of litigation.  But in any

17   event, the representation terminated by its own natural

18   causes.

19      Q.  Was there a written settlement agreement between

20   Hunts Point Ventures and digEcor?

21      A.  Yes.

22      Q.  When did that occur?

23      A.  I am not able to tell you that based on both

24   privilege and contractual confidentiality.

25      Q.  When you are referring to privilege and

John Du Wors                                          October 10, 2014

Page 54

1        contractual confidentiality, can you be more specific

2        about why you are invoking or using those terms.

3            A.   Well, my sources of information relating to the

4        resolution agreement with digEcor include the agreement,

5        itself, and my communications with representatives from

6        Hunts Point Ventures.  Communications with

7        representatives from Hunts Point Ventures are

8        privileged.  The settlement agreement is confidential.

9        I'm not allowed to talk about it.

10           Q.   Is that pursuant to the content of the

11       agreement, itself?

12           A.   The confidentiality provision within the

13       agreement, yes.

14                Let's take a break.

15                (Recess taken from 11:26 to 11:36.).

16                MR. KIMBALL:  I'm going to mark this as

17       Exhibit 4.

18                (Exhibit 4 marked for identification.)

19                MR. KIMBALL:  And this as Exhibit 5.

20                (Exhibit 5 marked for identification.)

21                MR. KIMBALL:  Go back on the record.

22                THE WITNESS:  When was the receivership

23       initiated?

24                MR. FRANKLIN:  The receivership was initiated, I

25       believe, in the latter part of '13.  November '13.  Does

John Du Wors                                    October 10, 2014

Page 55

1       that sound right, Mark; do you remember?

2                 MR. KIMBALL:  Yes.

3                 THE WITNESS:  Well -- okay.  If that is true,

4       then Exhibit 5 has no legal force and effect whatsoever.

5       Steve Schweickert can, you know, roll over in exchange

6       for his bribe as much as he wants to, but it doesn't

7       have legal effect with respect to Hunts Point Ventures'

8       rights.

9                 Diana Carey, assuming this is an authentic

10      e-mail from her -- I guess, on that point, Mr. Kimball,

11      can I rely on your representation, as counsel in this

12      matter, that Exhibit 4 is an authentic e-mail from Diana

13      Carey, counsel for the receiver?

14                MR. KIMBALL:  Yes, you can.

15                THE WITNESS:  Just to make sure she knew, so

16      that it was knowing and voluntary, you provided -- your

17      office provided her with a transcript of my depositions

18      in the Jennifer Schweickert case, so she knew what kind

19      of questions were being answered.

20                MR. KIMBALL:  I believe Mr. Wayman can answer

21      that question better.

22                MR. WAYMAN:  She's been provided with

23      transcripts from Jennifer Schweickert's case and your

24      previous deposition as well.

25                THE WITNESS:  What was my previous deposition?

John Du Wors                                    October 10, 2014

                                                    Page 56

1      I've only been deposed in the Jennifer --

2              MR. WAYMAN:  I'm sorry.  It was the Schweickert

3      case.

4              THE WITNESS:  But both transcripts have been

5      provided to her.

6              MR. WAYMAN:  Correct.

7              THE WITNESS:  You can confirm that, Mr. Kimball?

8              MR. KIMBALL:  I did not personally arrange for

9      their delivery, so I don't know.

10             THE WITNESS:  Mr. Wayman from your office

11     provided my two deposition transcripts.

12             MR. KIMBALL:  That's what he's indicated.

13             THE WITNESS:  Did you read those transcripts

14     before you provided them?

15             MR. WAYMAN:  Yes.

16             THE WITNESS:  So you saw the provision where it

17     was agreed that they would be treated as attorneys' eyes

18     only for purposes of this litigation until a written

19     stipulated protective order was entered into, before

20     they were shared with anyone, including your client?

21             MR. WAYMAN:  I don't believe that was in there.

22             THE WITNESS:  No, it was in there.

23             So you just sent out transcripts from that

24     deposition in violation of the stipulation we entered

25     into to treat them as attorneys' eyes only.

John Du Wors                                          October 10, 2014

Page 57

1            MR. KIMBALL:  I think we need to go off the

2      record to get the documents to inspect them.

3            THE WITNESS:  Let's stay on the record.

4            MR. FRANKLIN:  Finish what you're saying, John.

5      We're not going to take any action right now here.  If

6      you believe you've got what you need on the record,

7      let's conclude that and then let's get on with the

8      deposition.  I think you probably got what you want.

9            THE WITNESS:  All right.  Let's proceed.

10     BY MR. KIMBALL:

11        Q.  Mr. Du Wors, you've been handed documents marked

12     as Exhibits 4 and 5, which I have just confirmed that

13     Exhibit 4 is an e-mail from Diana Carey to my office;

14     and Exhibit 5 is a document provided to us, signed by

15     Steven Schweickert, waiving rights and privileges to

16     documents and communications involving Hunts Point

17     Ventures.

18            Are you continuing to assert, as you did before

19     the break, that there is a privilege between you and

20     Hunts Point Ventures; and that you are invoking that

21     privilege with regard to questions concerning

22     communications between you and Hunts Point Ventures in

23     the representation issues that are referred to in

24     Exhibit 3?

25        A.  Well, there certainly still is a privilege, but

John Du Wors                                October 10, 2014

Page 58

1       I'm relying on your representation as a member of the

2       bar that indeed this is -- that Exhibit 4 is an

3       authentic e-mail from Diana Carey, effectuating a broad

4       and unconditional and unlimited waiver with respect to

5       the privilege associated with those communications.

6           Q.  So turning back to the matter of the Wisconsin

7       Hunts Point Ventures v. digEcor case, you indicated

8       earlier that there was a settlement of the issues in

9       that case.  Correct?

10          A.  Correct.

11          Q.  And your testimony is that there was a

12      confidentiality clause contained within the settlement

13      agreement that has just been referred to.  Correct?

14          A.  Correct.

15          Q.  Was that a written agreement?

16          A.  It was.

17          Q.  Was the confidentiality clause contained in that

18      agreement subject to waiver by the parties, as you

19      understand them?

20          A.  What do you mean, subject to waiver?

21          Q.  So that the right to rely upon or invoke the

22      confidentiality provision in the settlement agreement

23      could be waived by the parties or a party who signed

24      that document?

25          A.  As phrased, I don't think I understand your

John Du Wors                                    October 10, 2014

Page 59

1       question in the slightest.  I think you're probably

2       conflating confidentiality as a feature of a written

3       contract with the attorney-client privilege in the hopes

4       of using Exhibit 4 as an excuse to inquire about the

5       substance and details of the settlement agreement

6       entered into between digEcor and Hunts Point Ventures,

7       but that would be legally erroneous.

8            Q.  Do you believe that you are permitted or not

9       permitted to testify about the content of the settlement

10      agreement involving HPV and digEcor?

11           A.  Not permitted.  And it is not on the basis of

12      privilege.

13           Q.  And specifically, it is on the basis of the

14      confidentiality clause in that document?

15           A.  Correct.  If it looks like most of them do,

16      you've got to give notice over to digEcor, and give them

17      a chance to object and be heard on motion before you can

18      get an order going into those agreements.  Unless you

19      get them from the receiver, who, of course, has the

20      right to breach that confidentiality agreement as much

21      as he wants to.

22           Q.  Is it your intention, then, not to answer any

23      questions concerning the settlement terms reached in the

24      HPV v. digEcor matter today?

25           A.  Not without a court order or direction by Hunts

John Du Wors                                          October 10, 2014

                                                              Page 60

 1      Point Ventures.  Even in the case of direction by Hunts

 2      Point Ventures, I'd have to look at the agreement to see

 3      if that's allowed, or whether or not we have to give

 4      notice of the inquiry to digEcor.

 5              MR. FRANKLIN:  Let me weigh in on this real

 6      briefly.  I think that even permission from HPV would

 7      not be sufficient.  My assumption is that this agreement,

 8      like most of these, particularly when it's a company

 9      like digEcor paying money -- they're the ones -- either

10      party -- in order to breach the confidentiality, you

11      have to get concurrence of both sides, I believe, is

12      typical, particularly -- it almost certainly would be

13      the case that you have to have permission from digEcor,

14      the payor, I believe.  I can't tell you that I've read

15      the provisions here.  So I believe that to be so.  It

16      has been so represented to me.

17      BY MR. KIMBALL:

18          Q.  Mr. Du Wors, when was the last time you looked

19      at the settlement agreement we've been discussing in the

20      last few minutes?

21          A.  I don't recall.

22          Q.  Is it your testimony that the agreement

23      contained a specific confidentiality clause?

24          A.  Yes.

25          Q.  Did you enter into any other agreements, either

John Du Wors                                    October 10, 2014

Page 61

```
 1       oral or in writing, with Hunts Point Ventures, to pursue

 2       any other patent infringement claims or cases?

 3            A.   I don't know whether we entered into additional

 4       agreements with them.

 5            Q.   Do you recall if you represented Hunts Point

 6       Ventures in any patent infringement matters other than

 7       the case we've been describing involving digEcor?

 8            A.   I did.

 9            Q.   What were those cases?

10            A.   Those cases included Hunts Point Ventures versus

11       Tonium, Hunts Point Ventures versus Research in Motion,

12       and Hunts Point Ventures versus Epson Corporation.

13            Q.   Let the record reflect that, apparently, you've

14       opened and are looking at a laptop computer.  Is that

15       correct?

16            A.   Sure.  Yeah.  That's fine.  I'm looking at --

17       I'm looking at the -- I'm looking at the transcript of

18       my first deposition in the Jennifer Schweickert case to

19       find the portion where you agreed to treat the

20       deposition as attorneys' eyes only.

21            MR. FRANKLIN:  Let's defer that until another

22       time, please, John, so we don't delay this deposition.

23            THE WITNESS:  I'm answering questions.  Keep

24       asking them.

25            MR. FRANKLIN:  All right.  Go ahead.
```

John Du Wors                                          October 10, 2014

Page 62

1          BY MR. KIMBALL:

2              Q.  Are you using your computer for the purpose of

3          refreshing your recollection relating to the questions

4          that are being interposed to you now?

5              A.  No.

6              Q.  With regard to the Hunts Point Ventures claims

7          against Tonium, what was the nature of those claims?

8              A.  Patent infringement.

9              Q.  Can you be more specific as to what was alleged

10         by HPV.

11             A.  Infringement by Tonium of a patent owned by HPV.

12             Q.  What kind of patent was this?

13             A.  What kinds of patents are there?

14             Q.  What did the patent concern?  What technology or

15         process?

16             A.  I don't recall.  It was either the buffering

17         technology or the playlist technology.

18             Q.  And the claim against Research in Motion, what

19         kind of technology or process was at issue in that case?

20             A.  I believe, the playlist technology.

21             Q.  And what was the technology or process involved

22         in the claim or case against Epson Corporation?

23             A.  Buffering.

24             Q.  Did HPV own the patents that were at issue in

25         those three controversies?

John Du Wors                                     October 10, 2014

                                                        Page 63

1          A.   That question calls for a legal conclusion with

2      respect to the clouding of title.  I have always

3      operated under the assumption that Hunts Point Ventures

4      did, at the time those claims were asserted, own title

5      to that intellectual property.

6          Q.   You indicated earlier, with regard to Mark

7      Phillips and the criminal case in which you provided

8      some representation, that there was another attorney, I

9      believe named Peter Mair in that matter.

10         A.   Correct.

11         Q.   Did you attend the trial in that matter?

12         A.   I did.

13         Q.   Were you there every day of the trial?

14         A.   I think so.

15         Q.   Was that a jury trial?

16         A.   It was.

17         Q.   Again, that was before Judge Coughenour.  Is

18     that correct?

19         A.   Yes.  For trial purposes.  It was before other

20     judges for certain pretrial matters.

21         Q.   Did you attend the sentencing hearing after the

22     jury had returned a finding of guilt?

23         A.   No.

24         Q.   Is there a reason why?

25         A.   I felt that I didn't have a whole lot of value

John Du Wors                                    October 10, 2014

Page 64

1        to contribute to the sentencing hearing.  I had

2        certainly never argued sentencing.  I don't know the

3        criteria to be argued at a sentencing hearing.  It was

4        Pete Mair's area of expertise.  So he said it just made

5        sense for him to handle it, and I agreed.

6            Q.  Did Mark Phillips ever discuss with you a

7        license agreement between him and a company called

8        Anything Box, Inc.?

9            A.  Yes.

10           Q.  What do you recall about the nature of that

11       discussion?

12           A.  As I sit here, I sure don't remember much.  I

13       would have to go back and read the documents at my --

14           Q.  Do you recall --

15           A.  I wasn't finished.

16               But my vague recollection is that Mark Phillips

17       had granted to Anything Box either a title interest or a

18       license interest to the intellectual property that later

19       became the subject of the contribution of title and/or

20       license to intellectual property to MOD Systems in or

21       about the fall of 2008 in exchange for the $5 million

22       licensing fee that was promised to Mark Phillips.  And I

23       think that because of the claim in interest by Anything

24       Box to that intellectual property, that one of the

25       things that that contribution and settlement agreement

John Du Wors                                    October 10, 2014

Page 65

1      did, in the fall of 2008, was to abrogate the Anything

2      Box license agreement, I think.  But I am going off such

3      a fuzzy recollection, I really couldn't tell you without

4      looking back at those documents and agreements.

5           Q.  Do you recall when you first became aware that

6      Mark Phillips asserted there was a licensing agreement

7      between him and Anything Box?

8           A.  Do I recall when that took place?

9           Q.  Yes.

10          A.  No.  I don't recall, with any specificity, when

11     Mark Phillips told me that.

12          Q.  Do you recall if there was a claim by Mark

13     Phillips that the agreement provided for a one and

14     one-half million dollar payment to Phillips from

15     Anything Box?

16          A.  From Anything Box?

17          Q.  Yes.

18          A.  I remember something relating to that.  I don't

19     remember exactly what.  I wonder if this is one of the

20     documents that we worried Mark had fabricated after the

21     fact in relation to the $1.5 million transfer of funds

22     from MOD Systems that he was convicted of committing

23     wire fraud in association with.

24          Q.  Are you aware if that conviction was upheld on

25     appeal?

John Du Wors                                    October 10, 2014

Page 66

1        A.   I know that some of the claims associated with
2        the $1.5 million were upheld on appeal.  I think maybe
3        it was that the wire fraud claim was upheld, but the
4        mail fraud claim was not, based on failure of use of the
5        postal service.  But the claim for -- I mean, the
6        criminal charges for -- you know, for some kind of
7        wrongdoing associated with the $1.5 million were upheld
8        on appeal, at least some of them were; and I think maybe
9        new ones were added back in on appeal, because there was
10       an option of resentencing for Mr. Phillips, and a
11       possibility that Judge Coughenour would actually give
12       him more time.  But I think Judge Coughenour declined to
13       give Mr. Phillips any greater sentence or punishment.
14       Q.   Do you recall if Mark Phillips had communicated
15       to you his belief that production of a written licensing
16       agreement between him and Anything Box would be helpful
17       or he believed it would be helpful to his case in the
18       Federal District Court?
19       A.   I believe that Mark Phillips, at minimum, told
20       me about the exculpating nature of the obligation to pay
21       him $5 million in the form of a license fee in
22       association with that transaction that took place in the
23       fall of 2008 with MOD Systems.  I'm trying to remember
24       when that $1.5 million was transferred into Mark's
25       account -- into his shadow account at Merrill Lynch, but

John Du Wors                                           October 10, 2014

Page 67

```
 1      I would have to look at that Anything Box agreement to
 2      remember more.  If you showed it to me, I could probably
 3      tell you more about what we discussed in association
 4      with the agreement, given that it was so long ago.
 5           I think that ultimately, what we argued to the
 6      Court and the jury in numerous instances in the criminal
 7      litigation was that the company owed Mark the money that
 8      he took, the $1.5 million; that he took that money on
 9      account of money owed to him, and, therefore, it
10      couldn't be characterized as any kind of an act of
11      criminal wrongdoing for him to take that money.
12      Unfortunately, the Court disagreed with us.
13      Q.  A moment ago, you referred to Mark having a
14      shadow account at Merrill Lynch.  Do you recall that
15      testimony?
16      A.  Yes.
17      Q.  What did you mean by a shadow account at
18      Merrill Lynch?
19      A.  I don't know if the institution was
20      Merrill Lynch or not.  But whichever banking institution
21      it was, the financial institution had a particular kind
22      of account, and the brand name attached to that
23      particular financial product was a shadow account, and
24      Mark had one of those.  It was the destination account
25      Mark used or allegedly used to transfer the $1.5 million
```

John Du Wors                              October 10, 2014

Page 68

1      of MOD funds associated with his condo purchase back in
2      2008 or 2009.
3          Q.   Do you recall what the name was on the account?
4          A.   For the shadow account?
5          Q.   What you've characterized as the shadow account.
6          A.   It's not my characterization.  It's the
7      trademarked brand name attached by that financial
8      institution for the account.  I'm not trying to use
9      pejorative terms to couch the nature of the account.
10     There is like an aggressive growth account and then
11     there is a shadow account.  They just called it a shadow
12     account.  I don't know why.
13              In terms of the account holder --
14         Q.   Yes.
15         A.   -- I don't recall.  I would assume it's Mark
16     Phillips, but I don't have an independent recollection
17     of that.  I suppose it might have been one of his
18     entities.
19              MR. KIMBALL:  Can I get this marked as 6.
20              (Exhibit 6 marked for identification.)
21     BY MR. KIMBALL:
22         Q.   Mr. Du Wors, in the last several minutes, we've
23     been talking about an agreement involving Anything Box,
24     Inc. and Mark Phillips concerning some IP.  I've handed
25     you a document marked as Exhibit 6.  Have you ever seen

John Du Wors                                          October 10, 2014

 1      this document before?

 2          A.  I don't know if I've seen this document.  I've

 3      seen an agreement with Anything Box.

 4          Q.  Do you have any reason to believe that Exhibit 6

 5      is not a true and correct copy of the agreement that you

 6      previously saw involving Anything Box?

 7          A.  I have no position either way.

 8          Q.  You have no reason to doubt its authenticity.

 9      Correct?

10          A.  I have no ability to doubt or confirm its

11      authenticity.

12          Q.  Page two, Section 3, is titled, "Royalties and

13      Other Payments."  Could you turn to that, please.

14          A.  (Complies).

15          Q.  Specifically, Section 3.1, which is titled,

16      "Initial Payment," reads, "ABI shall within 30 days of

17      the effective date pay to Phillips $1,500,000 in

18      consideration of Phillips entering this agreement."  Do

19      you see that?

20          A.  I do.

21          Q.  Do you recall having any discussions with Mark

22      Phillips about the $1.5 million referred to in this

23      document having been paid to him?

24          A.  I think, in the most general sense, yeah.

25          Q.  What do you mean by "in the most general sense"?

John Du Wors                                    October 10, 2014

Page 70

1      A.   There was a bunch of documents that were kind of

2      along these lines that Mark talked to us about or showed

3      us in various forms at one time or another.  And I

4      remember the theme of a lot of our advice to Mark was

5      kind of consistent, which was either, A, it appears that

6      you produced this after the fact and that it is

7      vulnerable to arguments of forgery and manufacturing;

8      but more importantly, it has no legal significance.

9           Now, I'm looking at this document, for instance.

10     Assuming that it is authentic, I don't understand how

11     this would exculpate Mark Phillips in association with

12     the claims that the government brought for wire fraud in

13     association with the $1.5 million.  I don't know who

14     owns Anything Box or I don't recall.  I think it was

15     Mark's company.  And if this is a license agreement

16     between Mark Phillips and Anything Box, even if it was

17     executed in April of 2008, I can't figure out why that

18     would entitle Mark Phillips to put his hand in the MOD

19     cookie jar and transfer $1.5 million to himself via the

20     wire transfer he ordered Kenn Gordon to effectuate.

