EXHIBIT "E"

Moburg, Seaton & Watkins
2033 Sixth Avenue, Suite 826
Seattle, WA  98121
(206) 622-3110
www.moburgreporting.com

Court Reporters & Legal Video

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

_____

MARK PHILLIPS,                    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )   No. 13-2-07233-5 SEA
                                  )
CHAD and ELIZABETH RUDKIN,        )   DEPOSITION UPON ORAL
STEPHEN JAMES SCHWEICKERT, and    )   EXAMINATION
JOHN and JANE DOES 1 THROUGH      )        OF
4,,                               )   ELIZABETH RUDKIN
                                  )
            Defendants.           )
_____  )
                                  )
MARK PHILLIPS,                    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )
                                  )
STEPHEN JAMES SCHWEICKERT,        )
HUNTS POINT VENTURES, INC. and    )
HUNTS POINT VENTURE GROUP,        )
LLC,                              )
                                  )
            Defendants.           )

_____

9:34 a.m.

March 19, 2014

2033 Sixth Avenue, Suite 826

Seattle, Washington

Kellie A. Smith, CCR, RPR, CRR



Page 2

```
 1                  APPEARANCES

 2

    FOR THE PLAINTIFF:
 3

 4              REED YURCHAK
                Attorney at Law
 5              LAW OFFICE OF REED YURCHAK
                40 Lake Bellevue Drive
 6              #100
                Bellevue, Washington  98005
 7              yurchaklaw@gmail.com.

 8
    MARK PHILLIPS, PLAINTIFF
 9

10

11  FOR THE DEFENDANTS:

12
                RYLAN S. WEYTHMAN
13              Attorney at Law
                FOSTER PEPPER PLLC
14              1111 Third Avenue
                Suite 3400
15              Seattle, Washington  98101
                WEYTR@FOSTER.COM
16

17

18  COURT REPORTER:

19              KELLIE A. SMITH, CCR, RPR, CRR
                MOBURG, SEATON & WATKINS
20              2033 SIXTH AVENUE
                SUITE 826
21              SEATTLE, WASHINGTON 98121

22

23

24

25
```



```
1                        I N D E X

2
   EXAMINATION BY:                            PAGE
3  MR. YURCHAK                                 6

4

5                     EXHIBIT INDEX
   EXHIBIT MARKED                             PAGE
6
```

| Exhibit | Marked | Page |
|---|---|---|
| 1 | Hunts Point Ventures - Materials from Foster Pepper - Index | 21 |
| 2 | HPV Summary 2012 notes | 45 |
| 3 | Hunts Point Ventures, Inc. Joint Consent in Lieu of Annual Meeting of Shareholders and Directors | 70 |
| 4 | Stock Subscription Agreement | 85 |
| 5 | Invoice from Newman Attorneys | 108 |
| 6 | Stock Redemption and Indemnification Agreement | 111 |
| 7 | Intellectual and General Intangible Property Purchase and Sale Agreement | 124 |
| 8 | Secured Promissory Note, dated January 14, 2013 | 130 |
| 9 | Share Purchase Agreement, Hunts Point Ventures, Inc. - Steve Schweickert | 132 |
| 10 | Security Agreement | 137 |
| 11 | Email titled, "FW: HPV note and security agreement." | 154 |
| 12 | Email titled, "Promissory Note and Security Agreement." | 174 |
| 13 | HPV Corporate Notes 2012 - Elizabeth Rudkin | 176 |
| 14 | Email titled "Share DropBox." | 194 |
| 15 | Durable Power of Attorney for Asset | 205 |

```
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

1          Management

2    16    Declaration of Yvonne Phillips        205
           Acknowledging Receipt of Various
3          Personal Items of Plaintiff Mark
           Phillips
4
     17    Email titled "FW: Extension of plea    209
5          offer deadline"

6    18    HPV, Inc., General Ledger, 2/19/2013   211

7    19    Photocopy of check from Sandy L.       215
           Hoover payable to Hunts Point
8          Ventures, Inc.

9    20    Bank of America bank statement for     215
           Hunts Point Ventures Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   ELIZABETH RUDKIN,   witness herein, having been

 2                            duly sworn by the Certified

 3                            Court Reporter, testified

 4                            under oath as follows:

 5

 6                MR. WEYTHMAN:  Counsel, at the onset I'd

 7   like to just read something for the record.

 8        In light of events that occurred during the

 9   deposition of Mrs. Rudkin's husband, I would like to

10   reiterate that the scope of this deposition is limited

11   to those subject areas relevant to your client's claims

12   and to questions reasonably likely to lead to

13   discoverable evidence.  Questions and/or exhibits that

14   focus on topics of a strictly personal nature, such as

15   the death of my client's young daughter, are not only

16   far outside the scope of permissible discovery, but they

17   are patently distasteful.  Should you continue to engage

18   in such inappropriate behavior, I will instruct my

19   client not to answer, and I will terminate this

20   deposition immediately.

21        Go ahead.

22                MR. YURCHAK:  I guess, for the record, I

23   hope the understanding was there was no intent to raise

24   the subject matter of the personal nature that was in

25   that call.  It was just that the relevant subject matter
```



1  was intertwined with the personal subject matter in that

2  call.  And my questions did not go towards any of the

3  personal subject matter raised in that call.

4

5                        EXAMINATION

6  BY MR. YURCHAK:

7        Q.    Good morning.

8        A.    Good morning.

9        Q.    My name is Reed Yurchak.  I'm the attorney

10  for Mark Phillips.  We're here today to take your

11  deposition.  Have you been deposed before?

12        A.    No.

13        Q.    And I would like to go over some ground rules

14  so you have an understanding of the process and the

15  procedure.  I'll be asking you questions.  My questions

16  and answers will be recorded by the court reporter.

17  Therefore it's important that any answers be verbal, and

18  not nonverbal, shake of the head, or like "mm-hm," that

19  people sometimes do.  Is that okay?

20        A.    Yes.

21        Q.    Since it's also being recorded, it's

22  important that we don't talk over each other, that I

23  finish my question before you answer, and likewise, that

24  I don't start asking a question before you have finished

25  your answer.  Is that understood?



1      A.      (Witness nods head affirmatively).

2      Q.      You just took an oath to tell the truth.  Do

3  you understand that this oath is the same oath that

4  would -- that you would take in a court of law, and the

5  meaning is the same?

6      A.      I do.

7      Q.      Breaks are permitted during a deposition.  If

8  you ever feel like you would like one, please simply so

9  indicate.  But please don't take a break during the line

10  of questioning or answering.  During the deposition

11  you're permitted to talk to your attorney and seek

12  advice with respect to matters of privileged

13  communications.  Privileged communication under the law

14  is something that only you and your attorney have

15  shared.  Otherwise, you're not permitted to seek advice

16  or consult with your attorney on how to answer a

17  question.  Do you understand that?

18      A.      I do.

19      Q.      Because it's critical that the record reflect

20  that your answers are full and complete and made with

21  your complete awareness, I'd like to ask if you're under

22  any sort of medications or drugs that may influence your

23  cognitive ability, your ability to understand me, and to

24  answer questions?

25                  MR. WEYTHMAN:  Objection.  Calls for a



Page 8

1    legal conclusion, calls for her opinion.

2        Q.    (BY MR. YURCHAK) Are you under any sort of

3    medications that may affect your ability to participate

4    today in this deposition?

5        A.    No.

6        Q    Are you currently sick?

7        A.    No.

8        Q.    Is there any reason why you could not give

9    complete and accurate testimony today?

10       A.    No.

11       Q.    For the record, would you please state your

12   full name?

13       A.    Elizabeth Ann Rudkin.

14       Q.    And where do you currently reside?

15       A.    In Bonney Lake.

16       Q.    Do you have any plans to move within the next

17   year?

18       A.    Not that I know of.

19       Q.    Starting with postsecondary education, can

20   you explain where you went to school?

21                MR. WEYTHMAN:  Objection.  Vague.

22                THE WITNESS:  Where did I go to school

23   after high school?

24       Q.    (BY MR. YURCHAK) Yes.

25       A.    I went to Washington State University.



1      Q.    Okay.  And did you graduate from there?

2      A.    I did.

3      Q.    And what degree did you receive?

4      A.    International business.

5      Q.    Okay.  And did you have -- you said

6    international business.  Was that the specialty that you

7    received in the business degree?

8                 MR. WEYTHMAN:  Objection.  Leading.

9    Vague.  What do you mean, "specialty"?

10     Q.    (BY MR. YURCHAK) Would you agree that a

11   business degree could have different specialties?

12                MR. WEYTHMAN:  Objection.  Vague.  What

13   do you mean by "specialty"?

14     Q.    (BY MR. YURCHAK) Would you agree that a

15   business degree may have different specialties?

16     A.    No.  That was the name of the degree.

17     Q.    Did you have any -- did you acquire any

18   education in corporate finance?

19     A.    A course.

20     Q.    Did you acquire any education in your degree

21   in accounting?

22     A.    I took a course.

23     Q.    How many courses?

24     A.    I can't recall.

25     Q.    Did you acquire any education in marketing?



1      A.    Again, I took a course.

2      Q.    Okay.  And did you receive any education

3   after Washington State University?

4      A.    I studied Italian in Italy at the university.

5      Q.    Which university did you go to in Italy?

6      A.    It was in Italy.  It was -- I can't remember

7   the name of the university.  It wasn't an Italian

8   university.  It was an American university in Italy.

9      Q.    Okay.  How long were you there at that

10  institution?

11     A.    I can't be sure.

12     Q.    Did you receive any sort of certification or

13  degree?

14     A.    No.

15     Q.    And any further education after that?

16     A.    Nothing where I earned a degree.

17     Q.    Was there any sort of courses that you took

18  related to any -- where you may have received any sort

19  of type of certification?

20     A.    Are you talking relevant to business?

21     Q.    No.  Anything.

22     A.    Sure.

23     Q.    What was that?

24     A.    I'm a ski instructor.

25     Q.    Okay.



1     A.    I have a ski instructor certification.

2     Q.    That required you to take courses to receive

3  that certification?

4     A.    Yes.

5     Q.    Any other types of certifications that you've

6  received?

7     A.    Human-animal interaction courses.

8     Q.    Okay.  And what was that certification

9  related to?

10     A.    It's related to non-profit work.

11     Q.    Okay.  Are you associated with a non-profit?

12     A.    I'm associated with several non-profits.

13     Q.    What are those non-profits?

14     A.    I prefer not to answer.  I feel like in the

15  past, my answers for personal information have been

16  sabotaged.  So is it important that you have that

17  information?

18     Q.    I guess all I can say is that you're free --

19  all I can do is ask you a question, and it's your choice

20  how to answer.

21     A.    I'd prefer not to answer.

22           MR. WEYTHMAN:  Counsel, can you

23  enunciate the relevance of asking Ms. Rudkin about her

24  non-profit associations?

25           MR. YURCHAK:  I think it's a fairly

1    standard questioning to inquire into a person's both

2    educational and work background, whether it's a

3    non-profit or for profit.

4                    MR. WEYTHMAN:  Well, we'll object as to

5    relevance.  Go ahead and answer the question.

6                    MR. YURCHAK:  And, again, you can answer

7    however you like.  I mean...

8                    THE WITNESS:  I do volunteer work for a

9    variety of non-profit organizations.  Camp Korey, Run of

10   Hope, Peyton's Ranch.  There's another one through

11   Children's Hospital.  I can't recall the exact name.

12       Q.    (BY MR. YURCHAK) What type of functions do

13   you perform in those non-profits?

14                    MR. WEYTHMAN:  Objection.  Ambiguity.

15   What do you mean by "functions"?

16       Q    (BY MR. YURCHAK) Are you working in -- I

17   assume are you volunteering your time?

18       A.    I am.

19       Q.    How are you volunteering your time,

20   performing what sort of functions?

21                    MR. WEYTHMAN:  Objection.  Compound.

22                    THE WITNESS:  Each role is different at

23   each organization.

24       Q    (BY MR. YURCHAK) Do you ever work in the

25   business office for any of the non-profits?

    1                    MR. WEYTHMAN:  Objection.  Leading.

    2                    THE WITNESS:  I'm not exact on what you

    3    mean by "business office."  I have worked in intake for

    4    patient intake.

    5        Q    (BY MR. YURCHAK) Okay.  Were you ever in the

    6    role of managing the business affairs of any of the

    7    non-profits?

    8        A.    No.

    9                    MR. WEYTHMAN:  Objection, vague.

   10        Q    (BY MR. YURCHAK) No?

   11        A.    No.

   12        Q.    And after Italy -- well, I should just ask,

   13    after you received your degree in international

   14    business, what was your first paid employment position?

   15        A.    I was a front desk clerk at the Adventure

   16    Travel Center.

   17        Q.    Where was that?

   18        A.    On Caserma Ederle in Vicenza, Italy.

   19        Q.    And how long did that last approximately?

   20        A.    I can't be sure.  Several months.  And then I

   21    was promoted.

   22        Q.    Okay.  And what were you promoted to?

   23        A.    Program coordination.

   24        Q.    How long did you stay in that role?

   25        A.    Throughout the rest of my time there.



1          Q.    And when did your time end there?

2          A.    Summer of 2001.

3          Q.    Okay.  And what was your next employment, or

4     what was your next position that was paid?

5                     MR. WEYTHMAN:  Objection.

6     Unintelligible.

7          Q.    (BY MR. YURCHAK) What was your next

8     employment position for which you received compensation?

9          A.    I worked for a non-profit in Lawton,

10    Oklahoma.

11         Q.    You received compensation for that?

12         A.    I did.

13         Q.    How long did that last?

14         A.    I can't be sure.

15         Q.    What was your -- what was your position

16    there?

17         A.    I was hired as an assistant.  I moved on to

18    become their health and safety officer, and the employee

19    assistance program manager.

20         Q.    What kind of duties did you perform as a

21    health and safety officer?

22         A.    Inspections on various locations.

23         Q.    Okay.

24         A.    Relating to health and safety.

25         Q.    And after that position, what was your next



1   paid employment job?

2        A.    We moved to Redding, California, and I worked

3   for OptionCare, a home infusion pharmacy, and I was the

4   supply department manager, I think was my title.

5        Q.    And what kind of duties did you perform in

6   that role?

7        A.    Managing, ordering of products, medications,

8   supplies; ensuring delivery of medications and supplies

9   to patients.

10       Q.    Okay.  Were you involved in any accounting

11  functions at that role?

12                 MR. WEYTHMAN:  Objection.  Vague.  What

13  do you mean by "functions"?

14       Q     (BY MR. YURCHAK) Were you involved in any

15  accounting functions in that role?

16       A.    I wasn't involved at the accountant level.

17       Q.    And to what period of time does that get us

18  to now with you working at that position?

19                 MR. WEYTHMAN:  Objection.  Vague.

20  Unintelligible.

21       Q     (BY MR. YURCHAK) Do you recall what year you

22  stopped working there?

23       A.    2004.

24       Q.    Okay.  And I think I mentioned -- I think I

25  heard you use the word, "We moved to Redding."  Who in



1    reference was "we" to?

2         A.    My husband.

3         Q.    And who's your husband?

4         A.    Chad Rudkin.

5         Q.    And how long have you been married?

6         A.    Since 1998.

7         Q.    And so where did you go -- what was your next

8    position after the job in Redding?

9         A.    Mother.

10        Q.    Okay.  How long did that last?

11        A.    Strange question.

12        Q.    That is a strange question.  How long -- what

13   period of time passed -- let me rephrase that.  After

14   becoming a mother, did you have a paid employment

15   position?

16        A.    I did.

17        Q.    And what was that first position?

18        A.    I worked for J&M Management.

19        Q.    Okay.  And what does J&M Management do?

20        A.    We manage homeowner associations.

21        Q.    And what was your role there?

22        A.    I was an account manager.

23        Q.    And what does that mean?

24        A.    I managed homeowner associations.

25        Q.    What kind of functions did you perform in



1   managing homeowner associations?

2        A.    I attended board meetings.  I ensured that

3   the homeowners' associations was in compliance with

4   their CC&Rs.

5        Q.    Would you agree that you have some

6   familiarity with the -- with how organizations run board

7   meetings?

8                   MR. WEYTHMAN:  Objection.

9   Mischaracterizations the witness's testimony.  Leading.

10                  THE WITNESS:  Can you repeat?

11       Q.    (BY MR. YURCHAK) Would you agree that you

12  have some familiarity with how organizations or how a

13  company conducts board meetings?

14       A.    Limited.  As it were, per homeowners'

15  associations, is run by homeowners who don't necessarily

16  have proper knowledge of how to run a board meeting.  So

17  I would answer that as limited.

18       Q.    Okay.  Were you ever involved in any other

19  company's board meetings, other than Hunts Point

20  Ventures?

21                  MR. WEYTHMAN:  Objection.  Assumes facts

22  not in the record.

23                  THE WITNESS:  Not that I remember.

24       Q     (BY MR. YURCHAK) Okay.  And what period of

25  time were you at J&M Management?



1     A.    I can't be -- I can't be sure.

2     Q.    Can you recall approximately what year that

3  position terminated?

4     A.    I believe it was the spring of 2010.

5     Q.    Okay.  And did you have any paid employment

6  positions following J&M?

7     A.    I've been paid to be a ski instructor.

8     Q.    Okay.  And when was that?

9     A.    I was paid in 2012 and 2013 and 2014.

10    Q.    Okay.  And have you had any other positions

11 other than -- any other employment positions from which

12 you received compensation besides what you've already

13 mentioned?

14    A.    I don't believe so.

15    Q.    Okay.  Prior to Hunts Point Ventures, have

16 you ever served as a corporate officer in any company?

17          MR. WEYTHMAN:  Objection.  Foundation.

18 Assumes facts not in the record.

19          THE WITNESS:  Are you asking prior to my

20 becoming an officer?

21    Q     (BY MR. YURCHAK) Prior to any involvement in

22 Hunts Point Ventures, did you ever serve in any capacity

23 as a corporate officer with any company?

24          MR. WEYTHMAN:  Objection.  Vague.  What

25 do you mean by "involvement"?



Page 19

1          MR. YURCHAK:

2          THE WITNESS:  Not prior to any

3    involvement.

4     Q.   Prior to your involvement in Hunts Point

5    Ventures, have you ever been a shareholder of any

6    private company?

7          MR. WEYTHMAN:  Objection.  Vague.  What

8    do you mean by "involvement"?

9     Q.   (BY MR. YURCHAK) Have you ever been a

10   shareholder of any private company prior to Hunts Point

11   Ventures?

12    A.   No.

13          MR. WEYTHMAN:  Objection.  Compound.

14   There's still the question pending.

15          MR. YURCHAK:  Okay.  I will strike the

16   question that was pending.

17    Q    (BY MR. YURCHAK) Have you ever been involved

18   in organizing the accounting books for any company prior

19   to Hunts Point Ventures?

20          MR. WEYTHMAN:  Objection.  Vague.  What

21   do you mean by "prior to Hunts Point Ventures"?

22          THE WITNESS:  Can you be more clear

23   about the timing?

24    Q.   (BY MR. YURCHAK) Prior to your involvement in

25   Hunts Point Ventures, any point?



Page 20

```
 1        A.     Aside from personal finances, no.

 2        Q.     And with respect to personal finances, what

 3    did you mean by that?

 4        A.     What did I mean by "personal finances"?

 5    Managing our personal finances is what I meant.

 6        Q.     Okay.  And how did you manage your personal

 7    finances?

 8               MR. WEYTHMAN:  Objection.  Can you

 9    define why this is relevant?

10               MR. YURCHAK:  It goes -- I believe it is

11    relevant.

12        Q.     (BY MR. YURCHAK) What sort of things would

13    you do in managing your personal finances?

14        A.     Pay bills.

15        Q.     Would you prepare your own taxes?

16        A.     I do.

17               MR. WEYTHMAN:  Objection.  Leading.

18        Q.     (BY MR. YURCHAK) I'm sorry.  I couldn't hear

19    your answer.  And this may have been something he

20    advised you of.  As you can tell, he's making frequent

21    objections, so it would be helpful to pause after a

22    question to let the objection be noted for the record.

23     I asked if you prepared your own taxes.

24        A.     I do prepare our taxes.

25        Q.     Okay.  You don't have -- do you have -- is
```



1    that something that you've done for many years?

2                    MR. WEYTHMAN:  Objection.  Ambiguous.

3    What do you mean by "many years"?

4                    THE WITNESS:  A few years.

5        Q    (BY MR. YURCHAK) Okay.

6        A.    I can't be specific as to how many.

7        Q.    Does that mean that some years you did not

8    prepare your own taxes?

9        A.    Yes.

10       Q.    And would you use the services of an

11   accountant?

12       A.    Yes.

13       Q.    Okay.  Were you ever involved in preparing or

14   helping to prepare the taxes for any of the non-profit

15   organizations that you mentioned?

16       A.    No.

17                    (Exhibit No. 1  marked

18                       for identification.)

19       Q.    Now, what was your position in Hunts Point

20   Ventures?

21                    MR. WEYTHMAN:  Objection.  Lacks

22   foundation.  Assumes facts not in the record.

23       Q    (BY MR. YURCHAK) Did you have any sort of

24   position at Hunts Point Ventures?

25       A.    I did.



1       Q.    And what was that position?

2       A.    Corporate secretary.

3       Q.    Did you hold any other positions?

4       A.    I can't recall.

5       Q.    Do you recall if you were the treasurer of

6    Hunts Point Ventures?

7       A.    It's possible.  I can't recall.

8       Q.    Do you recall if you were the chief financial

9    officer of Hunts Point Ventures?

10      A.    I believe I was.

11      Q.    And you took some time to try to recollect if

12   you were the chief financial officer.  Why is that?  Why

13   did it take you time to recall if you were the chief

14   financial officer?

15      A.    We were a very small entity operating as a

16   husband and wife.

17      Q.    Mm-hm.

18      A.    So it was a less formal environment.

19      Q.    Okay.  What did you understand your role to

20   be in that environment?

21              MR. WEYTHMAN:  Objection.  Vague.

22      Q.    (BY MR. YURCHAK) What did you understand your

23   role to be with respect to Hunts Point Ventures in that

24   environment?

25      A.    Can you give me a time frame you're referring



1    to?

2         Q.    No.  Just generally.

3         A.    After becoming shareholders, my role was to

4    help manage HPV.

5         Q.    Okay.  And in what ways did you help manage

6    HPV?

7         A.    I weeded through many documents and financial

8    information.  Had a difficult time understanding what I

9    was looking at, so I sought professional guidance,

10   professional services to assist me.

11        Q.    Now, you mentioned Hunts Point Ventures was a

12   small entity; is that correct?

13        A.    Yes.

14        Q.    Consisted of you and your husband; is that

15   correct?

16        A.    If you're talking about the time --

17        Q.    During the time of your involvement --

18        A.    -- that we were involved, then yes.

19        Q.    And you defined your role as trying to make

20   sense of the documents that were in the possession of

21   Hunts Point Ventures?

22        A.    Correct.

23        Q.    Was your husband involved at all with what

24   you were doing?

25        A.    Yes.

1      Q.    How so?

2                MR. WEYTHMAN:  Objection.  Calls for

3    speculation.

4      Q.    (BY MR. YURCHAK) In terms of managing the

5    documents, how was Chad Rudkin involved?

6                MR. WEYTHMAN:  Same objection.

7                THE WITNESS:  I sought his guidance in

8    interpreting the documents.

9      Q     (BY MR. YURCHAK) Okay.  Was he involved at

10    all in helping you manage the documents?

11      A.    Yes.

12      Q.    Okay.  And he provided guidance in terms of

13    what something was?

14                MR. WEYTHMAN:  Objection.  Assumes facts

15    not in the record.  Mischaracterizes the witness's

16    testimony.

17      Q.    (BY MR. YURCHAK) Helped you make sense to

18    understand what something might be; is that correct?

19      A.    Yes.

20      Q.    Okay.  And why did you seek -- let me go

21    back.

22                Now, the exhibit in front of you, do you

23    recognize -- can you identify this exhibit?

24      A.    Not sure.

25      Q.    Are you familiar with any of the items listed



1    in this exhibit?

2                    MR. WEYTHMAN:  Objection.  Vague.

3        Q.    (BY MR. YURCHAK) As you look at it, you can

4    ignore the yellow highlights.  It has no significance.

5        A.    Looks to be a list of HPV-related contents.

6        Q.    Did you -- are you familiar with these items?

7        A.    Without reading through each one, they look

8    familiar.

9        Q.    And how is it that you're familiar with them?

10       A.    They look like a list of documents that

11   belonged to HPV.

12       Q.    Okay.  And do these documents -- can you

13   represent that these documents are the corporate

14   documents of Hunts Point Ventures?

15       A.    If this is a list of the documents that I put

16   into a box that was then transferred to the

17   receivership, then those are the documents that I had in

18   my possession.

19       Q.    Okay.  So at some point in time, you

20   assembled all of the documents of Hunts Point Ventures

21   to provide to the receiver; is that correct?

22       A.    No.

23       Q.    No?

24       A.    That is not correct.

25       Q.    What is correct?  What did you do after

1  assembling the documents of Hunts Point Ventures?

2                    MR. WEYTHMAN:  Objection.  Assumes facts

3  not in the record.  Mischaracterizes the witness's

4  testimony.

5       Q.    (BY MR. YURCHAK) You stated that you

6  assembled the documents of Hunts Point Ventures; is that

7  right?

8                    MR. WEYTHMAN:  Objection.

9  Mischaracterizes the witness's testimony.

10                    THE WITNESS:  Can you be more specific

11  about what you're asking?

12                    MR. YURCHAK:  Could you read back her

13  answer when she said she assembled the documents to be

14  delivered to the receiver?

15                              (Answer on Page 25,

16                               Lines 14 through 17,

17                               read by the reporter.)

18

19       Q.    (BY MR. YURCHAK) So those documents that you

20  referred to in that answer, were those the entirety of

21  the corporate documents of Hunts Point Ventures?

22       A.    I can't be sure.

23       Q.    Why can't you be sure?

24       A.    Because I didn't prepare the documents to be

25  sent to receivership.



1      Q.    Who prepared the documents to be sent to the

2   receiver?

3      A.    They weren't prepared to be sent to the

4   receivership.  They were prepared for the purpose of

5   putting them in one place.

6      Q.    Who prepared them?

7      A.    I did.

8      Q.    And you said they were prepared for the

9   purpose of putting them in one place?

10     A.    Yes.

11     Q.    What do you mean by that?

12     A.    A location in my office.

13     Q.    Okay.  And where is that office?

14     A.    At my home.

15     Q.    And did you prepare those documents for that

16   purpose?

17            MR. WEYTHMAN:  Objection.  Vague.

18   Ambiguous.

19            THE WITNESS:  For what purpose?

20     Q.    (BY MR. YURCHAK) Of keeping them in one

21   place.

22     A.    Yes, I did.

23     Q.    So you accomplished your task?

24     A.    I wouldn't say it was accomplished.  It

25   wasn't complete.



1      Q.     How do you know it's not complete?

2      A.     Because I never intended for it to be

3   complete.  It was for the purpose of putting the

4   documents that I had that were loose into one place.

5      Q.     Did you ever have any intent to create a

6   complete list of corporate documents for Hunts Point

7   Ventures?

8      A.     I intended to, yes.

9      Q.     Did you ever -- were you ever able to do

10  that?

11     A.     I was not.

12     Q.     Why is that?

13     A.     As I dug through the material, I wasn't able

14  to make complete sense of the materials that I had in my

15  possession.

16     Q.     In what way could you not make sense of it?

17            MR. WEYTHMAN:  Objection.  Vague.

18     Q.     (BY MR. YURCHAK) Are you able to clarify your

19  answer in what way you could not make sense of the

20  information?

21     A.     I needed further clarification to identify

22  documents in my possession.

23     Q.     Do you feel that the problem you were having

24  was in identifying documents, or was the problem you

25  were having in making sure you had all the documents of



1    the corporation?

2                    MR. WEYTHMAN:  Objection.  Leading.

3    Argumentative.

4                    THE WITNESS:  Can you re-ask that?

5        Q    (BY MR. YURCHAK) I think you stated that

6    you're not sure if the documents were the complete

7    corporate records of Hunts Point Ventures.  Is that

8    correct?

9        A.    That's correct.

10       Q.    What's the basis of your knowledge that it

11   was not a complete set of corporate records for Hunts

12   Point Ventures?

13                   MR. WEYTHMAN:  Objection.

14   Mischaracterizes the witness's testimony.

15                   THE WITNESS:  There were gaps in

16   information that I didn't know the answers to.

17       Q.    (BY MR. YURCHAK) Did it appear to you as if

18   documents were missing?

19                   MR. WEYTHMAN:  Objection.  Calls for

20   speculation.

