EXHIBIT "F"

Moburg, Seaton & Watkins
2033 Sixth Avenue, Suite 826
Seattle, WA  98121
(206) 622-3110
www.moburgreporting.com

Court Reporters & Legal Video

```
           ISSUED BY THE SUPERIOR COURT OF WASHINGTON
              COUNTY OF KING, STATE OF WASHINGTON
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
MARK E. PHILLIPS,               )
                                )
            Plaintiff,          )
                                )
vs.                             ) No. 13-2-07233-5 SEA
                                )
CHAD HAROLD RUDKIN AND          )
ELIZABETH RUDKIN, STEPHEN       )
JAMES SCHWEICKERT, AND JANE     )
DOES 1 THROUGH 4,               )
                                )
            Defendants.         )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
MARK E. PHILLIPS,               )
                                )
            Plaintiff,          )
                                )
vs.                             ) No. 13-2-07233-5 SEA
                                )
STEPHEN JAMES SCHWEICKERT,      )
HUNTS POINT VENTURES, INC.,     )
and HUNTS POINT VENTURE         )
GROUP, LLC,                     )
                                )
            Defendants.         )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )
In the Receivership of:         )
                                )
HUNTS POINT VENTURES, INC., a ) No. 13-2-40014-6 SEA
Washington Corporation          )
                                )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

            Deposition Upon Oral Examination

                          of

                     CHAD RUDKIN

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

                     9:03 a.m.
                   March 17, 2014
              2033 Sixth Avenue, Suite 826
                  Seattle, Washington

Kristin L. Mattsen, CCR
```

COPY



Page 2

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFF:
                 REED YURCHAK
 3               Attorney at Law
                 LAW OFFICE OF REED YURCHAK
 4               40 Lake Bellevue Drive
                 Suite 100
 5               Bellevue, Washington 98005
                 yurchaklaw@gmail.com
 6
     FOR CHAD AND ELIZABETH RUDKIN:
 7               RYLAN S. WEYTHMAN
                 Attorney at Law
 8               JOEL B. ARD
                 Attorney at Law
 9               FOSTER PEPPER PLLC
                 1111 Third Avenue
10               Suite 3400
                 Seattle, Washington 98101-3299
11               weytr@foster.com
                 ardjb@foster.com
12


13
     THE COURT REPORTER:
14               KRISTIN L. MATTSEN, CCR
                 MOBURG, SEATON & WATKINS
15               2033 Sixth Avenue
                 Suite 826
16               Seattle, Washington 98121
                 info@MoburgReporting.com
17

18

19

20

21

22

23

24

25
```



Page 3

1                      I N D E X

2

3   EXAMINATION                                          PAGE

4   BY MR. YURCHAK:  ................................    7

5

6

    TRANSCRIPT PORTION MARKED                            PAGE
7
                        (None)
8

9

10

11                   EXHIBIT INDEX

12  EXHIBIT MARKED                                       PAGE

13       1   Printout of online renewal of Articles     43
             of Incorporation of Hunts Point Ventures,
14           Inc., completed May 23, 2013, 10:21 a.m.,
             8 pages
15
         2   3/29/2010 1:23 a.m. email from Steve        48
16           Schweickert to Mark Phillips, Doug Lower,
             Chad Rudkin, and Kenn Gordon, 2 pages
17
         3   Limited Liability Company Agreement of      58
18           Hunts Point Intellectual Properties, LLC,
             8 pages
19
         4   Joint Consent in Lieu of Special Meeting    59
20           of Board of Directors and Shareholders,
             6 pages
21
         5   Intellectual Property Contribution          61
22           Agreement, 4 pages

23       6   Stock Subscription Agreement, 6 pages       63

24       7   5/20/2010 2:50 p.m. email from Steve        66
             Schweickert to Mary Orvis, CC to Chad
25           Rudkin, 2 pages



Page 4

1                    EXHIBIT INDEX continued

2     EXHIBIT MARKED                                          PAGE

3          8    Technology License Agreement, 8 pages          70

4          9    3/23/2013 9:43 a.m. email from Douglas         72
                Lower to Mark Phillips (and attachments),
5               4 pages

6         10    Stock Subscription Agreement, 4 pages          78

7         11    "Hunts Point Ventures Nuclear Unit,"           88
                16 pages
8
          12    Durable Power of Attorney for Asset            92
9               Management, 4 pages

10        13    Written Notice of Trustee Selection to         97
                Registered Holders of Voting Trust
11              Certificate Shareholder and Company,
                signed by Mark E. Phillips, shareholder;
12              Mark E. Phillips, trustee; Steve
                Schweickert, witness and replacement
13              trustee; Chad Rudkin, witness and
                replacement trustee; Cheryl Gradwohl,
14              witness and replacement trustee, 1 page

15        14    Written Notice of Trustee Selection to         99
                Registered Holders of Voting Trust
16              Certificate Shareholder and Company,
                signed by Mark E. Phillips, shareholder,
17              and Chad Rudkin, trustee, 1 page

18        15    6/24/2010 5:19 p.m. email from Chad           105
                Rudkin to Mary Orvis (and attachment),
19              1 page

20        16    7/22/2010 10:37 a.m. email from Mary          107
                Orvis to Chad Rudkin (and attachment),
21              1 page

22        17    9/10/2010 7:17 a.m. email from Mary           109
                Orvis to Chad Rudkin (and attachments),
23              1 page

24

25



```
                                                        Page 5
 1                   EXHIBIT INDEX continued

 2    EXHIBIT MARKED                                      PAGE

 3         18   4/14/2010 9:20 a.m. email from Mark       112
                Edward Phillips to Josette Jenkins and
 4              Chad Rudkin, Subject:  A DOT warrants,
                1 page
 5
           19   11/25/2010 handwritten letter to Mark    115
 6              from Dad, 3 pages

 7         20   9/16/2010 handwritten letter to          131
                Mark-(Son) from Dad, 2 pages
 8
           21   9/28/2010 11:34 a.m. email from Chad     135
 9              Rudkin to Mary Orvis (and attachments),
                6 pages
10
           22   Joint Consent in Lieu of Annual Meeting  140
11              of Shareholders and Directors, 8 pages

12         23   11/8/2010 typewritten letter to Mark     157
                from Chad, 2 pages
13
           24   5/31/2012 typewritten letter to Mark     160
14              from Chad, 1 page

15         25   Mann Law Group Contingent Fee            163
                Agreement, 6 pages
16
           26   Handwritten notes, 1 page                165
17
           27   Transcript of Recorded Inmate Call       169
18              Between Mark Phillips and Chad Rudkin,
                17 pages
19
           28   Petition for the Appointment of a        185
20              Receiver Pursuant to RCW 7.08.030(3)
                and RCW 7.60.025(1)(j), 11 pages
21
           29   6/14/2010 7:49 p.m. email from Mark      191
22              Phillips to Chad Rudkin, CC to Steve
                Schweickert and Megan Campbell, 1 page
23
           30   5/28/2010 12:22 p.m. email from Steve    193
24              Schweickert to Doug Lower, Chad Rudkin,
                and Kenn Gordon, 1 page
25
```



Page 6

1                       EXHIBIT INDEX continued

2    EXHIBIT MARKED                                            PAGE

3         31   10/1/2010 11:09 a.m. email from Peter K.        195
               Mair to John Du Wors, CC to Charlotte
4              Williams, Subject:  FW: Extension of
               plea offer deadline (and attachments),
5              4 pages

6         32   6/11/2010 3:10 p.m. email from Steve            196
               Schweickert to John Du Wors, CC to Chad
7              Rudkin and Mark Phillips, 1 page

8         33   Consent in Lieu of Organizational Meeting       198
               of Board of Directors, 6 pages
9
          34   Two typewritten "Mark E. Phillips              200
10             Liquidation of various Accts 6-7-10"
               with handwritten notes, 2 pages
11
          35   6/7/2010 5:18 p.m. email from Mark             200
12             Phillips to Steve Schweickert and Chad
               Rudkin, 1 page
13
          36   Promissory Note and Agreement Between          231
14             Hunts Point Ventures, Inc. and Sandy L.
               Hoover, 1 page
15

16

17

18

19

20

21

22

23

24

25



```
 1   CHAD RUDKIN,          witness herein, having been duly

 2                         sworn by the Certified Court

 3                         Reporter, testified under oath as

 4                         follows:

 5                              EXAMINATION

 6   BY MR. YURCHAK:

 7        Q.   Thank you for coming.  My name is Reed

 8   Yurchak.  I'm here to take your deposition today, and

 9   you understand that; correct?

10        A.   Yes.

11        Q.   And I thought, before we -- before I begin to

12   formally ask you questions, I'd go over some of the

13   ground rules.

14             Have you ever been deposed before?

15        A.   No.

16        Q.   Okay.  In terms of the process, I'll be

17   asking you questions.  My questions and your answers

18   will be recorded by this court reporter; therefore, it's

19   important that we both speak not over the top of each

20   other.  When we -- when I am giving questions and you

21   are responding, it's important to speak clearly, and

22   it's important to give verbal responses instead of

23   nonverbal shakes of the head or maybe an "uh-huh."

24             Do you understand that?

25        A.   Yes.
```



1          Q.    And you just took an oath with the reporter

2     to tell the truth.  Do you understand that's the same

3     oath that you would take were you -- were you in a court

4     of law?

5          A.    Yes.

6          Q.    If for any reason you have trouble

7     understanding a question that I've asked you, please let

8     me know so that I can reask and state it more clearly.

9     Okay?

10              If at any time you feel you need a break,

11     breaks are okay.  I would only ask that you not take a

12     break in the middle of a line of questioning.

13              During the deposition, you are permitted to

14     talk and confer with your attorneys only regarding

15     matters of privilege, privileged communications, whether

16     an answer that you may have is something that was a

17     privileged communication.  Otherwise, under the rules,

18     you're not allowed to confer or seek advice on how to

19     answer a question that I've asked of you.

20              Is that clear?

21          A.    Yes.

22          Q.    And last, because it's critical that we get

23     your full, complete answers, I want to ask if you're

24     taking any medications that may impair your ability to

25     understand my questions or impair your ability to answer

```
 1    my questions.  Are you on any such medication?

 2         A.    No.

 3         Q.    Are you under the care of any doctor at the

 4    moment, receiving treatment for something that would

 5    impair your ability to answer my questions?

 6         A.    No.

 7         Q.    And have you taken any substances which may

 8    affect your ability to respond and understand my

 9    questions?

10         A.    No.

11         Q.    With that, I'll begin.

12               Could you please state your full name for the

13    record.

14         A.    Chad Harold Rudkin.

15         Q.    And where do you currently reside?

16         A.    Bonney Lake, Washington.

17         Q.    And do you have any plans to move within the

18    next year?

19         A.    No.

20         Q.    Before you came to testify today at this

21    deposition, did you speak to any -- did you speak to

22    your attorneys in preparation?

23         A.    Yes.

24         Q.    Can you identify which attorneys that you

25    spoke with.
```



1        A.    Rylan and Joel.

2        Q.    Could you please state your educational

3   background.

4        A.    Washington State University, Bachelor of

5   Arts.

6        Q.    And when did you go there?

7        A.    1993 to 1997.

8        Q.    And you said you got a degree, a Bachelor of

9   Arts?

10       A.    English.

11       Q.    And did you receive any other formal

12   education after that?

13       A.    Can you clarify that.

14       Q.    Did you receive any education from -- from --

15   a degree from an institution providing any sort of

16   degree?

17       A.    No.

18       Q.    Did you receive any instruction or education

19   from any institution that provided some sort of

20   certificate?

21       A.    The military.

22       Q.    And could you explain what that is.

23             MR. WEYTHMAN:  Objection.  Vague.

24       Q.    (BY MR. YURCHAK)  What was the education that

25   you received from the military?



1        A.    Leadership; tactics, techniques, and

2    procedures; special operations; aerial delivery of

3    personnel and equipment.

4        Q.    And when were you -- so can I -- is it safe

5    to assume that you were in the military?

6        A.    Yes.

7        Q.    And at what times were you in the military?

8        A.    1998 -- actually -- yeah, '98 until 2003.

9        Q.    And --

10        A.    '97 till 2003.

11        Q.    And what capacity were you serving in the

12    military?

13        A.    Can you clarify that.

14        Q.    What position?  What were you doing there?

15        A.    I was an officer.

16        Q.    Okay.  Did your position ever change while

17    you were in the military, or were you always an officer?

18        A.    I was always an officer.

19        Q.    Did your rank ever change?

20        A.    Yes.

21        Q.    In what way?

22        A.    Promotion.

23        Q.    From what to what?

24        A.    Second lieutenant is where you start.  Then

25    you get promoted to first lieutenant and then to



1   captain.

2         Q.   Is that what happened to you?

3         A.   Yes.

4         Q.   And at what point did you become a captain?

5         A.   I don't recall exactly.  It was about 3 1/2

6   to 4 years in.

7         Q.   Okay.  And what were the circumstances with

8   you leaving the military?

9         A.   I decided I wanted to do other things with my

10  life.

11        Q.   So how did you get out?

12        A.   I dropped the paperwork and was discharged

13  from the military.

14        Q.   Is my understanding correct that it would be

15  dishonorably discharged?  Is that how they term it?

16        A.   No.

17        Q.   Okay.  Could you --

18        A.   It was an honorable discharge.

19        Q.   Oh, I'm sorry.  Honorable discharge.  Sorry.

20  I'm not familiar with -- very familiar with the

21  military.

22             And what did you do -- did you hold any other

23  positions, while you were in the military, in the

24  private sector?

25        A.   Can you clarify that for me.

1          Q.   Did you hold any other employment positions

2     in the private sector while you were in the military?

3          A.   Not while I was active duty, no.

4          Q.   Were you active duty the whole time you were

5     in the military through 2003?

6          A.   No.  Well, through 2003, I was active duty.

7     That's correct.

8          Q.   Okay.  And so what did you do upon leaving

9     the military for employment?

10         A.   Went to work for Johnson & Johnson.

11         Q.   And what did you do there?

12         A.   Sold pharmaceuticals.

13         Q.   And is that the same work position that

14    you're in today?

15         A.   Yes.  The role's changed.

16         Q.   And how has the roles changed?

17         A.   I work in institutions.

18         Q.   Could you clarify what you mean by that --

19         A.   Hospitals --

20         Q.   -- working in institutions.

21         A.   Large accounts, hospitals.

22         Q.   And how is that different than -- from what

23    it was when you began?

24         A.   When I began, it was calling on office-based

25    physicians.

Page 14

```
 1          Q.   Okay.  Now, prior to your involvement with
 2    Hunts Point Ventures --
 3                    MR. WEYTHMAN:  Objection.  Lack of
 4    foundation.  Calls for evidence not in the record.
 5          Q.   (BY MR. YURCHAK)  Prior to your involvement
 6    in Hunts Point Ventures, have you ever been a corporate
 7    officer of any corporation?
 8          A.   No.
 9          Q.   Have you ever received any specialized
10    training or had any education in corporate governance?
11          A.   No.
12          Q.   Did you have any training or experience in
13    corporate finance prior to your involvement in Hunts
14    Point Ventures?
15          A.   No.
16          Q.   Prior to your involvement in Hunts Point
17    Ventures, have you ever owned shares in any private
18    company?
19          A.   No.
20          Q.   Prior to Hunts Point -- your involvement in
21    Hunts Point Ventures, have you ever been involved in a
22    sale of shares in any company?
23          A.   Can you clarify that.
24          Q.   Have you ever been involved in the sale of
25    shares as a shareholder in any private company?
```

1          MR. WEYTHMAN:  Objection.  Vague.

2          Can you describe what you mean by "involved."

3      Q.   (BY MR. YURCHAK)  Have you ever sold any

4  shares or acquired any shares in a private company prior

5  to your involvement in Hunts Point Venture?

6          MR. WEYTHMAN:  Objection.  Asked and

7  answered.  He's already testified -- he's already

8  testified that he's only been the shareholder of one.

9      Q.   (BY MR. YURCHAK)  Can you answer the

10  question, please.

11      A.   No.

12      Q.   Do you have any educational background in

13  information technology?

14      A.   No.

15      Q.   Do you have any background or experience or

16  expertise in computer programming?

17      A.   No.

18      Q.   Do you have any work experience in either

19  information technology or computer programming?

20      A.   No.

21      Q.   Now, you are currently the president and CEO

22  of Hunts Point Ventures; is that correct?

23      A.   Yes.

24      Q.   And there was a pause before you responded.

25  Is there a reason why you needed time to answer that



1    question?

2         A.    The company's in receivership.

3         Q.    And as a result of it being in receivership,

4    how did that --

5         A.    My understanding is it takes it out of my

6    control.

7         Q.    But as far as you're aware, you are still its

8    president and CEO; is that correct?

9         A.    Yes.

10        Q.    What is -- and what -- what is the primary

11   assets of Hunts Point Ventures?

12        A.    Intellectual property.

13        Q.    And what's your understanding of what that

14   intellectual property is?

15        A.    It is in the IT realm.

16        Q.    It's in the IT realm.  What is your

17   understanding of what that intellectual property does?

18        A.    Management of digital media.

19        Q.    And in what ways does it manage digital

20   media?

21                  MR. WEYTHMAN:  Objection.  Calls for a

22   lay opinion.

23              You can go ahead and answer.

24                  THE WITNESS:  It manages the way

25   information is transferred.  It manages how -- the

1   user interface on selecting music and media.

2        Q.   (BY MR. YURCHAK)  And what does that

3   intellectual property consist of?

4        A.   Patents.

5        Q.   How many patents?

6        A.   Several.

7        Q.   Do you have an approximate idea of how many

8   patents?

9             MR. WEYTHMAN:  Objection.  Calls for

10  speculation.

11       Q.   (BY MR. YURCHAK)  How would you define

12  "several"?

13       A.   More than four, less than seven.

14       Q.   What's your current understanding of the

15  status of those patents?

16       A.   They're in a receivership.

17       Q.   Are the patents in good standing?

18       A.   Yes.

19       Q.   Is that -- are there any patents that are not

20  in good standing?

21       A.   It is my understanding there is one that

22  there is issue with.

23       Q.   And which patent is that?

24       A.   I don't recall exactly.

25       Q.   And what is the issue?

```
 1        A.   I don't recall.

 2        Q.   Now, did you rely upon anyone else in the --

 3   in your management of Hunts Point Ventures?

 4        A.   Yes.

 5        Q.   And who did you rely upon?

 6        A.   Attorneys.

 7        Q.   Which attorneys?

 8        A.   Several attorneys.

 9        Q.   I didn't ask how many.  I asked which

10   attorneys.

11        A.   John Du Wors, Derek Linke, John Whitaker.

12        Q.   Was there any one of those attorneys in

13   particular that you relied more upon than others?

14        A.   Can you clarify.

15        Q.   Is there any one attorney of those three that

16   you mentioned -- well, first of all, let me strike that

17   and back up.

18             Are there any other attorneys other than

19   these three that you mentioned -- John Du Wors, Derek

20   Linke, John Whitaker -- that you relied upon but did not

21   mention?

22        A.   Not that I recall.

23        Q.   And where do these attorneys work?  Are they

24   associated with a certain firm?

25        A.   Yes.
```

Page 19

1       Q.    And which firm is that?

2       A.    Newman & Du Wors.

3       Q.    And going back to my previous question, was

4    there any one of those three that you relied upon to a

5    greater extent than the others?

6       A.    Yes.

7       Q.    And which attorney was that?

8       A.    John Du Wors.

9       Q.    And what role did John Du Wors play in Hunts

10   Point Ventures?

11      A.    That's kind of vague.  Can you clarify that

12   for me.

13      Q.    I'm not sure I can.

14            What role did he play in Hunts Point

15   Ventures?

16      A.    Prosecution of the patents.

17      Q.    And did he play any other role?

18      A.    Advising on corporate matters.

19      Q.    Anything else that you can recall that he

20   did?

21      A.    Not that I recall.

22      Q.    And who did he represent?

23            MR. WEYTHMAN:  Can you clarify "who."

24      Q.    (BY MR. YURCHAK)  Who or what did he

25   represent?



Page 20

```
 1        A.    Hunts Point Ventures.
 2        Q.    Did you have an attorney-client relationship
 3   with John Du Wors?
 4        A.    No.
 5        Q.    At that point in time, did you seek
 6   Mr. Du Wors' advice for any personal matters that you
 7   may have had, unrelated to Hunts Point Ventures?
 8        A.    I don't recall.
 9        Q.    Is there anything that would help refresh
10   your recollection as to whether or not you ever sought
11   his advice with respect to personal matters?
12        A.    I didn't have an attorney-client relationship
13   with him.
14        Q.    And I believe you stated that he was the
15   attorney for Hunts Point Ventures; is that correct?
16        A.    That's correct.
17        Q.    During the time that you were president and
18   CEO of Hunts Point Ventures up to 2013, did you have an
19   attorney to represent you as president and CEO of Hunts
20   Point Ventures?
21        A.    Can you clarify that for me.
22        Q.    Between -- up until 2013 --
23        A.    Uh-huh.
24        Q.    -- did you have an attorney-client
25   relationship with an attorney for your role as president
```

1    and CEO of Hunts Point Ventures?

2         A.   No.

3         Q.   In your role as president and CEO of Hunts

4    Point Ventures, would you ever have occasion to seek

5    advice about what actions to take?

6         A.   Yes.

7         Q.   From whom did you seek advice?

8         A.   The corporate attorney, John Du Wors.

9         Q.   Did you ever recall signing any sort of

10   conflict waiver with Mr. Du Wors in seeking that advice?

11        A.   I don't recall.

12        Q.   When you were seeking advice from

13   Mr. Du Wors, was that of a legal nature?

14        A.   I don't recall.

15        Q.   And I believe your answer to my question was

16   that you did seek advice from John Du Wors in your role

17   as president and CEO of Hunts Point Ventures; is that

18   correct?

19        A.   No, that is not correct.

20        Q.   Oh, what was your answer?

21        A.   My answer was in dealing with the

22   corporation, what the corporation should do.  That's

23   what I said, talked to him about consulting with

24   counsel.

25        Q.   So you never sought advice from John Du Wors



1    in terms of how -- in terms of seeking legal advice for

2    your role as president and CEO?

3         A.   I don't recall.

4         Q.   Is it possible that you did?

5         A.   I don't recall.

6              MR. WEYTHMAN:  Objection.  Calls for

7    speculation.

8         Q.   (BY MR. YURCHAK)  Is it possible that you

9    did, even though you don't recall?

10        A.   In the operations of the business, he was the

11   corporate counsel.

12        Q.   I understand that, and what I'm asking is if

13   you ever sought guidance from him legally as far as your

14   role as CEO and president.

15             MR. WEYTHMAN:  Objection.  Vague.

16             THE WITNESS:  I don't recall.

17        Q.   (BY MR. YURCHAK)  Going back to two

18   thousand -- early 2010, at what point do you recall

19   conversations regarding the setting up of a corporation

20   in relation to Mark Phillips?

21             MR. WEYTHMAN:  Objection.  Assumes

22   evidence not in the record.  Also, vague.

23             THE WITNESS:  Can you restate that -- I

24   mean, break it down a little bit.

25        Q.   (BY MR. YURCHAK)  Going back to early 2010,



1   at what point in time can you recall conversations

2   starting about setting up a corporation in relation to

3   Mark Phillips?

4         A.   Conversations with whom?

5         Q.   Could be with anybody.

6         A.   I don't recall specifics on conversations

7   that I had four years ago.

8         Q.   Did you have any conversations with Mark

9   Phillips about setting up a corporation?

10        A.   Yes.

11        Q.   What was the -- what were those conversations

12  about?

13        A.   I don't recall.

14        Q.   Did you ever have a conversation about

15  setting up a specific corporation, called Hunts Point

16  Ventures?

17        A.   Yes.

18        Q.   Did you have a conversation with Mark

19  Phillips about that?

20        A.   I'm sure there were many conversations about

21  that.

22        Q.   Did you have a conversation with any other

23  persons about that?

24        A.   I don't recall, but I'm sure there was --

25               THE COURT REPORTER:  I can't hear you.



```
 1                    THE WITNESS:  I don't recall

 2   specifically.  I'm sure there were other conversations

 3   that happened.

 4        Q.   (BY MR. YURCHAK)  Do you recall with what --

 5   which other people you may have had other conversations

 6   about that?

 7        A.   Can you clarify that for me, as far as --

 8        Q.   I'm asking who you remember having

 9   conversations with about forming Hunts Point Ventures.

10        A.   Okay.  Steve Schweickert, Doug Lower, Kenn

11   Gordon.

12        Q.   Are there any other people?

13        A.   Mark Phillips, I'm sure.

14        Q.   And what was your understanding of what the

15   Hunts Point Ventures corporation was supposed to be

16   about?

17        A.   Supposed to be a corporation that pursued

18   intellectual property.

19        Q.   Pursued -- pursued intellectual property?

20   What do you mean by that?

21        A.   License intellectual property.

22        Q.   And who was it to be licensing from?

23        A.   Hunts Point Ventures.

24        Q.   Hunts Point --

25        A.   Hunts Point Ventures to infringing companies.
```



1       Q.   You said Hunts Point Ventures was set up to

2  be -- to license intellectual property; is that correct?

3       A.   Pursue and license -- pursue licenses for

4  intellectual property, yes.

5       Q.   So Hunts Point Ventures -- can you describe

6  what that means, to pursue licensing of the intellectual

7  property.

8       A.   To contact companies to potentially utilize

9  the technology held by the patents in order to get them

10  to pay a license fee.

11       Q.   Okay.  And what was -- you mentioned four

12  people with whom you had conversations regarding this

13  corporation -- right? -- Stephen, Doug, Kenn, and Mark?

14       A.   (No audible response.)

15       Q.   What was your understanding of the roles

16  those individuals were to play in Hunts Point Ventures?

17       A.   I don't recall.

18       Q.   What was your understanding of the role

19  Stephen Schweickert was to play?

20       A.   Steve was the initial -- I don't know how to

21  say it -- forming person of the company.

22       Q.   Okay.  And what role was Doug supposed to

23  play?

24       A.   I don't recall.

25       Q.   And what role was Kenn supposed to play?

1         A.    Kenn was not ever really part of anything.

2         Q.    You recall having conversations with him

3    about Hunts Point Ventures?

4         A.    Uh-huh.

5         Q.    How was he not a part of anything?

6         A.    He did not trust that Mark Phillips could be

7    a viable person to work with.

8         Q.    Do you recall specifically what he said

9    regarding why Mark Phillips would not be a viable person

10   to work with?

11        A.    I don't recall exactly, no.

12        Q.    Do you have any communications from him

13   regarding that statement?

14        A.    No.

15        Q.    And what were your conversations with Mark

16   Phillips about his role in Hunts Point Ventures?

17        A.    I don't recall.

18        Q.    You have no recollection --

19              MR. WEYTHMAN:  Objection.  Asked and

20   answered.

21        Q.    (BY MR. YURCHAK)  -- of any conversation that

22   you had with Mark Phillips about any role in Hunts Point

23   Ventures?

24        A.    I don't recall.

25        Q.    Is it possible that you had any conversation



Page 27

```
 1   with Joyce Schweickert in her role with Hunts Point

 2   Ventures?

 3        A.   I don't recall that either.

 4        Q.   And do you recall any conversations with

 5   James Schweickert about Hunts Point Ventures?

 6        A.   No.

 7        Q.   And do you know who James Schweickert is?

 8        A.   Yes.

 9        Q.   Who is James Schweickert?

10        A.   He's the son of Steve Schweickert.

11        Q.   And going back to Steve, how long have you

12   known Steve?

13        A.   Since the early '90s.

14        Q.   Do you recall how you met?

15        A.   Yes.

16        Q.   How did you meet?

17        A.   When his son went to school at Missouri

18   Military Academy.

19        Q.   Is that James?

20        A.   Yes.

21        Q.   He went to the military academy?

22             And how did you meet Doug Lower?

23        A.   At Missouri Military Academy.

24        Q.   And how did you meet Kenn Gordon?

25        A.   Through Mark Phillips.
```



1       Q.    Do you remember when?

2       A.    I don't recall.

3       Q.    Do you remember approximately when?

4       A.    I would say early 2010.

5       Q.    And how did you meet Mark Phillips?

6       A.    At Missouri Military Academy.

7       Q.    Now, when were you at the Missouri Military

8    Academy?

9       A.    1989 to 1992.

10      Q.    Was the -- was that academy a secondary

11   school prior to college, or was it college?

12              MR. WEYTHMAN:  Objection.  Compound.

13              THE WITNESS:  It was high school.

14      Q.    (BY MR. YURCHAK)  It was high school.  Okay.

15            And how many years were you there for?

16      A.    Three.

17      Q.    Do you recall how many years Mark was there

18   for?

19      A.    I don't recall.  He was a year behind me.  I

20   don't know if he was there for three or four years.  I

21   don't recall.

22      Q.    And how would you characterize the nature of

23   your relationship with Mark at the time you were at the

24   academy?

25            A.    Friendly.



1          Q.   Could you elaborate.  Were you good friends?

2     Were you casual friends?

3                    MR. WEYTHMAN:  Objection.  Compound.

4                    THE WITNESS:  More casual friends.

5          Q.   (BY MR. YURCHAK)  Did that friendship always

6     remain the same way?

7                    MR. WEYTHMAN:  Objection.  Vague.

8          Q.   (BY MR. YURCHAK)  Did it always remain

9     casual?

10         A.   Yes.

11         Q.   After the military academy, did you and Mark

12    stay in touch?

13         A.   No.

14         Q.   At what point in time did you reconnect?

15         A.   I don't recall exactly.  I believe I ran into

16    him once when I was at school at Washington State

17    University during the summertime.  Then I remember I ran

18    into him -- I don't recall the year, but it was here in

19    Seattle at a restaurant.

20         Q.   Okay.  And what did you understand your role

21    was to be in the -- in the entity Hunts Point Ventures

22    at -- during the time these conversations were happening

23    that I was asking about?

24                   MR. WEYTHMAN:  Objection.  Vague.

25                   THE WITNESS:  I don't think any roles



1    were clearly defined as the intent, purpose of Hunts

2    Point Ventures was very mercurial and kept changing.

3         Q.   (BY MR. YURCHAK)  I'm sorry.  You said the

4    roles were not clearly defined?

5         A.   Yes.

6         Q.   And in what way did the roles continue to

7    change?  Well, let me strike that.

8              What did you initially understand your role

9    to be?  What was the first understanding you had of your

10   role?

11                   MR. WEYTHMAN:  Objection.  Compound.

12        Q.   (BY MR. YURCHAK)  What was the first

13   understanding of what your role was to be at Hunts Point

14   Ventures?

15        A.   To work with other individuals to get the

16   business up and running.

17        Q.   In what way were you to work?

18        A.   That changed a lot.

19        Q.   In what way did you understand how you were

20   to work initially?

21        A.   To keep Mark out of trouble.

22        Q.   What does that mean?

23        A.   Mark was being sued by several different

24   people, I think his corporation, MOD Systems.  And

25   trying to help organize and help him at the time.



1      Q.   And how were you to help him?  What kind of

2  assistance?

3      A.   Initially, I helped him by having him

4  released into my custody after he was arrested by the

5  FBI.

6      Q.   Now, was this a role that you understood to

7  be related to Hunts Point Ventures?

8      A.   No.  I did it as a friend.

9      Q.   You were explaining -- you were answering my

10  question about what your role initially was in Hunts

11  Point Ventures, and your answer was that you were

12  helping Mark to stay out of trouble; is that correct?

13      A.   That -- initially, as the corporation was

14  being formed, as the group was being formed -- it wasn't

15  even a corporation -- Mark was arrested by the federal

16  government, and I volunteered to have him come be

17  released into my custody so he didn't have to stay in

18  the Federal Detention Center.

19      Q.   When do you recall that -- when do you recall

20  him being arrested?

21      A.   I believe it was at the end of March of 2010.

22      Q.   At what point did he -- was he released to --

23  is it okay to say your custody?

24              MR. WEYTHMAN:  Objection.  Vague.

25  Compound.