21     Q.   Did MOD enter into a merger or acquisition of

22     Anything Box?

23     A.   I don't recall.  I recall that Anything Box was

24     discussed, I think, in the fall of 2008 contribution and

25     licensing agreement entered into by and between Mark

John Du Wors                                    October 10, 2014

Page 71

 1     Phillips and MOD Systems, the one that entitled

 2     Mr. Phillips to a $5 million payment.

 3         Q.   There have been several references, in the last

 4     several moments, to a payment or wire transfer of

 5     $1.5 million.  Do you recall that?

 6         A.   Yes.

 7         Q.   Again, so I'm clear, did Mr. Phillips argue or

 8     assert that he was entitled to that money by virtue of

 9     an agreement that had been entered into involving

10     intellectual property?

11         A.   Yes.  I mean, as I recall -- as I recall, MOD

12     Systems' board had voted to pay Mark Phillips not just

13     $1.5 million, but I think substantially more than that --

14     maybe it was $5 million, I'm not sure -- before the time

15     that he transferred those funds to himself or caused

16     Kenn Gordon to transfer those funds to his shadow

17     account for the purchase of his condominium.  And

18     thereafter, the board, especially Anthony Bay and Bill

19     Bromfield and maybe others, dragged their feet on

20     actually paying that money to Mark Phillips, which kind

21     of jerked his chain, because he had obligated himself to

22     pay the down payment on a very nice condo over on the

23     Seattle waterfront in Belltown.

24              I don't remember why it was that the board was

25     dragging their feet, but as I recall, Mark was sick of

John Du Wors                                    October 10, 2014

Page 72

1    waiting for his money, so he went ahead and made the

2    order for Kenn Gordon to transfer those funds to him on

3    account of what it had been agreed the board owed him

4    associated with the intellectual property he was letting

5    MOD Systems use in order to do the Toshiba project,

6    which I think was the Green Box deal maybe.  But later

7    on, after he gave the $1.5 million back, finally I think

8    Mark used his pull with Toshiba to make Toshiba require

9    MOD Systems to execute that licensing agreement with

10   Mark Phillips; that Mark Phillips got the $5 million

11   bonus he had kind of been waiting for, for a long time.

12          I think there was some kind of symmetry between

13   the $5 million bonus from Toshiba and the amount of

14   the -- I'm sorry -- some kind of symmetry or connection

15   between the $5 million license fee to be paid to Mark

16   and the amount that Toshiba was paying as a project fee

17   to build this technology that MOD Systems was building

18   for Toshiba, which I think was called the Green Box.

19       Q.  A few moments ago, you used the term "our

20   advice" in discussing or responding to a question

21   concerning some documents and whether or not they would

22   be used or advantageous to Mark Phillips in his criminal

23   case.  When you used the term "our," in "our advice,"

24   who would be the other individual or individuals that

25   you were thinking of?

John Du Wors                                    October 10, 2014

Page 73

1           A.   Pete Mair.  The problem is that Mark Phillips

2      kept showing up with documents in the course of handling

3      his criminal defense, and he would say, "Well, sure, I

4      had board authority to take the $100,000," or, "I had

5      board authority to take the $1.5 million."  And what he

6      would show us is documents that looked like they were

7      created after the fact or were dated after the fact

8      and/or contained only the signatures of Mark Phillips on

9      behalf of some entity and Mark Phillips on behalf of

10     himself.  The problem is a document Mark Phillips

11     executes on behalf of an entity or himself is not

12     legally binding to entitle him to take money from MOD

13     Systems.

14           Now, we argued in the litigation that it

15     shouldn't matter, because Mark Phillips had the power to

16     fire the entire board at MOD Systems, as well as the

17     entire officer team, and appoint himself as sole officer

18     and the sole board member, and thereby contract on

19     behalf of MOD Systems to pay him all of the money in MOD

20     Systems' bank accounts as a bonus for being such a great

21     CEO.  He had that ability.  The problem was that when he

22     transferred those funds, he hadn't done that.  So he was

23     transferring those funds without the authority of MOD

24     Systems' existing board or officers other than himself,

25     and that was the basis upon which the Court denied our

John Du Wors                                    October 10, 2014

Page 74

1    dismissal motions, including a half-time motion, and

2    allowed the jury to convict Mr. Phillips.

3        Q.  A moment ago, you used the term "showing up"

4    when you were describing Mark Phillips producing

5    documents.  He would show up with documents.  Isn't it

6    correct that he was actually in detention during the

7    pretrial and trial phase?

8        A.  Not for all of it.  There was an interim phase

9    there where Mark was out of jail.  So when I first

10   showed up, Mark had been arrested at Chad Rudkin's

11   house, but he had been released on pretrial conditions

12   of some sort.  He was rearrested for a while on the

13   claim or accusation that he had attempted to access, via

14   computer, the computer systems of the pretrial services

15   company that contracted with the federal courts for the

16   sake of, I guess, monitoring Mr. Phillips.  He was then

17   released from that incarceration.  There was some kind

18   of motion practice about it, and the result of that

19   motion practice was that Federal Magistrate Judge

20   Donohue ordered that for the duration of his pretrial

21   release, Mr. Phillips would not be allowed to have a

22   computer.

23        Thereafter, Mr. Phillips was rearrested when he

24   became the subject of a 911 call initiated by his, I

25   guess, then romantic partner, Eileen Acheson -- I

John Du Wors                                      October 10, 2014

                                                        Page 75

1       actually can't testify, Mr. Phillips and Mr. Wayman are

2       talking so audibly.

3            Q.   Please continue.

4            A.   Anyway, Mr. Phillips was staying at Mr. Rudkin's

5       house with an Eileen Acheson, who was then his romantic

6       partner, I believe the mother of his child.  And

7       Ms. Acheson reported, in any event, that she had found

8       Mr. Phillips naked and unconscious on the floor of the

9       bathroom at Mr. Rudkin's house.

10           It later came out that, I guess, Mr. Phillips

11      had asked Ms. Acheson to bring home some computer

12      cleaner to Mr. Rudkin's house where Mark was staying

13      because Mark needed computer cleaner.  I guess what

14      Ms. Acheson did not put together was that computer

15      cleaner didn't make any sense, because Mr. Phillips was

16      not allowed to have a computer anymore based on his

17      previous violation of the pretrial release.

18           So it was sort of a funny hearing that took

19      place at the federal court after that, also before Judge

20      Donohue, because I think that Dave Bukey, on behalf of

21      Mark Phillips, argued Mr. Phillips should be released

22      from incarceration; because although he, as Eileen

23      Acheson had reported, attempted suicide briefly by

24      virtue of huffing this computer cleaner, those suicidal

25      tendencies were not serious and they passed, they're

John Du Wors                                    October 10, 2014

Page 76

 1      transient ideations, and he'll be fine, he won't try to

 2      commit suicide.  The prosecutors argued he should stay

 3      in jail, because he's a threat to himself and danger to

 4      himself generally, because his suicidal tendencies are

 5      going to continue.

 6            Then Judge Donohue kind of shut everybody down

 7      and said, I have no idea why you guys are accusing

 8      Mr. Phillips of being a threat to himself or attempting

 9      suicide.  He was clearly not attempting suicide.  He was

10      using the computer cleaner as a hallucinogen because he

11      knew it wouldn't show up in a urine test.  So that was

12      the conclusion of that.  It was at that point that

13      Mr. Phillips was re-incarcerated for the duration of the

14      pendency of the pretrial period before his criminal

15      trial.

16            So there were months and months in there where

17      we were having out-of-incarceration contact with

18      Mr. Phillips.

19      Q.  Do you recall if Mr. Phillips' request that you

20      either obtain or use the license agreement which has

21      been marked as Exhibit 6 came during a period in which

22      he was incarcerated or not incarcerated?

23      A.  I have no such recollection on the subject.

24      Q.  Was Exhibit 6 a document that was used at trial

25      in Mr. Phillips' criminal proceeding?

John Du Wors                                    October 10, 2014

Page 77

1         A.  I don't recall.  I'd have to check.

2         Q.  Do you recall if Mark Phillips asked you to

3    obtain a licensing agreement involving himself and

4    Anything Box specifically for use at trial, before trial

5    commenced?

6         A.  I don't have a specific recollection on that,

7    but certainly discussion of the intellectual property

8    that was the subject of the Anything Box license

9    agreement was something that we talked about.

10        Q.  Did you contact anyone, prior to the trial in

11   Federal District Court, to try to get ahold of the

12   document?

13        A.  I don't recall with specificity.  We contacted

14   lots of people, Pete Mair and I and associated attorneys

15   at my firm, in the course of preparing for that trial

16   and gathering documents.  I mean, there was a tremendous

17   volume of exhibits used at that trial and gathered for

18   possible use at that trial.  So, I mean, I couldn't tell

19   you, with specificity, if we contacted anyone.  We

20   contacted tons of people.

21        Q.  Were there notes or records kept of who was

22   being contacted by you and/or other people at your

23   office?

24        A.  We had lots of notes and records.  I couldn't

25   tell you what the specific substance of them would have

John Du Wors                                    October 10, 2014

Page 78

1        been.

2              Q.  Do those records still exist?

3              A.  I don't know.

4              Q.  If they do exist, where would they be located?

5              A.  I don't know.

6              Q.  Do you have a location where you keep notes and

7        records from former cases?

8              A.  We keep notes and records from the former cases

9        in electronic form on our servers, in physical form in

10       our file cabinets, and in physical form at our document

11       repository called Iron Mountain.  At least I think we're

12       still using Iron Mountain.  We may be using another

13       repository service now.  I just don't know.

14             Q.  At any time prior to today's date, have you made

15       an effort to determine whether or not you have the notes

16       and records that we've been discussing concerning

17       pretrial preparation and Mark Phillips' criminal federal

18       court trial?

19             A.  Your question is objectionable on the basis that

20       it presupposes I've done that on today's date, but the

21       answer is that as I recall, we scooped up all the

22       documents in all of our holdings that were associated

23       with Mark Phillips' representation and turned them over

24       both to you and to the receiver.  I didn't lead the

25       effort on that production; rather we appointed personnel

John Du Wors                                                October 10, 2014

Page 79

```
1     at our law firm to do so.  And my assumption, my
2     understanding, is that you guys have everything.
3          Q.  When you say that you used personnel at your
4     office, who would that be specifically?
5          A.  I don't know.  You'd have to ask Derek Newman.
6     He would have directed those efforts.
7          Q.  Did Mark Phillips ever discuss with you the
8     subject of who drafted Exhibit 6 or any other licensing
9     documents between himself and Anything Box?
10         A.  I don't recall.  I see 720 Third Avenue,
11    Suite 1100.
12         Q.  Do you know what businesses are located at
13    720 Third Avenue, Suite 1100?
14         A.  I think that's five blocks south of me on Third
15    Avenue.  And we're at University.  So I guess Seneca,
16    Spring, Madison, Marion, Columbia.  I'm trying to
17    remember all the law firms that Mark Phillips has used.
18    I can't remember who is at 720.  I don't know which
19    building that was.
20         Q.  Have you ever heard the name Eric Prager?
21         A.  I have.
22         Q.  Who is Eric Prager?
23         A.  Eric Prager is an intellectual property attorney,
24    working now, I believe, for K&L Gates out of their
25    New York office.
```

John Du Wors                                    October 10, 2014

Page 80

1      Q.  Did Mark Phillips ever discuss with you using

2    Eric Prager or being involved with Eric Prager for

3    purposes of drafting any IP licensing documents

4    involving him?

5      A.   IP licensing documents, no.  Eric Prager told

6    me, in a conversation I had with Mr. Prager after

7    Mr. Phillips asked me to talk to Eric Prager, that

8    Mr. Prager was doing some IP strategy work with

9    Mr. Phillips.  Neither he, nor Mr. Phillips told me what

10   that IP strategy work was, except that -- I believe that

11   Mr. Prager drafted for Mr. Phillips a demand for

12   something.  Might be mediation, might be settlement, or

13   payment of royalty from Toshiba Corporation.

14         Mark had decided what he would do is send

15   Toshiba a notice that had been specified and dictated

16   under the provisions of the Freedom of Operation

17   Agreement that had been entered into by and between

18   Toshiba and either MOD Systems or Mark Phillips.  I

19   don't remember which.  That Freedom of Operation

20   Agreement, sort of a common agreement to see in these

21   settings, provided that if Mark Phillips ever concluded

22   that Toshiba was infringing his intellectual property,

23   he could send them a demand -- or rather had to precede

24   any lawsuit by a demand, which might trigger license fee

25   negotiations; but what he could not do, under any

John Du Wors                                    October 10, 2014

Page 81

1    circumstance, was sue them for an injunction.

2            These Freedom of Operation Agreements usually

3    function for the purpose of making sure that the party

4    that is accused of infringement will not experience a

5    business interruption by way of a suit for injunctive

6    relief by a patent rights holder.  These were in the

7    pre-eBay days when patent plaintiffs could still get

8    preliminary injunctions and permanent injunctions

9    against infringement defendants.  So if you did a deal

10   with a party that had a licensing component, a lot of

11   times they would want to include a Freedom of Operation

12   Agreement.  So if there ever was a dispute about

13   infringement, the only remedy that could be sought by

14   the patent rights holder is some kind of a royalty fee.

15   That was indeed the nature of the agreement that had

16   been entered into by and between Mark Phillips on the

17   one hand and Toshiba on the other hand.

18           So anyway, Mark Phillips hired Eric Prager or

19   had Eric Prager send a demand pursuant to the provisions

20   of that Freedom of Operation Agreement.

21       Q.  Did you ever discuss with Mark Phillips the

22   subject of bringing into court to testify as a witness

23   during the federal criminal trial, any witnesses who

24   could discuss the preparation of a licensing agreement

25   between Anything Box and Mr. Phillips?

John Du Wors                                          October 10, 2014

Page 82

1        A.  I don't recall.

2        Q.  Do you recall if Mr. Phillips asked you to

3   arrange for such a witness to come in and testify that

4   there was such an agreement?

5        A.  What kind of a witness?  To come in --

6        Q.  A witness to verify --

7        A.  I'm still talking.  Please don't interrupt me.

8            You're asking if he talked to me about a witness

9   to come in and authenticate the validity of an agreement

10  entered into between Mark Phillips and Anything Box?

11       Q.  That is not my question.

12       A.  What is it?

13       Q.  My question is, did Mark Phillips discuss with

14  you his desire or request that a witness come into court

15  at the criminal trial to testify that there was an

16  agreement between him and Anything Box concerning IP?

17       A.  I don't recall.  I'd have to review the records,

18  but I don't recall.

19       Q.  So, sitting here today, you don't recall if he

20  had requested that or not?

21       A.  Correct.

22       Q.  Did you offer into evidence or seek to offer

23  into evidence what has been marked as Exhibit 6 today at

24  Mark Phillips' criminal trial in Federal District Court?

25       A.  I don't recall.  I would have to review the

John Du Wors                                          October 10, 2014

                                                           Page 83

1         transcript of that trial to see all of the exhibits that

2         we either entered or offered into evidence.

3                  (Exhibit 7 marked for identification.)

4         BY MR. KIMBALL:

5              Q.  Mr. Du Wors, you've been handed a document

6         marked as Exhibit 7, which I will represent to you are

7         pages from the Verbatim Report of Proceedings concerning

8         trial in the federal case that we have just discussed.

9         Specifically, I'd like you to turn to the third page of

10        Exhibit 7, which is actually numbered 76.  Do you see

11        that?

12             A.  I do.

13             Q.  There is some discussion beginning at line 13 on

14        that page.

15                 "Q.  Thank you.  Mr. Phillips, can I please

16        direct your attention to Exhibit D50 in the black

17        binders in front of you and also on the screen in front

18        of you.  Do you recognize this agreement or do you

19        recognize this document?"  Do you see that?

20             A.  Yes.

21             Q.  In fact, was that a question posed by you to

22        Mr. Phillips when he was on the stand?

23             A.  I don't have a specific recollection.

24             Q.  If you look at line three on the same page,

25        there is a statement or a line which reads, "By

John Du Wors                                        October 10, 2014

Page 84

1        Mr. Du Wors:"  Do you see that?

2        A.  The document speaks for itself.  I see what

3     you're talking about.

4        Q.  Do you have any reason to believe that the

5     question that I just read beginning at line 13 was not

6     posed by you?

7        A.  I have no independent recollection either way,

8     as I sit here.  My recollection would have to be

9     refreshed by reviewing the transcripts of proceedings.

10        Q.  And you don't remember actually asking him that

11     question today?

12        A.  As I sit here, I don't recall.  I mean, the

13     question is, "Can I please direct your attention to

14     Exhibit D50 in the black binders in front of you and

15     also on the screen in front of you."  You're asking if I

16     have an independent recollection of that question?

17        Q.  Yes.

18        A.  That is such a vanilla, non-specific, general

19     question, I have no independent recollection

20     specifically about that question.  In fact, I'll bet you

21     I asked him something along those lines 100 times in the

22     course of that trial, because the black binders were our

23     binders and the white binders were the prosecution's.

24     That's how you got documents in at that trial.  Please

25     direct your attention to the binders in front of you.

John Du Wors                                        October 10, 2014

Page 85

1           So I'm going to say that in some form or

2     fashion, I probably asked him and other witnesses that

3     at trial so many times, that to answer this question

4     you're posing to me right now, it would be like me

5     answering whether or not I used the word "the" during

6     that trial.  No specific recollection, but I bet it

7     happened a lot.

8           Q.  I'm going to object and move to strike as

9     non-responsive.

10          A.  When is my opposition to that motion due?

11          Q.  When it goes before the Court.

12          A.  Okay.  I hope to get a notice.

13          Q.  Turn to line 19.

14          A.  Okay.

15          Q.  This appears to be an answer from Mr. Phillips

16    in response to your question, "What is this document,"

17    in which he states, "This is a licensing agreement

18    between myself and Anything Box."

19          He is then asked, "What is the date of the

20    document?"  The answer given is, "April 25, 2008."

21          Then, on line 23, the transcript reads,

22    "Mr. Du Wors:  Defense moves to admit Exhibit D50 into

23    evidence."  Do you see that?

24          A.  I see it.

25          Q.  Do you have any reason to doubt or believe that

John Du Wors                                      October 10, 2014

                                                          Page 86

1       that did not occur as reported on page 76?

2           A.  I have no position either way.

3           Q.  Then the following line, line No. 25, reads,

4       "Mr. Swaminathan:  Objection, Your Honor.  This isn't

5       signed."

6               Then, on line two of the following page, which

7       is numbered 77, the Court rules, "Sustained."  Do you

8       see that?

9           A.  I see that exchange between Mr. Swaminathan,

10      Mr. Aravind Swaminathan, and the Court.

11          Q.  Do you have any reason to doubt that this is not

12      an accurate reporting of that event?

13          A.  I have no position on this either way.  It

14      sounds vaguely familiar.  Wait a minute.  Just a moment.

15      Note this.  Make a note in here.

16              MR. FRANKLIN:  Note on mine here.

17              THE WITNESS:  I'm noting it on yours.

18      Exhibit 7.

19              Just a moment.  Okay.  Go on.

20      BY MR. KIMBALL:

21          Q.  Taking a look at Exhibit 7 -- specifically, page

22      numbered 76 -- you, I believe, answered at least part of

23      this inquiry a few moments ago -- but the reference

24      beginning at line 13, which is a question asking

25      Mr. Phillips to direct his attention to Exhibit D50 in

John Du Wors                                October 10, 2014

Page 87

1          the black binders.  Do you see that?

2               A.  I do.

3               Q.  And I believe you indicated that the black

4          binders were exhibits or proposed exhibits for trial in

5          the federal criminal case.  Is that correct?

6               A.  Correct.

7               Q.  So Exhibit D50 in the black binders, that would

8          have been among defendant's exhibits or proposed

9          exhibits.  Is that correct?

10              A.  I don't know.  I mean, I don't know what our

11         numbering system was.  I don't recall.

12              Q.  But you do not contest that as reported on lines

13         23 and 24, you sought to admit Exhibit D50 into

14         evidence.  Correct?