21                   THE WITNESS:  I couldn't be sure.

22       Q    (BY MR. YURCHAK) Do you feel it was part of

23   your duties as secretary of Hunts Point Ventures to make

24   sure the corporate records of Hunts Point Ventures were

25   complete?



```
 1                    MR. WEYTHMAN:  Objection.  Calls for

 2    legal conclusion.

 3                    THE WITNESS:  I was attempting to get

 4    the legal and corporate records complete.

 5        Q    (BY MR. YURCHAK) And I think you stated that

 6    you felt you were not able to do so; is that correct?

 7        A.    No.  Let me rephrase.  I was in the process

 8    of attempting to do so.

 9        Q.    Why were you not able to complete that

10    process?

11                    MR. WEYTHMAN:  Objection.  Asked and

12    answered.

13                    THE WITNESS:  I was unable to complete

14    the process because I was in the middle of

15    investigating, through the hired professional services

16    of Clark Nuber and our attorney.

17        Q    (BY MR. YURCHAK) Okay.  And was it because

18    you retained professional services that you were not

19    able to complete your review of the corporate records of

20    Hunts Point Ventures?

21                    MR. WEYTHMAN:  Objection.

22    Mischaracterizes the witness's testimony.

23                    THE WITNESS:  We hadn't completed our

24    process of working together.

25        Q    (BY MR. YURCHAK) What kept you and Clark
```



```
 1    Nuber from completing the process of working together?

 2         A.   I can't say.  It simply didn't have enough

 3    time to complete the process.

 4         Q.   Would you then say that the process was left

 5    not complete?

 6         A.   Yes.

 7         Q.   Did you take any steps, realizing that the

 8    process was not complete, to complete the process?

 9         A.   Yes.

10         Q.   What were those steps that you took?

11         A.   We hired Clark Nuber's legal accounting team

12    to aid in assisting and interpreting documentation.

13         Q.   Okay.  And what was the result of that?

14         A.   It was open-ended.

15         Q.   And what do you mean by that?

16         A.   We never -- at the time I was -- had an

17    active role in HPV.  We didn't complete the accounting

18    process because we didn't have final answers and

19    conclusions regarding the transactions and documents in

20    our possession.

21         Q.   Okay.  Would you agree -- okay.  Did you ever

22    complete the process?

23              MR. WEYTHMAN:  Objection.  Asked and

24    answered.  Also vague and ambiguous as to what the

25    process refers to.
```



1      Q      (BY MR. YURCHAK) Are you able to represent

2   that the corporate records of Hunts Point Ventures have

3   now been put into order?

4                  MR. WEYTHMAN:  Objection.  Vague and

5   ambiguous.  Is counsel asking if she has the physical

6   ability to represent?

7                  THE WITNESS:  I can't confirm that the

8   corporate records were in perfect order.

9      Q      (BY MR. YURCHAK) Okay.  Was Clark Nuber --

10   okay.  At some point -- I believe you said you could not

11   complete the process because there was gaps in the

12   information that you needed to provide to Clark Nuber;

13   is that correct?

14      A.      Correct.

15      Q.      What steps did you take to try to fill in

16   those gaps?  Define the information that was missing.

17      A.      I reached out to those associated with HPV in

18   the past to ask questions and locate proper

19   documentation.

20      Q.      Which people do you recall reaching out to?

21      A.      Steve Schweickert.

22      Q.      Any others?

23      A.      John Du Wors, Mark, naturally Chad, because I

24   lived with him.

25      Q.      Did you reach out to Sandy Hoover?



Page 33

1       A.      No.

2       Q.      Did you reach out to Jennifer Schweickert?

3       A.      Yes.

4       Q.      In what ways?

5       A.      We telephoned her.  We invited her to a

6   shareholder meeting to help us identify contracts and

7   understand transactions made prior to our being

8   shareholders or officers of HPV.

9       Q.      Do you recall why you needed to reach out to

10  her?

11      A.      Yes.  We needed clarification on the

12  transactions she made with Steve.

13      Q.      Do you recall why you needed the

14  clarification?

15      A.      Because we didn't have any documenting

16  evidence of any transactions.

17      Q.      Did you understand at that time that she had

18  given money to Hunts Point Ventures?

19              MR. WEYTHMAN:  Objection.  Leading.

20              THE WITNESS:  I saw in the financial

21  records a deposit had been made.

22      Q.      (BY MR. YURCHAK) Okay.  And were you able --

23  prior to reaching out to her, were you able to find any

24  supporting documentation for that deposit?

25      A.      No.



1      Q.    Did you ever find or were provided with any

2   supporting documentation for that transaction?

3      A.    "Ever" meaning up until this very moment,

4   yes.  At the time I was attempting to put the

5   transactions together for accounting and financial

6   reasons, I did not.

7      Q.    Okay.  Did you ever ask Steve Schweickert

8   about that transaction?

9      A.    I did.

10     Q.    And do you recall what he said about it?

11     A.    Not exactly.

12     Q.    Did you ever ask why there was no supporting

13   documentation in the records that you had?

14     A.    Yes.

15     Q.    Do you recall his answer?

16     A.    I don't.

17     Q.    Were there -- do you recall how many -- were

18   there any other -- well, now, do you recall how you

19   instructed Clark Nuber to book the Jennifer Schweickert

20   transaction?

21            MR. WEYTHMAN:  Objection.  Leading.

22   Assumes facts not in the record.  Vague.  Ambiguous.

23            THE WITNESS:  I don't recall instructing

24   Clark Nuber.  I handed them a whole stack of documents

25   and asked them to try to make sense of it.

1    Q.    (BY MR. YURCHAK) Do you recall if you had

2  received the documentation regarding the Jennifer

3  Schweickert money at the time you handed it to Clark

4  Nuber?

5    A.    Do I recall?  Yes, I recall.

6    Q.    Was that document -- or one of those

7  documents that was provided to Clark Nuber to make sense

8  of?

9              MR. WEYTHMAN:  Objection.

10  Unintelligible.  Assumes facts not in the record.  Do

11  you understand the question?

12              THE WITNESS:  Are you asking was

13  Jennifer Schweickert's transaction documentation

14  provided to Clark Nuber?

15    Q.    (BY MR. YURCHAK) Yes.

16    A.    I don't believe so.

17    Q.    At any point in time was that documentation

18  regarding Jennifer Schweickert's transaction provided to

19  Clark Nuber?

20    A.    I don't recall.

21    Q.    At some point in time did you -- at what

22  point in time did you find -- at what point in time did

23  you acquire or see the documentation regarding Jennifer

24  Schweickert's transaction?

25    A.    I don't remember at what point.



1      Q.    Do you agree that you did at some point

2    review that documentation?

3      A.    I have seen documentation, incomplete, not

4    signed, and a variety of documentation at that.

5      Q.    Where did that documentation come from?

6      A.    I believe it came from Steve Schweickert.

7      Q.    Was it -- did you see it after you had

8    engaged Clark Nuber?

9      A.    Yes.

10     Q.    How much longer in time did you see it after

11   engaging Clark Nuber?

12              MR. WEYTHMAN:  Objection.

13   Unintelligible.

14              THE WITNESS:  I can't be sure.

15     Q    (BY MR. YURCHAK) Did you make any effort to

16   provide that information to Clark Nuber?

17     A.    I can't be sure.

18     Q.    And why is that?

19     A.    The documentation I saw was incomplete, and I

20   simply can't recall if we provided it to them or not

21   because I can't remember if I saw it while I was still

22   working with Clark Nuber.

23     Q.    Do you feel you would have had an obligation

24   to accurately reflect the accounting of that money once

25   you acquired the documentation?



```
 1                    MR. WEYTHMAN:  Objection.  Calls for

 2   legal conclusion.  Speculation.

 3                    THE WITNESS:  I never had in my

 4   possession legally signed contracts.

 5        Q.    (BY MR. YURCHAK) Do you recall what you had

 6   -- what was in your possession?

 7        A.    At some point in time I had in my possession

 8   two documents that appeared to be financial

 9   transactions, both incomplete with signatures.

10        Q.    Both incomplete with signatures?

11        A.    Both incomplete, as in they did not have the

12   signatures.

13        Q.    Are you -- is your testimony that those

14   documents were blank?

15        A.    There was one --

16                    MR. WEYTHMAN:  Objection.

17   Mischaracterizes the witness's testimony.

18        Q.    (BY MR. YURCHAK) I'm asking you to clarify

19   what you meant by --

20        A.    I saw one signature on a contract.

21        Q.    Okay.  And whose signature did you see?

22        A.    Steve Schweickert's.

23        Q.    And because of that you felt the

24   documentation was incomplete?

25        A.    The documentation was incomplete, and there
```



1    were two documents.

2         Q.    On the second to last page of Exhibit 1,

3    there are, on bullet points one, two, three, four, and

4    five, does that help refresh your recollection about the

5    documents that we're talking about?

6         A.    I'm sorry, what page?

7         Q.    The second to last page of Exhibit 1.

8         A.    Which one?

9         Q.    The fourth and fifth bullet point.

10        A.    What are you asking?

11        Q.    Does that help refresh your recollection

12   about the documents we're talking about?

13        A.    No.  Doesn't refresh anything.

14        Q.    When you see on the fifth bullet point that

15   there's a promissory note between HPV and Jennifer

16   Schweickert that's unsigned an undated --

17        A.    Yes, that's exactly what I read.

18        Q.    Does that help refresh your recollection

19   about the documents that we're talking about?

20              MR. WEYTHMAN:  Objection.  Leading.

21   Argumentative.

22        Q.    (BY MR. YURCHAK) When you reference the

23   document that was unsigned?

24              MR. WEYTHMAN:  Lack of foundation.

25   Still don't know where this document came from.



1           THE WITNESS:  I'm not sure what you're

2    asking.

3        Q.    (BY MR. YURCHAK) Do you see on bullet point 4

4    that there's a duplicate entry for promissory note,

5    joint participation agreement between HPV and Jennifer

6    Schweickert?

7        A.    I do.

8        Q.    Do you see that there's no notation that that

9    document was unsigned and undated?

10       A.    I do.

11       Q.    Given that you've provided these documents

12   for delivery to the receivership, what's your

13   explanation for why one entry notes that the document is

14   unsigned and undated but the other entry does not?

15           MR. WEYTHMAN:  Objection.

16   Mischaracterizes the witness's testimony.  Calls for

17   speculation.  Lack of foundation.  And any number of

18   other objections.

19           THE WITNESS:  I didn't write this.  I

20   can't be sure.

21       Q    (BY MR. YURCHAK) You did testify that you --

22   these documents came from you; is that correct?

23           MR. WEYTHMAN:  Objection.

24   Mischaracterizes the witness's testimony.

25           THE WITNESS:  That's not true.  I said



1    that it appears to be a list of documents.

2         Q     (BY MR. YURCHAK) That what?

3         A.    That went from -- from myself to Foster

4    Pepper, and it appears that this went from Foster Pepper

5    to the receivership.

6         Q.    Okay.

7                   MR. WEYTHMAN:  Counsel, would this be a

8    good time to take a short break?

9                   MR. YURCHAK:  If you'd like one.

10                  (Recess 10:29 to 10:34 a.m.)

11        Q.    (BY MR. YURCHAK) We're back on the record.

12   Last question on the Schweickert note.  At some point in

13   time, did you ever understand that the money provided by

14   Jennifer Schweickert to Hunts Point Ventures was in the

15   form of a loan?

16                  MR. WEYTHMAN:  Objection.  Calls for

17   speculation.

18                  THE WITNESS:  I never saw supporting

19   documents that it was a loan.  I understood it to be a

20   loan.

21        Q.    (BY MR. YURCHAK) And how did you have that

22   understanding?

23        A.    I have recollection of conversations about

24   seeking the loan.

25        Q.    Seeking the loan?  What did you mean by that?

1          A.     I have recollection of a conversation with

2     Steve Schweickert seeking a loan from Jennifer

3     Schweickert.

4          Q.     Oh.  And do you remember what -- why Steve

5     Schweickert was seeking a loan from Jennifer

6     Schweickert?

7                    MR. WEYTHMAN:  Objection.  Calls for

8     speculation.

9                    THE WITNESS:  I can't be sure of why

10    Steve was seeking a loan from Jennifer.

11         Q.     (BY MR. YURCHAK) And do you recall ultimately

12    how Ms. Schweickert's money was booked with Hunts Point

13    Ventures?

14                   MR. WEYTHMAN:  Objection.  Vague.

15                   THE WITNESS:  When I received the Hunts

16    Point Ventures' financial ledger, it didn't exist.

17    There were possibly five to ten transactions in the form

18    of what appeared to be a spreadsheet.  That was it.

19         Q.     (BY MR. YURCHAK) You said when you received

20    the ledger it didn't exist.  What did you mean -- what

21    is it in reference to?

22         A.     It would be the ledger.  It was incomplete.

23         Q.     So you received a ledger?

24         A.     In the format of a piece of paper.

25         Q.     Who did you receive that from?



1      A.    Steve Schweickert.

2      Q.    Okay.  Ultimately, how was Jennifer

3  Schweickert's money booked on HPV's records?

4      A.    It was not.

5      Q.    So is your testimony according to the final

6  documentation, as it exists today, of the corporate

7  records of Hunts Point Ventures, Jennifer Schweickert's

8  money is not booked?

9            MR. WEYTHMAN:  Objection.  Assumes facts

10  not in the record.

11            THE WITNESS:  No.  It's not accurate.

12      Q     (BY MR. YURCHAK) My question, I thought, was

13  how was her money booked?

14      A.    I believe you asked me when I received the

15  HPV information, how was the money booked.

16      Q.    I was asking ultimately on the final -- when

17  the accounting was done, how was her money booked on the

18  records of Hunts Point Ventures?

19            MR. WEYTHMAN:  Objection.  Assumes facts

20  not in the record.  Can you clarify what time frame

21  you're talking about?  I think there's some confusion.

22      Q.    (BY MR. YURCHAK) When the final accounting

23  was complete.

24      A.    The final accounting was never complete.

25      Q.    In whatever state the accounting is in today,

1   how's the money reflected?

2                   MR. WEYTHMAN:  Objection.  Calls for

3   speculation.

4                   THE WITNESS:  I'm uncertain.  I don't

5   have control over HPV accounting because it's in

6   receivership.

7       Q.    (BY MR. YURCHAK) Okay.  At the point you were

8   no longer involved in Hunts Point Ventures because of

9   the receivership, or in control of Hunts Point Ventures

10  because of the receivership, how was the money of

11  Jennifer Schweickert reflected on the books of Hunts

12  Point Ventures?

13                  MR. WEYTHMAN:  Objection.  Ambiguous.

14                  THE WITNESS:  Again, it was never

15  complete.

16      Q.    (BY MR. YURCHAK) And, again, what does "it"

17  refer to?

18      A.    The general ledger.

19      Q.    On the incomplete general ledger, does

20  Mrs. Schweickert's money appear?

21                  MR. WEYTHMAN:  Objection.  Calls for

22  speculation.

23                  THE WITNESS:  When I last saw the

24  general ledger, yes.

25      Q    (BY MR. YURCHAK) Yes?  Her money appeared



1   there?

2         A.    Yes.

3         Q.    Do you recall how it was reflected there?

4         A.    As a loan.

5         Q.    Was it ever booked on Hunts Point Ventures'

6    records as an investment?

7         A.    No.

8         Q.    So just to establish this current state of

9    Hunts Point Ventures' accounting records, your testimony

10   is that when you're -- prior to the receivership, the

11   records, accounting records, remained incomplete; is

12   that correct?

13        A.    That's correct.

14        Q.    And do you recall what time frame -- at what

15   point did you stop trying to make the records complete?

16               MR. WEYTHMAN:  Objection.  Assumes facts

17   not in the record.  Mischaracterizes the witness's

18   testimony.

19        Q.    (BY MR. YURCHAK)  I assume the records were

20   never completed; correct?

21        A.    Correct.

22        Q.    So at what point in time did you stop trying

23   -- at what point in time were you no longer working to

24   try to make them complete?

25        A.    At the point in time that HPV was turned over



Page 45

1    to receivership.

2         Q.    Do you recall when that was?

3         A.    Not specifically.

4         Q.    Is your testimony that you continued to work

5    on the accounting records of Hunts Point Ventures up

6    until that point in time?

7         A.    Yes.

8         Q.    Were the accounting records changing as you

9    were working on them?

10             MR. WEYTHMAN:  Objection.  Vague.  What

11   do you mean by "changing"?

12        Q.    (BY MR. YURCHAK) Were you making changes to

13   the records up until the point in time of the

14   receivership?

15        A.    They were never in a state of completion to

16   change.

17        Q.    Okay.

18        A.    They were being categorized.  We were

19   attempting to identify how to quantify transactions.

20        Q.    Okay.  And I understand that process of

21   quantifying what a transaction should be was never

22   complete; is that right?

23        A.    Correct.

24                    (Exhibit No. 2 marked

25                      for identification.)



1      Q.     Exhibit 2, can you identify this document?

2      A.     It looks like my notes, my personal notes.

3      Q.     Was it authored by you?

4      A.     Offered how?

5      Q.     Authored.

6      A.     Authored?

7      Q.     As in, like, did you create it?

8      A.     It appears to be my notes that I created.  I

9   can't be perfectly sure because it's been out of my

10  possession.

11     Q.     Do you recall when you would have created

12  this?

13     A.     At some point in time when I was involved

14  with HPV.

15     Q.     Do you recall writing "HPV summary 2012" at

16  the top of the first page?

17     A.     I don't specifically recall writing it.  I

18  would imagine that I did.

19     Q.     On the bottom footer of every page, do you

20  see the date, "August 29, 2012, by Elizabeth Rudkin"?

21     A.     Sure.

22     Q.     Would that date correspond in your memory to

23  when you may have authored this document?

24     A.     It could correspond to when I created it or

25  it could correspond to when I last opened it.  I'm

1  uncertain.

2       Q.    Does your computer change the dates on

3  documents based on when you open them?

4       A.    It depends on the setting on the document, so

5  I'm unsure.

6       Q.    Was this document prepared in the ordinary

7  scope of business in Hunts Point Ventures?

8                 MR. WEYTHMAN:  Objection.  Calls for

9  legal conclusion.

10                THE WITNESS:  This document was prepared

11  for my own personal ability to make sense of the pile of

12  crap that I received from Steve Schweickert.

13      Q.    (BY MR. YURCHAK) Is this a corporate document

14  of Hunts Point Ventures?

15                MR. WEYTHMAN:  Objection.  Calls for a

16  legal conclusion.

17                THE WITNESS:  I don't know.

18      Q.    (BY MR. YURCHAK) What was your answer?

19      A.    In my personal opinion, I don't believe so.

20      Q.    Was this document prepared for the purpose of

21  organizing the affairs of Hunts Point Ventures?

22      A.    This document was prepared to allow for me to

23  -- make sense of Hunts Point Ventures.

24      Q.    Okay.  Was that for the purpose of -- in

25  helping you to understand Hunts Point Ventures, were you



1    furthering a corporate purpose?

2                    MR. WEYTHMAN:  Objection.  Vague.

3                    THE WITNESS:  These were personal notes,

4    for myself.

5        Q    (BY MR. YURCHAK) Okay.  Did you keep this

6    document as a regular part of the Hunts Point Ventures'

7    records?

8        A.    No.

9        Q.    How did you keep this document?

10        A.    In a file on my computer, labeled "notes."

11        Q.    Okay.  Was that kept separate and apart from

12    the Hunts Point Ventures' corporate records?

13        A.    Yes.

14        Q.    Does this document in front of you appear to

15    be an accurate copy of the documents of the notes that

16    were on your computer?

17        A.    I can't say for sure.

18        Q.    Why is that?

19        A.    It appears similar.

20        Q.    Okay.  I'll ask you some questions on what's

21    written here.  On the first page, under the fourth

22    heading, "financial summary," you note that all funds

23    are in a trust account with Newman and Du Wors.  Is that

24    correct?

25        A.    That's what I read.



Page 49

1     Q.    Were the funds -- what funds is that in

2   reference to?

3              MR. WEYTHMAN:  Objection.  Calls for

4   speculation.

5              THE WITNESS:  It's hard to be a hundred

6   percent sure.  I believe it's referring to Hunts Point

7   Ventures' funds.

8     Q    (BY MR. YURCHAK) Would you have been writing

9   about some other matter when you were preparing this

10  document?

11    A.    Unlikely.

12    Q.    Now, you refer to a trust account.  What is

13  your understanding of the trust account?

14    A.    I understood that the attorneys had a

15  separate account that kept a specific quantity of money

16  for the purposes of paying for litigation, and that

17  happened that we didn't have a large quantity of money,

18  and so I believed that it was all in that account.

19    Q.    Were those funds the corporate funds of Hunts

20  Point Ventures?

21    A.    I believe so.

22    Q.    And you said it was kept in a separate trust

23  account?

24              MR. WEYTHMAN:  Objection,

25  mischaracterizes the witness's testimony.



```
 1                    THE WITNESS:  My intention for saying

 2   separate was separate from whatever banking account

 3   Newman Du Wors used.  I'm new to the legal world so the

 4   trust account was new to me.

 5        Q.    So your understanding was that Newman and Du

 6   Wors used an account for themselves and had a separate

 7   account for Hunts Point Ventures?

 8        A.    Well, yes.

 9        Q.    Your understanding was not that those two

10   accounts were the same?

11        A.    I'm not sure I understand what you're asking.

12        Q.    Was your understanding that the account you

13   mentioned of Newman and Du Wors used for themselves was

14   not the same account used for Hunts Point Ventures'

15   money?

16        A.    I'm uncertain of that.  I don't know how

17   attorneys manage money.  I understood that Newman and

18   Du Wors had an account called a trust account that was

19   an HPV trust account, and that's where our money was

20   held.

21        Q.    Okay.  Did you have signing authority on that

22   HPV trust account?

23                    MR. WEYTHMAN:  Objection.  Calls for

24   legal conclusion.

25                    THE WITNESS:  I don't recall.
```



1      Q.     (BY MR. YURCHAK) How would you have been able

2   to access funds from the Newman and Du Wors' HPV trust

3   account?

4                  MR. WEYTHMAN:  Objection.  Assumes facts

5   not in the record.

6                  THE WITNESS:  I'm not sure that I ever

7   did.

8      Q.    (BY MR. YURCHAK) Okay.  What was your

9   understanding as to why the HPV account was set up with

10  Newman and Du Wors?

11                 MR. WEYTHMAN:  Objection.  Calls for

12  speculation.

13                 MR. YURCHAK:  Let me strike that.

14     Q.    (BY MR. YURCHAK) What was your understanding

15  as to why the bank account for Hunts Point -- did Hunts

16  Point Ventures have its own separate bank account at

17  that time?

18     A.    At what time?

19     Q.    At the time that we're talking about here,

20  when you write, "All funds are currently in a trust

21  account with Newman and Du Wors."

22     A.    At that time, I believe the answer's no.

23     Q.    What was your understanding as to why?

24     A.    Steve Schweickert had opened an account for

25  HPV.  I believe it didn't have very much funds in it, so



1  we were accruing finance charges or empty account costs.

2  I can't recall the term of the charges, so they decided

3  to close it to avoid paying those fees.  And so for a

4  period of time, all of the money was held at the trust

5  account of John Du Wors, Newman and Du Wors.

6       Q.    And you said "they decided to close it."  Who

7  was "they"?

8       A.    I can't be exactly sure on the timing, but I

9  believe it was between Steve and Chad.

10      Q.    Okay.  How was Hunts Point Ventures able to

11  access its funds through the Newman and Du Wors'

12  account?

13                 MR. WEYTHMAN:  Objection.  Calls for

14  speculation.

15                 THE WITNESS:  We didn't -- I believe the

16  only bills that were paid were to Clark Nuber from a

17  checkbook.

18      Q.    (BY MR. YURCHAK) What do you mean by that,

19  "from a checkbook"?

20      A.    Well, I don't recall that we had reason to

21  access those funds for any purpose.

22      Q.    Are you saying that Hunts Point Ventures had

23  no purpose to access its funds?

24                 MR. WEYTHMAN:  Objection.

25  Mischaracterizes the witness's testimony.



1                    THE WITNESS:  No.  The majority of our

2    operational costs were associated with litigation that

3    would naturally flow from the trust account to pay the

4    attorneys for their work.

5         Q    (BY MR. YURCHAK) Okay.  Is that the

6    explanation for why Hunts Point Ventures kept its

7    account with Newman and Du Wors?

8         A.    Yes.  For that period of time.

9         Q.    For that period of time I thought you said

10   that the only transactional costs were related to not

11   wanting to incur account maintenance fees?

12                    MR. WEYTHMAN:  Objection.

13   Unintelligible.  Assumes facts not in the record.

14   Mischaracterizes the witness's testimony.

15        Q.    Was there any related costs to attorney work

16   being done from which the attorneys would receive funds

17   from the Hunts Point Ventures' trust account?

18                    MR. WEYTHMAN:  Objection.  Vague.

19   Unintelligible.

20                    THE WITNESS:  I'm not sure I understand

21   what you're asking.

22        Q    (BY MR. YURCHAK) Were there any funds

23   received to Hunts Point Ventures at the time -- its only

24   account was with Newman and Du Wors?

25                    MR. WEYTHMAN:  Same objection.  Vague.

1    Unintelligible.

2                    THE WITNESS:  Are you asking if we

3    deposited into that account?

4        Q.    (BY MR. YURCHAK) I'm asking if you received

5    deposits or if funds were earned on behalf of Hunts

6    Point Ventures, if any money came into it during the

7    time it was with Hunts Point Ventures -- if Hunts Point

8    Ventures' account was with Newman and Du Wors?

9                    MR. WEYTHMAN:  Same objection.  Vague.

10   Unintelligible.

11                   THE WITNESS:  I can't be certain.  I

12   believe there was money deposited into that account from

13   a settlement.

14       Q.    (BY MR. YURCHAK) You believe?  Do you recall

15   what settlement?

16       A.    That was specifically deposited into the

17   trust account.

18       Q.    I think you said at that time Hunts Point

19   Ventures' account was with Newman and Du Wors, it

20   received a deposit from settlement.  I was asking if you

21   recall what that settlement was.

22       A.    It's possible that it received a deposit from

23   a settlement.  And it's possible that it was from one of

24   the two settlements.  I can't recall the specifics.

25       Q.    Okay.  How many settlements are you aware of



Page 55

1    Hunts Point Ventures receiving?

2                    MR. WEYTHMAN:  Objection.  Vague.

3    Ambiguous.

4                    THE WITNESS:  I think it was two.

5        Q.    (BY MR. YURCHAK) Do you recall the details of

6    those transactions?

7                    MR. WEYTHMAN:  Objection.  Asked and

8    answered.

9                    THE WITNESS:  If you want to be more

10   specific about what details?

11       Q.    (BY MR. YURCHAK) Do you recall with -- when

12   the first settlement was?

13       A.    No.

14       Q.    Do you recall with whom?

15       A.    DigEcor.

16       Q.    Do you recall where the funds from that

17   settlement, what bank account those funds went into?

18       A.    I'm not certain.

19       Q.    Do you recall when the second settlement was

20   -- when was the second settlement?

21       A.    I can't be sure either.

22       Q.    Do you recall with whom?

23       A.    Epson, I believe.

24       Q.    Do you recall where the money -- which

25   account that money flowed into?



Page 56

1     A.    I can't be sure.

2     Q.    Do you recall whose decision it was to keep

3  Hunts Point Ventures' account with Newman and Du Wors as

4  a trust account?

5     A.    You're presuming that we did.

6     Q.    I'm presuming what?

7     A.    That we kept it with John Du Wors.

8     Q.    No.  It was the testimony given today that

9  Hunts Point Ventures' account was with Newman and Du

10  Wors in a trust account.

11    A.    No, the testimony was that there was a trust

12  account with Newman and Du Wors.

13    Q.    Right.  I'm asking --

14    A.    That's true.

15    Q.    I don't think that's any different from what

16  I said.  But my question was --

17    A.    It is different.

18    Q.    Do you recall who made the decision to keep

19  the account in that way?

20    A.    Well, I suppose your question is incorrect.

21  The account wasn't kept in that way.

22    Q.    The account was kept as a trust account with

23  the firm of Newman and Du Wors; correct?

24    A.    There was a trust account kept with Newman

25  and Du Wors, correct.



Page 57

1       Q.    For Hunts Point Ventures?

2       A.    Correct.

3       Q.    And, again, my question is, who made that

4  decision to keep the account in that way?

5       A.    It wasn't a decision to be made.  It was

6  mandatory, in order to have the services from an

7  attorney, that there be a trust account with funds

8  available.

9       Q.    Okay.  And --

10              MR. WEYTHMAN:  Counsel, are you asking

11  who initiated?

12              MR. YURCHAK:  No.

13       Q.    (BY MR. YURCHAK) In your experience, do all

14  firms who transact business with an attorney keep all

15  their accounts with the attorney office?

16              MR. WEYTHMAN:  Objection.  Calls for

17  speculation.

18              THE WITNESS:  I feel like you don't have

19  all the information so you're not really asking the

20  right question, and I'm not quite sure if I should help

21  you or not.

22       Q.    (BY MR. YURCHAK) How would you answer my

23  question?

24       A.    I can't.  It's not the entirety.

25       Q.    At any point in time did Hunts Point Ventures

1    open up its own bank account?

2              MR. WEYTHMAN:  Objection.  Calls for

3    speculation.

4              THE WITNESS:  While we were shareholders

5    of Hunts Point Ventures, we opened up an additional bank

6    account for Hunts Point Ventures.

7         Q.   (BY MR. YURCHAK) Why did you do that?

8         A.   So that we would have a business account to

9    operate from.

10        Q.   Okay.  Did you not need a business account to

11   operate from at the time HPV's account was with Newman

12   and Du Wors?

13             MR. WEYTHMAN:  Objection.  Calls for

14   speculation.  Lacks foundation.  Counsel hasn't

15   established when the trust account was established.

16             THE WITNESS:  Trust account was in

17   existence when we became shareholders and directors of

18   Hunts Point Ventures.  I don't recall the date that the

19   commerce bank account was closed, but I believe it was

20   near the time when Steve Schweickert was no longer a

21   part of HPV.  After a period of time we opened a new

22   business account.

23        Q.   (BY MR. YURCHAK) Do you remember when you

24   opened a new business account?