```
 1                    THE WITNESS:  I don't recall exactly,
 2   but I believe it was April.
 3         Q.   (BY MR. YURCHAK)  Okay.  Is that a fair way
 4   to describe how he was released to you, as being in your
 5   custody?
 6         A.   You would have to look at the documents --
 7   the release documents for his bond, but I believe that's
 8   what it was -- is -- is -- if I recall, the judge did
 9   not want him just released out.  He wanted him in
10   someone's custody.
11         Q.   Okay.  So from what -- when you say the judge
12   did not want Mark released out, what does that mean?
13         A.   Out to his own devices.
14         Q.   Do you recall receiving any instruction from
15   any -- from the Court or a probation officer as far as
16   what you understood your role to be when Mark was to be
17   in your custody?
18         A.   I don't recall.  They were -- there was
19   documents that they -- that they gave, but I don't
20   recall.  It involved getting him to his drug tests and
21   court appointments.
22         Q.   These are documents they gave to you?
23         A.   Yes.
24         Q.   Okay.  So you understood you had certain
25   responsibilities?
```



1              MR. WEYTHMAN:  Objection.

2  Mischaracterizes the witness's testimony.

3        Q.   (BY MR. YURCHAK)  Did you have -- did you

4  understand that you had certain responsibilities from

5  the Court over Mark Phillips?

6        A.   To provide him a place -- safe place to live.

7        Q.   Did you have any other responsibilities that

8  you were aware of in terms of making sure Mark followed

9  any court orders?

10       A.   No.

11       Q.   What was your understanding about how long

12  this custodial care, if you will, was to last?

13       A.   I don't recall.

14       Q.   Did you have an -- was there any sense that

15  it was to last indefinitely?

16       A.   No.

17       Q.   At what point did you understand that it

18  should terminate?

19              MR. WEYTHMAN:  Objection.  Asked and

20  answered.

21              THE WITNESS:  My understanding was that

22  the charges against Mark wouldn't stick and that he

23  would be done with those in a very short order, which

24  did not happen to be the case.

25       Q.   (BY MR. YURCHAK)  And how long did Mark end



Page 34

1    up staying with you?

2         A.   I believe he stayed until sometime in August

3    2010.

4         Q.   Sorry to ask again, but I believe you said he

5    came in April; is that right?

6         A.   Yes.

7         Q.   And left in August?

8         A.   Oh, he left -- that was the second time he

9    left.  He left once before.

10        Q.   Okay.  When was that?

11        A.   I believe it was in June.  He was rearrested

12   for violating his bond.

13        Q.   So the first stint with you was from April to

14   June; is that correct?

15        A.   I believe so.  I'm not sure on the specific

16   dates but that --

17        Q.   In the summertime, you mean?

18        A.   Yes.  It was in that time frame.

19        Q.   But at some point in time, he was rearrested;

20   is that right?

21        A.   Yes.  The FBI showed up at my door at

22   6:00 o'clock in the morning and raided my home.

23        Q.   And what do you mean by that?

24        A.   At 6:00 o'clock in the morning, they were

25   pounding on my door with approximately 15 to 20 vehicles



1    blockading my street with agents in full body armor and

2    weapons drawn.

3          Q.   What do you mean by "raiding" your home?

4          A.   They came into my home in front of my

5    children and my wife with their guns drawn, looking for

6    Mark Phillips.

7          Q.   And their purpose there was to do what?

8          A.   To arrest him.

9          Q.   Did they search your home?

10         A.   No.

11         Q.   And at some point, Mark came back to your

12   home?

13         A.   Yes.

14         Q.   And when was that?

15         A.   I don't recall.  A couple weeks afterwards.

16         Q.   And he stayed until August; is that right?

17         A.   I believe it was August time frame, yes.

18         Q.   Now --

19         A.   He was rearrested at that point.

20         Q.   Okay.  Do you -- the second time he came

21   back, after the FBI showed up at your door, was that

22   again a voluntary placement with you that you accepted?

23         A.   Yes.

24         Q.   And you've described that situation with Mark

25   staying at your house as being part of your first role

1    in Hunts Point Ventures.

2         A.    No.   That's incorrect.

3         Q.    Could you then state what your -- what you

4    understood your initial role to be in Hunts Point

5    Ventures.

6         A.    None of that was clearly defined.

7         Q.    Did you understand what your role was to be

8    in -- initially in Hunts Point Ventures?

9         A.    I already answered your question.

10         Q.    You said it wasn't clearly defined, and I'm

11   asking if you had any understanding at all of what it

12   was to be.

13         A.    I don't recall.

14         Q.    And you said that role changed a lot, did you

15   not?

16         A.    I didn't say that my role changed a lot.   I

17   said that the idea of the company changed a lot.

18         Q.    Okay.   What was the idea of the company

19   initially supposed to be?

20         A.    To go out and litigate patents.

21         Q.    What was the first change to litigating

22   patents?

23                    MR. WEYTHMAN:   Objection.   Vague.

24                    THE WITNESS:   Mark Phillips being

25   arrested by the FBI.

1      Q.   (BY MR. YURCHAK)  How did that change what

2  the function of what Hunts Point Ventures was supposed

3  to be?

4      A.   The resources were directed towards clearing

5  up that mess instead of litigating patents.

6      Q.   In what ways did Hunts Point Ventures act to

7  clear up that mess, as you put it?

8      A.   Can you clarify for me.

9      Q.   What things did Hunts Point Ventures do to

10  help clear up that mess, as you put it?

11      A.   Hired attorneys.

12      Q.   Which attorneys?

13      A.   Okay.  Yeah.  I shouldn't say that Hunts

14  Point Ventures hired attorneys.  Hunts Point Ventures

15  loaned Mark money to hire attorneys.

16      Q.   So which attorneys did Hunts Point Ventures

17  hire?

18      A.   Hunts Point Ventures didn't hire attorneys.

19  Hunts Point Ventures loaned money so Mark could hire

20  attorneys.

21      Q.   Who did Hunts Point Ventures loan money to?

22      A.   Mark Phillips.

23      Q.   Are there any contracts or documents to that

24  effect that are in the records of Hunts Point Ventures?

25      A.   There were checks written on behalf of Mark



1    Phillips.

2        Q.   Were there any loan documents signed by Hunts

3    Point Ventures and Mark, showing that a corporate loan

4    was being made on behalf of Mark Phillips?

5        A.   I don't recall.

6        Q.   And isn't it true that Mark Phillips was

7    arrested in March, as you said?

8        A.   I believe so.  I don't know the exact dates.

9        Q.   How is it that Hunts Point Ventures' role

10   changed towards clearing up that mess if it -- if the

11   charges were filed in March?

12               MR. WEYTHMAN:  Objection.  Vague.

13               THE WITNESS:  I don't understand.

14       Q.   (BY MR. YURCHAK)  Wouldn't Hunts Point

15   Ventures, in the initial stages of its development, have

16   already understood that criminal charges were filed

17   against Mark?

18       A.   No.

19       Q.   Why?  Why not?

20               MR. WEYTHMAN:  Do you understand the

21   question?

22               THE WITNESS:  I don't understand what

23   you're saying.

24       Q.   (BY MR. YURCHAK)  Your testimony was that the

25   concept of Hunts Point Ventures changed a lot.



1     A.   Yes.

2     Q.   And it changed because of the mess Mark got

3  into.  I'm simply asking, didn't Mark's mess start in

4  March of 2010, at the same time Hunts Point Ventures was

5  being formed?

6     A.   A new iteration of Mark's mess started in

7  March when Mark got arrested.  Prior to that, Mark had a

8  whole other set of messes going on in civil court.

9     Q.   What was the new iteration?

10     A.   His criminal proceedings.

11     Q.   When did the criminal proceedings begin?

12     A.   When he was arrested.

13     Q.   And was that in March?

14     A.   I already answered that, and I said that,

15  yes, I believe so.

16     Q.   So how does that change anything?  How does

17  Hunts Point Ventures change?

18     A.   I'm not sure I understand your question.

19     Q.   I'm trying to understand your testimony,

20  because you said -- you testified that Hunts Point

21  Ventures, as a company, changed drastically because of

22  the mess Mark got into.  I'm simply pointing out that --

23  didn't Mark's mess start in March 2010?

24     A.   The latest iteration of his mess started in

25  March of 2010.



1          Q.    So how did Hunts Point Ventures change from

2    that point on, from March?

3          A.    Resources that Hunts Point Ventures had were

4    redirected away from doing legitimate business it was

5    supposed to do, litigating patents, to loaning Mark

6    funds so he could fund his criminal defense.

7          Q.    Would Hunts Point Ventures have already known

8    that Mark Phillips was charged criminally in March of

9    2010?

10         A.    I don't -- I don't understand what you're

11   trying to get at here, what you're asking.

12         Q.    Would Hunts Point Ventures have known that

13   Mark was charged criminally in March of 2010?

14         A.    Mark didn't know he was going to be charged

15   criminally.

16         Q.    That doesn't answer my question.

17               Did Hunts Point Ventures --

18         A.    I don't know.  I don't know.

19         Q.    You testified that Mark was charged

20   criminally in March of 2010.

21         A.    Yes, he was.

22         Q.    Was Hunts Point Ventures not aware that it

23   had to -- that a defense was needed from March of 2010?

24               MR. WEYTHMAN:  Objection.  Vague.

25         Q.    (BY MR. YURCHAK)  Was Hunts Point Ventures



1   not aware that it would have to -- that it may have to

2   spend resources regarding Mark -- Mark's defense --

3       A.   No.

4       Q.   -- for -- because he was charged in March of

5   2010?

6       A.   No.

7       Q.   Why was it not aware?

8       A.   Why should it?

9       Q.   Why should it what?

10      A.   Why should it have to spend money?

11      Q.   That wasn't my question.  My question was was

12  it aware?  Was it aware that Mark had criminal issues in

13  March of 2010?

14      A.   After he was arrested.

15      Q.   Yes or no?

16      A.   I just answered your question.  Yes, after he

17  was arrested.

18      Q.   I didn't hear you say "yes."

19           Is your testimony still the same, that Hunts

20  Point Ventures changed in what it was about --

21      A.   It was --

22      Q.   -- from March of 2010 on?

23      A.   It was sidetracked, yes.  It was sidetracked.

24      Q.   Sidetracked in what way?

25      A.   It couldn't move forward and do anything.



1        Q.    What was the purpose for setting up Hunts

2    Point Ventures, as you understood it to be?

3                    MR. WEYTHMAN:  Asked and answered.

4        Q.    (BY MR. YURCHAK)  And I'll strike that

5    question.

6                What did you understand the purpose of Hunts

7    Point Ventures to be with respect to Mark Phillips?

8                    MR. WEYTHMAN:  Objection.  Vague.

9                    THE WITNESS:  At the time, Mark Phillips

10   owned intellectual property.

11       Q.    (BY MR. YURCHAK)  Is that your -- your

12   answer?  Did you have anything else to add?

13       A.    No.

14       Q.    So Mark Phillips owned intellectual property.

15   Do you have any other understanding with respect to the

16   relationship between Mark's intellectual property and

17   Hunts Point Ventures?

18       A.    Can you clarify that for me.

19       Q.    What did you understand -- did you have any

20   other understanding with respect to what the

21   relationship was between Mark's intellectual property

22   and Hunts Point Ventures?

23       A.    I don't recall.

24       Q.    Do you recall when Hunts Point Ventures was

25   set up?



1                    MR. WEYTHMAN:  Objection.  Vague.

2              What do you mean by "set up"?

3         Q.   (BY MR. YURCHAK)  Incorporated.  Do you

4    recall when it was incorporated with the State of

5    Washington?

6         A.   I don't recall specifically.

7         Q.   Would -- would you disagree if I said it was

8    incorporated on May 5th, 2010?

9                    MR. WEYTHMAN:  Objection.  Complex.

10   Confusing.

11                   THE WITNESS:  I couldn't agree or

12   disagree because I don't know.

13        Q.   (BY MR. YURCHAK)  Would it help to refresh

14   your recollection if you saw a document?

15             If you could mark that as Exhibit 1.

16                   (Exhibit No. 1 marked for

17                   identification.)

18        Q.   (BY MR. YURCHAK)  And I've handed one copy to

19   you and to your attorney.

20             Do you recognize this document?

21                   MR. WEYTHMAN:  Objection.  Compound.

22             There's still the question pending on the

23   record.

24                   THE WITNESS:  No, I don't recognize this

25   document.



1        Q.    (BY MR. YURCHAK)  I'll give you a minute to

2   look through the document.

3              Are you able to identify this document?

4        A.    I have never seen this document.

5        Q.    If I could --

6        A.    I should say I don't recall seeing this

7   document.

8        Q.    -- direct your attention to page 3.

9              Do you ever recall seeing this document?

10                  MR. WEYTHMAN:  Objection.

11             I don't see a page 3.

12                  MR. YURCHAK:  They're not numbered, but

13   you can count.

14                  THE WITNESS:  I don't recall seeing this

15   document, no.

16        Q.    (BY MR. YURCHAK)  This document is titled

17   "Articles of Incorporation of Hunts Point Ventures."

18             This is the corporation that you're the CEO

19   of; correct?

20        A.    Uh-huh.

21        Q.    And you've never seen this document before?

22        A.    I don't recall seeing this document, no.

23        Q.    You see that it's been filed with the

24   Secretary of State on May 3, 2010?

25        A.    Yes, I do see that.



1        Q.    Is this a document that you would have kept

2    in the ordinary course of business in running Hunts

3    Point Ventures?

4        A.    As you can see on here, I was not a director

5    of Hunts Point Ventures as of May 3rd, 2010.

6        Q.    Okay.  And --

7        A.    So I wouldn't have these documents, no.

8        Q.    Okay.  Do you have any of the documents prior

9    to your involvement in Hunts Point Ventures?

10       A.    I don't recall.

11       Q.    Have you reviewed the corporate documents for

12   Hunts Point Ventures during your time as CEO?

13       A.    I reviewed documents.  I don't recall exactly

14   which ones they were, no.

15       Q.    And when did your involvement in Hunts Point

16   Ventures -- when do you consider your involvement with

17   Hunts Point Ventures as beginning?

18             MR. WEYTHMAN:  Objection.  Vague.

19             What do you mean by "involvement"?

20       Q.    (BY MR. YURCHAK)  When do you consider your

21   involvement as an officer beginning in Hunts Point

22   Ventures?

23       A.    I believe that occurred in 2012.

24       Q.    Do you remember approximately when?

25       A.    It would have been in the first half of the



1    year.

2          Q.    Would you agree that this document shows that

3    Hunts Point Ventures incorporated on May 3, 2010?

4          A.    That's what the document says.

5          Q.    Do you have anything to dispute that Hunts

6    Point Ventures was not incorporated with Washington

7    State on that day?

8          A.    I don't have any dispute.  I just don't know

9    the veracity of where these documents came from.

10         Q.    Do you have any personal knowledge as to when

11   your corporation was incorporated?

12         A.    I'm sorry.  Can you restate the question.

13         Q.    Do you have any personal knowledge about when

14   your corporation, Hunts Point Ventures, was incorporated

15   with Washington State?

16         A.    Do I have any knowledge of it?

17         Q.    Any personal knowledge.

18         A.    No.  It was done by Steve Schweickert.

19         Q.    Now, you would agree that Hunts Point

20   Ventures was formed after the point in time when Mark

21   was charged criminally; is that correct?

22         A.    That's what the documents say.

23         Q.    Is it your recollection that Hunts Point

24   Ventures was aware of Mark's criminal charges at the

25   time it was formed?

1      A.   I don't know.

2      Q.   What was your understanding about what --

3  about who was to own intellectual property after Hunts

4  Point Ventures was formed?

5            MR. WEYTHMAN:  Objection.  Vague.

6            THE WITNESS:  Can you restate that.

7      Q.   (BY MR. YURCHAK)  What was your understanding

8  about who was to own the intellectual property after

9  Hunts Point Ventures was formed?

10     A.   The company.

11     Q.   And why do you have that understanding?

12     A.   That's what Steve Schweickert said was going

13  to happen.

14     Q.   And where -- what is the basis for your

15  knowledge when you say that is what Steve Schweickert

16  said that is what was to happen?

17     A.   I don't recall.

18     Q.   Could that have been in a conversation with

19  you?

20     A.   Possibly.

21     Q.   Could that have been in a conversation with

22  him, you, and Mark?

23     A.   Possibly.

24     Q.   Could that have been in an email?

25            MR. WEYTHMAN:  Objection.  Leading.



1                    THE WITNESS:  I don't recall.

2                    MR. YURCHAK:  Could you mark that as

3     Exhibit 2.

4                         (Exhibit No. 2 marked for

5                         identification.)

6          Q.   (BY MR. YURCHAK)  If I could direct your

7     attention to the header --

8          A.   Uh-huh.

9          Q.   -- who does it appear this email came from?

10         A.   Steve Schweickert.

11         Q.   And do you recognize that email address?

12         A.   Yes.

13         Q.   And who does it appear the email was sent to?

14         A.   Mark Phillips, Doug Lower, Chad Rudkin, and

15    Kenn Gordon.

16         Q.   With respect to your email address, is that

17    the email address that you are familiar with?

18         A.   Yes.

19         Q.   Do you have any recollection -- and I'll give

20    you time to review this email -- of this email?

21         A.   Do I have any recollection of this specific

22    email?

23         Q.   Correct.

24         A.   No.

25         Q.   If I could direct your attention to the third



1   paragraph, fourth line down, starting with "There":

2            "There has never been a question in my mind

3            that Mark's IP's are his and that cap value

4            of those are his."

5            Do you see that written there?

6   A.    Uh-huh.

7            THE COURT REPORTER:  "Yes"?

8            THE WITNESS:  Yes.

9   Q.    (BY MR. YURCHAK)  So where did your

10  understanding come from, again?  Well, let me strike

11  that.

12           What is your understanding of that sentence?

13           MR. WEYTHMAN:  Objection.  Calls for

14  speculation.

15           THE WITNESS:  Steve wrote this.  I

16  didn't.  This is -- this is Steve's opinion.  This is

17  his thoughts.  It looks like Steve's thoughts.

18  Q.    (BY MR. YURCHAK)  You said that Steve formed

19  Hunts Point Ventures; correct?

20  A.    That's correct.

21  Q.    And did you have any involvement in Hunts

22  Point Ventures at that time?

23  A.    Yes.

24  Q.    What was your involvement?

25  A.    I don't recall.  Meetings, conversations.



```
 1        Q.    Did you have any formal involvement?

 2        A.    No.

 3        Q.    Why --

 4        A.    I should ask you to clarify.  What do you

 5   mean "formal involvement"?

 6        Q.    As an employee, officer, subcontractor.

 7        A.    Not as an employee, not as an officer.

 8        Q.    Why were you -- if you had -- so let me make

 9   sure I'm straight on this.

10              Did you have no involvement with Hunts Point

11   Ventures around this time frame -- and my -- when it was

12   incorporated?

13                    MR. WEYTHMAN:  Objection.

14   Unintelligible.  I didn't understand what you said.

15        Q.    (BY MR. YURCHAK)  You had -- am I correct

16   that you did not have any involvement in Hunts Point

17   Ventures at the time that it was incorporated in May

18   2010?

19        A.    I was there for conversations.  I was there

20   for meetings.  However, it states clearly here that the

21   incorporating officers are Steve Schweickert and Joyce

22   Schweickert.

23        Q.    Okay.  So you were just there for meetings;

24   is that correct?

25                    MR. WEYTHMAN:  Objection.
```



1    Mischaracterizes the witness's testimony.

2         Q.    (BY MR. YURCHAK)  Did I mischaracterize your

3    testimony --

4         A.    Yes, you did.

5         Q.    -- that you were just there for meetings?

6         A.    I was involved in discussions and meetings on

7    how this was all going to get set up.

8         Q.    Okay.  Why were you not -- why are you not

9    reflected in the -- as having any sort of formal

10   involvement in Hunts Point Ventures when it was set up?

11                   MR. WEYTHMAN:  Objection.  Vague.

12              What do you mean by "reflected"?

13                   THE WITNESS:  Yeah.  Are you referring

14   to the Articles of Incorporation?

15        Q.    (BY MR. YURCHAK)  Were you a board member of

16   Hunts Point Ventures?

17        A.    No.

18        Q.    Were you a shareholder?

19        A.    No.

20        Q.    Were you an officer?

21        A.    No.

22        Q.    Did you have any formal recognition of having

23   any sort of involvement with Hunts Point Ventures?

24        A.    The only formal recognition of anybody who

25   had involvement in Hunts Point Ventures is right here,



1    Steve Schweickert and Joyce Schweickert.

2        Q.   Fair enough.  So why were you involved in

3    those conversations about setting up Hunts Point

4    Ventures?

5        A.   Because there was a plan to move forward that

6    there would be individuals involved with Hunts Point

7    Ventures.

8        Q.   And what was that plan?

9        A.   That at some point, I would become a

10   shareholder of Hunts Point Ventures.

11       Q.   And was that all there was to that plan,

12   involving you as a shareholder?

13                 MR. WEYTHMAN:  Objection.  Vague.

14                 THE WITNESS:  I don't recall.

15       Q.   (BY MR. YURCHAK)  What other -- what else did

16   the plan involve -- entail that you were having

17   discussions about?

18       A.   I don't know.  I don't know what you're

19   getting at.  I don't under --

20       Q.   In response to my question about what those

21   plans were, you only said that it was -- it was my

22   understanding that you would become a shareholder.

23       A.   Yes.

24       Q.   What other -- what other things did that plan

25   involve?



     1          A.   I don't understand what you're -- what you're

     2    saying.  What other things?

     3          Q.   Was the entirety of the discussions that you

     4    were having at that time just about you becoming a

     5    shareholder in Hunts Point Ventures?

     6          A.   No.

     7          Q.   So what other --

     8          A.   I don't recall.

     9          Q.   You don't recall?

    10          A.   No.

    11          Q.   Now, Steve was the person to incorporate

    12    Hunts Point Ventures, as you say.  Was there a reason

    13    for that?

    14               MR. WEYTHMAN:  Objection.  Calls for

    15    speculation.  Assumes personal knowledge.

    16               THE WITNESS:  I don't recall.

    17          Q.   (BY MR. YURCHAK)  Do you have any reason or

    18    evidence or document to show that Steve's statement that

    19    Mark's IP is his was not the plan for Hunts Point

    20    Ventures?

    21          A.   Can you clarify that for me.  I'm sorry.

    22          Q.   Do you have any evidence to show that Steve's

    23    statement that Mark's IP is his was not true or was not

    24    the plan for Hunts Point Ventures?

    25               MR. WEYTHMAN:  Objection.  Compound.



1                    THE WITNESS:  I'm not sure I understand

2    what you're asking.

3         Q.   (BY MR. YURCHAK)  Do you have anything to

4    show or anything to say with respect to Steve's

5    statement here in his email to you and the others that

6    Mark's IP is his?

7                    MR. WEYTHMAN:  Objection.  Vague.

8              Is whose?

9         Q.   (BY MR. YURCHAK)  That Mark's IP's belongs to

10   him.

11                   MR. WEYTHMAN:  Objection.  Vague.

12             Who's "him"?

13        Q.   (BY MR. YURCHAK)  Mark.

14        A.   I believe at the time the IP belonged to Mark

15   Phillips, yes, and that Mark -- as of when he wrote

16   this, that March the 29th, 2010, at 1:23 in the morning,

17   I believed that to be the case.

18        Q.   Did your understanding of that ever change?

19                   MR. WEYTHMAN:  Objection.  Vague.

20             Understanding of what?

21                   THE WITNESS:  Can you clarify that.

22   Understanding --

23        Q.   (BY MR. YURCHAK)  Has your understanding of

24   Mark's IP belonging to him ever changed?

25        A.   Yes.



1      Q.   Why?

2      A.   Hunts Point Ventures had purchased

3  intellectual property from Mark Phillips; so, therefore,

4  when the company purchases something from an individual,

5  it no longer -- the ownership transfers from that

6  individual to the company.

7      Q.   Okay.  And when did that occur?

8      A.   I don't recall.

9      Q.   What were the circumstances when Hunts Point

10  Ventures acquired the intellectual property?

11           MR. WEYTHMAN:  Objection.  Vague.

12           THE WITNESS:  Can you clarify that for

13  me, "circumstances."

14      Q.   (BY MR. YURCHAK)  Do you recall -- did you

15  have any role in Hunts Point Ventures at the time it

16  acquired the Hunts Point -- it acquired -- Hunts Point

17  Ventures acquired the intellectual property?

18      A.   Can you clarify.  I just don't understand

19  what you --

20      Q.   Did you have any role in Hunts Point Ventures

21  at the time it acquired intellectual property?

22      A.   "Role" is a broad term.  Can you be more

23  specific, please.

24      Q.   How would you define your role in Hunts Point

25  Ventures at the time it acquired the intellectual



1    property?

2         A.    Very minimal.

3         Q.    How would you define "very minimal"?

4         A.    My daughter was dying of an inoperable brain

5    tumor; so I was not actively involved.

6         Q.    Were you recognized by Hunts Point Ventures

7    in any way at that time it acquired the intellectual

8    property, as a shareholder --

9         A.    No.

10         Q.    -- director or officer --

11         A.    No.

12         Q.    -- employee?

13         A.    No.

14         Q.    And when did -- you mentioned your daughter

15    having a brain disease?

16         A.    A brain tumor, yes.

17         Q.    When did that begin?

18         A.    She was diagnosed the day after Thanksgiving

19    in 2010.

20         Q.    Okay.  Did you ever have the understanding

21    that Mark Phillips was to be a shareholder in Hunts

22    Point Ventures?

23         A.    Not that I recall.  I don't recall.

24         Q.    Do you recall seeing any documents prepared

25    by the law firm of Cairncross & Hempelmann to amend the

```
 1   Articles of Incorporation of Hunts Point Ventures?

 2        A.   I don't recall.

 3              MR. WEYTHMAN:  Want some coffee?

 4              THE WITNESS:  Yeah, I'll take some

 5   coffee.  Thank you.

 6              (Discussion held off the record.)

 7              MR. WEYTHMAN:  Actually, you know, since

 8   you're sorting for documents, would this be a good time

 9   to take a short break?

10              MR. YURCHAK:  That's fine.

11              MR. WEYTHMAN:  Thanks.

12              (Break taken from 10:15 to 10:20 a.m.)

13              MR. YURCHAK:  We're back.

14         If you could repeat my last question for me

15   so I can refresh in terms of where we left off.

16              (The record was read.)

17        Q.   (BY MR. YURCHAK)  Do you recall if you were

18   involved in any way with the discussions in -- in the

19   amendment of Hunts Point Ventures' Articles of

20   Incorporation?

21        A.   I don't know what documents you're speaking

22   of as far as the amendment with Cairncross.  I don't --

23   the Articles -- the amended Articles of Incorporation.

24        Q.   I think I was asking do you recall being

25   involved in any of the discussions?
```



 1          A.    No, I don't recall being involved in any of

 2     those discussions.

 3          Q.    Do you recall if you were to be a part of the

 4     amended documents --

 5                     MR. WEYTHMAN:  Objection.  Assumes facts

 6     not in the record.

 7          Q.    (BY MR. YURCHAK)  -- of -- of Hunts Point

 8     Ventures?

 9          A.    I don't -- I don't recall.

10                     MR. YURCHAK:  Shoot.  If I could have

11     you mark that as Exhibit 3.

12                         (Exhibit No. 3 marked for

13                          identification.)

14                     MR. YURCHAK:  Here's a copy.

15          Q.    (BY MR. YURCHAK)  Have you ever seen this

16     document that I've handed to you?

17          A.    I don't recall seeing this document.

18          Q.    Do you see in the first paragraph of that

19     document -- first of all, let's identify it.  What is

20     that document identified as?

21          A.    "Limited Liability Company Agreement of Hunts

22     Point Intellectual Properties, LLC."

23          Q.    Okay.  And do you see that your -- in the

24     first paragraph, that your name is included?

25          A.    Yes.

```
 1        Q.   How did it come about that your name was

 2   included there to be a part of that entity?

 3                 MR. WEYTHMAN:  Objection.  Assumes

 4   personal knowledge.

 5                 THE WITNESS:  I don't recall.  I don't

 6   recall the LLC, this right here.

 7        Q.   (BY MR. YURCHAK)  Do you have any idea why

 8   your name would be included there?

 9                 MR. WEYTHMAN:  Objection.  Calls for

10   speculation.  Also, objection to foundation.  Counsel

11   still hasn't established what the document is, where it

12   came from, or any identifying characteristics of the

13   document.

14                 MR. YURCHAK:  Was there a question

15   pending, and what was it?

16                 THE COURT REPORTER:  Yes.

17                 (The record was read as follows:

18                 "QUESTION:  Do you have any idea why your

19                 name would be included there?")

20                 THE WITNESS:  I don't recall.

21        Q.   (BY MR. YURCHAK)  I'll put forward another

22   document to be marked Exhibit 4, a copy to you and your

23   attorney.

24                 (Exhibit No. 4 marked for

25                 identification.)
```



```
 1                   THE WITNESS:  Thank you.

 2         Q.   (BY MR. YURCHAK)  Could you identify the

 3    caption of that document.

 4         A.   "Hunts Point Ventures, Inc. Joint Consent in

 5    Lieu of Special Meeting of Board of Directors and

 6    Shareholders."

 7         Q.   Upon your review of that document, do you

 8    recognize it?

 9         A.   I do not recognize this document in its

10    entirety.

11         Q.   Do you recognize it in any other way?

12         A.   I recognize a -- I have seen a document that

13    resembles this but was one page and not -- didn't have

14    these other pages, pages 2, 3, 4, 5, and 6.

15         Q.   And when do you recall seeing this document

16    that was the one page?

17         A.   I think the first time I saw the document was

18    in 2012 when Steve Schweickert turned over a box of

19    documents to me.

20         Q.   Is it possible that the document you saw then

21    was different than the document you have before you?

22         A.   The document that I saw then was different

23    than the one that I have before me here.