15              A.  Oh, I mean I -- I don't contest it.  I don't not

16         contest it.  I don't have personal knowledge to

17         authenticate the document marked for identification as

18         Exhibit 7.  I couldn't tell you this is for sure real.

19         I couldn't tell you what Exhibit D50 was.  I couldn't

20         tell you if Exhibit D50 was in our numbering system.

21         And I couldn't tell you what document I was talking

22         about without having the authenticated actual

23         transcripts and binders from that trial of both admitted

24         and offered exhibits.  So I just don't know.

25              Q.  Did you include, in defendant's proposed

John Du Wors                                          October 10, 2014

Page 88

1        exhibits, a signed copy of a licensing agreement between

2        Mark Phillips and Anything Box?

3            A.  I don't recall.

4                I note that the details of the transaction were

5        apparently offered into evidence by way of Exhibit D57,

6        an e-mail between Bay, Bromfield, and Phillips,

7        outlining the terms of that licensing agreement.

8            Q.  Was Exhibit D57 the same document as

9        Exhibit D50?

10           A.  I don't know.  I couldn't tell you.

11           Q.  Do you recall what D57 was?

12           A.  Nope.

13               MR. KIMBALL:  I think now would be a reasonable

14       time to take a lunch break, as we discussed earlier.

15               THE WITNESS:  Okay.

16               MR. FRANKLIN:  That will be fine.

17               (Lunch recess taken from 12:30 to 1:09.)

18               MR. KIMBALL:  Back on the record.

19       BY MR. KIMBALL:

20           Q.  So we're back on the record after taking a lunch

21       break.  Before the break, I had been asking you some

22       questions regarding Exhibit 6 and a license agreement or

23       document which is purporting or appears to be a license

24       agreement between Mark Phillips and Anything Box, Inc.

25       Just to be clear, Mr. Du Wors, is it your -- strike

John Du Wors                                        October 10, 2014

Page 89

1      that.  Sitting here today, you don't recall whether or

2      not you ever saw a version of Exhibit 6 that actually

3      had signatures on it.  Correct?

4           A.  I would object on the basis that that question

5      misstates my prior testimony and assumes facts not in

6      evidence.  My testimony is that I don't have a specific

7      recollection, as I sit here, as to whether or not I saw

8      any version of Exhibit 6 with or without a signature on

9      it.

10          I definitely recall having seen documents

11     relating to Anything Box, and I believe I saw an

12     Anything Box licensing agreement in some form or

13     fashion, but I would have to review the documents on

14     file back in my office to tell you for sure what I saw

15     and whether it had a signature.

16          Q.  Earlier today, you expressed a concern that

17     Mr. Phillips might be generating documents or I think

18     you used the term backdating documents.  Would Exhibit 6

19     fall into the category that you characterized

20     accordingly?

21          A.  I don't know.  I would have to see what I

22     actually had in my possession at the time relevant to

23     this case.  So without doing so, I would be speculating.

24          Q.  Were you ever given any documents by

25     Mr. Phillips which indicated that the license

John Du Wors                                    October 10, 2014

                                                        Page 90

1        agreement -- that any license agreement between

2        Mr. Phillips and Anything Box had been or would be

3        terminated?

4            A.  I think that question is vague, and, therefore

5        only somewhat answerable.  My answer being that my

6        recollection on that subject is pretty hazy.  I do think

7        I saw documents generally relating to that subject

8        matter.  To be sure, I would have to review the

9        documents at my office, after which I could tell you

10       what the substance of the documents were.

11               I think I testified earlier that it is the case

12       that I think the Anything Box license agreement entered

13       into by and between Mark Phillips and Anything Box was

14       terminated as a function of the fall 2008 contribution

15       agreement that entitled Mr. Phillips to a $5 million fee

16       associated with his intellectual property.

17               MR. KIMBALL:  Could I get this marked.

18               (Exhibit 8 marked for identification.)

19       BY MR. KIMBALL:

20           Q.  Mr. Du Wors, you've been handed a document

21       marked as Exhibit 8.  Could you take a look at that and

22       let me know if Exhibit 8 is a copy of the document that

23       you just referred to a moment ago?

24           A.  I don't know.  I don't recall.  I'd have to look

25       at the documents at my office to tell you that

John Du Wors                                    October 10, 2014

Page 91

1       affirmatively.
2           Q.   Taking a look at --
3           A.   Let me take just a moment with this exhibit.
4                Go on with your questions.
5           Q.   Taking a look at Exhibit 8 -- specifically, page
6       11 -- do you have any information which would lead you
7       to question whether the signature of David Douglass
8       appearing thereon is authentic?
9           A.   As I sit here today, I have no opinion either
10      way.
11          Q.   And you have no information to suggest that that
12      is not, in fact, a correct and true signature of
13      Mr. Douglass.  Correct?
14          A.   I have no knowledge either way.
15          Q.   We paused the deposition for a few minutes as
16      you were going through the pages of Exhibit 8.  As you
17      went through that document, were you able to refresh
18      your memory at all as to whether or not you've seen this
19      document before?
20          A.   Well -- no.
21          Q.   What was the purpose of going through the pages
22      of Exhibit 8?
23          A.   To understand its nature and terms.
24          Q.   Is it possible that you have a copy of Exhibit 8
25      in your office?

John Du Wors                                          October 10, 2014

                                                            Page 92

     1          A.  Within the boundaries of reality, anything is

     2     possible.

     3          Q.  I take that as a yes.

     4          A.  You can take that however you want, but that

     5     wasn't my answer.

     6              (Exhibit 9 marked for identification.)

     7     BY MR. KIMBALL:

     8          Q.  You've been handed a copy of a document marked

     9     as Exhibit 9.  Have you ever seen this document before?

    10          A.  I don't know.

    11          Q.  Specifically, page one of Exhibit 9 purports to

    12     be an e-mail from Mark Phillips dated Monday, May 5,

    13     2008, to Ron Braley, with a copy to Kenn Gordon.  Do you

    14     see that at the top of the first page of Exhibit 9?

    15          A.  I see that.

    16          Q.  Do you have any reason to believe that this is

    17     not an accurate and true and complete printout of the

    18     e-mail which is represented at the top of page one of

    19     Exhibit 9?

    20          A.  I have no personal knowledge relative to that

    21     question either way.

    22          Q.  There is a reference in the attachment line, in

    23     that same portion of the first page, to, "Attachments:

    24     Anything Box Incorporation Documents.pdf; License

    25     Agreement Phillips ABI 05-08.pdf."  Do you see that?

John Du Wors                                     October 10, 2014

                                                      Page 93

1              A.  Can I have that question read back.

2                  (Question read by the reporter.)

3                  THE WITNESS:  I see that.

4       BY MR. KIMBALL:

5              Q.  Do you have any reason to believe that the pages

6       following the first page of Exhibit 9 and contained in

7       Exhibit 9 are not a true and complete copy of the

8       document which is referenced as the license agreement in

9       the line that I just described?

10             A.  I have no personal knowledge responsive to that

11      question either way.

12             Q.  Did Mark Phillips ever give you a copy of the

13      e-mail which is the first page of Exhibit 9?

14             A.  I don't recall.

15             Q.  Who is Kenn Gordon?

16             A.  Kenn Gordon is an individual that Mark Phillips

17      is friends with.

18             Q.  Is he associated or connected in any way with

19      the company called MOD?

20             A.  I believe he was the acting chief financial

21      officer at MOD Systems.

22             Q.  Do you know if he was also on the board of

23      directors?

24             A.  I don't know.  I don't think so.

25             Q.  Who is Ron Braley?

John Du Wors                                    October 10, 2014

Page 94

1          A.   Ron Braley is an attorney at Lasher Holzapfel.

2               (Exhibit 10 marked for identification.)

3     BY MR. KIMBALL:

4          Q.   You've been handed a document marked Exhibit 10.

5     Will you please look at that document.

6          A.   (Complies).

7          Q.   Have you ever seen Exhibit 10 before today?

8          A.   I'm not finished reviewing it.

9               Okay.  What's your question?

10         Q.   Have you ever seen Exhibit 10 before today?

11         A.   I don't recall.

12         Q.   Do you know if Mark Phillips gave you a copy of

13    Exhibit 10 prior to his criminal trial in federal court?

14         A.   I don't recall.

15         Q.   Do you have any information at your office that

16    would allow you to refresh your memory as to whether or

17    not you had this document prior to Mr. Phillips'

18    criminal trial in federal court?

19         A.   I'd have to review my office's document holdings

20    to answer that question.

21         Q.   Again, what would the documents you would be

22    looking at consist of?

23         A.   The contents of our Mark Phillips file in both

24    electronic and hard copy form, whether that be at our

25    offices on our servers, or deposited within our holdings

John Du Wors                                    October 10, 2014

                                                         Page 95

1      at Iron Mountain or whatever repository it is we're

2      using these days.

3          Q.   There is a reference in the line in the, it

4      looks like, forwarded e-mail from Kenn Gordon to Thomas

5      Grohman -- and this is about four inches down from the

6      top of the page -- and it reads, "Hi, Tom.  I've

7      attached a draft of a proposed board consent, the stock

8      purchase agreement and the ABI Phillips license

9      agreement for everyone to review.  Thanks, Kenn."

10              Do you see that text?

11         A.   I do.

12         Q.   Do you know what ABI is referring to there?

13         A.   I would be speculating, but in the course of

14     speculating, I would guess that it was Anything Box.

15         Q.   Who is Thomas Grohman?

16         A.   I don't know.

17         Q.   Do you know if there was a witness called during

18     Mark Phillips' criminal trial named Thomas Grohman?

19         A.   I don't believe so.  Oh.  I see, from the upper

20     portion of Exhibit 10, that Thomas Grohman has an e-mail

21     address of GrohmanT@LanePowell.com.  So my bet is that

22     Mr. Grohman is an attorney at Lane Powell, and that Lane

23     Powell served as counsel for MOD Systems during the time

24     period relevant to this e-mail, that being summer of

25     2008; in addition to, of course, Lane Powell's service

John Du Wors                                    October 10, 2014

Page 96

1      to MOD Systems as counsel for the Demand Review

2      Committee appointed to investigate Mark Phillips and

3      Anthony Bay in response to Bob Arnold's derivative

4      demand to MOD Systems.

5          Q.  In light of those comments, do you have a

6      recollection at all as to whether or not Mr. Grohman was

7      called as a witness during the Phillips criminal trial?

8          A.  I testified about this just a moment ago, and my

9      answer was no, I have no such recollection.  But I don't

10     think that he was.

11         Q.  Do you recall if you ever spoke with or

12     interviewed Mr. Grohman prior to the Phillips criminal

13     trial?

14         A.  I have no recollection of any such conversation.

15             (Exhibit 11 marked for identification.)

16     BY MR. KIMBALL:

17         Q.  You've been handed a document marked as

18     Exhibit 11.  Do you recall if you've ever seen this

19     document before?  Strike that.  I'll rephrase.

20             Do you recall if you've ever seen the content of

21     Exhibit 11 before?

22         A.  What's your question?

23         Q.  Have you ever seen the content of Exhibit 11

24     before today?

25         A.  I don't recall.  I may have.

John Du Wors                                      October 10, 2014

Page 97

 1          Q.  The heading for the e-mail near the top of page
 2     one of Exhibit 11 is addressed from Michael Morgan.  Do
 3     you see that?
 4          A.  I do.
 5          Q.  Do you know who Michael Morgan is?
 6          A.  No.
 7          Q.  Do you recall if you made any effort to speak to
 8     or interview Mr. Morgan prior to Mark Phillips' trial in
 9     Federal District Court?
10          A.  I don't know.
11          Q.  Did you keep a list of people that you
12     interviewed for the purpose of investigating Mark
13     Phillips' trial or the issues that would be coming up at
14     Mark Phillips' criminal trial in Federal District Court
15     regardless of whether or not those individuals were
16     ultimately called as witnesses?
17          A.  I don't recall keeping a list denominated as
18     such.  I believe that records in the form of my own
19     notes or Peter's notes would reflect whom we had
20     interviewed that we felt would be good as a witness at
21     trial.
22          Q.  Do you recall if Mark Phillips asked you to
23     interview Michael Morgan?
24          A.  I have no recollection of Mr. Phillips ever
25     asking me to do that.

John Du Wors                                          October 10, 2014

Page 98

1                (Exhibit 12 marked for identification.)

2         BY MR. KIMBALL:

3             Q.  You've been handed a document marked as

4         Exhibit 12.  Have you ever seen the contents of

5         Exhibit 12 before?

6             A.  I don't recall.

7             Q.  There is an individual referenced on Exhibit 12,

8         Kyleen Cane.  Do you know who that is?

9             A.  I do.

10            Q.  Who is Kyleen Cane?

11            A.  A woman -- I mean, a man -- I mean, I'm not sure

12        which gender.

13            Q.  Do you know what they do for a living, this

14        individual?

15            A.  I believe that Mr. and/or Mrs. Cane is a

16        securities lawyer or perhaps a business lawyer with

17        particular emphasis in securities.

18            Q.  There is a reference next to the name Kyleen

19        Cane on Exhibit 12 of CaneClark.com.  Have you ever

20        heard of a law firm called CaneClark?

21            A.  I believe that is Kyleen Cane's law firm in

22        Nevada.

23            Q.  Do you know if you sought to introduce

24        Exhibit 12 as an exhibit during the Mark Phillips

25        Federal District Court trial?

John Du Wors                                    October 10, 2014

Page 99

1          A.  I don't have an independent recollection, as I
2     sit here, as to whether I did.
3          Q.  Do you know if Mark Phillips gave you this
4     document prior to the trial?
5          A.  I don't recall.
6          Q.  Do you know if Kyleen Cane was a member of the
7     board of MOD at any time?
8          A.  She was.  He was.  Whatever gender moniker is
9     appropriate for Kyleen Cane.  That person was.
10          Q.  Looking toward the bottom of the text portion of
11     Exhibit 12, there is apparently an earlier e-mail in
12     this chain of e-mails from Kyleen Cane to Mark Phillips
13     and Kenn Gordon, the text of which reads, "I have set up
14     a conference call board meeting for 1:30 to approve the
15     Anything Box transaction."  Do you see that?
16          A.  I do.
17          Q.  Do you have any idea what transaction is being
18     referred to there?
19          A.  Kyleen Cane has never told me, so I would be
20     speculating; but if asked to speculate, I would say that
21     was a transaction to acquire Anything Box as a
22     corporation by MOD Systems.
23          Q.  Was Kyleen Cane called as a witness during the
24     Phillips trial?
25          A.  Yes.

John Du Wors                                        October 10, 2014

                                                        Page 100

1          Q.  By defendants or by the plaintiff?

2          A.  Kyleen Cane was offered as a witness for the

3     prosecution.

4          Q.  Did Kyleen Cane testify?

5          A.  Kyleen Cane did.

6          Q.  Were you in court during his or her testimony?

7          A.  I was.

8          Q.  Do you recall what the substance of the

9     testimony from Kyleen Cane was?

10         A.  Generally, I believe Kyleen Cane testified as to

11    observations made by Cane during service on the Demand

12    Review Committee appointed by MOD Systems in response to

13    Bob Arnold's derivative demand.

14         Q.  Do you recall if you conducted the

15    cross-examination of Kyleen Cane at trial?

16         A.  I think Peter Mair did.

17         Q.  In light of the answers you've given in the last

18    minute or so to my questions, does that refresh your

19    memory at all as to what gender Kyleen Cane was?

20         A.  I don't know the specific details of Kyleen

21    Cane's gender.  Kyleen Cane originally had been a man

22    named Michael Cane, and had changed his name to Kyleen

23    Cane at some point; and attended trial in women's

24    clothing and with physical attributes, including hair

25    and make-up, that one might normally associate with

John Du Wors                                        October 10, 2014

Page 101

1        female appearance.  I was told by numerous sources that

2        Cane had undergone surgery of some kind associated with

3        gender reassignment, but I do not know the details of

4        those surgical procedures or the final outcome; or

5        whether Kyleen Cane would be identified legally as a

6        male transvestite or a gender-reassigned legal female,

7        and to what extent female appearance was something that

8        Kyleen Cane donned on a regular or part-time basis.

9        They are details I just never asked about, and I didn't

10       know then and I don't know now.

11               (Exhibit 13 marked for identification.)

12       BY MR. KIMBALL:

13          Q.  Mr. Du Wors, you've been handed a document

14       marked as Exhibit 13.  Would you take a look at that and

15       let me know if you ever recall seeing the content

16       thereof prior to today.

17          A.  I don't recall whether I have or have not.

18          Q.  Do you recall if Mark Phillips provided you with

19       either Exhibit 13 or -- strike that -- if he provided

20       you with the content which is reproduced on Exhibit 13

21       at the time of or prior to his criminal trial in Federal

22       District Court?

23          A.  I don't recall.

24               You know what would refresh my recollection a

25       lot is if you could show me the e-mails or trial

John Du Wors                                          October 10, 2014

                                                       Page 102

1          transcript demonstrating when Mark Phillips transferred

2          $1.5 million from MOD's account to his shadow account.

3          That would orient me a great deal and probably better

4          enable me to testify as to the information related to

5          these documents.  So if you do have that handy, which I

6          suspect you do, please feel free to show that to me and

7          I may be able to give you more voluminous and specific

8          testimony.

9                   (Exhibit 14 marked for identification.)

10         BY MR. KIMBALL:

11             Q.  You've been handed a document marked as

12         Exhibit 14, which is titled, "Minutes of Meeting of the

13         Board of Directors of MOD Systems Incorporated, a

14         Washington State Corporation."  Have you ever seen

15         either Exhibit 14 or the content thereof prior to today?

16             A.  I don't recall.

17             Q.  This document discusses a meeting of the board

18         of directors of MOD Systems, Inc., that was held on or

19         about June 20th of 2008.  Do you recall ever discussing

20         with anyone, including but not limited to Mark Phillips,

21         what occurred at that meeting?

22             A.  I don't recall.

23             Q.  Did you have this document at the time of the

24         Mark Phillips criminal trial?

25             A.  I don't recall.

John Du Wors                                    October 10, 2014

Page 103

1          Q.  Was there any testimony that was elicited by the

2     defense at Mr. Phillips' criminal trial about the level

3     of his salary or compensation at MOD?

4          A.  I believe so.

5          Q.  What was the nature of that information?

6          A.  I don't specifically recall.  The things I do

7     recall were that Mark had been pretty severely underpaid

8     for a long time at MOD; and at some point, the board

9     resolved to increase his compensation, both prospectively

10    and, I think, pay him some amounts for a retrospective

11    pay increase.  And I think the five million bucks they

12    ended up promising to pay him may have had something to

13    do with that.  I think that this $5 million that MOD

14    eventually agreed to obligate itself to pay Mark

15    Phillips was structured in that license agreement as a

16    license fee, but in essence, was contemplated by all of

17    the parties to compensate Mark Phillips for all the

18    stuff that he really felt he needed to be compensated

19    for in the past; partly for intellectual property,

20    partly for having been underpaid, partly for stuff he

21    had contributed in founding the company and being its

22    chief inventor for so long.  You know, and I think he

23    had proposed a bunch of different transactions to get

24    him that money, and a bunch of accounts upon which that

25    money ought to be paid to him.

John Du Wors                                    October 10, 2014

                                                    Page 104

1              Ultimately, I think when he finally got

2       signature from MOD Systems, it was on a document called

3       License Agreement; but really, I think that there had

4       been discussions going on for a long time about how Mark

5       Phillips needed to be paid something more than he had

6       been paid for founding this company that everybody was

7       getting into.  There was a lot of talk about different

8       ways to get him paid.

9          Q.  Could you please look at the bottom of each of

10      the four pages comprising Exhibit 14.  Specifically, I'm

11      referring to, "Grand Jury Material, Subject to Rule 6(e),

12      FOIA Confidential Treatment Requested."  Then, over

13      toward the right at the bottom, MOD-DOJ 0029, and then

14      there are some other numbers.

15         A.  Okay.

16         Q.  Followed by -- it looks like a Bates stamp --

17      Phillips, with three zeros, and then a four-digit number

18      following the zeros.  Do you see that?