25        A.   I can't be sure.  I believe it's -- there's

1  notes in reference made to it in our board meeting

2  minutes and such.

3      Q.   Okay.  So would it sound about accurate that

4  the account was opened in January, 2013?

5                MR. WEYTHMAN:  Objection.  Leading.

6                THE WITNESS:  I absolutely cannot say.

7  I just don't know.

8      Q    (BY MR. YURCHAK) Did you have any way to

9  access Hunts Point Ventures' funds after the point in

10  time the Commerce Bank account was closed?

11                MR. WEYTHMAN:  Objection.  Vague.  Lacks

12  foundation.  Hasn't established when the bank account

13  was closed.

14                THE WITNESS:  I don't know.

15      Q    (BY MR. YURCHAK) Were there any other --

16  during the time that Hunts Point Ventures did not have

17  its own corporate bank account, can you recall any

18  business-related expenses that Hunts Point Ventures was

19  obligated to pay?

20      A.   I can't recall without looking at

21  documentation.

22      Q.   Do you recall if Hunts Point Ventures would

23  have been obligated to pay one of its patent maintenance

24  fees?

25                MR. WEYTHMAN:  Objection.  Calls for



1    legal conclusion.  Asks for expert opinion.

2                    THE WITNESS:  I can't recall.

3        Q    (BY MR. YURCHAK) Can you recall if Hunts

4    Point Ventures was obligated to pay interest on any of

5    the loans that had been made to it?

6                    MR. WEYTHMAN:  Objection.  Asks for

7    legal conclusion.

8                    THE WITNESS:  Do I recall if HPV was

9    obligated to pay interest?  Is that your --

10       Q.   (BY MR. YURCHAK) During -- yes, during the

11   time this account was set up only with Newman and Du

12   Wors?

13       A.   We were in the process of attempting to

14   understand what moneys were owed, if moneys were owed at

15   that time.

16       Q.   Okay.  So you had no awareness if Hunts Point

17   Ventures owed any interest on any loans?

18       A.   There was awareness, but not clear

19   understanding.

20       Q.   Okay.  Were you aware of any re-examination

21   fees that Hunts Point Ventures was obligated to pay for

22   work related to its patents?

23       A.   I didn't pay those sorts of expenses.  Those

24   were paid directly by Newman and Du Wors.

25       Q.   Did -- do you recall if Newman and Du Wors



1  ever sought authorization from Hunts Point Ventures to

2  pay those expenses?

3      A.    I can't be sure.

4      Q.    Can you recall if there was any sort of board

5  meetings, board resolution, corporate documents related

6  to the expenditure of Hunts Point Ventures' corporate

7  funds, any of their corporate funds, while their account

8  was with Newman and Du Wors?

9                  MR. WEYTHMAN:  Objection.  Calls for

10  speculation.

11                 THE WITNESS:  Are you asking if there's

12  written documentation around that discussion or

13  conversation?

14     Q.    (BY MR. YURCHAK) Regarding any corporate

15  expenditures of Hunts Point Ventures.

16     A.    I can't be sure if it's written.

17     Q.    Do you recall if Newman and Du Wors ever

18  sought authority from the officers of Hunts Point

19  Ventures to make any expenditures on Hunts Point

20  Ventures' behalf?

21                 MR. WEYTHMAN:  Objection.  Calls for

22  speculation.

23                 THE WITNESS:  If you're asking if John

24  Du Wors asked Chad and I if he could make payments on

25  HPV's behalf, he did.



1          Q.     (BY MR. YURCHAK) Okay.  And can you recall

2    what type of payments he requested authority from you to

3    make?

4          A.     I can't.

5          Q.     Do you recall how often he requested such

6    authority?

7          A.     I don't recall how often.

8          Q.     Do you recall, in your work with Hunts Point

9    Ventures' accounting documents, any entries related to

10   payment on behalf of Steve Schweickert for a DUI?

11         A.     Yes.

12         Q.     Was the amount 8500, best of your

13   recollection?

14         A.     I can't be certain, but it sounds close.

15         Q.     Do you recall how Hunts Point Ventures

16   treated that expense?

17         A.     That --

18                MR. WEYTHMAN:  Objection.  Calls for

19   speculation.

20                MR. YURCHAK:  It's county records.

21                THE WITNESS:  At the point in time I

22   received the accounting, that was one of the

23   transactions that was inconclusive.

24         Q.     (BY MR. YURCHAK) Was that a transaction that

25   you recall Mr. Du Wors seeking authority to make from



1    Hunts Point Ventures' officers?

2         A.    I can't be sure of the time frame on it, so I

3    don't recall being asked specifically regarding that

4    transaction, but I can't recall the timing specific to

5    when we had authority to make that decision.

6         Q.    Okay.  Did you feel it was an obligation of

7    yours to accurately reflect all the costs and expenses

8    of Hunts Point Ventures?

9                   MR. WEYTHMAN:  Objection.  Calls for

10   legal conclusion.

11                  THE WITNESS:  It was my desire to

12   accurately reflect all the expenses associated with HPV.

13        Q.    (BY MR. YURCHAK) Do you recall what steps you

14   took to try to meet that obligation with respect to this

15   DUI expense?

16        A.    I sought professional advice from accountants

17   and from our attorney and from Steve Schweickert.

18        Q.    Okay.  Did you learn anything after doing

19   that regarding what the corporate purpose was for that

20   transaction?

21        A.    I could not draw a conclusion based on the

22   information I was given.

23        Q.    Do you have an opinion today if that

24   corporate transaction was appropriate?

25                  MR. WEYTHMAN:  Objection.  Calls for



1   legal conclusion, speculation.

2              THE WITNESS:  I wouldn't have authorized

3   that transaction.

4        Q.    (BY MR. YURCHAK) As the Chief Financial

5   Officer of Hunts Point Ventures, what was your

6   conclusion regarding whether that transaction was an

7   appropriate business-related expense?

8        A.    My conclusion was it was not an appropriate

9   business-related expense.

10       Q.    Does Hunts Point Ventures take the position

11   that because it's not an appropriate related business

12   expense, that it should be reimbursed?

13              MR. WEYTHMAN:  Objection.  Calls for

14   speculation.

15       Q.    (BY MR. YURCHAK) From Steve, for that

16   expense?

17              MR. WEYTHMAN:  Still calls for

18   speculation.

19              THE WITNESS:  My position at the time

20   that I had authority over the financial records was that

21   that expense ought to be reimbursed.

22       Q.    (BY MR. YURCHAK) Were there any corporate

23   board resolutions made to that effect?

24       A.    As our accounting process was still underway,

25   no conclusions were yet drawn.



1      Q.     Did you ever acquire an understanding of who

2   authorized that transaction?

3      A.     I would need you to reference the time frame

4   exactly, because I can't recall if Steve was the

5   shareholder and director officer at that time or if we

6   were.  I don't recall.

7      Q.     Did you seek input from Mr. Du Wors as to

8   whether that was an authorized transaction?

9      A.     Yes.

10     Q.     And what was his representation?

11     A.     I'm not sure I can -- I'm not sure I

12   remember.

13     Q.     Would it have been your practice to keep

14   corporate notes as you were doing your investigation of

15   the different transactions?

16     A.     Possibly.

17     Q.     And why do you say "possibly"?

18     A.     Because I wasn't always consistent in my

19   note-taking.  When I had the time I took notes.  And

20   when I was busy and engaged, I often didn't have time to

21   take notes.  So notes could be left in any state.

22     Q.     Would you take handwritten notes?

23     A.     Possibly.

24     Q.     In your review of the corporate records of

25   Hunts Point Ventures, is it possible that there are



1   notes from the different periods of time when you were

2   doing investigation regarding the accounting

3   transactions of Hunts Point Ventures that may still be

4   in your possession?

5           MR. WEYTHMAN:  Objection.  Vague.

6           THE WITNESS:  Are you asking if it's

7   possible?

8       Q.   (BY MR. YURCHAK) (Nods head affirmatively).

9       A.   Possible.

10      Q.   I feel like I'm using your language because

11  you seem uncertain if you may have it or not.

12      A.   Have what?

13      Q.   Your notes.  So you said it is possible you

14  may have some notes that you may have taken?

15      A.   Yes, that's possible.

16      Q.   Would you have turned those notes over to

17  your attorneys?

18      A.   I can't be sure.  It appears to me that you

19  all have my notes.

20      Q.   At the time the receivership -- of the

21  receivership, do you recall if you provided all of the

22  documentation that was in your possession regarding

23  Hunts Point Ventures at that time?

24           MR. WEYTHMAN:  Objection.  Vague.  At

25  what time?



1          Q.    (BY MR. YURCHAK) At the time the documents

2     were provided to your attorneys.

3          A.    Our attorneys were given possession of all

4     the hardcopy documents that I had in a box.

5          Q.    Okay.  Does that mean there were other areas

6     outside of this box that may contain corporate records

7     of Hunts Point Ventures?

8          A.    You'd have to define "corporate records."

9          Q.    Notes, for instance.

10         A.    That's possible.

11         Q.    Or other corporate records in general?  I

12    can't define what I don't know what you might have.  So

13    I can only ask if there are maybe other corporate

14    records of Hunts Point Ventures not contained in that

15    box?

16         A.    You'd have to be specific as to what you were

17    looking for.  I don't consider my personal notes to be

18    corporate records.

19         Q.    What do you consider them to be?

20         A.    Personal notes.

21         Q.    And why do you consider them to be personal

22    notes?

23         A.    Because they weren't for any other person's

24    benefit other than my own.

25         Q.    Were you acting in the interest of Hunts



1    Point Ventures when you took those notes?

2                    MR. WEYTHMAN:  Objection.  Ambiguous.

3                    THE WITNESS:  I was acting in my

4    interest to provide understanding.

5         Q.    (BY MR. YURCHAK) Regarding what?

6         A.    Regarding Hunts Point Ventures.

7         Q.    Going back to your notes on Exhibit 2, under

8    the "Early Development" paragraph midway down, starting,

9    "However, the intention was to bring on all four

10   business partners in an official, legally binding

11   business venture."

12        And in that paragraph, you mention four people

13   there in the first sentence:  Steve Schweickert, Chad

14   Rudkin, Mark Phillips, Doug Lower, who conceptualized

15   Hunts Point Ventures.

16        What is Hunts Point Ventures regarding -- what is

17   Hunts Point Ventures' position regarding its intent with

18   respect to how it was supposed to be formed?

19                    MR. WEYTHMAN:  Objection.  Vague.

20   Ambiguous.  Objection as to counsel's reference to this

21   as my client's notes.  Assumes facts not in the record.

22   Asks for speculation.

23                    THE WITNESS:  I can't say.  I wasn't

24   officially part of HPV at that time.

25        Q.    (BY MR. YURCHAK) I understand.  Would you

1    agree that you took notes, that these are your notes

2    regarding Hunts Point Ventures?

3        A.    These are notes I took to attempt to

4    understand the development of Hunts Point Ventures.

5        Q.    Okay.  That's -- okay.  And where does your

6    understanding come from?

7        A.    From those involved that are mentioned here

8    in these notes:  Steve Schweickert, Chad Rudkin, Mark

9    Phillips, Doug Lower.

10        Q.    And your understanding from the discussions

11    with those involved was that Hunts Point Ventures was to

12    have four business partners?

13        A.    At the time of inception, that was my

14    understanding.

15        Q.    And you then write that Mark would not be

16    affiliated with HPV.  What was the basis of your

17    understanding for that statement?

18        A.    I understood through conversations with Chad

19    and Steve -- and I can't recall if Mark was there at the

20    time or not -- that -- I don't really know how to answer

21    that.  Can you ask me that again?

22        Q.    Do you recall what the basis of your

23    knowledge was when you took that note that Mark was not

24    to be affiliated?  In other words, from whom did you --

25        A.    Where did I get that information?  It came



1    from Steve and Chad and Doug and possibly Mark.  I can't

2    recall the time line of when I wrote this.

3         Q.    Okay.  Do you recall having an understanding

4    of why Mark would want to have a concern to protect his

5    IP if it was being sold to Hunts Point Ventures?

6                    MR. WEYTHMAN:  Objection.  Assumes facts

7    not in the record.  Speculation.  Unintelligible.

8                    THE WITNESS:  You're talking of

9    information that took place over a long period of time

10   that's summarized in a few sentences.  So it's hard to

11   answer the question based on time relevance.

12        Q.    (BY MR. YURCHAK) Okay.  What is Hunts Point

13   Ventures' official position with respect to whether Mark

14   Phillips was to be a shareholder?

15                   MR. WEYTHMAN:  Objection.  Calls for

16   speculation.

17                   THE WITNESS:  I wasn't a part of HPV at

18   that time that they developed -- Steve and Joyce

19   developed HPV.

20                        (Exhibit No. 3 marked

21                         for identification.)

22        Q.    (BY MR. YURCHAK) Do you recognize -- can you

23   identify the document placed before you?

24                   MR. WEYTHMAN:  Objection.  Ambiguous.

25   Witness has several documents in front of her.  It's



1    your record, counsel.

2                    MR. YURCHAK:  Fair enough.

3         Q.    (BY MR. YURCHAK) Can you identify Exhibit 3?

4         A.    It appears to be the HPV Joint Consent.

5         Q.    Do you recognize this document?

6         A.    It looks familiar.

7         Q.    Are you aware of who authored this document?

8         A.    I believe it was Steve Schweickert with the

9    assistance of John Du Wors.  Are there two documents or

10   do I just have two?

11        Q.    You have two.  And if you look at the last

12   page of the one document --

13        A.    They're different signatures.

14        Q.    Do you recognize the signature there?

15        A.    Yes.

16        Q.    Whose signature do you recognize?

17        A.    I recognize three signatures.  I'm sorry.

18   There's two signatures.  There's three places.  My

19   signature and Chad Rudkin's signature.

20        Q.    Do you recall signing it?

21        A.    Yes, I do.

22        Q.    And do you see that the -- what is the date

23   that you see on the last page where those signatures

24   appear?

25        A.    Well, it was resolved this 29th day of May,



1    2012.  That was the date of the signature.

2        Q.    And what date do you see by Chad Rudkin's

3    name -- signature?

4        A.    I see a backdated date of May 31st, 2011.

5        Q.    Do you see any date by your signature?

6        A.    May, 2011.

7        Q.    And you said -- you used the word

8    "backdated."  Why did you do that?

9        A.    Because in this document it identifies this

10   document as being backdated.

11       Q.    The document itself identifies itself as

12   being backdated?

13       A.    Yes.

14       Q.    Are you able to show me where it says that?

15       A.    Letter C on the first page.

16       Q.    I see under letter C of the first page that

17   it says that Chad Rudkin -- actually it just says Rudkin

18   became an owner as of January 1st, 2011.  If the intent

19   was to backdate the document, why would it not have been

20   backdated to January 1st of 2011?

21                MR. WEYTHMAN:  Objection.  Calls for

22   speculation.  Witness has already testified someone else

23   drafted the document.

24                THE WITNESS:  I don't know.  Can you ask

25   -- I don't know what you're asking.



1      Q.    (BY MR. YURCHAK) You said paragraph C

2  explains why the document was backdated.  And I'm asking

3  that -- my question is why in paragraph C does it say

4  that Rudkin is an owner as of January 1st, 2011, but the

5  date on the signature lines is May, 2011?

6                 MR. WEYTHMAN:  Objection.

7  Mischaracterizes the witness's testimony.  Also still

8  calls for speculation.

9                 THE WITNESS:  I don't know.

10     Q.    (BY MR. YURCHAK) On the second page, under

11  "Ratify and Elect Directors," starting "Further

12  Resolved," do you agree that it reads, "that all actions

13  taken by the directors of the corporation in managing

14  the affairs of the corporation from the company's

15  inception through the date hereof, are hereby approved

16  adopted, adopted, ratified and confirmed"?

17     A.    I do.

18     Q.    How do you interpret -- what do you interpret

19  that to mean?

20                 MR. WEYTHMAN:  Objection.  Calls for

21  speculation.

22     Q.    (BY MR. YURCHAK) What does HPV interpret that

23  to mean?

24                 MR. WEYTHMAN:  Objection.  Still calls

25  for speculation.  The witness has already testified that



1  HPV is in receivership and she doesn't have any control

2  over the company.

3              THE WITNESS:  I can't speak for HPV at

4  this point in time.

5       Q.   (BY MR. YURCHAK) Why is that?

6       A.   Because HPV's in receivership.

7       Q.   Because it's in receivership -- why does the

8  fact that it's in receivership prevent you for speaking

9  for HPV at this time?

10             MR. WEYTHMAN:  Objection.  Calls for

11 legal conclusion.

12             THE WITNESS:  I no longer represent HPV.

13      Q.   (BY MR. YURCHAK) According to your

14 understanding, who does?

15             MR. WEYTHMAN:  Objection.  Calls for

16 legal conclusion.

17             THE WITNESS:  The receiver.

18      Q.   (BY MR. YURCHAK) Did you at one time -- at

19 one time, would you agree that you were the corporate --

20 you were an officer of HPV?

21      A.   Yes.

22      Q.   As an officer, are you still an officer of

23 HPV?

24             MR. WEYTHMAN:  Objection.  Calls for

25 legal conclusion.



```
 1                    THE WITNESS:  That's uncertain to me.

 2        Q.    (BY MR. YURCHAK) And why is it uncertain?

 3        A.    Because I no longer have control over HPV.

 4        Q.    What is your understanding about the

 5   transaction that occurred between HPV and the receiver?

 6                    MR. WEYTHMAN:  Objection.  Calls for

 7   legal conclusion.  Calls for expert opinion.

 8                    THE WITNESS:  My conclusion is that HPV

 9   is in receivership and the receivers are responsible for

10   all HPV business.

11        Q.    (BY MR. YURCHAK) Who are the current

12   corporate officers of HPV?

13                    MR. WEYTHMAN:  Objection.  Calls for

14   legal conclusion.

15                    THE WITNESS:  I'm uncertain.

16        Q.    (BY MR. YURCHAK) Was there any corporate

17   document documenting the resignation of HPV's officers

18   prior to or following the receivership?

19                    MR. WEYTHMAN:  Objection.  Ambiguous.

20   Calls for speculation.  What point in time, counsel?

21        Q.    (BY MR. YURCHAK) For you and Chad Rudkin.

22        A.    I can't be sure.  The transaction took place

23   between us and our attorneys.

24        Q.    Okay.  Going back to the document, Exhibit 3,

25   same question.  How does Hunts Point Ventures interpret
```



1  the clause beginning with "Further Resolved" on the

2  second page?

3              MR. WEYTHMAN:  Same objection.  Calls

4  for legal conclusion, speculation.

5              THE WITNESS:  I don't represent Hunts

6  Point Ventures at this point.

7      Q.   (BY MR. YURCHAK) Irrespective of your belief

8  that you don't represent Hunts Point Ventures?

9              MR. WEYTHMAN:  Asked and answered.

10      Q.   (BY MR. YURCHAK) That's a different question.

11  Irrespective of that belief, what is Hunts Points

12  Ventures' position -- interpretation, I'm sorry, with

13  respect to that clause?

14              MR. WEYTHMAN:  Objection.  Still calls

15  for speculation.  That question has been asked and

16  answered.

17              MR. YURCHAK:  Not with respect to --

18              MR. WEYTHMAN:  The witness is not

19  compelled to speculate.

20              MR. YURCHAK:  This isn't speculation.

21  This is the corporation answering for its own documents.

22      Q.   (BY MR. YURCHAK) How does the corporation

23  respond to what that clause means?

24      A.   I respond to you that the document was

25  drafted by our attorney and advised to be signed by our



```
 1    attorney.  Therefore, we acted on the advice of our

 2    attorney.

 3        Q.    Do you feel Hunts Point Ventures is bound by

 4    the language in this document?

 5              MR. WEYTHMAN:  Objection.  Calls for

 6    legal conclusion.  Impermissible lay opinion.

 7              THE WITNESS:  I can't be sure without

 8    legal representation regarding the document.

 9        Q.    (BY MR. YURCHAK) You mentioned getting -- you

10    mentioned that this document was executed pursuant to

11    some legal advice; correct?

12        A.    Yes.

13        Q.    Did you have legal advice from any attorney

14    at the time this document was executed?

15        A.    Did I have separate legal counsel?

16        Q.    (Witness nods head affirmatively).

17        A.    No, I did not.

18        Q.    Did you obtain legal advice as an officer of

19    Hunts Point Ventures to have an understanding of what

20    you were signing?

21        A.    Yes.

22        Q.    From whom did you obtain that legal advice?

23        A.    From HPV's attorney, John Du Wors.

24        Q.    And John Du Wors also represented HPV?

25        A.    He only represented HPV.
```

1    Q.    Did you not just say you obtained advice from

2    John Du Wors as well?

3    A.    You asked who I obtained advice from as an

4    officer.

5    Q.    Mm-hm.

6    A.    And I obtained advice from HPV's attorney,

7    John Du Wors.

8    Q.    Do you view yourself as an officer in the

9    corporation as the same thing?

10          MR. WEYTHMAN:  Objection.  Vague.

11    Q.    (BY MR. YURCHAK) In other words, when you're

12    receiving advice from John Du Wors, as you said you did,

13    is that the same thing as HPV receiving legal advice?

14          MR. WEYTHMAN:  Objection.  Calls for

15    legal conclusion.

16          THE WITNESS:  I don't know how to answer

17    that.

18    Q.    (BY MR. YURCHAK) Why?

19    A.    Because I'm not sure what you -- I'm not sure

20    what you're specifically getting at.

21    Q.    You received legal advice from John Du Wors?

22    A.    Yes.

23    Q.    Regarding this document?

24    A.    Yes.

25    Q.    Are you aware if the other corporate officer,

1    Chad Rudkin, received any legal advice at the time of

2    assigning this document?

3                MR. WEYTHMAN:  Objection.  Calls for

4    speculation.

5                THE WITNESS:  We received legal advice

6    from John Du Wors.

7        Q.   (BY MR. YURCHAK) I notice, as you said that

8    your date was May 2011, was that because you may have

9    forgotten to write in the date of when you signed the

10   document --

11               MR. WEYTHMAN:  Objection.  Leading.

12       Q.   (BY MR. YURCHAK) -- on the last page?

13       A.   The actual date number?

14       Q.   Day.

15       A.   Day of the month?

16       Q.   Yeah.

17       A.   Day?  I don't recall why that wasn't

18   completed.

19       Q.   Do you recall signing it at the same time as

20   Chad Rudkin?

21       A.   Yes.

22       Q.   So you were together at the same time?

23       A.   Yes.

24       Q.   So is it fair to assume that your signature

25   occurred on the same date, the 29th?



1                    MR. WEYTHMAN:  Objection.  Vague.

2                    THE WITNESS:  I can't be sure.

3       Q.    (BY MR. YURCHAK) But you do recall being

4  together with Chad Rudkin at the time this document was

5  discussed and signed?

6       A.    Yes.

7       Q.    And you were discussing it together with John

8  Du Wors?

9       A.    We had discussed it with John Du Wors.

10      Q.    Okay.  And it was your understanding that --

11  did you ever receive any other legal advice from John Du

12  Wors regarding your role as an officer in Hunts Point

13  Ventures?

14      A.    Yes.

15      Q.    Do you recall what kind of matters?

16      A.    No.  Not specifically.

17      Q.    How often did you receive advice from him?

18      A.    I don't know how to quantify that.

19      Q.    How would you describe your relationship with

20  him as an officer during the time you were an officer of

21  Hunts Point Ventures?

22                   MR. WEYTHMAN:  Objection.  Vague.

23                   THE WITNESS:  It was a relationship that

24  took place mostly over the phone.  That was really the

25  only way I can categorize it.  A professional, legal



1   relationship providing guidance for HPV.

2        Q.   (BY MR. YURCHAK) Okay.  So he would talk to

3   you on the phone and he would give you guidance about

4   HPV?

5        A.   Yes.

6        Q.   Did he ever request you to sign any sort of

7   document called a conflict waiver?

8        A.   I don't believe I did.

9        Q.   Do you recall any discussions about that?

10       A.   No, I don't.

11       Q.   Would John Du Wors also talk to Chad Rudkin?

12            MR. WEYTHMAN:  Objection.  Calls for

13   speculation.

14            THE WITNESS:  Yes.

15       Q.   (BY MR. YURCHAK) Were you present -- would

16   those conversations occur over the phone?

17       A.   I was present for them.

18       Q.   And did you hear at the time you were present

19   for those conversations that Chad Rudkin was having

20   discussions about Hunts Point Ventures' issues?

21       A.   Yes.  I've been present for conversations

22   with John Du Wors and Chad discussing Hunts Point

23   Ventures.

24       Q.   Did it seem to you that the nature of those

25   discussions was about legal advice, what to do with

1   respect to issues in Hunts Point Ventures?

2       A.    Yes.

3       Q.    Okay.  Now, would you agree, going back to

4   Exhibit 3, that the clause that states that the

5   directors of the corporation approve, adopt, ratify and

6   confirm in all respects the actions taken by the

7   directors of the corporation, that this would obligate

8   the corporation, regardless of who's running it, to

9   approve, adopt, and ratify every act taken by the

10  corporation?

11              MR. WEYTHMAN:  Objection.  Calls for

12  legal conclusion.  Also ambiguous.  Which clause are you

13  referring to, Counsel?

14      Q.    (BY MR. YURCHAK) Second page, same clause,

15  beginning with "Further Resolved."

16      A.    My understanding of this document is based

17  off of my trust for our attorney's direction and advice.

18      Q.    Fair enough.  Would you often feel, in making

19  decisions, that you were relying upon the trust that you

20  put in the advice of John Du Wors?

21      A.    I think that's fair to say.

22      Q.    In doing so, would you take the time to make

23  sure that you understood the documents or direction that

24  you were being advised on?  It's not well put.  In doing

25  so, did you understand all -- would you take the time

1    personally to make sure you understood all of the

2    corporate documents that you were involved with during

3    your time as an officer of Hunts Point Ventures from

4    which you received advice on from John Du Wors?

5        A.    I did take the time to understand and ask

6    appropriate questions.  Though I tended to make the

7    final decisions based upon the advice of our attorney.

8        Q.    Do you recall having taken the time to read

9    this document, Exhibit 3?

10       A.    Yes, I do.

11       Q.    Do you recall reading that clause beginning

12   with "Further Resolved"?

13       A.    Yes, I do.

14       Q.    Did you -- do you recall understanding what

15   that meant at the time you signed this document?

16       A.    Yes.

17       Q.    What is your understanding then of what that

18   clause means?

19       A.    My understanding was that it meant that

20   somehow we were to take in Steve's actions and decisions

21   and adopt them as a part of the corporation.

22       Q.    Okay.  What is Hunts Point Ventures' position

23   with respect to whether Mark Phillips was to be

24   recognized as a shareholder in Hunts Point Ventures?

25                   MR. WEYTHMAN:  Objection.  Calls for



1   speculation.

2            THE WITNESS:  At the time I received the

3   box of documents from Steve Schweickert, I wasn't able

4   to conclude anything regarding Mark's being a

5   shareholder to HPV based on the evidence and the

6   documents.

7        Q.   (BY MR. YURCHAK) Does that mean you base your

8   decision based on the documentation that you have

9   available to you?

10           MR. WEYTHMAN:  Objection.  Ambiguous.

11   Available to her now or available to the witness at the

12   time?

13           MR. YURCHAK:  Available to the witness

14   at any point in time.

15           THE WITNESS:  We used the documentation

16   we were given to help understand the structure of HPV.

17       Q.   (BY MR. YURCHAK) Understood.  We talked

18   earlier about the Jennifer Schweickert note; correct?

19       A.   Correct.

20       Q.   And you testified there was a point in time

21   when you weren't sure if it was an investment because

22   there was no documentation; is that right?

23       A.   Correct.

24       Q.   And you came into documentation later, which

25   helped clarify what that was even though it wasn't

1    signed; is that correct?

2         A.    It didn't help to clarify because it was

3    incomplete documentation that meant relatively little.

4         Q.    But you would have relied upon it if it was

5    complete?

6         A.    Had it been a signed document that had been

7    introduced to corporate records, absolutely.

8         Q.    Okay.  So if you were to become aware of

9    other documents that were not made available to you at

10   the time, would that cause you to change your position

11   with respect to how you viewed something?

12                  MR. WEYTHMAN:  Objection.

13        Q.    (BY MR. YURCHAK) And at the time you become

14   aware of the document?

15                  MR. WEYTHMAN:  Objection.  Calls for

16   speculation.

17                  THE WITNESS:  I'm not really sure I know

18   what you're asking me.  If I were to come across a

19   document that provided evidence contrary to what I

20   believed?  Prior to that?

21        Q.    (BY MR. YURCHAK) Yeah.  Maybe you said it

22   better than I did.

23        A.    Then, yes, that would help to educate me.

24        Q.    Fair enough.  Sounds reasonable.

25                  (Exhibit No. 4 marked

1                     for identification.)

2      Q.    (BY MR. YURCHAK) You've received Exhibit 4?

3      A.    Yes.

4      Q.    Are you able to identify it?

5      A.    No.

6      Q.    Why is that?

7      A.    I'm unfamiliar with it.

8      Q.    Do you know what a stock subscription

9   agreement is?

10     A.    Yes.

11     Q.    What is it?

12     A.    It's a contract of a person buying stock in a

13  company.

14     Q.    Okay.  Reading the first paragraph,

15  beginning, "This Stock Subscription Agreement," what do

16  you understand this document to be?

17             MR. WEYTHMAN:  Objection.  Assumes facts

18  not in the record.