24         Q.   If I could have you turn to the second

25    page --
```

Page 61

1      A.    Uh-huh.

2      Q.    -- do you see your name on that second page?

3      A.    Yes.

4      Q.    Do you have any idea what the purpose of that

5   document was?

6      A.    I have never seen this page or this document.

7      Q.    Do you have any idea why your name is on that

8   document?

9      A.    No.  I've never seen this -- this document

10  before.  I don't know the origins of this document, and

11  I question the origins of this document.

12     Q.    I'm sorry.  You what?

13     A.    I question the origins of this document.

14     Q.    And what do you mean by that?

15     A.    Anybody can make documents, and this is -- I

16  have never seen this document before.  I don't recall

17  seeing this document before, no.

18     Q.    And what do you mean by "Anyone can create

19  documents"?

20     A.    All it takes is a computer and a printer.

21           MR. YURCHAK:  Okay.  Handing forward the

22  next document to be marked as Exhibit 5 --

23                (Exhibit No. 5 marked for

24                identification.)

25     Q.    (BY MR. YURCHAK)  Do you recognize the



1   document that's been handed to you, marked as Exhibit 5?

2          A.   I don't recognize this document.

3          Q.   And what is that document captioned as?

4          A.   "Intellectual Property Contribution

5   Agreement."

6          Q.   Do you have any understanding of what that

7   document represents?

8          A.   No.  I've never -- I don't recall ever seeing

9   this document.

10          Q.   And do you see your name there on that

11   document?

12          A.   Yes.  I see it here on page 3.

13          Q.   And how are you identified?

14          A.   "Chad Rudkin, its Manager."

15          Q.   Okay.  Do you have any recollection of any

16   discussion about you being a manager with respect to --

17          A.   Hunts Point Intellectual Properties, LLC?

18   No.

19          Q.   -- Hunts Point?

20          A.   No.

21          Q.   And have you ever heard of Hunts Point

22   Intellectual Properties?

23          A.   Yes.

24          Q.   What was your understanding of what -- if I

25   can abbreviate it to "HPIP," of what HPIP was?



1        A.    The first time I recall seeing anything about

2   HPIP was in the litigation that was initiated against me

3   and my wife by Mark Phillips.

4        Q.    So prior -- and when was that, do you recall,

5   the litigation commenced?

6        A.    2013.

7        Q.    So prior to 2013, you had never -- is it fair

8   to say you'd never heard of HPIP?

9        A.    I don't recall hearing of HPIP.

10            MR. YURCHAK:   Okay.  I'm handing forward

11   the next document.

12                  (Exhibit No. 6 marked for

13                  identification.)

14            THE WITNESS:   Thank you.

15        Q.   (BY MR. YURCHAK)  What is the caption of that

16   document?

17        A.   "Stock Subscription Agreement."

18        Q.   And --

19            MR. WEYTHMAN:   Excuse me, Counsel.  Do

20   you have our copy?

21            Thank you.

22        Q.   (BY MR. YURCHAK)  In the first paragraph

23   there, what is your understanding of what that

24   document -- of what purpose that document would effect?

25            MR. WEYTHMAN:   Objection.  Calls for



Page 64

```
 1    speculation.  Lacks foundation.
 2         Q.   (BY MR. YURCHAK)  Based upon your reading of
 3    the first paragraph.
 4         A.   "This Stock Subscription Agreement...dated as
 5              of May," blank, "2010 (the 'Effective Date'),
 6              is by and between Hunts Point Ventures, Inc.,
 7              a Washington corporation (the 'Company'), and
 8              Chad Rudkin ('Founder')."
 9         Q.   Do you have any recollection of seeing this
10    document previously?
11         A.   No, I do not.
12         Q.   You did testify earlier that part of the plan
13    of Hunts Point Ventures was that you would become a
14    shareholder; is that correct?
15         A.   Yes.
16         Q.   Were you -- do you recall, in those
17    conversations, how you were to become a shareholder, how
18    you were to acquire shares?
19         A.   Steve Schweickert said that, at some point in
20    the future, when all the litigation was settled out,
21    that I would become a shareholder in the company.
22         Q.   Okay.  Was that -- when do you recall him
23    saying that?
24         A.   In 2010.
25         Q.   Do you recall if that was in a conversation
```



Page 65

1    that you had?

2         A.   I believe so.  I don't recall specifically.

3         Q.   Was that in an email that he may have said

4    that?

5         A.   I don't recall.

6              MR. WEYTHMAN:  Objection.  Leading.

7         Q.   (BY MR. YURCHAK)  And what was your

8    understanding of how you were to become a shareholder?

9              MR. WEYTHMAN:  Objection.  Asked and

10   answered.

11        Q.   (BY MR. YURCHAK)  Did you have any

12   understanding about how you were to become a

13   shareholder?

14        A.   It was a promise that I would become a

15   shareholder once the mess was cleaned up.

16        Q.   Did he offer -- was he offering to sell you

17   shares?

18        A.   I don't recall the exact consideration.

19        Q.   Was he offering to gift you shares?

20        A.   I don't recall.

21        Q.   Do you recall any conversations about

22   changing the Hunts Point Ventures entity to include you

23   as a shareholder in May or June of 2010?

24        A.   I don't recall.

25        Q.   Is it possible that there were such



Page 66

 1    conversations?

 2         A.    I don't know.

 3         Q.    Were you ever asked to be a manager of the

 4    reformed Hunts Point Ventures entity --

 5                    MR. WEYTHMAN:  Objection.  Vague.

 6         Q.    (BY MR. YURCHAK)  -- as reflected in these

 7    documents that I've showed you?

 8         A.    I don't understand what you're asking.

 9         Q.    Were you ever asked to be a member and play a

10    role in the reformed Hunts Point Ventures entity?

11         A.    Can you clarify "reformed."

12         Q.    Reformed as in amending its Articles to

13    include additional members other than Steve and Joyce.

14         A.    I don't recall.

15         Q.    Would it help refresh your memory to see a

16    document from that time?

17         A.    Sure.

18                    MR. YURCHAK:  Could I have that marked

19    as the next exhibit in line.

20                    THE COURT REPORTER:  It's Exhibit 7.

21                       (Exhibit No. 7 marked for

22                       identification.)

23                    THE WITNESS:  Thank you.

24                    THE COURT REPORTER:  You're welcome.

25         Q.    (BY MR. YURCHAK)  What does this document



Page 67

1    appear to be?

2         A.   I don't know.  I'm looking -- I'm reading

3    through it.

4         Q.   I'll give you a minute.

5         A.   Thank you.

6              So what -- what was your question?

7         Q.   What does this document appear to be to you?

8         A.   An email from Steve Schweickert to Mark's

9    real estate agent, Mary Orvis.

10        Q.   And do you see your email address there in

11   the "To" line?

12        A.   Yes.  In the "CC" line, yes.

13        Q.   In the "CC" line.

14             Is that your email address?

15        A.   Yes.

16        Q.   And at that -- when do you see this email

17   having been sent?

18        A.   I'm sorry?

19        Q.   When do you see that this email was sent?

20        A.   May 20th, 2010.

21        Q.   And were you actively receiving and reviewing

22   emails at that email address at that time?

23        A.   Yes.

24        Q.   Do you have any recollection of receiving

25   this email?



Page 68

1          A.    No.

2          Q.    Do you see that this email is requesting

3    you -- first of all, do you see this email discusses the

4    formation of an entity where the intellectual property

5    will be held?

6                    MR. WEYTHMAN:  Objection.  Leading.

7                    THE WITNESS:  What I see here is one of

8    what I alluded to earlier and told you about, the

9    evolving nature of Hunts Point Ventures.

10         Q.    (BY MR. YURCHAK)  Okay.  Rather than allude,

11   could you explain in better detail what you see the

12   evolving nature of Hunts Point Ventures to be.

13         A.    I don't fully understand.  That's what it

14   started out as and what it went through.  None of this

15   stuff was ever executed or done or -- and that was --

16   there was different iterations that was supposed to

17   happen, and I don't recall any of this.  This -- things

18   got started and stopped and redirected.  You'd have to

19   ask Steve Schweickert about that.  He knows more about

20   this than I do.

21         Q.    How do you know that things weren't done, if,

22   for the most part --

23         A.    Do you see any signatures on documents?

24         Q.    We'll get to that.

25                    For the most part, you've responded that you

1    don't recall what was occurring at this time; is that

2    correct?

3         A.   That's correct.  I don't recall this.

4              Did this happen for longer than one day?

5         Q.   What does that mean?  I'm not sure what your

6    question is.

7         A.   I don't know.  I'm asking you about the

8    documents.  I don't recall this.

9         Q.   I'm not sure what you mean by "happened

10   longer than one day," but we'll leave that.

11             So you have no specific recollection about

12   this email --

13        A.   No.

14        Q.   -- is that correct?

15        A.   That's correct.  I have no specific

16   recollection about this email.

17        Q.   Did you save emails -- have you saved emails

18   from this time period?

19        A.   Can you clarify.  Did I save --

20        Q.   Have you saved emails from this time period

21   regarding the Hunts -- the discussions in Hunts Point

22   Ventures?

23        A.   I didn't purposefully save them.  They should

24   be out there in the Ethernet someplace.

25        Q.   I may have misheard.  Did you say you did not



1   purposefully save them?

2          A.   They're in my inbox, I'm sure.

3          Q.   So you -- do you recall deleting emails

4   regarding issues with Hunts Point Ventures?

5          A.   No.

6          Q.   Now, this email we were talking about refers

7   to establishing a limited liability company; is that

8   correct?

9          A.   That's what it appears to me, yes.

10              MR. YURCHAK:  If I could make sure, do

11   you have the other copy there?  Did I already hand that

12   forward?  Actually, I think I handed it forward.

13              I'll hand this document forward.

14                 (Exhibit No. 8 marked for

15                  identification.)

16              THE COURT REPORTER:  That's Exhibit 8.

17              THE WITNESS:  Okay.  Thank you.

18          Q.   (BY MR. YURCHAK)  Do you recognize the

19   document marked Exhibit 8?

20              Did I not give you a copy?

21              MR. WEYTHMAN:  No.

22              THE WITNESS:  If you'd give me a moment,

23   I'll -- I don't recognize this document.

24          Q.   (BY MR. YURCHAK)  How is that document

25   captioned?



1      A.   "Technology License Agreement."

2      Q.   What does it appear that document purports to

3  do, based on what's written there in the first

4  paragraph?

5      A.   "This Technology License Agreement...is

6           entered into as of May," blank, "2010...by

7           and among [Hunts Point Intellectual

8           Properties], LLC...and Hunts Point Ventures,

9           Inc."

10     Q.   Okay.  And we had just discussed Exhibit 7,

11  which was an email about establishing an LLC.

12     A.   Uh-huh.

13     Q.   If you look at the last page of that

14  Exhibit 7 --

15     A.   Okay.

16     Q.   -- do you see that -- what do you see there?

17     A.   I see three attachments.

18     Q.   And what does that imply to you?

19     A.   That there's documents attached to the email.

20     Q.   And you said that you have not deleted any

21  emails that you received from that time regarding Hunts

22  Point Ventures; is that correct?

23          MR. WEYTHMAN:  Objection.

24  Mischaracterizes the witness's testimony.

25     Q.   (BY MR. YURCHAK)  I believe that's what you



1    stated, is it not?

2         A.   Yeah.  I don't believe I deleted any emails.

3         Q.   Is it safe to assume that you received this

4    email and that you've retained it?

5         A.   I'm not sure.  I don't know.

6         Q.   Would you have --

7         A.   I have to see --

8         Q.   Would it have been in your common practice to

9    read emails that you receive, to open attachments that

10   are included in any documents?

11        A.   Generally speaking, yes.  Sometimes, no.

12   Depends on how many emails were flying around.

13        Q.   Now, as far as you were aware -- you

14   testified that the plan was to make you a shareholder of

15   Hunts Point Ventures after the litigation mess was

16   cleared up; is that correct?

17        A.   That was my understanding, yes.

18                    (Exhibit No. 9 marked for

19                    identification.)

20                    THE COURT REPORTER:  Exhibit 9.

21                    THE WITNESS:  Thank you.

22        Q.   (BY MR. YURCHAK)  A document has been handed

23   to you, marked as Exhibit 9.  What do you recognize this

24   document to be?

25        A.   An email.



1      Q.   And looking at where it reads from "Forwarded

2   message," who does it appear this email is from?

3      A.   Steve Schweickert -- or the forwarded email,

4   it's from --

5      Q.   Correct.

6      A.   The forwarded?  From Doug Lower.

7      Q.   Right.  And do you recognize Steve's email

8   address?

9      A.   Yes.

10      Q.   And do you recognize your address appearing

11   on the "To" line -- or appearing on the informed copy

12   line?

13      A.   Yes.

14      Q.   And that is your email address?

15      A.   Yes.

16      Q.   And in the highlighted section, what do you

17   see there?

18                MR. WEYTHMAN:  Objection.  Ambiguous.

19   There's multiple highlighted sections.

20                THE WITNESS:  Are you asking about right

21   here on the --

22      Q.   (BY MR. YURCHAK)  Yes.

23      A.   It says "HPV- Mark and Chad subscribed for

24   9200 shares," or "sh," "each."

25      Q.   And what do you understand that to mean?



```
 1                    MR. WEYTHMAN:  Objection.  Calls for

 2   speculation.

 3                    THE WITNESS:  That Steve wanted to issue

 4   or subscribe Mark and I shares in the company.

 5        Q.   (BY MR. YURCHAK)  If I understood your

 6   statement, you said that -- it sounds as if that was an

 7   expression of desire?  It was not something that had

 8   happened already; is that correct?

 9        A.   That's what I assume was -- to the best of my

10   knowledge, yes.

11        Q.   And why do you interpret his statement in

12   that way?

13        A.   Because at the time -- for -- for well over a

14   year, Steve wanted to keep everything just within

15   himself.  He didn't want to, I guess -- how do you say

16   it? -- memorialize or make things official.

17        Q.   And what was your understanding about why he

18   wanted to not make things official?

19        A.   Because he --

20                    MR. WEYTHMAN:  Objection.  Calls for

21   speculation.

22                    THE WITNESS:  You'd have to ask him.

23        Q.   (BY MR. YURCHAK)  You never had any

24   conversations with Steve about why he was not allowing

25   any other people to become shareholders in Hunts Point
```



1   Ventures?

2          A.    I believe we did, and to the best of my

3   recollection, it was because he wanted to keep it safe.

4          Q.    And what did you understand "keeping it safe"

5   to mean?

6          A.    From litigation that was ongoing.  He didn't

7   want to open any avenues into the company.

8          Q.    Did you have any discussions about why

9   including additional shareholders may not keep it safe?

10         A.    I don't recall specifically.

11         Q.    Did you have any discussions about why you,

12  in particular, could not be a shareholder in the context

13  of being unable to keep Hunts Point Ventures safe?

14         A.    I don't recall specifically.

15         Q.    Did you have any conversations with Steve

16  about including Mark Phillips as a shareholder in the

17  context of not being able to keep Hunts Point Ventures

18  safe?

19         A.    I don't recall any specific conversations,

20  but I think it's pretty obvious.  Do you --

21         Q.    How is it obvious?

22         A.    He was under federal indictment and was being

23  sued by Robert Arnold and his former company, MOD

24  Systems, and God knows who else.

25         Q.    Was that your understanding, that Mark was

1   being sued by MOD?

2        A.   There was -- yeah.  There was litigation

3   going on between Mark Phillips and MOD, and I believe

4   they were -- I believe they were both suing each other

5   back and forth.

6        Q.   Okay.  So was that your understanding about

7   why Steve was keeping everything on hold, because of the

8   fear --

9             MR. WEYTHMAN:  Objection.  Vague.

10            On hold?

11       Q.   (BY MR. YURCHAK)  -- of liability associated

12   with Mark Phillips' litigation?

13       A.   Can you restate that for me, just to clarify.

14   I'm sorry.

15       Q.   Is that your general understanding about why

16   Steve was keeping Hunts Point Ventures -- and I forgot

17   the term you used -- I think, closed --

18       A.   Uh-huh.

19       Q.   -- was due to Mark -- you know, litigation

20   surrounding Mark Phillips?

21       A.   That's the best of my understanding, yes.

22       Q.   Did you ever have any conversations about

23   that with John Du Wors?

24       A.   I don't recall.

25       Q.   Did you have any conversations with John

1  Du Wors about HPV and your role in May or June of 2010?

2      A.   I don't recall.

3      Q.   So your understanding, again, with respect to

4  the statement here that "Mark and Chad subscribed for

5  9200 shares each," was that -- this was something

6  prospective, was something to happen in the future?

7      A.   Reading here to understand it, yeah, it was

8  something that was to happen eventually.

9      Q.   So your testimony is that you did not

10  subscribe to 9,200 shares at -- at the time this email

11  was written?

12      A.   I don't recall.

13      Q.   Do you have any corporate documents to

14  reflect when you obtained your shares?

15      A.   Yes.

16      Q.   Would those reflect that this occurred in May

17  2010?

18      A.   I don't believe so.  I don't recall.  I'd

19  have to look at them.

20      Q.   Why do you think Steve would say -- would use

21  the past tense, not that Mark -- Steve does not write

22  that "Mark and Chad will subscribe," does he?

23          MR. WEYTHMAN:  Objection.  Calls for

24  speculation.

25          THE WITNESS:  Maybe that's his style of



Page 78

```
 1   writing.
 2                   MR. WEYTHMAN:  Could you speak up for
 3   the record, please.
 4                   MR. YURCHAK:  I'm speaking with my
 5   client.
 6                   MR. ARD:  Are you asking for the Stock
 7   Subscription Agreements?
 8                   MR. YURCHAK:  Could I have that marked
 9   as the next exhibit.
10                      (Exhibit No. 10 marked for
11                       identification.)
12                   THE COURT REPORTER:  Exhibit 10.
13                   THE WITNESS:  Thank you.
14       Q.   (BY MR. YURCHAK)  Do you recognize the
15   document that has been handed to you as Exhibit 10?
16       A.   No.
17       Q.   Do you recognize what this document purports
18   to be?
19                   MR. WEYTHMAN:  Objection.  Vague.
20                   THE WITNESS:  The document says it's a
21   Stock Subscription Agreement.
22       Q.   (BY MR. YURCHAK)  And what do you understand
23   that to mean?
24                   MR. WEYTHMAN:  Objection.  Calls for lay
25   opinion.
```



1      Q.   (BY MR. YURCHAK)  What do you understand a

2  Stock Subscription Agreement to be?

3      A.   Someone is issued stock.

4      Q.   Okay.  And do you see that this is an

5  agreement, issuing stock between Hunts Point Ventures

6  and Mark Phillips?

7      A.   I see that that's what this document purports

8  to be.

9      Q.   And do you see on the last page of that

10  document, page 4 --

11      A.   Yes.  What about page 4?

12      Q.   Do you see that it's been signed?

13      A.   It has signatures on it, yes.

14      Q.   Are you familiar with the signatures of Steve

15  Schweickert?

16      A.   Yes.

17      Q.   Are you familiar with the signature of Mark

18  Phillips?

19      A.   Yes.

20      Q.   Does the signature of Steve Schweickert on

21  this document appear to be his authentic signature?

22                  MR. WEYTHMAN:  Objection.  Calls for lay

23  opinion, legal conclusion.

24                  THE WITNESS:  I don't know when these

25  documents were produced or signed.



1          Q.   (BY MR. YURCHAK)  I'm not asking you when

2    they were produced or signed.  I'm asking you do you

3    recognize that signature on that last page as being from

4    Steve Schweickert?

5          A.   I don't recognize this as being a valid

6    document.

7          Q.   We can get to that, but I'm first asking do

8    you recognize Steve's -- does that signature on the last

9    page appear to be --

10         A.   It appears to be one of a variation of Steve

11   Schweickert's signatures.

12         Q.   And I think you said you were familiar with

13   Mark Phillips' signature as well; is that right?

14         A.   Yes.

15         Q.   And same question with his signature.

16              MR. WEYTHMAN:  What question?

17              THE WITNESS:  Is that --

18         Q.   (BY MR. YURCHAK)  Do you recognize that to be

19   Mark Phillips' signature?

20         A.   Yes.

21         Q.   Okay.  Now, you said you don't recognize this

22   as a valid document?

23         A.   I don't -- I don't recall ever seeing this

24   document.

25         Q.   Okay.  But I believe you also said you don't

Page 81

1    recognize it as a valid document; is that right?

2         A.   Well, it has been my experience that Mark

3    Phillips has generated documents at his convenience at

4    different times.

5         Q.   And what does that mean?  What kind of

6    documents has Mark Phillips generated?

7         A.   Various things to make things go the way he

8    wants them to go.

9         Q.   Can you give me any example?

10        A.   This would probably be one of them.  I've

11   never seen this document before.

12        Q.   Can you give me an example of -- any other

13   example?

14        A.   I don't have it with me, but yes.

15        Q.   And what is it that you don't have with you?

16        A.   Documents that have been altered.

17        Q.   Okay.  What documents?

18        A.   I'm trying to recall.  It was a list of

19   assets that was altered from the original and submitted,

20   I believe under your name, in some court pleadings and

21   proceedings.

22        Q.   A list of assets?

23        A.   It was a list of -- I don't recall exactly

24   what the document was.  I have it someplace, or the

25   attorneys have it.



 1          Q.   Are you able to be more specific?

 2          A.   No.  I told you I don't recall exactly what

 3    the document was.

 4          Q.   Are you able to be more specific in how -- I

 5    believe you said it was altered?

 6          A.   Because I remember comparing it to an

 7    original, and it was definitely altered.

 8               I think the receiver actually has those

 9    documents.

10          Q.   So you don't remember what the document was;

11    is that correct?

12          A.   I don't remember exactly what the document

13    was, no.

14          Q.   And you don't remember how it was altered?

15          A.   It had handwritten direction added to it.

16          Q.   What did that concern?

17          A.   Actually, it concerned the same kind of

18    thing, purchasing or the subscription agreement of

19    shares.

20          Q.   Okay.  And are you familiar with the fact

21    that Steve Schweickert gave a declaration under penalty

22    of perjury wherein he stated that Mark was issued shares

23    in the Hunts Point Ventures entity?

24               MR. WEYTHMAN:  Objection.  Assumes a

25    fact not in this record.



```
 1                    THE WITNESS:  I am aware of a
 2   declaration that Steve Schweickert signed and submitted
 3   under the -- under perjury, which was later revealed was
 4   in fact written by your client, Mark Phillips, and
 5   admitted to.
 6        Q.   (BY MR. YURCHAK)  So you're aware of his
 7   declaration?
 8        A.   That was written by Mark Phillips.
 9        Q.   And you're aware in that declaration that
10   Steve said that Mark Phillips subscribed to shares in
11   Hunts Point Ventures; is that correct?
12        A.   I don't recall specifically that portion of
13   it.  I recall that that document stated many things.
14        Q.   If I were to tell you that that's what the
15   document said, how do you respond to Steve's statement
16   that Mark Phillips subscribed to shares in Hunts Point
17   Ventures?
18                    MR. WEYTHMAN:  Objection.  Calls for
19   speculation.
20                    THE WITNESS:  I don't know.
21        Q.   (BY MR. YURCHAK)  Do you have an official
22   opinion of whether or not that document there is
23   authentic or not?
24        A.   I'm not --
25                    MR. WEYTHMAN:  Objection.  Calls for
```



Page 84

1     speculation.  Calls for a legal conclusion.

2                    THE WITNESS:  I'm not an expert but --

3          Q.   (BY MR. YURCHAK)  I'm not asking you to give

4     an expert opinion.  It's simply a document; right?

5          A.   You're asking me if I think this is real or

6     fabricated?

7          Q.   Correct.

8          A.   My personal belief is this is fabricated.

9          Q.   And what's that belief based upon?

10         A.   The past actions and history of Mark

11    Phillips.

12         Q.   If your belief is that that document is

13    fabricated --

14         A.   Uh-huh.

15         Q.   -- what would your opinion be of Steve

16    Schweickert's statement that Mark subscribed to shares?

17         A.   Could you restate that for me.

18         Q.   If your belief is that this document is

19    fabricated, what is your opinion of Steve Schweickert's

20    statement that Mark Phillips subscribed to shares in

21    Hunts Point Ventures?

22                    MR. WEYTHMAN:  Objection.  Asked and

23    answered.

24                    THE WITNESS:  Again --

25                    MR. YURCHAK:  He didn't answer.



1                    THE WITNESS:  You're asking me my

2    opinion of Steve's declaration?

3         Q.   (BY MR. YURCHAK)  No.

4         A.   My opinion -- is that what you're asking me?

5         Q.   No.  His opinion of -- what is your opinion

6    of his statement that Mark Phillips subscribed to

7    shares, given that you think the Stock Subscription

8    Agreement is fraudulent?

9         A.   My opinion of Steve Schweickert's declaration

10   is that it was written by Mark Phillips.

11        Q.   Am I to take it, then, that you have no

12   specific opinion about Steve's statement that Mark

13   Phillips subscribed to shares in Hunts Point Ventures?

14        A.   That's correct.  Because I don't believe that

15   was Steve's statement that was written there.  I think

16   that was Mark Phillips' statement that was written in

17   that declaration.

18        Q.   You do recall seeing that document?  That

19   declaration, I should say.

20        A.   Yes.

21        Q.   And did you notice if it was signed or not?

22        A.   I don't recall.

23        Q.   If I told you it was signed by Steve

24   Schweickert, what is your opinion about whether those

25   are his representations or Mark Phillips'



1    representations?

2         A.    It is my belief that they are Mark Phillips'

3    representations that he asked Steve Schweickert to sign.

4         Q.    Are you saying that Steve Schweickert would

5    have a different representation about what --

6         A.    You'd have to ask him.

7         Q.    And is that your opinion?

8                    MR. WEYTHMAN:  Objection.  Calls for

9    speculation.

10                   THE WITNESS:  I can't speak for Steve.

11        Q.    (BY MR. YURCHAK)  But your opinion -- is your

12   opinion that the information contained in his

13   declaration does not accurately reflect Steve's personal

14   knowledge of the events described therein?

15                   MR. WEYTHMAN:  Objection.  The witness

16   has no personal knowledge.  Still calls for speculation.

17   Asked and answered.

18                   THE WITNESS:  You'd have to ask Steve.

19        Q.    (BY MR. YURCHAK)  Do you have any specific

20   recollection of any conversation with any person

21   regarding Mark Phillips subscribing to shares in Hunts

22   Point Ventures during this time frame of May and June of

23   2010?

24        A.    I don't recall.

25        Q.    Do you have any specific recollection of any

1    conversation that Mark's intellectual property should

2    remain under his ownership?

3         A.   I don't recall specifically.

4         Q.   Did you have any conversation with Mark

5    Phillips that you promised to protect his interests?

6         A.   I don't recall.

7         Q.   Did you ever promise to protect Mark

8    Phillips' interest in his intellectual property?

9         A.   I don't recall.

10        Q.   Did you ever have any discussion with any

11   person that Mr. Phillips' intellectual property should

12   not belong to him?

13        A.   Can you state that again, please.

14        Q.   Did you ever have any discussions with any

15   persons that Mark Phillips' intellectual property should

16   not belong to him?

17        A.   I don't recall.

18        Q.   Are you familiar with a Memorandum of

19   Understanding agreement that was prepared --

20             MR. WEYTHMAN:  Objection.  Vague.

21   Ambiguous.

22        Q.   (BY MR. YURCHAK) -- in early 2010?

23        A.   You'd have to -- I'd have to see the

24   document.  There were multiple memorandums and

25   documents, as you can see by your own exhibits moving



```
 1   around.  So I --
 2        Q.   How many different memorandums do you recall?
 3        A.   I don't -- I don't recall.  More than one.
 4        Q.   But you recall there being more than one?
 5        A.   Yes.
 6                  (Exhibit No. 11 marked for
 7                   identification.)
 8                  THE COURT REPORTER:  Exhibit 11.
 9                  THE WITNESS:  Thank you.
10                  MR. WEYTHMAN:  Counsel, do you have
11   another copy?
12             Thank you.
13        Q.   (BY MR. YURCHAK)  Do you have any
14   recollection of the document marked as Exhibit 11 that's
15   been -- now before you?
16        A.   Yes.
17        Q.   What is your recollection?
18        A.   That this was supposed to serve as an initial
19   road map for Hunts Point Ventures, Inc.
20        Q.   And what do you recall that road map to be?
21        A.   To move to form a company in order to
22   litigate intellectual property.  I think we've answered
23   that question already.
24        Q.   And what do you recall your role to be as it
25   was defined in this Memorandum of Understanding?
```



1                    MR. WEYTHMAN:  Objection.  Vague.

2     Ambiguous.

3                    THE WITNESS:  To be a shareholder, to

4     undertake different tasks as the company moved forward

5     and began operations.

6         Q.   (BY MR. YURCHAK)  What did you understand

7     your tasks to be?

8         A.   We never got started; so tasks were never --

9     I mean, there was a general ideas of what people would

10    do, but there was never anything really -- it was very

11    discombobulated and confusing and kind of like -- it's a

12    plan.  This is kind of like a plan when you go into

13    battle and no one survives the first shot fired.

14              This is, you know -- this was a plan to move

15    forward, but when you're basing your plans moving

16    forward on somebody who's not telling you the whole

17    truth and you're finding out later that things aren't

18    quite as they are represented, plans have to change in

19    order to try to salvage what's left.

20        Q.   Do you recall any discussions that you had

21    with any other person regarding the preparation of this

22    Memorandum of Understanding?

23        A.   I don't recall.

24        Q.   Do you recall meeting with any

25    attorney/law firm in the preparation of this Memorandum



```
 1   of Understanding?

 2        A.    I don't recall, no.

 3        Q.    And I believe you said it's hard to follow a

 4   plan when there are -- when people don't -- make

 5   misrepresentations to you?  Is that what you said?

 6        A.    Basically, yes, when people don't represent

 7   exactly what --

 8        Q.    Right.

 9        A.    -- they're going to do.  And there was

10   multiple people that did that; so --

11        Q.    So let's talk about that.  Which people did

12   not represent accurately what they were going to do?

13        A.    It's not necessarily what they were going to

14   do but accurately represent -- Mark Phillips, for

15   example, really understated the nefariousness of this

16   behavior and the litigation that was pending and the

17   possibility of federal criminal charges.

18        Q.    Understated?

19        A.    Just --

20        Q.    What do you mean by that?

21        A.    Just he was -- he had done nothing wrong and

22   was part of a large conspiracy to get him out of a

23   company, which has been proving to be not true.