19         A.  I do.

20         Q.  Does looking at any of that content refresh your

21      memory as to whether or not you saw Exhibit 14 before

22      today?

23         A.  No.

24         Q.  Have you ever seen other documents which bear

25      the footer, "MOD-DOJ," followed by a six-digit number?

John Du Wors                                          October 10, 2014

                                                     Page 105

 1          A.  Oh, I don't specifically recall.  Do you mean

 2     seven-digit number?  No, it's six digits; isn't it?  No,

 3     I don't recall.

 4          Q.  Was that the footer that was applied or the

 5     stamp that was applied to documents produced by the

 6     Department of Justice in advance of the Phillips trial?

 7          A.  I don't know -- or I don't recall.

 8          Q.  Did your office use a Bates stamp protocol

 9     similar to that appearing at the bottom of the four

10     pages of Exhibit 14, beginning "Phillips," followed by

11     seven digits?

12          A.  I don't recall.

13          Q.  Look, if you would, at page three of Exhibit 14.

14     There are a series of small case lettered paragraphs.

15     I'd like you to look at the small case lettered

16     paragraph marked (l), which contains a sentence reading,

17     "Resolved further, that the License Agreement (April 25,

18     2008), Development Agreement (April 9, 2008), and

19     Memorandum of Understanding (September 10, 2007), along

20     with subsequent amendments, with Toshiba Corporation are

21     hereby ratified."  Do you see that?

22          A.  I do.

23          Q.  Do you know what that's referring to?

24          A.  No.

25          Q.  Was there any testimony elicited on behalf of

John Du Wors                                    October 10, 2014

Page 106

1        Mr. Phillips during the federal criminal trial about

2        whether or not there had been an agreement between

3        either Mr. Phillips or any company and Toshiba

4        Corporation?

5            A.  Yes.

6            Q.  What was the substance of that testimony?

7            A.  I think there were multiple agreements.  I doubt

8        I could remember all of them or all of their substance,

9        especially given the passage of time.  But as I sit here

10       today, I think -- there were a couple of deals with

11       Toshiba.  I think Toshiba paid a half million bucks for

12       some design work early on.  I think that kind of got

13       Toshiba hooked on both Mark and his products.  Although,

14       I think Toshiba had been hooked on Mark since 2007, when

15       he had breakfast with Kato-San and another

16       representative of Toshiba in Los Angeles.

17            But that initial consulting fee or services fee

18       or development fee, whatever it was, that led to a

19       couple of transactions, both -- I think a $5 million

20       development fee, maybe in the summer of 2008, to build

21       out that Toshiba product, the Green Box -- I think it

22       was called the Green Box -- and then a Series A

23       financing that took place in the fall of 2008, where

24       Toshiba contributed some amount of money.  It might have

25       been the five million; it might have been separate of

John Du Wors                                    October 10, 2014

1      the five million, I'm not sure.  And as a result of that
2      Series A financing, Mark was going to get a chunk of
3      stock beyond what he already had.  I think it was a
4      super majority, even afterwards -- both before and
5      after.
6              Mark was going to contribute intellectual
7      property.  I think the Anything Box deal was going to be
8      killed, and Mark was going to contribute intellectual
9      property directly to MOD Systems.  Toshiba would get
10     stock.  Deluxe would get stock.  NCR would get stock.  I
11     think some individual board members like Bay might have
12     gotten some stock out of that thing, too.  Mark was
13     going to get some cash.
14              There was a whole confluence of transactions
15     that occurred during that time period.  But the end
16     result and end goal of the whole thing, I think,
17     ultimately, was that the Series A financing would be
18     effectuated.  MOD would be funded to the tune of a bunch
19     of money.  Mark would get the $5 million he felt he was
20     owed for a bunch of different things.  Mark would end up
21     something like a 71 percent shareholder in the company,
22     maybe a little less, but still a super majority.
23     Toshiba, NCR, and Deluxe would get their stock.  Arnold,
24     Bay, and others would be diluted.  That was the thrust
25     of it.

John Du Wors                                    October 10, 2014

                                                    Page 108

 1              That by, you know, late fall of 2008, Series A
 2      financing would be completed; and everybody would have
 3      their stock and cash; and MOD would have the intellectual
 4      property it needed from Mark to do its business,
 5      especially its business for MOD -- I'm sorry -- for
 6      Toshiba; and Toshiba would get the benefit of the
 7      Freedom of Operation Agreement to make sure it never had
 8      business disruption as a result of an infringement claim
 9      from Mark.
10         Q.  Look, if you would, at paragraph (g) on page
11      three of Exhibit 14.
12         A.  Okay.
13         Q.  There is a sentence there which reads, "Resolved
14      that Mark Phillips' annual salary as an officer of the
15      company is increased to $250,000 effective 10/15/07."
16      Do you see that?
17         A.  I do.
18         Q.  Do you know if, in fact, his salary was actually
19      paid at the rate of $250,000 per year, effective
20      10/15/07?
21         A.  I don't have any independent personal knowledge
22      responsive to that.
23         Q.  Was this issue brought up on behalf of the
24      defense at the trial, in any way, specifically referring
25      to Mr. Phillips' federal criminal trial?

John Du Wors                                    October 10, 2014

                                                      Page 109

1          A.  I don't recall.  I'd have to check.  But the

2     transcript will tell you that.

3          Q.  Do you recall if you ever made any efforts to

4     verify whether or not the $250,000 level of salary had

5     been paid?

6          A.  I don't recall.

7              (Exhibit 15 marked for identification.)

8     BY MR. KIMBALL:

9          Q.  Mr. Du Wors, you've been handed a document

10    marked as Exhibit 15.  Have you ever seen this document

11    or the content thereof prior to today?

12         A.  I don't recall.

13         Q.  Do you know if this document was made an exhibit

14    for the defense or for the prosecution in the Phillips

15    federal criminal trial?

16         A.  I don't recall.

17         Q.  The document is titled, "Minutes of the Meeting

18    of the Board of Directors of MOD Systems, Inc.,

19    September 17, 2008."  Do you see that?

20         A.  I do.

21         Q.  If you look at the last page of Exhibit 15,

22    there appear to be two signatures dated September 17,

23    2008, one being Mark Phillips and Thomas Grohman.  Do

24    you see that?

25         A.  I see the language and markings you're

John Du Wors                                    October 10, 2014

                                                        Page 110

 1     describing.

 2          Q.  Do you have any reason to believe that the two

 3     signatures represented on the last page of Exhibit 15

 4     are other than those of Mark Phillips and Thomas

 5     Grohman?

 6          A.  I have no opinion either way.

 7          Q.  The content of Exhibit 15 appears to primarily

 8     concern amended and restated articles of incorporation,

 9     along with private placement of Series A preferred

10     stock, and then content license agreements and warrants.

11     Do you recall if any of those subjects were elicited in

12     any testimony or other evidence on behalf of the defense

13     at the Phillips criminal trial?

14          A.  I generally recall those subjects being

15     discussed in testimony at the trial, yes.

16          Q.  Can you give me a summary of what you recall the

17     testimony was?

18          A.  As I recall, the testimony related to our

19     defense theory -- I mean -- you know, there was

20     testimony both offered by the prosecution and the

21     defense on that subject, but the testimony related to

22     our defense theory that on account of a bunch of stuff,

23     including underpayment and intellectual property

24     licensing, the company had agreed it owed Mark Phillips

25     money, including, but not limited to, five million bucks;

John Du Wors                                    October 10, 2014

Page 111

1        and the board, who we thought -- principally driven by
2        Anthony Bay -- whom we felt was kind of trying to screw
3        Mark, was dragging their feet on taking the necessary
4        steps to pay Mark Phillips his five million bucks.
5        Those steps potentially including, but not limited to,
6        execution of final agreements necessary to effectuate
7        that obligation, and also payment of that obligation by
8        wire, such that Mark Phillips, as CEO, took it upon
9        himself to make that payment to himself for a debt or on
10       account of a debt that was legitimately owed to him as a
11       contributor of a lot of value to MOD Systems, but not
12       because he was engaging in any kind of corporate theft
13       or wire fraud, and, therefore, could not be convicted of
14       the criminal charges being waged against him in the
15       context of that trial.
16            Q.  Turn, if you would, to page ten of Exhibit 15.
17       Specifically, going down about a third or more of the
18       way on the page, there are four paragraphs which begin
19       with the word "Whereas" in capital letters.  Do you see
20       those?
21            A.  I do.
22            Q.  So, in the first of those, the text reads,
23       "Whereas Mark E. Phillips, the president, chief
24       executive officer, chief technology officer, and a
25       director of the company, is the owner of, or has

John Du Wors                                    October 10, 2014

                                                        Page 112

1        exclusive rights to certain inventions, technology and

2        other intellectual property that is currently used by,

3        licensed to, or useful to the company."  Do you see

4        that?

5            A.  I do.

6            Q.  Do you recall if there was any testimony about

7        that subject matter specifically during the Phillips

8        criminal trial in Federal District Court?

9            A.  As I recall, generally, yeah.

10           Q.  And do you recall who offered that testimony?

11           A.  I know that we offered it.  It may have been

12       offered by the prosecution as well.  It was germane to

13       their culpability theory.

14           Q.  What was their culpability theory?

15           A.  Well, their theory was it didn't matter if Mark

16       was legitimately owed that money by MOD Systems or if

17       the company had agreed to pay it to him.  The fact that

18       he took it without board resolution or transfer by

19       someone with authority at MOD to make that transfer, it

20       was still theft, even if the debt was legitimately owed;

21       even if the board later acknowledged, by way of executing

22       the contribution and licensing agreement, that Mark

23       Phillips deserved that money.

24               It was essentially a direct response to our

25       theory, which was that Mark wasn't stealing something

John Du Wors                                    October 10, 2014

Page 113

1          from the company; he was paying something the company

2          had already acknowledged was owed to Mark Phillips.

3          It's just that Bay was being a sleazy jerk and trying to

4          withhold that stuff from Mark, because Bay was always

5          trying to figure out ways to steal money and stock from

6          Mark; and also push Mark out based on jealousy and, I

7          think, anger that Mark was experiencing a growing

8          feeling that Bay's utility at MOD Systems was less than

9          he had originally thought.

10              Q.  Look, if you would, at the following paragraph,

11         again beginning, "Whereas," which begins with the

12         sentence and reads, "The board had previously discussed

13         and approved at its July 9, 2008 meeting, the company's

14         acquisition of the Phillips IP by acquiring 100 percent

15         of the stock of Anything Box, Incorporated, a company

16         wholly owned by Mr. Phillips, that was to own certain

17         Phillips IP pursuant to the terms of a stock purchase

18         agreement and the acquisition of a license agreement

19         between Mark Phillips and the company for certain

20         Phillips IP."  Do you see that?

21              A.  I do.

22              Q.  Do you recall if any testimony was offered on

23         that subject?

24              A.  I think so, yeah.  I generally recall that.

25              Q.  Who offered that testimony?

John Du Wors                                    October 10, 2014

Page 114

1          A.  What witnesses?

2          Q.  Yes.

3          A.  At least Mark.  I don't know who else.  I don't

4      recall who else.

5          Q.  Was the testimony elicited by you or by

6      Mr. Mair?

7          A.  Some would have had to have been elicited by me,

8      because I conducted the direct examination of Mark

9      Phillips.  Mr. Mair may have also elicited the testimony

10     from other people.

11         Q.  I believe you already indicated, in response to

12     my question, you don't recall if Exhibit 15 was offered

13     into evidence as a defense or prosecution exhibit.  Is

14     that correct?

15         A.  I don't recall.

16             (Exhibit 16 marked for identification.)

17     BY MR. KIMBALL:

18         Q.  Mr. Du Wors, you've been handed a document

19     marked as Exhibit 16, which is comprised of, in the

20     first two pages, Minutes of Special Meeting -- which is

21     a document titled, "Minutes of Special Meeting of the

22     Board of Directors of MOD Systems, Inc., a Washington

23     State Corporation."  Do you see that document?

24         A.  I do.

25         Q.  Do you recall if you've ever seen this document

John Du Wors                                October 10, 2014

Page 115

1       before?

2            A.  I don't.

3            Q.  It appears, for the record, that, in fact,

4       Exhibit 16 is two copies, comprising four pages of what

5       is actually a two-page document.

6            A.  If you say so.

7            Q.  Look, if you would, at the first page of

8       Exhibit 16, under the heading, "Anything Box Agreement,"

9       at the paragraph which reads, "Whereas, the Board deems

10      it advisable and in the best interests of the company

11      and its shareholders to acquire Anything Box,

12      Incorporated, pursuant to which, among other things,

13      (a), the company would acquire 100 percent of Anything

14      Box stock as stated in the stock purchase agreement

15      attached hereto as Exhibit A; and (b), the company would

16      acquire that certain license agreement between Mark

17      Phillips and Anything Box attached hereto as Exhibit B,

18      the material provisions of which have been previously

19      discussed with each member of the board."  And then it

20      goes on, which I won't read the rest of it.

21           Do you recall if, during trial, there was any

22      testimony offered by anyone concerning the subject

23      matter of the paragraph I've just read?

24           A.  I think so.

25           Q.  Do you recall specifically what that was?

John Du Wors                                    October 10, 2014

Page 116

1          A.   Not specifically.  I recall it generally.

2          Q.   What is your general recollection?

3          A.   My general recollection was that our defense

4     theory was that Mark Phillips had licensed intellectual

5     property to Anything Box, and was going to sell Anything

6     Box's shares to MOD Systems, I guess for some amount of

7     money that would have funded Anything Box's ability to

8     pay the license fee to Mark Phillips that was the

9     subject of that license Mark Phillips granted to

10    Anything Box; but that MOD Systems' board was dragging

11    its feet in some form or fashion with respect to that

12    transaction as a whole, and thereby not finalizing

13    whatever steps were necessary to get Mark Phillips his

14    $5 million; and that as a result, even though the

15    company had agreed, one way or another, that Mark

16    Phillips would get paid that $5 million, because they

17    weren't doing it, Mark took it upon himself to pay

18    himself a portion of what was generally agreed that he

19    was owed so that he could go buy the condo that Jan

20    Wallace had sort of coaxed him into buying.  So he

21    transferred that $1.5 million as his down payment on

22    that condo.

23          And that when the board objected because the

24    Anything Box transaction had not been finalized, such

25    that the company had not yet assumed its obligation to

John Du Wors                                          October 10, 2014

1      pay him that money or had not yet taken the steps to pay

2      him that money, Mark Phillips transferred the money back

3      out of the shadow account into MOD's account to repay

4      it; and persuaded the company, perhaps with Toshiba's

5      help, to eventually finalize the written deal that

6      entitled Mr. Phillips to payment of that $5 million,

7      which was memorialized in the October 2008 licensing

8      agreement as part of the Series A financing.

9           Q.  Look, if you would, at the area just above the

10     paragraph I read and just to the right and below that

11     same paragraph.  There appears to be some handwriting on

12     this document.  Do you see that?

13          A.  I do.

14          Q.  Do you recognize that handwriting at all?

15          A.  No.  It's not mine.

16          Q.  Did you ever talk about whether or not it would

17     be necessary to return to the board for final approval

18     about any of the matters that were referred to or

19     discussed in Exhibit 16?

20          A.  No.  I would assume that is the handwriting of

21     someone relevant to that transaction at the time as

22     opposed to litigation counsel after the fact.  I don't

23     think that's me or Pete Mair or anyone like that.  It's

24     probably Bill Bromfield or Anthony Bay or David Douglass

25     or Tom Grohman or someone else associated with the

John Du Wors                                October 10, 2014

Page 118

1     transaction.  It's not Mark Phillips' handwriting

2     either.  And it's not Pete Mair's handwriting.

3            MR. KIMBALL:  I'd like to take a break for about

4     five minutes.

5            (Recess taken from 2:03 to 2:12.)

6            (Exhibit 17 marked for identification.)

7     BY MR. KIMBALL:

8        Q.  Mr. Du Wors, you've been handed a document

9     marked as Exhibit 17.  Have you ever seen this document

10    before today?

11       A.  I don't recall.

12       Q.  Exhibit 17 is titled, "MOD Systems Incorporated

13    Written Consent for Shareholder Action in Lieu of

14    Special Meeting," and appears to involve, according to

15    the content, amended and restated articles of

16    incorporation, increase in a stock option pool,

17    placement of some Series A preferred stock, addressing a

18    question of conflict of interest transaction with Mark

19    Phillips, Mark Phillips' employment agreement, and makes

20    a provision for counterpart signatures.

21            Does any of that discussion in my question

22    refresh your memory as to whether or not you've seen

23    this document before?

24       A.  No.  The document sure is weird, though.

25       Q.  How is it weird?

John Du Wors                                              October 10, 2014

Page 119

1          A.  Warren Lieberfarb's signature looks forged by

2     Mark.  It sure looks like Mark's handwriting.  Also, I

3     thought I remembered that Warren Lieberfarb was off the

4     board by October 1, 2008, and I thought Robert Arnold

5     was, too.  I thought by October 1, 2008 -- that's just

6     shortly before the Series A financing was finalized on

7     October 17, 2008 -- that the board was -- gosh, I think

8     Phillips, Bay, Carey, Kyleen Cane, maybe one other

9     person who is not reflected here.  There is a lot of

10    quirks about this document.  But okay.

11         Q.  Turn, if you would, to the third page of

12    Exhibit 17.

13         A.  Okay.

14         Q.  There is discussion of conflict of interest

15    transaction with Mark Phillips.  Do you see that?

16         A.  I do.

17         Q.  That section begins with the paragraph reading,

18    "Whereas, Mark E. Phillips, the president, chief

19    executive officer, chief technology officer, and a

20    director of the company, is the owner of or has

21    exclusive rights to certain inventions, technology, and

22    other intellectual property that is currently used by,

23    licensed to, or useful to the company."

24              Then it goes down, if you skip the next

25    paragraph, to the third paragraph under that heading,

John Du Wors                                    October 10, 2014

                                                        Page 120

1        and it says, "Whereas, Mark Phillips has agreed to

2        contribute to the company all of his right, title and

3        interest in and to certain of the Phillips IP pursuant

4        to the terms of a Subscription and Contribution

5        Agreement and Assignment attached to this consent as

6        Exhibit G, and to license certain other Phillips IP to

7        the company pursuant to the terms of a license agreement

8        attached hereto as Exhibit H," and then goes to provide,

9        "and the transactions contemplated therein, collectively

10       as the 'Phillips Transaction.'"

11              Do you recall if any of the subject matter I

12       have just questioned about was brought up at the

13       Phillips criminal trial in federal court?

14       A.   Yeah, I believe it was.

15       Q.   Which subjects specifically?

16       A.   Well, you know, I think we've discussed this so

17       thoroughly.  I'm really kind of repeating myself at this

18       point.  Our defense theory was that Mark Phillips

19       felt -- and perhaps justifiably so -- that he was owed a

20       bunch of money for a lot of reasons.  He had never been

21       paid much in the way of salary.  He had never been given

22       much in the way of a cash payment for the intellectual

23       property that he contributed to MOD Systems.  I think he

24       felt like he had given away too much stock for too

25       little to folks like Anthony Bay.  And he persuaded MOD

John Du Wors                                        October 10, 2014

                                                        Page 121

1        Systems and its people that he needed to be paid

2        $5 million.

3                They talked about a bunch of different ways to

4        structure that payment and a bunch of different reasons

5        that the payment should be made on account of.

6        Ultimately, what was negotiated was that the payment of

7        that money would be structured as a payment for the

8        acquisition of Anything Box that would fund the payment

9        Anything Box had contractually obligated itself to pay

10       Mark Phillips for the license granted to Anything Box.

11       I think they kind of drug their feet on that.  Folks

12       like Anthony Bay and other members of the board drug

13       their feet on finalizing that Anything Box acquisition.

14       Eventually, they decided not to proceed with the

15       transaction to get Mark Phillips his five million bucks

16       as an Anything Box acquisition; rather they structured

17       it as a license and contribution agreement, coupled

18       together, associated with a Series A financing

19       transaction.