19     Q.    (BY MR. YURCHAK) On its face, what does this

20  document appear -- purport to be?

21     A.    This document says it's a stock subscription

22  agreement.

23     Q.    Between who and who?

24     A.    Between Hunts Point Ventures and Mark

25  Phillips.



1      Q.    Have you ever seen this document before?

2      A.    I can't be sure that I have.

3      Q.    Would this appear to be a corporate document

4  related to Hunts Point Ventures?

5            MR. WEYTHMAN:  Objection.  Calls for

6  legal conclusion.

7            THE WITNESS:  Being unfamiliar with this

8  document, I can't say.  It appears that it's possible.

9      Q.    (BY MR. YURCHAK) And on the last page --

10  sorry.  In that first paragraph there, do you see the

11  date of this document?

12     A.    I do.

13     Q.    And what is it?

14     A.    May 20th, 2010.

15     Q.    Would that date fall within the time period

16  of when Hunts Point Ventures was in an active

17  incorporated entity?

18            MR. WEYTHMAN:  Objection.  Calls for

19  speculation.

20            THE WITNESS:  I believe Hunts Point

21  Ventures was incorporated at the beginning of May, 2010.

22     Q.    (BY MR. YURCHAK) Okay.

23     A.    To the best of my recollection.

24     Q.    Would it fall within that time period?

25     A.    May 20th, 2010, falls within that time period,

1  yes.

2      Q.    And the signatures on the last page, do you

3  recognize either of them?

4      A.    Yes, I see them.

5      Q.    Do you recognize either of them?

6      A.    Yes.

7      Q.    How do you recognize them?

8      A.    Well, it appears to be a signature of Mark

9  Phillips and Steve Schweickert.

10      Q.    Have you ever seen those signatures on other

11  documents before?

12      A.    Yes.

13      Q.    Do those signatures appear to be consistent

14  with the signatures that you saw from those individuals

15  before?

16          MR. WEYTHMAN:  Objection.  Calls for

17  impermissible lay opinion and legal conclusion.

18          THE WITNESS:  I can't say for sure.

19      Q.    (BY MR. YURCHAK) Okay.  Putting aside the

20  question of whether this is a proper corporate document,

21  or any questions you may have about it, what does it

22  appear to be to you on its face?

23          MR. WEYTHMAN:  Objection.  Calls for

24  speculation.  Asked and answered.

25          THE WITNESS:  The document says it's a



1  stock subscription agreement.  That's what it appears to

2  be.  I can't confirm whether it is or it isn't.  I don't

3  know.

4        Q.    (BY MR. YURCHAK) How do you think you would

5  try to confirm if it is or it isn't?

6                 MR. WEYTHMAN:  Objection.  Calls for

7  speculation.

8                 THE WITNESS:  Because it's just being

9  handed to me today, I can't be certain if it came

10  through an attorney in a legal transaction.  That would

11  be helpful, but I don't know where this document came

12  from.

13        Q.    (BY MR. YURCHAK) Mm-hm.

14        A.    I don't have any reference for this document.

15        Q.    That's understandable.  You're seeing it for

16  the first time today; is that right?

17        A.    I can't be sure.

18        Q.    Why is that?

19        A.    I just don't recollect.  It doesn't look

20  familiar to me.

21        Q.    Is it possible you may have seen it before?

22                 MR. WEYTHMAN:  Objection.  Asked and

23  answered.

24                 THE WITNESS:  I can't say.  I don't

25  know.



1      Q.    (BY MR. YURCHAK) Were you ever aware of any

2    documents prepared by the law firm of Cairncross &

3    Hempelmann in the time frame of May 2010?

4      A.    Was I aware at that time?

5      Q.    No.  Were you ever aware -- and I'm assuming

6    that when you were actively involved in Hunts Point

7    Ventures, you were seeing lots of stuff; is that right?

8                    MR. WEYTHMAN:  Objection.  Leading.

9                    THE WITNESS:  Not at that time.

10     Q.    (BY MR. YURCHAK) At the time you were

11   actively involved with Hunts Point Ventures, I imagine

12   -- it sounds as if you were bombarded with all sorts of

13   information.

14                   MR. WEYTHMAN:  Counsel, ambiguous.  What

15   time do you mean by "actively involved"?

16     Q.    (BY MR. YURCHAK) Is that a fair assessment?

17     A.    Are you asking if I've seen lots of documents

18   at the time I was actively involved?

19     Q.    Generally, yeah.

20     A.    Generally, yes.

21     Q.    It sounds -- it sounds like it was a mess; is

22   that a fair assessment?

23     A.    Yes.

24     Q.    Chad Rudkin two days ago testified that this

25   box, he referred to as a box of crap.  Do you have any

1    response to that assessment of the state of affairs as

2    it was reflected at that time?

3         A.    That's a fair assessment.

4         Q.    The box?  So are you able to say with any

5    certainty that you ever saw any documents that were

6    produced by the law firm of Cairncross & Hempelmann in

7    the time frame of May 2010 regarding Hunts Point

8    Ventures?

9         A.    I can't say either way.  I'm not certain of

10   what they prepared matched to what I've seen.

11        Q.    Do you have any specific recollection of any

12   document that purported to be an amended article of the

13   corporation of Hunts Point Ventures from the May 2010

14   time frame?

15        A.    I don't recall that.

16        Q.    Any document that you can recall that

17   purported to set up an entity called Hunts Point

18   Intellectual Properties in May 2010 time frame?

19        A.    I did see a document with that on it.

20        Q.    Okay.  And what do you recall about that

21   document?

22        A.    It appeared to be a business.  I'm actually

23   not sure of what that document was.  I don't know how to

24   properly title that document.

25        Q.    But you do recall -- was it a memorandum of



Page 92

1   understanding possibly?

2              MR. WEYTHMAN:  Objection.  Leading.

3              THE WITNESS:  No.  That's not what I'm

4   remembering.

5      Q.   (BY MR. YURCHAK) Okay.  And I'm just going

6   over the list of items produced by you to be handed to

7   your attorneys for the receivership.  I don't see any

8   reference to Hunts Point Intellectual Property document.

9   Is it possible if that document is not on this list that

10  you may still be in possession of it?

11             MR. WEYTHMAN:  Objection.  Assumes facts

12  not in the record, mischaracterizes the witness's

13  testimony.

14             THE WITNESS:  So are you asking if it's

15  possible if I still have that document?

16     Q.   (BY MR. YURCHAK) Yeah.

17     A.   I don't believe it's possible.  It is

18  possible that it went to Clark Nuber.  I don't have that

19  document in my possession.

20     Q.   Were you aware of any intent on the part of

21  Hunts Point Ventures to reincorporate in order to

22  include Chad Rudkin, Mark Phillips, Doug Lower as

23  shareholders, Joyce Schweickert, in the May/June 2010

24  time frame?

25             MR. WEYTHMAN:  Objection.  Ambiguous.



1    Are you asking if she was aware in May 2010 if that was

2    going on, or aware at any time that they were intending

3    that in 2010?  That's unclear.

4                    MR. YURCHAK:  That's being overly

5    technical.

6        Q.    (BY MR. YURCHAK) Are you aware?

7        A.    I don't know.

8        Q.    You don't know?  You'll -- do you see on the

9    stock subscription agreement that it appears to purport

10   that Mark Phillips had subscribed to 9200 shares?

11       A.    I see that.

12       Q.    Okay.  Do you have any specific recollection

13   as to whether there was any intent that the

14   reincorporation -- the reincorporated Hunts Point

15   Ventures would issue shares in the amount of 9200 to

16   Chad Rudkin, Mark Phillips, Doug Lower?

17                   MR. WEYTHMAN:  Objection.  Calls for

18   speculation.  Assumes facts not in the record.

19                   THE WITNESS:  I don't know.

20                   MR. YURCHAK:  I have to take a minute to

21   look at my documents.

22                   MR. WEYTHMAN:  It's almost lunch.

23                   MR. YURCHAK:  I was going to ask if you

24   wanted to do it now or --

25                   MR. WEYTHMAN:  If you're comfortable



 1   with stopping now, we can take lunch now.

 2                    MR. YURCHAK:  That's fine.

 3                    MR. WEYTHMAN:  Okay.  About an hour?

 4                    MR. YURCHAK:  An hour.  1 o'clock?

 5                    MR. WEYTHMAN:  Sure.  That works.

 6                    (Recess 11:56 a.m. to 1:00 p.m.)

 7

 8                    EXAMINATION (Continuing)

 9   BY MR. YURCHAK:

10        Q.    I think we left off discussing your

11   understanding of Hunts Point Ventures' intent with

12   respect to recognizing other shareholders other than

13   Steve.  Does that sound generally right to you as far as

14   where we left off?

15        A.    I don't know.  Let's go with it.

16        Q.    All right.  So if I could have you refer back

17   to Exhibit 2, these were your notes on the second page?

18                    MR. WEYTHMAN:  I'm going to have to

19   object to the characterization that they are the

20   witness's notes.  I believe she said they appear to be

21   similar to her notes.

22                    THE WITNESS:  Okay.

23        Q.    (BY MR. YURCHAK) The exhibit that appears to

24   look similar to your notes on page 2, do you see on the

25   second bullet point that it was understood, Steve was to



1   be a sole shareholder, and then all three would join

2   Steve as 22 percent shareholders?

3        A.    Mm-hm (answers affirmatively).

4        Q.    And Joyce would have an eight percent

5   interest?

6        A.    Mm-hm (answers affirmatively).

7        Q.    Do you recall where you acquired that

8   understanding?

9        A.    I can't say for sure.  It was among

10  conversation with all the people involved.

11       Q.    Okay.  Do you have any idea -- from your

12  knowledge of Hunts Point Ventures, has Hunts Points

13  Ventures recognized Mark Phillips as a shareholder?

14                  MR. WEYTHMAN:  Objection.  Ambiguous.

15                  THE WITNESS:  When?

16       Q.    (BY MR. YURCHAK) At any point in its

17  corporate life.

18                  MR. WEYTHMAN:  Objection.  Calls for

19  speculation.

20                  THE WITNESS:  I don't know how to answer

21  that.  At the point in time when we were the

22  shareholders of HPV, there wasn't documentation to show

23  that Mark was a shareholder.

24       Q.    (BY MR. YURCHAK) I understand.  Insofar as

25  you're aware, has Hunt Points Ventures at any point



1  recognized him as a shareholder?

2      A.    Not as far as I'm aware.

3      Q.    What's your understanding as to why it did

4  not, given your notes regarding the intent that he be

5  one of the people recognized as a shareholder?

6              MR. WEYTHMAN:  Objection.  Calls for

7  speculation.  Also, again, the characterization of the

8  document as the witness's notes.  That is not consistent

9  with witness's testimony.

10             THE WITNESS:  So you're -- ask your

11  question of me.

12             MR. YURCHAK:  Could you read back the

13  question?

14                  (Question on Page 96,

15                   Lines 2 through 4,

16                   read by the reporter.)

17

18      Q.    (BY MR. YURCHAK) Why did you not recognize

19  him?

20      A.    I can't say why Steve and Joyce did what they

21  did in forming the company.  I don't know.

22      Q.    Okay.  On the fourth page of your notes, in

23  the middle, in the section of "Original Partners,"

24  there's a line that starts "Intended Shareholders," and

25  again, you make reference to Steve, Mark, Doug, and Chad

1    as being equal shareholders?

2        A.    Mm-hm (answers affirmatively).

3        Q.    Based on a Memorandum of Understanding.

4    What's your knowledge of what the Memorandum of

5    Understanding is?

6                  MR. WEYTHMAN:  Same objection regarding

7    the characterization, misstatement of the witness's

8    testimony.

9                  THE WITNESS:  I didn't -- I haven't read

10   the Memorandum of Understanding.  I have a summary idea

11   of what the intent was.  I also know that it was never

12   executed or signed.  And I can't speak to the behavior

13   of everybody's actions.

14       Q.    (BY MR. YURCHAK) Okay.  And you said it was

15   your -- you are aware that it was not signed; is that

16   right?

17       A.    Yes.

18       Q.    In that same section I just referred you to,

19   the last part says, "Not signed by Doug or Mark."

20       A.    Mm-hm (answers affirmatively).

21       Q.    When you state that certain people did not

22   sign it, does that mean that other people did sign it?

23       A.    I can't be sure.  I do recall the day that

24   that document was talked about to be signed.  I don't

25   know what day that was, but I remember the sort of

1    intent or plan of everyone wanting to.  And then I also

2    remember that Doug and Mark chose not to.  I can't speak

3    to -- as to what reason.  And that's all I know about

4    that.

5         Q.   Do you ever recall seeing signatures of

6    anybody on the document called a Memorandum of

7    Understanding?

8         A.   I can't say.

9         Q.   Okay.

10        A.   I don't know.

11        Q.   Going back to page 2 of your notes --

12                  MR. WEYTHMAN:  Counsel, can we just

13   refer to it as Exhibit 2 so I don't have to make that

14   characterization objection every time?

15                  MR. YURCHAK:  No problem.  I'm sorry.

16                  MR. WEYTHMAN:  No worries.

17        Q.   (BY MR. YURCHAK) Going back to Exhibit 2,

18   page 2 of Exhibit 2, you make reference to an investment

19   of 200,000 by Joyce Schweickert?

20        A.   Mm-hm (answers affirmatively).  Where?

21        Q.   Top of the page.

22        A.   Okay.  I see it.

23        Q.   Was there any records or documentation

24   regarding that 200,000 from Joyce Schweickert?

25        A.   No.  Not that I ever saw.



1     Q.     And do you recall how you chose to represent

2   that transaction in Hunts Point Ventures' accounting?

3                MR. WEYTHMAN:  Objection.  Assumes facts

4   not in the record.

5                THE WITNESS:  Handling of that was

6   identical to all the other handling of transactions that

7   didn't have supporting evidence.

8     Q.     (BY MR. YURCHAK) And how was that handled?

9     A.     It was sort of left up in the air to be

10  determined by the accountants as the process we were

11  going through.

12    Q.     Okay.

13    A.     With the accountants.

14    Q.     The accountants ever seek out from you

15  additional information regarding Hunts Point Ventures'

16  transactions?

17    A.     Yes.

18    Q.     Did they ever ask you about the Joyce

19  Schweickert transaction?

20    A.     Yes.

21    Q.     Did you ever reach out to Joyce Schweickert

22  for information about that transaction?

23    A.     Yes.

24    Q.     And when did that occur?

25    A.     I can't be specific as to dates, but there

1    were phone calls, as well as a lunch.

2         Q.    Okay.  And what was your understanding of

3    what -- of how Joyce represented what that money was?

4                   MR. WEYTHMAN:  Objection.  Assumes facts

5    not in the record.

6                   THE WITNESS:  At that lunch, Joyce

7    explained to us that she didn't want to have anything to

8    do with HPV.  She didn't want her money back.  She

9    didn't want anything to do with anything with HPV.

10        Q.    (BY MR. YURCHAK) And who was present at the

11   lunch?

12        A.    Chad, Joyce and myself.

13        Q.    And did she give a reason why she didn't want

14   any of her money back?

15        A.    Not on that occasion.

16        Q.    Did she give an indication on -- did she say

17   something about that on a different occasion?

18        A.    Yes.

19        Q.    And what did she say about why?

20        A.    It would be hearsay.  I didn't hear it

21   directly from her.

22        Q.    Oh.  I understand.  Sometimes comments --

23   things that are said in a deposition aren't always

24   proper evidence, but we can ask about it anyway.  So

25   even though it's hearsay, do you still recall?



1     A.    My understanding was that she -- because of

2  her gaming license in Nevada, that she didn't want to be

3  associated with Mark Phillips in regards to what was

4  going on with his criminal investigation and such.  That

5  was the understanding.  We had the lunch, because we

6  were now then the shareholders of HPV, to understand her

7  loan or investment, we wanted to be able to properly

8  classify it and understand what her wants and desires

9  and expectations were, because we couldn't find the

10  evidence, and we were simply given she didn't want to

11  have anything to do with it.

12     Q.    Did you ask her to sign anything?

13     A.    No.

14     Q.    At that time?

15     A.    No.  It was a very casual lunch for the

16  purpose of discussing HPV, but not a business formal

17  setting.

18     Q.    Sure.  And you don't ever recall when that

19  occurred, approximately?

20     A.    Not -- I can't even -- let me see.  It may be

21  a stretch, but I think it was near the time when we were

22  having our board meeting or we invited people to the

23  board meeting, and that was in August 2012, I believe,

24  so probably somewhere near that date.  But again, I'm

25  guessing.

1      Q.    Okay.  On the same page of Exhibit 2, you

2   discussed Sandy Hoover loan?

3      A.    Uh-huh (answers affirmatively).

4      Q.    And for the record, Sandy Hoover is -- who's

5   Sandy Hoover?

6      A.    She's my mother.

7      Q.    And did she give money to Hunts Point

8   Ventures?

9      A.    Yes.

10     Q.    And how much did she give?

11     A.    I think it was 100,000.

12     Q.    Was she owed any interest on that loan?

13     A.    Yes.

14     Q.    Do you recall if Hunts Point Ventures ever

15   paid any interest on that loan?

16     A.    No.

17     Q.    And why --

18     A.    Yes, I recall.  No, we did not.

19     Q.    Thanks for being precise.  And why was that?

20     A.    We had a discussion with her relative to the

21   state of HPV and its mission of pursuing litigation to

22   create income.  And at that state there wasn't a lot of

23   money in HPV, and so she verbally agreed on multiple

24   occasions to put a stay on her note, in an effort to

25   allow HPV to continue to litigate in the hopes of making



 1  money.

 2      Q.   Do you recall at what point her principal --

 3  her interest payments were due on the principal?

 4      A.   I know it's in the note, but I don't know

 5  what it is.  I don't remember.

 6      Q.   Are you aware if HPV ever had funds available

 7  to it to make payments to any of its creditors?

 8              MR. WEYTHMAN:  Objection.  Calls for

 9  speculation.

10              THE WITNESS:  Without having the

11  documentation in front of me, I can't speak to the bank

12  account.

13      Q.   You note that it appears Ms. Hoover had

14  conversations with Mark, Chad, and Steve in the spring

15  of 2010?

16      A.   Mm-hm (answers affirmatively).

17      Q.   Is that an accurate statement?

18              MR. WEYTHMAN:  Objection.  Vague.

19  Ambiguous.

20              THE WITNESS:  To the best of my

21  knowledge.

22      Q.   (BY MR. YURCHAK) Do you know if Mark ever had

23  conversations with Ms. Hoover after the spring of 2010?

24              MR. WEYTHMAN:  Objection.  Foundation.

25  Personal knowledge.  Calls for speculation.

```
 1                    THE WITNESS:  I don't know what
 2   individual conversation they may or may not have had.  I
 3   was present for conversation at a dinner at her home.
 4        Q.    (BY MR. YURCHAK) And do you recall when that
 5   dinner was?
 6        A.    I think it was in the fall after Mark was
 7   released.
 8        Q.    Was it prior to her making a loan?
 9                    MR. WEYTHMAN:  Objection.  Misstates the
10   witness's testimony, as far as being a loan.
11                    THE WITNESS:  You're saying it's a --
12   are we trying to characterize whether this is a loan or
13   an investment?
14        Q.    (BY MR. YURCHAK) No.
15        A.    Okay.  So your question was -- no.
16        Q.    My question --
17        A.    When Mark was released it was --
18        Q.    You recall --
19        A.    -- well after the loan had taken place.
20        Q.    Are you talking about 2012?
21                    MR. WEYTHMAN:  Objection.  Ambiguous.
22        Q.    (BY MR. YURCHAK) I'm asking if you recall
23   when -- you mentioned Mark coming for a dinner?
24        A.    Yes.
25        Q.    With you and Sandy?
```



Page 105

1    A.    Yes.

2    Q.    And you said that happened after his release?

3    A.    Correct.

4    Q.    I guess we should define what you mean by

5    "release," because I understood there were different

6    points in time in 2010 when he was released?

7    A.    Okay.  That's true.  So the last time that

8    Mark was out of jail.

9    Q.    For good?

10   A.    Yeah, the last time.

11   Q.    Okay.  Also in your notes, in the last

12   sentence you write, "It was also believed by Sandy that

13   Steve was the sole shareholder at HPV and that Chad

14   Rudkin was an operating director and intended

15   shareholder of HPV."

16            MR. WEYTHMAN:  Objection.  Assumes facts

17   not in the record, that the witness actually wrote this.

18   Q.    (BY MR. YURCHAK) Did you recall writing that

19   statement?

20   A.    Can you identify it again?

21   Q.    It's just the last sentence of the paragraph

22   beginning 10/15/10.

23   A.    Oh.

24   Q.    Using that to try to refresh your

25   recollection, do you recall where -- from whom you

1    acquired the knowledge that Chad Rudkin was an operating

2    director?

3         A.    I don't know.

4         Q.    On the third page of your notes -- on the

5    third page of Exhibit 2, at the top of -- there's

6    discussion about Joyce Schweickert, Joyce Schweickert's

7    resignation.

8         A.    Mm-hm (answers affirmatively).

9         Q.    When was your understanding about when she

10   formally resigned?  What is HPV's understanding about

11   when she formally resigned?

12                 MR. WEYTHMAN:  Objection.  Speculation.

13   Assumes facts not in the record.

14                 THE WITNESS:  I can't speak to HPV's

15   understanding, but I can tell you that when I got that

16   box of crap from Steve, it was the first time that it

17   was brought to my awareness that Joyce was ever a

18   shareholder of HPV up until that point.  We didn't have

19   knowledge that she was a shareholder.

20        Q.    (BY MR. YURCHAK) Do you feel that you're able

21   to speak for HPV prior to the time of your involvement

22   on the date of May 29, 2012, as was indicated in Exhibit

23   3?

24                 MR. WEYTHMAN:  Objection.  Vague.

25   Ambiguous.  Unintelligible.



1                    THE WITNESS:  I don't feel I can speak

2    on behalf of HPV.  I feel like I could speak on behalf

3    of my understanding.

4        Q.    (BY MR. YURCHAK) And what do you mean by that

5    statement?

6        A.    I wasn't in any capacity to do -- to perform

7    HPV business.  And clearly we were going through a

8    personal tragedy.  So though we were aware of things

9    brought to our attention, we weren't directly involved.

10       Q.    Do you recall, according to HPV's records,

11   when her resignation occurred?

12                   MR. WEYTHMAN:  Objection.  Assumes facts

13   not in the record.

14                   THE WITNESS:  I can't say for certain,

15   but I believe it was towards the end of 2010.

16       Q.    (BY MR. YURCHAK) Would it make sense, if

17   these are your notes in Exhibit 2, that the dates you

18   indicate would have been the time at which the different

19   events described would have occurred?

20                   MR. WEYTHMAN:  Objection.  Calls for

21   speculation.  Vague.  Ambiguous.

22                   THE WITNESS:  I think I would be

23   speculating on what's in front of me.

24       Q.    (BY MR. YURCHAK) Mm-hm.  Would it help to

25   look at the dates for other entries, for instance, the



1    one below it, dated 1/1/2011, describing the time that

2    Chad became a 50 percent shareholder?  Would it help to

3    look at the date below that, 4/29/11, Jennifer

4    Schweickert invested 200K?

5         A.    Sure.  If these are my notes, my efforts were

6    in an attempt to put together a time line of events.

7         Q.    Okay.  So if these are your notes, then you

8    were endeavoring to create an accurate time line of when

9    those events occurred?

10        A.    Yes.

11                        (Exhibit No. 5 marked

12                          for identification.)

13        Q.    Do you -- can you identify Exhibit 5?

14        A.    It appears to be an invoice from Newman and

15   Du Wors to HPV.

16        Q.    Have you ever seen such similar invoices

17   before while working?

18        A.    Yes.

19        Q.    As an officer of Hunts Point Ventures?

20        A.    Yes.

21        Q.    And if I could direct your attention to the

22   second page, do you see the date, February 8th, '11?

23        A.    Mm-hm (answers affirmatively).

24        Q.    And do you see the description of services

25   performed, which includes a resignation of Joyce



Page 109

```
 1   Schweickert?

 2        A.    Yep.

 3        Q.    Board Resolution to Accept the Resignation?

 4        A.    Yep.

 5        Q.    Does HPV have any explanation as to why its

 6   attorney performed that work on February 8th, 2011, when

 7   the -- when, upon your belief and understanding, the

 8   resignation was finalized as of December 2010?

 9                  MR. WEYTHMAN:  Objection.  Calls for

10   speculation.  Misstates and mischaracterizes the

11   witness's testimony.  Assumes facts not in the record.

12   No foundation that the statement here actually is true.

13   You can answer if you understand the question.

14                  THE WITNESS:  You would have to ask

15   Steve.  I wasn't there.

16        Q.    (BY MR. YURCHAK) You've never had any

17   conversation with anybody about the backdating of Joyce

18   Schweickert's resignation from Hunts Point Ventures?

19                  MR. WEYTHMAN:  Objection.  Assumes facts

20   not in the record.

21                  THE WITNESS:  Have I had conversations

22   with anybody regarding backdating?

23        Q.    (BY MR. YURCHAK) Of Joyce Schweickert's

24   resignation from Hunts Point Ventures?

25        A.    Not that I recall.
```



1        Q.    And does Hunts Point Ventures have any

2    explanation, if it were true that Joyce Schweickert's

3    resignation was backdated, as to why that happened?

4                    MR. WEYTHMAN:  Objection.  Calls for

5    speculation.  Again, the witness has already stated that

6    she can't testify on behalf of HPV.

7                    THE WITNESS:  I can't.  You'd have to

8    ask Steve.

9        Q.    (BY MR. YURCHAK) Did Hunts Point Ventures

10   recognize that Joyce was a shareholder at any point in

11   time?

12                   MR. WEYTHMAN:  Objection.  Calls for

13   speculation.

14                   THE WITNESS:  I feel like you'd have to

15   ask Steve.

16       Q.    (BY MR. YURCHAK) You presently are unable to

17   answer whether Joyce Schweickert was a shareholder at

18   any point in time at Hunts Point Ventures?

19                   MR. WEYTHMAN:  Objection.  Asked and

20   answered.

21       Q.    (BY MR. YURCHAK) Is that correct?

22       A.    I can't answer for HPV.  Are you asking me

23   or are you asking on behalf of HPV?

24       Q.    On behalf of HPV.

25       A.    Okay.  I can't answer for HPV.



1                    (Exhibit No. 6 marked

2                        for identification.)

3        Q.    Exhibit 6 should be to your right.  Does

4    Hunts Point Ventures recognize this document?

5                    MR. WEYTHMAN:  Objection.  Speculation.

6    Foundation.  Personal knowledge.  Again, the witness has

7    testified that she can't represent anything for HPV.  If

8    you'd like to depose HPV, you can send a subpoena to

9    HPV's counsel and you can ask them to send a

10   representative to sit for deposition.

11                   MR. YURCHAK:  Well, I am asking

12   questions of HPV.  And my understanding, under the civil

13   rules, 30, subsection D, I believe, the rules state that

14   I may notice a corporation to have a representative

15   appear, but that I'm not required to follow that

16   procedure in order to depose a corporation.  I am

17   seeking to have Hunts Point Ventures' testimony on the

18   record regarding the state of its corporate affairs.  If

19   that's an issue for you, I think we need to address it

20   now.  And I can -- we can look specifically at the rule

21   if you'd like.

22                   MR. WEYTHMAN:  Go ahead.

23                   MR. YURCHAK:  So I'm reading off of C R

24   30(b)(6).  "A party may in his notice name as a deponent

25   a public or private corporation.  In that event the



1    organization so named shall designate one or more

2    officers to testify on its behalf."  And the last

3    sentence is, "This subsection does not preclude taking a

4    deposition by any other procedure authorized in these

5    rules."

6                    MR. WEYTHMAN:  Correct.  That doesn't

7    give my client personal knowledge or representative

8    capacity to testify on behalf of a corporation she no

9    longer controls.  So you can ask all the questions you

10   want to of HPV, but my client can't represent anything

11   on behalf of HPV.  She's already testified as such.

12                   MR. YURCHAK:  Your client was and still

13   is an officer of HPV.

14                   MR. WEYTHMAN:  That's a legal

15   conclusion, and I can't testify to that.

16                   MR. YURCHAK:  That's plain on its face,

17   according to the corporate documents, that she's an

18   officer of HPV and remains so to this day, and has

19   signed corporate resolutions saying that she adopts and

20   ratifies everything done by the corporations since its

21   inception.  HPV has no other officers to depose.

22   There's no one else to go to.  The corporation is, after

23   all, its people.  And there are only two people, as you

24   know, involved in this corporation.  So there is no one

25   else to ask questions of regarding HPV.  If your client

1   wishes to state as her testimony on behalf of HPV that

2   she's not authorized to give testimony, then I guess

3   that's what the record's going to reflect.  I think what

4   I simply need to know is that we have an understanding

5   that the questions are being posed to HPV and that these

6   are the answers that I am receiving from the

7   corporation.  And if we don't have that understanding,

8   then we need to discuss that.

9                  MR. WEYTHMAN:  We don't have that

10  understanding.

11                 MR. YURCHAK:  Then what is your

12  understanding?

13                 MR. WEYTHMAN:  That my client can't

14  testify on behalf of HPV.

15                 MR. YURCHAK:  Okay.  If I were to notice

16  you -- if I were to notice HPV, whom would it produce to

17  provide testimony?

18                 MR. WEYTHMAN:  I don't know.  I don't

19  represent HPV.  That's up to the corporation, according

20  to the rule.