24        Q.    And how has that been proven to be not true?

25        A.    He was convicted on several federal counts.
```



```
1    I don't remember exactly which ones they were, but I
2    believe they involved money laundering, wire fraud.  I
3    don't think bank fraud was in there.
4         Q.   How could Mark -- and when did that
5    conviction happen?
6         A.   I don't recall exactly.
7         Q.   Would it sound wrong were I to say it
8    happened -- that the trial was in January/February of
9    2011?
10                   MR. WEYTHMAN:  Objection.  Calls for
11   speculation.
12                   THE WITNESS:  It was -- I believe it was
13   in that time frame.  I don't recall exactly.
14                   MR. YURCHAK:  Okay.  Could we take a
15   break?
16                   THE WITNESS:  Sure.
17                   MR. WEYTHMAN:  Sure.
18                      (Break taken from 11:11 to 11:18 a.m.)
19        Q.   (BY MR. YURCHAK)  At any point in time did
20   you agree to act as Mr. Phillips' attorney-in-fact under
21   a Power of Attorney?
22        A.   Yes.
23                   MR. YURCHAK:  I guess, if you could pull
24   that out.
25        Q.   (BY MR. YURCHAK)  And when did that -- when
```



1    did you agree -- well, did you agree to serve as his

2    Power of Attorney?

3                      MR. WEYTHMAN:  Asked and answered.

4                      THE WITNESS:  Yes.

5         Q.   (BY MR. YURCHAK)  So that was your choice?

6         A.   Yes.

7         Q.   And when did that -- so when was that

8    Power of Attorney executed?

9         A.   I don't recall.

10                     MR. YURCHAK:  I'm handing forward the

11   next document to be marked.

12                         (Exhibit No. 12 marked for

13                          identification.)

14                     THE COURT REPORTER:  Exhibit 12.

15                     THE WITNESS:  Thank you.

16        Q.   (BY MR. YURCHAK)  Do you recognize this

17   document, marked as Exhibit 12?

18        A.   I don't recognize this specific document.

19        Q.   And why is that?

20        A.   It doesn't have my signature on it, and I've

21   just -- I've never seen a document printed like -- I

22   don't recognize this document, no.

23        Q.   Do you believe that you've retained a copy of

24   the Power of Attorney that was --

25        A.   Yes.



1        Q.   -- executed by Mark to you?

2        A.   Yes.

3        Q.   Do you believe you still have that document

4   in your possession?

5        A.   I believe my attorneys have it.

6        Q.   And to the best of your recollection, does

7   this document reflect an accurate representation of the

8   document in possession of your attorneys?

9        A.   I don't know.  I'd have to sit down and

10  compare them.

11       Q.   Okay.  And I believe I asked if you recalled

12  when that Power of Attorney was executed.  Do you see a

13  date there on the -- page 7?

14       A.   Yes.  It says "June 7, 2010."

15       Q.   Does -- would that seem to comport with your

16  recollection about when this document was executed?

17       A.   If I recall, the Power of Attorney that I

18  executed was done at the federal courthouse; so --

19       Q.   Under -- what were the circumstances there at

20  the federal courthouse?

21       A.   It was for Mark's bond hearing, I believe.

22  So it was for a hearing of some sort there.  I think --

23  I believe it was his bond hearing.  I don't recall

24  exactly.

25       Q.   Are you saying that you executed a



1   Power of Attorney at a bond hearing -- I should say --

2   that Mark executed a Power of Attorney to you at a bond

3   hearing?

4        A.   I believe it was a bond hearing.  I'm not

5   positive that's what it was, but it was at a courthouse

6   there.  I don't recall exactly.

7        Q.   Wasn't -- okay.  And what's your recollection

8   about the circumstances under which it was executed?

9                  MR. WEYTHMAN:  Objection.  Ambiguous.

10  Vague.

11                 THE WITNESS:  Can you clarify that for

12  me a little bit.  What do you mean --

13       Q.   (BY MR. YURCHAK)  Well, I don't want to be

14  leading, but is this a document produced by the Court?

15  Was it produced by Mark?  Was it produced by you?  What

16  were the circumstances under which it was executed?

17       A.   I remember a notary reading -- bringing it to

18  the court.  And there was several people, I believe,

19  that had Powers of Attorney issued to them by Mark at

20  that point in time, because he was being incarcerated,

21  and he needed people to be able to try to handle things

22  for him at the time.  So I don't -- I mean --

23       Q.   Did you read the document at the time you --

24  you obtained it?

25       A.   I believe I scanned through it.  I don't



1    recall.  You know, there was a lot of things going on.

2         Q.   What was your understanding about what your

3    duties were under the Power of Attorney?

4         A.   That if Mark needed something done, at his

5    direction, I would now be able to do that.  If he needed

6    help with something, if he needed something done on his

7    behalf, that, at his direction, I would use the

8    Power of Attorney to do that.

9         Q.   What was your understanding of your legal

10   duties under the Power of Attorney?

11                   MR. WEYTHMAN:  Objection.  Calls for a

12   legal conclusion.

13                   THE WITNESS:  I don't recall.  I'm not a

14   lawyer.

15        Q.   (BY MR. YURCHAK)  Did you ever speak with

16   anybody, including a lawyer, about the relationships --

17   the relationship between the agent and the principal of

18   the Power of Attorney?

19        A.   I don't recall.

20        Q.   Did you ever speak with anybody, including an

21   attorney, about the concept of what a fiduciary duty

22   meant under a Power of Attorney?

23        A.   I don't recall.

24        Q.   What is your understanding of what a

25   fiduciary duty means --



```
 1                    MR. WEYTHMAN:  Objection.  Calls for a
 2   legal conclusion.
 3        Q.   BY MR. YURCHAK:  -- under a
 4   Power of Attorney?
 5        A.   My understanding of a Power of Attorney was
 6   so that I could do things at Mark's request while he was
 7   locked up in a Federal Detention Center.
 8        Q.   Okay.
 9        A.   While he was -- while he was unable to do
10   things, he could call and ask me to do something, and a
11   lot of things require, obviously, Mark's signature and
12   that this piece of paper -- well, not necessarily this
13   piece of paper, but a Power of Attorney would enable me,
14   at Mark's direction, to do things for him.
15        Q.   And did you have an understanding of -- of
16   how you were to perform your duties, under what sort of
17   standard?
18        A.   Can you clarify that for me.
19        Q.   Do you have any understanding about how you
20   were to perform your duties according to a standard of
21   care?
22        A.   I would do things that Mark asked me as long
23   as they were legal and I -- yeah.  If he asked me to do
24   something, take care of business, help him out, that was
25   my understanding of it.
```



     1          Q.    Had you ever served in any other capacity

     2    where you were acting on behalf of Mark Phillips prior

     3    to the Power of Attorney?

     4                    MR. WEYTHMAN:  Objection.  Vague.

     5    Ambiguous.

     6                    THE WITNESS:  Not that I recall.

     7          Q.    (BY MR. YURCHAK)  Do you ever recall acting

     8    as his voting trustee?

     9          A.    I don't understand "voting trustee."

    10          Q.    Do you ever --

    11                I'll hand you forward a document to mark.

    12                    (Exhibit No. 13 marked for

    13                     identification.)

    14                    THE COURT REPORTER:  Exhibit 13.

    15          Q.    (BY MR. YURCHAK)  Do you recognize the

    16    document that's been --

    17          A.    I do.

    18          Q.    -- marked for you?

    19                What do you recognize this document to be?

    20          A.    The last time I saw this document, two

    21    FBI agents put it in front of me and asked me if I had

    22    signed it.

    23                And I told them, "Yes," and I had signed

    24    this -- I don't know -- a week or so before Mark was

    25    arrested at his -- right in front of him, at his



1    request, at Hunts Point.

2         Q.    Arrested at what point in time?

3         A.    When he was initially arrested by the FBI.

4         Q.    Initially, I believe to mean in March of

5    2010?

6         A.    If that's when he was arrested, then yes.

7         Q.    And you said the FBI gave you this document?

8         A.    They showed it to me.  When I -- when I -- in

9    an interview with the FBI.  They asked me like this,

10   "Have you seen that?  Is that your signature?"

11        Q.    Oh, okay.  So this was executed prior to the

12   time that you met with the FBI --

13        A.    Yes.

14        Q.    -- is that correct?

15              And do you recall executing this document?

16        A.    Yes.

17        Q.    Is that your signature on the document?

18        A.    Yes.

19        Q.    And what did you understand this document to

20   be?

21        A.    It's kind of confusing but that I could be

22   a -- if I remember correctly, Mark's shares of MOD

23   Systems had been placed in a voting trust.  And the

24   trustee at the time was Kyleen Cane, who Mark was

25   adverse to.  I believe, for some reason or another, he



1    was able to decide or change or -- decide who the

2    trustee or replacement trustee could be.  And so as you

3    can see on this document, he had myself, Steve

4    Schweickert, and Cheryl Gradwohl all sign up as

5    potential replacement trustees.

6          Q.   Okay.  And did you ever perform any functions

7    as his voting trustee?

8          A.   Not that I recall, no.

9               MR. YURCHAK:  And just to put this on

10   the record --

11               (Exhibit No. 14 marked for

12               identification.)

13               THE COURT REPORTER:  Exhibit 14.

14         Q.   (BY MR. YURCHAK)  Do you recognize the

15   Exhibit 14 that's been placed in front of you?

16         A.   Vaguely.  I think it was signed about the

17   same time as Exhibit 13.

18         Q.   And does it appear to appoint you as his

19   voting trustee, as you said, to replace Kyleen Cane?

20         A.   That's what it appears, yes.

21         Q.   And did you have any discussions with anybody

22   about your duties as far as executing -- I mean, as far

23   as acting in a trust capacity on behalf of Mark

24   Phillips?

25         A.   Just with Mark.

Page 100

1          Q.   What did Mark say, if you can recall?

2          A.   That this was not a big deal, roughly.  I

3     mean, it's -- I don't recall exactly, but it was along

4     the lines of "This is not a big deal.  All you're doing

5     is signing paperwork at my direction."

6               I believe there were also other people that

7     signed this exact same document, just with their name on

8     it.  He had multiple trustees, if I remember correctly.

9          Q.   And do you recall who those people were?

10         A.   I can't say with specificity, but it is my

11    belief that it was probably the three people listed on

12    here as -- as replacement trustees.  It would be Steve

13    Schweickert and Cheryl Gradwohl.

14         Q.   Okay.

15         A.   That's my assumption.  He could have had

16    others.

17         Q.   Going back to the Power of Attorney, was

18    there any point in time when you believed that you were

19    no longer Mr. Phillips' fiduciary under that

20    Power of Attorney?

21         A.   Yes.

22              MR. WEYTHMAN:  Objection.  Calls for a

23    legal conclusion.

24              Go ahead and answer.

25              THE WITNESS:  Yes.  It was my



1   understanding that he had -- he told me that his then

2   girlfriend, Eileen Acheson, was his Power of Attorney.

3        Q.   (BY MR. YURCHAK)  You said that Mark, I

4   believe, had multiple Powers of Attorney?

5        A.   Uh-huh.

6        Q.   Did Mark ever tell you that you were no

7   longer to be his -- to act under his Power of Attorney?

8        A.   Yes.

9        Q.   And when did he tell you that?

10       A.   I don't recall specifically but it -- he told

11   me that Eileen was now his Power of Attorney.

12       Q.   Did you receive any written document from

13   Mark Phillips that terminated the Power of Attorney?

14       A.   I don't recall.

15       Q.   Are you aware if the Power of Attorney that

16   was executed had any termination -- period of time in

17   which it would terminate?

18       A.   I don't recall.

19       Q.   Do you recall which actions you may have

20   taken while under -- while operating under Mr. Power --

21   Mr. Phillips' Power of Attorney?

22                 MR. WEYTHMAN:  Objection.  Vague.

23   Ambiguous.  Assumes facts not in the record.

24                 THE WITNESS:  I don't recall doing --

25   the only thing I recall doing as his Power of Attorney

1    was the sale of the Mosler condominium, but I had a

2    special -- I guess, you'd call it a specific or --

3    Power of Attorney for the sale of the Mosler.

4         Q.   (BY MR. YURCHAK)  Are you saying you had a

5    second Power of Attorney just for the sale of the

6    Mosler?

7         A.   Yes.

8         Q.   Where did that come from?

9         A.   From Mark Phillips.

10        Q.   Is that something that you believe is still

11   in your possession?

12        A.   I don't know.  To be honest with you, I don't

13   know where that is.  I have seen it in -- as an

14   attachment to an email with Mary Orvis.

15        Q.   Why do you think -- why do you remember the

16   need for there to be a second Power of Attorney for the

17   Mosler sale?

18              MR. WEYTHMAN:  Objection.  Vague and

19   ambiguous.

20              THE WITNESS:  I don't know.

21        Q.   (BY MR. YURCHAK)  Do you have a specific

22   recollection that it was executed?

23        A.   Can you clarify that --

24        Q.   Do you have a specific recollection that that

25   Power of Attorney was actually executed by Mark for the



Page 103

```
 1   Mosler sale?
 2        A.   Do I remember him signing it?
 3        Q.   Yes.
 4        A.   I don't recall that.  I recall the
 5   Power of Attorney.  I recall Mary Orvis requested that
 6   Power of Attorney, a specific one for the sale of the
 7   Mosler.
 8        Q.   Do you recall if that Power of Attorney was
 9   limited in any way?
10        A.   Yes.  It was for -- specifically for the sale
11   of Mosler Lofts Penthouse 1.
12        Q.   Do you recall if the other Power of Attorney
13   was limited in any way?
14        A.   I don't recall.
15        Q.   Did you ever give any notice to Mr. Phillips
16   that you no longer wished to operate as -- under his
17   Power of Attorney?
18        A.   I believe he told me I was no longer his
19   Power of Attorney.
20        Q.   And you don't recall --
21        A.   Then I said, "That's fine."
22        Q.   You don't recall ever saying to Mark that you
23   no longer wished to be his Power of Attorney?
24        A.   I think it was in the same conversation that
25   he -- when he told me I was no longer his
```

1   Power of Attorney, I said, "That's" -- that Eileen was

2   his Power of Attorney, I said, "That's fine.  Let Eileen

3   handle all your crap."

4        Q.   Do you recall whether -- so going back to the

5   sale of the Mosler condo --

6        A.   Uh-huh.

7        Q.   -- how were you involved in the sale of that

8   condo?

9        A.   I interacted with Mary Orvis.

10       Q.   Okay.  And how did you interact?

11       A.   She called me and said, "We have a buyer, and

12   we need to take this offer because it's going to

13   foreclose in two weeks, and unless we take this offer,

14   Mark is going to owe a bunch of money."  So that was

15   about it.  I came down there with her and signed the

16   appropriate documents for the sale of the Mosler.

17       Q.   Okay.  And were those signed on behalf of

18   Mark Phillips?

19       A.   Yes.

20       Q.   Do you recall if there was any equity in the

21   sale?

22       A.   No.  If I remember correctly, it was -- she

23   had to reduce her fees in order to help pay off debt for

24   him because there was not going to be enough to cover

25   liens and moneys owed.  There was no -- there was no



1    money in the sale of that condominium.

2         Q.   Okay.  And did you fulfill any other roles as

3    a fiduciary under that Power of Attorney that you can

4    recall?

5         A.   No.

6         Q.   Do you recall managing a parking space on

7    behalf of Mark Phillips?

8         A.   No.

9         Q.   Do you recall receiving any money for the

10   rental of a parking space on behalf of Mark Phillips?

11        A.   No.

12        Q.   Is it -- okay.  I guess we'll go one by one.

13                   (Exhibit No. 15 marked for

14                    identification.)

15                   THE COURT REPORTER:  Exhibit 15.

16        Q.   (BY MR. YURCHAK)  Do you recognize -- what do

17   you recognize this exhibit to be that's been placed in

18   front of you?

19        A.   An email regarding a parking spot.

20        Q.   And who is it from?

21        A.   From Mary Orvis.

22        Q.   And that was Mark's real estate agent?

23        A.   Yes.

24        Q.   And it's addressed to who?

25        A.   To me.



1          Q.   And does this help refresh your recollection

2     about managing a parking space for Mark Phillips?

3          A.   I don't recall anything about a parking

4     space.  I knew she had talked about selling it, but I

5     never heard anything from her about that.

6          Q.   Do you recall writing the email to Mary,

7     stating that "Mark asked that...future checks for the

8     parking space be made out to me"?

9                    MR. WEYTHMAN:  Objection.  Vague.

10    Ambiguous.  Unintelligible.

11                    THE WITNESS:  Made out to -- who's "me"?

12         Q.   (BY MR. YURCHAK)  That's the -- I'm just

13    reading off of the email there.  It appears that you

14    wrote an email to Mary, saying that "future checks for

15    the parking space be made out to me."

16                    MR. WEYTHMAN:  Objection.

17              Counselor, do you have the document?

18                    THE WITNESS:  I don't recall that, no.

19    It says:

20              "Hi Chad:  I can rent one of Mark's Mosler

21              spaces for $150 on a month to month.  Are we

22              good with that?"

23              And I replied "Yes."

24         Q.   (BY MR. YURCHAK)  Okay.  I was reading off

25    the wrong document.  Can I see that one, please.



 1        A.    Sure.

 2        Q.    Okay.  So do you recall the conversation with

 3   Mary about renting out the parking space?

 4        A.    I don't recall, no.

 5        Q.    Now we can move on to the one that I mixed

 6   up.

 7                   (Exhibit No. 16 marked for

 8                    identification.)

 9                   THE COURT REPORTER:  Exhibit 16.

10              And could you make sure that one gets back in

11   my stack.

12                   THE WITNESS:  Yes.

13        Q.    (BY MR. YURCHAK)  And you recognize this as

14   an email between Mary and yourself; is that correct?

15        A.    I don't recall this, but that's what it

16   appears to be, yeah.

17        Q.    And you said, after reviewing this, you don't

18   recall --

19                   MR. WEYTHMAN:  Objection.  This is the

20   first time that we've seen this.

21        Q.    (BY MR. YURCHAK)  -- this email?

22        A.    I don't recall this, no.

23        Q.    Do you recall asking Mary that "the future

24   checks for the parking space be made out to me"?

25        A.    I don't recall doing that.  If I did, it was



1   probably at Mark's direction, if I asked him, "Where do

2   you want money to go?"

3       Q.   Would you have kept an accounting of the

4   money, if that had happened?

5       A.   Yes.  There's no -- no checks were ever done.

6   I don't know what happened with this.

7       Q.   So your statement is you never received any

8   funds on behalf of Mark Phillips from --

9       A.   No.

10      Q.   -- a parking space?

11      A.   No.

12               (Exhibit No. 17 marked for

13               identification.)

14           THE COURT REPORTER:  Exhibit 17.

15           THE WITNESS:  Thank you.

16      Q.   (BY MR. YURCHAK)  What does this document

17  appear to be to you?

18      A.   An email.

19      Q.   And who is it from?

20      A.   It looks like -- it looks like it's

21  back-and-forth between myself and Mary Orvis.

22      Q.   And do you see on the email from Mary to you,

23  reflected on the bottom portion --

24      A.   Uh-huh.

25      Q.   -- in the last sentence, it says "I picked up



Page 109

1    two parking rental checks for you and will mail them

2    tomorrow"?

3        A.   I don't recall ever getting any parking

4    rental checks.

5        Q.   Okay.  If you had gotten any parking rental

6    checks, what would you have done with them?

7                MR. WEYTHMAN:  Objection.  Calls for

8    speculation.

9                THE WITNESS:  Probably would have

10   deposited them in -- I -- I don't know.  I never

11   received any parking rental checks.  I know Mark was

12   needing money while he was locked up.  I don't recall

13   ever receiving any parking rental checks.

14       Q.   (BY MR. YURCHAK)  Now, I wanted to ask also

15   about any of Mark Phillips' personal items of possession

16   that may be -- personal items that may be in your

17   possession.  Do you currently have any of Mark Phillips'

18   property in your possession?

19       A.   No.

20       Q.   And why is that?

21               MR. WEYTHMAN:  Objection.  Vague.

22   Ambiguous.

23       Q.   (BY MR. YURCHAK)  Did you ever have any of

24   his property in your possession?

25       A.   When he lived at my house, there was property



1    he brought with him, yes.

2         Q.    And what was that property?

3         A.    Oh, my God.  Television, computers, a couch,

4    his clothes, cigarettes, binders, that sort of stuff.

5         Q.    And you said there was two different times

6    when he came to you due to the arrest in June.  At what

7    point in time did he bring that property?

8         A.    I believe it was when -- after he was first

9    released into my custody.

10        Q.    And you said you no longer have possession of

11   any of his property; correct?

12        A.    That is correct.

13        Q.    I was asking why.  Where did it go?

14        A.    Went to -- Doug Lower and I moved it all to

15   his girlfriend Eileen's house; got it out of our house.

16   And then we also -- at the same time, we moved the --

17   after the sale of the Mosler, we moved the contents of

18   the Mosler over to Eileen's house as well.

19        Q.    So it's your testimony that all of his

20   property was transferred into Ms. Acheson's possession;

21   is that correct?

22        A.    With the exception of a couch, because I

23   didn't have a truck big enough to get it out of my

24   house.

25        Q.    And what happened to the couch?



1          A.   I wanted it moved out, and I asked Mark what

2    he wanted me to do with it, and he said to contact Gigi,

3    his sister Yvonne.  She didn't have room for it.

4               And so I asked Eileen -- said, "Hey, can we

5    bring this couch up to your house?"  And she said she

6    didn't want it or have room for it.  And my daughter was

7    sick at the time, and I needed the space; so I had -- I

8    gave it to a friend.

9          Q.   And when did you -- essentially, like a

10   donation?

11         A.   Yeah.  I just needed it out of my house.  I

12   said, "Hey, you know" --

13         Q.   And when did that happen?

14         A.   I don't recall.  It was 2011 time frame.

15         Q.   Do you recall what happened to his office

16   chairs?

17         A.   I -- that stuff all got moved up to Eileen

18   Acheson's house.

19              MR. YURCHAK:  Okay.  It's nearing

20   12:00 o'clock, and I presume you'd like a lunch break --

21   right? --

22              MR. WEYTHMAN:  Sure.

23              MR. YURCHAK:  -- which is usually an

24   hour, and I don't want to get in the next phase of

25   things and run into 12:00 o'clock.  So if you don't



1    object, we can reconvene at around 12:50?

2                    MR. WEYTHMAN:  That's okay.

3                    (Lunch recess from 11:49 a.m. to

4                    12:47 p.m.)

5                    (Exhibit No. 18 marked for

6                    identification.)

7                    MR. YURCHAK:  So we're back on the

8    record.

9         Q.   (BY MR. YURCHAK)  If you could take a look at

10   the next exhibit, 18, what do you recognize this exhibit

11   to be?

12        A.   It looks like an email from Mark's prison

13   account to Josette Jenkins and myself.

14        Q.   Is that your true and accurate email address

15   noted there?

16        A.   Yes.

17        Q.   And do you have any recollection of receiving

18   this email?

19        A.   Let me read through it for just a second.

20        Q.   Uh-huh.

21        A.   I don't recall this specific email, no.

22        Q.   Do you see the date on the email?

23        A.   Yes.

24        Q.   And you said that you were not in the habit

25   of deleting emails that you received from this



1  time frame; is that correct?

2       A.   Yes.

3       Q.   Okay.  Is it possible that you may still have

4  a copy of this in your email account?

5       A.   Could be possible.

6       Q.   And what's the date on this email that you

7  see?

8       A.   It is April 14th, 2010.

9       Q.   And -- and you recognize this to be an email

10 from Mark Phillips?

11      A.   That's what it says.

12      Q.   And the first line there, "Since you both

13 have power-of-attorney" -- do you recall having a

14 Power of Attorney at this time?

15      A.   I don't recall.

16      Q.   Do you recall being requested to exercise

17 warrants in A DOT?

18      A.   No.

19      Q.   When Mark made requests pursuant to his --

20 the Power of Attorney, would you ever document those

21 requests in a written format?

22           MR. WEYTHMAN:  Objection.  Assumes facts

23 not in the record.

24           THE WITNESS:  I want to clarify a couple

25 things.  What are warrants in A DOT?



1        Q.   (BY MR. YURCHAK)  I don't know.  I'm simply

2   asking --

3        A.   Okay.

4        Q.   -- if you had any recollection of his request

5   to do that, to exercise warrants in A DOT.

6        A.   No.  I don't have any recollection of him

7   asking me to do that.  I don't even know what the

8   warrants in A DOT are.

9        Q.   Okay.  Do you have any recollection -- and I

10  want to be clear.  I was asking if you had a

11  recollection of him asking you to do that.  Do you have

12  any recollection of actually doing that?

13       A.   No.

14       Q.   So when Mark Phillips would make requests to

15  you pursuant to the Power of Attorney, would you

16  document them in a written format, journal, ledger,

17  something on a computer?

18       A.   No.

19       Q.   Do you recall if requests would come to you

20  in both verbal and written format from Mark?

21              MR. WEYTHMAN:  Again, objection.

22  Assumes facts not in the record.

23              THE WITNESS:  I don't really recall.

24  Most of the time when Mark made a request for a

25  Power of Attorney, he did it in a group-email format, as



1   you see here, where he would ask everybody that he had

2   issued a Power of Attorney to to do something.  And

3   whether or not people did it or not --

4       Q.   (BY MR. YURCHAK)  Okay.

5       A.   -- who knows?

6       Q.   Now, you stated that you did not manage a

7   parking space for Mark Phillips --

8       A.   No.

9       Q.   -- is that right?

10      A.   That's correct.  I did not manage a parking

11   place for Mark Phillips.

12      Q.   You never obtained any money for any parking

13   space?

14      A.   No, none at all.

15      Q.   Do you have any doubt about that?

16      A.   I'm absolutely positive.  I never received

17   any money for a parking place.

18                  MR. YURCHAK:  Sorry.

19                    (Exhibit No. 19 marked for

20                     identification.)

21                  THE COURT REPORTER:  Exhibit 19.

22                  THE WITNESS:  Thank you.

23      Q.   (BY MR. YURCHAK)  Just looking at this

24   exhibit generally, what do you recognize this exhibit to

25   be without even reading it?



 1        A.    A letter.

 2        Q.    And do you recognize the handwriting in that

 3   letter?

 4        A.    Yeah.  It's mine.

 5        Q.    And do you have a particular way in which you

 6   write zeroes?

 7        A.    I write zeroes.

 8        Q.    Is there a particular way in writing zeroes

 9   to usually put a dash through them?

10        A.    Yeah.

11        Q.    Is the 2010 date there in the corner how you

12   would typically write "2010" in your handwriting?

13        A.    That is written in my handwriting, yes.

14        Q.    On the last page of the letter, how is the

15   letter signed?

16        A.    "Dad."

17        Q.    And why is that?

18        A.    Because that's what Mark used to call me.

19        Q.    Why did Mark call you "Dad"?

20        A.    Because I tried to impart some rational

21   wisdom on him --

22        Q.    Understood.

23        A.    -- which I'm sure you've found quite

24   difficult yourself.

25        Q.    So does this appear to be a letter written by

1    you to Mark Phillips?

2         A.   Yes.

3         Q.   If I can direct your attention to a few

4    portions of this letter --

5         A.   Okay.

6         Q.   -- on the first page, do you recall, there in

7    the second paragraph, where you sold two queen bed

8    frames for $500?

9         A.   Yes.  There was -- the buyer of the condo

10   wanted the two bed frames for $500, but she would not

11   pay that until she got a remote for the blinds, which

12   was never located.

13        Q.   And you write -- do you agree that you write

14   "I will deposit the money into your FBOP account"?

15        A.   FBOP, yes, Federal Bureau of Prison accounts,

16   yes.

17        Q.   Okay.  Was that pursuant to any request by

18   Mark, if you can recall?

19        A.   Yeah.  He was always asking for money.

20        Q.   With respect to the bed frames --

21        A.   Uh-huh.

22        Q.   -- did he have any specific -- was that a

23   request from Mark regarding the sale of the bed frames?

24        A.   I don't understand what you're asking.

25        Q.   Was he requesting you to sell the bed frames

1   and put the money on his account?

2          A.   No.  Mary Orvis had said that the buyer

3   wanted the beds and that she had told the buyer that

4   they can have them for $500.  And then if I remember

5   correctly, the buyer did not -- wouldn't give the check

6   for $500 until the remote for the blinds had shown up.

7   And I remember -- I think at this point all the stuff

8   had been moved to Eileen's house, and we couldn't find

9   the remote for the blinds.

10         Q.   Okay.  Going to the next paragraph --

11         A.   Uh-huh.

12         Q.   -- correct me if I'm wrong, but it reads:

13              "The $300 I have been putting into your

14              account has been coming from the parking

15              space rental that obviously will be going

16              away at the end of the month."

17         A.   Maybe I misspoke, and I don't -- I don't

18   recall having received any money, but if I did, it went

19   to Mark in his -- in his account, his Federal Bureau of

20   Prisons account.

21         Q.   In reading that statement, does it -- do you

22   have any recollection of -- of the parking space?

23         A.   I don't.

24         Q.   Do you have any recollection of receiving

25   money for it?

1          A.    No, I don't.

2          Q.    Do you have any recollection of receiving

3     money from it that you put into your account?

4          A.    No, I don't.

5          Q.    Any recollection of receiving money for it

6     that you put into Mark's account?

7          A.    No, I don't.

8          Q.    Is there a reason that you can remember with

9     particularity the bed frames and the remote control but

10    you have no recollection of the parking space?

11         A.    Because I just reviewed those emails from

12    Mary Orvis on the sale, which Mark accused me of taking

13    money from the Mosler, and we brought up for the

14    receivership the documents from Mary Orvis and the

15    specific Power of Attorney, which is -- for the

16    property, which is the only Power of Attorney that I

17    ever executed anything on for Mark, which you were kind

18    of commingling at the conclusion of -- before lunch.

19              There was two separate Powers of Attorney,

20    and the one that I executed on was the special

21    Power of Attorney for the Mosler Lofts.

22              And so I had just reviewed that documentation

23    and read the email where Mary had been wondering if we'd

24    found the remote so that she could get money from the

25    buyer for the beds.



1        Q.    And when did you review that email?

2        A.    Probably two weeks ago.

3        Q.    Okay.  And you seem to draw a distinction

4   between the Powers of Attorney -- you state there was a

5   Mosler Power of Attorney that was limited to the sale of

6   that unit; correct?

7        A.    I'm sorry.  I didn't --

8        Q.    You said there was a Power of Attorney for

9   the Mosler sale; correct?

10       A.    Yes.

11       Q.    You said that there's other Powers of

12  Attorneys as well?

13       A.    He -- Mark gave Powers of Attorney to

14  everybody.

15       Q.    There was other Powers of Attorneys that he

16  gave to you as well?

17       A.    He gave one Power of Attorney, which we've

18  already discussed.

19       Q.    And is it your testimony that he gave only

20  one that was limited simply to the sale of the Mosler

21  condo?

22       A.    He gave a Power of Attorney -- and I believe

23  it was at Mary Orvis's request -- that was limited to

24  the sale of the Mosler.

25       Q.    That was the one and only Power of Attorney

1    that Mark gave to you?

2         A.    That's not what I said.

3         Q.    That's what I'm trying to parse through here.

4         A.    No.

5         Q.    Because when I asked you, I thought -- if

6    there was more than one, you said no.  Am I mistaken?

7         A.    That's not what I said.

8         Q.    Okay.  What did you say when I asked if

9    there's more than one Power of Attorney?

10        A.    Okay.  I'll say this one last time for you.

11   Okay?  So let's try to listen.  There was a

12   Power of Attorney for the Mosler that would be called, I

13   guess, a special Power of Attorney.  Then there was

14   several Powers of Attorney that Mark gave to various

15   people, me being one of those people, that was a general

16   Power of Attorney.

17        Q.    Okay.

18        A.    The only Power of Attorney I ever acted on

19   was the special Power of Attorney for the Mosler.

20        Q.    Okay.  So you took --

21        A.    Are we clear?

22        Q.    Yeah, a lot more clear.

23              So you took no action on the, we'll call it,

24   general Power of Attorney?

25        A.    To the best of my recollection, no, I took no



1   action with the general Power of Attorney.

2       Q.   Would you agree that the statement in your

3   letter that you took $300 from the parking space rental

4   would have been under the general Power of Attorney,

5   despite the fact that you have no recollection of --

6       A.   No.  I don't -- I don't recall that.  I don't

7   recall that.

8       Q.   I understand you don't recall it, but if it

9   were to have happened -- and it appears to have

10  happened, because it's your statement --

11           MR. WEYTHMAN:  Objection.  Calls for a

12  legal conclusion.

13      Q.   (BY MR. YURCHAK)  -- would that have happened

14  under the general Power of Attorney?

15      A.   I don't know.

16      Q.   Did you ever -- referring you down to the

17  next paragraph, there is a statement, after the first

18  sentence:

19           "I received a statement on the MW account and

20           there is $676 in there, as well as $412 in

21           the AB account.  If you will send me

22           instruction I will transfer that to you as

23           well."

24           What is the MW account?

25      A.   I'm not sure but my -- I would guess it

Page 123

1    stands for "MetaWallet."

2         Q.   And what was MetaWallet?

3         A.   MetaWallet was one of Mark's shell companies.

4         Q.   And how would you know what the account

5    balances were?

6         A.   Because Mark was having all of his mail sent

7    to my house.

8         Q.   Okay.

9         A.   And, actually, I think this was -- either my

10   house, or was it going to Eileen?  I don't recall

11   exactly.

12        Q.   And if you asked for instruction from Mark to

13   take the money out of the account, would that have been

14   done under the special Power of Attorney for Mosler?

15             MR. WEYTHMAN:  Objection.  Calls for a

16   legal conclusion.

17             THE WITNESS:  I was asking what he

18   wanted done with it.  He was -- he needed money.

19   Because if you read the rest of the letter in here, it

20   says:

21             "You need to understand that I am on a very

22             tight budget and am going to have a hard time

23             putting money in your account after the

24             parking money stops.  I received a

25             statement," blah, blah, blah.



1              Basically, I was putting money -- I have

2    records of all this -- out of my personal account and

3    giving him money while he was in prison so that he could

4    buy whatever he needed to buy.  So, yeah, I was taking

5    my own personal money -- this is also -- this letter was

6    written the day before my daughter was diagnosed; so I'm

7    sorry if I'm a little fuzzy on exactly what went on.  I

8    had a pretty traumatic event happen in my life the next

9    day.

10        Q.   (BY MR. YURCHAK)  I certainly understand

11   that.

12        A.   So --

13        Q.   But my question was confined to simply the

14   statement that you make, "If you send me instruction to

15   transfer money" -- "if you...send me instruction I will

16   transfer that," referring to the money in MW, "as well."

17   And my question was did that -- would those instructions

18   have been executed under the special Power of Attorney,

19   as you testified, for the Mosler unit?

20              MR. WEYTHMAN:  Same objection.  Calls

21   for a legal conclusion.

22              THE WITNESS:  I don't know.  How did he

23   want the money moved out of his account?  It's his

24   account.  I was asking -- I don't do anything with his

25   stuff without his permission.  I don't know.