20           Q.  All right.

21           A.  I mean, that was our defense theory.  They owed

22       Mark Phillips this money.  They had said they were going

23       to pay him.  They didn't want to finalize the deal by

24       signing off on it, but the board had approved it a bunch

25       of different times, a bunch of different ways.  Then

John Du Wors                                    October 10, 2014

Page 122

1    when Mark Phillips transferred that $1.5 million to
2    himself, he was just paying himself what he was owed,
3    which he had authority to do as the CEO.  But the Court,
4    unfortunately, disagreed with us.
5        Q.  A few moments ago, you questioned whether or not
6    the signature on Exhibit 17 had been forged;
7    specifically, that of Warren Lieberfarb.  Do you recall
8    that?
9        A.  Yes.
10       Q.  And you questioned, I think, earlier today as
11   well, whether or not Mark Phillips had forged signatures
12   on other documents.  Do you recall that?
13       A.  I do.
14       Q.  Has he ever admitted to you that he forged
15   signatures?
16       A.  No.  But my general recollection was that he
17   admitted, during the course of our criminal
18   representation of him, when preparing for trial, that he
19   had created and executed some number of documents after
20   the fact in order to either conjure up ratification or
21   approval for some of his corporate actions with respect
22   to MOD Systems.  I mean, one example is obviously the
23   bank fraud stuff and the resolutions that he executed
24   purportedly on behalf of MOD Systems, that he brought to
25   the bank -- I don't remember the name of the bank -- I

John Du Wors                                    October 10, 2014

Page 123

1      think it was Wells Fargo, but it might not have been --
2      to try and freeze that $12 million.  Those were the
3      subject, obviously, of a bank fraud claim by the
4      government, because Mark Phillips lacked actual
5      authority to execute those documents on behalf of MOD
6      Systems.  Because, of course, at that point, his shares
7      were the subject of a voting trust.  So he didn't have
8      the ability to unilaterally fire the board and the
9      officers and appoint himself sole board member or one of
10     other board members that he was appointing so that he
11     could authorize himself to have the funds frozen.
12         Q.  Was he convicted of bank fraud?
13         A.  Thanks to me, no.
14         Q.  Why do you say thanks to you?
15         A.  I think we did a hell of a job on that claim and
16     in the trial in general; and as a result, the jury came
17     back and said no bank fraud conviction.  I think a lot
18     of it had to do with my cross-examination of Larry
19     Gagness, after which Mark Phillips said to me openly in
20     the courtroom, "I love you."
21         Q.  Have there been any third parties -- more
22     accurately, any individuals whose signatures have
23     appeared on documents that have been made exhibits to
24     today's deposition who have told you that Mark Phillips
25     forged their signature on any document?

John Du Wors                                    October 10, 2014

                                                    Page 124

1           A.  No.

2           Q.  Again, you do not recall today whether or not

3      you attempted to get Exhibit 17 or another version of

4      Exhibit 17 into evidence during the Phillips criminal

5      trial?

6           A.  I don't have an independent recollection of

7      that, as I sit here today, but could probably give

8      better testimony after reviewing the documents in our

9      holdings at my law firm.

10          Q.  Did you review any documents in preparation for

11     your deposition today?

12          A.  I did not.

13              (Exhibit 18 marked for identification.)

14     BY MR. KIMBALL:

15          Q.  Mr. Du Wors, you've been handed a document

16     marked as Exhibit 18, consisting of three pages.  Have

17     you ever seen this document before?

18          A.  I don't recall.

19          Q.  This document, which is titled, "Agreement to

20     Terminate Prior License Agreements Between Mark E.

21     Phillips and MOD Systems Incorporated and Between

22     Mark E. Phillips and Anything Box Incorporated,"

23     contains, on the first page, at the second paragraph

24     beginning with the word, "Whereas," the following text:

25     "Whereas, prior to entering into the stock purchase

John Du Wors                                    October 10, 2014

Page 125

1      agreement, Phillips had licensed certain intellectual

2      property and technology to ABX under that certain

3      license agreement by and between Phillips and ABX, dated

4      April 25, 2008; and he had licensed certain other

5      intellectual property and technology to MOD under that

6      certain license agreement by and between Phillips and

7      MOD, dated April 23, 2007."  Do you see that?

8          A.  I do.

9          Q.  Were the recitals contained in the paragraph I

10     just read brought up at all during trial in the form of

11     any written exhibits?

12         A.  I think -- were the recitals brought up in

13     the -- that question is so vague, I don't know how to

14     answer it.

15         Q.  I would also like to ask you -- a moment ago,

16     when I was reading the question, you were looking at

17     your phone again, as you are doing now.  Are you using

18     the phone to refresh your memory as to the subject of

19     your testimony today?

20         A.  I am not.

21         Q.  Again, noting that you are using your telephone

22     as I am speaking, the question is, the content contained

23     in the second paragraph, beginning with the word

24     "Whereas" on the first page of Exhibit 18, contains

25     content which states that Phillips had licensed certain

John Du Wors                                  October 10, 2014

Page 126

1    intellectual property and technology to ABX under that

2    certain license agreement by and between Phillips and

3    ABX dated April 25, 2008.  Do you see that language?

4         A.  I believe so.

5         Q.  Were any documents offered by you, on behalf of

6    the defense, at the Phillips federal criminal trial,

7    which supported the language contained in the recital

8    paragraph I just read?

9         A.  I am able to tell you generally, based on my

10   current recollection, that we offered documents relating

11   to our defense that I've described before; specifically,

12   that the company, MOD Systems, had agreed to effectuate

13   payment to Mark Phillips in the amount of about five

14   million bucks on account of a bunch of different things.

15   Originally, they had agreed to structure it as an

16   acquisition of Anything Box, which was in receipt of an

17   IP license by Mark Phillips, and that later on, they

18   decided to do the transaction differently; specifically,

19   as a contribution of title and license rights to

20   intellectual property by Mark Phillips directly to MOD

21   Systems, in association with the October 17, 2008

22   license and contribution agreements, as well as the

23   Series A financing.  And as a component of that, because

24   they changed directions on how they were going to

25   structure the transaction to get Mark Phillips that

John Du Wors                                          October 10, 2014

Page 127

1    money, they agreed to terminate the license by Mark

2    Phillips to Anything Box.

3            So we introduced a bunch of documents and

4    testimony related to that defense theory, specifically

5    being that because he was owed that money and they had

6    agreed for a long time that he was owed that money, when

7    he took the $1.5 million for his new condo, he was just

8    paying himself what he was entitled to -- what the board

9    and everyone else had agreed he was entitled to, but

10   they hadn't finalized the paperwork necessary to pay him

11   yet.

12           So I couldn't tell you specifically what

13   documents were introduced in support of that theory at

14   trial without reviewing the clerk's minutes to see what

15   was offered and ultimately admitted by the Court, but

16   there was a bunch of documents relating to that theory,

17   a bunch of testimony relating to that theory.  I don't

18   know if Exhibit 18 was one of those documents or not.

19   I'd have to check.

20       Q.  Are you aware that you and/or your attorneys in

21   this matter have propounded discovery requests to

22   Mr. Phillips asking for documents?

23       A.  Am I aware that we have propounded discovery

24   requests?

25       Q.  Asking Mr. Phillips for documents.

John Du Wors                                    October 10, 2014

Page 128

1        A.  I don't know.

2        Q.  You don't know if you did or not?

3        A.  No.  I don't think so.  I don't think I've been

4    in the loop on that.

5        Q.  Have you reviewed any documents that were

6    provided through the discovery process by Mark Phillips

7    in this case?

8        A.  I don't think so.

9        Q.  Are you aware that either you or your counsel

10   provided to Mark Phillips, in the context of this case,

11   certain documents pursuant to discovery requests?

12       A.  I'm generally aware that we've made production,

13   indeed.

14       Q.  Did you review any of those requests or the

15   documents provided in response thereto?

16       A.  Well, I've reviewed written discovery requests

17   in the form of interrogatories.  I've reviewed answers

18   to those interrogatories.  I think I've signed off on

19   them.  I don't know whether we've reviewed written

20   inspection demands or requests for production of

21   documents.  I know that what we've done internally at

22   the firm is produced everything in our holding relating

23   in any way, shape, or form to Mark Phillips, Hunts Point

24   Ventures, or any of the parties or claims at issue in

25   the case; and we turned that over kind of wholesale to

John Du Wors                                          October 10, 2014

Page 129

1       our attorneys, and left it to them to review for
2       privilege and produce to you all as necessary.  So
3       whatever we had that could ever possibly fall within the
4       ambit of what should be produced in the case has been
5       produced to our lawyers.  I assume they've given it to
6       you.  And those efforts were led principally by Derek
7       Newman, with some help from me.
8               (Exhibit 19 marked for identification.)
9       BY MR. KIMBALL:
10          Q.  You've been handed a document marked as
11      Exhibit 19.  Have you ever seen this document before?
12          A.  I don't recall.
13          Q.  Again, this document is somewhat similar to the
14      document that was made an exhibit earlier today.  It has
15      two stamps near the bottom right-hand corner of each
16      page, beginning "MOD-DOJ," followed by a six-digit
17      number; and then "Phillips," followed by a seven-digit
18      number.  Do you see that?
19          A.  I see those characters that you're referencing.
20          Q.  Do those footers or those characters refresh
21      your memory as to whether or not you've seen these
22      documents before?
23          A.  No.
24          Q.  Do they refresh your memory as to whether or not
25      you or your office had received this document before?

John Du Wors                                          October 10, 2014

Page 130

1          A.   No.  I kind of remember something that looked

2     like this.

3          Q.   Was the footer or Bates stamping, Phillips in

4     capital letters, followed by a seven-digit number

5     beginning with at least one zero, used in your office to

6     chronicle and to track documents that were used in the

7     Phillips criminal defense?

8          A.   Oh, I don't know.  I mean -- yeah, I don't know.

9          Q.   You never saw a document with that Bates

10    stamping on it before?

11         A.   I'm not saying that.

12         Q.   So you're testifying that you don't know whether

13    or not that form of Bates stamping appeared on documents

14    in your office?

15         A.   No.  I mean, look, that form of Bates stamping

16    is so commonplace, it would likely be the Bates stamping

17    that would be used by any firm representing Mr. Phillips

18    in either criminal or civil litigation.  Mr. Phillips

19    had a veritable barrage of law firms representing him

20    during the time period spanning 2006 and 2012.  I

21    couldn't tell you if we did it, if Johnson Flora did it,

22    if Lasher Holzapfel did it, if Foster Pepper did it, if

23    DLA Piper did it, if Fenwick West did it, and I couldn't

24    tell you if it was for civil or criminal litigation.  I

25    mean, obviously, this document, assuming its

John Du Wors                                    October 10, 2014

Page 131

1       authenticity, was used a bunch of different times, a

2       bunch of different ways, because it's got so-called

3       Bates-like stamps on it a bunch.

4            Q.  Do you know if it was offered by plaintiff as an

5       exhibit at trial?

6            A.  Offered by the plaintiff as an exhibit at trial?

7       What trial are you talking about was there that had a

8       plaintiff?

9            Q.  Federal District Court.

10           A.  Which case?

11           Q.  The prosecution case.

12           A.  Well, there is no plaintiff in that case.  It's

13      a criminal case.  You don't have plaintiffs.  Those are

14      in civil cases.

15           Q.  The plaintiff would be the United States.

16           A.  Well, it's not the plaintiff.  Are you talking

17      about Mark's criminal prosecution?

18           Q.  Yes.

19           A.  I have no idea if it was introduced.  I'd have

20      to check the clerk's minutes to see if it was either

21      offered -- I'd have to check the transcript to see if it

22      was offered, and check the clerk's minutes to see if it

23      was admitted.

24           Q.  Does the notation appearing at the bottom of the

25      first page of Exhibit 19, which reads, "United States v.

John Du Wors                                       October 10, 2014

                                                      Page 132

 1          Mark E. Phillips, CR10-269JCC, Plaintiff's Exhibit
 2          No. 308," refresh your memory?
 3               A.  No.
 4               Q.  Who is Jan Wallace?
 5               A.  A woman, ostensibly.  I'm not sure what else
 6          you're asking me.
 7               Q.  Did you discuss any actions or activities of Jan
 8          Wallace with Mark Phillips as they may have related to
 9          his liability or culpability at his trial?
10               A.  Extensively.
11               Q.  Can you give me a summary of what his claims
12          about Ms. Wallace were?
13               A.  No.  As phrased, that question is overbroad.  I
14          could tell you the story of Jan Wallace's involvement,
15          at a very high level, and it would take a while.  I
16          mean, it's up to you if you want to use your time that
17          way.
18               Q.  Was Jan Wallace called as a witness by the
19          defense in the federal criminal prosecution?
20               A.  No.  We had no subpoena power over her.
21               Q.  Why was that?
22               A.  Because she lived in Arizona.
23               Q.  Was her deposition taken in Arizona by you or by
24          Mr. Mair?
25               A.  No.  We had no deposition rights in that case.

John Du Wors                                          October 10, 2014

                                                          Page 133

1          Q.  Did you seek the permission of the Court to take

2     her deposition in Arizona at any time?

3          A.  No.  I believe we relied on her -- I don't think

4     we were allowed to take her deposition at all.  She was

5     a target letter recipient and represented by criminal

6     counsel.  So she had the ability to take the fifth on

7     all matters until she entered into her amnesty agreement.

8          Q.  Did she enter into an amnesty agreement?

9          A.  As I understand it.

10         Q.  Do you know when that agreement occurred?

11         A.  I don't recall with specificity.

12         Q.  Did Jan Wallace testify on behalf of the

13     prosecution in the federal criminal case?

14         A.  She did.

15         Q.  How long was her testimony?

16         A.  I don't recall.

17         Q.  Prior to her testimony, did you attempt to

18     interview her?

19         A.  Did I?  No.

20         Q.  Do you know if Mr. Mair did?

21         A.  I don't know.

22         Q.  Is there a reason why you did not interview

23     Ms. Wallace?

24         A.  I don't think I was allowed to talk to her.  As

25     a criminal defendant in that matter, I don't think we

John Du Wors                                October 10, 2014

Page 134

1      had a right to interview her.

2           Q.  What are you basing your position that you

3      didn't have that right on?

4           A.  I don't remember.  That would have been Pete's

5      department.

6           Q.  Did you consult with Peter Mair about whether or

7      not you did have the right to interview Jan Wallace?

8           A.  I don't recall.  I think I understood that no

9      one could talk to her or Kenn Gordon, because they were

10     target letter recipients in the case, represented by

11     counsel.  I think the same was true with Doug Lower.  I

12     think he was represented by some woman who was also a

13     public defense panelist.

14          Q.  Did Doug Lower testify on behalf of the

15     prosecution at the Phillips criminal trial?

16          A.  I don't think so.

17          Q.  Did Kenn Gordon?

18          A.  Yes.

19          Q.  Did Kenn Gordon also have his own counsel?

20          A.  I think so.

21          Q.  Do you know who that was?

22          A.  I don't.

23          Q.  What efforts did you make, prior to

24     Mr. Phillips' trial, to interview Kenn Gordon?

25          A.  None.

John Du Wors                                    October 10, 2014

Page 135

1        Q.  Is there a reason why?

2        A.  I don't think I ever thought that was an option.

3        Q.  Did any of the testimony at the Phillips

4    criminal trial involve or concern payments made to Jan

5    Wallace?

6        A.  Yes.

7        Q.  What was the general substance of that

8    testimony?

9        A.  Well, a lot of people testified about it.  I

10   mean, you've got to remember, they flew up the guy that

11   owned Feel Good Watches down in Arizona to testify about

12   it.  They interviewed Jan Wallace -- I mean, they

13   examined Jan Wallace on it.  Of course, we examined Mark

14   on it -- I did.  And the general -- I mean very

15   general -- substance of the testimony was that Mark

16   testified he was paying Wallace on account of consulting

17   services.  The prosecution -- the government argued

18   through prosecutors that they were not legitimately on

19   behalf of consulting services, but rather Jan Wallace's

20   purported consulting services were a mask for Mark

21   Phillips to use company money to have Jan Wallace buy

22   him watches.  I mean, that was it.  That was the

23   conflicting testimony.

24           Mark would give money to Jan, $10,000, $20,000,

25   $30,000, whatever it was.  Jan would send it to Feel

John Du Wors                                          October 10, 2014

Page 136

1      Good Watches.  Mark would say, these are for the watches.
2      Jan would give that money to Feel Good Watches, almost
3      all of it.  I think Mark was owing them some money at
4      the end.  They would send the watch up to Mark.  You
5      know, some were Breguet.  I want to say one of them
6      might have been a Cartier, but I'm not sure.  Actually,
7      I think a Cartier was what the guy from Feel Good
8      Watches wore at trial on that particular day.
9            But Mark said, no, those funds I transferred to
10     Jan Wallace were for her consulting services; and the
11     watches she used that money to buy for me, Mark
12     Phillips, those were just gifts.  And the prosecution
13     effectively painted a picture that it was not the case
14     that Mark Phillips was transferring that $100,000 to Jan
15     Wallace as payment for her services and she just
16     happened, by coincidence, to be using it to transfer it
17     to Feel Good Watches to buy Mark Phillips gifts which
18     were then sent to him close in time to the time that he
19     transferred it to Jan Wallace.  Instead, the jury found
20     that that constitutes the use and disposition of MOD's
21     funds by Mark Phillips to buy himself watches, and,
22     therefore, constitutes wire fraud.
23         Q.  Do you recall the name of the individual who
24     worked at Feel Good Watches and appeared at trial to
25     testify?

John Du Wors                                          October 10, 2014

Page 137

1          A.   No.   But if it helps to find him, I remember he
2      was a New York Jew with a thick Brooklyn accent.
3          Q.   And a Cartier watch?
4          A.   And a Cartier watch.   Because that was Judge
5      Coughenour's joke to him as he took the stand.   There
6      had been all this talk of watches.   The jury heard about
7      watches ad nauseam.   When they finally got the CEO of
8      Feel Good Watches in there and he took the stand, Judge
9      Coughenour, who is a veteran trial lawyer and can't
10     resist starting testimony or examination with the kind
11     of joke a trial lawyer should make, turned to the
12     representative from Feel Good Watches and said, "So what
13     kind of a watch are you wearing?"   And everyone laughed,
14     including the jury.   And the representative from Feel
15     Good Watches said, it's a Cartier something or other.
16     Pete Mair who then cross-examined that individual, who
17     practices very much as a trial lawyer, the way that
18     Judge Coughenour did, asked of that representative,
19     "Where is that accent from?"   And the witness said,
20     "Brooklyn, New York."   But, of course, he was living now
21     in Arizona.   So Pete Mair asked, "And is that a Brooklyn
22     tan?"   Because he was kind of a pale Jewish guy with
23     kind of a sunburn.   The witness said, "It's probably my
24     high blood pressure."   And all laughed again.
25         Q.   Did you interview this individual prior to

John Du Wors                                    October 10, 2014

                                                        Page 138

1      trial?

2           A.  No.

3           Q.  Did you attempt to interview him?

4           A.  No.  I don't think we even knew that he was

5      going to be put on the stand.  Or at least I didn't

6      know.  Pete might have known.

7           Q.  Was there a pretrial witness disclosure from the

8      United States?

9           A.  I don't recall.  I think so.

10          Q.  And you don't recall if he was listed there or

11     not?

12          A.  Oh, I don't recall.  I know that we wouldn't

13     have had subpoena power over him, because he was down in

14     Arizona, and the government flew him up and put him up

15     in a hotel for his testimony.

16          Q.  But you chose not to interview him as well.

17     Correct?

18          A.  I don't recall ever having been faced with that

19     decision.  It probably would have been Peter Mair's

20     decision.  I remember being very frustrated with the

21     criminal process, because I didn't have the broad

22     discovery rights that I would have as a civil litigator.

23          Q.  Do you recall what city Jan Wallace was living

24     in, in Arizona, during the time that these watch

25     transactions were occurring?