21                 MR. YURCHAK:  As far as I'm still aware,

22  your firm has a notice of appearance on file for Hunts

23  Point Ventures.  You have assigned its asset to a

24  receiver, but you still have an effective notice of

25  appearance which you kept on file even after the



1  receivership was filed last November.

2                  MR. WEYTHMAN:  My firm's representation

3  of HPV has been terminated.

4                  MR. YURCHAK:  How so?

5                  MR. WEYTHMAN:  We were fired.

6                  MR. YURCHAK:  I believe I received a

7  notice of withdrawal to which we objected.

8                  MR. WEYTHMAN:  That's fine.  That's

9  based off the fact that my firm's been terminated.

10                 MR. YURCHAK:  I feel as if this would

11 not be a productive use of time for your client to

12 terminate a deposition and renote it following your

13 logic, that you've been terminated, and renote it with

14 -- through the receiver and have them produce the same

15 witness that's here today.

16                 MR. WEYTHMAN:  Counsel, I can't -- one

17 of the issues is if I'm not representing HPV, how can I

18 object on behalf of HPV?  I can't represent HPV.  I

19 can't make decisions for HPV.  I'm not authorized to do

20 that.  It would be illegal practice of law to do that.

21 I can't make those decisions.

22                 MR. YURCHAK:  Yeah.

23                 MR. WEYTHMAN:  So as I said before, if

24 you want HPV to designate a representative, you need to

25 subpoena HPV.



1                    MR. YURCHAK:  Okay.  I'll take a minute

2    with my client, but we'll probably continue, and I

3    won't --

4                    MR. WEYTHMAN:  If --

5                    MR. YURCHAK:  -- ask questions of HPV.

6                    MR. WEYTHMAN:  Right.  If you want to

7    ask questions regarding her personal knowledge, you're

8    welcome to do that, but it puts us in a legal conundrum

9    with the status of the corporation and the status of its

10   representation.

11                   (Pause in proceedings.)

12       Q.    (BY MR. YURCHAK) Okay.  So for the record, I

13   will direct my questioning towards what your personal

14   knowledge was as -- during the time of your role as an

15   officer.

16              I can't remember where I left off.

17                   MR. WEYTHMAN:  We'd just received

18   Exhibit 6.

19       Q.    (BY MR. YURCHAK) Exhibit 6.  Okay.  Do you

20   have any -- do you recognize Exhibit 6?

21       A.    Yes, it looks familiar.

22       Q.    And is it something you may have seen before?

23       A.    Without being able to compare it to the

24   original document that I know to be true, it looks to be

25   it, but I can't -- I can't verify specifically.



1    Q.    Okay.  Does this document -- would you agree

2    that this document is a document between Hunts Point

3    Ventures and Joyce Schweickert?

4    A.    It appears to be the stock redemption and

5    indemnification agreement between Hunts Point Ventures

6    and Joyce Schweickert.

7    Q.    So does that mean to you that Joyce

8    Schweickert had stock in Hunts Point Ventures?

9              MR. WEYTHMAN:  Objection.  Calls for

10   legal conclusion.

11   Q.    (BY MR. YURCHAK) Do you see in the second

12   paragraph that -- I'll strike the last question -- that

13   the seller is the record and beneficial owner of 50

14   shares?

15   A.    In the last paragraph?

16   Q.    Second paragraph.

17   A.    I'm sorry.  Yes.

18   Q.    Is it your understanding that Joyce

19   Schweickert had 50 shares in Hunts Point Ventures?

20   A.    It is.

21   Q.    Okay.  So my question is, if you had any

22   doubts about whether you were to recognize Mark

23   Phillips' shares in Hunts Point Ventures, would it have

24   made sense to ask Joyce Schweickert's opinion about

25   that?



 1                    MR. WEYTHMAN:  Objection.  Vague.

 2    Ambiguous.

 3                    THE WITNESS:  At the time we became

 4    shareholders of HPV, Steve Schweickert was the sole

 5    shareholder of HPV.

 6         Q.    (BY MR. YURCHAK) Correct.

 7         A.    So we sought clarification from HPV's

 8    attorney and from Steve Schweickert.

 9         Q.    Would you agree that Joyce Schweickert,

10    according to the date on Exhibit 6, signed a document on

11    December 31st, 2010, wherein she sold her shares to Hunts

12    Point Ventures?

13                    MR. WEYTHMAN:  Objection.  Lacks

14    foundation.  We haven't established the documents on

15    that.

16                    THE WITNESS:  If this is the actual

17    agreement, then it appears that that's true.

18         Q.    (BY MR. YURCHAK) Would that mean to you that

19    she was a shareholder in 2010 for Hunts Point Ventures?

20         A.    Yes.

21         Q.    If there was any dispute as to whether there

22    were other people who were supposed to be shareholders

23    during that same period, would it make sense to you as a

24    current officer to ask someone like Joyce Schweickert

25    her opinion as to whether or not her corporation



```
 1   recognized other shareholders from that period of time?
 2              MR. WEYTHMAN:  Calls for speculation.
 3   Lay opinion.
 4              THE WITNESS:  Are you asking if it
 5   occurred to me?
 6        Q.   (BY MR. YURCHAK) (Nods head affirmatively).
 7        A.   Yes, it occurred to me.
 8        Q.   And did you ever take any steps to ask Joyce
 9   Schweickert that question?
10              MR. WEYTHMAN:  Objection.  Ambiguous.
11   What question?
12        Q.   (BY MR. YURCHAK) To ask what her
13   understanding was as to whether Hunts Point Ventures had
14   intent to recognize others as shareholders in 2010.
15        A.   I can't be sure if I asked her or not.
16        Q.   Okay.  Now, do you recall working to deal
17   with the issue of how to book -- in HPV's accounting
18   records, any funds that had received from Mark Phillips?
19              MR. WEYTHMAN:  Objection.  Ambiguous.
20   Vague.
21              THE WITNESS:  Do I recall?  I'm sorry.
22   I forgot --
23        Q.   (BY MR. YURCHAK) Do you recall working to try
24   to book -- to understand how to book any funds received
25   from Mark Phillips to Hunts Point Ventures?
```



1      A.    Yes.

2      Q.    And do you recall what the amounts were?

3      A.    Vaguely, but not specifically.

4      Q.    What do you vaguely recall it being?

5      A.    I recall somewhere in the neighborhood of

6    75,000 coming in from investment accounts, liquidated

7    investment accounts.

8      Q.    Did you come to a final determination on how

9    to book that?

10     A.    My recollection at the time was that it was

11   to pay back moneys paid out on his behalf.

12     Q.    Okay.  So what is your understanding of the

13   moneys that were paid out on his behalf?

14     A.    I could never figure out or understand why

15   Steve Schweickert, HPV, paid out personal moneys on

16   Mark's behalf.

17     Q.    And what do you mean by "personal moneys"?

18     A.    It appeared by documents that I was given

19   that they were personal debts to be repaid.

20     Q.    So your characterization of the word

21   "personal" refers to Mark Phillips' personal debts?

22     A.    Correct.

23     Q.    Okay.  And do you recall what those debts

24   consisted of?

25     A.    There were several that were legal expenses.



 1   One for a storage unit, I believe.  One to pay off --

 2   one being a transaction.  I can't recall the quantity.

 3   To pay off an architect.

 4        Q.    Do you have a vague recollection -- that's my

 5   assumption -- of how much money HPV paid out on Mark

 6   Phillips' behalf?

 7        A.    I'm going to go with the vague assumption,

 8   but somewhere in the neighborhood of 125, 130,000.

 9        Q.    And did HPV ever get any money from Mark

10   other than 75 -- from what you recall being $75,000?

11                  MR. WEYTHMAN:  Objection.  Calls for

12   speculation.  Are you referring to the time when she had

13   control or ever?

14                  MR. YURCHAK:  Ever.

15                  MR. WEYTHMAN:  Then it calls for

16   speculation.

17                  THE WITNESS:  Not that I'm aware.

18        Q.    (BY MR. YURCHAK) Would it be your position,

19   as the secretary and treasurer, that Mark Phillips owes

20   HPV money?

21        A.    That is certainly something I was trying to

22   understand as I was going through the general ledger

23   that we were attempting to put together based on the

24   documentation we had.

25        Q.    Okay.  Did you ever come to any



1    understanding?

2       A.    All of the -- I can't say all -- most of the

3    transactions were not confirmed in a finalized general

4    ledger format.   They were being investigated.

5       Q.    Okay.  And does Hunts Point Ventures claim

6    any money spent on Mark Phillips' behalf due to clearing

7    up title to the patents that he had sold Hunts Point

8    Ventures in August 2010?

9               MR. WEYTHMAN:  Objection.  Calls for

10   speculation.  She's already testified that she can't

11   represent or make representations for Hunts Point

12   Ventures.

13      Q.    (BY MR. YURCHAK) Did you make any request for

14   repayment from Mark Phillips due to legal services paid

15   on his behalf by the corporation to clear up title to

16   patents that he sold to Hunts Point Ventures in August

17   of 2010?

18      A.    Did I make a request for repayment?  Did I

19   misunderstand?

20      Q.    Did you -- did you -- do you feel the

21   corporation was owed that money?

22               MR. WEYTHMAN:  Objection.  Calls for lay

23   opinion, legal conclusion.

24      Q.    (BY MR. YURCHAK) For legal services to clear

25   up patents?



 1                    MR. WEYTHMAN:  Same objections.

 2                    THE WITNESS:  I can't -- I can't clarify

 3    whether that was a corporate expense or a payment to be

 4    sought of reimbursement.  At this time I can't clarify

 5    that.

 6         Q.    (BY MR. YURCHAK)  Why is that?  Do you recall

 7    -- let me strike that.  Do you recall if any payments

 8    for legal services were made to attorneys to clear up

 9    title to patents that Mark Phillips sold to HPV?

10         A.    My understanding is that yes.

11         Q.    And what's your understanding about that?

12         A.    That HPV paid money to attorneys to clear up

13    the ownership status of the IP.

14         Q.    Do you recall what they were trying to -- do

15    you recall why there was an issue with title?

16                    MR. WEYTHMAN:  Objection.  Depending on

17    what the time line is, this potentially calls for

18    speculation.

19         Q.    (BY MR. YURCHAK) Would it help refresh your

20    recollection to look at Exhibit 2 on page 3?

21         A.    Mm-hm (answers affirmatively).

22         Q.    Where it's indicated that, "Funds were

23    necessary to settle Mark's civil litigation with MOD,

24    freeing up the IP license that had been exclusively

25    contracted to MOD."  Does it help refresh your



1    recollection about why title to the patents was not

2    clear -- free and clear at the time of the sale?

3         A.   This refreshes my recollection, and this is

4    my recollection in the most simplistic form.

5         Q.   Okay.  What do you now recall about why the

6    title to the patents was not clear?

7         A.   My understanding was that Mark had

8    represented the patents as being free and clear when

9    they were purchased, when in fact there was a licensing

10   agreement with MOD in place.

11        Q.   Okay.  And I believe you said -- and again,

12   to be clear, so the money spent to deal with that issue

13   is -- is that money that you have indicated the

14   corporation is entitled to reimbursement for?

15             MR. WEYTHMAN:  Objection.  Asked and

16   answered.

17             THE WITNESS:  I don't recall that we

18   took that position.

19        Q    (BY MR. YURCHAK) So what position do you take

20   with respect to any money spent on freeing up the title

21   to the patents?

22        A.   Well, it was the cost of doing business, and

23   it seemed that perhaps Mark had engaged in

24   misrepresenting that his patents were free and clear

25   when he sold them to HP V.



1      Q.      Do you know how the corporation has booked

2   the money that was spent on that issue?

3      A.      No.  I can't be sure.

4      Q.      Have you ever made any representation to

5   anyone, including the court, that the corporation may be

6   entitled to that money as a breach of warranty claim?

7      A.      No.

8      Q.      No?

9      A.      (Witness shakes head negatively).

10                      (Exhibit No. 7 marked

11                       for identification.)

12      Q.      Looking at Exhibit 7, is this a document that

13   you recall having seen before?

14      A.      It appears to be the purchase and sale

15   agreement.  That's not the copy that I've seen, but it

16   appears to look like it.

17      Q.      So you're saying that you've seen a different

18   copy?

19      A.      I'm saying that I can't verify anything

20   without the exact documentation that I've held in my

21   hand.

22      Q.      Did you keep a copy of that documentation

23   that you provided in a box to your attorneys?

24      A.      I don't know about keeping a copy, but I

25   probably have a digital copy --



1      Q.    Why is that?

2      A.    -- on the computer.  Because we have e-mail.

3      Q.    Did you ever scan any of the -- of the

4  corporation's documents as you were working on them into

5  the computer?

6      A.    It's possible.

7      Q.    Looking at the -- just the first page,

8  paragraph 3, subsection B, it states that the

9  purchaser's obligation to pay up to a million dollars of

10  sellers' attorneys' fees, et cetera, in the matters of

11  Phillips vs. MOD, provided that these fees are incurred

12  on or after 2010.  Might this be a reason, according to

13  the terms of the settlement agreement, why, as you said,

14  you're not seeking any breach of warranty claim against

15  Mr. Phillips for the money spent to clear title on the

16  sale agreement of the patents?

17              MR. WEYTHMAN:  Objection.  Calls for

18  speculation.  Calls for impermissible lay opinion, legal

19  conclusion.

20              THE WITNESS:  I wasn't a part of HPV at

21  the time that this contract was made, or any of the

22  agreements you're discussing.  So the transactions and

23  conclusions that took place were done by HPV, which at

24  the time was Steve Schweickert.

25      Q.    (BY MR. YURCHAK) Okay.  And do you see in



1    paragraph 3(a) that the purchaser shall pay to sellers'

2    representative in an amount equal to $100,000 dollars?

3         A.    I see that.

4         Q.    Were you aware of that term in this contract

5    that had been made when you were working as an officer

6    in Hunts Point Ventures?

7         A.    I didn't have this in front of me as I was

8    attempting to classify transactions, if that's what

9    you're asking.

10        Q.    Just asking if you were aware of it.

11        A.    I had possession of the Purchase and Sale

12   Agreement.  This particular 3(a) wasn't brought out to

13   my attention as something that needed attention.

14        Q.    Who typically would bring to your attention

15   things that needed attention?

16        A.    Our attorney.

17        Q.    Would you ever take any action on your own

18   with respect to Hunts Point Ventures if your attorney

19   did not bring anything to your attention?

20        A.    Action meaning doing research?  Yes.

21        Q.    Okay.  Was that -- was doing research

22   something you did on your own outside of your attorney

23   asking you or directing you to do something?

24                   MR. WEYTHMAN:  Objection.

25   Unintelligible.



1              THE WITNESS:  Yes.  I did research on my

2    own without my attorney's direction.

3         Q.   (BY MR. YURCHAK) Okay.  Did you ever take any

4    action with respect to your role as an officer of Hunts

5    Point Ventures independent of any advice from your

6    attorney?  And I can rephrase that too.  Was it your

7    common practice and habit to only take action with

8    respect to decisions of the company after receiving

9    advice from your attorney?

10        A.   In the decision-making process, I sought

11   legal counsel's advice.

12        Q.   Uh-huh.

13        A.   Maybe if you could be more specific about

14   what action, because I'm unsure of what you're asking.

15        Q.   It's hard to be more specific.  I'm trying to

16   get a general sense of how you made your decisions when

17   a decision needed to be made.  What was typical process

18   that -- in how decisions were made?

19        A.   Most of our legal -- most of our decisions

20   were legally based, and those all went per the guidance

21   of our attorney.  Any other decisions to be made

22   regarding HPV that were made independently or in seeking

23   professional guidance regarding finance, those were the

24   only actions we took on behalf of HPV.

25        Q.   Okay.  So because your attorney did not make



1   you aware of the term of this contract, that is the

2   reason why you did not become aware of it?

3                   MR. WEYTHMAN:  Objection.

4   Mischaracterizes the witness's testimony.

5                   THE WITNESS:  You're suggesting I took

6   action based on this term?

7        Q.    (BY MR. YURCHAK) No.  I'll strike the

8   question.

9                   Are you aware in the work that you did, in

10  trying to understand the accounting of Hunts Point

11  Ventures, if Hunts Point Ventures ever made a payment

12  under this contract to Mark Phillips for $100,000?

13                  MR. WEYTHMAN:  Objection.  Calls for

14  speculation.

15                  THE WITNESS:  I can't say.  I'm not

16  aware.

17       Q.    (BY MR. YURCHAK) Okay.  Now, some of the

18  decisions that were made in Hunts Point Ventures

19  occurred around the end of 2012.  Do you recall what

20  decisions I may be referring to?

21                  MR. WEYTHMAN:  Objection.  Leading.

22  Ambiguous.  Apparently assumes facts not in the record.

23  If you can read counsel's mind, you can answer.

24       Q.    (BY MR. YURCHAK) At the end of 2012 -- and

25  I'll strike the last question -- did you work -- what



1    did -- was there a loan made to Hunts Point Ventures?

2         A.    I believe so.

3         Q.    Were you involved in the process of the

4    making of that loan?

5                   MR. WEYTHMAN:  Objection.  Ambiguous.

6    Vague.

7                   THE WITNESS:  Involved in the process?

8    Yes, I would have to say that I was.

9         Q.    (BY MR. YURCHAK) And as you seem to do with

10   other decisions -- as you seem to do with other things

11   that required decision-making, did you also in this

12   instance seek out the advice of your attorney in the

13   making of the loan at the end of 2012, Hunts Point

14   Ventures?

15        A.    Yes, I did.

16        Q.    Who do you recall that loan being made -- who

17   were the parties to that loan that was made at the end

18   of 2012?

19        A.    I'm assuming you're referring to the loan

20   between Sandy Hoover and HPV.

21        Q.    Okay.

22        A.    Is that correct?

23        Q.    Were there other loans that were made during

24   that time frame?

25        A.    Not that I recall.



Page 130

1      Q.    Do you recall if there were any board

2   resolutions that were made for that loan?

3      A.    Board resolution, I can't be sure.

4      Q.    And do you recall when that loan was signed?

5            MR. WEYTHMAN:  Objection.  Assumes facts

6   not in the record.

7      Q.    (BY MR. YURCHAK) Do you recall when that loan

8   was signed?

9      A.    No, I don't know the date.

10           (Exhibit No. 8 marked

11            for identification.)

12     Q.    Exhibit 8.  How do you recognize Exhibit 8?

13     A.    It looks familiar.

14     Q.    What does it look familiar as?

15     A.    It looks like a promissory note.

16     Q.    Who is it between?

17     A.    Hunts Point Ventures and Sandy Hoover.

18     Q.    Do you recall who prepared that promissory

19   note?

20     A.    I do not.

21     Q.    You don't recall?

22     A.    Hm-mm (answers negatively).

23     Q.    And do you see where the promissory note was

24   dated?

25     A.    It says January 14th, 2013.



1          Q.     It's your understanding that that's when the

2     promissory note was actually dated?

3          A.     I can't recall.

4          Q.     Do you have any -- okay.  And what was the --

5     how much was the promissory note made for?  What was the

6     sum, money being loaned?

7                    MR. WEYTHMAN:  Objection.  Ambiguous.

8     Are you referring to the amount of the document as

9     Exhibit 8 or the loan that she recalls?

10                   MR. YURCHAK:  No, I'm -- the document.

11                   THE WITNESS:  The loan in the document

12     says $20,000.

13         Q.     (BY MR. YURCHAK) And was that a transaction

14     that you authorized as an officer of Hunts Point

15     Ventures?

16         A.     Yes.

17         Q.     What was the corporate purpose for that loan?

18         A.     To acquire funds for HPV.

19         Q.     And what were the funds intended to be used

20     for?

21         A.     I believe HPV was low on funds.  We had a

22     case pending that promised to bring in money to HPV.

23     But we needed a bridge loan to get us to that point.

24         Q.     Okay.  Did HPV have any funds in its account

25     during this time frame at the end of 2012?

1      A.    I don't know the answer to that.

2      Q.    Would it stand to reason that it had no money

3  if it was seeking a bridge loan?

4      A.    That sounds reasonable.

5      Q.    Do you recall how the money was spent?

6            MR. WEYTHMAN:  Objection.  Assumes facts

7  not in the record.

8            THE WITNESS:  I believe it was used to

9  purchase shares from Steve Schweickert.

10           (Exhibit No. 9 marked

11             for identification.)

12     Q.    (BY MR. YURCHAK) Do you recognize this

13  document?

14     A.    It looks like the Share Purchase Agreement

15  between HPV and Steve Schweickert.

16     Q.    Was this document that you authorized as an

17  officer -- in your role as an officer?

18     A.    If this is the actual document, we did

19  authorize the Share Purchase Agreement.

20     Q.    And how much -- who were the parties to this

21  agreement?

22     A.    Steve Schweickert and Hunts Point Ventures

23  are the two signers.

24     Q.    And how much does the document show was paid

25  -- this document reflects what transactions?

1          MR. WEYTHMAN:  Objection.  Calls for

2    speculation.

3          THE WITNESS:  It reads that it's a

4    transaction between Steve Schweickert and HPV, where

5    Steve Schweickert is selling his shares to HPV.

6          Q.    (BY MR. YURCHAK) Okay.  And how much is he

7    selling the shares for?

8          A.    The document says $20,000.

9          Q.    And where do you read that?

10         A.    Section B, Agreement, line 2.

11         Q.    Do you see the numbers that are written?

12         A.    Yeah.

13         Q.    And how do you read those numbers?

14         A.    It appears that it reads 20 million.

15         Q.    Do you have any explanation why the writing

16    is 20,000, and the numbers say 20 million?

17         MR. WEYTHMAN:  Objection.  Calls for

18    speculation.  Foundation.  No personal knowledge of this

19    particular document.

20         THE WITNESS:  Are you waiting for me to

21    respond?

22         Q.    (BY MR. YURCHAK) Yeah.

23         A.    I can't say.  It appears to be a mistake.

24         Q.    Okay.  And what do you think the correct

25    amount is that Mr. Schweickert was owed for his shares?



1      A.    20,000.

2      Q.    Okay.  Did Hunts Point Ventures have any

3  funds at the time this was executed in order to pay

4  Mr. Schweickert?

5      A.    I can't say.

6      Q.    Why is that?

7      A.    I don't have access to the bank account

8  information.

9      Q.    To the best of your recollection, did it have

10  any funds?

11              MR. WEYTHMAN:  Objection.  Calls for

12  speculation.

13      Q.    (BY MR. YURCHAK) At the time this was signed?

14      A.    Did HPV have $20,000 to pay Steve

15  Schweickert?

16      Q.    At the time this was executed.

17      A.    Again, unless I'm sitting in front of our

18  finances, I can't say.

19      Q.    On the handwritten -- in the handwriting, do

20  you see any handwriting on this document?

21      A.    I do.

22      Q.    Do you recognize either -- what do you

23  recognize that handwriting to be on the right margin?

24      A.    It looks like an initial.

25      Q.    Do you recognize the initials?

1     A.    I don't.  I'd have to guess.

2     Q.    What would your guess be?

3           MR. WEYTHMAN:  Objection.  Calls for

4  speculation.

5           THE WITNESS:  One appears to be very

6  similar to Steve Schweickert.  The other appears to be a

7  JD.

8     Q.    (BY MR. YURCHAK) Do you know anyone with the

9  initials of JD?

10     A.    I would have to assume that would be our

11  attorney, John Du Wors.

12     Q.    Do you know why his initials appear there?

13     A.    I don't.

14     Q.    Do you know if he was given authority over

15  the execution of this document?

16     A.    Yes, I do.

17     Q.    What authority was he given?

18     A.    He had the authority to carry out this

19  transaction.

20     Q.    And where did that authority come from?

21     A.    Myself and Chad.

22     Q.    Okay.  And did you feel that you needed his

23  authority to carry that transaction out?

24     A.    We relied upon him to perform the business

25  duties relating to anything contractual because we



1   didn't have the knowledge to do that ourselves.

2        Q.    Did you feel that you needed his authority in

3   order to approve the transaction?

4                    MR. WEYTHMAN:  Objection.  Vague.

5                    THE WITNESS:  He aided in the

6   transaction.  I'm not sure what you're getting at by

7   asking about authority.

8        Q.    (BY MR. YURCHAK) However you choose to

9   interpret that word.

10       A.    We gave him permission to execute this

11   transaction.

12       Q.    Okay.  Did you feel as if you needed his

13   permission to do so?

14       A.    I can't make sense of what you're asking.

15       Q.    If, say, John Du Wors said, "I don't like

16   that transaction, I don't want to do it," would you have

17   dropped the issue and not proceeded with that

18   transaction?

19                    MR. WEYTHMAN:  Objection.  Calls for

20   speculation.

21       Q.    (BY MR. YURCHAK) Do you have an answer?

22       A.    If he had hypothetically said, "I don't like

23   this transaction, let's not engage in the transaction,"

24   I would have taken his advice.

25       Q.    Okay.  Have you ever taken any action



1    contrary to John Du Wors' advice?

2         A.    I can't recall.

3         Q.    Is it possible?

4         A.    Is it possible that John Du Wors advised us

5    to do something and we did the opposite?

6         Q.    (Nods head affirmatively).  Yeah.

7         A.    To answer your question, is it possible, it's

8    possible.  Do I recall?  I don't recall.

9                         (Exhibit No. 10 marked

10                          for identification.)

11        Q.    Exhibit 10, I believe, is in front of you.

12   Do you recognize this document?

13        A.    I do.

14        Q.    What do you recognize it to be?

15        A.    It appears to be the Security Agreement.

16        Q.    For what?

17        A.    Signed between Sandy Hoover and HPV.

18        Q.    Okay.  And what do you understand the

19   function this document serves?

20                    MR. WEYTHMAN:  Objection.  Calls for

21   legal conclusion.

22        Q.    (BY MR. YURCHAK) First of all, let me go

23   back.  Was this document a part of the loan transaction

24   that occurred between Sandy Hoover and Hunts Point

25   Ventures?



1      A.    That was the intention.

2      Q.    What do you mean by that, that it was the

3  intention?  Do you mean that you intended something to

4  happen but it did not?

5      A.    I don't know if it did or didn't because you

6  haven't gotten there yet.

7      Q.    Okay.

8      A.    I assume you're leading to something with

9  this.  My understanding of the security agreement was to

10  provide her a secured note to protect her investment.

11      Q.    Okay.  And did you authorize that

12  transaction?

13      A.    Yes.

14      Q.    And was that something you sought legal

15  advice for from John Du Wors?

16      A.    That was her requirement.  That was Sandy

17  Hoover's requirement regarding any sort of financial

18  transaction with HPV.

19      Q.    Okay.  And was that discussed with John Du

20  Wors?

21      A.    Yes.

22      Q.    Okay.  And can I assume that if the

23  transaction was executed, that John Du Wors did not

24  oppose it?

25      A.    Yes.

1      Q.    Do you see -- what's your understanding of

2  what a security agreement is?

3              MR. WEYTHMAN:  Again, objection.  Calls

4  for legal conclusion.

5              THE WITNESS:  To ensure the repayment of

6  her loan to HPV.

7      Q.    (BY MR. YURCHAK) How does it -- how would it

8  ensure her repayment of the loan to HPV?

9      A.    I have no idea.  I'm not an attorney.  I'm

10  told that's what it was supposed to do.

11      Q.    Did you seek advice as an officer to HPV at

12  the time this agreement was entered as to what the legal

13  effect of it would be on HPV?

14      A.    Yes.

15      Q.    And you sought that advice from John Du Wors?

16      A.    Yes.

17      Q.    And do you recall, again, what that advice

18  was with respect to what the legal effect of the

19  security agreement is, of what legal effect this

20  security agreement would have?

21      A.    Do I recall the conversation?

22      Q.    Do you recall the advice of what you

23  understood, what this security agreement was obligating

24  -- what you were obligating Hunts Point Ventures to do

25  under this security agreement?



1                    MR. WEYTHMAN:  Objection.

2    Unintelligible.

3                    THE WITNESS:  I suppose the answer to

4    the question would be yes.

5         Q.    (BY MR. YURCHAK) So what did you understand

6    as far as --

7         A.    I understood that Hunts Point Ventures would

8    be borrowing funds.  In exchange, that Sandy Hoover

9    would be ensured her money be repaid.

10        Q.    And, again, how did you understand --

11        A.    That she would have first rights to the funds

12   of repayment.

13        Q.    Your understanding was that the security

14   agreement gave her a right to the funds of repayment?

15        A.    At the time of repayment she was assured that

16   she would be repaid.

17        Q.    And I'm simply asking about the mechanics of

18   how she was to be repaid.  Let's assume Hunts Point

19   Ventures does not repay her because it has no money.

20   How would she ensure she gets repaid?

21                    MR. WEYTHMAN:  Objection.  Calls for

22   speculation.  Calls for legal conclusion.  Impermissible

23   lay opinion.

24        Q.    (BY MR. YURCHAK) And if you'd answer the

25   question.



1       A.    I assume she could foreclose on her note and

2    take possession of HPV.

3       Q.    Okay.  First, why do you use the word

4    "assume"?

5       A.    Because, again, I'm not an attorney.  I

6    didn't draft any of this stuff.  I simply have an

7    understanding for what needs to happen, and our attorney

8    and her attorney were responsible for making it happen.

9       Q.    Who was her attorney?

10       A.    I don't know.

11       Q.    Are you sure she had an attorney?

12       A.    I can't say for sure either way.

13       Q.    Do you feel you have an obligation to know

14    what agreements are being entered into on behalf of

15    Hunts Point Ventures?

16               MR. WEYTHMAN:  Objection.  Calls for

17    legal conclusion.