```
 1                    What are you trying to get at here?
 2          Q.   (BY MR. YURCHAK)  You testified you never
 3   took any actions under the general Power of Attorney.
 4          A.   To my -- best of my recollection, I did not
 5   take any actions under the general Power of Attorney.
 6          Q.   And I'm asking if the instructions you were
 7   seeking from Mark to move money from the MetaWallet
 8   account would have been executed under the general
 9   Power of Attorney.
10          A.   I don't know.  I thought you asked me would
11   it be under the special Power of Attorney.
12          Q.   I asked that too.
13          A.   Do you know?
14          Q.   Because that was your testimony, that you
15   only took action under the special Power of Attorney.
16          A.   I did only take action under the special
17   Power of Attorney.
18          Q.   Did you ever interact with attorneys on
19   Mark's behalf under his Power -- under his
20   Power of Attorney?
21                    MR. WEYTHMAN:  Objection.  Calls for a
22   legal conclusion.
23                    THE WITNESS:  No.  I don't believe so.
24   I don't recall.
25          Q.   (BY MR. YURCHAK)  Looking at the second page,
```

1   middle, it says:

2            "Lately I have been doing some document

3            research to help Mair."

4            Who was Mair?

5   A.   Pete Mair was his public defender for his

6   federal criminal trial.

7   Q.   "Please let me know where I can find the MOD

8            formation...documents," et cetera.

9            Would you have been operating under the

10  general Power of Attorney at the direction of Mark's

11  attorney --

12  A.   No.

13  Q.   -- in preparation of his criminal case?

14  A.   No.

15            MR. WEYTHMAN:  Objection.  Calls for a

16  legal conclusion.

17  Q.   (BY MR. YURCHAK)  No?  And why not?

18  A.   I didn't --

19            MR. WEYTHMAN:  Objection.  Calls for a

20  legal conclusion.

21  Q.   (BY MR. YURCHAK)  Why would you not have been

22  operating under a Power of Attorney to have access, I

23  presume, to Mr. Phillips' personal documents at the

24  request of his attorney?

25            MR. WEYTHMAN:  Same objection.  Legal



 1   conclusion.

 2             THE WITNESS:  I don't understand how

 3   they were personal documents.

 4        Q.   (BY MR. YURCHAK)  When you were opening -- I

 5   think you testified that you opened mail?

 6        A.   I never testified that I opened mail.

 7        Q.   Did you ever open any mail that was in Mark

 8   Phillips' name?

 9        A.   I don't recall.  Not when he wasn't there.

10        Q.   Did you ever open any mail that came from any

11   companies affiliated with Mark Phillips, such as

12   MetaWallet?

13        A.   I don't recall.  I was -- I don't recall.

14        Q.   Would you -- the date of the letter that

15   we're discussing is November 25, 2010; is that correct?

16        A.   That appears to be so.

17        Q.   Would you agree that you were still operating

18   under Mark Phillips' Power of Attorney at that time?

19             MR. WEYTHMAN:  Asked and answered.

20             THE WITNESS:  No.

21        Q.   (BY MR. YURCHAK)  And why not?

22        A.   Because before he had left my house after

23   being arrested the second time for huffing keyboard

24   cleaner, by the FBI, he had told me that Eileen was his

25   Power of Attorney.  He was in fact preparing to move to



1   her house, and Eileen was now his Power of Attorney.

2        Q.   How do you reconcile that with your statement

3   that you were taking $300 from a parking space to put on

4   his account?

5        A.   I don't recall taking $300, but I do recall

6   that his girlfriend at the time was not doing a whole

7   lot; and, therefore, some of us felt like we should help

8   Mark out.  And so I was continuing to help him out by

9   giving him actual personal money out of my own account.

10  I was wiring it to him to try to help a friend out.

11       Q.   Do you recollect how much money you were

12  giving to him of your own funds?

13       A.   I have it written down at home.  It was a

14  couple hundred bucks at a time because it was all I

15  could afford.

16       Q.   In total?

17       A.   Oh, I assume probably between 2- and $3,000.

18       Q.   And you said you did keep a written record of

19  these disbursements to him; is that correct?

20       A.   I wrote down the Western Union transfer

21  numbers just in case I had problems with them.

22       Q.   And you've retained those?

23       A.   Yeah.  They're -- yes, I have those.

24       Q.   And you said before the break that you

25  weren't certain when the Power of Attorney was



1    terminated, but you sounded more clear now that it -- it

2    happened around the time frame that his girlfriend,

3    Eileen, was getting involved.  Do you have a specific

4    recollection about that time frame?

5                    MR. WEYTHMAN:  Objection.

6    Mischaracterizes the witness's testimony.

7                    THE WITNESS:  Yeah.  That's not -- I --

8    it happened right around the time he went back to jail

9    for the second time for huffing cleaner in my bathroom,

10   and the paramedics had to come.  And she was the one

11   that called.  I was in Priest Lake, and she was the one

12   that called the paramedics.

13        Q.    (BY MR. YURCHAK)  Where is Priest Lake?

14        A.    What's that?

15        Q.    Where is Priest Lake?

16        A.    In Idaho.

17              But it was around that time that the

18   discussion happened where Mark decided that he didn't --

19   he wanted Eileen to be his Power of Attorney in charge

20   of his affairs.

21        Q.    Is it correct that you recall that being

22   around June?

23        A.    I don't -- I don't recall exactly when that

24   was.  It was sometime in the summer months.  I don't

25   know if it was in June or July or August.  It was



```
 1    sometime before Mark went to jail for the second time.

 2         Q.    I believe in your testimony that you stated

 3    that it was in June.  Would I be incorrect on that?

 4         A.    No.  That's when he got rearrested the first

 5    time for --

 6         Q.    Okay.

 7         A.    Okay?  Then -- have you --

 8         Q.    Oh.

 9         A.    Have you talked to your client about his

10    criminal history and when he was arrested and what

11    happened, or has he been telling you the truth?  Because

12    you seem awful confused here.

13         Q.    I sometimes get dates mixed up.

14         A.    I would say so.

15         Q.    And I now remember --

16         A.    Just -- just so that you know --

17         Q.    -- that you said it happened a second

18    time that he got arrested.

19         A.    -- he -- he got --

20              THE COURT REPORTER:  One at a time.

21              THE WITNESS:  -- arrested the second

22    time --

23         Q.    (BY MR. YURCHAK)  And -- and I'm sorry I

24    didn't hear that.

25              The second time, you said, was in July --
```



1  June, July, or August; is that correct?

2          A.    No.  The first time was in June, I believe,

3  and the second time, when he was gone for good, I

4  believe was in late July, early August.  It was sometime

5  there.

6          Q.    Thank you, and I'm sorry.  I know there's a

7  lot of facts to go through with these things, isn't

8  there?

9                So I'd like you to look at another letter.

10                    (Exhibit No. 20 marked for

11                    identification.)

12                    THE COURT REPORTER:  Exhibit 20.

13                    THE WITNESS:  Thank you.

14          Q.    (BY MR. YURCHAK)  Looking at Exhibit 20

15  that's been placed before you, again, looking at the

16  handwriting of the letter, looking at how it's been

17  signed, do you recognize this -- what do you recognize

18  this document to be?

19          A.    Let me -- let me look at it first here.

20                Okay.  What was your question about it?

21          Q.    What do you recognize it to be?

22          A.    It's a letter.

23          Q.    And written by whom?

24          A.    It appears to be written by me.

25          Q.    And is it signed in the same fashion that you



1   signed letters to Mark?

2        A.   At that time, yes.

3        Q.   How are they signed now, if you were to write

4   one, I wonder?

5        A.   I think it's --

6             MR. WEYTHMAN:  Objection.  Calls for

7   speculation.

8             THE WITNESS:  I think it's appropriate.

9        Q.   (BY MR. YURCHAK)  Now, do you have a

10  recollection of writing this letter?

11       A.   No.

12       Q.   Looking at the second page, in the third

13  paragraph, which is the last, you write:

14            "Please tell her," which I believe is in

15            reference to Ms. Acheson, "that we," under --

16            which is underlined, "have everything under

17            control and not take action that is going to

18            make" -- "make more complicated for us" --

19            "make more complications for us."

20            Trying to read your writing there correctly.

21            Do you see when this letter is dated?

22       A.   Yeah.  It's dated not in my handwriting.

23       Q.   Oh, okay.  Whose handwriting --

24       A.   I don't know.

25       Q.   Do you have any recollection when this letter



1    may have been written?

2         A.   Obviously, he was in jail.

3         Q.   Do you dispute -- okay.

4              So at the time this letter was written, Mark

5    Phillips was in jail.  Looking at the -- you're not

6    aware of what time frame this letter may have been

7    written in?

8         A.   Well --

9              MR. WEYTHMAN:  Objection.  Vague and

10   ambiguous.

11             THE WITNESS:  There's a date on here,

12   but it's not in my writing.  So, once again, as we've

13   seen in federal court and we've seen in the

14   receivership, Mark has a tendency to date documents that

15   are convenient for him.

16        Q.   (BY MR. YURCHAK)  So you dispute that this

17   document was dated --

18        A.   9/16 --

19        Q.   -- on the date indicated?

20        A.   -- 2010?  It's not my writing.  I don't know

21   when it was dated.

22        Q.   You'll notice the paragraph preceding the one

23   I just spoke about discusses --

24        A.   I forget.  Which one did you just speak

25   about?

1          Q.    The one starting with "Please."

2                The second paragraph discusses --

3                    MR. WEYTHMAN:  Objection.  Ambiguous.

4    Multiple paragraphs start with "Please."

5                    MR. YURCHAK:  You're right.

6          Q.    (BY MR. YURCHAK)  So on the second page,

7    second paragraph, beginning with "Recently," what does

8    that paragraph discuss?

9          A.    Would you like me to read it?

10         Q.    Yes.

11         A.    It says:

12               "Recently she has been trying to screw around

13               with Mary Orvis business, by bringing in a

14               new person & having a fire sale."

15               Talking about Mary Orvis, I think it's safe

16   to say it's talking about the sale of the condominium.

17         Q.    Do you recall --

18         A.    And I kind of remember what was going on now,

19   and this is --

20         Q.    If you could just answer my questions.

21               Do you recall when the sale of the

22   condominium occurred?

23         A.    No, not specifically.  I'd have to go back

24   and look.

25                    MR. YURCHAK:  Okay.  If I could hand



Page 135

```
 1   forward this set of emails.
 2                   (Exhibit No. 21 marked for
 3                   identification.)
 4                   THE COURT REPORTER:  Exhibit 21.
 5        Q.   (BY MR. YURCHAK)  On Exhibit 21, what do you
 6   recognize the first page to be?
 7        A.   An email.
 8        Q.   From who to who?
 9        A.   Looks like from me to Mary Orvis.
10        Q.   And --
11        A.   Oh, I'm sorry.  That was my reply to Mary
12   Orvis.  It was Mary writing to me, and I replied "mailed
13   today."
14        Q.   And the date?
15        A.   September 27th.
16        Q.   And what do you recall this email being in
17   reference to?
18        A.    It looks like the sale -- anything that
19   had -- anything that was with the sale of the Mosler
20   Lofts with Mary Orvis.
21        Q.   Does that help refresh your recollection as
22   to when the lofts -- when the condo unit was sold?
23        A.   Yeah.  The -- let's see, where's the dates on
24   here?  Condo association -- fees reduced -- so this says
25   October 1st, 2010.
```



1       Q.    Does --

2       A.    And this purchase and sale -- these --

3  there's several documents here.  There's one that says

4  "Addendum/Amendment to Purchase and Sale Agreement," and

5  it says September 17th, 2010.  I don't know if that was

6  an offer.

7       Q.    Does that sound right to you, that the sale

8  occurred around that time frame --

9       A.    Yes.

10      Q.    -- late September?  Okay.

11            Does that date of the sale correspond with

12  the date of September 16, 2010, on the letter in the

13  previous exhibit, Exhibit 20?

14      A.    No.

15      Q.    Why not?

16      A.    Because this says September 17th.  This says

17  September 16th.  This one says October 1st.  So I don't

18  know what you're getting at.  Can you clarify for me

19  what you're -- what are you --

20      Q.    So looking at the second page of Exhibit 20,

21  of your letter --

22      A.    Okay.  Exhibit 20 is the letter.  Okay.

23  Second page.

24      Q.    It states -- you write:

25            "Recently she has been trying to screw around



1              with Mary Orvis business" --

2       A.    Uh-huh.

3       Q.    -- trying to have a fire sale.

4       A.    Uh-huh.

5       Q.    What does that sound like it's in reference

6   to?

7       A.    Well, this is what happens when you give

8   multiple people Powers of Attorney and you ask somebody

9   who's acting under a special Power of Attorney to handle

10  the Mosler sale but then you give your girlfriend a

11  general Power of Attorney and she comes in and tries to

12  oversee and do things.

13            And so that's when Eileen was in there when

14  there was things in the works to try to benefit Mark to

15  actually make him break even.  And Eileen was trying to

16  bring in a new real estate agent, if I remember

17  correctly, and wanted to do a, quote/unquote, fire sale,

18  what she called it.

19      Q.    So were you operating under a

20  Power of Attorney at that time?

21      A.    For the Mosler Lofts.  I thought we made this

22  clear.  There was a special Power of Attorney for the

23  Mosler Lofts, and that's what I was operating under.  Do

24  we have to hash through this again?

25      Q.    No.  I just wanted to make it clear.



Page 138

```
 1          A.    I've already stated that several times.

 2          Q.    Okay.  And what was your relationship with

 3    Ms. Acheson like?

 4          A.    An acquaintance.  We weren't really the best

 5    of friends.  I didn't personally care for her.

 6          Q.    And do you know what her opinion is of you?

 7                    MR. WEYTHMAN:  Objection.  Speculation.

 8                    THE WITNESS:  I don't, and I don't care.

 9          Q.    (BY MR. YURCHAK)  Were you ever friends at

10    any point in time?

11          A.    More acquaintances.

12          Q.    And how would you -- when was the last time

13    that you spoke with Ms. Acheson or had any communication

14    with Ms. Acheson?

15          A.    I don't recall.  It's been a long, long time.

16          Q.    What do you recall the -- so what do you

17    recall the nature of -- of your association or

18    acquaintance, I think you put it, at the time of that

19    last communication?

20                    MR. WEYTHMAN:  Objection.  Vague.

21    Ambiguous.

22                    THE WITNESS:  I don't recall.

23          Q.    (BY MR. YURCHAK)  Basically --

24          A.    I -- I want to say the last time I really had

25    contact with Ms. Acheson was moving Mark's belongings to
```

1  her house in Bellevue.  That was kind of the end of it.

2       Q.   And how would you describe her general

3  attitude towards you?

4            MR. WEYTHMAN:  Objection.  Asked and

5  answered.

6            THE WITNESS:  I don't know what her

7  attitude was.  I didn't really interact with her.  Kind

8  of flippant.

9       Q.   (BY MR. YURCHAK)  Skipping ahead somewhat,

10 you testified earlier that you became an officer of HPV

11 in May of 2012; is that correct?

12      A.   Yes, I believe so.

13      Q.   And how did that occur?

14      A.   Shareholder consent.

15      Q.   Okay.  And what effect did that consent have

16 in terms of your relationship with Hunts Point Ventures?

17           MR. WEYTHMAN:  Objection.  Calls for a

18 legal conclusion.

19      Q.   (BY MR. YURCHAK)  What did you acquire from

20 that consent?

21           MR. WEYTHMAN:  Objection.  Vague and

22 ambiguous.

23           MR. PHILLIPS:  One signed by Steve, one

24 signed by him.

25           MR. YURCHAK:  Oh.

 1        Q.   (BY MR. YURCHAK)  What happened after that

 2   consent?

 3        A.   Can you clarify.  I don't understand what

 4   you're asking.

 5        Q.   What did that consent do with respect to you

 6   and your relationship with Hunts Point Ventures?

 7                  MR. WEYTHMAN:  Objection.  Calls for a

 8   legal conclusion.

 9                  THE WITNESS:  I'd have to see the exact

10   document you're asking about.

11        Q.   (BY MR. YURCHAK)  Did you become a

12   shareholder?

13        A.   There are -- there are -- I'd like to see the

14   documents that you're talking about, you're referencing.

15                  (Exhibit No. 22 marked for

16                  identification.)

17                  THE COURT REPORTER:  Exhibit 22.

18                  THE WITNESS:  Thank you.

19        Q.   (BY MR. YURCHAK)  I've put a document before

20   you, Exhibit 22.  What do you recognize this document to

21   be?

22        A.   I recognize this to be the Hunts Point

23   Ventures, Inc. Joint Consent in Lieu of Annual Meeting

24   of Shareholders and Directors.

25        Q.   Okay.  And, again, going back to my question,



1    what effect did this joint consent have in terms of your

2    relationship with Hunts Point Ventures?

3        A.   It made me officially a 50 percent

4    shareholder in Hunts Point Ventures.

5        Q.   Okay.  Did you ever pay any money to acquire

6    your shares?

7        A.   No.

8        Q.   And why did you become a 50 percent

9    shareholder of Hunts Point Ventures through this joint

10   consent?

11       A.   Because the shareholders and directors

12   decided that I should become a shareholder of Hunts

13   Point Ventures.

14       Q.   Who were the shareholders and directors at

15   that time?

16       A.   Steve Schweickert.

17       Q.   And what was the reason for it?

18               MR. WEYTHMAN:  Objection.  Calls for

19   speculation.  No personal knowledge.

20       Q.   (BY MR. YURCHAK)  What was the reason that

21   you were given shares?

22       A.   I was promised shares in the company, and all

23   of a sudden, Steve decided he wanted to have me become

24   50 percent shareholder, as he had promised.  I think, if

25   you read the document, it actually states the stuff in



1    there.  So --

2         Q.   When were you promised shares?

3         A.   I don't recall exactly.  On a number of

4    occasions.

5         Q.   A number of occasions?

6         A.   (No audible response.)

7         Q.   Any of those occasions happen in 2010?

8         A.   I don't recall.

9         Q.   And why did you want to become a shareholder?

10        A.   I don't recall.  Why not?

11        Q.   You don't recall why you wanted to become a

12   shareholder in Hunts Point Ventures?

13        A.   To make money, to start a company.  Why would

14   somebody want to become a shareholder in a company?

15        Q.   I'm asking you.  What was your state of mind

16   at that time?

17        A.   It was an opportunity to move forward with

18   the business.

19        Q.   And where did you see that business moving

20   forward to?

21        A.   Litigating intellectual property.

22        Q.   Okay.  And why did you choose Hunts Point

23   Ventures to be a part of?

24        A.   Hunts Point Ventures asked me.

25        Q.   And you accepted?



1          A.    Yes.

2          Q.    And why did you accept?

3          A.    Why not?

4          Q.    Okay.  Now, what did you understand your role

5    to be when you acquired your shares in Hunts Point

6    Ventures?

7          A.    To be a 50 percent shareholder.

8          Q.    The document says that you were -- you became

9    its president; is that correct?

10          A.    Yes.  I also -- the second part of the

11   document -- I did become an officer of the corporation.

12          Q.    And who was the president prior to you

13   becoming the president?

14          A.    Steve Schweickert.

15          Q.    And what has Steve Schweickert become after

16   this joint consent was signed?

17          A.    I'd have to look here.  Let me see.

18                Vice president.

19          Q.    What was the reason that you -- now, you --

20   you said earlier that -- well, what was the reason that

21   you became president of HPV?

22          A.    Because the shareholders and directors asked

23   me to become president of HPV.

24          Q.    Did they feel you had any certain

25   expertise --



1          MR. WEYTHMAN:  Objection.  Calls for

2   speculation.  No -- no foundation, personal knowledge.

3          Q.   (BY MR. YURCHAK)  -- in making you president?

4          A.   Ask Steve.  He's the one that was the

5   shareholder that decided that everyone would be that.

6          Q.   And when was this joint consent signed?

7          A.   Let's see.  29th day of May 2012.

8          Q.   Do you recognize your signature as your

9   signature on -- on the very last page of the joint

10  consent?

11         A.   Yes.

12         Q.   And you said it was signed on May 29th, 2012?

13         A.   Well, if you read -- it was backdated at

14  Steve's insistence.

15         Q.   And what do you mean by that?

16         A.   He asked that it be backdated back to

17  May 31st of 2011.

18         Q.   You do see that the -- there's two dates on

19  the document; is that not correct?  There's May 29,

20  2012, and there's May 2011.

21         A.   Uh-huh.

22         Q.   If there's two dates, how can you be certain

23  that this was backdated?

24         A.   Because I signed it.

25         Q.   I understand, but it's also -- is it not



1   signed according to both dates?  There's two dates

2   there.

3         A.   Yeah.  It says "so resolved this 29th day of

4   May 2012" and then dated May 31st, 2011.

5         Q.   So according to your understanding and the

6   way that it's written, this is a backdated document to

7   May 31, 2011?

8         A.   According to the document, yes.

9         Q.   And what was your understanding about why --

10  did you have any understanding about why Steve wanted it

11  done that way?

12        A.   I have speculation as to why Steve wanted it

13  that way.

14        Q.   Okay.  And what is that speculation?

15        A.   He was involved in legal problems with his

16  girlfriend, Joyce Schweickert, at the time.

17        Q.   So you think it was related to that?

18        A.   Absolutely.

19        Q.   Now, you'll notice under -- on the first

20  page, paragraph D, it states:

21              "To the extent that the transfer of shares to

22              Chad Rudkin was not legally effectuated as of

23              January 1, 2011, the Shareholders now

24              unanimously make and ratify the issuance of

25              shares to Rudkin."



1          And on the second page, under the Ratify and

2     Elect Directors section, it states:

3               "FURTHER RESOLVED, that all actions taken by

4               the directors of the Corporation in managing

5               the affairs of the Corporation from the

6               company's inception through the date hereof,

7               are hereby approved, adopted, ratified and

8               confirmed in all respects."

9          Does this document appear to make you an

10    officer as of January 11 -- January 1st, 2011?

11         A.   It appears to make me an officer of the

12    company and a shareholder as of the 29th day of May

13    2012.

14         Q.   When you read -- and why is that?

15         A.   That's what it states at the top right here

16    when "this resolution" was "entered into effective this

17    29th day of May 2012, pursuant to the RCW."

18         Q.   Why does it state "To the extent that the

19    transfer of shares to Chad Rudkin was not legally

20    effectuated as of January 1, 2011"?

21         A.   I think it's pretty evident because it states

22    that the transfer of shares to Chad Rudkin were not

23    legally effectuated.

24         Q.   Does that mean they were supposed to be

25    legally effectuated as of January 1st, 2011?



Page 147

1                    MR. WEYTHMAN:  Objection.  Was that

2     legally or illegally?

3          Q.   (BY MR. YURCHAK)  Legally.

4          A.   Steve had been speaking for some time about

5     making me a shareholder, making me a shareholder, and he

6     kept putting it off and putting it off and putting it

7     off.  I don't know why he put that in there.

8          Q.   Do you -- what is your understanding, then,

9     of that paragraph?

10         A.   Which paragraph?

11         Q.   D.

12         A.   D on the first page?

13         Q.   Yeah.

14         A.   That I was not a legal shareholder as of

15    January 1st, 2011 --

16         Q.   Okay.

17         A.   -- and that the shareholders now unanimously

18    make and ratify that issuance of shares.

19         Q.   Right.

20         A.   I mean, it's in English.

21         Q.   Is your understanding that the intent was

22    that you be a shareholder as of January 1st, 2011?

23                   MR. WEYTHMAN:  Objection.  Calls for

24    speculation.

25                   THE WITNESS:  My -- I am saying that



1    Steve had offered to make me a shareholder many times

2    previously, and as of the 29th day of May 2012 is when I

3    became a shareholder.

4         Q.    (BY MR. YURCHAK)  Let's look at paragraph C,

5    then:

6              "Although the Shareholders never memorialized

7               the transfer in writing, it has been the

8               agreement and understanding of Schweickert

9               and Rudkin that Rudkin became an owner of 50%

10              of the shares of Hunts Point Ventures, Inc.,

11              effective January 1, 2011, and have shared

12              equally in all operating decisions of the

13              corporation since that time."

14        A.    What's your question?

15        Q.    Didn't you just testify that your -- you just

16   gave testimony, as an officer of this corporation, that

17   your shares only became effective as of May 29, 2012,

18   did you not?

19        A.    That's what the document says.

20        Q.    The document says in paragraph C that you

21   were to be an owner of 50 percent of Hunts Point

22   Ventures from January 1st, 2011, does it not?

23        A.    It also says the shareholders never

24   memorialized the transfer in writing.

25        Q.    And what does this document do, in your



Page 149

```
 1   opinion, with respect to that transfer of shares?
 2        A.   It makes it legally effective as of
 3   January -- or May 29th, 2012.
 4        Q.   So I'm trying to understand again.  And, you
 5   know, maybe I'm just stupid.  I don't know.  But does
 6   the document itself not say that you had an agreement --
 7   an agreement and understanding that you were to become
 8   an owner as of January 1st, 2011 --
 9        A.   I don't recall.
10        Q.   -- not May 29, 2012?
11        A.   I don't recall.  At times previously, Steve
12   Schweickert had said that I would become a shareholder
13   of the corporation.  On May 29th, 2012, is when that
14   happened.
15        Q.   Did you sign this document?
16        A.   Yes.
17        Q.   Did you read it before you signed it?
18        A.   Yes.
19        Q.   Did you see this language in paragraph C and
20   D that were included in this document at the time you
21   signed it?
22        A.   I don't recall.
23        Q.   Do you -- what is your recollection of the
24   agreement that you had between Schweickert and yourself
25   about you becoming an officer -- shareholder, I should
```

1  say -- 50 percent shareholder as of January 1st, 2011?

2      A.   I don't recall.

3      Q.   And do you know who prepared this document?

4      A.   I do not know.  I believe it was Steve, but I

5  do not know for sure.

6      Q.   Do you think Steve would have had any

7  assistance in the preparation of the document?

8              MR. WEYTHMAN:  Objection.  Calls for

9  speculation.  Lacks personal knowledge.

10             THE WITNESS:  I don't know.  Ask Steve.

11     Q.   (BY MR. YURCHAK)  I last just want to point

12  out, on page 3 of 4, in the very first paragraph, it

13  says:

14             "NOW, THEREFORE, BE IT RESOLVED, that the

15             Board hereby approves, adopts, ratifies, and

16             confirms all past actions taken by Steve

17             Schweickert as President, Vice President,

18             Secretary and Treasury" -- "Treasurer of the

19             Corporation from December 31, 2010 through

20             the date hereof."

21             According to this document, you were

22  appointed to the board of Hunts Point Ventures --

23  correct? -- as of -- well, according to the document,

24  you were appointed to the board of Hunts Point Ventures;

25  correct?



1                      MR. WEYTHMAN:  Objection.  Calls for a

2      legal conclusion.  The document speaks for itself.

3                      THE WITNESS:  Yes.

4          Q.   (BY MR. YURCHAK)  So --

5          A.   Read the document.

6          Q.   So you don't dispute this language in the

7      document that you ratify all actions of Steve

8      Schweickert taken since January 31st -- since

9      December 31st, 2010, in Hunts Point Ventures; is that

10     correct?

11                     MR. WEYTHMAN:  Do you understand the

12     question?

13                     THE WITNESS:  I don't understand the

14     question.

15         Q.   (BY MR. YURCHAK)  Your answer was that the

16     document speaks for itself, and I am --

17                     MR. WEYTHMAN:  Objection.

18     Mischaracterizes the witness's testimony.

19         Q.   (BY MR. YURCHAK)  And I'm making sure that I

20     understand your testimony so that it's clear for the

21     record, that you agree with the language written in that

22     paragraph that you, as a board member, ratify all

23     actions taken by Steve Schweickert in his capacity as --

24     as the president, vice president, secretary and

25     treasurer since December 31st, 2010.



1          A.   If I'm not mistaken, Steve was the board, and

2     the board decided to make me a shareholder and made me

3     an officer.  And the board, in the same document,

4     decided to ratify all of Steve Schweickert's actions

5     from December 31st, 2010, to the current date.  And then

6     I -- it's resolved that I am confirmed and appointed as

7     president of -- of the company.

8          Q.   Are you trying to say that you -- this

9     document does not reflect that you ratified his actions,

10    as a board member?

11         A.   I don't know.

12         Q.   You don't know?

13         A.   Yeah.  That's what I'm trying to say to you,

14    that I'm just reading the document.

15         Q.   Is your testimony that the answer is in the

16    document?  The document speaks for itself?

17         A.   I don't understand what you're saying.

18    The -- read the document.

19         Q.   What I'm asking is if your -- if you have any

20    other different understanding from what the document

21    says on its face.

22                   MR. WEYTHMAN:  Objection.  Vague and

23    ambiguous.

24                   THE WITNESS:  I don't understand what

25    you're trying to get at.



1      Q.   (BY MR. YURCHAK)  Well, again, I asked you a

2  question with respect to that paragraph, that the board

3  approves, adopts, ratifies Steve Schweickert's actions

4  since December 31st.  And I'm asking if that means that

5  you, in being appointed an officer, the president, and

6  50 percent shareholder of HPV, therefore agree with what

7  the face of document says, that you therefore ratified

8  Steve Schweickert's actions taken since December 31st,

9  2010?

10      A.   What I'm saying is this document appoints me

11  as the shareholder, puts me on the board of directors,

12  makes me the president, but how can I be appointed and

13  have ratified in the same document what Steve had done

14  for years past?

15      Q.   Because the document says so?

16      A.   Maybe I don't understand the -- the language

17  of the document, but --

18      Q.   Okay.

19      A.   -- I don't understand.

20      Q.   Do you have any concerns with how Steve

21  Schweickert managed Hunts Point Ventures since

22  December 31st, 2010?

23              MR. WEYTHMAN:  Objection.  Calls for a

24  narrative.

25              THE WITNESS:  What are you -- can you be



1    more specific.

2         Q.   (BY MR. YURCHAK)   Is there anything in his

3    management since December 31st, 2010, that you disagree

4    with?

5         A.   After being privy to documents and looking

6    back, the lack of management and the way some of the

7    money was spent that the corporation had was -- judgment

8    was questionable.

9         Q.   Let's talk about your concern with his lack

10   of management.  What do you see as a lack of management

11   in how he operated Hunts Point Ventures?

12        A.   There was no organization.  I was handed a

13   box of documents that was incomplete.

14        Q.   How was the box of documents incomplete?

15        A.   It was a hodgepodge of documents in a blue

16   plastic container.

17        Q.   Did you have any other concerns with his lack

18   of management?

19        A.   There was no accounting.  There was -- it was

20   just kind of a mess.

21        Q.   And what were your concerns with how money

22   had been spent?

23        A.   There -- there didn't seem to be a whole lot

24   of documentation on, you know, fees for services for

25   ViaCam and other projects and things of that nature.