John Du Wors                                          October 10, 2014

                                                            Page 139

 1          A.  No.

 2          Q.  Do you recall the City in which Feel Good

 3     Watches was located?

 4          A.  No.

 5          Q.  Was there testimony offered at trial that

 6     Mr. Phillips had had direct contact with the individual

 7     representative from Feel Good Watches that you referred

 8     to a few moments ago?

 9          A.  I don't recall.  I think there might have been

10     an e-mail or two between Mark and that guy or someone

11     from Feel Good Watches.  I think, at some point, Mark

12     had not paid his bill for the watch, for one of the

13     Breguet watches; and the guy from Feel Good had sent him

14     an e-mail, asking him to either pay or return the watch.

15     And I think Mark maybe wrote an apology e-mail and then

16     paid his bill.

17          Q.  Was there an individual named David Douglass who

18     testified at trial?

19          A.  David Douglass was an important character in

20     that litigation, and I have to assume he testified at

21     trial, but I can't remember what he looked like or what

22     his testimony was at trial.  I assume, for that reason,

23     that Pete Mair must have examined him -- cross-examined

24     him.

25          Q.  A little bit earlier this afternoon, I asked you

John Du Wors                                    October 10, 2014

Page 140

1    about Exhibit 19 and whether or not you had seen it

2    before.

3         A.  Yes.

4         Q.  And your answer was that you didn't have a

5    recollection one way or the other.  Is that correct?

6         A.  Well, I said that, but I also said it looks kind

7    of familiar.  I think I saw something that looks like

8    this.

9         Q.  Do you recall if David Douglass was questioned

10   about Exhibit 19 or about the existence of any

11   Independent Contractor Services Agreement between MOD

12   and Meteor International Group Corporation?

13        A.  As I told you, I don't remember Douglass'

14   testimony at trial.  I can't picture him as I sit here.

15   I do recall that in the context of the overall story of

16   Mark Phillips' trial, David Douglass had been brought in

17   as sort of a CFO to try to clean up the company to make

18   it ready for a Series A financing.  You know, because

19   Mark had treated the company the way that founders treat

20   the company.  They commingle their own assets and funds

21   with it.  They live out of the company bank account.

22   They, when it starts to do well, use it for luxury

23   items.

24            That's all sort of fine and good in the very

25   early stages, but then when you're going to do an

John Du Wors                                    October 10, 2014

Page 141

 1        institutional financing under the Series A that occurred
 2        at MOD Systems, you have to bring in a professional CEO
 3        who properly accounts for everything and creates a
 4        founders account to debit for inappropriate expenditures
 5        and things like that.  Dave Douglass was that person.
 6        He kind of came in and he said, I see these transfers
 7        you're making to Jan Wallace, and we need an agreement
 8        with Jan Wallace in place in order to legitimize wire
 9        transfers that you're making to Jan Wallace, so go get
10        me an agreement with her.  If I understand correctly,
11        Mark went and got an agreement with Meteor, because
12        Meteor was a company Jan Wallace owned.  I think Mark
13        might have even formed it for her or paid a law firm to
14        form it for her.
15        Q.  So was the --
16        A.  I'm still talking.
17             Because previously, when there was not an
18        Independent Contractor Agreement in place sufficient,
19        from David Douglass' point of view, to legitimize those
20        financial transfers, all that Mark was getting to make
21        them seem legitimate was an invoice.  But the company
22        that was invoicing was Wallace Black.  I think Kenn
23        Gordon had wanted the invoice.  The problem was that
24        Wallace Black, which was Jan Wallace's consulting
25        company, had her name on it -- had Jan Wallace's name on

John Du Wors                                    October 10, 2014

Page 142

```
 1        it.  That was problematic, because everybody on the
 2        board knew that that was Mark Phillips' girlfriend.  So
 3        it didn't look like legitimate consulting services; it
 4        looked like Mark Phillips was funneling money to his
 5        girlfriend.
 6                I'm looking at the date of this Meteor
 7        agreement.  It's June 3, 2008.  Mark Phillips bought
 8        those watches, made those wire transfers to Jan Wallace
 9        for watches, I think in the months spanning January 2008
10        through April or May of 2008.  It was in that time
11        period that Jan Wallace was sending him invoices to
12        satisfy Kenn Gordon from Wallace Black.  Because the
13        problem with them being Wallace Black invoices and
14        having Jan Wallace's name on them when everyone knew she
15        was Mark Phillips' girlfriend -- because of that, Mark
16        Phillips changed the invoice to W. Black, put it in his
17        Adobe Acrobat program or whatever it was and modified
18        that agreement.
19                That, of course, came out in trial as another
20        source of my concerns about Mark Phillips' cosmetic and
21        dishonest modification of agreements or forgery of
22        documents to support his position at a given time.  It
23        was after that, that David Douglass said I don't care if
24        there is invoices, we don't have an independent
25        contractor consulting services agreement in place.
```

John Du Wors                                        October 10, 2014

Page 143

```
 1              I think, if I recall correctly, what Mark did at
 2      that point was had some attorney form Meteor for Jan
 3      Wallace.  Of course, I see this document has an address
 4      for Meteor being -- for MOD Systems being 720 Third
 5      Avenue.  That makes sense.  Earlier, you and I were
 6      talking about what business was it that resided at 720
 7      Third Avenue, Suite 1100, because that was the address
 8      for Anything Box.  Turns out that's also the address for
 9      MOD Systems.  In 2008, that must have been before MOD
10      Systems moved into the Washington Mutual tower at 1201
11      Third Avenue, Suite 1000, I think.  I think they were
12      taking up the whole tenth floor there.
13              Anyway, so Douglass came in and wanted an
14      Independent Contractor Agreement.  I think Mark Phillips
15      caused this to be put together in an effort to make his
16      transfer of funds to Jan Wallace somehow okay.
17         Q.  So, at trial, did Douglass testify about these
18      events and corporate governance questions?
19         A.  I sure don't know how to better tell you what
20      I've told you several times before, which is that I
21      don't have an independent recollection of the substance
22      of Dave Douglass' testimony at trial, or even whether he
23      testified at all, and I still don't.
24         Q.  And if he testified, you don't recall if it was
25      you or Mr. Mair that would have examined or
```

John Du Wors                                     October 10, 2014

Page 144

1    cross-examined him.  Correct?

2        A.  I feel almost sure that it would have been Pete

3    Mair that examined him.  That's true for a number of

4    reasons.  One, if I examine somebody, I generally

5    remember them.  Because I have to prepare for that

6    examination, look them in the eye, and that leaves an

7    impression on you.

8            Two, Peter Mair spent a lot of time -- I mean a

9    lot -- with the law enforcement interview transcripts of

10   David Douglass, as well as his Grand Jury testimony.

11   Because during that preparation period, Pete Mair came

12   back to me a lot of times, saying Douglass says this and

13   Douglass says that, and here is what I think we can get

14   out of Douglass, et cetera, here is how Douglass factors

15   into all of this.  So I think Pete Mair had taken on

16   Douglass as his witness, just as Mair had taken on

17   Wallace and Cane and the Feel Good Watches guy.

18           (Exhibit 20 marked for identification.)

19   BY MR. KIMBALL:

20       Q.  You've been handed a document marked as

21   Exhibit 20, which appears to be an e-mail from David

22   Douglass -- strike that -- forward of an e-mail from

23   David Douglass to Mark Phillips, which in turn is

24   forwarding an e-mail from David Douglass to Mark

25   Phillips, copying Kenn Gordon.  Have you ever seen the

John Du Wors                                     October 10, 2014

                                                      Page 145

1      content of Exhibit 20 before?

2          A.  I don't recall.

3          Q.  The second or earlier e-mail on the page, which

4      purports to have been sent Wednesday, August 13, 2008,

5      at 9:15 a.m., to Mark Phillips, copying Kenn Gordon,

6      from David Douglass, has text which reads, "Mark,

7      attached is the final version of the agreement we

8      discussed yesterday for Meteor/Jan Jardin.  Please have

9      Jan sign.  Also, please ask Jan to submit a revised

10     invoice (just one more invoice) for the $50,000 that

11     requests $25K be paid to Meteor and $25K be paid to

12     Holman Cahill Garrett.  The ICA allows for this."  Then

13     there is a sharing website URL that appears below that.

14          Do you recall talking about the substance of the

15     text I just read with Mark Phillips at any time?

16          A.  I don't recall.  You did misread that message,

17     though.  You said, "Just one more invoice," when, in

18     fact, the text from David Douglass says, "Just one

19     invoice."

20          Q.  You are correct.

21          A.  I don't recall whether or not we discussed this

22     e-mail.  We knew and talked with Mark about the fact

23     that generally speaking, David Douglass had asked for

24     Mark to get an Independent Contractor Agreement in place

25     with Jan Wallace.  I don't know whose suggestion it was

John Du Wors                                    October 10, 2014

Page 146

1    that it was Meteor that be formed as the performance

2    obligor on that agreement, but ultimately that was

3    decided, apparently.

4            And, of course, Mark had asked that his

5    attorney, Larry Garrett, at the law firm of Holman

6    Cahill Garrett, allow his -- Larry Garrett's trust

7    account to be used to funnel money through to Jan

8    Wallace for the purpose of purchasing those watches.

9    Mark Phillips had sent an e-mail to Larry Garrett, which

10   came out at trial, saying that he wanted to use Larry

11   Garrett's trust account to make those transfers, because

12   he really liked the confidentiality and attorney-client

13   privilege associated with his use of that trust account

14   as a payment conduit.

15       Q.  Did Mark Phillips specifically use the words

16   "payment conduit"?

17       A.  Pretty close.  If that's not verbatim, it was

18   something pretty close to that.  He definitely verbatim

19   mentioned how much he liked the confidentiality and/or

20   privilege associated with it.

21       Q.  Did he tell you that he was using the account to

22   funnel money to Jan Wallace for purposes of getting

23   watches?

24       A.  I believe he told us expressly that he was using

25   the account for purposes of transferring funds to Jan

John Du Wors                                    October 10, 2014

                                                    Page 147

1       Wallace.  I think that he always maintained, in his

2       conversations with us, that he was sending that money to

3       Jan Wallace on account of consultant services.  I don't

4       know that we ever challenged him on that.  He told us

5       that that was the truth; and that even though he was

6       paying her amounts on account of consulting services and

7       they were the exact amounts she needed to go and buy him

8       watches that he knew from her she wanted to buy for him,

9       that they were still just for consulting services and

10      the watches were just gifts.  That was what he always

11      told us.  And it's our job to advise Mark as to whether

12      or not that theory is credible, not to try and convict

13      him, ourselves, as his defense lawyers.

14          Q.  Do you recall when you had those discussions

15      with Mr. Phillips?

16          A.  You know, it would have been from that six- or

17      nine-month period spanning the fall of 2010 through the

18      time of trial in or about May of 2011.

19          Q.  I notice you're looking at your phone again.

20      Are you using that to refresh your memory as to dates or

21      any other subject in question?

22          A.  No.  I'm looking to see what time it is to see

23      how close we are to being in a reasonable position to

24      take a break.  I'm also checking out an e-mail I just

25      got on that same case where I won the motion to compel.

John Du Wors                                    October 10, 2014

                                                      Page 148

1       Because they're now proposing dates to me for the

2       deposition I get to take as a function of my victory on

3       that motion to compel.

4               MR. KIMBALL:  Why don't we take a break now.

5               THE WITNESS:  Can we take ten?

6               MR. KIMBALL:  Sure.

7               THE WITNESS:  Thanks.  I'm going to make a phone

8       call or two.

9               (Recess taken from 2:56 to 3:13.)

10              MR. KIMBALL:  Back on the record.

11      BY MR. KIMBALL:

12          Q.  Before the break, I had asked you some questions

13      concerning Exhibit 19, and you had also been testifying

14      concerning payments to Jan Wallace and some watches from

15      a store in Arizona.  Do you generally recall those

16      subject matters?

17          A.  Yeah.  I don't know that your prefatory comments

18      necessarily accurately summarize my testimony, but I do

19      recall the testimony that I gave prior to the break in

20      relation to those subjects.

21          Q.  Did you talk to Mark Phillips, at any point

22      prior to the trial or during his trial, regarding

23      whether or not there had been a reimbursement to the

24      corporation of the money that had been sent to Jan

25      Wallace?

John Du Wors                                    October 10, 2014

Page 149

1        A.  I don't recall.

2        Q.  Do you recall if you ever discussed whether Mark

3    Phillips had voluntarily reduced his compensation from

4    $250,000 to $150,000 to compensate for the $100,000

5    payments that had been paid to Jan Wallace?

6        A.  You know, I seem to remember some discussion and

7    even argument at trial that given what Mark Phillips was

8    owed in terms of the salary he was not paid, that the

9    amounts all came out in the wash.

10       Q.  Do you recall if you had any discussions with

11   Mr. Phillips, before trial or during trial, concerning

12   the $100,000 going into an attorney's trust account and

13   the reason for that was so it would go to Jan Wallace?

14       A.  Well, that question is compound in nature.  The

15   first part that you asked about the funds going into

16   Larry Garrett's trust account, that certainly was

17   something we discussed; and I believe that we discussed

18   that was so that those payments could be re- --

19   transferred again out of the Cahill trust account to Jan

20   Wallace, yeah.

21       Q.  I believe you've answered this, because you

22   indicated that you didn't have a good recollection of

23   the substance of Douglass' testimony.  But do you recall

24   if he was asked, by either the government or by you or

25   Mr. Mair, whether or not any of the payments to Wallace

John Du Wors                                    October 10, 2014

Page 150

1      had been made prior to 2009?

2             A.  Can I have that question read back.

3                 (Question read by the reporter.)

4                 THE WITNESS:  I don't recall.

5      BY MR. KIMBALL:

6             Q.  Turn, if you would, to Exhibit 20 again.

7             A.  Okay.

8             Q.  Do you recall if that was, either in this

9      present form or in a different form, introduced as an

10     exhibit at the time or during Mark Phillips' trial?

11            A.  I don't recall.

12                (Exhibit 21 marked for identification.)

13     BY MR. KIMBALL:

14            Q.  You've been handed a document marked as

15     Exhibit 21.  I'd like you to look at that and let me

16     know if you've ever seen it before.

17            A.  It looks familiar.  I don't specifically recall

18     it.  But yes, I think I saw this.

19            Q.  And it appears that this was originally an

20     e-mail sent by Aravind Swaminathan --

21            A.  Swaminathan.

22            Q.  -- at the U.S. Attorney's Office to Pete Mair,

23     who then forwarded it on to you and Charlotte Williams.

24            A.  Okay.

25            Q.  Do you have any reason to believe that you did

John Du Wors                                    October 10, 2014

Page 151

1      not receive the e-mail which forwarded the content of

2      pages one, two, and -- one and two?

3          A.  I don't.

4          Q.  Do you recall discussing the plea offer terms or

5      the content of Exhibit 21 with Mark Phillips?

6          A.  Yeah.  I think -- I know that we did, in fact,

7      discuss that with Mark.

8          Q.  Where did that discussion occur?

9          A.  It would have been down at the Federal Detention

10     Center in Tukwila or Sea-Tac.

11         Q.  Was he in custody at the time that this was

12     received?

13         A.  I don't know.  I don't recall.  I think so.

14         Q.  Did Mr. Phillips agree, at any point, to a

15     guilty plea or to any sort of plea arrangement that

16     would have resulted in not going through with trial?

17         A.  No.

18         Q.  Did you ever discuss a counter-offer to the

19     terms that the U.S. Government was seeking in terms of a

20     potential plea agreement?

21         A.  I think that Pete Mair discussed a counter-offer

22     with Mark.

23         Q.  Did Peter Mair have any visits, to your

24     knowledge, with Mark Phillips at the detention center in

25     which you were not present after you became involved in

John Du Wors                                October 10, 2014

Page 152

1      the case?

2              A.  Yes.

3              Q.  Do you know how many, approximately?

4              A.  Two or more.

5              Q.  Did you provide or give a copy of Exhibit 1 to

6      HPV or any person who was working for or at HPV?

7              A.  I don't recall.

8              Q.  Did you provide a copy of Exhibit 21 to the

9      Rudkins?

10             A.  I don't recall.

11             Q.  If you did provide a copy to the Rudkins or to

12     HPV, was there a reason why that would have been done?

13             A.  I would be speculating, given that I don't

14     recall whether I did that or not.

15             Q.  Did the Rudkins or HPV request a copy of any

16     communications that you had in your office concerning

17     plea agreements?

18             A.  Not that I recall.

19             Q.  Again, sitting here today, it is your testimony

20     that you do not recall if you gave a copy of Exhibit 21

21     to either the Rudkins or to HPV.  Correct?

22             A.  Correct.

23             (Exhibit 22 marked for identification.)

24     BY MR. KIMBALL:

25             Q.  You've been handed a document marked as

John Du Wors                                        October 10, 2014

                                                      Page 153

1        Exhibit 22.  At the top of that document, it reads,

2        forwarded message from Steve Schweickert; subject,

3        latest text from J.D.  And then underneath, it says,

4        "Slowly inching our way to the goal line."  Do you see

5        that?

6             A.  I do.

7             Q.  It appears to be, on the two-page document

8        marked as Exhibit 22, a series of text messages between

9        you and Steve Schweickert.  Is that correct?

10            A.  I don't know.  I've never seen this before.

11            Q.  You've never seen the text messages before?

12            A.  I don't recall them.  But I've certainly never

13       seen this document before.  I don't remember the text

14       messages.

15            Q.  Did you ever communicate with Steve Schweickert

16       about Mark Phillips' trial prior to or during the trial?

17            A.  Constantly.

18            Q.  Why was that?

19            A.  Mark had made Schweickert, Rudkin, Lower, the

20       whole sort of HPV team his -- I don't know --

21       benefactors and support team during the course of that

22       criminal prosecution, including the trial.  Hunts Point

23       Ventures, led by Steve Schweickert, was paying for my

24       work in the trial.  They were closely monitoring it,

25       rooting for Mark more or less, and wanted lots of

John Du Wors                                          October 10, 2014

Page 154

1    updates on progress and whether he was going to come

2    out, and whether or not he was going to get a felony

3    conviction, wanting to settle the MOD Systems civil

4    litigation, and also thinking and talking about the

5    relationship between the civil litigation at MOD and the

6    trial.  Steve Schweickert and Chad Rudkin, Chad's wife,

7    Elizabeth, other friends of Mark's from Mark's past and

8    social life were showing up at the trial to see the

9    entire thing, to sort of be there as Mark's emotional

10   support.  You know, we were talking to all of them to

11   the extent we could without compromising Mark's defense.

12       Q.  Again, if you would take a look at the content

13   of Exhibit 22, specifically the text messages or what

14   appear to be text messages going back and forth, can you

15   tell me what the subject matter of these texts were?

16       A.  No.  Except to say that my mention of de Bakker

17   must have had something to do with Mark's settlement

18   with MOD Systems.

19       Q.  Who is de Bakker?

20       A.  He was in-house counsel for MOD Systems.  Mark

21   had hired him after he had been Mark's personal attorney

22   or maybe MOD Systems' personal testimony, maybe both,

23   when Derek de Bakker was at Foster Pepper.

24       Q.  When was the Phillips trial -- when did it

25   actually occur?  Do you recall the months or months and

John Du Wors                                    October 10, 2014

Page 155

1     year?

2          A.  I think it was May 2011.

3          Q.  And sentencing was when?

4          A.  I think it was a couple of weeks after the

5     trial.  So either May or June of 2011, I think.

6          Q.  Do you recall if a presentence report, a PSR,

7     was done by the government, prior to sentencing?

8          A.  I don't know.  I didn't work on the sentencing

9     portion of the trial.

10         Q.  Did you meet with any parole or probation

11    officers after trial?

12         A.  No.

13         Q.  At the time you were representing Mark Phillips

14    during the criminal trial, you were also doing civil

15    work, as I understand it, for HPV.  Is that correct?

16         A.  Can I have that question read back.

17             (Question read by the reporter.)