18       Q.    (BY MR. YURCHAK) As a part of your duties as

19    an officer?

20               MR. WEYTHMAN:  Same objection.

21               THE WITNESS:  I was able to perform at

22    the best of my knowledge that I had at the time, and

23    then sought legal guidance or professional guidance in

24    every area that I wasn't able to make those decisions.

25       Q.    (BY MR. YURCHAK) Were people asking you to do



Page 142

1    things that you lacked a good awareness of?

2                    MR. WEYTHMAN:  Objection.  Vague.

3    Unintelligible.

4                    THE WITNESS:  Yeah.  I don't know how to

5    answer that.

6        Q.    (BY MR. YURCHAK) In your response to how

7    Sandy Hoover gets repaid, you stated that she could be

8    ensured repayment because she would receive Hunts Point

9    Ventures; is that correct?

10       A.    My understanding of a security agreement is

11   that it secures your loan, so it's directly tied to any

12   assets of a corporation.

13       Q.    Okay.  What's your understanding, then, with

14   respect to this security agreement and its assets?

15                   MR. WEYTHMAN:  Objection.  Vague.

16       Q.    (BY MR. YURCHAK)  And with which assets it

17   would be pledging as security?

18       A.    It's not specified, any of the documentation.

19   It's simply a security agreement securing her loan.

20                   MR. WEYTHMAN:  Whenever you get a

21   comfortable chance for a break, it's been about an hour

22   and a half.

23                   MR. YURCHAK:  Now's fine.

24                   (Recess 2:25 to 2:33 p.m.)

25



 1

 2                  EXAMINATION (Continuing)

 3   BY MR. YURCHAK:

 4        Q.    So we left off talking about your

 5   understanding of what exactly was securing Ms. Hoover's

 6   loan.

 7        A.    Yeah.

 8        Q.    If you look at paragraph 3 of the first page

 9   of Exhibit 10, would you agree that it says, "The

10   company assigns, grants to the secured party security

11   interest in all of its right, title and interest, and

12   into all of its assets, including, but not limited to

13   the assets described in the attached Exhibit A"?  What

14   would you understand those -- first, that was a

15   question.  Sorry.  Would you agree that's what it says?

16        A.    Yes.

17        Q.    What did you understand the assets of the

18   company to be?

19        A.    Likely it would be the IP that the company

20   holds.

21        Q.    Did you understand at the time this agreement

22   was approved that the company was securing the IP to a

23   $20,000 loan?

24        A.    No, because the $20,000 loan was going to be

25   attached to the original loan, making it a $120,000



Page 144

1    loan, which did seem like a reasonable thing to do.

2         Q.    Okay.  Was -- when was the original $100,000

3    loan made?

4         A.    I can't give you a date.  I don't recall.

5         Q.    Was that loan secured?

6         A.    The original $100,000 loan was not secured.

7         Q.    Were you successful in securing it?

8         A.    Attached to the $20,000 loan?  To the best of

9    my knowledge, yes.

10        Q.    And how did that happen?

11        A.    I have no idea.  We told our attorneys to do

12   it, and they did.

13        Q.    Were there any board resolutions that

14   documented that transaction?

15        A.    I can't be certain.  I believe so.

16        Q.    Are you certain that the $100,000 loan became

17   a secured loan?

18              MR. WEYTHMAN:  Objection.  Calls for

19   legal conclusion.  Asked and answered.

20        Q.    (BY MR. YURCHAK) Are you certain that it

21   became a secured loan?

22        A.    Yes.

23        Q.    What gives you that certainty?

24        A.    Well, because our attorneys told us that it

25   was.



1    Q.    Did you ever see any documentation to that

2   effect?

3    A.    I don't -- I don't recall.

4    Q.    And if your attorney tells you something, do

5   you generally believe that what he's telling you is

6   true?

7    A.    Yes.

8    Q.    Would you be surprised to learn that the

9   $100,000 loan is not secured?

10                MR. WEYTHMAN:  Objection.

11                THE WITNESS:  No.  Because I don't

12   believe that to be true.

13    Q.    (BY MR. YURCHAK) My question was, supposing,

14   hypothetically, it was not secured, what would your

15   reaction be?

16                MR. WEYTHMAN:  Objection.  Calls for

17   speculation.

18                THE WITNESS:  I can't say what my

19   reaction would be.  I don't believe that's the case.

20    Q.    (BY MR. YURCHAK) I understand, ma'am.  What

21   if you learned it was the case?

22                MR. WEYTHMAN:  Same objection.

23    Q.    (BY MR. YURCHAK) How would you react?

24    A.    The transaction that was supposed to have

25   taken place didn't take place.



1    Q.    Mm-hm.

2    A.    That would be my conclusion.

3    Q.    Not conclusion.  What would your reaction be

4    to learn that the $100,000 loan was not secured, as your

5    attorneys had told you it had been?

6    A.    That would not be acceptable to learn that

7    was the case.

8    Q.    Why would it not be acceptable?

9    A.    Because that was the direction given.

10   Q.    Would it be unacceptable for any other

11   reason?

12   A.    I don't have a good answer for you.

13   Q.    How would you feel with respect to the

14   corporation were you to learn that you were unable to

15   secure an additional $100,000 of debt?

16              MR. WEYTHMAN:  Objection.  Vague.

17   Ambiguous.

18   Q.    (BY MR. YURCHAK) Are you able to answer?

19   A.    I'm not sure what you're asking, if you're

20   asking me how I might feel or react to learn something

21   that I haven't learned.

22   Q.    As a corporate officer, in your role as a

23   corporate officer, what would your reaction be to learn

24   that the $100,000 hadn't been secured?

25              MR. WEYTHMAN:  Objection.  Calls for

1   speculation.

2        Q.    (BY MR. YURCHAK) In the sense that you have

3   an interest over the affairs --

4        A.    It would be a mistake -- my feeling would be

5   that it would be a mistake that would need to be

6   corrected because we assured the creditor that that

7   would be the case.

8        Q.    Okay.  So you assured the creditor that her

9   100,000 would be secured?

10       A.    We did.

11       Q.    Was that -- what was the reason -- was the

12   only way to get the creditor to make the loan is if her

13   interest was secured?

14                  MR. WEYTHMAN:  Objection.  Leading.

15                  THE WITNESS:  The creditor required her

16   loan be secured.

17       Q.    (BY MR. YURCHAK) Now, you said you were in a

18   position where you needed to find additional funding for

19   Hunts Point Ventures at that point in time; is that

20   right?

21       A.    Correct.

22       Q.    Did you ever seek out any other sources of

23   funding other than your mother?

24       A.    We discussed plenty of other options, and we

25   made a decision to choose her loan.

1       Q.    What were those other options?

2       A.    I don't recall.

3       Q.    Do you have an IRA account?

4       A.    I do.

5       Q.    Was there any discussion about you loaning

6    money from your IRA account to Hunts Point Ventures?

7       A.    Yes.

8              MR. WEYTHMAN:  Objection.  Calls for

9    speculation.

10      Q.    (BY MR. YURCHAK) Are you able to recall any

11   other discussions about how to derive funding for Hunts

12   Point Ventures?

13      A.    A traditional means of a loan, from a bank.

14   Myself and Chad were the two likely, and Sandy as active

15   people supporting and invested in HPV, we were the

16   likely sources.

17      Q.    Okay.

18      A.    That's where the discussion -- that's where

19   the discussion was.

20      Q.    I assume you have a good relationship with

21   your mother?

22      A.    I do.

23      Q.    A trusting relationship?

24      A.    It is.

25      Q.    Did you understand through the security

1   agreement that your mother would have the right to

2   acquire all of the assets of your corporation if she was

3   not paid back on her loan?

4                    MR. WEYTHMAN:  Objection.  Assumes facts

5   not in the record.  Calls for legal conclusion.

6                    THE WITNESS:  I was aware that that was

7   the nature of the security agreement.

8        Q.    (BY MR. YURCHAK) Is that the reason why you

9   chose your mother from whom to receive funding for Hunts

10  Point Ventures?

11                   MR. WEYTHMAN:  Objection.  Leading.

12                   THE WITNESS:  I -- no, I guess, is the

13  right answer.

14       Q.    (BY MR. YURCHAK) No?

15       A.    No.

16       Q.    In other words, if another individual had

17  come along, John Doe, and offered to lend 20,000 to

18  Hunts Point Ventures in exchange for a security

19  agreement to all of its assets, would you have made that

20  transaction?

21                   MR. WEYTHMAN:  Objection.  Calls for

22  speculation.

23                   THE WITNESS:  It's unlikely.

24       Q.    (BY MR. YURCHAK) Why is that?

25       A.    She was --



1          Q.    Sorry.  Let me rephrase.  Why is it that you

2     then made that same transaction except with a person who

3     was your mother?

4          A.    Say that again?

5          Q.    Why is it then that you made that transaction

6     but only with a person who is your mother?

7          A.    It had nothing to do with her being my

8     mother.  She made the first loan on the account of

9     Mark's promises to build a thriving company.  Had

10    nothing to do with our relationship.  Had to do with

11    Mark.  She was then the only legitimate creditor to HPV

12    with proper documentation, so it seemed a natural

13    course.

14         Q.    Was there anything in your mind as to why

15    additional moneys should be sought from prior creditors

16    of Hunts Point Ventures with respect to this

17    transaction?

18                    MR. WEYTHMAN:  Objection.  Vague.

19                    THE WITNESS:  I'm not sure I understand

20    what you're asking.

21         Q.    (BY MR. YURCHAK) It sounds as if the basis

22    for why you chose your mother is because she was the

23    prior creditor?

24         A.    Yes, this is true.

25         Q.    And I was simply trying to understand, to get



1   a better understanding of why, why her being a prior

2   creditor should matter.

3       A.    Because she was very interested in the

4   success of HPV.  So she was there and available.

5       Q.    And did you reach out to any of the other

6   past creditors of Hunts Point Ventures?

7       A.    No.

8       Q.    Given your understanding that Hunts Point

9   Ventures -- given your awareness today that Hunts Point

10  Ventures was contractually obligated to pay Mark

11  Phillips $100,000, did you approach him to seek a loan?

12      A.    I don't know that that's true.

13      Q.    Now, on the security agreement, we discussed

14  in Exhibit 9 that the promissory note was dated January

15  14, 2013; is that correct?

16      A.    The secured promissory note is dated January

17  14th, 2013.  Is that what you just said?

18      Q.    Yeah.  That was our understanding; right?

19      A.    Correct.

20      Q.    Now, the security agreement, Exhibit 10, did

21  you see what date there is indicated in the very first

22  sentence?

23      A.    November 19th, 2012.

24      Q.    Do you understand why -- and if you look at

25  the last page of the security agreement, do you see any



1  date there?

2       A.    "As of the date and year first written

3  above."

4       Q.    And what would you interpret that to mean,

5  then?

6                  MR. WEYTHMAN:  Objection.  Calls for

7  legal conclusion, inadmissible lay opinion, speculation.

8  Foundation.  We still don't know who drafted this.

9       Q.    (BY MR. YURCHAK) What would you interpret

10  that to mean, then?

11       A.    It appears that they're referring to the date

12  on the front of the document.

13       Q.    Would your understanding be that this was

14  executed then on the date on the front of the document?

15       A.    I can't be sure.  I don't know.

16       Q.    According to your understanding of the

17  document, as a corporate officer, is that your

18  understanding?

19                  MR. WEYTHMAN:  Same objections.

20       Q.    (BY MR. YURCHAK) And how you read it now?

21       A.    It appears from reading this document that

22  they signed it on November 19th, 2012.

23       Q.    Do you recognize the signatures on the last

24  page?

25       A.    I do.



Page 153

1    Q.    Have you had occasion to see either signature

2  before?

3    A.    Yes.

4    Q.    Do those signatures on this document

5  accurately -- or appear in the way that you have seen

6  these signatures before?

7    A.    I recognize them, and they appear to be their

8  signatures.

9    Q.    Of which people?

10    A.    Sandy Hoover and Chad Rudkin.

11    Q.    Do you have any explanation as to why on the

12  last page Sandy's name is both typed and handwritten?

13  Her name, not signature.

14    A.    Mm-hm (answers affirmatively).

15            MR. WEYTHMAN:  Objection.  Calls for

16  speculation, lack of foundation.  We still haven't

17  established who's drafted the document.

18    Q.    (BY MR. YURCHAK) Do you have any explanation

19  about that?

20    A.    I'm not sure what you need to be explained.

21    Q.    Why "Sandy" is typewritten and "Hoover" is

22  not.

23    A.    I have no idea.  I didn't make this.  I don't

24  know.

25    Q.    Do you know who did make it?



Page 154

1      A.    I don't know.

2      Q.    Okay.  What is your explanation as to why the

3   security agreement is dated November 19, but the

4   promissory note is dated January 14?

5                   MR. WEYTHMAN:  Objection.  Calls for

6   speculation.  Lack of foundation.

7      Q.    (BY MR. YURCHAK) Do you have any awareness as

8   to why that was?

9      A.    I don't remember.  I'm sure there was a valid

10  reason.  I just don't recall.

11     Q.    Do you think it's possible to execute a

12  security agreement without there being a loan in place?

13     A.    Objection.  Calls for legal conclusion.

14  Calls for speculation.  Impermissible lay opinion.

15                   (Exhibit No. 11 marked

16                      for identification.)

17     Q.    What do you recognize Exhibit 11 to be?

18     A.    It appears to be a printed e-mail.

19     Q.    Okay.  And who do you see on the very first

20  page there that the sender -- who is the sender?

21     A.    Well, the very top of the document it looks

22  like that sender is John Du Wors.

23     Q.    Do you recognize that e-mail address?

24     A.    I don't know.

25     Q.    John@Newmanlaw?

1     A.     Looks good to me.  I can't say either way.  I

2 don't know.

3     Q.     How would you typically correspond with John

4 Du Wors?

5     A.     I'd type in "John" and my little field would

6 populate automatically and I'd send an e-mail.

7     Q.     The "to" line, do you recognize that e-mail

8 address?

9     A.     I do.

10     Q.     Who's that?

11     A.     Chad Rudkin.

12     Q.     Now, do you -- are you aware -- do you have a

13 recollection of this being one of the documents that you

14 organized in order to provide to your attorneys to go to

15 the receiver?

16     A.     I don't know.  I can't say.

17     Q.     Would it help your recollection to see

18 Exhibit 1?

19     A.     I didn't organize the document to go to the

20 receiver.  I organized the documents for the purpose of

21 putting them in one place, so I can't answer that

22 question.

23     Q.     Does this look like one of the documents you

24 organized to put in one place?

25     A.     I -- I don't know.  I can't say for sure.



Page 156

1      Q.     Looking at the e-mails, if we look in the

2   middle of the page, the e-mail from Michael Spain, do

3   you know Michael Spain?

4      A.     I don't.

5      Q.     Does that name sound familiar?

6      A.     It rings a bell.

7      Q.     In what way?

8      A.     Perhaps it's my mother's attorney, but I

9   would be completely speculating.

10      Q.     Okay.  Looking at Michael Spain's e-mail, he

11   writes there, "A secured promissory note and security

12   agreement for HPV are attached."

13             MR. WEYTHMAN:  Objection.  Foundation.

14   We know nothing about this document or this particular

15   e-mail of the document.

16      Q.     (BY MR. YURCHAK) Would you agree that's what

17   it says?

18      A.     That's what I read on this document.

19      Q.     And John Du Wors, does it appear to you that

20   he forwards that e-mail to Chad Rudkin with a comment

21   that, "We'll get them finalized over the weekend"?

22      A.     That's what I read.

23      Q.     And you notice that the date is November 23,

24   2012, on that e-mail?

25      A.     I see that.



1        Q.    And on page 3 of 14, do you see that there's

2    a "from" line, Chad Rudkin, and then there's a "to"

3    address, Sandy@bobandsandy.com.  Do you see that?

4        A.    I do.

5        Q.    Do you recognize the "to" address?

6        A.    I do.

7        Q.    And who do you recognize that to be?

8        A.    To Sandy Hoover.

9        Q.    Would I be off base in assuming Bob is her

10   husband?

11       A.    Her deceased other half.

12       Q.    And do you see the comment that Chad makes,

13   "Here's a draft of the note from HPV for you to comment

14   for review"?

15             MR. WEYTHMAN:  Objection.  Assumes facts

16   not in the record.  Foundation.  Personal knowledge.

17   Speculation.  We don't know that Chad wrote this.  He

18   hasn't established any foundation in the document.

19       Q.    (BY MR. YURCHAK) Do you see the writing there

20   that says, "Here's the draft of the note"?

21       A.    I see that.

22       Q.    Do you see the date of that e-mail?

23       A.    I do.

24       Q.    And what is that date?

25       A.    Saturday, 1 December, 2012.



1      Q.    Do you have any explanation -- what is --

2  having read that, and looking at the date, would you

3  assume -- what would your understanding be as to whether

4  or not those -- the documents that were being discussed,

5  the promissory note and security agreement, what would

6  your understanding be as to whether or not those

7  documents had been executed by Sandy or not as of that

8  day on December 1st, 2012?

9                  MR. WEYTHMAN:  Objection.  Calls for

10 speculation.  Same lack of foundation.

11                 THE WITNESS:  Based on the documents I'm

12 reading in my hand, it appears that they are reviewing

13 documents.

14     Q.    (BY MR. YURCHAK) Is there a reason why you're

15 not included on these e-mail threads?

16                 MR. WEYTHMAN:  Objection.  Calls for

17 speculation.  No personal knowledge.

18                 THE WITNESS:  I didn't -- I wasn't

19 participating in this part of the process.

20     Q.    (BY MR. YURCHAK) When you mean "this part of

21 the process," what do you mean?

22     A.    When they were working on the security

23 agreement, I wasn't participating.

24     Q.    Okay.  Were you aware of what was happening?

25     A.    I was aware that it was happening.



1       Q.      How would you define the scope of your role

2    and what happened?

3       A.      "You guys taking care of this?"

4               "Yes."

5               "Great."

6       Q.      That's it?

7       A.      That's it.

8       Q.      And would that be a reason -- would that be

9    your understanding as to why you would not have been

10   included in the communications with John Du Wors about

11   this security agreement?

12              MR. WEYTHMAN:  Objection.  Calls for

13   speculation.  Same objection to foundation.

14              THE WITNESS:  It sounds like a

15   reasonable thing to assume.

16      Q.      (BY MR. YURCHAK) Do you know if you ever

17   requested to be a part of those communications?

18      A.      I don't believe I did.

19      Q.      Is there a reason why you chose not to

20   participate?

21      A.      Because we have a life.  We had other jobs

22   and responsibilities, and this was a very small

23   component of our life.

24      Q.      Is that the way you've always viewed Hunts

25   Point Ventures during the time you were an officer?

1                    MR. WEYTHMAN:  Objection.  Leading.

2                    THE WITNESS:  I would have to say that

3    that answer would vary on what given day or week.

4        Q.    (BY MR. YURCHAK) What's the reason you chose

5    to become an officer of Hunts Point Ventures?

6        A.    I suppose we were the last men standing.

7        Q.    Did anyone ever request that you become an

8    officer?

9        A.    I don't recall.

10       Q.    When you say you were the last men standing,

11   what did you mean by that?

12       A.    From the inception of the HPV concept,

13   throughout its running its course, people have fallen

14   like flies, and we were the last two people that have

15   the integrity and ability to do anything with HPV.

16       Q.    Was there ever any point at which one of

17   these people who had dropped like flies reappeared and

18   expressed an interest to be a part of HPV?

19       A.    Funny.  So when Mark Phillips got out of jail

20   and he came to us to be a part of HPV, did that happen?

21   Yes, that happened.

22       Q.    So it sounds as if you describe HPV as being

23   rather a burden?

24       A.    Yeah.

25       Q.    Did you ever get any compensation for all the



Page 161

1     work that you did?

2          A.    At the very beginning we received a very

3     small amount of compensation to help us financially

4     while Mark was living with us.  I had to stay home

5     because we had small children at home.  I wasn't working

6     at that time.

7          Q.    Are you talking about 2010?

8          A.    I am.  After we became shareholders -- I

9     don't believe that we did.  We had a generalized

10    agreement between us and our attorney, and our attorney

11    did not tell us to do this, but our belief was that we

12    wanted to keep the money in HPV to allow us to go out

13    and litigate the patents for the purpose of making

14    money, and when there was money to be had, that was

15    actually money that was available, not necessary for the

16    next litigation, then we would compensate ourselves and

17    pay back shareholders and creditors.  Although during

18    that entire process we were trying to establish who

19    those people actually were.

20         Q.    So why do you think that never happened?

21         A.    It was happening.  It was in the middle of

22    happening.

23         Q.    How long -- do you recall when John Du Wors

24    began -- is it correct that John Du Wors was retained to

25    prosecute the patents?



Page 162

1                    MR. WEYTHMAN:  Objection.  Calls for

2     speculation.

3                    THE WITNESS:  I believe that to be the

4     case, but I didn't make that choice.

5         Q.   (BY MR. YURCHAK) Do you recall when that was?

6         A.    Again, I wasn't formally a part of HPV, but

7     in reviewing documents and e-mails, it appears that he

8     was asked to do so, I believe, by Mark and Steve in

9     2010.

10        Q.    Okay.  And you testified earlier that you

11    believe there was two settlements obtained by Hunts

12    Point Ventures; is that correct?

13        A.    Yeah.

14        Q.    Did you ever receive an explanation from John

15    Du Wors as to why it wasn't happening?

16                   MR. WEYTHMAN:  Objection.  Leading.

17    Argumentative.

18                   THE WITNESS:  We had many conversations,

19    but there's nothing that I could share with you that

20    would be specific.

21        Q.    (BY MR. YURCHAK) Did you ever express any

22    frustration that more wasn't happening?

23        A.    Yes.

24        Q.    How is that -- was that expressed to John Du

25    Wors?



1      A.    Yes.

2      Q.    And what was his response?

3      A.    I'm not sure I could quote for you.  I don't

4  even have a good summary.

5      Q.    Would it seem to you as if he would make

6  promises?

7              MR. WEYTHMAN:  Objection.  Leading.

8              THE WITNESS:  Hopeful indications of

9  expected results, maybe.

10     Q.    (BY MR. YURCHAK) And you feel you tended to

11  have gotten that a lot from him?

12              MR. WEYTHMAN:  Objection.  Leading.

13              THE WITNESS:  I'm not sure what I'm

14  supposed to do with that.  Should I just answer that?

15  Yes.  We felt that -- that we were made -- I don't know

16  if I could say promises, but much conversation was had

17  around the idea that they would litigate more frequently

18  and more effectively.  And it appeared to us that wasn't

19  always the case.

20     Q.    (BY MR. YURCHAK) Did you have any

21  understanding as to why, though?

22     A.    It was language that I didn't fully

23  understand, so it's difficult for me to summarize.

24     Q.    Do you recall if John Du Wors ever blamed

25  Mark Phillips for the inability to effectively and more

1   efficiently prosecute the patents?

2        A.    Did he ever?

3        Q.    Mm-hm.

4        A.    Throughout the scope of time that we were a

5   part of HPV, yes.

6        Q.    What would he say about that?

7        A.    I'm really summarizing here, and I don't know

8   how this works legally, so forgive me.

9        Q.    That's fine.

10       A.    At the point in time that the IP was

11  purchased, that it wasn't fully owned by HPV to

12  litigate.  There was an outstanding agreement with MOD

13  that needed to be taken care of.  That's the first half.

14  The second half I understood that Mark Phillips

15  contacted RIM, putting the ownership of the patent in

16  question, thus stopping litigation.

17       Q.    Those were the two examples that you recall

18  having been given to you by John Du Wors, as far as

19  putting blame on Mark for the challenges with

20  prosecuting the patents?

21       A.    Yes.

22       Q.    So to be clear, you have a specific

23  recollection that John Du Wors blamed Mark Phillips for

24  the issue with the title that was not clear to the IP in

25  2010?

```
 1                    MR. WEYTHMAN:  Did you understand the
 2     question?
 3                    THE WITNESS:  I think I do.  Would you
 4     like to say that again?
 5          Q.    (BY MR. YURCHAK) I was just making -- wanting
 6     to make clear for the record that John -- that John Du
 7     Wors told you he was blaming Mark Phillips for the
 8     problems associated with having clear title to the IP in
 9     2010?
10                    MR. WEYTHMAN:  Objection as ambiguous.
11     Are you saying that they made communication in 2010, or
12     the problems were in 2010?
13                    MR. YURCHAK:  The communication.
14                    THE WITNESS:  No, that's not true.
15          Q.    (BY MR. YURCHAK) So what did John Du Wors
16     specifically say about Mark having fault for the IP not
17     being fully owned in 2010?
18          A.    Well, I was summarizing my takeaway from
19     conversations with John Du Wors, so I can't be specific
20     as to what he said.
21          Q.    I understand.
22          A.    The conversation wasn't had that John Du Wors
23     specifically said, "I blame Mark Phillips."  However, I
24     understood that it was because of actions taken by Mark
25     Phillips in the purchase and sale that led HPV to not be
```



1    able to litigate the patents.

2         Q.    Okay.  And is it safe to assume you don't

3    know what those actions were that Mark Phillips had

4    taken?

5         A.    I think it's safe to say I couldn't get real

6    technical about it.

7         Q.    And you mentioned as another example that

8    Mark Phillips had contacted RIM?  That was a problem?

9         A.    Yes.

10        Q.    Did John Du Wors inform you that RIM had

11   instituted a re-examination process against the patents?

12        A.    Yes.

13             MR. WEYTHMAN:  Objection.  Leading.

14        Q.    (BY MR. YURCHAK) He had?

15        A.    I was aware that there was a re-exam.

16        Q.    Were you able to reconcile how RIM taking

17   that action on the re-exam was Mark's fault?

18             MR. WEYTHMAN:  Objection.  Leading.

19   Mischaracterizes the witness's testimony.

20   Argumentative.

21             THE WITNESS:  I don't recall making that

22   association.

23        Q.    (BY MR. YURCHAK) Sort of jumping around here.

24   You had mentioned you being the last people standing and

25   that Mark Phillips came out of prison.  Did he approach



1    you at the end of 2012 with respect to understanding

2    what his status was in Hunts Point Ventures?

3        A.    Yes.

4        Q.    And if I'm not mistaken, I think some hours

5    ago you said there was a meeting, meeting at Sandy's

6    house?

7        A.    Yes.

8        Q.    Was that the meeting you were talking about

9    having occurred after his release from prison?

10       A.    Yes.

11       Q.    What was the purpose of that meeting?

12       A.    To see Mark again and reengage and have

13   discussion about HPV.

14       Q.    Okay.  And what did Mark request at that

15   meeting with respect to HPV?

16       A.    He requested a certain amount of access to

17   HPV documents.

18       Q.    Was that given to him?

19       A.    There was some information shared with him,

20   specifically the -- the general ledger that I had been

21   working on.  For classification purposes, he was going

22   to assist me in allocating specific classifications for

23   transactions, and he was going to help identify those

24   transactions and prepare past documentation for the

25   purpose of those transactions to be able to clarify for



Page 168

1    accounting purposes.

2        Q.    Was there any discussion about him being

3    recognized as a shareholder?

4        A.    There was some discussion about that.

5        Q.    Okay.  And what was the response to that?

6              MR. WEYTHMAN:  Objection.  Vague.

7        Q.    (BY MR. YURCHAK) How did you respond to his

8    request to become a shareholder?

9              MR. WEYTHMAN:  Objection.  Assumes facts

10   not in the record.  Mischaracterizes the witness's

11   testimony.  She didn't testify that he made a request.

12       Q.    (BY MR. YURCHAK) Did Mark Phillips request to

13   become a shareholder?

14       A.    I don't believe that that actually happened

15   that -- at that time.

16       Q.    What did he -- at any point in time after his

17   release in 2012, did he request to become a shareholder?

18       A.    I can't recall a specific time he requested

19   to become a shareholder.  It was clear that the

20   intention was to be a part of HPV.

21       Q.    Do you know in what way that was intended to

22   happen, to be a part of HPV?

23              MR. WEYTHMAN:  Objection.  Ambiguous.

24   At what point in time, counsel?

25              THE WITNESS:  Are you referring to on



1  that day or that day thereafter?

2      Q.    (BY MR. YURCHAK) I'm referring to that time

3  frame, 2012.

4      A.    Mark drafted up notes indicating his

5  interpretation of the conversation and his desires for

6  HPV.

7      Q.    Okay.  Do you recall what those notes -- what

8  -- those notes would intend to have happen with respect

9  to him and HPV?

10     A.    I recall that they were specific and they

11 identified him with specific titles.  I can't tell you

12 today exactly.

13     Q.    And your testimony was that you can't recall

14 any request being made by Mark to be a shareholder; is

15 that right?

16     A.    I don't remember a specific conversation

17 where he asked to be a shareholder.  Perhaps in those

18 notes it's possible that he stated that.

19     Q.    So after he drafted these notes, what

20 happened with them?

21     A.    He sent them to us to sign.

22     Q.    Did you sign them?

23     A.    We didn't.

24     Q.    And why not?  Wait.  After you received the

25 notes to be signed, what was your -- did you first



1  contact John Du Wors to get advice about it?

2        MR. WEYTHMAN:  Objection.  Leading.

3        THE WITNESS:  The notes came in an

4  e-mail, and I believe the attachment read, "Please read

5  through and make any appropriate changes."

6     Q.   (BY MR. YURCHAK) So what did you do after

7  getting the e-mail?