```
 1    There was just no -- there was no accounting ledger.

 2    There was no -- there was -- there was -- it was like it

 3    had been shoved in a box and forgotten about.

 4         Q.   If we could jump back to Ms. Acheson, you

 5    talked about delivering some items of Mark to her

 6    residence; is that correct?

 7         A.   Yes.

 8         Q.   Was one of those items a laptop computer?

 9         A.   I don't recall.

10         Q.   Do you recall there being any dispute over

11    two laptops and confusion?

12         A.   Yes.

13         Q.   And what was that about?

14         A.   To the best of my recollection, Mark had a

15    laptop computer, and when he was arrested, I believe the

16    federal government had that laptop computer.  Eileen

17    purchased him another laptop computer for him to use,

18    and if I remember correctly, it was -- it was almost the

19    same model.  I mean, they were almost identical.

20         Q.   Uh-huh.

21         A.   What else do you --

22         Q.   Did you say that the federal government took

23    possession of one of his computers?

24         A.   I believe so.  I'm not sure.  But I remember

25    that for some reason she bought him a new laptop.  I
```



Page 156

1  don't remember exactly why.

2       Q.   Okay.

3       A.   I don't know if the federal government had it

4  or if his defense attorney had it or -- I don't remember

5  exactly where that computer was.

6       Q.   Was there any issue with the power button on

7  that laptop?

8               MR. WEYTHMAN:  Objection.  Vague.

9  Ambiguous.

10              What laptop?

11              THE WITNESS:  I don't know which one had

12  the problem with the power button, but I do remember a

13  power button being broken.  I don't recall which one --

14  whether it was Mark's -- I don't recall -- original

15  computer or his one that Eileen bought him.  I don't

16  remember which one was which.

17      Q.   (BY MR. YURCHAK)  Okay.  Did you -- what was

18  your understanding about whose laptop with the broken

19  power button -- who that belonged to?

20      A.   I don't know.  It was either Mark or Eileen.

21      Q.   Did you ever go on to that laptop to delete

22  any files?

23      A.   No.

24      Q.   Did Mr. Du Wors ever give you any direction

25  to delete information off of either of the two



1    laptops --

2          A.   No.

3          Q.   -- that was in your possession, despite you

4    not being able to remember which one of them belonged to

5    Mark?

6          A.   No.

7          Q.   Did you ever create a user account profile on

8    either of those two laptops?

9          A.   No.

10              Pass the coffee.

11                   MR. WEYTHMAN:  That's a full pot.

12                   THE WITNESS:  Thank you.

13                 (Discussion held off the record.)

14                   MR. YURCHAK:  I'm going to need a minute

15   to look through some documents; so --

16                   THE WITNESS:  Okay.

17                   MR. YURCHAK:  -- you want to take a

18   short break?

19                 (Break taken from 1:49 to 1:55 p.m.)

20                   MR. YURCHAK:  If I could hand you --

21                 (Exhibit No. 23 marked for

22                  identification.)

23                   THE COURT REPORTER:  This is going to be

24   23.

25          Q.   (BY MR. YURCHAK)  Do you recognize this



1  document?

2      A.    Let me just take a second to review it.

3            Yes, I -- I recognize this.

4      Q.    Okay.  And what do you recognize it to be?

5      A.    A letter I wrote to Mark, or an email I wrote

6  to Mark, when he was in jail.

7      Q.    Okay.  So this is -- this is actually an

8  email?

9      A.    I believe it was an email.  I'm not sure if

10 it was an email or if it was a letter that I typed.  I

11 don't recall.

12     Q.    But you do recognize it as coming from you?

13     A.    Yes.

14     Q.    And the third paragraph there talks about a

15 laptop with a broken power button?

16     A.    Uh-huh.

17     Q.    Does that help refresh your recollection at

18 all as to which laptop that you had been in possession

19 of?  I should say whose laptop you had been in

20 possession of.

21     A.    I always assumed both of the laptops were

22 Mark's, but I knew Eileen had purchased one for him, but

23 they were -- it was Mark's laptop.

24     Q.    Okay.  And it mentions an angry text from

25 her.  Do you recall having text messages with her --

Page 159

```
1        A.    I do.

2        Q.    -- about the laptop issue?

3        A.    I do.

4        Q.    Did you save any of those text messages?

5        A.    I went back and looked for them, and they

6   were on my phone several phones ago; so I don't have

7   those text messages anymore.

8              I remember her calling and wanting, you know,

9   a bunch of stuff to take up there.  So I said, "Yeah,

10  you know what?  I can get those up to you, but, you

11  know, it's going to have to wait until I can have access

12  to my wife's truck to take it up there."

13             And then she really wanted a laptop back, and

14  there was only one laptop in the house, and it was one

15  of the laptops -- it looked identical.  I mean, the

16  laptops were identical.  And so I remember driving it up

17  there to her, because she was throwing quite a hissy fit

18  about needing it for a class, and she was pissed off

19  because she bought that and paid $2,000 for it or

20  whatever and it's hers.

21             So I was like, "I don't give a shit whose

22  laptop it is."  And so I grabbed the laptop that was

23  there and took it up there.

24       Q.    And you don't recall sending any text message

25  to her that you'd created a user profile for her?
```



1          A.    No.

2          Q.    And you didn't send any text message that you

3    deleted and backed up the files on the computer you were

4    delivering to her?

5          A.    No.  I don't recall doing that -- I don't

6    know how to do that.

7          Q.    You don't know how to do what?

8          A.    I -- you'd have to ask the administrator to

9    create a user profile, and I'm not the administrator on

10   that computer.  I mean, I'm not the most tech-savvy

11   person there is.

12         Q.    Sure.  Would you have known how to back up

13   computer files on a CD?

14         A.    You mean, like, copy them onto a CD?

15         Q.    Yeah.

16         A.    Yeah, I could probably do that.

17         Q.    Okay.  And did you have any conversations

18   with John Du Wors about that computer?

19         A.    Not that I recall, no.

20         Q.    That's all for that one.

21               If I could have that marked Exhibit 24.

22               (Exhibit No. 24 marked for

23               identification.)

24         Q.    (BY MR. YURCHAK)  If you could take a minute

25   to review --



1        A.    Is it this one?

2        Q.    -- Exhibit 24.

3        A.    Okay.

4        Q.    All right.  So what do you recognize this

5   exhibit to be?

6        A.    A letter to Mark.

7        Q.    And do you recall this letter to Mark?

8        A.    No.

9        Q.    Do you recall writing it?

10       A.    No.

11       Q.    Did you review the letter during the --

12       A.    Just now.

13       Q.    And after reviewing it, does it refresh your

14   recollection as to the information that you wrote about

15   or that was written about in the letter?

16       A.    Yes.  A little bit.

17       Q.    Okay.  And do you notice the date on the

18   letter?

19       A.    31st of May 2012.

20       Q.    Does this appear to be a letter that you

21   would have written?

22       A.    Yes.

23       Q.    And does it appear altered or changed in any

24   way from the original letter, as you recall it?

25       A.    I couldn't tell you that.



1    Q.   And in the third paragraph, you mention that

2    "Steve is in dire straits."  What did you mean by that?

3                    MR. WEYTHMAN:  Objection.  Lacks

4    foundation.

5                    THE WITNESS:  He --

6                    MR. WEYTHMAN:  You haven't established

7    that he drafted the letter.

8                    MR. YURCHAK:  I thought he said he

9    didn't recall.

10    Q.   (BY MR. YURCHAK)  Do you recall writing this

11    letter?

12    A.   No.

13    Q.   So the letter references that "Steve is in

14    dire straits," in paragraph 3.  Was there any period of

15    time around May of 2012 where Steve wasn't doing too

16    well?

17                    MR. WEYTHMAN:  Objection.  Vague and

18    ambiguous.

19                    THE WITNESS:  He was -- I'm trying -- he

20    was going through a hard time with Joyce.

21    Q.   (BY MR. YURCHAK)  Okay.  Was there any other

22    difficulty that he was facing?

23    A.   May 2012 -- yeah.  I mean, she'd kicked him

24    out of the house.

25    Q.   And what do you remember about his situation,



1   living situation?

2        A.   He was -- if I remember correctly, he was

3   living at his daughter's house and then maybe his

4   girlfriend's house sometimes.  Just -- he was kind of

5   couch surfing, if you will.

6        Q.   And what was his frame of mind, if you can

7   recollect, in that period of time?

8                  MR. WEYTHMAN:  Objection.  Calls for

9   speculation.  Lack of foundation and personal knowledge.

10                 THE WITNESS:  I don't know.

11                 MR. YURCHAK:  Okay.  If I can have that

12  marked.

13                 (Exhibit No. 25 marked for

14                  identification.)

15                 THE COURT REPORTER:  Exhibit 25.

16       Q.   (BY MR. YURCHAK)  Exhibit 25.  After you've

17  reviewed it, do you have any idea of what this document

18  is?

19       A.   This looks like a patent contract to --

20  Contingent Fee Agreement with the Mann Law Group for

21  patent --

22       Q.   Do you --

23       A.   -- patent litigation.

24       Q.   Okay.  And do you have any recollection of

25  having any discussion with Mark about this --



1      A.    No.

2      Q.    -- fee agreement?

3      A.    No.

4      Q.    Any recollection with him about the Mann Law

5  Group?

6      A.    I'd heard of them before, and I know Mark

7  talked a lot about them, but I don't recall much

8  about -- I recognize Whitaker and the Mann Law Group.  I

9  think Philip Mann was the gentleman's name.

10     Q.    Do you recollect any conversations with Mark

11 regarding direction in terms of the use of the Mann Law

12 Group to pursue his IP -- violations of his IP?

13              MR. WEYTHMAN:  Objection.  Vague.

14              THE WITNESS:  Can you clarify for me a

15 little bit.

16     Q.    (BY MR. YURCHAK)  Do you recall any

17 conversations with Mark regarding using -- the use of

18 the Mann Law Group for patent violations on his IP?

19     A.    No.  I don't recall.  I -- if I -- what I

20 vaguely remember is that these attorneys were the ones

21 that helped him, I think, write -- maybe that's Olympic

22 Patent Works.  That's a different group.  Somebody that

23 were the lawyers that helped him write the patents.  I

24 don't recall.

25     Q.    Any recollection of seeking his direction for



```
 1    using Mann Law Group in the Hunts Point Ventures entity?
 2         A.   No.  I'm not sure, yeah.
 3                   MR. YURCHAK:  If I could have that
 4    marked as Exhibit 26.
 5                        (Exhibit No. 26 marked for
 6                        identification.)
 7         Q.   (BY MR. YURCHAK)  Do you recognize the
 8    handwriting in Exhibit 26?
 9         A.   Yes.
10         Q.   And whose handwriting do you recognize that
11    to be?
12         A.   The top part appears to be mine.
13         Q.   And could you read what you mean by "the top
14    part."
15         A.   It says "permission from Mark to Mann Group
16    for HPV."
17         Q.   And you're saying that's the part that
18    appears to be in your handwriting?
19         A.   Yes.
20         Q.   Do you have any recollection of writing that?
21         A.   I don't.  It looks like extemporaneous notes
22    of some sort.
23         Q.   Do you recollect why you would have asked
24    Mark's permission for the Mann Group for HPV?
25         A.   I don't recall specifically why.  I believe
```

1   on here that John Whitaker worked for Newman &

2   Du Wors -- was part of Newman & Du Wors.  I don't --

3   that's -- I don't recall the specifics about the Mann

4   Law Group, Mann Group, Mann whatever.

5       Q.   Do you have any recollection about when you

6   may have written this?

7       A.   No.

8       Q.   And which firm ultimately ended up doing the

9   patent violations?

10      A.   Newman & Du Wors.

11               MR. WEYTHMAN:  Objection.  Vague and

12  ambiguous.

13      Q.   (BY MR. YURCHAK)  And when did they -- when

14  were they retained, if you recollect, to do the patent

15  violation work?

16      A.   I don't recall.

17      Q.   How were they retained?

18      A.   I don't know.

19      Q.   Did you have any involvement in retaining

20  Newman & Du Wors for patent violations and HPV?

21      A.   Not that I recall.

22      Q.   Do you recall if you were an officer of HPV

23  at the time that Newman & Du Wors was retained for

24  patent violations?

25      A.   Can you clarify that.



1          Q.    Were you an officer at the time -- of HPV at

2    the time Newman & Du Wors was retained to do patent

3    violations?

4          A.    At the time they were retained?  No, I was

5    not.

6          Q.    Now, would you agree that, by 2011, your --

7    the Power of Attorney -- the general Power of Attorney

8    would have been terminated by that point?

9          A.    Would I agree that my -- the general

10   Power of Attorney that Mark had given me was terminated

11   at that point?

12         Q.    That's correct.

13         A.    Yes.

14         Q.    Is it then fair to say that you would not

15   have been taking -- doing any actions for the benefit of

16   Mark Phillips -- let me strike that.

17              Did you ever take any actions for the benefit

18   of Mark Phillips with respect to the Hunts Point

19   Ventures entity?

20                   MR. WEYTHMAN:  Objection.  Vague.

21   Ambiguous.

22                   THE WITNESS:  I -- can you clarify that

23   for me.

24              In 2011, I was dealing with my daughter

25   dying.  I was not doing anything on behalf of Mark

Page 168

```
 1   Phillips.  I was trying to survive for my family.

 2        Q.   (BY MR. YURCHAK)  Did you ever take any

 3   involvement -- did you ever take any actions with

 4   respect to Mark Phillips and the Hunts Point Ventures

 5   entity on his behalf?

 6        A.   Not that I recall, no.

 7        Q.   And what is your position on what Mark

 8   Phillips' role was in the Hunts Point Ventures entity?

 9        A.   Initially, the idea behind setting up Hunts

10   Point Ventures was to move forward and litigate patents,

11   intellectual property.  And the idea was to have Mark

12   act as a chief technology-type person, because he was a

13   horrible businessman but a brilliant software, creative

14   person.  And --

15        Q.   Did you understand that Mark Phillips was to

16   have -- to be a shareholder in Hunts Point Ventures?

17        A.   I don't recall.  That was Steve Schweickert's

18   venue.

19        Q.   Okay.  When we reviewed all of the emails

20   previously that you had been copied on regarding

21   subscription of shares and the setting up of Hunts Point

22   Ventures, does that refresh your recollection as to

23   whether Mark Phillips was to have a role in Hunts Point

24   Ventures?

25                  MR. WEYTHMAN:  Counsel, to which
```



1   exhibits are you referring to?

2                MR. YURCHAK:  Well, we could go through

3   them and be more specific, but I'm just going to ask

4   generally.

5                MR. WEYTHMAN:  Then objection.  Vague

6   and ambiguous.

7                THE WITNESS:  There was a lot of

8   intention for people -- for things to be set up, and

9   Steve Schweickert was in control of that.  And I don't

10  know -- wasn't privy to conversations he had with Mark

11  Phillips or other parties.  I was privy to the

12  conversations that he had with me, where he had stated

13  his intentions for what I have seen very little of what

14  Steve had intended actually took place.  And --

15       Q.   (BY MR. YURCHAK)  Okay.  I'm going to play an

16  audio clip off of my computer, and it's about

17  eight minutes long, and I'd just ask for you to listen

18  to it.

19       A.   Sure.

20       Q.   I'm also going to have -- I think it also

21  makes sense to introduce the next exhibit, which is a

22  transcript of what you're going to be listening to.

23                (Exhibit No. 27 marked for

24                identification.)

25                THE COURT REPORTER:  That is Exhibit 27.



 1                    THE WITNESS:  Okay.

 2                      (Audio clip played at 2:16 p.m.)

 3          Q.   (BY MR. YURCHAK)  Are you able to hear the

 4     audio?

 5          A.   Uh-huh.

 6                      (Audio clip played from 2:16 p.m. to

 7                      2:29 p.m.)

 8                    THE WITNESS:  Can I ask you what -- the

 9     purpose of playing that and having me relive that kind

10     of crap again?  I mean, I don't see any relevance to

11     this stuff, and I think it's kind of in low taste on

12     your part.  Seriously?

13          Q.   (BY MR. YURCHAK)  Yeah.

14          A.   If you play that for my wife --

15          Q.   Well, I'm --

16          A.   No, Reed.

17          Q.   I'm surprised that that's your reaction.

18          A.   That was a low-life piece of shit to play.

19          Q.   And why is that?

20          A.   Because all it was was me talking about my

21     dying daughter.  Have some fucking class.

22          Q.   Well, you know, if I could -- if I could edit

23     out the parts --

24          A.   There was nothing relevant to anything in

25     there.



1         Q.    Well, we can discuss that.

2                    MR. ARD:  We're going to take a break.

3                    THE COURT REPORTER:  Off the record?

4    Counsel, off the record?

5                    MR. YURCHAK:  Yep.

6                    (Break taken from 2:30 to 2:33 p.m.)

7                    MR. WEYTHMAN:  Counsel, I'd like to

8    advise you that anything pertaining to this document,

9    I'd like to keep it relevant.  If you venture off on

10   anything that is irrelevant, we're going to instruct the

11   witness not to answer, and we're going to end the

12   deposition.

13                   MR. YURCHAK:  Fair enough.

14           And I did stop it a bit early, prior to the

15   end, because I thought we were just -- we were close to

16   the end.  So I am going to hit "play."

17                   (Audio clip played from 2:33 p.m. to

18                    2:35 p.m.)

19        Q.    (BY MR. YURCHAK)  Now, on page 4 of the --

20   well, first of all, do you recognize the voices on that

21   audio clip?

22        A.    Is that a stupid question?

23        Q.    No.  This is a part of what's called "laying

24   a foundation."

25        A.    Yeah.  It was me talking to Mark.



Page 172

```
 1          Q.   And so you do recognize the voices?

 2          A.   Do you want me to say it in Chinese?

 3          Q.   If you can.

 4          A.   I'm being facetious.

 5          Q.   So was I.

 6               But there was no mention of any time frame or

 7     date as you were talking.  Do you have any recollection

 8     of when that conversation may have occurred?

 9          A.   Probably in the winter of 2011.

10          Q.   At the end of 2011?

11          A.   No.  My daughter was just, I think, finishing

12     up radiation; so I would say it was probably

13     end-of-January time frame, 2011.

14          Q.   As you were -- okay.  As you were listening

15     to the audio clip, were you following along with the

16     written transcript?

17          A.   A little bit.

18          Q.   Did it seem, in the little bit that you were

19     following, that the written transcript reflected what

20     was -- what you were hearing?

21          A.   What I heard was me kind of shining Mark on

22     because I had more important shit going on in my life

23     than dealing with his crap and wanting to sue everybody

24     under the sun.

25          Q.   Okay.  So in what way were you shining him
```



1    on?

2         A.    "Yeah.  Yeah.  This is what they're doing."

3              I wasn't paying attention to HPV at this

4    point.  Okay?  You heard me state in here I was getting

5    up every morning -- we just finished in Seattle for

6    six weeks straight, five days a week of going in for

7    radiation therapy.  Okay?  I wasn't paying attention to

8    anything that was going on with your client.  I didn't

9    care.

10        Q.    I did want to ask you about some of the

11   statements that you did make during that phone

12   conversation.

13        A.    Okay.

14        Q.    Now, your recollection was this happened in

15   the beginning of 2011, not the end --

16        A.    The date on your transcript here, if you can

17   read, says January 26th, 2011.  That's when the date

18   was -- right? -- because that's what -- the Federal

19   Bureau of Prisons keeps their transcripts of a recorded

20   inmate call.  So, yeah, why don't you read your own

21   document.

22        Q.    So that seems accurate to you?

23        A.    I don't think the Federal Bureau of Prisons

24   is going to lie.

25        Q.    So on page 4, it states -- Mark asks you



```
 1    [reading]:

 2              Is everyone happy about the settlement?

 3              And you say that [reading]:

 4              Yeah.  You did the right thing.

 5        A.   I don't recall.

 6        Q.   What settlement do you think Mark is

 7    referring to?

 8        A.   I have no idea.

 9        Q.   When you answered "You did the right thing,"

10    what did you mean by that?

11        A.   I don't recall.

12        Q.   Mark then proceeds to say that he wants to

13    recognize you for protecting him and taking care of

14    corporate governance.  What does "taking care of" -- and

15    your response is "Exactly."

16              What does "taking care of corporate

17    governance" mean?

18        A.   I don't know.

19        Q.   Do you think Mark was referring to Hunts

20    Point Ventures?

21              MR. WEYTHMAN:  Objection.  Speculation.

22              THE WITNESS:  I don't know what he was

23    referring to.  If you can tell in this conversation, I

24    was hardly listening to what he was saying.

25        Q.   (BY MR. YURCHAK)  That's your -- that's your
```



Page 175

```
 1    impression?

 2         A.    Yeah.

 3         Q.    Okay.

 4         A.    Look at it.  Read it.  Listen to it again, if

 5    you want to.

 6         Q.    And what do you take it to mean when Mark

 7    asks you to protect him --

 8              MR. WEYTHMAN:  Objection.  Speculation.

 9         Q.    (BY MR. YURCHAK)  -- and you said, "Exactly"?

10         A.    I don't recall.  You know, I don't recall.  I

11    was dealing with something else bigger than he'll ever

12    have to deal with in his life.  Okay?

13              Do you want to continue down this line?  Is

14    this all you got?

15         Q.    Yeah.  I have some more questions.

16              Why do you think Mark would be asking about

17    you helping him to take care of corporate governance?

18              MR. WEYTHMAN:  Objection.  Calls for

19    speculation.

20              THE WITNESS:  I don't know.

21         Q.    (BY MR. YURCHAK)  Was Mark asking you to take

22    care -- does it appear to you as if you were still

23    operating in a fiduciary capacity given your answer of

24    "Exactly" when Mark asked you to take care of him,

25    protect him, and shield him?
```



 1                     MR. WEYTHMAN:  Objection.  Calls for a

 2  legal conclusion.  Calls for speculation.

 3                     THE WITNESS:  No.  I don't recall.  I

 4  don't --

 5       Q.   (BY MR. YURCHAK)  Why does Mark -- why is

 6  Mark talking to you about you guys taking care of -- of

 7  helping him with Robert Arnold and holding Robert Arnold

 8  accountable?

 9                     MR. WEYTHMAN:  Objection.  Calls for

10  speculation.

11                     THE WITNESS:  I don't know.  Ask him.

12       You do know your client has a $4.1 million

13  judgment against him by Robert Arnold; right?  Yeah.

14       Q.   (BY MR. YURCHAK)  Uh-huh.

15       A.   Okay.  Just wanted to make sure you knew

16  that.

17       Q.   Right.  And he's asking you for help with

18  respect to Robert Arnold.  Why would he be asking you

19  for help?

20                     MR. WEYTHMAN:  Asked and answered.

21  Speculation.  Same objections.

22                     THE WITNESS:  I don't know.  He was

23  asking everybody and anybody for help.

24       Q.   (BY MR. YURCHAK)  Is your testimony that you

25  were not involved in any way with helping Mr. Phillips



1    with respect to Robert Arnold?

2         A.   I don't recall if I helped him with Robert

3    Arnold.  I was dealing with my daughter that had an

4    inoperable brain tumor.  My daughter couldn't walk at

5    the time.  I wasn't paying -- how many times do I have

6    to tell you that I wasn't paying attention to what the

7    hell was going on with Mark Phillips at this time?

8    Okay?  He had attorneys working for him and everything

9    else.  I was dealing with my family.

10        Q.   Was the Hunts Point Venture entity set up to

11   protect Mark with respect to civil litigation?

12        A.   I don't know.  Ask Steve Schweickert.  He was

13   Hunts Point Ventures.

14        Q.   When Mark says on page 5 that he's seeking

15   your help to get back to work so that "we can outdo MOD

16   and out do NCR in two...or three years," who do you

17   interpret "we" to mean?

18        A.   I don't --

19                  MR. WEYTHMAN:  Objection.  Calls for

20   speculation.

21                  THE WITNESS:  I don't know.

22        Q.   (BY MR. YURCHAK)  Was "we" in reference to

23   you and him?

24        A.   I was going to get chicken wings.

25        Q.   Was "we" in reference to you and him?



1        A.   I don't know what "we" was in reference to.

2        Q.   Why did you answer that "that's what we are

3   here to do"?

4        A.   I don't recall.  I don't even recall having

5   this phone call with Mark.

6        Q.   And your answer of "that's why we are" --

7   "what we are here to do, to protect you," et cetera --

8             MR. WEYTHMAN:  Objection.  Facts not in

9   the record.  That's not what it says.

10       Q.   (BY MR. YURCHAK)  -- which -- which "we" were

11   you referring to?

12       A.   I don't recall.  I don't know what you're

13   talking about.

14       Q.   I'm talking about your statement where it

15   says "that's what we" --

16       A.   And I've told you --

17             THE COURT REPORTER:  One at a time.

18             THE WITNESS:  -- over and over again, to

19   the same question, I don't know.

20       Q.   (BY MR. YURCHAK)  It hasn't been the same

21   question.  Hopefully, I've been asking different

22   questions.

23            Now, you make the statement on page 14 that

24   you have his back no matter what happens.  Why did you

25   make that statement?

1          A.    I don't know.  I don't recall.

2          Q.    Were you aware at the time that Mark Phillips

3     didn't have shares in Hunts Point Ventures -- was not --

4     let me strike that.

5               Were you aware at the time of this phone call

6     that Mark Phillips was not recognized at having shares

7     in Hunts Point Ventures?

8          A.    I told you I don't recall this phone call;

9     so, therefore, I don't recall whether or not Mark

10    Phillips had shares in Hunts Point Ventures.

11         Q.    And what did you mean when you said that you

12    "have your back no matter what"?

13         A.    At the time, I considered Mark a friend, and

14    friends do things like take them into their house and

15    provide a place for them and drive them over to

16    piss tests to make sure -- while he's being released on

17    an ankle monitor and buy cigarettes and buy groceries

18    and do things for him, answer the phone when no one else

19    will answer the phone because everybody else got smart

20    and left him beforehand.  And maybe I was a little slow

21    on the uptake on that.  That's what friends do.

22         Q.    On the next page, Mark has a discussion with

23    you about the attorneys' strategy with respect to suing

24    on the patents.  You respond that they're doing

25    research, "the best people to go after, the low-hanging

1   fruit...start hitting those folks first."

2           Do you recall where you acquired that sense

3   of what the attorneys were doing with respect to suing

4   the patents?

5                   MR. WEYTHMAN:  Objection.  Vague.

6   Ambiguous.

7                   THE WITNESS:  I don't recall.

8       Q.  (BY MR. YURCHAK)  Does it seem to -- does

9   your statement seem to reflect that you had some

10  knowledge as to what the attorneys were doing?

11      A.   I don't recall where I -- where that came

12  from.  I mean, there was emails going around, and I

13  wasn't meeting with attorneys.  I was meeting with

14  radiologists and oncologists.  So I -- once again, Reed,

15  you're barking up the wrong tree, because during this

16  time frame, I was pretty much preoccupied.

17      Q.   Well, I understand -- I understand that.

18      A.   You seem to be a little thick about it.

19      Q.   Well, maybe I'm a little thick but --

20      A.   Yeah, you are a little thick.  Why don't

21  you --

22      Q.   -- because of -- only because of a

23  statement --

24      A.   What are you asking?  The statement -- what

25  are you asking in here?  I'm blowing Mark off and going



1    to get chicken wings.

2         Q.   That you have knowledge of the attorneys'

3    strategy.  Which attorney --

4                   THE COURT REPORTER:  I need one at a

5    time; otherwise, I can't get it.

6                   THE WITNESS:  Jesus Christ.

7         Q.   (BY MR. YURCHAK)  So which attorney did you

8    obtain that knowledge from?

9         A.   I don't recall.

10        Q.   Why would you be having discussions with

11   attorneys regarding suing on the patents when, as you

12   described, you have much better things to attend to --

13        A.   I never said I was having discussions with

14   attorneys.  Stop putting words in my mouth.

15        Q.   Which attorneys do you recall were the ones

16   who were going after the patent violations?

17        A.   I don't recall at that time.  All the

18   attorneys I ever heard about were working on his

19   criminal defense.

20        Q.   Were you involved in any way with the

21   attorneys at that time of this phone call with the

22   patent violations?

23        A.   No.  I told you I was involved with

24   neuro-oncologists and radiologists at the time.

25        Q.   Do you recall any discussions with David

1   Bukey?

2          A.    No.   That was Mark's attorney, Mark's

3   criminal attorney.

4          Q.    Do you recall any discussions with Du Wors

5   about David Bukey?

6          A.    Not that I recall, no.

7          Q.    Do you recall David Bukey ever requesting

8   that HPV take care of his criminal bill --

9          A.    Yes.

10         Q.    -- for services to Mark?

11         A.    Yes, I do recall David Bukey wanting money.

12         Q.    Okay.   And when --

13         A.    I don't know.

14         Q.    -- was that conversation?

15               Was that conversation with you and David

16   Bukey?

17         A.    I don't remember when it was.

18         Q.    And what was the response --

19               MR. WEYTHMAN:   You okay?

20               MR. YURCHAK:   Yeah.   Just some

21   indigestion.

22         Q.    (BY MR. YURCHAK)   What was the response to

23   Mr. Bukey upon his request to be paid by HPV?

24         A.    I don't know.

25         Q.    You've said you did recall --



1        A.    I recall chitchat going around about David

2   Bukey wanting money from HPV.

3        Q.    You were also aware in the phone call of the

4   contingency fee agreement for the attorneys.  You said

5   it's 40 percent; is that correct?

6        A.    Yes.

7        Q.    How were you aware of that?

8        A.    I had heard from Steve -- Steve was handling

9   all this -- that that's what he had set up with the

10   attorneys.

11        Q.    How was it your understanding that HPV

12   acquired the intellectual property it now holds?

13        A.    It's my understanding that Mark sold the

14   intellectual property to Hunts Point Ventures.

15        Q.    When that occurred, are you aware of what

16   Mark Phillips was owed from that settlement agreement?

17                    MR. WEYTHMAN:  Objection.

18   Argumentative.

19                    THE WITNESS:  I don't understand.

20        Q.    (BY MR. YURCHAK)  When that settlement

21   occurred, are you aware of what, in the -- its terms and

22   provisions, what Mark was owed under that settlement

23   agreement?

24                    MR. WEYTHMAN:  Objection.  Assumes facts

25   not in the record, because there's no mention of a



1   settlement.

2                   THE WITNESS:  I don't know what

3   settlement you're talking about.

4        Q.   (BY MR. YURCHAK)  Are you aware of the terms

5   and conditions of the settlement in which the

6   intellectual property was sold to Hunts Point Ventures?

7                   MR. WEYTHMAN:  Objection.  Assumes facts

8   in the record.  Foundation.

9                   THE WITNESS:  I am not sure what

10  settlement you're talking about.

11       Q.   (BY MR. YURCHAK)  Are you aware of any

12  settlement in which -- that occurred in order to

13  facilitate the transfer of the intellectual property

14  into Hunts Point Ventures?

15       A.   I'm aware of a purchase and sale.

16       Q.   In the transcript, on page 4, it references a

17  settlement.  And you said -- Mark asks how do people

18  feel about the settlement, and you said "You did the

19  right thing."

20            Have you --

21       A.   Oh.

22       Q.   -- forgotten terms of the settlement?

23       A.   I never knew the specific terms of the

24  settlement, but I do remember that Mark represented,

25  when he sold Hunts Point Ventures the intellectual



1    property, that it was free and clear.  And then Steve

2    came to find out that there was a licensing agreement

3    with MOD Systems that Steve then had to unwind and ended

4    up in a settlement with Mark.  I was not privy to that

5    information.  I knew the top-line gist of what it was,

6    not the -- the ins and outs of it all.

7                    MR. YURCHAK:  Can I have that marked.

8                    (Exhibit No. 28 marked for

9                    identification.)

10                   THE COURT REPORTER:  Exhibit 28.

11        Q.   (BY MR. YURCHAK)  Do you recognize the

12   exhibit that's been placed before you?

13        A.   Yes.

14        Q.   It's a court filing.  I won't get into the

15   foundation of it.  On the page -- well, it's not

16   numbered -- the second-to-last page, subsection ii-1,

17   does that statement there -- first of all, if I could

18   refer you to the third-to-the-last page, what do you

19   recognize this document to be that we're looking at?

20        A.   End of Schedule A.

21        Q.   And Schedule B is what?

22        A.   So Schedule B is a List of Potential

23   Property.

24        Q.   In what?

25        A.   It doesn't say.



1        Q.    Would it be in Hunts Point Ventures --

2        A.    Oh, Hunts Point Ventures, Inc.,

3    Schedule B-List of Potential Property.

4        Q.    So you list in this schedule, going back to

5    the second-to-the-last page, subsection ii, that there's

6    a potential breach of warranty claim in the amount of

7    $300,000.

8             Is the description noted there -- is that the

9    same thing that you were talking about a minute ago with

10   respect to the issue of title in the settlement of the

11   IP?

12       A.    That deals with this same thing, yes, that

13   came up -- after Mark sold, you know, intellectual

14   property to Hunts Point Ventures, it was then discovered

15   that there was a -- what do you call it? -- a licensing

16   agreement with MOD Systems that prevented Hunts Point

17   Ventures from litigating the patents.

18       Q.    And what is the $300,000 in reference to?

19       A.    I believe it was money that was spent --

20   you'd have to ask Steve Schweickert exactly what

21   happened there, but I believe that was the amount that

22   they pulled out of the documents that showed what was

23   spent trying to negotiate and -- with MOD Systems to

24   free up the patents so that HPV could actually do

25   something with them.



1        Q.   Well, I'm afraid I can't ask Steve

2   Schweickert because, on the last page, this is signed by

3   you and Elizabeth.  You are corporate officers of --

4        A.   Yeah.

5        Q.   -- HPV?

6        A.   But at the time, the person who did that work

7   and did that settlement with MOD Systems was Steve

8   Schweickert.

9        Q.   Are you saying that you would have no

10  knowledge of it because at the time Steve Schweickert

11  was the person involved?

12       A.   Yes.  I did not have knowledge of that.  I

13  never read that document.

14       Q.   Have you looked through the corporate records

15  of HPV to gain a betting understand of what --

16       A.   That is something that Steve did not pass on

17  to HPV in the box of stuff that he passed on to me.

18       Q.   Do you have any -- is it your representation

19  on behalf of HPV that $300,000 was spent to clear title?

20       A.   To answer roughly, what was spent on

21  attorneys that do that.

22       Q.   Do --

23       A.   I'd have to go back and look at the

24  documents.

25       Q.   Is the -- is the $300,000 reflected in the

1    financial records of Hunts Point Ventures?

2         A.   I'd have to go back and look, because like I

3    said, there was no financial ledger that was kept at

4    that time.

5         Q.   Did -- is it your representation that Hunts

6    Point Ventures spent $300,000 to clear title?

7         A.   Yes.

8         Q.   Do you know whose money was spent?  Bad

9    question.  Strike it.

10             Do you know who the $300,000 was spent on?

11        A.   Attorneys.

12        Q.   Do you know which attorneys?

13        A.   I believe Newman & Du Wors.

14        Q.   Do you know where the $300,000 came from?

15        A.   Investors within Hunts Point Ventures.

16        Q.   Do you know which investors?

17        A.   No.

18        Q.   Is it your understanding that John Du Wors

19   was involved in that settlement?

20        A.   Yes.

21        Q.   And what is your understanding about what

22   period of time John Du Wors was an attorney for Mark

23   Phillips?

24                  MR. WEYTHMAN:  Objection.  Vague.

25                  THE WITNESS:  I don't know.



Page 189

1          Q.   (BY MR. YURCHAK)  Are you aware that
2    Mr. Du Wors was Mr. Phillips' criminal attorney?
3          A.   I'm aware that Mr. Du Wors assisted Pete Mair
4    in Mark's criminal defense, yes.
5          Q.   Are you aware if Mr. Du Wors acted as
6    Mr. Phillips' civil attorney in any matters?
7          A.   I don't recall if he represented Mark.  Mark
8    had a lot of different attorneys in civil matters, and I
9    don't recall if Mr. Du Wors represented Mark personally
10   or not.
11         Q.   Do you recall if Hunts Point Ventures was set
12   up to pay for the legal costs associated with Mark
13   Phillips' litigation?
14              MR. WEYTHMAN:  Objection.  Speculation.
15   Lacks personal knowledge.
16              THE WITNESS:  No.
17         Q.   (BY MR. YURCHAK)  No?
18         A.   (No audible response.)
19         Q.   Did you ever have any meeting with John
20   Du Wors regarding Mr. Phillips' criminal case?
21         A.   Not that I recall.
22         Q.   Did you ever have any meeting with him --
23   with John Du Wors regarding Mr. Phillips' civil cases?
24         A.   Not that I recall.
25         Q.   Do you recall if Mr. Du Wors ever asked you

1    to take any action on behalf of Mr. Phillips with

2    respect to his criminal case?

3         A.   Not that I recall.

4         Q.   With respect to any civil case?

5         A.   Not that I recall, no.

6         Q.   Did you ever have any conversations with

7    Mr. Du Wors regarding the -- either the general

8    Power of Attorney or special Power of Attorney between

9    Mr. Phillips and you?

10        A.   Not that I recall.

11        Q.   Did Mr. Du Wors ever tell you that he was not

12   Mr. Phillips' attorney?

13        A.   Not that I recall, no.

14        Q.   Do you recall any conversation with

15   Mr. Du Wors regarding the amended Articles of

16   Incorporation of Hunts Point Ventures?

17        A.   Not that I recall, no.

18             Can I take a bathroom break real quick?

19        Q.   Yeah.  If you want to take 10, 15 minutes, I

20   can organize my thoughts and close this out.

21        A.   I don't need that long.

22        Q.   I know.  But --

23             MR. WEYTHMAN:  That's fine.

24             MR. YURCHAK:  Just asking if you want to

25   take a --



Page 191