18             THE WITNESS:  I don't recall.  I don't know if

19    the patent infringement litigation had commenced as of

20    the time of the criminal trial.  I think it had not.  I

21    think that we did not begin our representation of HPV in

22    that patent litigation until after the trial was over,

23    because I was so consumed with the trial.  So the

24    sentencing portion of the trial may have been still

25    taking place at the time that we commenced the patent

John Du Wors                                    October 10, 2014

Page 156

1       litigation, but the jury trial portion of it, I feel
2       pretty certain would have concluded before we started
3       work on that.
4       BY MR. KIMBALL:
5           Q.  Prior to the criminal trial in federal court,
6       had you done any corporate or similar kind of
7       reorganization or other related work for HPV?
8           A.  I don't think so.  I think that Steve had other
9       lawyers in my firm do some really limited stuff.  We had
10      done the intellectual property assignment at the end of
11      2010 and finalized the settlement early in 2011, but in
12      terms of corporate for Hunts Point Ventures, I
13      understand Steve retained Michael Spain of my office to
14      handle redemption of shares for Joyce Schweickert, but I
15      wasn't involved in that.  Steve sort of left me alone to
16      focus on the criminal trial and didn't ask me to involve
17      myself in that.  I really didn't do any work for Hunts
18      Point Ventures during that period at all.  It wasn't
19      until after the criminal trial.  Just because I was
20      pretty consumed and Steve was happy to leave me out of
21      it and go straight to Michael Spain to do that stuff for
22      him.
23          Q.  Was Michael Spain an employee of the firm?
24          A.  Yeah.
25          Q.  Does he also have a profit sharing arrangement

John Du Wors                                    October 10, 2014

Page 157

1          or any kind of equity position in the company?

2              A.  No.

3              Q.  Did he in 2010 or 2011?

4              A.  Not as far as I know.

5              Q.  I believe, a moment ago, you pluralized your

6          response to indicate that other attorneys in the firm

7          may have done work.  In addition to Michael Spain, can

8          you think of any other attorney at Newman or Newman &

9          Du Wors that did any corporate or similar work for Hunts

10         Point Ventures at any time?

11             A.  At any time or prior to Mark Phillips' trial?

12             Q.  Prior to Mark Phillips' trial.

13             A.  Derek Linke assisted with the IP transfer, but

14         I'm not aware of Mr. Linke having had any role in either

15         the formation of HPV LLC or in the Joyce Schweickert

16         redemption agreement.

17             Q.  Those would have been Michael Spain?

18             A.  Correct.

19             Q.  Any others?

20             A.  No.  That's all I can think of.

21             Q.  Is Derek Linke still with the firm?

22             A.  He is.

23             Q.  Does he have any kind of equity or profit

24         sharing interest?

25             A.  I don't think so, but I don't know.  I don't

John Du Wors                                      October 10, 2014

Page 158

```
 1      have visibility into the compensation packages of the

 2      other lawyers in the firm, because I'm not an owner.

 3          Q.  Prior to the time that you represented Mark

 4      Phillips in the criminal matter that we've been talking

 5      about, did you provide any legal services for Steve

 6      Schweickert?

 7          A.  No.

 8          Q.  Other than what you have described in the last

 9      few minutes, did anyone at the firm provide any services

10      for Steve Schweickert?

11          A.  I don't think so.

12          Q.  Did you do an assessment, at any time, as to

13      whether or not representation of HPV and/or Schweickert,

14      by either you or the firm, would create a conflict with

15      your representation of Mark Phillips?

16          A.  Yes.

17          Q.  What did you do specifically to make that

18      determination?

19          A.  Well, when Phillips and Schweickert approached

20      us about transferring Phillips' intellectual property to

21      Schweickert, we concluded that that transaction would

22      constitute a conflicting transaction, but that the

23      conflict was waivable.  So we had Phillips and

24      Schweickert execute a conflict waiver -- Schweickert on

25      behalf of Hunts Point Ventures and Phillips on behalf of
```

John Du Wors                                          October 10, 2014

Page 159

1      himself individually -- to allow us to transfer title to

2      that intellectual property to Hunts Point Ventures in

3      exchange for the litigation funding obligation agreement.

4          Q.  That was only with regard to that one agreement.

5      Correct?

6          A.  I don't know.  I don't know what it covered.  I

7      mean, I think we had a conflict waiver signed with

8      respect to Hunts Point Ventures' payment of our fees for

9      representing Mark civilly and criminally as well.

10         Q.  Other than the conflict waiver document that you

11     referred to a minute ago involving Jennifer Schweickert

12     and Mark Phillips, and Jennifer both individually and on

13     behalf of HPV, were any other written conflict waiver

14     documents signed by anyone involving Mark Phillips or

15     HPV?

16             MR. FRANKLIN:  Object to the form.

17             THE WITNESS:  Yeah.  As phrased, that question

18     assumes a bunch of stuff that isn't true.  It misstates

19     my prior testimony, and is unclear and incomprehensible.

20     BY MR. KIMBALL:

21         Q.  All right.  I'll rephrase it.

22             Were any other written conflict waiver documents

23     or agreements signed other than the one that you've just

24     identified involving Mark Phillips' representation?

25         A.  I don't know how many documents those conflict

John Du Wors                                          October 10, 2014

Page 160

1    waivers appear in.  There, at minimum, was one written

2    document entitled "Conflict Waiver"; and other provisions

3    may have appeared in other agreements, including but not

4    limited to retainer agreements.  I just don't recall.

5         Q.  Did you ever inform Judge Coughenour that your

6    firm had represented Hunts Point Ventures and that a

7    conflict waiver had been executed?

8         A.  I don't know.  I don't think it ever came up.  I

9    think that -- I believe that we disclosed to the

10   prosecution -- and I think Judge Coughenour -- I know we

11   discussed certain aspects of it with Judge Coughenour --

12   that Hunts Point Ventures was paying Mark's -- or my

13   fees in association with Mark's criminal defense.  In

14   fact, there was one point where Judge Coughenour came

15   down off the bench, when he was hearing all this stuff

16   about various condos and intellectual property, and

17   pulled me and the prosecutors and Pete Mair aside and

18   said, "I'm really concerned about the fact that he has

19   publicly funded defense counsel.  What the heck is going

20   on here, and how are you getting paid, Du Wors?"  I

21   said, "Hunts Point Ventures is paying me."  But I said,

22   "Mark Phillips has transferred away all of his assets,

23   and he's now penniless, as far as we know."

24        Q.  Was this during trial or before trial commenced?

25        A.  That conversation was during trial.  Because he

John Du Wors                                          October 10, 2014

Page 161

1    was having that conference in response to testimony that

2    he was hearing.  I think it came up in the subject of

3    items discussed before trial as well.

4           (Exhibit 23 marked for identification.)

5    BY MR. KIMBALL:

6       Q.  You've been handed a document marked as 23.  Is

7    this the conflict waiver document you were referring to

8    a few minutes ago?

9       A.  I don't recall.

10      Q.  Can you look at it and then let me know.

11      A.  Well, yeah.  I mean, I am looking at it.

12          I would have to compare this with the documents

13   at my office, but this looks like at least one of the

14   conflict waivers we had the clients execute.

15      Q.  Do you believe that there were more than this

16   one document?

17      A.  I think so.  I just don't recall.

18      Q.  When did you first begin advising Mark Phillips

19   about issues relating to the criminal case and/or

20   investigation?

21      A.  In or around the time that Dave Bukey withdrew.

22   I don't remember when that was.  I want to say fall of

23   2010.

24      Q.  So after August 1st of 2010?

25      A.  I don't know.  I don't recall.

John Du Wors                                    October 10, 2014

Page 162

 1        Q.  Were you advising Mark Phillips at all

 2   concerning the criminal investigation or the criminal

 3   matter in June of 2010?

 4        A.  I don't know.  I mean, I just don't recall.

 5            I think that I would have, at minimum, said to

 6   him that a felony conviction would have impacts on his

 7   litigation.  So I probably would have been discussing

 8   the criminal litigation to the extent that it bore any

 9   relationship to his civil litigation or to litigation

10   for enforcement of his intellectual property by any

11   party.

12        Q.  Were there any provisions in any of the bylaws

13   or member agreements for Hunts Point Ventures or any

14   other company in which Mark was an owner or part owner

15   that contained a clause requiring his removal in the

16   event he were convicted of a felony?

17        A.  I don't know.  I have no idea.

18        Q.  Did you prepare any such documents?

19        A.  No.  I played no role in the preparation of

20   corporate documents for Hunts Point Ventures during that

21   time period.  That was all Cairncross & Hempelmann.  And

22   I played no role ever in the formation or corporate

23   governance of documents -- sorry -- corporate governance

24   for any entity owned by Mark Phillips.

25        Q.  Do you ever recall discussing with Mark Phillips

John Du Wors                                    October 10, 2014

Page 163

```
 1      an allegation concerning a rape-for-hire scheme
 2      involving Jan Wallace's daughter?
 3          A.  I think that we discussed it in the most general
 4      sense, but it never received a great deal of focus in
 5      any of our discussions.
 6          Q.  Do you recall what the substance of that
 7      discussion was?
 8          A.  No.  Because that allegation had been disclaimed
 9      by the prosecution prior to my appointment as
10      Mr. Phillips' criminal counsel.  So it wasn't really an
11      issue in play.  We didn't have a reason to talk about it.
12          Q.  When you say appointment as his criminal
13      counsel, do you mean in the federal case that we've been
14      discussing today?
15          A.  Correct.
16          Q.  All right.  Did Mark Phillips ask you to do any
17      investigation before it had been resolved or after it
18      had been resolved?
19          A.  About the rape matter?
20          Q.  Yes.
21          A.  No.
22          Q.  Did you ever interview or discuss the
23      allegations with Jan Wallace?
24          A.  No.  The allegation was not the subject of any
25      civil or criminal claim, and, therefore, did not, from
```

John Du Wors                                    October 10, 2014

                                                       Page 164

1        my point of view, deserve any attorney attention.

2            Q.  Was this allegation ever brought up during trial

3        in the federal case?

4            A.  No.  I think it was the subject of a motion in

5        limine, actually.  I think it was specifically excluded

6        from trial.

7            Q.  Do you recall ever being interviewed by or

8        interviewing anyone at the FBI in which this allegation

9        was discussed?

10           A.  No.  I was not interviewed by anyone from the

11       Federal Bureau of Investigation, and we had no access to

12       interview anyone at the FBI, nor did I interview anyone

13       about that allegation; because once again, it was not

14       the subject of any claims or criminal charges being

15       asserted against Mr. Phillips.

16           Q.  Do you know who Eric Lundvall is?

17           A.  I do.  I've never met him or seen him, but yes,

18       I know.

19           Q.  What is your understanding of who he is and how

20       he is connected to Mark Phillips?

21           A.  As far as I know, he was a friend of Mark

22       Phillips or purported friend of Mark Phillips.  I guess

23       Eric Lundvall -- who sometimes went by Chris Lundvall,

24       if I understand correctly -- I'm not sure why he used

25       two different first names -- was the guy that had done

John Du Wors                                          October 10, 2014

Page 165

```
 1      some work for Mark Phillips at MOD Systems, I think on a
 2      consulting basis; and had started becoming romantically
 3      involved with Chloe, the daughter of Jan Wallace.  I
 4      mean, the story went -- I have no personal knowledge --
 5      but the story went that Eric Lundvall had collaborated
 6      with Jan Wallace and Chloe -- I think, Chloe Jardine to
 7      set Mark up by calling him to precipitate this
 8      conversation, which conversation formed the basis of the
 9      claim that Mark had offered to bribe Chris Lundvall or
10      Eric Lundvall for raping Chloe after her 18th birthday.
11      I never listened to that call or read a transcript of
12      it, so I couldn't tell you what was actually said on
13      that call.
14           Q.  Did you ever have any laptop or other computers
15      belonging to Mark Phillips in your possession?
16           A.  Yes.
17           Q.  Do you recall the name brand of each of the
18      items?
19           A.  No.
20           Q.  Were they laptops?
21           A.  I think we had a laptop of Mark Phillips'.
22           Q.  When did you have that laptop?
23           A.  Oh, I don't know.  During the criminal
24      prosecution.
25           Q.  Why did you have the laptop?
```

John Du Wors                                    October 10, 2014

Page 166

1        A.  Mark wanted us to have it to try and retrieve

2    documents.

3        Q.  So Mark Phillips gave you or allowed you to have

4    possession of the laptop.  Correct?

5        A.  Correct.

6        Q.  And asked you to go through it to try to get

7    documents?

8        A.  I don't remember his instructions in that

9    regard.  But we were trying to find documents related to

10   his criminal defense.  I think one of the places that we

11   looked was on the laptop, including for e-mails with Jan

12   Wallace.

13       Q.  Did you have the password or passwords that

14   allowed you full access to the laptop?

15       A.  I don't recall.  I think the main person

16   investigating the laptop was Derek Linke.  He's more

17   tech savvy than I am.  I remember there were some

18   problems with the passwords.  Mark Phillips used a bunch

19   of different passwords.  I think he wasn't remembering

20   which one he was using for that laptop.  I think,

21   eventually, we got access.

22       Q.  Was any data lost during the time that you had

23   the laptop in your or your firm's possession?

24       A.  Not to my knowledge.

25       Q.  Was any data erased?

John Du Wors                                    October 10, 2014

Page 167

1           A.  Not by me, and not to my knowledge.

2           Q.  Did Derek Linke ever tell you that data had been

3      taken off?

4           A.  No.

5           Q.  Did he ever ask you about taking data off?

6           A.  No.

7           Q.  Did you hire any kind of a forensic expert to

8      examine the laptop to determine if there had been any

9      kind of data compromises or data removal?

10          A.  No.  Compromise of data was never a suggestion

11     that was raised during that time period or since, except

12     perhaps in this litigation.

13          Q.  When did your firm first begin doing work for

14     Hunts Point Ventures?

15          A.  Well, I think that we started receiving payments

16     from Hunts Point Ventures for Mark Phillips'

17     representation in early summer of 2010.  I don't know

18     that I would consider that Hunts Point Ventures specific

19     work, though, although they probably were a co-client at

20     that point.  Work for Hunts Point Ventures probably did

21     not begin until the IP transfer in the fall of 2010.

22     And then we did work for Hunts Point Ventures in the

23     form of the settlement agreement, because I think Hunts

24     Point Ventures became an indemnitor on that settlement

25     agreement in case Mark Phillips breached any of his

John Du Wors                                    October 10, 2014

                                                    Page 168

1        obligations under the MOD settlement agreement.  And

2        then Michael Spain did the share redemption for Joyce

3        Schweickert.  Beyond that, I don't think our

4        representation of Hunts Point Ventures occurred again

5        until we started bringing patent litigation suits.

6                 (Exhibit 24 marked for identification.)

7        BY MR. KIMBALL:

8            Q.  Mr. Du Wors, I've handed you or you've been

9        handed a document marked as Exhibit 24, which is titled

10       on the top page, "Hunts Point Ventures Nuclear Unit."

11       Do you see that?

12           A.  I do.

13           Q.  Have you ever seen this document before?

14           A.  Yes.

15           Q.  Can you describe generally what it is.

16           A.  No.

17           Q.  What is referenced or what is meant by the term

18       "nuclear unit"?

19           A.  I don't know.

20           Q.  Did you participate in the drafting of this

21       document?

22           A.  Certainly not.

23           Q.  I'm sorry?

24           A.  Certainly not.

25           Q.  Who drafted this document?

John Du Wors                                    October 10, 2014

Page 169

1           A.   I don't know.

2           Q.   Did anyone at your firm participate in the

3      drafting of the contents of this document?

4           A.   I feel reasonably confident the answer is no.

5           Q.   Did you ever talk to Mark Phillips about who

6      drafted this document?

7           A.   Nope.

8           Q.   Was Mark Phillips a shareholder in Hunts Point

9      Ventures?

10          A.   Not that I'm aware of.

11          Q.   Was he on the board of directors of Hunts Point

12     Ventures?

13          A.   I've never known him to be one or ever had

14     anyone say that he was one.

15          Q.   Did he have any kind of title, such as CEO, CFO,

16     CTO, anything like that?

17          A.   Not to my knowledge.

18          Q.   Was he ever listed in any document or identified

19     in any document as an officer of the company?

20          A.   Not that I prepared or have seen.  I think --

21     not that I'm aware of.

22          Q.   So you've never seen a document which has

23     identified Mark Phillips as having any kind of role with

24     the company?

25          A.   Not that I can recall.

John Du Wors                                    October 10, 2014

                                                    Page 170

1           Q.  But you have seen Exhibit 20 before.  Correct?

2           A.  Since this litigation --

3           Q.  I'm sorry, Exhibit 24.

4           A.  Since this litigation commenced, I've seen

5      Exhibit 24.

6               Also, at some point in the year 2011 -- and I

7      don't know when -- Steve Schweickert sent me an e-mail,

8      and I think it had an MOU of some kind attached to the

9      e-mail.  I didn't read it until this litigation

10     commenced.  Steve sent me a lot of e-mails during that

11     period.  I mean, the guy didn't have a job, and the Mark

12     Phillips affair was his entire hobby.  So I got a lot of

13     e-mails.  I didn't read all of them.  But I did see, in

14     my e-mail account, that there was some message from him

15     attaching a document.  It might have been Exhibit 24.

16     It might have been an MOU of some kind.  I don't really

17     know.  But I've seen Exhibit 24 since we've started this

18     case.

19          Q.  Have you had any discussions with the Rudkins or

20     any of the Schweickerts regarding Phillips' role as a

21     shareholder or director at any time in the company?

22          A.  Yes.

23          Q.  What were those conversations?

24          A.  I couldn't tell you with much specificity.  I

25     think that the Rudkins have each told me and that

John Du Wors                                        October 10, 2014

                                                        Page 171

1      Schweickert has told me over the last few years, at one

2      time or another, that Mark Phillips was not a

3      shareholder.

4            Separately, I have told Hunts Point Ventures,

5      when Chad and Elizabeth were the heads of it, that my

6      firm would not be willing to prosecute patent

7      infringement claims on behalf of Hunts Point Ventures if

8      Mark was a figurehead that could be deposed or put on

9      the witness stand, because of his felony record, because

10     that would function as such a challenge to credibility

11     that it would be more of a barrier than I could stand

12     for a case that I was taking on a contingent-fee basis.

13         Q.   When you refer to a case that you were taking on

14     a contingency-fee basis, were those the patent

15     infringement case or cases that you've talked about

16     earlier today?

17         A.   Correct.

18         Q.   Did you ever talk to Mark Phillips about whether

19     or not he thought he was a shareholder at Hunts Point

20     Ventures?

21         A.   Once.

22         Q.   When did that occur?

23         A.   Mark Phillips came to my office with Chad Rudkin

24     to have a discussion about Mark Phillips' role in Hunts

25     Point Ventures following his release from prison.  The

John Du Wors                                    October 10, 2014

Page 172

1      conversation took place, also, following Mark Phillips'

2      release from prison.

3          Q.  And in addition to yourself, present were Mark

4      Phillips and Chad Rudkins?

5          A.  Mr. Rudkin --

6          Q.  Rudkin.  I'm sorry.

7          A.  -- was indeed present, as was Mr. Phillips.

8          Q.  Anyone else from your firm?

9          A.  Derek Linke may have sat in for part of the

10     meeting.  I don't recall.

11         Q.  Can you tell me the substance of the discussion

12     from Mark Phillips to you about his role in the company

13     going forward?

14         A.  Well, I don't think it was as much to me as it

15     was to Chad.  I mean, Mark Phillips was -- the substance

16     of his communications was that Mark Phillips was unhappy

17     that he was not a shareholder, officer, or a director of

18     Hunts Point Ventures, and that he wanted to be.

19         Q.  What did Mr. Rudkin say about that subject

20     during the meeting?