8     A.   I'm not sure I remember.  We did not sign the

9  notes.  I know that it aroused discussion between Chad

10 and I as to where we were all going to be, what we were

11 going to do, but I don't recall what we did next.

12    Q.   Did you ever talk to John Du Wors about it?

13    A.   We did.

14    Q.   Did you ever -- what was John Du Wors'

15 position?

16    A.   That, "Let's get together to talk about it."

17    Q.   Okay.  Do you recall if either of the

18 officers of Hunts Point Ventures told Mark that they

19 were considering recognizing him in some way with Hunts

20 Point Ventures prior to meeting with John Du Wors?

21        MR. WEYTHMAN:  Objection.  Leading.

22        THE WITNESS:  We discussed Mark's

23 involvement with HPV at every level, but I can't

24 remember specific times and places of those discussions,

25 but it did happen around that time frame.  So it was on



1    the table for discussion between the three of us.

2         Q.    (BY MR. YURCHAK) What do you mean by "every

3    level"?

4         A.    Director, officer.  I'm going to go ahead and

5    assume shareholder, but I don't have direct recollection

6    of him asking that.  Again, it could be in those notes.

7    But we discussed how Mark would be a part of HPV.

8         Q.    Do you know if Chad Rudkin ever told him that

9    he would follow through on any of those things you just

10   mentioned?

11             MR. WEYTHMAN:  Objection.  Calls for

12   speculation.  Lack of foundation.  Personal knowledge.

13        Q.    (BY MR. YURCHAK) Were you ever present to

14   witness Chad Rudkin telling Mark Du Wors -- were you

15   ever present to witness Chad Rudkin telling Mark

16   Phillips that he had an intent to follow through on

17   making him an officer or shareholder or director?

18             MR. WEYTHMAN:  Objection.  Leading.

19             THE WITNESS:  It's possible, but I don't

20   recall.

21        Q.    (BY MR. YURCHAK) So when you talked to John

22   Du Wors about this, what was his position?

23             MR. WEYTHMAN:  Objection.  Vague.

24   Ambiguous.  What is "this"?

25             THE WITNESS:  What I remember of our

1  discussion with John Du Wors was, "Let's get together

2  and have a meeting."

3     Q.   (BY MR. YURCHAK) Okay.  Were you present --

4  okay.  Did you guys -- did you, Chad, Mark, or Chad and

5  Mark, or you and Mark get together with John Du Wors to

6  have a meeting?

7     A.   We did.

8     Q.   Who was present?

9     A.   Myself, Chad, John Du Wors, and Mark.

10    Q.   And what was said at that meeting with

11 respect to whether Mark Phillips could be recognized?

12    A.   Well, the intent of that meeting was to

13 figure out how to bring us all together.  Then we asked

14 Mark to sign a nondisclosure agreement, and Mark assured

15 us that he didn't have to because HPV belonged to him.

16 There was heated discussion and anger and frustration,

17 and the meeting ended with no resolution.

18    Q.   Did John Du Wors ever give a legal opinion as

19 to whether Mark Phillips could be recognized in Hunts

20 Point Ventures?

21              MR. WEYTHMAN:  Objection.  Calls for

22 speculation.

23              THE WITNESS:  Did he give his opinion on

24 whether Mark could be recognized?  I can't -- I don't

25 recall.



```
 1        Q.    (BY MR. YURCHAK) Do you ever recall -- do you

 2   ever recall if Chad Rudkin ever told Mark Phillips he

 3   could not be a part of Hunts Point Ventures because he

 4   was a convicted felon?

 5               MR. WEYTHMAN:  Objection.  Calls for

 6   speculation.  Lack of personal knowledge.

 7               THE WITNESS:  I recall discussion around

 8   the complexity of that issue between Chad, John, myself,

 9   and Mark.

10        Q.    (BY MR. YURCHAK) What was your position on

11   that issue?

12        A.    Okay.  My takeaway from that was that Mark

13   may not be a shareholder of HPV.  He may just be an

14   officer and director or hold a title of HPV in an effort

15   to protect HPV from his criminal background.

16        Q.    Okay.  How did you form that opinion?

17        A.    I can't say.

18        Q.    You can't say?

19        A.    Not because I don't want to.  Because I don't

20   have a reference point.

21        Q.    Do you recall whether or not that may have --

22   that the reference point to that opinion may have been

23   John Du Wors?

24        A.    Well, and to clarify, I'm not quite sure that

25   was just an opinion.  I think that it was a concern.  So
```



1    it was part of the dialogue to be had in that meeting

2    that didn't properly take place.

3         Q.    Do you know who first raised the concern?

4         A.    I think it was always a concern from the time

5    that Mark was convicted.

6         Q.    Okay.

7         A.    So I don't recall a particular time and date

8    when it became a concern on the docket.

9         Q.    And, again, at any point in time, can you

10   recall first who it was that raised that as a concern?

11                  MR. WEYTHMAN:  Objection.  Asked and

12   answered.

13                  THE WITNESS:  No.

14                     (Exhibit No. 12 marked

15                       for identification.)

16        Q.    Going to Exhibit 12, could you please take a

17   look at Exhibit 12.

18         What do you recognize this Exhibit 12 to be?

19        A.    It appears to be a printed e-mail.

20        Q.    And, again, do you recognize the e-mail

21   addresses in the "from" and "to" lines?

22        A.    I do.

23        Q.    And the date on the e-mail?

24        A.    Monday, January 14th.

25        Q.    Of 2013?

Page 175

1       A.      2013.

2       Q.      Would you agree that the e-mail states that

3   -- that it's from John Du Wors, it's addressed to Chad

4   and Sandy, and he says to "please find the promissory

5   note and security agreement"?

6       A.      That's what it reads.

7       Q.      And do you see that there's two attachments

8   to that e-mail?

9       A.      I do.

10      Q.      And would you agree that they say "secured

11  promissory note final," and "security agreement final"?

12      A.      Yes, that's what it says.

13      Q.      Would you agree that the date on the

14  promissory note was January 14, 2013?

15      A.      On this particular promissory note?

16      Q.      Yeah.  Of Exhibit 10.  Secured promissory

17  note?

18      A.      Exhibit 8?

19      Q.      I'm sorry.

20      A.      On that particular secured promissory note,

21  Exhibit 8, the date is January 14th, 2013.

22      Q.      Again, do you have an explanation as to why

23  the document that appears to be attachment called

24  "Security Agreement" is e-mailed on January 14, 2013,

25  but dated as of November 19, 2012?



 1                      MR. WEYTHMAN:  Objection.  Calls for

 2     speculation.  Lack of foundation.  Haven't established

 3     the authenticity of the documents.

 4                      THE WITNESS:  I can't say.  You'd have

 5     to ask Sandy or Chad.

 6                      (Exhibit No. 13 marked

 7                       for identification.)

 8          Q.    This is Exhibit 13.  And you have Exhibit 13

 9     before you?

10          A.    I do.

11          Q.    Do you recognize this exhibit?

12          A.    It appears to be very similar to my personal

13     notes.

14          Q.    Is that in reference to the other exhibit,

15     Exhibit 2, I believe?

16          A.    How do you mean, "in reference to"?

17          Q.    You said, "This looks very similar to my

18     personal notes."  I was trying to understand what you

19     meant by "personal notes."

20          A.    Well, again, these are notes that I took --

21     these appear to be notes that I took.

22          Q.    Okay.

23          A.    That I kept.  It's a printed copy of

24     something that resembles my notes.

25          Q.    Okay.  And I know it's a lot to ask because



1    there's 12 pages, but does it appears as if this is a

2    true and accurate copy of the personal notes that you

3    recall having created?

4         A.    I can only tell you that it looks very

5    similar.

6         Q.    Were you -- on -- do you notice a date on the

7    footer of your notes?

8         A.    Saturday, January 26, 2013.

9         Q.    Is your name present there?

10        A.    It is.

11        Q.    And, again, would that date correspond to

12   when these notes were created?

13        A.    I can't tell you that for sure.  I don't

14   know.

15        Q.    Is that because you testified earlier that

16   sometimes when you open documents, the document will

17   update itself automatically with a date?

18                   MR. WEYTHMAN:  Objection.  Leading.

19   Objection.  Mischaracterizes and categorizes the

20   witness's testimony.

21                   THE WITNESS:  That's possible that date

22   was added by an automated date mark.

23        Q.    (BY MR. YURCHAK) Would that occur just by

24   opening the document?

25        A.    That's possible.



1      Q.    Do you recall what program you used to do

2   your notes in, computer program?

3      A.    Yes, it's a Mac program.  It's called Pages.

4      Q.    Pages?

5      A.    Mm-hm (answers affirmatively).

6      Q.    Would you still have an electronic file of

7   your notes on that Mac?

8      A.    Likely.

9      Q.    Have you looked anytime recently?

10     A.    At these notes?

11     Q.    Yeah.

12     A.    No.

13     Q.    After you created your notes, can you recall

14   how often you would look at them?

15     A.    No.

16     Q.    What was the purpose, if you can recall, for

17   the creation of these notes?

18     A.    Very similar to our earlier discussion

19   regarding my intent to put together a time line of

20   events to make sense of HPV matters.

21     Q.    Okay.  If I could direct your attention to

22   page 3 under "Actionable Items List" -- actually, can we

23   establish -- do you agree that you authored these notes?

24     A.    If these are direct replica of my notes, then

25   I was the author.



1                    MR. YURCHAK:  Shall I refer to it as an

2     exhibit?

3                    MR. WEYTHMAN:  Please do, actually.

4     We're not willing to authenticate any documents based on

5     Mr. Phillips' history of forgery.

6                    MR. YURCHAK:  Oh.

7          Q.    (BY MR. YURCHAK) Okay.  So there, under

8     "Actionable Items Lists" on Exhibit 13, you write

9     "Secured loan -- to secure asset (IP) from lenders

10    foreclosing on note."

11         Does that refresh your recollection as to what

12    you were thinking at the time you created these notes?

13         A.    Sure.  It refreshes my memory as to that

14    particular topic.

15         Q.    Okay.  Do you recall what lenders you're

16    referring to when you write that?

17         A.    I thought we already established that we

18    hadn't identified exactly who the lenders or creditors,

19    shareholders were at that time.

20         Q.    What did you mean when you said that you need

21    -- that -- when you wrote, "to secure the asset from

22    lenders foreclosing on the note"?

23                    MR. WEYTHMAN:  Objection to foundation.

24                    THE WITNESS:  I imagine I meant to

25    secure the asset -- to secure the loan to protect the IP



1    from being foreclosed upon.

2         Q.    (BY MR. YURCHAK) Okay.  And in 1.2 you

3    write -- it is written, "How much does loan need to be

4    to ensure IP security in regards to Jennifer's note?"

5         A.    Uh-huh (answers affirmatively).

6         Q.    What does that sentence mean?

7         A.    Can you ask me the specific question, because

8    I feel like you're trying to have me put words where

9    they don't belong.

10        Q.    How -- what does that -- what does that

11   sentence mean when you write, "How much does loan need

12   to be to ensure IP security in regards to Jennifer's

13   note?"

14        A.    That would be an accounting question.

15        Q.    To answer what question specifically?

16        A.    Well, we have to assume that Jennifer has a

17   note or Jennifer doesn't have a legal note.  So in both

18   cases I need to seek advice from our accountants and our

19   attorneys in regards to if we were to get another loan

20   and it needed to be secured, is there a certain quantity

21   that it would need to be if Jennifer's note is valid,

22   versus if Jennifer's note is not valid.  So I was

23   attempting to write a question to seek more information.

24        Q.    Why would you be seeking to ensure IP's

25   security in regards to Jennifer's note?



1       A.      Why would I be seeking IP security?

2       Q.      Why would you be seeking to ensure IP

3   security in regards to Jennifer's note?

4       A.      Well, as you can see, we had a bit of an

5   inclination that there would be a lot of litigation

6   going on, which appears to be the truth.

7       Q.      Okay.  And because of that inclination, what

8   steps did you try to take with respect to the IP

9   security?

10      A.      Well, as you can see from the Actionable

11  Items List, the paragraph talks about reducing our

12  vulnerability by selling our new business profitability

13  plan to our creditors and renegotiate creditor notes.

14  So first we needed to identify who was a creditor.  We

15  needed to identify the status of each

16  creditor/shareholder/whatever the hell everybody was.

17  And then we needed to be able to identify what they were

18  and what the terms are so that we reduce risk in our one

19  and only asset of our company.

20      Q.      Did you believe that Jennifer's note posed a

21  risk to the one and only asset in your company?

22              MR. WEYTHMAN:  Objection.  Calls for

23  legal conclusion.

24              THE WITNESS:  We were concerned, based

25  upon the ambiguity and all the open-ended non-signed



1    documents that existed, that anything could be claimed

2    at that time.

3         Q.    (BY MR. YURCHAK) And the next sentence, it's

4    written, "Secured loan will have priority, but would a

5    judge force sale of IP to pay off secured, then

6    Jennifer?"

7         A.    Yeah.

8         Q.    Were you seeking a way to create a priority

9    security interest over other creditors?

10        A.    Let's get something straight.  We hadn't

11   established that Jennifer was a valid creditor, nor the

12   terms of a loan.  So I was simply asking questions that

13   I needed clarification for from people with the proper

14   professional background.  So the question there is would

15   a secured loan have priority?  Or would a judge force

16   the sale of the IP to pay off the secured note and then

17   to pay off Jennifer's note?  So it's hard to make

18   assumptions based on questions I was asking.

19        Q.    I'm not trying to make assumptions.  I'm

20   trying to get an understanding of what some of the

21   intent was behind the notes.

22        A.    I'll make it real clear what the intent was.

23   The intent was to protect the business with a whole

24   bunch of loose, open-ended documents.

25        Q.    Did you feel you were protecting the business



 1   by making a security agreement of the entire assets to

 2   your mother?

 3                    MR. WEYTHMAN:  Objection.

 4   Argumentative.

 5                    THE WITNESS:  Yes.

 6        Q.    (BY MR. YURCHAK) Yes?

 7        A.    Yes.  That was the security agreement for the

 8   business.

 9        Q.    Did you feel you were protecting the business

10   by making a secure --

11        A.    Absolutely.

12        Q.    And how so?

13        A.    Because the open-ended contracts that did or

14   did not exist, that could or could not be identified

15   left a lot of exposure vulnerability to a business.  So

16   we were concerned.  Until those loose ends were

17   tightened up and we could have an understanding for what

18   they meant and reach agreement with each of those

19   people, which hadn't been done at the time, we needed to

20   protect the business.

21        Q.    If -- even if it's an unknown, if Jennifer

22   had a secured note and could have foreclosed on that

23   note, and that the security interest was against the

24   assets of the corporation, why would you feel you would

25   have to protect against that if the corporation entered



Page 184

1   into such an agreement?

2                 MR. WEYTHMAN:  Objection.  Calls for

3   speculation.  Calls for legal conclusion.

4                 THE WITNESS:  I heard way too many "ifs"

5   in that question, and the basis for everything you're

6   asking revolves around contracts that didn't legally

7   exist.  So we were doing our best to understand those

8   contracts and reach out to those folks to reach an

9   understanding.  At the same point we needed to protect

10  the assets of HPV.

11      Q.    (BY MR. YURCHAK) Do you recall what you

12  intended -- what the intent of your -- of the note that

13  says on 1.2.1, "Enough to argue fraudulent transfer"?

14  What was the "fraudulent transfer" in reference to?

15                THE WEYTHMAN:  Objection.  Vague.

16                THE WITNESS:  So you're asking me what

17  was enough to argue fraudulent transfer?  What was that

18  referring to?

19      Q.    (BY MR. YURCHAK) Yeah, do you have -- does

20  reading that now refresh your recollection as to what

21  "fraudulent transfer" was in reference to?

22      A.    It's all in reference to asking the proper

23  questions of our accountants and our attorneys about the

24  security of notes versus notes that exist legally and

25  notes that are still unidentified.



1    Q.    Was it a legal opinion that you followed that

2    in order to ensure that the assets of the corporation

3    were protected, that you should make a new security

4    agreement?

5              MR. WEYTHMAN:  Objection.  Vague and

6    ambiguous.  Unintelligible.

7              THE WITNESS:  I don't recall.

8    Q.    (BY MR. YURCHAK) And at 1.3.2, it's written,

9    "Can we transfer Sandy's note payable to a secured

10   note?"  Would this correspond to what you were saying

11   earlier about asking your attorneys to transfer the

12   earlier loan by Ms. Hoover into a secured loan?

13   A.    Yes.

14   Q.    Do you know why you wrote, then, "Would it be

15   better to create a new secured note?"  "No, needs to be

16   new value"?

17             MR. WEYTHMAN:  Objection.  Assumes facts

18   not in the record.  Same foundation objection as

19   earlier.

20             THE WITNESS:  I can only defer to what's

21   written here, and it says "or would it be better to

22   create a new secured note?"  So there's a question,

23   "Would it be better to create a new secured note?"  And

24   it appears that the response is, "No, it needs to be of

25   a new value."  So I said that wrong.  The question is

```
 1    actually, "Can we transfer Sandy's note payable to a

 2    secured note?"  And the response was, "No, it needs to

 3    be of a new value."

 4         Q.    (BY MR. YURCHAK) And what's your

 5    understanding of why there needs to be new value?

 6         A.    My understanding is that was the advice from

 7    our accounting team and our legal team.

 8         Q.    That there needs to be new value in order to

 9    do what?

10         A.    To create a secured note we needed to have a

11    new loan for a new value.

12         Q.    Okay.  Does that sound to you as if the new

13    value that would be secured would only be in reference

14    to the new loan?

15               MR. WEYTHMAN:  Objection.  Calls for

16    legal conclusion.  Calls for speculation.

17               THE WITNESS:  No, I don't think that

18    that's fair to say.

19         Q.    (BY MR. YURCHAK) And why is that?

20         A.    Because I know otherwise.

21         Q.    And that was because you were told that?

22         A.    We sought legal advice and accounting advice

23    and we were told that the new loan would allow us to

24    bring in the first loan into that secured note.

25         Q.    Do you recall when the first note was set to
```



1   come due?

2        A.    I don't recall.

3        Q.    Do you recall if there was any additional new

4   documentation created to reissue or extend that first

5   loan?

6                   MR. WEYTHMAN:  Objection.  Calls for

7   speculation.

8                   THE WITNESS:  I don't know.

9        Q.    (BY MR. YURCHAK) You would recognize that in

10  Exhibits 8 and 11, I think it is, there's no reference

11  made to any prior loan made by Ms. Hoover?

12       A.    I can't say that I've read through all that.

13  I will tell you that I understand that there was some

14  falling back and forth as to how to achieve that.  I was

15  not a part of that transaction that happened between the

16  attorneys and Sandy.

17       Q.    On the fourth page and the first line, 2.2,

18  it talks about, "Rudkin to become majority shareholder,

19  reduce or eliminate Steve's shares."

20        Do you recall what that was about?

21       A.    How do we make that happen?

22       Q.    What were you trying to make happen?

23       A.    Steve was going through an insanity moment of

24  his life, I suppose.  I have no idea what was happening

25  with him personally, but it appeared to be nothing good.



1   And he needed to alleviate his burden of HPV, and he

2   needed money.

3        Q.    Okay.  And how did it come about that Steve

4   sold his shares to Hunts Point Ventures?

5        A.    I don't understand your question.  How did it

6   come about?

7        Q.    What were the circumstances surrounding the

8   reasons for why Steve sold his shares to Hunts Point

9   Ventures?

10                  MR. WEYTHMAN:  Objection.  Vague.

11                  THE WITNESS:  Steve faced a lot of

12   ridicule from us as to his poor performance, and he

13   couldn't account for the lack of documentation.

14   Therefore, it became very clear that he needed to step

15   down.

16        Q.    (BY MR. YURCHAK) Okay.  Was any of his

17   conduct as an officer reflected in any of the board

18   meetings or minutes of Hunts Point Ventures?

19        A.    I can't say yes or no to that because I don't

20   recall.  However, just on my personal note, I can't

21   imagine we would have talked about him in that light, in

22   our corporate anything.

23        Q.    Why is that?

24        A.    I suppose I left myself open.  Well, I don't

25   recall what we put into our meeting minutes.



Page 189

```
 1        Q.    How would you describe your relationship with

 2   Steve Schweickert at the time you were both corporate

 3   officers at Hunts Point Ventures?

 4        A.    Again, I'm not sure how to answer that.  We

 5   didn't communicate a lot because he didn't respond a

 6   lot.  We reached out to Steve for answers, and we

 7   weren't getting a response.  So I don't know how to

 8   characterize a relationship based on that.  But that's

 9   what I know.

10        Q.    Do you know if Steve had a trusting

11   relationship with you?

12                   MR. WEYTHMAN:  Objection.  Calls for

13   speculation.  Lack of personal knowledge.

14                   THE WITNESS:  I can't say.

15        Q.    (BY MR. YURCHAK) Do you know if he felt that

16   you were honorable?

17                   MR. WEYTHMAN:  Objection.  Calls for

18   speculation.  Lack of personal knowledge.

19                   THE WITNESS:  My interpretation of him

20   was that he felt we were honorable.

21        Q.    (BY MR. YURCHAK) In 2.4 of your -- of Exhibit

22   13, it's written, "If not, we will foreclose on our

23   secured loan and he will lose all shares."

24        A.    Yeah.  That's what it says.

25        Q.    What does that mean?
```



```
 1        A.    It means exactly what it says.

 2        Q.    Could you explain it to me?

 3        A.    Steve was doing a poor job of managing HPV

 4   business, and so if he wasn't willing to walk away or

 5   step up to the plate and be of assistance, there was

 6   little option for us as a business than to ask him to

 7   step down.

 8        Q.    Is that what this sentence says, that you

 9   would ask him to step down, or does it say that "We will

10   foreclose on our secured loan"?

11        A.    That's what it says.  It says, "We will

12   foreclose on our secured loan and he will lose his

13   shares."

14        Q.    Right.

15        A.    Yes.  Was that a potential option?  Yes.

16        Q.    To foreclose on the loan as being a potential

17   option?

18        A.    Well, HPV couldn't foreclose on the loan.

19        Q.    What do you mean by "HPV couldn't foreclose

20   on the loan"?

21        A.    Well, you said "we," so I'm not quite sure

22   how to clarify what you meant by "we."

23        Q.    I didn't say "we."  I was just reading off of

24   what is written there on page 4.

25        A.    Those are notes, so it's not concrete.  There
```



1   was discussion around foreclosing on the loan if

2   necessary.  It never came up again.  It wasn't

3   necessary.

4        Q.    And that was a potential option, in order to

5   force out a corporate officer, was to simply foreclose

6   on the loan knowing the assets would be transferred to a

7   non-member of Hunts Point Ventures?

8                   MR. WEYTHMAN:  Objection.

9   Argumentative.

10                  THE WITNESS:  It was a note I made in

11  discussion about options.

12       Q.    (BY MR. YURCHAK) And your interpretation of

13  "we would foreclose," who is "we" in reference to?

14       A.    It just says "we."  Those are my notes.

15                  MR. WEYTHMAN:  It's been about an hour

16  and 20.  Can we take a break?

17                  MR. YURCHAK:  Yeah.

18                  (Recess 3:50 to 3:57 p.m.)

19

20                  EXAMINATION (Continuing)

21  BY MR. YURCHAK:

22       Q.    Going back to Exhibit 13 on page 9, I had a

23  question about a note that was made.  It's the fourth

24  from the bottom point, reading, "John drafted secured

25  promissory note for Sandy."  Who would John be in

1  reference to in that sentence?

2       A.   I can only assume it was John Du Wors, but I

3  can't be sure.

4       Q.   And I was just curious for you to comment.

5  Would you agree that that statement would seem to mean

6  that John drafted the secured promissory note for Sandy?

7       A.   I don't recall.  I remember discussion about

8  that, so I don't recall if he did or did not.

9       Q.   If you had written down that note, would you

10 tend to recall it -- that was your recollection at the

11 time you made the note?

12                  MR. WEYTHMAN:  Objection.  Calls for

13 speculation.

14                  THE WITNESS:  You have to assume I could

15 have been presuming.

16      Q.   (BY MR. YURCHAK) Okay.  On page 6 of those --

17 of Exhibit 13 in the top little paragraph, mentions a

18 phone call.  If this had been written by you, would that

19 mean that you made a note of a phone call that you had

20 with John Du Wors on 9/7/12?

21                  MR. WEYTHMAN:  Objection.  Calls for

22 speculation.

23                  THE WITNESS:  That's possible.

24      Q.   (BY MR. YURCHAK) Was it your general habit to

25 make such entries when you made and kept your notes to



 1   reflect the activity that was happening on the date that

 2   it happened?

 3        A.    I occasionally kept notes about conversations

 4   and dated them.

 5        Q.    Do you have any recollection, reading one,

 6   two, three -- the third point, it says, "Sandy to give

 7   Steve the option of foreclosure or buyout"?

 8        A.    I have a recollection of it right now.

 9        Q.    Of what it means?  Or what do you have a

10   recollection of?  Of what?

11        A.    I have a recollection of -- of working

12   through a situation and exploring options.  I'm not sure

13   what you're getting at.

14        Q.    Does that note give you any recollection as

15   to what you -- as to what was discussed regarding Sandy

16   having options with Steve?

17                  MR. WEYTHMAN:  Objection.  Vague.

18        Q.    (BY MR. YURCHAK) Any recollection as to what

19   that meant?

20        A.    The recollection is a discussion with John Du

21   Wors and a conversation where it appears I took notes.

22        Q.    Would there be any reason that Sandy would be

23   able to give Steve options regarding a foreclosure or

24   buyout?

25                  MR. WEYTHMAN:  Objection.  Calls for



```
 1   speculation.  Foundation.  Lack of personal knowledge.

 2   You can answer if you understand the question.

 3                   THE WITNESS:  I don't know.

 4                   (Exhibit No. 14 marked

 5                    for identification.)

 6        Q.    (BY MR. YURCHAK) Do you recognize Exhibit 14?

 7        A.    I see that it appears to be a printed e-mail.

 8        Q.    And do you recognize who the e-mail is from?

 9        A.    It's from myself.

10        Q.    Is that your -- do you recognize your e-mail

11   address there?

12        A.    I do.

13        Q.    And do you recall this e-mail -- do you

14   recall having authored this e-mail?

15        A.    I remember sending an e-mail to Mark of this

16   nature.  Whether this is the exact one, I can't promise,

17   but...

18        Q.    Are you in the habit of saving your e-mails

19   from the past?

20        A.    Not in the habit of.  It's a practice.

21   Either do or don't.

22        Q.    Is there any factor you consider in terms of

23   which gets saved and which don't?

24        A.    Not a consistent factor.  I make a choice

25   whether to keep them or delete them.
```



1      Q.     Do you recall if you were saving any

2   communications that you were having with respect to

3   Hunts Point Ventures' business?

4      A.     Just ask me if I recall -- do I recall saving

5   e-mails?

6      Q.     That were related to anything involving Hunts

7   Point Ventures' business?

8      A.     Yes.  I recall saving e-mails.

9      Q.     Okay.  Was that a regular practice to save

10  all the e-mails that you got or sent with respect to

11  HPV's business?

12     A.     I can't say all, so I suppose the answer's

13  no.

14     Q.     Okay.  But you did save e-mails of that

15  nature; is that correct?

16     A.     I did.

17     Q.     I was curious just to ask about the

18  statement -- what does this appear the e-mail was about?

19     A.     It appears this is an e-mail follow-up to our

20  conversation and meeting at Sandy's home.

21     Q.     Okay.  Was that meeting about Mark trying to

22  understand what kind of role or status he may have with

23  Hunts Point Ventures?

24                  MR. WEYTHMAN:  Objection.  Leading.

25                  THE WITNESS:  It could be.



1        Q.     (BY MR. YURCHAK) And you notice the date on

2   this e-mail?

3        A.     Yep.

4        Q.     What is that date?

5        A.     Tuesday, November 6th, 2012.

6        Q.     And do you recall what you meant when you

7   wrote, "There are a few small things that need to be

8   ironed out regarding dissolution or transfer shares and

9   ensure that this in no way appears as a fraudulent

10  transfer by Steve"?

11                 MR. WEYTHMAN:  Objection.  Foundation.

12  We haven't established the authenticity of the document.

13                 THE WITNESS:  I recall all of my

14  conversation and intention to do the right thing for

15  HPV, and so if I stated that, then that was to ensure we

16  were doing things properly.

17       Q.     (BY MR. YURCHAK) Is fraudulent transfer, to

18  you, sort of a legal term or is that something you would

19  use in your own vernacular?

20       A.     That would be something I would only use --

21  not only.  It would be a term that I used when

22  discussing HPV business.

23       Q.     Okay.  Do you recall having any conversations

24  with your attorney, John Du Wors, about fraudulent

25  transfer of shares by Steve?



1          A.     I recall having discussion with John Du Wors

2     about ensuring that we didn't do anything that was

3     inappropriate or fraudulent.

4          Q.     Why was there a concern that -- that

5     something like this might appear as fraudulent?

6          A.     It's not something like this might appear.

7     It's simply that we don't have the legal background to

8     understand how to perform these sorts of tasks for -- or

9     sales or anything regarding the nature of this

10    conversation.  And so we needed to seek clarification

11    for all of our actions.

12         Q.     So this is -- if I understood your comment

13    correctly, is the reference of fraudulent transfer more

14    in reference to yourself that you want to make sure you

15    don't do something that may appear fraudulent and that

16    you would need to first seek the guidance of your

17    attorney?