```
 1                    MR. WEYTHMAN:  That's fine.

 2                    (Break taken from 3:00 to 3:06 p.m.)

 3                    (Exhibit No. 29 marked for

 4                    identification.)

 5                    THE COURT REPORTER:  Exhibit 29.

 6                    THE WITNESS:  Thank you.

 7          Q.   (BY MR. YURCHAK)  So, again, we're going

 8     through the usual questions.  What do you recognize this

 9     document to be?

10          A.   An email.

11          Q.   And who is it from?

12          A.   Mark Phillips.

13          Q.   And do you recognize the email address from

14     Mark Phillips?

15          A.   It was one of many that Mark used, I think.

16          Q.   And do you recognize your email?

17          A.   Yes.

18          Q.   And we were just talking about the settlement

19     agreement and the -- whether title was clear or not.  Do

20     you recall receiving this email?

21          A.   Let me read it first.  Then I'll tell you,

22     but I don't think I recall receiving this email.

23               I don't recall this email specifically, no.

24          Q.   Okay.  Do you have any understanding as to

25     why Mark would have emailed you directly regarding the
```



Page 192

1   licensing agreements with MOD?

2      A.   Evidently, he thought this may be interesting

3   to provide to John Du Wors.

4      Q.   And why do you think he emailed you directly

5   about it?

6           MR. WEYTHMAN:  Objection.  Calls for

7   speculation.

8           THE WITNESS:  I don't know.  Steve

9   Schweickert's also in here too.

10     Q.   (BY MR. YURCHAK)  And this email concerns

11  his -- the licensing rights to his IP there in the first

12  sentence.

13          Do you see the date on this email?

14     A.   Yes.

15     Q.   And June 14, 2010; is that correct?

16     A.   It appears so.

17     Q.   Do you recall any discussions with Mark about

18  the licensing of his IP?

19     A.   No.

20     Q.   And you don't know why Mark would have

21  written to you directly?

22     A.   I don't know why.  I don't recall.  I -- I

23  know Mark had all kinds of licenses -- if I recall

24  correctly, the litigation, Mark had all kinds of

25  licenses and stuff with MOD and another company called

```
 1    AnythingBox, and there was -- it was way more

 2    complicated than I was able to understand.

 3        Q.   Okay.  Fair enough.

 4                  (Exhibit No. 30 marked for

 5                  identification.)

 6                  THE COURT REPORTER:  Exhibit 30.

 7        Q.   (BY MR. YURCHAK)  So what do you recognize

 8    Exhibit 30 to be?

 9        A.   An email.

10        Q.   And do you recognize the "From" email address

11    as being from Steve Schweickert?

12        A.   Yes.

13        Q.   And do you recognize your email address there

14    in the "To" line?

15        A.   Yes.

16        Q.   And do you recall receipt of this email?

17        A.   I don't recall receipt of this email.

18        Q.   Do you recall the information in this email?

19        A.   Yes.

20        Q.   And what do you recall about it?

21        A.   What do I recall about it?  I recall Doug

22    Lower asking -- asking me, "Hey, I need some money," and

23    asking Steve, you know, for money.  And we had

24    conversations around that.

25                  And at the time, I had Mark coming to live at
```



1   my house, and my wife had quit her job so that I could

2   help Mark out because of -- the times while she was at

3   work, I would stay home with the children, and we lost

4   about $2,000 worth of income.  And so when Doug had

5   brought up getting money, I was like, "Well," you know,

6   "I only need a little bit to help offset what my wife

7   had given up and also now supporting Mark."

8           And Doug decided he needed $8,000.  And I

9   said, "Well" -- you know, I went home with Elizabeth and

10  talked to her and figured that $2,000 for a month would

11  help offset the expenses.

12      Q.   Okay.  And was there any documents produced

13  regarding the payment -- the disbursement to you of

14  $2,000 from Hunts Point Ventures?

15              MR. WEYTHMAN:  Objection.  Ambiguous.

16          What do you mean by "produced"?

17      Q.   (BY MR. YURCHAK)  Were there any documents

18  produced to document this transaction of 2,000 -- of

19  this $2,000 disbursement to you?

20      A.   Isn't that what this is?

21      Q.   Were there any corporate documents that were

22  produced?

23      A.   Not that I'm aware of.

24      Q.   Was there any loan document that was made?

25      A.   Not that I'm aware of.



 1          Q.    Do you recall signing anything with respect

 2    to the receipt of the $2,000?

 3          A.    No.

 4          Q.    Do you recall how Hunts Point Ventures has

 5    booked this transaction?

 6          A.    I believe it was an advance on future

 7    earnings when in fact we did become shareholders.

 8          Q.    And so this happened on May 28, 2010;

 9    correct?

10          A.    Yes.

11          Q.    So was it your understanding at that early

12    time that you were to be a shareholder?

13          A.    At some point in time, yes.

14          Q.    And your understanding of that came from who?

15          A.    Steve Schweickert.

16                MR. YURCHAK:  Okay.  I'm going to hand

17    forward another document.

18                THE WITNESS:  You know, Reed --

19                    (Exhibit No. 31 marked for

20                    identification.)

21                THE COURT REPORTER:  Wait, wait, wait.

22              Exhibit 31.

23                THE WITNESS:  Okay.

24                THE COURT REPORTER:  Go ahead.

25                THE WITNESS:  Never mind.



1              Oh, I'd like to read this.  I've never seen

2    this before.

3         Q.   (BY MR. YURCHAK)  Have you ever seen this

4    document before?

5         A.   No.

6         Q.   Would it -- if I were to say that it was

7    provided by you to the receiver in Hunts Point Ventures,

8    would that be news to you?

9         A.   Yes.

10        Q.   As far as you're aware, has this document

11   ever been in your possession at any point in time?

12        A.   No.  I don't recall this document.

13        Q.   Did you ever receive documents from John

14   Du Wors regarding his representation of -- let me

15   rephrase that.

16             Have you ever received documents regarding

17   communications between Mr. Du Wors and Mr. Phillips in

18   his representation of Mr. Phillips?

19        A.   No.  I don't recall receiving documents.

20   It's very interesting reading, though.

21                  (Exhibit No. 32 marked for

22                  identification.)

23             THE COURT REPORTER:  Exhibit 32.

24        Q.   (BY MR. YURCHAK)  Do you have any explanation

25   for how the receiver may have come into possession of



1    that document?

2         A.    No.

3         Q.    Okay.  Moving on to Exhibit 32, again, what

4    do you recognize this document to be?

5         A.    It's an email.

6         Q.    And it's an email from Steve Schweickert;

7    correct?

8         A.    Yes.

9         Q.    And you recognize his email address, and who

10   is it sent to?

11        A.    To John Du Wors.

12        Q.    Do you recognize his email address?

13        A.    Yes.

14        Q.    Is that his correct email address?

15        A.    He -- one of a couple, yeah.

16        Q.    And have you been copied on that email?

17        A.    It looks like I was copied on that email.

18        Q.    And I'll give you a moment to review it.

19        A.    Uh-huh.

20        Q.    You notice the date, June 11, 2010; correct?

21        A.    Uh-huh.

22        Q.    Do you recall receiving this email?

23        A.    No.

24        Q.    Do you recall the -- what the contents of

25   this email are about?



Page 198

1          A.   If I don't recall receiving the email, I

2     don't recall what the contents is about.

3          Q.   Reading it now, it may refresh your

4     recollection as to what occurred.

5          A.   It looks like we are going to John's office,

6     according to Steve, for a meeting.

7          Q.   Do you recall ever going to John's office

8     for -- with Steve for a meeting?

9          A.   Yes.

10         Q.   Do you recall that happening around this

11    time frame in June of 2010?

12         A.   No.

13         Q.   You do recall -- okay.

14              Do you have any explanation why the email

15    says that "Chad is the vice president of hunts point" --

16    "hunts point ventures"?

17                   MR. WEYTHMAN:  Objection.  Calls for

18    speculation.  Personal knowledge.

19                   THE WITNESS:  Ask Steve.

20         Q.   (BY MR. YURCHAK)  Did you have any

21    conversations with Steve about you being the

22    vice president of Hunts Point Ventures?

23         A.   I don't recall.

24                   MR. WEYTHMAN:  Thanks.

25                   (Exhibit No. 33 marked for



1                  identification.)

2                  THE COURT REPORTER:  Exhibit 33.

3       Q.   (BY MR. YURCHAK)  Do you recognize the

4  document that's been placed in front of you?

5       A.   Not yet.

6       Q.   I'll give you time to review it.

7       A.   Okay.  What was your question?

8       Q.   Do you recognize that document?

9       A.   Sort of, yes.

10      Q.   And what do you mean by "Sort of, yes"?

11      A.   It looks like some of the formation documents

12  of Hunts Point Ventures.

13      Q.   Did you ever have occasion to view this

14  document prior to today?

15      A.   I don't recall specifically, but I think I've

16  seen this before.

17      Q.   And would this be a document that would be

18  kept in the ordinary business of Hunts Point Ventures?

19      A.   Evidently, yes, it should be.

20      Q.   Is this a document that you recall keeping in

21  the corporate records of Hunts Point Ventures?

22      A.   I don't recall if this was turned over by

23  Steve or not.

24      Q.   Okay.

25      A.   I think it may have been, but I'm not sure.



```
 1        Q.    Okay.

 2                    MR. WEYTHMAN:  Thanks.

 3                       (Exhibit No. 34 marked for

 4                       identification.)

 5                    THE COURT REPORTER:  Exhibit 34.

 6                    THE WITNESS:  Thank you.

 7                    MR. YURCHAK:  Mark that one as well.

 8                       (Exhibit No. 35 marked for

 9                       identification.)

10                    THE COURT REPORTER:  And 35.

11                    THE WITNESS:  Thank you.

12        Q.    (BY MR. YURCHAK)  So with Exhibit 35, do you

13   recognize the document in front of you?

14        A.    35, yes.  That would be an email.

15        Q.    And the email is from Mark Phillips?

16        A.    Yes.

17        Q.    Do you recognize his email address?

18        A.    Yes.

19        Q.    And you are included on the "To" line?

20        A.    Yes.

21        Q.    And you recognize your email address there?

22        A.    Yes.

23        Q.    And do you recall -- and the email was sent

24   on June 7, 2010; is that correct?

25        A.    That's what it says.
```



```
 1          Q.   And do you recall the content of this email?

 2          A.   I -- I don't recall -- I saw this -- this,

 3   actually, relatively recently, this -- these documents

 4   here and this email, these here that you gave me.

 5   Document 34 was part of Steve Schweickert's deposition.

 6   So I just saw these recently, yes.

 7          Q.   So with respect to document 35, do you recall

 8   receiving an email from Mark about liquidating accounts?

 9          A.   I don't recall this email specifically.  I

10   think there was several hundred emails that were sent.

11          Q.   Okay.  Do you recall Mark ever asking you to

12   liquidate any of his financial accounts?

13          A.   I recall Mark living at my house and asking

14   for help liquidating some of these accounts -- I think

15   most of them were education -- educational funds for his

16   nieces and nephews -- for the purpose of repaying funds

17   that Hunts Point Ventures had loaned him to pay.  I

18   think the initial was $10,000 to David Bukey and another

19   $50,000 to David Bukey, and then I think there was some

20   funds to an architect or some -- of some sort.

21          Q.   So what's the basis for the information that

22   it was to repay Hunts Point Ventures?

23          A.   I think it's because Steve had told Mark, "We

24   can't continue to do this.  This is not" -- "Hunts Point

25   Ventures is not your own piggy bank."
```



1        Q.    And how do you know that Steve told Mark

2   that?

3        A.    I just recall in conversations.

4        Q.    Conversations with who?

5        A.    Steve and Mark.

6        Q.    So you said that Hunts Point Ventures had

7   loaned Mark money.  Do you recall in what amounts it had

8   loaned Mark money?

9        A.    I believe I saw just recently a check for

10  $10,000 to David Bukey when Mark was arrested, and then

11  I remember hand delivering a check for $50,000 for a

12  retainer to David Bukey for Mark's criminal defense.

13       Q.    And where do you recall the money coming

14  from?  What was the source of the money that HPV paid

15  for -- with respect to those two transactions, the

16  10,000 and the 50,000?

17       A.    I'm sorry.  Can you clarify what --

18       Q.    Do you know what the source of that money

19  was?

20       A.    That HPV had?  It was from an investment by

21  Joyce Schweickert.

22       Q.    And to be clear, when those accounts -- when

23  Mark's -- the money that came from Mark into HPV, what's

24  the basis of knowledge that that was to repay Hunts

25  Point Ventures?



```
 1          A.    Conversations and -- that he -- Mark would

 2    repay Hunts Point Ventures because the money was going

 3    out quickly and was not intended to pay for criminal

 4    defense.  It was intended to start doing business, and

 5    instead Mark basically told everybody, "If you don't pay

 6    this retainer, if you don't pay for all this stuff, I'm

 7    going to take my IP and leave."

 8              It should also be noted that this right here

 9    is added after the fact.  This little note right here

10    where Mark purports to say "Oh, you know, by the way,

11    proceeds to pay my new subscription of stock" is

12    fabricated after the fact by your client.  And I can

13    prove that with a string of emails that we recently

14    discovered.  When you open the documents up, they do not

15    in fact say that, these exact documents, including this

16    one with the writing up here.  This is a false document.

17              Maybe you should talk to your client about

18    that.  That's why I'm kind of suspect about all the

19    documents that you produced to me, because the veracity

20    of them is definitely in question, as has been shown by

21    the federal court and other state court things, that

22    Mark has a tendency to doctor, remove, exclude, or

23    produce documents as he sees fit.  So if you want to

24    continue down that path --

25          Q.    Yeah.
```

1        A.   -- we can continue down that path, and you're

2  going to lose.

3        Q.   So was Mark's IP in HPV at the time these

4  transactions were being made, the 50,000 going out to

5  his attorney --

6        A.   No.

7        Q.   -- his money coming in?

8        A.   No.

9        Q.   Okay.  So why was HPV making those payments?

10       A.   We had -- HPV had secured investment from

11  Joyce Schweickert on the promise of litigating the IP.

12  Mark was using that as leverage, because that's one of

13  his favorite things to do -- is leverage people.

14            Eventually, it got to the point where -- I

15  don't think you understand this, because there was a

16  little bit of confusion on your part about a settlement

17  with MOD Systems and a purchase and sale of the

18  intellectual property.  Those are two different things,

19  or has your client not shown that to you?  There was a

20  purchase and sale of the intellectual property from Mark

21  Phillips to Hunts Point Ventures.

22            Subsequently, when Hunts Point Ventures went

23  to enforce the intellectual property rights, lo and

24  behold, you couldn't do it because there was a licensing

25  agreement with MOD Systems that Hunts Point Ventures



1    then had to expend a substantial amount of cash to

2    unwind so they could hope to recoup the moneys that they

3    had borrowed from investors.  Mark had conveniently left

4    that out when he signed that purchase and sale

5    agreement.

6              So maybe you should go do some homework and

7    look up and see the purchase and sale agreement that was

8    executed by Mark Phillips to Hunts Point Ventures and

9    signed by Steve Schweickert and Mark Phillips and then

10   the MOD settlement agreement as well that, I think, was

11   dated afterwards.  It might answer some questions for

12   you.

13        Q.   When do you recall the purchase and sale

14   agreement being executed?

15        A.   I don't recall.  Maybe in the fall of 2010,

16   fall/winter.  I'm not sure.

17             I think, before you start grilling people on

18   stuff like this, you should get, in your own head, the

19   clear facts of what's going on.

20        Q.   Part of a deposition is to get --

21        A.   Well, you think you might have --

22        Q.   -- the facts are --

23             THE COURT REPORTER:  One at a time.

24             THE WITNESS:  You think you might have

25   kind of an accurate road map to go by.

1              MR. WEYTHMAN:  Let's just try to get

2    through it.

3         Q.   (BY MR. YURCHAK)  Are you aware of the

4    details in the purchase and sale agreement?

5         A.   I can't recall.  I might have to have them in

6    front of me.

7         Q.   Do you recall if the purchase and sale

8    agreement had any terms which promised Mark any

9    payments?

10        A.   Not that I'm aware of.

11        Q.   Do you recall any conversations with Mark

12   regarding receipt of funds that he was owed under the

13   purchase and sale agreement?

14        A.   I don't recall.

15        Q.   You stated that Mark promised Hunts Point

16   Ventures that he would -- that, in exchange for the

17   money being spent -- or loaned, I should say -- to him,

18   that he would then put his intellectual property into

19   Hunts Point Ventures; is that correct?

20             MR. WEYTHMAN:  Objection.

21   Mischaracterizes the witness's testimony.

22             THE WITNESS:  That's not what I stated.

23        Q.   (BY MR. YURCHAK)  Did you not state that Mark

24   Phillips made promises to people and that's what he did

25   to gain leverage over others?



1          A.    He did make promises to people, and that's

2   what he did to gain leverage over others, as I'm sure he

3   did you.

4          Q.    Was one of those promises to sell his

5   intellectual property to Hunts Point Ventures?

6          A.    No.

7          Q.    What's your understanding, then, about how

8   his -- about -- about how Mark decided to sell his

9   intellectual property to Hunts Point Ventures?

10         A.    It's my understanding from Steve that Hunts

11  Point Ventures was running out of money, had no assets

12  except for the promise that Mark Phillips would

13  participate with Hunts Point Ventures and his

14  intellectual property.  And, therefore, Steve made the

15  judgment that Hunts Point Ventures could not, on good

16  conscience, move forward with paying money for Mark's

17  legal troubles without owning any assets, which they

18  hoped to recoup costs.

19         So Mark was going to be cut off and left at

20  the -- the public defender unless he had more money to

21  pay for it, and the only way he was going to get money

22  to pay for it was if somebody bought his intellectual

23  property.

24         Q.    Okay.  And was it your understanding that he

25  was selling his intellectual property to an entity to



1    which he was -- to which he belonged?

2         A.    I don't know.  Ask him.

3         Q.    Does Hunts Point Ventures have any source

4    documents -- loans, contracts, anything of that

5    nature -- with respect to the money it spent on behalf

6    of Mark Phillips regarding the $10,000 transaction and

7    the $50,000 transaction that you mentioned?

8         A.    Not that I'm aware of.

9         Q.    Are you aware of who would have authorized

10   those expenditures?

11              MR. WEYTHMAN:  Objection.  Calls for

12   speculation.

13              THE WITNESS:  I have an idea of who

14   authorized those expenditures.

15        Q.    (BY MR. YURCHAK)  And who do you think that

16   is?

17        A.    Steve Schweickert.  I think you've submitted

18   to me here in your -- here on Exhibit 33, it says the

19   "Organizational Meeting of Board of Directors," and it

20   lists Steve Schweickert and Joyce Schweickert as the

21   sole shareholders of the corporation as of May 5th,

22   2010.

23        Q.    Okay.  With respect to Exhibit -- was it

24   35? -- the one you -- the one behind it, the one you

25   refer to as -- this one.



1          A.   Oh.   The -- yeah.   What about it?

2          Q.   Now --

3                    MR. WEYTHMAN:   Can I see that.   What

4    number is that?

5                    THE WITNESS:   Number 35.

6                    MR. WEYTHMAN:   It's actually 34.

7                    MR. YURCHAK:   Thank you.   34.

8          Q.   (BY MR. YURCHAK)   Do you recall receiving

9    this document from Mark Phillips?

10         A.   No, I don't.

11         Q.   In -- June 7, 2010, to the best of your

12   recollection, was Mark Phillips still at your residence?

13         A.   Yes.

14         Q.   And what would he -- what would he be

15   typically doing on any given day while at your

16   residence?

17         A.   Either sleeping on the couch, writing a

18   qui tam complaint, or directing people off and about to

19   take care of different things and his conspiracy

20   theories and lawsuits that he had going on with MOD

21   Systems.

22         Q.   Is -- was a transfer of these funds one of

23   those things he may have given you instruction to take

24   action on?

25         A.   Yes.



1      Q.   Do you recall being the agent who transferred

2  his funds from Mark Phillips' accounts to HPV?

3      A.   No.  I believe he did that, because he was

4  living in my house.  There was no reason to do -- the

5  checks got mailed to my house.

6      Q.   Could you describe how the funds were

7  transferred into HPV.

8      A.   I gave them to Steve Schweickert in the form

9  of a check, and I believe he took them to Commerce Bank

10  and deposited them there, because that's where the HPV

11  bank account was.

12      Q.   I'm looking for more particulars in how the

13  transfer of money -- from what account to what account.

14          So how did the money first come into your

15  possession?

16      A.   It was never in my possession.  It showed up

17  at my house in an envelope addressed to Mark Phillips.

18  It was a check.

19      Q.   How -- it showed up as a check?

20      A.   Yes.

21      Q.   Was it one check?

22      A.   No.  There were multiple checks, because

23  there were multiple accounts.

24      Q.   Who were the checks made out to?

25      A.   Mark Phillips.



1          Q.    And I assume the checks were from these

2     respective --

3          A.    T. Rowe Price --

4          Q.    -- accounts listed on the document?

5          A.    Yes, as far as I know.

6          Q.    And how were the checks endorsed?

7          A.    I believe Mark Phillips endorsed it and I

8     drove him up to give them to Steve Schweickert.

9          Q.    The checks, you said, were made out to Mark

10    Phillips?

11         A.    I believe so.

12         Q.    Do you have any understanding of how --

13         A.    I don't recall if they were exactly, but I

14    believe so.

15         Q.    Do you recall how the checks were deposited

16    into Hunts Point Ventures when they were made out to

17    Mark Phillips?

18         A.    I don't -- I don't recall.  I handed them

19    off.

20         Q.    Okay.  And with respect to the instructions

21    on the second page of Exhibit 34, do you have any

22    recollection of seeing -- of seeing this document in

23    June of 2010?

24         A.    I don't have any recollection of seeing it in

25    June of 2010.



Page 212

1      Q.   Do you have any recollection of seeing the

2   first page of Exhibit 34 --

3      A.   No.

4      Q.   -- in June of 2010?

5      A.   No, I don't.

6      Q.   And you stated that you had found these --

7   found the documents -- found the email that these

8   documents were attached to in your email; is that

9   correct?

10     A.   Yes.

11     Q.   Okay.  And what did those documents show in

12  that email?

13     A.   The email was just like it is here; right?

14  But then you open the attachments, and there's this one

15  right here, and then there's this document sans the

16  handwriting at the bottom where it says "chad and

17  steve."  Otherwise, the rest of it is there.  And I

18  hadn't seen that document until I started going through

19  it for the receiver.

20     Q.   So on the rest of that document --

21     A.   Because the receiver showed me this, and I

22  was just like, "Wow," and went back and looked up and

23  opened up the PDF document on the original email, and lo

24  and behold, this is there, and this is there, but it

25  didn't have this, this writing here at the bottom.



1                   That's what I'm talking about.  Your client

2    has a history of altering documents and forging

3    documents to his own benefit.

4         Q.   Did --

5         A.   Ask the federal court about it.  He got

6    caught doing it there too.

7         Q.   Did the document have the handwriting -- the

8    document that you opened up in your email account have

9    the handwriting on the left margin?

10        A.   Yes, it did, right here at the top where it

11   says -- I can't -- it's ineligible -- intelligible.  I

12   can't read it, but it was -- that was in there.

13        Q.   So you don't recall seeing this document at

14   the time in June of 2010; correct?

15        A.   No, I did not.  It was a PDF that I opened up

16   about two weeks ago and looked at.

17        Q.   Do you recognize the handwriting in the

18   left-hand margin?

19        A.   No, I don't recognize the handwriting in the

20   left-hand margin.  It could be -- it looks suspiciously

21   like Mark Phillips' handwriting, because he has a

22   tendency to write very small and all lowercase letters.

23        Q.   Okay.  Did the document have any sort of

24   watermark on it that you can recall, from a scanner?

25        A.   I don't recall.



Page 214

1            How does a scanner leave a watermark?  Just

2   for my information.  I'm not sure how a scanner leaves a

3   watermark.  Usually, a watermark's impregnated on a

4   piece of paper; correct?

5        Q.   Yes.

6        A.   Okay.  So how would a scanner leave a

7   watermark?

8        Q.   I think I was just asking if the document

9   that you recall seeing had -- if it had any sort of

10  watermark on it.

11       A.   No.  It was a PDF document I opened on the

12  computer.

13       Q.   And -- okay.  Are you in possession of any

14  other handwritten documents from Mark that you have not

15  received by email?

16       A.   Not any -- no.  Not now.

17       Q.   So what do you mean by "not now"?

18       A.   As of this moment, I don't have any

19  handwritten documents from Mark Phillips.

20       Q.   Do you recall, at the time in June when Mark

21  was living with you, if he ever provided you with

22  written documents in his handwriting?

23       A.   I don't recall, but I'm sure he did.  He

24  lived in my house.

25       Q.   Okay.  Would -- would it be possible that



1    these were handwritten instructions or notes to you?

2                    MR. WEYTHMAN:  Objection.  Calls for

3    speculation.

4                    THE WITNESS:  I don't -- I don't know.

5         Q.   (BY MR. YURCHAK)  Now, are these documents

6    that you're able to provide to us from your email

7    account regarding what we have just discussed?

8                    MR. WEYTHMAN:  Objection.  Vague.

9         Q.   (BY MR. YURCHAK)  Are you able to provide

10   these documents that you've -- that you've referenced

11   having received from Mark with respect to Exhibit 34?

12        A.   Do I have these on an email?  Yes, I have

13   them in an email, in a PDF -- attachment -- PDF

14   attachment to an email.  Yes, I have them.

15        Q.   I understand you have them.  Are you able to

16   provide them?

17        A.   I don't know.  It depends on what my

18   attorneys say.

19        Q.   Okay.  Do you recall when Mark Phillips was

20   released from custody?

21        A.   Which time?

22        Q.   When he was released from Sheridan in Oregon

23   after serving his sentence.

24        A.   Vaguely, yeah.  I believe it was in October

25   time frame?



1        Q.   Of what year?

2        A.   I think it was 2012.

3        Q.   Okay.  Did you have -- do you recall any

4   conversations with Mark at that time, after his release?

5        A.   We had a couple conversations, yes.

6        Q.   Did Mark come to ask about what was happening

7   with Hunts Point Ventures?

8        A.    Mark wanted a meeting, and he had drafted

9   Joint Consent in Lieu of Shareholders or some other

10  stuff and meeting minutes, making him CTO and -- and

11  shareholder of Hunts Point Ventures.

12       Q.   Okay.  And did he ask you to do anything?

13       A.   He asked me to sign those.

14       Q.   And what was your response?

15       A.   "No."

16       Q.   Did you have any further discussions about

17  what kind of role Mark might have in Hunts Point

18  Ventures at that time?

19       A.   Yes.

20       Q.   What were those discussions?

21       A.    Steve and I spoke with Mark and informed him

22  that we would very much like to have a business

23  relationship with him as far as Hunts Point Ventures is

24  concerned because we saw the value in his technology

25  genius; however, because of the fact that he was a



Page 217

1    convicted felon on white-collar criminal counts,

2    including fraud and money laundering, that having him as

3    a director or board member of the company could prove

4    detrimental, considering the fact that the primary

5    business purpose of Hunts Point Ventures was to litigate

6    patents.

7              To have somebody who'd been already

8    admonished by a federal judge for lying on the stand

9    would not be conducive to business; however, we were

10   open to trying to set up some sort of a contractual

11   relationship with him and make everybody happy, at which

12   point Mark decided that, no, that everything was his.

13   And he yelled at us and stormed out and said we were

14   going to be sued.  He threw a tantrum.

15             MR. PHILLIPS:  Bullshit.

16             MR. ARD:  Let the record reflect the

17   attendee said, "Bullshit."

18        Q.   (BY MR. YURCHAK)  Was -- the concern about

19   him being a convicted felon, was that a concern that you

20   shared?

21        A.   About Mark being a convicted felon?

22        Q.   Right.

23        A.   Having him on the corporate -- as CTO of a

24   corporation when your whole job is to prosecute patents

25   and people are going to call into question whether or



1    not -- you know, the honesty of things, it would seem

2    that kind of a foolish move, instead to have him work

3    behind the scenes, you know?  I mean, it just --

4         Q.   Is that --

5         A.   What would you do?

6         Q.   I don't know.

7              Is that a discussion -- did you have any

8    discussions with John Du Wors about how to handle Mark

9    with respect to Hunts Point Ventures?

10        A.   Yes.

11        Q.   And what was John Du Wors' opinion about

12   that?

13        A.   I'm trying to remember.  John Du Wors was, I

14   believe, the one that suggested that we try to find some

15   sort of -- what do you want to call it? -- advisor or

16   contractual relationship with Mark in that capacity.

17        Q.   Did you propose any terms to Mr. Phillips

18   with respect to the involvement that you saw him having?

19        A.   We didn't quite get that far because, like I

20   said, he threw a temper tantrum and stormed out of the

21   room.

22        Q.   You said that Mark Phillips was admonished

23   for lying on the stand.  How are you aware of that?

24              MR. WEYTHMAN:  Objection.

25   Mischaracterizes the witness's testimony.



Page 219