21         A.  I believe that Mr. Rudkin said that he didn't

22     feel it would work to have Mark be a shareholder,

23     officer, or director in Hunts Point Ventures; but that

24     he was not opposed to including Mark as a participant,

25     financially or otherwise, in the company's affairs by

John Du Wors                                    October 10, 2014

Page 173

 1      making him an independent contractor with profit-sharing
 2      rights.
 3          Q.  So not a shareholder, but essentially someone
 4      kind of like an employee that would also get a share of
 5      the profits?
 6          A.  Well, not an employee.  Specifically, an
 7      independent contractor.  Because as an independent
 8      contractor, he would not be a speaking agent for the
 9      company, and, therefore, not somebody whose credibility
10      could be attributed to the company.
11          Q.  Did you ever talk to Mark Phillips about whether
12      or not he could or should be a witness in the Research
13      in Motion matter?
14          A.  No.  Maybe.  Maybe during that meeting.  That
15      would have been the only time.  I don't recall.
16              (Exhibit 25 marked for identification.)
17      BY MR. KIMBALL:
18          Q.  Mr. Du Wors, there is a document which has been
19      handed to you marked Exhibit 25.  Can you take a look at
20      that document and let me know if you've ever seen the
21      content thereof before.
22          A.  Yeah.  Hang on a sec.
23          Q.  I note that you are again doing something with
24      your phone.  Are you using the telephone to refresh your
25      recollection about this or any other matter today?

1          A.  No.  I just got a really, really important and

2     awesome set of e-mails and actually ECF decisions on a

3     summary judgment motion.  In fact, if it didn't bother

4     you, I'd like to take a quick break and read those.

5          MR. KIMBALL:  We can take a break for five

6     minutes.

7               THE WITNESS:  Give me five.

8               (Recess taken from 3:57 to 4:04.)

9               MR. KIMBALL:  Back on the record.

10     BY MR. KIMBALL:

11          Q.  Mr. Du Wors, with regard to Exhibit 25, have you

12     seen this document before today?

13          A.  I vaguely recall it.

14          Q.  And this appears to be an e-mail from you to

15     Mark Phillips, with a copy to Derek Linke.  Is that

16     correct?

17          A.  It appears to be that.

18          Q.  And it begins with the number one, "I don't

19     understand what the Freedom of Operation Agreement is";

20     and then is followed by two, "Putting the IP into a

21     holding company wouldn't keep them safe, because you own

22     the holding company."  Do you see that?

23          A.  I do.  That would be the -- but I mean, that's

24     the text of the last e-mail in that string.

25          Q.  Were those meant to be responsive to the prior

John Du Wors                                    October 10, 2014

                                                        Page 175

1      e-mail?

2          A.  Yeah.  I think so.  I don't have a great

3      recollection of this e-mail.  It comes from four and a

4      half years ago.  But yeah, it seems to be.

5          Q.  So there is text in the first paragraph of the

6      prior e-mail, the one that was sent on 5/22/2010 at

7      9:08 a.m.  It reads, "We will end up destroying MOD in

8      this process, but we have to shut these people down,

9      because they won't stop until they get a judgment

10     against me and take my IP.  So we have to move this to a

11     separate company, which I am doing now, company X, and

12     then use an agent to sue MOD customers."  Do you see

13     that?

14         A.  Uh-huh.

15         Q.  As I look at that, do you know what is being

16     discussed here?

17         A.  In the most general sense.

18         Q.  What was that?

19         A.  Well, I think the document speaks for itself.  I

20     don't think I can summarize it better than the plain

21     text of the document does.

22         Q.  Does it appear to be Mark Phillips' request that

23     he wants to move the IP to a separate company?

24         A.  Yes.

25         Q.  Then your response to that appears to be,

John Du Wors                                    October 10, 2014

Page 176

1        "Putting the IP into a holding company wouldn't keep
2        them safe, because you own the holding company."  Do you
3        see that?
4            A.  Yes.
5            Q.  Did you have any discussions other than what I'm
6        seeing in these e-mails about MOD's IP and whether or
7        not there would be ways to either protect it or in which
8        Mr. Phillips could own it?
9            MR. FRANKLIN:  I guess I'm going to object to
10       the form of the question, because I didn't understand
11       it.  Maybe you did.  So I'll stand down if you
12       understood the question.
13           THE WITNESS:  The question is vague and somewhat
14       incomprehensible.  I interpret the question to be one
15       that asks whether I discussed asset protection
16       strategies with Mark Phillips as they pertain to
17       intellectual property owned by Mark Phillips.  Is that
18       what you want to ask me?
19       BY MR. KIMBALL:
20           Q.  Specifically MOD.  MOD's IP.
21           A.  I don't know what you mean by MOD's IP.  That's
22       clearly not the subject of this e-mail exchange.
23           Q.  All right.  What IP did this e-mail exchange
24       concern?
25           A.  I can only assume that it would have related to

John Du Wors                                        October 10, 2014

Page 177

```
 1      IP owned by Phillips.  MOD doesn't need a judgment

 2      against Mark Phillips to get MOD's own IP.  So when Mark

 3      Phillips says to me, "They are not going to stop until

 4      they get a judgment against me and take my IP," that's

 5      not something MOD Systems has to do, to get its own IP.

 6      That's just silly talk.  So I assume what they're

 7      talking about is IP owned separately by Mark Phillips.

 8           So what do you want to ask me about?  Asset

 9      protection strategies with respect to MOD's IP?  Because

10      those conversations didn't occur.  But there were some

11      asset protection conversations about Mark Phillips'

12      separately owned IP, which I later found out was the

13      subject of an exclusive license to MOD already, but I

14      didn't know that at the time.

15      Q.  So with regard to the IP owned by Mark Phillips

16      that you just referred to, did you have discussions with

17      him other than the discussion going on in the e-mail

18      chain which has been reproduced as Exhibit 25?

19      A.  Yes.

20      Q.  Can you give me an overview of what he was

21      seeking to do and what your responses were to those

22      requests?

23      A.  Well, there were a number of conversations, but

24      generally speaking, the conversation went as follows:

25      Mark and Steve came to me and said, "We want to protect
```

John Du Wors                                    October 10, 2014

Page 178

1    Mark's IP from MOD Systems and the government who might

2    seek it through a civil forfeiture associated with the

3    criminal prosecution.  Can he transfer it to Hunts Point

4    Ventures or another entity to hide it?"  My response was

5    that no, you can't just transfer intellectual property

6    or any other assets to a separate entity.  Case in

7    point, my advice in response to his e-mail; putting the

8    IP into a holding company wouldn't keep him safe,

9    because you own the holding company.  I said, if it was

10   put into an entity that you own or control, they can

11   still get that entity.

12        Later, I said to him and Steve, you can't just

13   transfer intellectual property to a different entity

14   without that entity paying fair consideration for that

15   asset, because that will be regarded as a fraudulent

16   transfer.  So they asked me a lot of questions about how

17   they could just give it to Hunts Point Ventures with a

18   side deal for taking it back.  My advice on all of those

19   questions was uniformly that no, that was not possible,

20   because he would have to testify truthfully about it in

21   a deposition.

22        So I did advise Mr. Phillips and Hunts Point

23   Ventures later that it would be a valid transfer if Mark

24   Phillips were to actually sell his intellectual property

25   to Hunts Point Ventures in exchange for either cash or

John Du Wors                                         October 10, 2014

                                                          Page 179

 1        the extension of credit to fund Mark Phillips'
 2        litigation efforts, provided there were no secret
 3        sweetheart deals where Mark somehow got it back at the
 4        end of the day, such that the transfer of consideration
 5        was illusory in nature.  That ultimately was what they
 6        decided to do, which is why they hired us to transact
 7        the sale of intellectual property to Hunts Point
 8        Ventures, with no secret handshake, wink, wink, nod,
 9        nod, gentlemen's agreements to transfer the IP back to
10        Mark Phillips or otherwise give consideration back to
11        Mark Phillips after his release from prison.  Or if
12        those secret handshake deals did occur, nobody told me
13        about them.
14             (Exhibit 26 marked for identification.)
15        BY MR. KIMBALL:
16             Q.  You've been handed a document marked as
17        Exhibit 26.  Have you ever seen this document before?
18             A.  Yes.
19             Q.  Is the Steve referred to in this e-mail Steve
20        Schweickert?
21             A.  It is.
22             Q.  What was the purpose of sending Mr. Schweickert
23        this e-mail?
24             A.  He asked me to send him an e-mail outlining how
25        patent trolling works so that he could use it internally

John Du Wors                                    October 10, 2014

Page 180

1          for business purposes, which business purposes included,

2          but were not limited to, raising money for Hunts Point

3          Ventures.  He wanted a document that explained to him

4          how the non-practicing entity, patent enforcement,

5          revenue-generation activities would take place; so that

6          if asked by potential investors and other people, he

7          could say, "This is how we're making money."

8               Q.   In this e-mail, which is dated April 10th of

9          2011, the third paragraph on the first page reads in

10         part, "HPV's buffering and playlist patents appear to

11         cover all portable video and audio players distributed

12         until 2009 and some distributed after.  On Monday, we

13         will file an action for infringement of the buffering

14         and playlist patents against digEcor, which distributes

15         the portable media players offered to customers on most

16         commercial airlines.  We will file our action in the

17         Western District of Wisconsin."  Do you see that?

18              A.   I do.

19              Q.   And that is the case that, in fact, we discussed

20         earlier today.  Correct?

21              A.   Yeah.  I don't think we filed it that quickly,

22         but yeah.

23              Q.   I believe you testified that ultimately, there

24         was a settlement in that case?

25              A.   Correct.

John Du Wors                                    October 10, 2014

Page 181

1          Q.  And that the terms thereof are subject to a

2     confidentiality clause.  Correct?

3          A.  Correct.

4          Q.  Did you ever discuss the outcome of that

5     settlement -- strike that -- the litigation and/or

6     settlement with Mark Phillips?

7          A.  Not that I recall.

8          Q.  At the time that the e-mail which has been

9     reproduced on Exhibit 25 was sent -- specifically,

10    May 22, 2010 -- do you recall who the members of the --

11    who the controlling parties were at MOD Systems?

12         A.  Can I have that question read back.

13              (Question read by the reporter.)

14              THE WITNESS:  By "controlling parties," do you

15    mean members of the C suites of officers?

16    BY MR. KIMBALL:

17         Q.  Yes.

18         A.  Anthony Bay and Derek de Bakker, but I don't

19    know of anyone else besides that.

20         Q.  As of April 10th of 2011, do you recall who the

21    controlling parties were for Hunts Point Ventures?

22         A.  Steve Schweickert.

23         Q.  Did you ever have any discussions with Jim Smith

24    of Smith & Hennessey concerning whether or not Mark

25    Phillips would get a shareholder interest in HPV or an

John Du Wors                                              October 10, 2014

Page 182

1        equity interest in HPV?

2            A.  I don't think so.

3            Q.  Do you recall any discussions with Jim Smith

4        about Mark Phillips' efforts or desires to get 49

5        percent ownership control of HPV?

6            A.  I don't recall that.  I know that I've had

7        conversations with Jim Smith about Mark Phillips, but I

8        don't recall that specific conversation content.

9            Q.  Do you recall any discussions with Jim Smith at

10       Smith & Hennessey concerning whether or not or how to

11       transfer the IP owned by HPV to Jennifer Schweickert?

12           A.  I don't recall.

13           Q.  Do you recall any discussion with Jim Smith

14       about a desire on the part of either Mark Phillips or

15       Jennifer Schweickert that Jennifer Schweickert would own

16       the IP then owned by HPV?

17           A.  You know, I don't recall specifically.  That

18       might have come up in the context of conversations Jim

19       Smith initiated with me after Mark Phillips contacted

20       him following Mark Phillips' release from federal

21       prison.  Mark Phillips contacted Jim Smith kind of to

22       use him as like a -- I don't know -- a sounding board or

23       a mediator or something along those lines.  And Jim is

24       friends with both me and Mark.  So Jim talked to me

25       about possibly trying to broker some kind of resolution.

John Du Wors                                    October 10, 2014

                                                        Page 183

 1              I think one of the things we may have discussed

 2      was that Bob Arnold's estate had a judgment against Mark

 3      Phillips for a lot of money.  So Mark Phillips wouldn't

 4      even be able to have some of the assets he was looking

 5      for, such as ownership in Hunts Point Ventures or title

 6      to the intellectual property at issue, because Bob

 7      Arnold's estate would just take it by using the judgment

 8      as judgment to levy.

 9          Q.  Was this conversation then after the period of

10      time in which the judgment had been obtained by the

11      Arnold estate?

12          A.  I think so.

13          Q.  When do you believe the judgment was entered

14      against Mark Phillips in that case?

15          A.  I don't recall.

16          Q.  Do you know what year it was?

17          A.  I would be estimating very, very roughly that it

18      took place sometime in 2012 or 2013.

19              (Exhibit 27 marked for identification.)

20      BY MR. KIMBALL:

21          Q.  Mr. Du Wors, you've been handed a document

22      marked as Exhibit 27.  Have you ever seen the content of

23      this document before?

24          A.  I don't recall it.

25          Q.  There is a reference in this e-mail -- what

John Du Wors                                      October 10, 2014

                                                        Page 184

1        purports to be an e-mail from Steve Schweickert to John

2        Du Wors, with a copy to Chad Rudkin and Mark Phillips,

3        which reads, "John, Chad Rudkin and I will be at your

4        office at 4 p.m. for our strategy update meeting today.

5        Mark was unable to get authorization from pretrial

6        services and thus will not be attending."  And then

7        parenthesis, "Chad is the vice-president of Hunts Point

8        Ventures."

9             If you look at the date next to the salutation

10       section, it says, "Friday, June 11, 2010, at 3:10 p.m."

11       Do you recall if such a meeting occurred on or about

12       June 11, 2010, involving yourself, Chad Rudkin, and

13       Steve Schweickert?

14            A.  No.

15            Q.  In the e-mail, there is a reference to a

16       strategy update meeting.  Do you recall what the subject

17       or what that strategy update concerned?

18            A.  Mark Phillips' civil litigation with MOD

19       Systems.

20            Q.  Did you discuss that subject with Chad Rudkin

21       and/or Steve Schweickert sometime in June of 2010?

22            A.  I'm sure that I did, but I don't independently

23       recall any specific instance of it.

24            Q.  Was it your understanding that at that period of

25       time, that Chad Rudkin was vice-president of HPV?

John Du Wors                                          October 10, 2014

                                                           Page 185

1        A.  No.

2        Q.  Who did you believe was vice-president of HPV?

3        A.  I don't think I had any belief on the subject.

4        Q.  Did you believe that Chad Rudkin was not

5    vice-president of HPV at that time?

6        A.  I don't think I had a belief or opinion on it

7    either way.

8        Q.  I'm going to have some more questions going

9    forward, but I do want to go back and just touch on a

10   couple of things that I addressed at the very beginning

11   of the deposition today to wrap it up for today.

12   Specifically, a couple of questions.

13           You indicated earlier that you practiced law at

14   a law firm in Pasadena, as I recall.

15       A.  Yes.

16       Q.  Again, what was the name of that firm?

17       A.  Hunter, H-U-N-T-E-R, Malloy, M-A-L-L-O-Y, and

18   Salcido, S as in Sam A-L-C-I-D-O.

19       Q.  They were located in the City of Pasadena?

20       A.  Yes.

21       Q.  Do you know if they're still in business?

22       A.  I think they are.  I think that Frank Malloy has

23   retired.  I don't know what the name of the firm is as a

24   function of his retirement.

25       Q.  And you are still licensed as an active attorney

John Du Wors                                      October 10, 2014

                                                      Page 186

1      in the State of California.  Is that correct?

2           A.  I am.

3           Q.  When you were working for Hunter Malloy &

4      Salcido, did you ever have an equity position in that

5      firm?

6           A.  No.

7           Q.  When you were working there, which I believe you

8      indicated was roughly a two-year period, did you live

9      down in the Pasadena area?

10          A.  I did.

11          Q.  What city did you live in?

12          A.  South Pasadena.

13          Q.  Have you ever used any names other than the name

14     you currently use, John Du Wors?

15          A.  Yes.

16          Q.  What names have you used?

17          A.  When I was a teenager, I had an acting agent,

18     and I did a couple of commercials when I was a kid.  And

19     I think that my mom convinced me that for the sake of

20     family privacy, I should have a stage name for those

21     television commercials.

22          Q.  What was that stage name?

23          A.  John Klein.

24          Q.  How do you spell Klein or did you spell Klein?

25          A.  It was either K-L-I-N-E or K-L-E-I-N.  But that

John Du Wors                                    October 10, 2014

Page 187

1      was 20 years ago, and I don't think I ever used that
2      name after my 17th birthday.
3          Q.   Since I didn't ask this question this morning, I
4      will ask it now.  When is the last time you did any work
5      as an actor for television or otherwise?
6          A.   Or otherwise?
7          Q.   Stage, television, movies, anything.
8          A.   Commercial-wise, I was in a Jolly Green Giant
9      vegetable commercial when I was 17.  Print work, I was
10     the poster boy for the 1997 Seattle International Film
11     Festival.  Stage work, I think I was in a graduate
12     school production of Shakespeare's Measure for Measure
13     at the University of Washington.
14         Q.   You indicated this morning that your major was
15     English, as I recall.
16         A.   Yes.
17         Q.   Did you have a minor or some other involvement
18     with the drama department there?
19         A.   Yeah, I minored in opera, and I spent a lot of
20     time and electives in the drama department.
21         Q.   Are there any other lawsuits currently pending
22     against you other than the lawsuits involving
23     Ms. Schweickert and Mark Phillips?
24         A.   Joyce Schweickert and that's it.
25         Q.   Have you ever been charged with a crime?

John Du Wors                                          October 10, 2014

Page 188

1          A.   I'm not answering questions like that.  I've

2     never been convicted of a felony or crime of dishonesty,

3     which is what you can ask.

4          Q.   Have you ever been convicted of any crime?

5          A.   I'm not answering questions about that.

6               MR. KIMBALL:  All right.  So I'm going to order.

7               MR. FRANKLIN:  Okay.  We'll talk about -- I need

8     to get some dates from you --

9               THE REPORTER:  Can we go off the record?

10              MR. KIMBALL:  We can go off.

11              THE REPORTER:  Are you reserving on this part?

12              THE WITNESS:  Yes.

13              MR. FRANKLIN:  Yes, we'll read it.

14              (Deposition adjourned at 4:28 p.m.)

15              (Signature reserved.)

16

17

18

19

20

21

22

23

24

25

John Du Wors                                    October 10, 2014

Page 189

1                    S I G N A T U R E

2

3          I declare under penalty of perjury under the laws

4      of the State of Washington that I have read my within

5      deposition, and the same is true and accurate, save and

6      except for changes and/or corrections, if any, as

7      indicated by me on the CHANGE SHEET flyleaf page hereof.

8          Signed in _____, Washington,

9      this _____ day of _____ 20___.

10

11

12                      _____

13                      JOHN DU WORS

14                      Taken:  Friday, October 10, 2014

15

16

17

18

19

20

21

22

23

24      Re:  Phillips vs. Du Wors, et al.
        Cause No.:  14-2-03111-4 SEA
25      Donald W. McKay, RMR, CRR, CCR

John Du Wors                                              October 10, 2014

1                         C E R T I F I C A T E

2

        STATE OF WASHINGTON    )
3                              ) ss
        COUNTY OF KING         )

4

5           I, the undersigned Washington Certified Court
        Reporter, hereby certify:
6
            That the foregoing deposition upon oral examination
7       of the witness named herein was taken stenographically
        before me and transcribed under my direction;
8
            That the witness was duly sworn by me pursuant to
9       RCW 5.28.010 to testify truthfully;

10          That the transcript of the deposition is a full,
        true and correct transcript to the best of my ability;
11
            That I am neither an attorney for, nor a relative
12      or employee of any of the parties to the action or any
        attorney or counsel employed by the parties hereto, nor
13      financially interested in its outcome.

14          I further certify that in accordance with CR 30(e),
        the witness was given the opportunity to examine, read,
15      and sign the deposition, within 30 days upon its
        completion and submission, unless waiver of signature was
16      indicated in the record.

17

18

19      _____

20      Donald W. McKay, RMR, CRR
        Washington Certified Court Reporter No. 3237
21      License effective until: 07/02/2015

22

23

24

25