18         A.     I think -- I'm not sure how to interpret what

19    you just said.  I think what you're saying is that we

20    didn't want to take any actions that were fraudulent or

21    appeared fraudulent.  And if that's what you're saying,

22    yes, that's true.

23         Q.     Okay.  And that would be juxtaposed to the

24    other possible interpretation that there was discussion

25    that any such transfer might be fraudulent; is that



1   right?

2       A.    There wasn't a lot of discussion about

3   fraudulent transfer.  It was simply -- it was -- I don't

4   know how to say -- all discussion around this topic was

5   to ensure that we were doing things properly.

6       Q.    Okay.  In the next sentence, why do you write

7   that, "We want Joyce's blessing and buy in on this

8   business maneuver"?

9                  MR. WEYTHMAN:  Objection.  Foundation.

10  Still haven't established the authenticity of the

11  document.

12                  THE WITNESS:  Probably because that's

13  what I meant.

14      Q.    (BY MR. YURCHAK) What did you mean by that?

15      A.    I can't recall from this time.

16      Q.    This was written in 2012, and we discussed

17  earlier that Joyce resigned her shares at the end of

18  2010.

19      A.    I understand.

20      Q.    And you testified that you met with Joyce in

21  2012 and she told you she wanted nothing to do with

22  Hunts Point Ventures?

23      A.    Correct.

24      Q.    So that's why I'm asking, why would you write

25  to Mark that you still seek her blessing in buying in on

1  this business maneuver?

2      A.    I can't be a hundred percent clear on my

3  answer for this.  I believe that there was dialogue

4  between Steve and Joyce where Joyce wavered back and

5  forth of wanting to participate in HPV.  And at this

6  particular moment in time when this document was

7  written, I don't know on what side of the fence Joyce

8  was.

9      Q.    Are you saying Joyce would change her

10 position with respect to HPV?

11     A.    I am.

12     Q.    Okay.  So sometimes she wanted to be a part

13 of HPV?

14     A.    I believe so.

15     Q.    Did Joyce ever express how she wanted to be a

16 part of HPV if she no longer was a shareholder?

17     A.    Not very well.

18     Q.    What do you mean by that?

19     A.    She didn't clearly indicate how she wanted to

20 be a part of HPV.

21     Q.    How well do you know Joyce?

22     A.    Not very well.

23     Q.    How long have you known her?

24     A.    I went to a funeral at her home, a memorial

25 service for a man named Bob.  And I can't tell you the



1   date because I don't recall.  But that's when I met her.

2        Q.    Okay.  You don't recall how many years ago

3   that might be?

4        A.    My children were small.

5        Q.    That's a nice way to try to remember things;

6   right?

7        A.    It was before HPV.  It was after I had kids.

8   I just don't recall.

9        Q.    I have trouble remembering the past as well.

10            MR. WEYTHMAN:  Yesterday.

11            MR. YURCHAK:  Yesterday as an example.

12       Q.    (BY MR. YURCHAK) You mentioned that -- when I

13  asked you if you'd ever received compensation for Hunts

14  Point Ventures, I think you said -- I think you used the

15  term "we" in reference to you and Chad having received

16  some disbursements which were to be paid against future

17  earnings in Hunts Point Ventures?  Is that a generally

18  accurate summary?

19       A.    Yes.

20       Q.    Do you recall what the amount was that --

21  I'll use the term, "you," received from Hunts Point

22  Ventures?

23       A.    It was in small disbursements in the amounts

24  of $2,000, I believe.  I don't think the total exceeded

25  15, maybe 16 total.



1        Q.    And after that, after those disbursements,

2    you never did earn any money from Hunts Point Ventures

3    as officers; is that right?

4        A.    No.  We earned it.

5        Q.    I'm sure you did.

6        A.    Did we receive compensation from HPV?  I

7    can't say never, but I don't believe so.

8        Q.    Would that mean that you would owe HPV back

9    the amount of money that you received in disbursements?

10       A.    Oh, no.

11                   MR. WEYTHMAN:  Objection.

12   Argumentative.

13       Q.    (BY MR. YURCHAK) What was the answer?

14       A.    The answer to the question of do we owe that

15   money back to HPV?  No.  I believe that HPV owes us

16   money.

17       Q.    And what's that based upon?

18       A.    That would be based upon the amount of time

19   that we put into managing this project.

20       Q.    Okay.  And have you made any claim for that

21   to the receiver?

22       A.    I don't believe that we did.

23       Q.    If you were to guesstimate, how much money do

24   you think that you're owed?

25                   MR. WEYTHMAN:  Objection.  Calls for



Page 202

```
 1   speculation.

 2                    THE WITNESS:  I think there are a lot of

 3   ways to do the math on that, and I don't have the

 4   correct answer.

 5        Q.    (BY MR. YURCHAK) Okay.  Were you ever aware

 6   of Chad Rudkin holding Mark Phillips' power of attorney

 7   at any point in time?

 8        A.    Yes.

 9        Q.    And how were you aware of that?

10        A.    I believe I have it in an e-mail.

11        Q.    Was that e-mailed to you directly?

12        A.    I don't recall.

13        Q.    And why do you think you would have it in an

14   e-mail?

15        A.    Because in scanning documents I have a

16   recollection of seeing reference to it.

17        Q.    Did you have an understanding that you were

18   also included in that power of attorney?

19        A.    Yes.  I do have a recollection of that as

20   well.

21        Q.    And what was your recollection?

22        A.    When?

23        Q.    What is your recollection about you being

24   included?  Were you included as Mark Phillips' agent in

25   his power of attorney?
```



 1                    MR. WEYTHMAN:  Objection.  Calls for

 2    legal conclusion.

 3                    THE WITNESS:  I remember being named in

 4    a power of attorney in 2010 when he was residing with

 5    us.

 6         Q.    (BY MR. YURCHAK) Okay.  Did you -- were you

 7    ever given any instruction by Mark to do anything under

 8    that power of attorney?

 9         A.    Not specifically under a power of attorney,

10    no.

11         Q.    Did you get any direction from him to do

12    anything?

13         A.    I helped him to liquidate his accounts by

14    sort of being his admin assistant.

15         Q.    And what did you do in so helping him?

16         A.    I believe I sent a few e-mails inquiring

17    about information that he'd asked me to inquire about,

18    in terms of what it would take to liquidate those

19    accounts.

20         Q.    Okay.  Did he ask anything else of you

21    besides helping him with those accounts?

22         A.    Not that I recall.

23         Q.    Do you recall him making requests of Chad

24    Rudkin to take action under his power of attorney?

25                    MR. WEYTHMAN:  Objection.  Calls for



Page 204

1    speculation.

2              THE WITNESS:  Not that I'm aware of.

3        Q.   (BY MR. YURCHAK) Were you ever aware of money

4    coming in to your personal account that arose from the

5    activity associated with the power of attorney?

6        A.   No.

7        Q.   So you're not aware of receiving at any point

8    money that was owed to Mark Phillips in your personal

9    accounts?

10       A.   I don't recall that.

11       Q.   Do you recall in 2010 Chad taking action to

12   sell or to be involved in the sale of any of Mark's real

13   estate properties?

14       A.   Yes.

15       Q.   Did you understand that to be occurring under

16   power of attorney?

17              MR. WEYTHMAN:  Objection.  Calls for

18   speculation.

19              THE WITNESS:  I believe that was

20   performed under a specific power of attorney to sell.

21       Q.   (BY MR. YURCHAK) Did Chad ever talk to you

22   about that?

23       A.   Possibly.

24       Q.   Did he ever talk to you in general about any

25   activity he undertook under the power of attorney on



```
 1   behalf of Mark?

 2                  MR. WEYTHMAN:  Objection.  Vague.

 3   Ambiguous.

 4                  THE WITNESS:  Are you no longer

 5   referring to the sale of the Mosler and you're just

 6   referring to general actions taken?

 7        Q.    (BY MR. YURCHAK) Yeah.

 8        A.    I don't recall any specific actions taken.

 9                     (Exhibit No. 15 marked

10                      for identification.)

11        Q.    Are you able to identify this document?

12        A.    It reads, "Durable Power of Attorney For

13   Asset Management," and I can't confirm without looking

14   at the original, but it looks like a Durable Power of

15   Attorney.

16        Q.    Does it look -- do you recognize it as being

17   similar to what you referred to as the original

18   document?

19        A.    I have no idea.  I couldn't tell you.

20        Q.    Do you recall ever receiving a signed copy of

21   a -- of Mark's power of attorney?

22        A.    I don't recall.

23                     (Exhibit No. 16 marked

24                      for identification.)

25        Q.    Okay.  I'll jump back to another question I'd
```



1    asked some time ago.  Exhibit 16, is this a document

2    that you recognize?

3         A.    No, I don't think so.

4         Q.    Do you know who Yvonne Phillips is?

5         A.    I think it's Mark's sister.

6         Q.    And you're currently represented by the firm

7    of Foster Pepper, if I'm not mistaken?

8         A.    Mm-hm (answers affirmatively).

9         Q.    In this declaration of Yvonne Phillips, on

10   page 2, letter "n" and "o" -- first of all, I should

11   refer to paragraph 2.  Yvonne Phillips declares that she

12   received from the office of Foster Pepper one box

13   containing the following items.

14        Did you recently provide a box of items, with the

15   intent that it be turned over to Mark Phillips, to the

16   offices of Foster Pepper?

17        A.    I did.

18        Q.    And where had that box been kept?

19        A.    It wasn't kept.  I simply went through the

20   house upon all of this litigation to collect up anything

21   that didn't belong to us and belonged to Mark, and I put

22   it in a box.

23        Q.    Okay.  And is there anything remaining in

24   your house that does belong to Mark?

25        A.    Nope.



Page 207

1      Q.    Is there any furniture that may belong to

2   Mark?

3                MR. WEYTHMAN:  Objection.  Asked and

4   answered.

5      Q.    (BY MR. YURCHAK) That you still possess?

6      A.    No.

7      Q.    And I had a question about -- when you look

8   at this list that's -- of items that's in this

9   declaration, does this list look like it accurately

10  reflects the items that were in the box and turned over

11  to Foster Pepper?

12     A.    With a quick scan through it does.

13     Q.    So going back to "n" and "o," you identified

14  a file folder in that box labeled, "LLC Operating

15  Agreement."  Do you have any explanation about why that

16  file folder was empty?

17     A.    I don't have an explanation for anything on

18  this document.

19     Q.    Why is that?

20     A.    Because I didn't -- I'm not familiar with

21  these items other than I collected them and put them in

22  a box.

23     Q.    How long were they in your possession?

24     A.    I'd imagine from the time that Mark came into

25  our home until the time that I put them in the box.



1      Q.    Okay.  So we're talking around 2010?

2      A.    Yeah.

3      Q.    And they weren't already in a box?

4      A.    Some things were in one of our desk drawers.

5  I found a pack of cigarettes in a drawer downstairs.

6      Q.    How did you know they belonged to Mark?

7      A.    Because they didn't belong to us and he

8  smoked those cigarettes.  I essentially just cleansed

9  through all of our files.  I'm fairly organized on

10  documents, and anything that -- well, to better answer

11  your question, as I was organizing each HPV stuff, I

12  believe some of these things were pulled from HPV stuff

13  to be Mark's stuff, and I think that's why they went

14  into the box.

15      Q.    How did you make that determination with

16  respect to what was property of HPV and what was

17  property of Mark?

18      A.    I did the best I could with what I knew.

19      Q.    Okay.  So you don't recognize -- on that file

20  folder you didn't recognize LLC Operating Agreement as

21  having anything to do with Hunts Point Ventures?

22      A.    I guess not if I didn't put it in Hunts Point

23  Ventures' box.  I put it in Mark's box.

24      Q.    Sure.  And in the entry below it, under "o,"

25  the "HP Intellectual Properties," that likewise was an



1    empty file folder?

2         A.    I guess so.

3         Q.    And if you put it in Mark's box, does that

4    mean you did not interpret that as having any relevance

5    or relationship to Hunts Point Ventures?

6         A.    It was an empty file folder.  There was a

7    bunch of Mark's office supplies that were there, that

8    just were in a pile, and there were some empty file

9    folders, so I scooped them all up together and put them

10   in the box.

11        Q.    How were those two folders labeled?

12        A.    I have no idea.

13        Q.    You don't remember if it was handwritten or

14   printed?

15        A.    I don't know.

16        Q.    But they were labeled as indicated?

17        A.    I can't even confirm that.  I don't know.

18        Q.    And why is that?

19        A.    Because I didn't take to memorizing all the

20   shit I put in the box.  I just picked it up and put it

21   in the box.  It wasn't mine.  It didn't belong to me.  I

22   didn't know what it was.  I didn't recognize it as being

23   something that we had used with HPV, so I put it in

24   Mark's box.

25                      (Exhibit No. 17 marked

1                    for identification.)

2        Q.    Have you ever seen Exhibit 17 that's been

3    placed in front of you before?

4        A.    I don't think so.

5        Q.    Do you -- in Exhibit 1, this document is

6    listed as being included in the items that were received

7    to Foster Pepper from you.

8        A.    Okay.

9        Q.    Does that help --

10       A.    No.  I mean --

11       Q.    -- to refresh your recollection?

12       A.    That's entirely possible.  I didn't know each

13    of those documents by heart, and I don't believe I've

14    ever seen this.

15       Q.    So you're unable to say how you came into

16    possession of that document?

17                 MR. WEYTHMAN:  Objection.  Assumes facts

18    not in the record.

19                 THE WITNESS:  I can't even say I assume

20    I had possession of this document.

21                 MR. YURCHAK:  Okay.  Maybe we could take

22    a short break.

23                 MR. WEYTHMAN:  Sure.

24                 (Recess 4:35 to 4:43 p.m.)

25



Page 211

1

2                    (Exhibit No. 18 marked

3                     for identification.)

4                 EXAMINATION (Continuing)

5    BY MR. YURCHAK:

6        Q.    I think I'm just going to ask you about this

7    one last document.  Can you identify the document,

8    Exhibit 18?

9        A.    It appears to be a general ledger.  I'm

10   assuming it came either from one of the many

11   spreadsheets I was working on or -- I don't know if it

12   came from Clark Nuber.  I'm not sure.

13       Q.    Is this a copy of something that you would

14   ever have provided to Mark Phillips?

15       A.    He gave me a key fob at my mom's house that

16   day that we were together in the fall of 2012, and I did

17   give him access to the general ledger I was working on.

18       Q.    Okay.  I noticed the date on that document to

19   be February of 2013.

20       A.    Yeah.  I have no idea where this document

21   came from or whose it is or who generated it.  I don't

22   know anything about this document, so I have no comment

23   for that date.

24       Q.    Is it safe to assume that you had a number of

25   different versions at different points in time?



```
1        A.    There were different versions, as we were

2   working to classify transactions.

3        Q.    Okay.

4        A.    But I don't even know that this is one of

5   them.  I mean, I don't know.

6        Q.    Why is that?

7        A.    Well, how would I know?

8        Q.    How would you know if that's one of the

9   versions?

10       A.    Right.

11       Q.    I guess that's my question to you.  Would you

12  be able to recognize one of the versions that you -- of

13  the ledger that you had been working on?

14       A.    I definitely could not verify that.  I mean,

15  it looks familiar.  There's similar names and

16  transactions and information that's very familiar, but I

17  could never say that this was the document I was working

18  on.

19       Q.    Okay.  I'm sorry.  Trying to refer back to a

20  prior exhibit, which were your second set of notes.  It

21  was 13.  It was Exhibit 13.  Is that the second set of

22  notes?

23       A.    Thirteen?

24       Q.    If I could refer you to page 9.

25       A.    Mine only goes to five.  I may have shuffled
```



1   it around.  I'm going to assume that this part goes to

2   this.  The first line on page 9 is 2010-2, "Mod Lawsuit

3   Expense."

4        Q.   That's correct.  So looking at the paragraph,

5   if you will, below that, starting with "Goal," when you

6   read through there, to do a joint shareholder consent by

7   Wednesday, to appoint Mark on the BOD, what is BOD in

8   reference to?

9        A.   Well, you have to put this in context.  These

10   notes were taken November 11th, 2012.  These are my notes

11   from my conversation.  It says, "Chad, Mark, Elizabeth

12   phone conference for purpose of defining past financial

13   transactions."  So it appears we had a meeting with Mark

14   on the phone to attempt to define "past financial

15   transactions."  And then we made a list of actionable

16   items from that conversation.

17        Q.   Uh-huh.

18        A.   Okay.

19        Q.   Okay.

20        A.   So now moving onto your question.  I'm sorry,

21   your question was?  Appoint Mark on the BOD?

22        Q.   Yeah.

23        A.   And you asked me what "BOD" means?

24        Q.   Yeah.

25        A.   Board of Directors.



1        Q.     Was that one of the actionable items to be

2    done?

3        A.     Well, you have to be careful of saying "be

4    done."  That was an actionable item that we discussed.

5        Q.     That was an actionable item that was

6    discussed on that day, November 11th, 2012?

7        A.     Correct.

8        Q.     Page 9, down below, "Questions for John."

9    Looks as if you had some discussion on November 11, and

10   you needed to follow up with John; is that right?

11       A.     Correct.

12       Q.     One of those things to follow up on was,

13   "Mark brings up 5M owed from MOD contract."  Do you

14   recall following up with John about that item?

15       A.     I recall the conversation with Mark where he

16   claims that that's what he believes to be true.  And I

17   recall that we needed to have that discussion, but I

18   don't recall the actual discussion.  And I think that

19   perhaps it might not have even happened because perhaps

20   it was going to happen at our meeting that didn't go

21   well.

22       Q.     Do you recall any discussion with John Du

23   Wors about a five million dollar contract that existed

24   with Mark as a signee/signor?

25       A.     I don't recall that discussion with John.



```
 1      Q.    Okay.

 2                  (Exhibit No. 19 marked

 3                   for identification.)

 4      Q.    (BY MR. YURCHAK) Last exhibit.  I usually

 5 like whole numbers, so I may have to find one more to

 6 get to 20, but do you recognize this exhibit?

 7      A.    Sadly enough, I don't.

 8                  (Exhibit No. 20 marked

 9                   for identification.)

10      Q.    Do you recognize Exhibit 20?

11      A.    I see that it appears to be a bank statement

12 from Bank of America, but do I recognize it?  I can't

13 say that I do.

14      Q.    Are you -- you stated earlier that you opened

15 up an account for Hunts Point Ventures, opened up a bank

16 account for Hunts Point Ventures?

17      A.    Chad opened up a bank account for Hunts Point

18 Ventures.

19      Q.    Do you recall who has signing authority on

20 that account?

21                  MR. WEYTHMAN:  Objection.  Calls for

22 legal conclusion.

23                  THE WITNESS:  I don't know.

24      Q.    (BY MR. YURCHAK) Did you ever transact any

25 business through that account on behalf of Hunts Point
```



Page 216

 1   Ventures?

 2              MR. WEYTHMAN:  Objection.  Vague.

 3              THE WITNESS:  The simple answer is I

 4   don't recall.

 5       Q.    (BY MR. YURCHAK) Do you see at the top of

 6   that document the account holders for Hunts Point

 7   Ventures?

 8       A.    Mm-hm (answers affirmatively).  I do.

 9       Q.    But you don't recognize that account

10   statement as being from the account for Hunts Point

11   Ventures; is that correct?

12       A.    I'm not sure that I ever even opened Bank of

13   America envelopes.  I think they went to Chad's desk.

14       Q.    So with reference to Exhibit 19, did you ever

15   see this check that is displayed on that exhibit?

16       A.    I can't confirm that I have.

17       Q.    Have you ever seen checks written by Sandy

18   Hoover before?

19       A.    Yes.

20       Q.    Does this check No. 6002 appear to be from

21   the checks you recall previously that are associated

22   with Sandy Hoover?

23              MR. WEYTHMAN:  Objection.  Vague.

24   Ambiguous.

25              THE WITNESS:  It looks like her



Page 217

```
1    handwriting.

2         Q.    (BY MR. YURCHAK) Okay.  Does the font of her

3    name and address in the upper left-hand corner look

4    familiar to you?

5         A.    No.

6         Q.    And do you note in the memo line where it

7    says "note secured"?

8         A.    I do.

9         Q.    Does that appear to be her handwriting?

10              MR. WEYTHMAN:  Objection.  Asks for

11   expert opinion.

12        Q.    (BY MR. YURCHAK) Do you recognize that as her

13   handwriting?

14        A.    I recognize the top two lines as her

15   handwriting and her signature as her handwriting.  I

16   recognize the date as her handwriting.  The note looks

17   very similar, but I couldn't -- I can't say.

18        Q.    And do you -- do you agree that the check's

19   made out for $20,000?

20        A.    I do.

21        Q.    And it's made out to Hunts Point Ventures,

22   Inc.?

23        A.    Yes.

24        Q.    And the date of the check is December 6th of

25   2012?
```



1       A.      Yes.

2       Q.      And on this exhibit, the checking account

3    number ending in 9321, does that account number

4    correspond with the bank account statement of Exhibit

5    20?

6       A.      Yes.

7       Q.      Does it appear as if $20,000 was deposited

8    into the Hunts Point Ventures' bank account of Bank of

9    America?

10              MR. WEYTHMAN:  Objection.  Calls for

11   speculation.

12      Q.      (BY MR. YURCHAK) I'm sorry?  What was your

13   answer?

14      A.      It appears the deposit for $20,000 was made.

15      Q.      On what day?

16      A.      I can't say.  It just says "statement

17   period."  Wow, sorry.  Posted January 29th.

18      Q.      Do you know why the check for Ms. Hoover is

19   dated on 12/6/12, but deposited on 1/29/13?

20              MR. WEYTHMAN:  Objection.  Calls for

21   speculation.  Assumes facts not in the record.  Lack of

22   foundation as to both documents.

23              THE WITNESS:  I don't know.

24              MR. YURCHAK:  I think we can go off the

25   record.  We're done.  Thank you.



Page 219

```
1                    THE COURT REPORTER:  Is this going to be

2    ordered?

3                    MR. YURCHAK:  (Nods head affirmatively.)

4    Did you want to review?

5                    MR. WEYTHMAN:  Please.

6        (Deposition concluded at 4:59 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                 D E C L A R A T I O N

 2

 3

 4

 5                   I declare under penalty of perjury that

 6    I have read my within deposition, and the same is true

 7    and accurate, save and except for the changes and/or

 8    corrections, if any, as indicated by me on the

 9    Correction Sheet.

10

11          Dated this _____ day of _____, 2014,

12

13    at _____(city/state).

14

15

16

17                         _____

18                              ELIZABETH RUDKIN

19

20

21

22

23

24    KELLIE A. SMITH, CCR, RPR, CRR

25    Court Reporter
```



```
 1                  C E R T I F I C A T E

 2   STATE OF WASHINGTON       )
                               ) SS.
 3   COUNTY OF KING            )
              I, the undersigned Washington Certified Court
 4   Reporter, pursuant to RCW 5.28.010 authorized to
     administer oaths and affirmations in and for the State
 5   of Washington, do hereby certify:

 6            That the annexed and foregoing deposition
     consisting of pages 1 through 219 of the testimony of
 7   each witness named herein was taken stenographically
     before me and reduced to typed format under my
 8   direction;

 9            I further certify that according to CR 30(e) the
     witness was given the opportunity to examine, read and
10   sign the deposition after the same was transcribed,
     unless indicated in the record that the review was
11   waived;

12            I further certify that all objections made at the
     time of said examination to my qualifications or the
13   manner of taking the deposition or to the conduct of any
     part have been noted by me upon each said deposition;

14

15            I further certify that I am not a relative or
     employee of any such attorney or counsel, and that I am
16   not financially interested in the said action or the
     outcome thereof;

17

18            I further certify that each witness before
     examination was by me duly sworn to testify the truth,
19   the whole truth and nothing but the truth.

20            I further certify that the deposition, as
     transcribed, is a full, true and correct transcript of
21   the testimony, including questions and answers, and all
     objections, motions, and exceptions of counsel made and
22   taken at the time of the foregoing examination and was
     prepared pursuant to Washington Administrative Code
23   308-14-135, the transcript preparation format
     guidelines;

24            I further certify that I am sealing the
     deposition in an envelope with the title of the above
25   cause and name of the witness visible, and I am
```



Page 222

1   delivering the same to the appropriate authority;

2        I further advise you that as a matter of firm
    policy, the Stenographic notes of this transcript will
3   be destroyed three years from the date appearing on this
    Certificate unless notice is received otherwise from any
4   party or counsel thereto on or before said date;

5        IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my official seal this 26th day of March,
6   2014.

7

8

9
                    _____
10                  KELLIE A. SMITH, CCR, RPR, CRR
                    Washington State Certified Court
11                  Reporter
                    License No. 1950
12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 223

```
 1  MARK PHILLIPS,                    )
                                      )
 2            Plaintiff,              )
                                      )
 3    vs.                             )   No. 13-2-07233-5
                                      )   SEA
 4  CHAD and ELIZABETH RUDKIN,        )
    STEPHEN JAMES SCHWEICKERT,        )   NOTICE OF READINESS
 5  and JOHN and JANE DOES 1          )   OF DEPOSITION FOR
    THROUGH 4,                        )   READING AND SIGNING
 6                                    )
              Defendants.             )
 7

 8  TO:     RYLAN S. WEYTHMAN
            Attorney at Law
 9          1111 Third Avenue
            Suite 3400
10          Seattle, Washington  98101

11
    NOTICE IS HEREBY GIVEN that the transcript of your
12  deposition given in the above entitled cause is ready
    for your reading and signing at MOBURG, SEATON &
13  WATKINS, 2033 SIXTH AVENUE, SUITE 826, SEATTLE, WA
    98121.  You must, within 30 days from the date of the
14  notice, read and sign the deposition or state in writing
    your refusal to sign, or state in writing the fact that
15  you waive your right to sign.  Failing to do so,
    signature shall be deemed for all purposes waived, and
16  your deposition will be sent to the ordering party for
    retention until time of trial.  DATED at Puyallup,
17  Washington, this 26th day of March, 2014

18

19                          BY: KELLIE A. SMITH, RPR, CRR
                            Moburg, Seaton & Watkins
20                          Court Reporters (206) 622-3110
                            2033 Sixth Avenue, Suite 826
21                          Seattle, Washington 98121

22

23  cc: R. Yurchak

24

25
```



```
 1   MOBURG, SEATON & WATKINS
     COURT REPORTERS
 2   2033 SIXTH AVENUE
     SUITE 826
 3   SEATTLE, WA 98121
     (206) 622-3110
 4
     _____
 5
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS SHEET
     AND SIGN THE ACCOMPANYING SIGNATURE PAGE (DECLARATION).
 7   _____

 8   PAGE        LINE      CORRECTION AND REASON

 9

10

11

12

13

14

15

16

17

18

19

20

21

22                   _____
                     ELIZABETH RUDKIN
23                   Date taken:  March 19, 2014

24

25   REPORTER:        KELLIE A. SMITH, RPR, CRR
```





**Court Reporters & Legal Video**

Date:   5-2-14

To:      Reed Yurchak
         Law Office of Reed Yurchak
         40 Lake Bellevue Drive #100
         Bellevue, WA 98005

In Re:   Phillips v. Rudkin

Deposition(s) of:  Elizabeth Rudkin  3-19-14

_____Enclosed is your transcript for review.  Make changes on the correction sheet, sign the correction sheet and signature page and return both pages to Moburg Seaton & Watkins within thirty days.

_____An E-Transcript has been transmitted to you and we are enclosing Exhibits Nos. _____.

_XX_ Enclosed is the original transcript(s) of the above-named deponent(s) for your retention until time of trial.

_____Deponent(s) waived the right to read and sign.

_____Signature page/correction sheet has not been received.

_XX__Signature page/correction sheet is enclosed.

Sincerely,
Moburg, Seaton & Watkins

By:     Kellie Smith

Cc:     Rylan Weythman

March 19, 2014

PHILLIPS vs. RUDKIN                                                        Elizabeth Rudkin

Page 224

```
 1    MOBURG, SEATON & WATKINS
      COURT REPORTERS
 2    2033 SIXTH AVENUE
      SUITE 826
 3    SEATTLE, WA 98121
      (206) 622-3110
 4
      _____
 5
      PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6    SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS SHEET
      AND SIGN THE ACCOMPANYING SIGNATURE PAGE (DECLARATION).
 7    _____

 8    PAGE         LINE       CORRECTION AND REASON

 9    37           9          Replace "with" with "without" due to

10                            obvious mistatement.

11    112          10         Remove "to" as error.

12    117          14-15      Replace "documents on that" with

13                            "document's authentic" as error.

14

15

16

17

18

19

20

21

22                 /s/Elizabeth A. Rudkin, 4-25-2014
                     ELIZABETH RUDKIN
23                   Date taken:  March 19, 2014

24

25    REPORTER:       KELLIE A. SMITH, RPR, CRR
```

Moburg, Seaton & Watkins                                         2033 Sixth Ave., Suite 826
206-622-3110                                                            Seattle, WA 98121

1                    D E C L A R A T I O N

2

3

4

5                         I declare under penalty of perjury that

6    I have read my within deposition, and the same is true

7    and accurate, save and except for the changes and/or

8    corrections, if any, as indicated by me on the

9    Correction Sheet.

10

11        Dated this 25th day of April, 2014,

12

13   at Bonney Lake, Washington.

14

15

16

17                         /s/Elizabeth A. Rudkin

18                         ELIZABETH RUDKIN

19

20

21

22

23

24   KELLIE A. SMITH, CCR, RPR, CRR

25   Court Reporter