```
 1                    THE WITNESS:  I believe it was when --
 2    in the federal court, in his criminal trial, he was
 3    caught, I remember reading someplace, mischaracterizing
 4    things and also in fabricating documents in the transfer
 5    of the watches and invoices and stuff of that matter.
 6         Q.   (BY MR. YURCHAK)  You said you read
 7    something?
 8         A.   I read, yeah, something about that in his --
 9    I don't recall exactly where, but it was part of the
10    reason why he got -- you know, went to jail.
11         Q.   Did you attend any part of his trial?
12         A.   I believe I attended the closing arguments.
13         Q.   Did you ever agree to make Mark Phillips an
14    officer of Hunts Point Ventures after his release?
15         A.   No.
16         Q.   How did Mark Phillips learn that he was not
17    going to be -- from whom did Mark Phillips learn that he
18    was not going to have any role in Hunts Point Ventures
19    because of him being a convicted felon?
20                    MR. WEYTHMAN:  Objection.  No personal
21    knowledge.
22                    THE WITNESS:  I don't know.
23         Q.   (BY MR. YURCHAK)  You don't know from whom he
24    learned that he would no longer have a role in Hunts
25    Point Ventures?
```



1        A.    No.

2        Q.    At some point in time -- did you become aware

3    in 2003 that there was a patent maintenance fee that was

4    due for the IP held in Hunts Point Ventures?

5        A.    I was living in California in 2003.

6        Q.    2013.  Thank you.

7        A.    Oh.  Yes.

8        Q.    And how did you become aware of that?

9        A.    I believe it was from John Du Wors.  I don't

10   recall exactly.

11       Q.    Do you recall if Hunts Point Ventures made

12   any payment on that patent?

13       A.    That was what John Du Wors was directed to do

14   with John Whitaker.  John Whitaker, I believe, was the

15   one that was handling that because he, like, does the

16   patent portion with Newman & Du Wors.

17       Q.    Did you retain John Whitaker to handle the

18   patents?

19       A.    He was part of Hunts Point Ventures' counsel

20   group.  He worked for Newman & Du Wors.

21       Q.    Who is part of the Hunts Point Ventures

22   counsel group?

23       A.    Newman & Du Wors.

24       Q.    I understand that law firm has a number of

25   attorneys.

Page 221

1      A.   Yes.

2      Q.   Is every attorney -- is your testimony that

3  every attorney in that firm is of counsel on Hunts Point

4  Ventures?

5      A.   I -- I don't -- I mean, we -- Hunts Point

6  Ventures employed that law firm, and they had various

7  attorneys working on various things.

8      Q.   Okay.

9      A.   So I don't know if that means you have to

10 deal with a single attorney or -- but I know that there

11 were several working on different aspects.  And I know

12 John Whitaker specialized in the patent exam and reexam

13 stuff and that sort of --

14     Q.   And as far as you're aware, John Whitaker is

15 a member of -- of that law firm?

16     A.   As far as I know, yeah.  If you look on their

17 website, he's on there.

18     Q.   And going back again to the issue with the

19 payment on the maintenance fee --

20     A.   Uh-huh.

21     Q.   -- how did you become aware of it?

22          MR. WEYTHMAN:  Asked and answered.

23          THE WITNESS:  I told you I believe John

24 Du Wors notified me of it and he was taking care of it.

25     Q.   (BY MR. YURCHAK)  So John Du Wors said that

1    he would take care of the patent fee; is that correct?

2         A.    If I -- that was his job.  That was -- the

3    law firm's job is to take care of that stuff.  I mean,

4    who do I send the check to?  I don't know.  That's what

5    patent attorneys get paid to do.

6         Q.    What was your understanding about where the

7    funds would come from to do that?

8         A.    There was limited funds left in the Hunts

9    Point Ventures IO -- "ILOTA" account and that that would

10   be covered there.

11        Q.    So John Du Wors told you that the fee would

12   be paid out of the IOLTA account?

13        A.    I don't recall him specifically stating that,

14   but that was kind of the understanding.

15        Q.    Your understanding was that he reassured you

16   he would take care of the payment and that you didn't

17   need to worry about it?

18        A.    Yes.  That's what their job was.

19        Q.    Okay.  He didn't ask you for funds for it?

20        A.    No.

21        Q.    And as far as you're aware, were any of the

22   patents undergoing a reexamination process?

23        A.    Yes.

24        Q.    Do you recall which patents?

25        A.    There was one, and I believe it was the



1    buffering patent, and that reexam was initiated by

2    Epson.

3          Q.   And when was that?

4          A.   I think in 2012 was when it was initiated.  I

5    don't recall exactly.

6          Q.   And do you recall if Newman & Du Wors was --

7    the same law firm, was the one to take care of the

8    reexamination issue?

9          A.   I assume so, because John Whitaker worked

10   for -- was a member of Newman & Du Wors.

11         Q.   Did you have any interaction with John

12   Whitaker regarding retaining him for the reexamination?

13         A.   If I remember correctly, there was some email

14   communication.  I don't recall exactly what it was.

15         Q.   Do you recall signing any retainer agreement

16   with John Whitaker?

17         A.   I don't recall.

18         Q.   Do you recall if the John Whitaker Law Group

19   ever billed Hunts Point Ventures for its services or if

20   it billed -- or if the bill came through Newman &

21   Du Wors?

22         A.   I don't recall.

23         Q.   And what further contacts did you have with

24   John Whitaker regarding the reexamination process?

25         A.   I'm sorry?



1          Q.    What further contacts did you have with John

2     Whitaker during the reexamination process?

3          A.    What context or contact --

4          Q.    Contacts -- contact.

5          A.    Contacts.

6          Q.    Contact.

7          A.    Okay.  I had limited contact with John

8     Whitaker in the reexamination process.

9          Q.    Were you kept aware of the process, the

10    status, the progress?

11         A.    Not that I recall.  It was being taken care

12    of.

13         Q.    Did you have any concerns that there was

14    any -- were you made aware of any concerns regarding how

15    it was being taken care of?

16         A.    Not until I think there was an issue that

17    cropped up; and, otherwise, I had -- it was the first I

18    had heard of it.

19         Q.    And what was that issue?

20         A.    That it was late.

21         Q.    And when were you made aware of it?

22         A.    I don't recall the date.  I just recall it

23    was late.

24         Q.    Time frame?

25         A.    I don't recall.



1          Q.    Do you recall who made you aware of it?

2          A.    I believe it was John Du Wors.  I'm not sure.

3          Q.    And do you recall what the concern was with

4     it being late?

5          A.    I remember being told that it would be fine,

6     it's not a big deal --

7          Q.    Okay.

8          A.    -- and it would be taken care of.

9          Q.    And you remember being told that by whom?

10          A.    I believe it was John Du Wors, because I

11     didn't really talk with John Whitaker.

12          Q.    And did you ever have occasion to follow up

13     to get additional information about how it was being

14     taken care of?

15          A.    I didn't understand the process.  That's what

16     attorneys get paid to do.  John Whitaker is supposed to

17     be an expert in that area.  I was told he was taking

18     care of it.  You rely on your attorneys to do the right

19     thing.

20          Q.    So how would you describe your involvement

21     in -- in the work that was being done on the

22     reexamination?

23          A.    "Take care of it."  Not -- that's what the

24     attorneys do.  That's what they get paid to do.

25          Q.    Were you ever copied on any of their

Page 226

1    work product?

2         A.   I don't recall if I was or not.

3         Q.   Did you ever seek reassurances that the

4    matter was in fact taken care of?

5                   MR. WEYTHMAN:  Objection.  Asked and

6    answered.

7                   THE WITNESS:  I asked John -- John

8    Du Wors made me aware of it.  I told him to take care of

9    it.

10        Q.   (BY MR. YURCHAK)  I guess what I'm getting

11   at -- were you ever told by any of those attorneys that

12   the matter had been taken care of?

13        A.   I don't recall.  I -- I don't recall if I had

14   been told that it had been taken care of, but they were

15   taking care of it.

16        Q.   Did you feel that there was any cause for

17   concern over the buffering patent, given your role as

18   the CEO of Hunts Point Ventures?

19        A.   I was concerned as to why this had come up at

20   such a late time, why the attorneys had let it wait that

21   long.  That was my concern.  I don't have the technical

22   expertise or the legal know-how around the United States

23   Patent and Trademark Office to go in and give direction.

24   That is their expertise and their job.

25        Q.   When you raised that concern, what was their



1    response?

2         A.    I believe it was "We'll take care of it.

3    Don't worry.  We do this all the time."

4         Q.    Did you get any answer as to why the -- what

5    the reason was for the lateness in addressing that

6    issue?

7         A.    If I remember correctly, it was kind of a

8    passing of the buck, kind of a passing of "This is not

9    my fault.  This is" -- "he's doing it.  He was supposed

10   to be" -- kind of a passing of the buck back and forth

11   between John Whitaker and John Du Wors.

12        Q.    And are you aware of what the final outcome

13   was?

14        A.    No.

15        Q.    Are you aware of the current status of the

16   buffering patent?

17        A.    I hear it's in question.

18        Q.    And why is that you're not aware of what the

19   final status of what -- the work that was done on the

20   reexamination?

21        A.    The company's in receivership.  I have no say

22   over anything.

23        Q.    I understand, but prior to the receivership,

24   did you have any awareness of the status of the work

25   that had been done on the buffering patent?



Page 228

1         A.    Last I had heard, it had been submitted, and

2    they were going through the process.

3                    MR. ARD:   Take five minutes so we can

4    talk?

5                    MR. YURCHAK:   Short break?

6                    MR. WEYTHMAN:   Sure.

7                    (Break taken from 4:04 to 4:08 p.m.)

8         Q.    (BY MR. YURCHAK)   I just want to ask about

9    one final thing regarding Sandy Hoover.

10         Do you recollect when -- first of all, who is

11   Sandy Hoover?

12         A.    She's my mother-in-law.

13         Q.    And did she ever make any -- did she ever

14   place -- ever place money into Hunts Point Ventures?

15         A.    Yes.

16         Q.    And when did that happen?

17         A.    I don't recall exactly, but I do know that

18   Mark was not back in jail yet; so if you're going to go

19   by those kind of events, it would have to be in the

20   summer of 2010.

21         Q.    And were you involved in any way when Sandy

22   made -- well, first of all -- yeah.  Were you involved

23   in any way when the money was put into Hunts Point

24   Ventures in the summer of 2010 by Ms. Hoover?

25                    MR. WEYTHMAN:   Objection.  Vague.



Page 229

1    Ambiguous.

2        Q.   (BY MR. YURCHAK)  Were you involved in any

3    way with her loaning the -- her making the payment to

4    Hunts Point Ventures?

5        A.   How -- what do you mean "involved"?

6        Q.   Were you involved in any of the discussions,

7    in the process?

8        A.   I introduced her to Steve Schweickert and

9    Mark Phillips.

10       Q.   Okay.  And what was your understanding about

11   what that transaction was whereby her money was put into

12   Hunts Point Ventures?

13       A.   I'm sorry.  Can you clarify that a little

14   bit.

15       Q.   What was your understanding of what the

16   transaction was whereby her money was put into Hunts

17   Point Ventures?

18       A.   It was a loan.

19       Q.   Okay.  So it was a loan.  It's not an

20   investment; correct?

21       A.   It was a loan.

22       Q.   Okay.  And so you stated your involvement was

23   simply to introduce her to Steve and Mark; is that

24   correct?

25       A.   That's correct.



1          Q.   And are you aware of how she came to decide

2    to make that loan to Hunts Point Ventures?

3                    MR. WEYTHMAN:  Objection.  Calls for

4    speculation.

5                    THE WITNESS:  I can tell you what her --

6    what she has said to me about it.  Is that what you're

7    looking for?

8          Q.   (BY MR. YURCHAK)  I'm looking for whatever

9    answer you want to give me.

10         A.   She had been approached -- I know Steve had

11   wanted to meet with her, and so I arranged for her and

12   Steve to meet, and they had coffee and talked about it.

13   And Steve initially asked her for a $250,000 loan, and I

14   know she -- she said she wanted to think about it.  I

15   mean, someone doesn't make those kinds of decisions in

16   haste.  And she was hesitant.

17                And then she met -- we had lunch, I believe,

18   with Steve, myself, and Mark.  And I don't know if Doug

19   Lower was there or not.  And that's where Mark worked

20   his magic and his charm.  Because Sandy has told me

21   after the fact that she went into that lunch not

22   intending to loan HPV any money because of all the

23   litigation that was going on, but she was charmed by the

24   story that Mark had and bought into the idea and decided

25   to loan the company $100,000.



 1          Q.    And was -- what was your understanding about

 2    the terms of that note?  Let me ask -- rephrase.

 3              Are you aware if that loan was secured or

 4    not?

 5          A.    Yes.

 6          Q.    And we're talking about the loan in 2010; is

 7    that correct?

 8          A.    I believe that's when it was, yes.

 9          Q.    And do you recall how it was secured?

10          A.    If I recall correctly, she did not want to

11    just give the loan and have a promissory note.  She

12    wanted some sort of security interest in the

13    corporation, in the assets of the corporation, before

14    she turned over the money.

15          Q.    And have you -- as the CEO of Hunts Point

16    Ventures, have you had occasion to come across a

17    security agreement from 2010 that secured that loan?

18          A.    Yes.  I've seen the security agreement.

19          Q.    Okay.  And I assume that's a document that

20    you'd be able to produce?

21          A.    Yeah.  The receiver's got all the

22    documentation now.

23                        (Exhibit No. 36 marked for

24                        identification.)

25                        THE COURT REPORTER:  Exhibit 36.



1          Q.   (BY MR. YURCHAK)  Do you recognize

2   Exhibit 36?

3          A.   Uh-huh.  Yes.

4          Q.   And what do you recognize it to be?

5          A.   A promissory note.

6          Q.   Between whom?

7          A.   Between Sandy Hoover and Hunts Point

8   Ventures, Incorporated.

9          Q.   Okay.  And do you see when it's dated?

10          A.   Yeah.  October 15th, 2010.

11          Q.   Okay.  And is there any language in this

12   promissory note with reference to an accompanying

13   security agreement?

14          A.   No.  I believe the security agreement was a

15   separate document.

16          Q.   And do you know when that security agreement

17   was executed?

18          A.   I believe it was executed the same time as

19   this document was executed.  I don't recall.  I wasn't

20   there for that -- this.  This was between Sandy and

21   Steve.

22          Q.   And the principal, it said, shall be repaid

23   no later than December 31st, 2012; is that correct?

24          A.   That's what it says.

25          Q.   Are you aware if her principal is repaid?

1       A.    No.

2       Q.    Are you aware of what the terms of the

3  security agreement were?

4       A.    I'd have to see the security agreement.

5       Q.    You're not presently aware, then?

6       A.    Well, I'm -- I know it's there, but I don't

7  know the specifics.  I'd like to see the security

8  agreement.

9       Q.    Are you aware of what was being secured as

10  collateral on this loan --

11      A.    Yes.

12      Q.    -- on this promissory note?

13            And what was that?

14      A.    It was the intellectual property, the assets

15  of the company.

16      Q.    So the entire assets?  Does that include all

17  of the patents?

18      A.    That -- those were the assets of the company.

19      Q.    I'm just asking -- there's multiple patents

20  and asking if your testimony is that the entire

21  portfolio of patents was secured with her note.

22      A.    Yes.

23      Q.    And did she take any -- and I believe you

24  said she was not repaid on her note.  Did she take any

25  action on the security agreement when she was not



Page 234

1    repaid?

2         A.    No.

3                   MR. WEYTHMAN:   Objection.

4    Mischaracterizes the witness's testimony.  I believe he

5    said he wasn't aware of whether it had been paid.

6         Q.    (BY MR. YURCHAK)  Can we clarify that.  Were

7    you -- are you aware or not if she -- if Ms. Hoover was

8    ever repaid on her note?

9         A.    She was not repaid on her note.

10        Q.    And you said she did not take action on the

11   security agreement?

12        A.    No.

13        Q.    And why was that?

14        A.    She wanted to give the company a chance to

15   make money because she knew it was tied up in

16   litigation.

17        Q.    Okay.

18        A.    And what's she going to do?  I mean,

19   foreclose on her note and take the IP and then do what

20   with it?

21        Q.    Did you have any discussions with her about

22   that?

23        A.    I don't recall specific discussions about it,

24   but it was kind of like she didn't want to sink the

25   company.



1          Q.    And did you mention that you had provided the

2    receiver with a copy of the security agreement?

3          A.    It was part of the corporate documents.

4          Q.    That were produced to the receiver?

5          A.    Yes.

6          Q.    Did you go over all of the documents that

7    were produced to the receiver?

8          A.    Most of them.  I mean, I believe so.  It

9    was -- yeah.  I mean, it's -- it's not like I read

10   through every single document with a fine-tooth comb,

11   but we had started a corporate binder and put together

12   the information.  And we had it there, and the receiver

13   asked for it; so it was turned over to the receiver.

14         Q.    Did all of that information come from that

15   box you described Steve Schweickert handing you in

16   mid-2012 of jumbled, disorganized documents?

17         A.    Yes.

18         Q.    You didn't otherwise have any -- possession

19   of any other corporate documents of Hunts Point

20   Ventures?

21         A.    With the exception of the ones that had

22   happened from meetings and so on and so forth since we

23   had received the box of crap, as I like to refer to it.

24         Q.    What was your understanding about Doug

25   Lower's role in Hunts Point Ventures?



1          A.   Doug Lower was supposed to be a part of Hunts

2   Point Ventures and at some point was supposed to become

3   a shareholder of Hunts Point Ventures, and then he

4   decided to leave.

5          Q.   Do you recall what period of time he was

6   involved in Hunts Point Ventures?

7          A.   I believe it was in -- I -- I don't recall

8   exactly when, but I'm trying to go through, like, time

9   milestones.  I believe it was until sometime in 2011.

10   I'm not sure.

11          Q.   Are you aware of what function he performed?

12          A.   No.

13          Q.   Are you aware of him receiving disbursements

14   from Hunts Point Ventures?

15          A.   Yes.

16          Q.   Do you know what those disbursements were

17   for?

18          A.   They were supposed to be loans to him to be

19   paid back when the company -- he started making money

20   from the company.  And trust me.  He took all he could

21   get.  I think Doug said to me -- he asked me why -- when

22   Steve started giving disbursements, why I wasn't taking

23   more.

24              And my response to him was "That's money to

25   run the company.  I don't need that."



Page 237
```
 1                  And he said, "You might as well get the money
 2       while it's there, because when it's gone, it's gone."
 3       That should tell you a little bit about Doug's
 4       mentality.
 5            Q.    So you characterize it as loans that's owed
 6       against money that he would make in the future from
 7       Hunts Point Ventures?
 8            A.    Yes.
 9            Q.    Was Doug Lower working on behalf of Hunts
10       Point Ventures at that time?
11            A.    He was doing different things.  What exactly,
12       I'm not sure.
13            Q.    Was it your understanding that he was
14       working, though, on behalf of the corporation, even if
15       you don't understand exactly what he was doing?
16            A.    Yes.  I mean, he was doing things and trying
17       to juggle the crap that Mark was dishing out.  And it
18       was just a convoluted history with that company.
19            Q.    Yeah.
20            A.    And I don't know exactly what people were
21       doing.
22            Q.    And to follow up on that, why -- why, then,
23       if he's working on behalf of Hunts Point Ventures, was
24       the decision made to characterize his payments as a loan
25       instead of -- instead of money owed for services
```



1  performed?

2      A.  I don't know.

3              MR. WEYTHMAN:  Objection.

4              THE WITNESS:  Oh, go ahead.

5              MR. WEYTHMAN:  Calls for speculation.

6              THE WITNESS:  I don't know.  You'll have

7  to ask Steve Schweickert.

8      Q.  (BY MR. YURCHAK)  Were any of those services

9  performed after 2011?

10     A.  I don't recall.

11     Q.  And what kind of relationship did Lower have

12  with Schweickert?

13             MR. WEYTHMAN:  Objection.  Calls for

14  speculation.  No personal knowledge.  Lacks foundation.

15             THE WITNESS:  Friendly.

16     Q.  (BY MR. YURCHAK)  Okay.  Do you feel that

17  Steve Schweickert ever received disbursements from Hunts

18  Point Ventures that he wasn't entitled to?

19             MR. WEYTHMAN:  Objection.  Calls for a

20  legal conclusion.

21             THE WITNESS:  I don't know.

22     Q.  (BY MR. YURCHAK)  Are you aware of Steve

23  Schweickert receiving $8,500 in mid-2012?

24     A.  Yes.

25     Q.  Did that come prior to the time or after the



1  time of your -- of that joint consent that was signed

2  in -- that was dated May 29, 2012?

3        A.   Prior.

4        Q.   And do you recall why he received those --

5  that payment?

6        A.   I believe it was to defend against a DUI.

7        Q.   Did you feel that was a legitimate corporate

8  purpose for those funds?

9        A.   No.

10       Q.   Did you approve -- do you approve of the use

11  of those corporate funds for Steve Schweickert's DUI?

12       A.   I didn't -- wasn't in the position to approve

13  them.

14       Q.   Were you ever in any position to approve

15  transactions that occurred -- financial transactions

16  that occurred with Steve when you were in a position to

17  approve them?

18       A.   No.  I don't recall any financial

19  transactions involving Steve when I was in a position to

20  approve them.

21       Q.   And it's -- is it your belief that you were

22  only in a position to approve them after May of 2012?

23       A.   Yes.

24            MR. YURCHAK:  And I think we'll end on

25  that note.



Page 240

1   MR. PHILLIPS:  Wait, Reed.

2   THE COURT REPORTER:  Off the record?

3   MR. YURCHAK:  Yeah.

4     (Signature reserved.)

5     (Deposition concluded at 4:26 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1           D E C L A R A T I O N

2

3

4

5            I declare under penalty of perjury that I

6    have read my within deposition, and the same is true and

7    accurate, save and except for the changes and/or

8    corrections, if any, as indicated by me on the

9    Correction Sheet.

10

11           Dated this ____day of _____, 2014, at

     _____(city/state).

12

13

14

15                 _____
                              CHAD RUDKIN
16

17

18

19

20

21

22

23

24   KRISTIN L. MATTSEN, CCR

25   Court Reporter



1               C E R T I F I C A T E

2   STATE OF WASHINGTON   )
                          )   SS.
3   COUNTY OF KING        )
         I, the undersigned Washington Certified Court
4   Reporter, pursuant to RCW 5.28.010 authorized to
    administer oaths and affirmations in and for the State
5   of Washington, do hereby certify:

6         That the annexed and foregoing deposition
    consisting of pages 1 through 240 of the testimony of
7   each witness named herein was taken stenographically
    before me and reduced to typed format under my
8   direction;

9             I further certify that according to CR 30(e)
    the witness was given the opportunity to examine, read
10  and sign the deposition after the same was transcribed,
    unless indicated in the record that the review was
11  waived;

12            I further certify that all objections made at
    the time of said examination to my qualifications or the
13  manner of taking the deposition or to the conduct of any
    party have been noted by me upon each said deposition;
14
              I further certify that I am not a relative or
15  employee of any such attorney or counsel, and that I am
    not financially interested in the said action or the
16  outcome thereof;

17            I further certify that each witness before
    examination was by me duly sworn to testify the truth,
18  the whole truth and nothing but the truth;

19            I further certify that the deposition, as
    transcribed, is a full, true and correct transcript of
20  the testimony, including questions and answers, and all
    objections, motions, exceptions of counsel made and
21  taken at the time of the foregoing examination and was
    prepared pursuant to Washington Administrative Code
22  308-14-135, the transcript preparation format
    guidelines;
23
              I further certify that I am sealing the
24  deposition in an envelope with the title of the above
    cause and the name of the witness visible, and I am
25  delivering the same to the appropriate authority;



Page 243

1        I further advise you that as a matter of firm
policy, the Stenographic notes of this transcript will
2    be destroyed three years from the date appearing on this
Certificate unless notice is received otherwise from any
3    party or counsel hereto on or before said date;

4        IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my official seal this 26th day of
5    March, 2014.

6

7

8

9

10

11

12

13                        _____
                          Kristin L. Mattsen, CCR
14                        Washington State Certified
                          Court Reporter
15                        License No. 3280

16

17

18

19

20

21

22

23

24

25



```
                                                           Page 244
 1   MARK E. PHILLIPS,                )
                                      )
 2                  Plaintiff,        )
                                      )
 3   vs.                              ) No. 13-2-01337-1 SEA
                                      )
 4   EILEEN CHRISTINE ACHESON and     )
     JOHN DOE ACHESON, and the        )
 5   marital community composed       )
     thereof; and JOHN AND JANE       )
 6   DOES 1-4,                        )
                                      )
 7                  Defendants.       )

 8   TO:  CHAD RUDKIN
          c/o RYLAN S. WEYTHMAN
 9        Attorney at Law
          FOSTER PEPPER PLLC
10        1111 Third Avenue, Suite 3400
          Seattle, Washington 98101-3299
11
     NOTICE IS HEREBY GIVEN that the transcript of your
12   deposition given in the above-entitled cause is ready
     for your reading and signing at MOBURG, SEATON &
13   WATKINS, 2033 SIXTH AVENUE, SUITE 826, SEATTLE,
     WASHINGTON 98121.  You must, within 30 days from the
14   date of the notice, read and sign the deposition or
     state in writing your reason for refusal to sign, or
15   state in writing the fact that you waive your right to
     sign.  Failing to do so, signature shall be deemed for
16   all purposes waived, and your deposition will be sent to
     the ordering party for retention until time of trial.
17   DATED at Seattle, Washington, this 26th day of March
     2014.
18

19
                              BY:  KRISTIN L. MATTSEN, CCR
20   cc:  R. Yurchak         Moburg, Seaton & Watkins
                             Court Reporters (206) 622-3110
21                           2033 Sixth Avenue, Suite 826
                             Seattle, Washington 98121
22

23

24

25
```



Page 245

```
 1   MOBURG, SEATON & WATKINS
     COURT REPORTERS
 2   2033 SIXTH AVENUE, SUITE 826
     SEATTLE, WASHINGTON 98121
 3   206-622-3110  FAX 206-343-2272


 4   _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 5   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS SHEET
     AND SIGN THE ACCOMPANYING SIGNATURE PAGE (DECLARATION).
 6   _____

 7   PAGE    LINE         CORRECTION AND REASON

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
                              _____
23                                 CHAD RUDKIN
                                Date taken:  3-17-14
24

25   REPORTER:  KRISTIN L. MATTSEN, CCR
```



```
 1                        D E C L A R A T I O N

 2

 3

 4

 5                  I declare under penalty of perjury that I

 6    have read my within deposition, and the same is true and

 7    accurate, save and except for the changes and/or

 8    corrections, if any, as indicated by me on the

 9    Correction Sheet.

10                  Dated this 25th day of April, 2014, at
11    Bonney Lake, Washington.
12

13

14

15                            /s/Chad H. Rudkin
                              CHAD RUDKIN
16

17

18

19

20

21

22

23

24    KRISTIN L. MATTSEN, CCR

25    Court Reporter
```

March 17, 2014

PHILLIPS vs. RUDKIN                                                    Chad Rudkin

Page 246

```
1    MOBURG, SEATON & WATKINS
     COURT REPORTERS
2    2033 SIXTH AVENUE, SUITE 826
     SEATTLE, WASHINGTON 98121
3    206-622-3110  FAX 206-343-2272

4    _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
5    SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS SHEET
     AND SIGN THE ACCOMPANYING SIGNATURE PAGE (DECLARATION).
6    _____

7    PAGE    LINE         CORRECTION AND REASON

8    78      6-7      Replace "MR. ARD" with "MR. PHILLIPS"

9                     because Mr. Phillips was the speaker.

10   201     5        Replace "deposition" with "declaration"

11                    due to obvious mistatement.

12

13

14

15

16

17

18

19

20

21

22                              /s/Chad H. Rudkin, 4-25-2014

23                                   CHAD RUDKIN
                                Date taken:  3-17-14
24

25   REPORTER:  KRISTIN L. MATTSEN, CCR
```